IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

In re:

JONATHAN R. THORNE and

DARLENE S. THORNE, Debtors

BANKRUPTCY CASE:

09-11763-DWH

CHAPTER 13

===============================================================

JONATHAN R. THORNE and
DARLENE S. THORNE, Debtors
LOCKE BARKLEY, Chapter 13 Trustee for the Northern
District of Mississippi

      Plaintiffs,

vs.

Adversary Proceeding Number:

10-01172-DWH

PROMMIS SOLUTIONS HOLDING CORPORATION,
GREAT HILL PARTNERS, LLC
MORRIS, SCHNEIDER AND PRIOR, now known as
JOHNSON & FREEDMAN,
LENDER PROCESSING SERVICES, INC.,
LPS DEFAULT SOLUTIONS, LLC

      Defendants,

===============================================================

<u>PLAINTIFFS' AFFIDAVIT IN SUPPORT OF THEIR RULE 56(f) MOTION BY
NICHOLAS WOOTEN</u>

| | |
|---|---|
| STATE OF ALABAMA    ) | |
| ) | **AFFIDAVIT** |
| LEE COUNTY    ) | |

Before me the undersigned authority, a notary public, in and for said State and County, personally appeared **NICHOLAS WOOTEN**, who, being duly sworn by me, deposes and says under oath as follows:

1. My name is Nicholas Wooten. To those who know me well instead of my full name I am known as Nick Wooten. I am an attorney duly admitted to the practice of law in the State of Alabama and have personal knowledge of the facts contained in this affidavit.

2. I am engaged in the private practice of law in Lee County, Alabama at 1702 Catherine Court Suite 2-D, Auburn, Alabama 36832.

3. I have been retained as a member of the counsel team for the Thornes and for Locke Barkley, to represent their interests in this action.

4. I have filed an application for PHV admission in this matter through my local counsel Hon. Jimmy Mcelroy and there is presently pending before the Court a motion to employ the counsel team for the debtors and the trustee.

5. Over most of the last three years I have been involved in litigation with the defendant LPS and LPS Default Solutions.

6. In the first case that I filed against them their attorney at that time, Mr. Michael Cash, called me at my office and claimed that I was mistaken in that matter and that LPS had no involvement in the loan which I had made claims against them in my lawsuit.

7. Mr. Cash said that he would provide me an affidavit from an Officer of LPS to that effect if I would agree to dismiss them from the case and that we could hash out our issues at a later date in another matter.

8. Mr. Cash provided me the affidavit of Mr. Scott Walters indicating that LPS was not involved in managing that loan on LPS' system. As a result of that affidavit I consented to dismissing my claims against LPS in that matter. I have attached that affidavit of Scott Walter as an exhibit to my affidavit in this case.

9. The affidavit provided by Mr. Cash from Mr. Walters later proved to be false. When I continued the litigation against the remaining defendants I deposed the 30b6 representative of the servicer many months later. Her name was Daphne Mosley and she testified thusly regarding LPS involvement in the loan:

Mosley, Daphne, (Pages 8:18 to 9:8)

```
                                                    8
18  Q.  Okay.  Does your -- to the best of your
19  knowledge, does your firm contract directly with local
20  attorneys for these services or does your firm work
21  through an outside provider, such as Lender Processing
22  Services?
23          MS. BEARDSLEY: Object to the form.  I'm
24  just objecting to the form of the question.  You can
25  answer, if you know.

                                                    9
1   A.  They use outsource providers.
2   Q.  (BY MR. WOOTEN)  And one of those outsource
3   providers is a company that used to be known as Fidelity
4   National Information and Bankruptcy -- or Foreclosure
5   and Bankruptcy Services.  It's now known as Lender
6   Process Services.  They call it LPS Default; is that
7   correct?
8   A.  Yes.
```

10. I have attached Ms. Mosley's deposition to this affidavit as an exhibit for the Court.

11. The allegations of the affidavit of Scott Walter are nearly identical to assertions made in the affidavit of Mr. Gloudeman in this case. In both the declarants claimed that LPS was not involved in "this transaction". However, I have much more information and evidence in this case than was available to me at that time and I have a much more thorough and advanced understanding of LPS' systems and procedures.

12. Needless to say when I saw Mr. Gloudeman's affidavit filed in support of a pre-discovery, pre-answer summary judgment motion in this case I was quite surprised that these parties would make this representation to the Court in such a serious matter as this case when these parties knew that I possessed personal knowledge and evidence which directly contradicted this declaration through my litigation with them in other matters.

13. In fact, it is clear from both the 2009 annual statement that LPS filed with the SEC under oath and from an investor conference call held on October 29, 2010 (an article reporting on this call is attached with quotes from the CEO of LPS) that JP Morgan Chase does in fact use LPS Desktop to manage its foreclosures.

14. By the very structure and terms of these parties contracts it is required that all defaulted loans of JP Morgan Chase be managed by lawyers who have a 'network agreement' with LPS so that LPS can split fees with the lawyers and earn

compensation for the referral of these files to the network law firms.

15. These issues are a matter of contract between the parties.

16. The Plaintiffs counsel team will disclose to the Court during discovery that LPS has put itself between the mortgage servicers and the attorneys for those servicers as a "service provider".

17. The nature of the contractual relationship between the parties is trilateral in this manner:

    a. There is an agreement called a Default Services Agreement between the Servicer and LPS.
    b. There is an agreement between LPS and the law firms called a "network agreement" and lastly,
    c. There is an agreement between the servicers, the law firms and LPS that the parties refer to as a "local counsel agreement" as set out in the default services agreement.

18. I have a copy of a Default Services Agreement from another servicer which I cannot currently put into evidence because it was produced confidentially by the servicer in the other matter.

19. I am willing to put this Default Services Agreement into evidence if the Court will authorize the disclosure of this Agreement either as a sanction for the misrepresentations of these parties in the affidavit of Mr. Gloudeman or simply in the interests of justice to demonstrate the falsity of the assertions of Mr. Gloudeman.

20. There are several important parts of this agreement which have a bearing upon the motion filed by these defendants and of which the Court should be aware:

    a. The standard agreement between the servicers and these defendants defines their "network" to include the national network of "law firms and others" who provide services to mortgage servicers who have an agreement with these defendants.
    b. Importantly this clause of the agreement sets out that the law firms will be "retained and managed" by LPS in accordance with the terms of the default services agreement.
    c. This agreement also provides that the servicer "shall be responsible" for selecting an LPS network firm to represent them during the term of the default services agreement.
    d. LPS also warrants specifically to its servicer clients in this standard agreement that it is not a party to any action which claims the unlawful referral of bankruptcy matters, the unauthorized practice of law or unfair and deceptive acts and practices.

    e. LPS also negotiates the flat fees the network attorneys will charge to the servicer in the case which are incorporated into a servicer addendum for the network firm the servicer selects.

    f. The agreement also provides that all of the default and bankruptcy support services will be managed by LPS.

21. LPS has testified in depositions I have taken that for the loans managed through LPS Default that the transfer of a defaulted loan is done automatically and electronically from the servicer's normal loan management system (in the case of JP Morgan Chase that is LPS' software product known as MSP) to the default services software product known as LPS Desktop.

22. The process of transferring the files from the servicer's computer system to the system that LPS uses called "LPS Desktop" is referred to by LPS in its testimony by the term "push" as explained in this excerpt of William Newland's testimony as LPS' corporate representative:

    newland61609 - Vol. I, (Pages 201:4 to 202:9)
              201

```
 4   Q   That would have been some of the documents
 5   which would have been prepared or which would've been
 6   retrieved through the automated processes of your
 7   software, your Process Management software, right?
 8   A   It would've been retrieved based off of the
 9   push from Option One on the documents.
10   Q   So your software would've made the request
11   and they would've responded with their original
12   documents --
13   A   That's right.
14   Q   -- or scans --
15   A   They would push the documents to us.
16   Q   Sure.
17   A   To our imaging system.
18       (Brief interruption.)
19       THE WITNESS:  To our imaging system.
20   BY MR. WOOTEN:
21   Q   So those documents would've -- would be part
22   of what was identified, we would be able to look back
23   to your imaging system at the date in the documents
24   and pick that information out, right?
25   A   Yes.

                        202
 1   Q   It looks like those documents would've been
 2   pushed by Arvind Kumar on 6/4/07, at Entry 150 is
```

>     3  where they were explained.
>     4        You have a corresponding entry numbered
>     5  67471979 that says it is the note and says that it
>     6  consists of eight pages on 6/5/07 at 5:42 a.m., and it
>     7  says it was uploaded by an automated process. Does
>     8  that sound right?
>     9  A   Sounds correct.

23. Because this action is completely automated by the software the assertion that the Thorne loan was not administered on the LPS desktop system subject to the contracts between these parties is less than credible.

24. As LPS has testified its only compensation comes from the 'network attorneys' and the only attorneys who have access to LPS Desktop are those who have a network agreement it is therefore unlikely that the Thorne loan was not subject to the same fee splitting conduct set out in the plaintiffs complaint.

25. LPS' testimony on this issues is found at Vol I of William Newland's deposition at page 95:

>     newland61609 - Vol. I, (Page 95:13 to 95:16)
>                                                    95
>     13  the only attorneys
>     14  available on LPS system are attorneys who have signed
>     15  a contract with LPS?
>     16     A   That have signed a contract with LPS, yes.

26. Assuming that the Court would grant the postponement of the Summary Judgment hearing in this matter I expect to obtain evidence through discovery that proves the following material facts which would demonstrate that there is a genuine issue of material fact for trial and that LPS and LPS Default's motion for summary judgment should be denied:

   a. There is a default services agreement between JP Morgan Chase and LPS.

   b. This agreement as a matter of contract requires JP Morgan Chase to send all defaulted loans to LPS for management.

   c. LPS, through the use of its automated processes, transfers these defaulted loans onto its LPS Desktop program automatically and electronically without any human discretion or involvement based upon the date of delinquency of the loans.

   d. LPS then refers these loans to lawyers who have executed a "network agreement" for foreclosure, in this case that would include Johnson &

Freedman and Prommis Solutions.

e. There exists contracts between LPS and Johnson and Freedman (and /or Prommis Solutions, Johnson & Freedman's corporate owner) to pay referral fees as set out in the deposition testimony of William Newland already provided.

f. That the evidence produced in discovery will demonstrate that these parties agreements are illegal and violate both Rules 2016(a) of the Rules of Bankruptcy Procedure and Section 504 of the Bankruptcy Code.

g. That the evidence will prove that these parties have acted willfully to commit fraud on the Court and to be unjustly enriched as set out in the Plaintiffs' complaint.

h. That the evidence uncovered in discovery will prove that these defendants are guilty of each of the claims made in the plaintiffs' lawsuit as a matter of law.

27. Based upon this affidavit and the other evidence submitted in this case I am requesting that the Court postpone ruling on the Summary Judgment motion until such time as the Plaintiffs can complete discovery.

28. Further than this the affiant sayeth not.

_____
NICHOLAS WOOTEN

**STATE OF ALABAMA** )
) **ACKNOWLEDGEMENT**
**LEE COUNTY** )

BEFORE ME, the undersigned, a Notary Public, personally appeared the Affiant, Nicholas Wooten, who is known to me and who being by me first duly sworn, subscribed to the foregoing Affidavit, and acknowledged before me that being duly informed of the contents of the Affidavit, he executed the same voluntarily.
WITNESS my hand and official seal of office on this the 30th day of October 2010.
My Commission Expires September 17, 2014.

My commission expires: _____

_____
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE