**Daphne Mosley**                                    **October 14, 2009**

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
OPELIKA DIVISION

IN RE:                        :

HUDSON, LORRAINE S.           :     CASE NO. 07-80806-WRS-13

Debtor.                       :

LORRAINE S. HUDSON,           :

Plaintiff                     :

VS.                           :     AP No. 08-08023

LITTON LOAN SERVICING,        :
LP, et al,                    :

Defendants                    :

ORAL DEPOSITION OF
DAPHNE MOSLEY,
ON BEHALF OF LITTON LOAN SERVICING
October 14, 2009

ORAL DEPOSITION OF DAPHNE MOSLEY, ON
BEHALF OF LITTON LOAN SERVICING, produced as a witness
at the instance of Plaintiff, and duly sworn, was taken
in the above-styled and numbered cause on October 14,
2009, from 8:18 a.m. to 4:08 p.m., before Melodie I.
Thompson, Certified Shorthand Reporter in and for the
State of Texas, reported by machine shorthand, at The
Hilton at the Houston Hobby Airport, 8181 Airport Blvd.,
Houston, Texas 77061, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record.

## Page 2

APPEARANCES

FOR THE PLAINTIFF:
    Mr. Nicholas H. Wooten
    Wooten Law Firm, P.C.
    P.O. Box 3389
    1695 East University Drive, Suite 105
    Auburn, Alabama 36831

FOR THE DEFENDANT:
    Ms. Robin Beardsley
    Sirote & Permutt, PC
    2311 Highland Avenue South
    Birmingham, Alabama 35205


ALSO PRESENT:
    Ms. Charlotte Wooten



REPORTED BY:
    Melodie I. Thompson, CSR, RPR, CRR, CCP
    Allied Advanced Reporting, Inc.
    1647 Colquitt
    Houston, Texas  77006
    713.524.6777
    1.800.223.9409
    AlliedAdvancedReporting.com

## Page 3

1          P R O C E E D I N G S
2          DAPHNE MOSLEY,
3  having been first duly sworn, testified as follows:
4          EXAMINATION
5  BY MR. WOOTEN:
6     Q.  Ma'am, if you will, state your full name for
7  the record, please.
8     A.  Daphne Mosley.
9     Q.  Daphne, have you ever given a deposition
10 before?
11    A.  Yes.
12    Q.  Okay.  How many times?
13    A.  I don't know the number, but --
14    Q.  And I'm not trying to pin you down or
15 anything, but I'm just trying to determine your level of
16 experience with these types of things.
17          Would you say it's less than ten, more
18 than ten?  Do you have an idea of roughly how many it
19 is, a ballpark?
20    A.  Could be around ten or so.
21    Q.  Okay.  Has it all generally been related to
22 the servicing of mortgage loan accounts?
23    A.  No.
24    Q.  Okay.  How are you presently employed?
25    A.  I'm employed by Litton Loan Servicing.

## Page 4

1     Q.  And what is your current position with them?
2     A.  I'm a senior litigation processor.
3     Q.  Okay.  And can you briefly explain to the
4  Court what a senior litigation processor job description
5  is.
6     A.  My job entails -- upon notice of a contested
7  matter is to engage local counsel and assist local
8  counsel with the preparation of responses, production of
9  documents, interrogatories.  Should an appearance be
10 necessary, I would also make the appearance if I'm
11 qualified to do so.
12    Q.  Okay.  Have you been the senior litigation --
13 did you say consultant?
14    A.  Processor.
15    Q.  -- processor for this file for the entire time
16 this matter has been contested?
17    A.  No.
18    Q.  Was someone else involved with it -- do you
19 know the identifies of other persons who are involved
20 with this file?
21    A.  Yes.
22    Q.  Who are they?
23    A.  Will Loch.
24    Q.  Is he still employed with Litton Loans?
25    A.  Yes.

**Daphne Mosley**                                    **October 14, 2009**

2 (Pages 5 to 8)

Page 5

1    Q.   And what's his job title?
2    A.   Senior litigation processor.
3    Q.   And how long have you been so employed, ma'am?
4    A.   Eight years.
5    Q.   In the present position?
6    A.   No.
7    Q.   So you have been employed eight years; is that
8    with Litton Loans?
9    A.   Yes.
10   Q.   All right.  And with respect to your
11   employment with Litton Loans, how did you begin your
12   employment with them?
13   A.   How did I begin?
14   Q.   What was your initial hiring-in job title?
15   A.   Bankruptcy specialist.
16   Q.   Okay.  And would that be within the portion of
17   Litton Loans that handles servicing of mortgage accounts
18   in bankruptcy?
19   A.   Yes.
20   Q.   And what did you do in that position?
21   A.   Proof of claim referrals, plan review.
22   Q.   All right.  And is that basically where you
23   take in a plan that you receive from whatever reporting
24   service your company uses, whether it's Banco or AACER
25   or whatever, and you verify that it's actually your

Page 6

1    mortgage account that you're servicing and then you
2    start preparing a proof of claim?
3    A.   Yes.
4    Q.   And then at that point, do you identify what
5    amounts to include in a proof of claim, what amounts to
6    include in an arrearage, and make decisions about
7    whether or not to pursue relief of stay, that sort of
8    thing?
9    A.   Yes.  I have done that, yes.
10   Q.   Was that part of your original job
11   description?
12   A.   Yes.
13   Q.   And is that all based upon information that
14   you receive from a computer programming software that
15   your company uses and the information that you input
16   into that data or into that system?
17   A.   Yes.  It's based on information that's on the
18   system.
19   Q.   And a portion at least of some of those
20   decisions is based upon the input that the operators
21   input into the system about the bankruptcy filing,
22   right?
23   A.   I'm not sure I understand that -- that
24   question.
25   Q.   And maybe I wasn't clear, and I'll try again.

Page 7

1    And if I ask something, please do what you did and tell
2    me if you don't understand, because I don't want to
3    confuse you in any way.
4         At least a portion of the decision
5    process that you would make in that original job
6    description would be based upon the information that you
7    put into your system, right?  In other words, you treat
8    a Chapter 7 different than a Chapter 13, right?
9    A.   Yes.
10   Q.   And you might treat different Chapter 13s
11   different.  For instance, if a filer has filed for the
12   third or fourth time in a short amount of time, you
13   might treat that bankruptcy different than somebody
14   who's never filed before, right?
15   A.   (Witness nods head.)  Yeah.
16   Q.   And that is one thing I will ask you to do.
17   We will need a verbal answer.  All of us tend to nod our
18   heads and things when we talk.  So if you don't give a
19   verbal answer, I'll prompt you or maybe Robin will
20   prompt you so we can keep a good record for the Court.
21        One of the things that -- at least part
22   of the decision making matrix for Litton in the job
23   position that you're describing is based upon what
24   information is input into the system from the bankruptcy
25   filing which you receive from your reporting service,

Page 8

1    correct?
2    A.   No.
3    Q.   Once you enter the data into the system from a
4    new bankruptcy filing, are there  a series -- or is
5    there a decision making tree or matrix that's set up
6    within the system that you follow as an operator?
7    A.   No.
8    Q.   Okay.  Where do you go for direction as to how
9    to handle each bankruptcy account as it's filed?
10   A.   That information normally would come from the
11   local attorney that was assigned to the case.
12   Q.   So for a case that is assigned to the Middle
13   District of Alabama, where the Sirote firm is assigned
14   to it, they would give you recommendations about how to
15   handle that case and then you would follow those
16   directions?
17   A.   Yes.
18   Q.   Okay.  Does your -- to the best of your
19   knowledge, does your firm contract directly with local
20   attorneys for these services or does your firm work
21   through an outside provider, such as Lender Processing
22   Services?
23        MS. BEARDSLEY:  Object to the form.  I'm
24   just objecting to the form of the question.  You can
25   answer, if you know.

**Daphne Mosley**                                    **October 14, 2009**

Page 9

1    A.  They use outsource providers.
2    Q.  (BY MR. WOOTEN)  And one of those outsource
3    providers is a company that used to be known as Fidelity
4    National Information and Bankruptcy -- or Foreclosure
5    and Bankruptcy Services.  It's now known as Lender
6    Process Services.  They call it LPS Default; is that
7    correct?
8    A.  Yes.
9    Q.  Other than LPS Default, is there any other
10   outsource provider that your company uses for that type
11   of service?
12   A.  Yes.
13   Q.  Okay.  Who else would you use?
14   A.  National Bankruptcy Services.
15   Q.  Okay.  And who is that affiliated with?
16   A.  It's affiliated with Brice, Vanderlinden &
17   Wernick.
18   Q.  So that's the processing service that the
19   national law firm Brice, Vanderlinden had started a few
20   years ago, right?
21   A.  Yes.
22   Q.  Do you also use Promise Solutions?
23   A.  Yes.
24   Q.  And they're affiliated with -- is that McCalla
25   Raymer's outfit or Morris, Schneider & Prior?

Page 10

1    A.  McCalla Raymer.
2    Q.  Okay.  And other than Promise and the Brice,
3    Vanderlinden outfit, are there any other outsource
4    providers that you use?
5    A.  Not to my knowledge.
6    Q.  Is there any rhyme or reason as to who your
7    company chooses to assign these accounts to, these
8    various outsource providers --
9    A.  No.
10   Q.  -- if you know?
11   A.  No.  I don't know.
12   Q.  So it might be geographically, it may be based
13   on the investor, or might be some other reason, right?
14   A.  Right.
15   Q.  So at least at your level, it's somewhat
16   random.  Is that true?
17   A.  Yes.
18   Q.  Okay.  Do you know who the outsource provider
19   is for this particular loan?
20   A.  McCalla Raymer.
21   Q.  Okay.
22   A.  I'm sorry.  Promise.
23   Q.  Promise through McCalla Raymer, right?
24   A.  Yes.
25   Q.  And do you know where Promise's headquarters

Page 11

1    is located?
2    A.  Atlanta, Georgia.
3    Q.  Greater Atlanta area?
4    A.  Yes.
5    Q.  Is it actually Alpharetta?
6    A.  I don't know the exact city.
7    Q.  But it's within what you consider Atlanta,
8    right?
9    A.  Yes.
10   Q.  And in that capacity, do they monitor those
11   accounts and talk to you about when it's time to take
12   certain actions and that sort of thing?
13   A.  Yes.
14   Q.  And are those accounts transferred to them
15   electronically?
16   A.  Yes.
17   Q.  And are they transferred at the time at which
18   the loan is -- the borrower files bankruptcy?
19   A.  Correct.
20   Q.  Do you have a contract for services with
21   McCalla Raymer or Promise Solutions?
22   A.  Yes.
23   Q.  Does that contract for services set forth what
24   your company will pay Promise Solutions for those
25   services?

Page 12

1    A.  I believe it does.
2    Q.  Do you know if it has an arrangement setting
3    forth what attorney fees will be paid, to whom they will
4    be paid for the services performed in relation to these
5    accounts?
6    A.  I do not know.
7    Q.  When you assign an account out to an outsource
8    provider, is it fair to say that the outsource provider
9    assumes all control and direction over how that account
10   is managed during the bankruptcy process?
11   A.  I don't know if they have full authority to --
12   I don't know what their authority level is.
13   Q.  Okay.  Do you know if they make determinations
14   about the application of payments?
15   A.  How do you mean?
16   Q.  When a client makes a payment in a
17   bankruptcy -- and let's try to break this down a little
18   bit, so that it's real clear.
19   A.  Okay.
20   Q.  You would agree with me that when you file a
21   Chapter 13 bankruptcy, two things going on:  You have a
22   borrower who continued allegedly to make their direct
23   post-petition payments as if there'd never been a
24   default of any type, right?
25   A.  Yes.

**Daphne Mosley**                                    **October 14, 2009**

Page 13

1    Q.  And that continues to come due under the
2  normal terms of the mortgage just as if they had never
3  been behind a penny, right?
4    A.  Right.
5    Q.  And then the amount that they are behind at
6  the time of filing is generally included in what we all
7  refer to as a proof of claim and it's generally called
8  an arrearage amount, right?
9    A.  Yes.
10    Q.  And that arrearage amount is basically a
11  static, certain, identifiable number as of the date of
12  filing, right?
13    A.  Yes.
14    Q.  Okay.  And that arrearage is typically paid
15  through the Chapter 13 plan through the trustee's office
16  on a monthly basis, right?
17    A.  Yes.
18    Q.  And that is typically paid in addition to the
19  monthly mortgage payment, correct?
20    A.  Correct.
21        MS. BEARDSLEY:  Nick, I don't mean to
22  interrupt, but do you mean it's paid by the --
23        MR. WOOTEN:  The trustee.
24        MS. BEARDSLEY:  -- by the trustee to
25  the --

Page 14

1        MR. WOOTEN:  The arrearage is paid
2  through the trustee's office.
3        MS. BEARDSLEY:  I know that, but the
4  payments from the borrower are made to the trustee.
5        MR. WOOTEN:  No.  The payments from the
6  borrower on the mortgage are paid direct.
7        MS. BEARDSLEY:  Oh, I know that.  I'm
8  talking about the arrearage.
9        MR. WOOTEN:  Right.  The borrower pays
10  the bankruptcy payment into the bankruptcy court.
11        MS. BEARDSLEY:  Right.
12        MR. WOOTEN:  And they split that payment
13  up among all the borrower's creditors, car or credit
14  card or mortgage, whatever else.
15        MS. BEARDSLEY:  Yeah.
16    Q.  (BY MR. WOOTEN)  And then the portion on that
17  bankruptcy payment that is assigned to the mortgage
18  arrearage is paid by the trustee on a monthly basis,
19  right?
20    A.  Correct.
21    Q.  And within your accounting software, within
22  your servicing software, you make allowances for the
23  trustee payments to be applied to the arrearage, right?
24        I'm sorry.  Did I ask a bad question?
25    A.  No, I'm trying to determine if I understand

Page 15

1  what you were saying.
2    Q.  Would you like me to restate it?
3    A.  Yes, please.
4    Q.  The trustee payment, the portion of the
5  bankruptcy payment that the client makes monthly into
6  bankruptcy court that is attributable to the mortgage
7  arrearage, within your accounting software, you make
8  provision for that payment to be applied to the mortgage
9  arrearage, the amount in the proof of claim, correct?
10    A.  Yes.
11    Q.  Okay.  And with respect to the direct monthly
12  mortgage payment that is ongoing, that money comes in
13  and it continues to be applied, at least in theory, to
14  the normal amortization of the mortgage over the 30-year
15  period, correct?
16    A.  Yes.
17        MS. BEARDSLEY:  I'm going to object to
18  the form.  When you say "normal," you mean
19  post-petition?
20        MR. WOOTEN:  The direct -- post-petition
21  direct payments.
22        MS. BEARDSLEY:  Yes.
23    Q.  (BY MR. WOOTEN)  And you agree with me,
24  wouldn't you, ma'am, that once a debtor has filed a
25  Chapter 13 bankruptcy, such as Ms. Hudson here, and a

Page 16

1  plan has been confirmed and your claim has been
2  approved, that from that point forward, her loan is to
3  be treated as if it is not in default post-petition
4  unless and until that debtor misses another
5  post-petition payment.  Is that fair?
6    A.  Yes.
7    Q.  Okay.  Now, with respect to that, what that
8  means is that on the date of filing of the bankruptcy
9  petition, whatever amount is delinquent as of that day,
10  that amount becomes part of the proof of claim and
11  unless the debtor misses another post-petition payment,
12  the debtor should not be accruing any additional charges
13  other than her normal monthly amortization of her
14  payment, correct?
15    A.  Theoretically, I would say that is
16  correct.
17    Q.  Practically, it's sometimes different, isn't
18  it?
19    A.  Yes.
20    Q.  There are certain things within your software
21  system that are set to charge to an account based on a
22  contractual due date, correct?
23    A.  Yeah, that would be a fair statement.  Yes.
24    Q.  Okay.  Name everything that you are aware of
25  that is charged to an account based upon the contractual

Case 10-01172-DWH   Doc 22-2   Filed 11/01/10   Entered 11/01/10 15:55:35   Desc
Deposition of Daphne Mosley   Page 5 of 104
**Daphne Mosley**                                           October 14, 2009

5 (Pages 17 to 20)

Page 17

1  due date.
2      MS. BEARDSLEY: Object to the form.
3      A.  I don't agree with -- or I'm not saying that
4  things are charged to an account just because it is
5  contractually delinquent; however, due to the
6  delinquency on the account, there may be certain actions
7  taken on the account which may prompt a charge to the
8  account.
9      Q.  (BY MR. WOOTEN)  Okay.  And that delinquency
10 we talked about is the delinquency that is encompassed
11 in the proof of claim amount and the arrearage in the
12 Chapter 13 plan, right?
13     A.  Yes.
14     Q.  Okay.  And that is based on a contractual
15 delinquency, right?
16     MS. BEARDSLEY: Object to the form.
17     Q.  (BY MR. WOOTEN)  In other words, typically a
18 person files a Chapter 13 bankruptcy because they're
19 trying to save their home and that's pretty much the
20 only way to stave off foreclosure is to file a
21 Chapter 13 and pay that delinquency over time, correct?
22     A.  Correct.
23     Q.  Within your accounting system, you track the
24 contractual due date throughout the time you service the
25 loan, correct?

Page 18

1      A.  Yes.
2      Q.  So irrespective of how you actually apply
3  payments in a spreadsheet that you present to the Court
4  for review, the constant in your accounting software is
5  that you track what your accounting software recognizes
6  as the contractual due date, correct?
7      A.  Yes.
8      Q.  And within your accounting software -- within
9  your mortgage servicing software -- excuse me -- there
10 are certain activities that are tied to a certain amount
11 of time that the loan is contractually delinquent,
12 right?
13     A.  I don't understand what that means.
14     Q.  Well, let me be a little more specific.
15     Take, for instance, a drive-by
16 inspection.
17     A.  Okay.
18     Q.  You charge a drive-by inspection based on an
19 account being contractually delinquent a certain number
20 of days, correct?
21     A.  Yes.  If an inspection has actually been
22 performed, yes.
23     Q.  I'm sorry.  You said, "If an inspection has
24 actually been performed."
25     A.  Yes.

Page 19

1      Q.  Tell me what you mean by "if an inspection has
2  actually been performed."
3      A.  Well, you stated that an inspection fee is
4  assessed if the loan is contractually delinquent.  The
5  answer to that is:  Yes, a charge will be assessed to
6  the account if the service is performed.
7      Q.  Right.
8      A.  Yes.
9      Q.  And the reason that your software system
10 requests that inspection is based on the days delinquent
11 as figured by the contractual due date, correct?
12     A.  Yes.
13     Q.  Okay.  So if a borrower is 90 days delinquent
14 at the time of filing their bankruptcy in your system,
15 then the entire time that they're in bankruptcy, your
16 system is going to show them as at least 90 days
17 delinquent if they pay every post-petition payment
18 perfectly, right?
19     MS. BEARDSLEY: Object to the form.
20     A.  Can you restate that please.  I'm sorry.
21     Q.  (BY MR. WOOTEN)  Sure.  Let's assume that a
22 bankruptcy debtor files Chapter 13 and then they have a
23 60-month plan.
24     A.  Okay.
25     Q.  At the date of filing, they're 90 days

Page 20

1  delinquent; they've missed three months' payments, okay?
2      A.  Yes.
3      Q.  For that whole 60 months, they pay every
4  monthly mortgage payment on time; it's in your office
5  the day that it's due like clockwork, right?
6      A.  Yes.
7      Q.  At the end of that 60 months, your system will
8  still show them as 90 days delinquent, will it not?
9      A.  If they have made every single payment and the
10 plan has not been paid, yes, it will.
11     Q.  So unless and until there is a post-discharge
12 audit of a completed plan with all payments made, that
13 plan or that debtor will show up as at least 90 days
14 contractually delinquent, right?
15     MS. BEARDSLEY: Object to the form.
16     Q.  (BY MR. WOOTEN)  Under that scenario we just
17 went over.
18     A.  Yes.
19     Q.  So during the term of that plan, your software
20 system is set up to continue to request certain
21 activities to be done based upon a 90-day delinquency as
22 recognized by your software system, right?
23     A.  I don't state that that is the norm across the
24 board, but in some instances that may occur.
25     Q.  What instances does that occur in?

**Daphne Mosley**                                    **October 14, 2009**

Page 21

1      A.  In the instance that you just spoke of, that
2  may occur.
3      Q.  Isn't it a fact that every loan that you
4  service that's in Chapter 13 bankruptcy would be treated
5  in that fashion during the term of the plan?
6      A.  Not necessarily.
7      Q.  Well, let's assume that any chapter bankruptcy
8  that you service where there's a mortgage delinquency --
9      A.  Uh-huh.
10     Q.  -- that whatever the date -- whatever -- let
11 me rephrase that -- however many days delinquent that
12 debtor is when they file --
13     A.  Uh-huh.
14     Q.  -- your system will show them at least that
15 many days delinquent throughout the life of the plan,
16 even if they pay every payment post-petition on time?
17     A.  Yes, if there have been no arrear payments
18 tendered, yes.
19     Q.  Are you saying that as the arrearage is paid
20 that your computer system will update their date of
21 delinquency?
22     A.  Yes.
23     Q.  So that is a sliding scale based on as the
24 arrearage is applied from trustee payments, correct?
25     A.  Yes.

Page 22

1      Q.  So in a few minutes, when we get into my
2  client's spreadsheet that you brought today, we'll be
3  able to see that date of delinquency adjust, right?
4      A.  Yes, if payments -- arrear payments were made,
5  yes, we will see that.
6      Q.  And the contractual due date will adjust.  Is
7  that your testimony?
8      A.  Yes.
9      Q.  Now, the contractual due date is tied to
10 requests for certain charges to be performed in your
11 software, correct?
12         MS. BEARDSLEY:  Object to the form.
13     A.  In some instances, yes.
14     Q.  (BY MR. WOOTEN) Okay.  There are certain
15 charges that are referred to as automatics or something
16 of that nature, is that fair?
17     A.  No, I don't think that's fair.
18     Q.  Okay.  When I say automatic, I mean that once
19 a loan reaches a certain level of delinquency, these
20 charges will be requested on a repeating basis until
21 that delinquency is cured.  Is that fair?
22     A.  Depending on the delinquency, certain services
23 may be requested to be performed and depending on the
24 delinquency will depend on the frequency of such
25 charges.

Page 23

1      Q.  Okay.  So when we talk about the things that
2  will be charged based on the contractual date of
3  delinquency, things like a drive-by inspection charge --
4      A.  Okay.
5      Q.  -- you order that when a loan is how many days
6  delinquent?
7      A.  Well, that depends.
8      Q.  Does that depend on the servicing criteria for
9  the particular mortgage loan pool you're dealing with?
10     A.  Yes, it will depend on who's the current
11 beneficiary and their requirements.
12     Q.  When you say beneficiary, you're talking about
13 the investor on the loan, right?
14     A.  Correct.
15     Q.  The person who is alleged to be the owner of
16 the debt.
17     A.  Correct.
18     Q.  Okay.  And you'd agree with me that your
19 company acts as a mortgage servicer for hundreds if not
20 thousands of investors?
21     A.  Yes, we act as a servicer for many different
22 parties, yes.
23     Q.  Okay.  And this particular loan that we're
24 here about today is alleged to be part of a -- what's
25 called a REMIC trust, where the loan was sold to a trust

Page 24

1  for the purpose of selling investment bonds; is that
2  correct?
3      A.  I don't -- I don't know the details.
4      Q.  Okay.  You will agree that your system
5  indicates that the trust owns this loan, right?
6      A.  Correct.
7      Q.  And you would agree that the trust would
8  acquire that loan, if it acquired that loan, based upon
9  the trust agreement which created that trust, correct?
10     A.  I don't really know the process behind it.
11     Q.  So what you're familiar with is what the
12 screen tells you on the computer when you look at it,
13 right?
14         MS. BEARDSLEY:  Object to the form.
15     Q.  (BY MR. WOOTEN) With respect to the instance
16 of ownership.
17     A.  Yes.
18     Q.  Okay.  Were you involved in gathering the
19 documents that we requested during discovery and for
20 this deposition?
21     A.  No.
22     Q.  Would that have been Mr. Loch?
23     A.  Yes.
24     Q.  Prior to coming today, did you verify that he
25 had produced all the documents or did you talk with

**Daphne Mosley**                                        **October 14, 2009**

Page 25

1   your -- and don't tell me what you said to your
2   attorneys, but did you make any effort to verify that
3   you have given us all the information in your mortgage
4   loan file regarding this loan?
5       A.  Yes, I looked into it.
6       Q.  Okay.  Is it your testimony that you have
7   produced every mortgage assignment related to this loan?
8       A.  I don't -- I don't know.
9       Q.  Okay.  That would be information that you
10  would have either in your files or have available to
11  you, correct?
12      A.  Yes.
13      Q.  So if we request it from you and there are
14  some here, would you expect that that would be all that
15  were in your records?
16      A.  I do know what was on file was provided.  If
17  there are additional assignments, I don't know.
18      Q.  Well, you would agree that the assignments
19  that purport to convey the mortgage note to the mortgage
20  trust would be the assignments that you were relying on
21  when you filed a motion for relief from stay in the
22  Bankruptcy Court in the Middle District of Alabama,
23  wouldn't you?
24      A.  Yes.
25      Q.  Then you would agree that whatever

Page 26

1   endorsements to the promissory note are present and
2   whatever alloneges to the promissory note are present
3   would be all of the alloneges and endorsements that you
4   have in your records?
5          MS. BEARDSLEY:  Object to the form.
6       A.  Yes.  We provided what was on file.
7       Q.  (BY MR. WOOTEN)  Okay.  Would you agree that a
8   portion of your duties as a servicer is to verify that
9   the appropriate and required legal documents are in
10  place pursuant to whatever agreements you have to act as
11  servicer?
12      A.  Yes.
13      Q.  Okay.  And you would agree that you have
14  access to or actual physical possession of whatever
15  records are available respecting ownership of the note
16  and the mortgage in this case, correct?
17      A.  Yes.
18      Q.  And you would agree that if those documents
19  were requested and documents were produced that you
20  would have produced everything that you either had
21  possession of or that you had access to?
22      A.  Yes.
23      Q.  And you would agree that your right to service
24  this loan arises from your agreement with respect to the
25  investors and the securitization of this loan, right?

Page 27

1       A.  Can you say that again.
2       Q.  Sure.  I'll represent to you that this loan is
3   alleged to be part of a securitized trust of which
4   Litton Loans is a party to the trust agreement to act as
5   the servicer.  So whatever that contract says with
6   respect to your rights to servicing would be the rights
7   that you have with respect to the servicing of this
8   loan, correct?
9       A.  Yes.
10      Q.  With respect to the issue of the application
11  of, for instance, the drive-by inspection fee, you said
12  that the right to charge that fee would be based upon
13  the requirements of the investor.
14      A.  I did not say that the rights to charge would
15  be based on the requirements of the investor.  I stated
16  that the frequency in which such service is obtained is
17  based on the investor requirements.
18      Q.  Are you familiar with the software systems,
19  including the mortgage servicing software, that you
20  used?  Are you familiar with those systems at all?
21      A.  Yes, I'm familiar.
22      Q.  Are you aware as to whether or not this loan
23  is serviced on the MSP, which is Mortgage Servicing
24  Program, provided by LPS?
25      A.  No.

Page 28

1       Q.  Okay.  Have you -- are you familiar with
2   whether or not your company uses something called LPS
3   Desktop?
4       A.  I'm not sure what that particular software is,
5   so no, I don't have knowledge.
6       Q.  Are you familiar with -- we talked earlier
7   about LPS and Fidelity.
8       A.  Yes.
9       Q.  And that LPS Default is a subsidiary of LPS
10  dealing with the management of the loans which are in
11  foreclosure and bankruptcy, right?
12      A.  Right.
13      Q.  And you indicated that your company does use
14  them for some loans.
15      A.  Yes.
16      Q.  But you said they were not involved with this
17  loan.
18      A.  Right, with respect to bankruptcy.
19      Q.  Okay.  Have they been involved with this loan
20  with respect to foreclosure?
21      A.  Yes.
22      Q.  So then you're familiar with what's called LPS
23  Desktop, which is the portal for communications between
24  the servicing agent and LPS and the attorneys who are
25  handling the foreclosure, right?

**Daphne Mosley**                                    October 14, 2009

Page 29

1    A.  I know the system is used.  I'm not a user.
2    Q.  Okay.
3    A.  Yes.
4    Q.  So you do not access LPS Desktop at all?
5    A.  No.
6    Q.  Are you familiar with the data that is
7  available to your company through LPS Desktop?
8    A.  I know of some things that are available.
9    Q.  Okay.  Are you familiar with the document
10  management function of LPS Desktop?
11    A.  Not exactly, because I'm not a user, so I'm
12  not familiar with all the functionality of the system.
13    Q.  So if I told you that LPS Desktop, the
14  document management portion, provided your company and
15  LPS and your attorneys copies of every document that had
16  been entered on that system since the loan had been
17  referred to LPS Default, you don't know?
18    A.  Yeah, I do know the answer to that, and no,
19  they have not.
20    Q.  Are you saying that document management does
21  not provide documents between the attorneys and servicer
22  and LPS Default?
23    A.  Not to Litton.
24    Q.  Okay.  What does it provide to Litton?
25    A.  With respect to documents, I believe it's --

Page 30

1  trustee's deed is the only document that we currently
2  receive.
3    Q.  Okay.  So you're saying that LPS Default,
4  through its document management system, would request
5  these documents from Deutsche Bank, the trustee?
6    A.  They will request the documents from Litton.
7    Q.  From Litton, okay.  Is that an electronic
8  process?
9    A.  Yes, it is.
10    Q.  Is that something that's automatically
11  uploaded?
12    A.  I'm not -- to my knowledge, it's manually
13  processed for -- somebody has to upload it to the
14  system.
15    Q.  Do you have LPS employees on site at Litton?
16    A.  Yes.
17    Q.  Do you know how many you have there?
18    A.  I do not.
19    Q.  Do you know the names of any of those
20  employees?
21    A.  Only one.
22    Q.  Who is that?
23    A.  Leigh Ann Blackwell.
24    Q.  Do you have any idea as to whether or not
25  there are more than one employee of LPS on site at

Page 31

1  Litton?
2    A.  Yes, there is more than one.
3    Q.  But you only know Leigh Ann?
4    A.  Yes.
5    Q.  Are you familiar with LPS Desktop's image
6  management system?
7    A.  No.
8    Q.  Are you aware that that system assigns a
9  unique identification number to every image that is
10  uploaded onto that system?
11    A.  No, I'm not aware of that.
12    Q.  And it also identifies the person who uploads
13  the image or who creates the image and the date and time
14  that it was requested and uploaded?  Are you familiar
15  with that?
16    A.  No.
17    Q.  Did you make any inquiry as part of your
18  response to the discovery in this case as to whether or
19  not there were any documents or communications on the
20  LPS Desktop system which were responsive to any of the
21  requests that were made in this case?
22    A.  I did not.
23    Q.  Are you familiar with the process management
24  portion of LPS Desktop?
25    A.  Not very familiar.

Page 32

1    Q.  Are you aware that that system tracks every
2  step taken to manage the foreclosure of a loan in a
3  sequential manner and numbers each transaction from the
4  first transaction through the final transaction?
5    A.  I am aware that it tracks the foreclosure
6  steps, yes.
7    Q.  And it also manages time lines for those steps
8  based on the state where the property is located,
9  correct?
10    A.  Correct.
11    Q.  And LPS more or less represents themselves to
12  be an expert in managing those processes for servicers.
13  Is that fair?
14        MS. BEARDSLEY:  Object to the form.
15    A.  Yes, I would say that that is fair.
16    Q.  (BY MR. WOOTEN)  And is it also fair to say
17  that when you refer a loan to LPS Default for
18  foreclosure management that they take responsibility for
19  each step of that process once it is referred until the
20  foreclosure is completed?
21    A.  Correct.
22    Q.  And is it also fair to say that Litton
23  authorized, through its agreement with LPS, LPS to act
24  on Litton's behalf in the management of that loan
25  through the foreclosure process?

Case 10-01172-DWH    Doc 22-2    Filed 11/01/10    Entered 11/01/10 15:55:35    Desc
Deposition of Daphne Mosley    Page 9 of 104
**Daphne Mosley**                                    October 14, 2009

9 (Pages 33 to 36)

Page 33

1      A.  I'm not familiar with what the arrangement is
2  with them.
3      Q.  Is it -- I don't want to mischaracterize it,
4  but is it fair to say that basically you hand that loan
5  account off to them and they take it and run with it
6  once it becomes a foreclosure referral?
7          MS. BEARDSLEY:  Object to the form.
8      A.  No, I don't -- I don't think that that is an
9  accurate statement.
10     Q.  (BY MR. WOOTEN)  What decisions does Litton
11 make once the loan is referred to LPS for foreclosure?
12     A.  I know Litton determines the attorney and --
13     Q.  Let me pause you there.
14         When you say Litton determines the
15 attorney, is it fair to say that Litton chooses an
16 attorney who already has an agreement with LPS to
17 provide services?
18     A.  No, I wouldn't say that that is accurate.
19     Q.  Okay.  Do you know whether or not the Sirote
20 firm is also a member of the national network of
21 Fidelity and LPS?
22         MS. BEARDSLEY:  Object to the form.
23     A.  I don't know exactly what that means or what
24 their relationship is, but I would assume because they
25 are the foreclosure attorney assigned to the file that

Page 34

1  they have a relationship with Fidelity and the use of
2  that system.
3      Q.  (BY MR. WOOTEN)  Okay.  And it's fair to say
4  that one of the selling points to you of LPS is that --
5  or your company is that they provide you a network of
6  qualified foreclosure attorneys who have agreed to
7  provide services at a known rate so that you can know
8  that wherever you have to go foreclose, you can kind of
9  figure what your costs are?
10         MS. BEARDSLEY:  Object to the form.
11     A.  I do know that Fidelity has a network of
12 attorneys available.  To my knowledge, Litton doesn't
13 rely on that information for the selection of attorneys.
14     Q.  (BY MR. WOOTEN)  Okay.  So you're saying that
15 your choice of Sirote was independent of their
16 relationship with LPS and your relationship with LPS.
17         MS. BEARDSLEY:  Object to the form.
18     A.  Yes.
19     Q.  (BY MR. WOOTEN)  Okay.  Are you familiar with
20 the typical contractual arrangements between LPS and the
21 servicer and the foreclosure network attorney for LPS?
22     A.  State that again.
23     Q.  When I deposed LPS a few months ago --
24     A.  Okay.
25     Q.  -- their testimony was that there was a

Page 35

1  contract between LPS and the servicer for foreclosure
2  and bankruptcy referrals --
3      A.  Okay.
4      Q.  -- and then there was a contract between LPS
5  and the attorneys for services to be provided at fixed
6  rates --
7      A.  Uh-huh.
8      Q.  -- but that there was never a contract between
9  the servicer and the attorney in that process.
10     A.  That is my understanding.
11     Q.  Okay.  So I guess my question is:  Are you
12 saying that this particular loan is treated differently
13 in that there is a direct contractual relationship
14 between the servicer and the attorney firm that's
15 foreclosing?
16     A.  No, there isn't.
17     Q.  Okay.  So it is, as was testified by LPS, a
18 typical foreclosure referral?
19     A.  Yes.
20     Q.  And with respect to the LPS Desktop system,
21 are you aware that they have part of that program called
22 invoice management?
23     A.  I was not aware.
24     Q.  And are you aware that that system maintains
25 copies of every invoice submitted in the foreclosure

Page 36

1  process, including invoices for fees and charges which
2  are not attorneys' fees such as broker price opinions
3  and inspection charges and things of that nature?
4      A.  I was not aware.
5      Q.  And are you aware of the fact that they
6  maintain copies of remittances which pay those invoices
7  as part of the LPS Desktop system?
8      A.  I'm not aware of that.
9      Q.  Did you make any inquiry as to whether or not
10 any of the data that is available from the LPS Desktop
11 system was relevant to the inquiry for this deposition?
12     A.  No, I did not.
13     Q.  And it's fair to say that you did not produce
14 any of the data that is available from the LPS Desktop
15 system?
16     A.  I don't know.  I didn't ask for it personally,
17 so I can't say that it was or wasn't requested or was or
18 wasn't provided.
19     Q.  Would you agree if it's not here, your company
20 didn't produce it, right?
21     A.  If it's not here, it either wasn't produced or
22 wasn't available.
23     Q.  But we know it's available because any user of
24 LPS Desktop can go in and print the stuff off, right?
25     A.  Well, you were speaking of invoices.

**Daphne Mosley**                                    **October 14, 2009**

Page 37

1    Q.   Sure.
2    A.   And to my knowledge, we don't use any software
3 related to LPS and invoicing.
4    Q.   Okay.  And I didn't say that you did.
5         They take an actual invoice, much like
6 the ones that you produced today, and scan it into their
7 system and store it there if it's related to this loan.
8    A.   Okay.
9    Q.   So my point being is that you just didn't
10 produce any documents related to LPS Desktop, right?
11    A.   Not to my knowledge.
12    Q.   With respect to Promise Solutions, how do you
13 typically communicate with Promise Solutions?
14    A.   How do you mean exactly, like --
15    Q.   How do they keep you apprised of the work that
16 they're doing for you with respect to the bankruptcy
17 file?
18    A.   They update the records in their system, and
19 that information is transmitted to Litton and uploaded
20 into our system.
21    Q.   Okay.  What is your company's name for your
22 system?
23    A.   RADAR.
24    Q.   Okay.  Are you familiar with the term LSAMS?
25    A.   Yes.

Page 38

1    Q.   What does that mean?  Or what does that stand
2 for maybe is a better way to say it.
3    A.   I'm going to get it wrong.
4    Q.   It's an acronym obviously.
5    A.   Right.
6    Q.   But it's related to your servicing software,
7 isn't it?
8    A.   Yeah, it's an account managing system.
9    Q.   And I'll show you a document that we -- you
10 brought this morning as an update, and I'm just going to
11 mark it.
12         (Plaintiff's Exhibit No. 1
13         marked for identification.)
14    Q.   (BY MR. WOOTEN)  Let me show you this.  It's
15 Plaintiff's Exhibit 1, and this is a Litton Loan
16 Servicing LP Detail Transaction History.  And I believe
17 you ran that off this morning, I think.
18         Is that the type of report that you would
19 generate from your LSAMS software?
20    A.   Yes.
21    Q.   And is it fair to say that that is what we
22 would typically refer to as raw data?  That's just each
23 transaction with its code and the dollar amount,
24 correct?
25    A.   Yes.

Page 39

1    Q.   And is it fair to say that typically you would
2 take that raw data and use that raw data to prepare a
3 spreadsheet such as --
4         THE WITNESS:  That's two copies.
5         MS. BEARDSLEY:  It's two copies of the
6 same thing.
7         THE WITNESS:  Two or three.
8         MR. WOOTEN:  We might want to split that
9 up.  I apologize.
10         THE WITNESS:  It's two pages per.
11         MR. WOOTEN:  Okay.  So there's actually
12 three of them, right?
13         THE WITNESS:  Yes.
14         MR. WOOTEN:  That will help us a little
15 bit.  I'll give you a copy right here, so you can follow
16 along, and I'll take this one and I'll mark it as
17 Exhibit 2.
18         (Plaintiff's Exhibit No. 2
19         marked for identification.)
20         MR. WOOTEN:  And I'm terrible with names.
21 It's Ms. Mosley, right?
22         THE WITNESS:  Yes.
23         MR. WOOTEN:  I apologize if I get your
24 name wrong.  Please don't be offended.  My wife is
25 trying to teach me how to remember somebody's name.  I'm

Page 40

1 just not any good at it.
2    Q.   (BY MR. WOOTEN)  But you would take the data
3 in Exhibit 1 and you would take that information and
4 convert it into a spreadsheet such as Exhibit 2, right?
5    A.   Yes.
6    Q.   And that would be based upon the data that you
7 had available in your system, correct?
8    A.   Yes.
9    Q.   And I noticed that you have entered in the
10 first set of yellow columns on Exhibit 2 an Unapplied
11 Amount and a Suspense Balance.  And then you've created
12 another set of two yellow columns out to the far right
13 of the page that says Prepetition Unapplied and
14 Prepetition Suspense Balance, right?
15    A.   Yes.
16    Q.   And with respect to that, the headings under
17 each of these spreadsheets, I don't see a column for
18 trustee payments or suspense.  Did you create one?
19    A.   That's the prepetition.
20    Q.   Okay.  I don't see a column on page 2 either.
21    A.   Maybe I'm confused.  You say you don't see a
22 column for --
23    Q.   Trustee payments, either suspense or --
24    A.   Yes, that's on the far right-hand side.
25    Q.   So you're calling the Prepetition Unapplied

**Daphne Mosley**                                    **October 14, 2009**

Page 41

1   and the Prepetition Suspense Balance where you're
2   dealing with trustee payments, right?
3       A.  Yes.
4       Q.  And I also noted that this runs from
5   September of 2003, which is when you picked up
6   servicing, correct?
7       A.  Yes.
8       Q.  And it runs only through July 31st of '08,
9   correct?
10      A.  Yes.
11      Q.  So the document marked as Exhibit 2 is not a
12  complete recapitulation of the data in Exhibit 1.  Is
13  that fair?
14      A.  Yes.
15      Q.  I also noted that with respect to the entry on
16  the first page of Exhibit 2, it indicates that the first
17  bankruptcy petition filed by my client on January 25th
18  of 2005, that on that day there was a suspense balance
19  of 304.96; is that correct?
20      A.  Yes.
21      Q.  And 304.96 is unapplied funds that would have
22  been paid by my client but not credited to her account
23  as of the date of filing, correct?
24      A.  Correct.
25      Q.  Okay.  And I noticed that on that date, the

Page 42

1   304.96 indicates its presence as of the date of filing,
2   but what did you do with the 304.96 after my client
3   filed her first bankruptcy petition?  Are you able to
4   tell that from the information that's on that sheet?
5       A.  Yes.
6       Q.  What exactly -- where did that money go?
7       A.  It remained in suspense.
8       Q.  Okay.  And it was apparently deducted over
9   some time beginning March of '05.  Is that fair?
10      A.  Yes.
11      Q.  And beginning first on March 7th of '05,
12  was the amount of 238.44 deducted?  Where did that money
13  go?
14      A.  It went towards the first post-petition
15  payment.
16      Q.  238.44 was not the payment amount
17  post-petition, was it?
18      A.  No, it was not.
19      Q.  What was the regular post-petition payment
20  amount?
21      A.  I don't know.
22      Q.  You don't know what the normal post-petition
23  payment was at the date of filing the first bankruptcy?
24      A.  Not off the top of my head.
25      Q.  Is there anywhere on that spreadsheet that

Page 43

1   someone reviewing it can determine what the exact
2   post-petition payment was?
3       A.  No.
4       Q.  Let me ask you this.  With respect to payments
5   that are not for exactly the amount of the monthly
6   payment, does your company typically consider those
7   payments to be what the industry refers to as an
8   irregular payment?
9       A.  I've never heard that term, but --
10      Q.  Never heard that term?
11      A.  (Witness shakes head.)
12      Q.  Do you have a term within your company for a
13  payment that is not for exactly the amount of payment
14  that is due?
15      A.  Short payment.
16      Q.  What about an excess payment if there's more
17  paid than what's due?  Do you have a term for that?
18      A.  No.
19      Q.  Never see that?  Okay.
20          And the reason I ask that is shortly
21  before this bankruptcy filing -- and I say shortly, a
22  few months before, there was a payment of $700.  And it
23  looks like approximately 445.63 was applied to a
24  payment, but then the difference between 700 and the
25  445.63 was placed into suspense.  And that is on a

Page 44

1   transaction for July 24th, 2004.
2       A.  No.
3       Q.  Okay.  Explain the July 24th, 2004, line for
4   me then, please.
5       A.  The customer tendered a payment amount of $700
6   and a payment was applied totaling -- looks like 445.63
7   and the difference of 254.37 was placed into suspense.
8       Q.  Okay.  So if you subtract 445.63 from 700, do
9   you, in fact, get 254.37?
10      A.  Yes.
11      Q.  So it does appear that on the 24th that my
12  client made the $700 payment and one payment was applied
13  to her account and the overage was added to her suspense
14  balance.
15      A.  Yes.
16      Q.  Okay.  Does your company have a standard
17  policy for dealing with suspense balances?
18      A.  They may.  I'm not familiar with it.
19      Q.  Are you aware of whether or not any industry
20  standards exist with respect to handling of funds held
21  in suspense?
22      A.  No, I'm not.
23      Q.  Are you aware of whether or not there are any
24  time limits for holding funds in suspense?
25      A.  No, I'm not aware.

**Daphne Mosley**                                    **October 14, 2009**

Page 45

1    Q.  Is it your testimony that if there are, your
2  company should be aware of them?
3    A.  Yeah.  If they're available, yes.
4    Q.  So if they're published by regulatory
5  authorities, governments, the GSE, Government Sponsored
6  Enterprises, like Fannie, Freddie, HUD, your company as
7  a professional mortgage servicer, you would be aware of
8  those types of things, right?
9    A.  Right.
10    Q.  It would be your testimony that you would do
11  your best to comply with those?
12    A.  To my knowledge, I feel that they would have
13  policies in place to be able to service loans in
14  accordance to the standards.
15    Q.  And if the contractual obligations state that
16  they will service them in compliance with law, that
17  would be your expectation of how this loan would have
18  been serviced, right?
19    A.  Yes.
20    Q.  With respect to the issue that we were
21  discussing earlier -- and I'm just going to double back
22  for a moment.
23       We talked about the inspection charges to
24  the property.  Once the delinquency trigger is reached
25  to trigger the initial property inspection, what

Page 46

1  information is your company looking for with respect to
2  the property inspection?
3    A.  The property inspection is primarily used to
4  verify the occupancy status of the property and the
5  condition of the property.
6    Q.  All right.  Once your company establishes that
7  the property is occupied and that it is in a normal
8  state of repair, what are the conditions under which
9  your company will order another property inspection?
10    A.  That will depend on what the investor requests
11  us to do, whatever that -- whatever that threshold is.
12    Q.  Okay.  Is it your testimony that the
13  inspections are set to recur based on the passage of
14  time alone?
15       MS. BEARDSLEY:  Object to the form.
16    A.  No, it's not -- to my knowledge, it's not
17  based on a particular date but rather the delinquency or
18  the severity of the delinquency.
19    Q.  (BY MR. WOOTEN)  Do you know what the initial
20  delinquency has to be before the first property
21  inspection is ordered?
22    A.  I do not.
23    Q.  Would you agree that this information would be
24  readily available to the persons who are managing the
25  account either at Litton or through an outsource

Page 47

1  agreement?
2    A.  No, I don't agree.
3    Q.  Okay.  Where would that information be and who
4  would have access to it?
5    A.  To my knowledge, these guides are something
6  that is kind of coded to the system so to speak.  And so
7  the agents that are responsible for monitoring or
8  managing these services may not know exactly what those
9  triggers are --
10    Q.  And you said --
11    A.  -- because you can't --
12    Q.  -- you said trigger.  What are the triggers
13  within your system?
14    A.  I don't know.
15    Q.  Who in your facility would have that
16  information?
17    A.  That I do not know.
18    Q.  Would that fall within the servicing function
19  or the bankruptcy department of Litton?
20    A.  That would be a servicing function.
21    Q.  Do you know who is in charge of servicing for
22  Litton?
23    A.  A lot of people.
24    Q.  Okay.  How is the servicing department broken
25  down for Litton?

Page 48

1    A.  It's broken down by various departments.
2    Q.  Tell me every department you are aware of in
3  servicing.
4    A.  Collections.
5    Q.  Obviously, right?
6    A.  Foreclosure, bankruptcy, REO.
7    Q.  And REO stands for real estate owned, right?
8    A.  Yes.
9    Q.  And that is the department that manages
10  properties that Litton has acquired through the
11  foreclosure process, right?
12    A.  That's correct.
13    Q.  Sorry to interrupt you.  I wanted to make that
14  clear on the record.
15    A.  Value -- I think there's valuations.
16    Q.  And that is people who would set, for lack of
17  a better term, a guesstimate of what the property should
18  be worth in that particular market, right?
19    A.  Yes.  They manage the values that we use, yes.
20    Q.  Okay.  Now, is that internal values or is that
21  values for foreclosure, values for sale?  What are they
22  valuing?
23    A.  They are valuing -- they value all properties
24  maybe with the exception of REO.
25    Q.  Okay.  Now, other than the departments that

| Page 49 | Page 51 |
|---|---|

Page 49

1  you've already mentioned, are there any other
2  departments that you are aware of in Litton?
3      A.  There are other departments, but those that I
4  previously named are the ones that come to my mind when
5  I think of servicing -- servicing the loans.  It's kind
6  of how we -- how they have it structured, but there are
7  other departments throughout the company.
8      Q.  Do you have a department that deals with loans
9  which are not in default and handles, for lack of a
10  better term, nondefaulted mortgage servicing?
11      A.  No, not a particular department.
12      Q.  Okay.  So a loan file may bounce around among
13  departments depending on its status?
14      A.  That's an accurate statement, yes.
15      Q.  Do you know who is in charge of the bankruptcy
16  department?
17      A.  The name of the person?
18      Q.  Right.
19      A.  John Crandall.
20      Q.  Can you spell his last name for me.
21      A.  C-R-A-N-D-A-L-L.
22      Q.  Okay.  What about the foreclosure department?
23      A.  Debra Lyman.
24      Q.  Can you spell Debra's last name.
25      A.  L-Y-M-A-N.

Page 50

1      Q.  Does she spell that D-E-B-R-A?
2      A.  D-E-B-R-A.
3      Q.  Do you have a loss mitigation department?
4      A.  Yes, we do.
5      Q.  And who runs that department, please, ma'am?
6      A.  Debbie Thayer.
7      Q.  Is that T-H-A-Y-E-R?
8      A.  Yes.
9      Q.  And do you know who runs your collections
10  department?
11      A.  I believe it's Oscar Southall and Toby
12  Gallegos.
13      Q.  Does Mr. Southall spell his name
14  S-O-U-T-H-A-L-L?
15      A.  Yes.
16      Q.  And Mr. -- I think you said Gallegos?
17      A.  Yes.
18      Q.  I assume that's a Hispanic spelling.  Would
19  that be G-A-L-L-E-G-O-S?
20      A.  Yes.
21      Q.  Okay.  And those two gentleman, you said, are
22  in charge of collections?
23      A.  Yes.
24      Q.  Is that because of the number of staff and the
25  amount of work they have going on, or why are there two

Page 51

1  managers there versus one for most of the other areas?
2          MS. BEARDSLEY:  Object to the form.
3      Q.  (BY MR. WOOTEN)  If you know.
4      A.  The collections department is structured where
5  there's, I think, like maybe two different --
6      Q.  Groups?
7      A.  -- groups.  And it depends on the -- or maybe
8  three different groups, but it depends on the
9  delinquency.  How delinquent it is -- it kind of depends
10  on where the loan would fall.
11      Q.  So you -- maybe you have a group that deals
12  with people who are very rarely late and maybe a month
13  behind, and then you have a group that's somebody who's
14  near foreclosure, more serious, and constantly behind,
15  right?
16          MS. BEARDSLEY:  Object to the form.
17      A.  Yes, we have a -- the last that I knew, the
18  departments were broken down into an early stage, late
19  stage, collection stage.
20      Q.  (BY MR. WOOTEN)  Okay.  You said that you had
21  been at Litton eight years, and you started out as a
22  bankruptcy processor.
23      A.  Yes.
24      Q.  What other jobs have you had at Litton?
25      A.  I've only worked in two departments, the

Page 52

1  bankruptcy department and now the legal department.
2      Q.  Let me ask you this.  Is there also a
3  cashiering group for Litton?
4      A.  Yes.
5      Q.  Do you know who the manager or supervisor of
6  that group is?
7      A.  Lynn Lindsey.
8      Q.  Is that L-I-N-D-S-E-Y?
9      A.  Yes.
10      Q.  Among these various departments, I'm assuming
11  that it would be possible that that borrower might be
12  contacted by more than one department within relatively
13  short intervals.
14      A.  That could be possible.
15      Q.  And I'm assuming that your departments have
16  some function within your software system where they
17  have the ability to notate their contacts with any
18  particular borrower, correct?
19      A.  Yes.
20      Q.  And that would typically be -- like in a
21  collection department, there would be a collection log
22  where they notate their writings and calls; and if they
23  made recordings, notate that, that sort of thing?
24      A.  Yes.
25      Q.  And they would make whatever comments there

**Daphne Mosley**                                    October 14, 2009

Page 53

1   were about what they found out or what they were hoping
2   to find out and that sort of thing, right?
3        A.   Yes.
4        Q.   Did you make any inquiry as to whether or not
5   there were any notes or logs from any of these other
6   departments related to Lorraine Hudson's mortgage
7   account?
8        A.   Yes.
9        Q.   Okay.  Were there any?
10       A.   Yes.
11       Q.   Did you bring those today?
12       A.   No.
13       Q.   That's something that you could more or less
14  just print off, right?
15       A.   Yes.
16       Q.   And there would have been entries, I'm
17  assuming, for Ms. Hudson's account from multiple
18  departments within your company, right?
19       A.   Correct.
20       Q.   You would have had something called a
21  consolidated notes log or something of that nature which
22  would have had all those contacts, right?
23       A.   Yes.
24            MS. BEARDSLEY:  And, Nick, just to
25  interject, we do have the comment logs, but it's got

Page 54

1   attorney-client privileged just about on every other
2   line, so --
3        Q.  (BY MR. WOOTEN)  Does that include the LPS
4   stuff in there or, is it --
5        A.   (Witness nods head.)
6        Q.   It does?
7            MS. BEARDSLEY:  I don't know.  I just
8   know that --
9            MR. WOOTEN:  It's got comments back and
10  forth between the attorneys?
11            MS. BEARDSLEY:  -- I looked through it,
12  and it's --
13            MR. WOOTEN:  So y'all have to redact
14  that?  Is that the issue?
15            MS. BEARDSLEY:  Uh-huh.  Yeah.
16            MR. WOOTEN:  Okay.  And that's fine.
17       Q.  (BY MR. WOOTEN)  So what you're saying is that
18  y'all have looked and you're trying to make an effort to
19  produce it, but you have to have time to redact
20  privileged information?
21       A.   That's correct.
22       Q.   Sure.  And I can understand that.
23            MS. BEARDSLEY:  Yes.
24            MR. WOOTEN:  And we can get back together
25  on how to deal with that at some point.

Page 55

1            MS. BEARDSLEY:  Yes.
2        Q.  (BY MR. WOOTEN)  You've never worked in just
3   simple mortgage servicing for Litton; is that correct,
4   Ms. Mosley?
5        A.   I don't know if I exactly know what just
6   normal servicing is, but --
7        Q.   Let's say nondefaulted servicing.
8        A.   No.
9        Q.   And that's not really a big part of your
10  company's business, is it?
11            MS. BEARDSLEY:  Hopefully it is a big
12  part.  I hope most people are not defaulting.
13       A.   We have a lot of both.
14       Q.  (BY MR. WOOTEN)  Okay.  Do you segregate those
15  two groups in any way, or are they all in the same
16  location?
17       A.   How do you mean?
18       Q.   Do you have, for lack of a better term, a
19  portion of the company that's dedicated to nondefaulted
20  mortgage servicing versus dedicated to defaulted
21  mortgage servicing?
22       A.   No, not to my knowledge.
23            MR. WOOTEN:  Robin, are there any other
24  documents that y'all think are relevant that you haven't
25  produced, other than what we've talked about, something

Page 56

1   you're waiting to redact?
2            MS. BEARDSLEY:  No, those are the only
3   two that I have for redaction, some of the additional
4   property inspections and then the comment log.
5            MR. WOOTEN:  Sure.
6            THE WITNESS:  The forced placed
7   insurance.
8            MS. BEARDSLEY:  Oh, I'm sorry.  She told
9   me that this morning, that she's requested the proof of
10  the forced placed insurance that was in place on that
11  property.
12            THE WITNESS:  The payments.
13            MS. BEARDSLEY:  The payments on that.
14            MR. WOOTEN:  Do y'all want a take a
15  little break?
16            MS. BEARDSLEY:  Yes, sure.
17            (Recess taken from 9:40 a.m. to
18              9:52 a.m.)
19       Q.  (BY MR. WOOTEN)  We were talking about
20  documents that y'all have produced and everything.  One
21  of the things that I haven't seen today -- and I don't
22  know.  Maybe -- Robin, I don't want to misstate
23  anything.  But did y'all bring a code sheet today, code
24  list?
25            MS. BEARDSLEY:  I don't think there is

**Daphne Mosley**                                    **October 14, 2009**

Page 57

1    one, from what I've been told.
2        Q.  (BY MR. WOOTEN)  Let me show you what I'm
3    going to mark as Plaintiff's Exhibit 3.
4            (Plaintiff's Exhibit No. 3
5            marked for identification.)
6        Q.  (BY MR. WOOTEN)  I'll ask you to took a look
7    at that, Ms. Mosley.
8            I'm not throwing things towards you.  I
9    apologize.  It's a big table.
10           Have you ever seen this document before?
11       A.  I've seen a document that looks similar to
12   this, yes.
13       Q.  Does this appear to be a code sheet from
14   Litton Loans?
15       A.  Yes, it is a code sheet, but I can't verify
16   that it's from Litton, but yes.
17       Q.  If you look down at the lower footnote, it
18   says "Litton versus Floyd" and it says "Litton 0007."
19       A.  Okay.
20       Q.  And I'll represent to you that that was a code
21   sheet that was produced by another law firm in another
22   case that I'm litigating currently with Litton.  And it
23   does say at the top of the page December 5th, 2007, but
24   in going through the records you provided, it appeared
25   most of these codes were accurate.

Page 58

1            As far as you know, are you familiar
2    with -- I think they indicated a transaction number on
3    the lower left or on the left column of this sheet?
4        A.  (Witness nods head.)
5        Q.  If you'll take Plaintiff's Exhibit 1 and just
6    open it up to a random transaction and tell me which
7    transaction it is and tell me which code it is.  If you
8    can do that by giving me the date.
9        A.  On Exhibit 1, Tran No. 166, Transaction
10   No. 166, dated August 16th, 2006.
11       Q.  Okay.  And what is that entry on that
12   Exhibit 1?
13       A.  It's an entry for a late charge.
14       Q.  And does it have a code there on that?
15       A.  Yes.
16       Q.  And what is that code?
17       A.  1499.
18       Q.  1399?
19       A.  1499.
20       Q.  1499.  And if you flip to the second page
21   numbered Litton 08, it says "Fee Assessment, System" and
22   it says out to the far right column, "Increase fee
23   balance due for fee code."
24           Does that correspond with the transaction
25   that seems to be entered that you randomly sampled?

Page 59

1        A.  Yes.
2        Q.  Do you know that code 14-99 typically deals
3    with a late charge?
4        A.  Yes.
5        Q.  So does that appear to be correct, at least
6    from your review of the code sheet I produced to you and
7    the Plaintiff's Exhibit 1?
8        A.  Yes.
9        Q.  Would you be comfortable relying on the codes
10   that are exhibited in Plaintiff's Exhibit 3 to interpret
11   the data on Plaintiff's Exhibit 1?
12       A.  Yes.
13       Q.  Is it your testimony that based on your
14   investigation, there is not a current code sheet such as
15   Plaintiff's Exhibit 3 that was readily accessible to you
16   as you prepared for this deposition?
17       A.  That's correct.
18       Q.  And is it your testimony that Litton has
19   discontinued the use of transaction codes?
20       A.  I have no knowledge of that.
21       Q.  I'm assuming that the Plaintiff's Exhibit 1
22   would be from the older transaction to the newest; is
23   that correct?
24       A.  Transaction 10.
25       Q.  What's the date of that transaction?

Page 60

1        A.  October the 2nd, 2003.
2        Q.  And so that's the last page of Exhibit 1?
3        A.  Yes.
4        Q.  So that would be -- the first page after the
5    cover page, what would be the second page of the
6    cumulative exhibit, would be the most recent
7    transactions, right?
8        A.  Correct.
9        Q.  And was that one of the pages -- one of the
10   codes that you just sampled?
11       A.  Yes.
12       Q.  So that would be a 2009 transaction?
13       A.  Correct.
14       Q.  And it is still coded apparently with the same
15   transaction code shown in Plaintiff's Exhibit 3?
16       A.  Yes.
17       Q.  Okay.  So at least from the document you
18   produced this morning, it appears that the same
19   transaction codes are still in use today that were in
20   use with respect to this other matter I'm involved in,
21   correct?
22       A.  Yes.
23       Q.  Do you know how many motions for relief from
24   stay were filed by your company in Ms. Hudson's
25   bankruptcy filing that took place in 2007?

Page 61

1     A.  I believe there was one motion for relief
2 filed for the 2007 case.
3     Q.  Okay.  Where on Plaintiff's Exhibit 1 would I
4 be able to identify that a bankruptcy was filed on -- by
5 my client Lorraine Hudson?
6     A.  You would not.
7     Q.  Okay.  How would a layperson be able to
8 interpret Exhibit 1 to identify those landmarks such as
9 the filing of a bankruptcy, filing of a motion for
10 relief from stay?
11     A.  I don't know.
12     Q.  Is there any way that that could be done from
13 just that information?
14         MS. BEARDSLEY:  You said "that."  Are you
15 referring to Exhibit 1?
16     Q.  (BY MR. WOOTEN)  We're referring to Exhibit 1.
17     A.  Is there any way that they can determine --
18     Q.  Would there be any entry in Plaintiff's
19 Exhibit 1 which would identify in any matter the date of
20 the filing of either of my client's bankruptcy
21 petitions, either in 2005 or 2007?
22     A.  No.
23     Q.  Would it require the use of codes, which we
24 talked about in Plaintiff's Exhibit 3, along with a
25 familiarity of the documents that have been filed in

Page 62

1 this case to make those determinations?
2     A.  Repeat that.
3     Q.  To be able to determine the dates such as the
4 filing of the bankruptcy petitions, both 2005 and 2007,
5 would require more information than is available in
6 Plaintiff's Exhibit 1?
7     A.  Yes.
8     Q.  May I see Plaintiff's Exhibit 1.
9     A.  (Witness hands document to counsel.)
10     Q.  I don't think we made an extra copy of that.
11         MS. BEARDSLEY:  I have one.
12         MR. WOOTEN:  If you don't mind, I'll flip
13 through this and it will save us a little bit of time.
14     Q.  (BY MR. WOOTEN)  In your relationships with
15 Promise Solutions and LPS Default, do they have any
16 ability to access your computer systems to add, change,
17 modify, or update any data contained on Litton's
18 computer system?
19     A.  No.
20     Q.  Does Litton share with either of those
21 entities basic servicing information such as transaction
22 codes so that they can make appropriate entries in their
23 records as they work on Litton's behalf?
24     A.  I don't know if they've been provided a
25 document such as this.  I can't confirm that.

Page 63

1     Q.  Is it your testimony that those entities such
2 as Promise and LPS Default maintain their own records,
3 which are then transmitted to Litton for updating?
4     A.  Yes, that does occur.
5     Q.  As part of your outsource agreements, do
6 Promise -- let me rephrase that.
7         As part of your outsource agreements,
8 does either Promise Solutions or LPS Default have the
9 right to assess or charge to the account of the borrower
10 any amount for any fee or charge or other service?
11     A.  And when you say -- just to clarify, when you
12 say if they can -- what rights do they have, are you --
13 are you asking do they -- can they make the entry to
14 assess the fee or can they -- what right do they have to
15 charge Litton for a service that they provided?
16     Q.  Well, I guess actually sort of both, but let's
17 take the first one, where they make an entry in the
18 system requesting that a charge be assessed to the
19 account.  Would they have the authority to do that?
20     A.  No, they don't have the authority to assess
21 any fees or make any entries regarding specifically
22 Exhibit 1.  They do not have authority to do that.
23     Q.  In their transactions, do they conduct
24 activities which result in charges to the borrower's
25 account?

Page 64

1     A.  Yes, that may occur.
2     Q.  Okay.  What charges would they be able to
3 cause to be incurred to the debtor or the borrower
4 through their activities?
5         MS. BEARDSLEY:  Object to the form.
6     A.  The filing of a proof of claim, a motion for
7 relief from stay.
8     Q.  (BY MR. WOOTEN)  Okay.  Do they require
9 Litton's approval for either of those actions prior to
10 undertaking them?
11     A.  No.
12     Q.  Okay.  Are there any entries in Plaintiff's
13 Exhibit 1 where a layperson could determine that Litton
14 made any separate accounting for trustee payments during
15 a bankruptcy proceeding?
16     A.  No.
17     Q.  Is it fair to say that in Plaintiff's
18 Exhibit 1, it would simply be money received in the form
19 of a payment?
20         MS. BEARDSLEY:  Payment from the
21 borrower?  Is that --
22     Q.  (BY MR. WOOTEN)  I'm talking about what's in
23 Exhibit 1.
24     A.  Exhibit 1 is reflective of all payments
25 received.

**Daphne Mosley**                                   **October 14, 2009**

---

Page 65

1    Q.  Okay.  So when a trustee makes a payment,
2  there's nothing in Exhibit 1 that you could look at to
3  determine that the money came from a bankruptcy trustee,
4  is there?
5    A.  No.
6    Q.  I do notice in the next to last column to the
7  right of Plaintiff's Exhibit 1, there is a heading that
8  says Suspense slash CD.  What is the purpose of that
9  column, if you know?
10    A.  That column would identify any funds that were
11  placed in and removed from a suspense account.
12    Q.  What is the -- the suspense, I get, but the
13  slash CD, what is the meaning of that?  Do you know?
14    A.  I do not know.
15    Q.  Do you know if the mortgage loan instrument or
16  promissory note authorized the creation or use of a
17  suspense account for a borrower's account?
18    A.  I don't know.
19    Q.  Is it your testimony that both amounts placed
20  in suspense as well as amounts withdrawn from suspense
21  are reflected in that column?
22    A.  Yes.
23    Q.  And by referring to the transaction code,
24  which if you look at page 3 of the exhibit on Loan
25  Transaction No. 269, it has a date of July 31st, 2008.

Page 66

1  Do you see that?
2    A.  Yes.
3    Q.  And then it has a code of 25 and 24, right?
4    A.  Yes.
5    Q.  And we could refer back to Plaintiff's
6  Exhibit 3 for a definition of 25 and 24, right?
7    A.  Yes.
8    Q.  And it says that 25 and 24 is a Forbearance
9  Suspense Cash Credit Adjustment; is that correct?
10    A.  Yes.
11    Q.  And it says it increases the forbearance
12  suspense balance, right?
13    A.  Yes.
14    Q.  So looking at that transaction, it would
15  indicate that the suspense balance increased by 304.01
16  on 7/31 of 2008, correct?
17    A.  Yes.
18    Q.  There is another entry out by the dollar
19  amount that is number 24.  Do you know what the 24
20  signifies?
21    A.  I do not.
22    Q.  Do you think it's possible that that is
23  related to the slash CD entry and that that is some
24  other type of additional coding?
25    A.  I really have no idea.

Page 67

1    Q.  Okay.  Who do you think would be the person
2  most likely to know that?
3    A.  Probably Lynn Lindsey.
4    Q.  Lynn Lindsey?
5    A.  Uh-huh.
6    Q.  Okay.  And with respect to the purpose of a
7  forbearance adjustment, there is nothing in this entry
8  that would indicate why that was treated as a
9  forbearance adjustment, is there?
10    A.  Not that particular entry.
11    Q.  So it would require more information than is
12  available to the layperson from reviewing this document
13  to try to interpret why that dollar amount went into
14  suspense, correct?
15    A.  Yeah, that may be possible.
16    Q.  What is the purpose of an escrow account?
17    A.  The purpose of the escrow account is to allow
18  the servicers to be able to collect funds from the
19  customer in order to pay their taxes and/or insurance
20  and to make disbursements on their behalf.
21    Q.  And it's your understanding that escrow
22  accounts are regulated heavily by federal law including
23  the Real Estate Settlement Procedures Act?
24    A.  Yes.
25    Q.  And you are aware that those laws impose

Page 68

1  strict liabilities and obligations with respect to what
2  items are truly escrow items versus what items are other
3  items that should not be included in escrow?
4    A.  Yes.
5    Q.  I'm going to detour just a second, because we
6  have to identify some of these documents.
7        (Plaintiff's Exhibit No. 4
8        marked for identification.)
9    Q.  (BY MR. WOOTEN)  You've brought this document
10  I marked Plaintiff's Exhibit 4, and it says it's an
11  amortization schedule.  Can you explain what that
12  document is.
13    A.  Yes.  The amortization schedule will reflect
14  how each contractual payment will be applied on an
15  amortized basis.
16    Q.  And that's assuming that those payments are
17  applied according to the promissory note and the
18  mortgage, right?
19    A.  Correct.
20    Q.  How does your company determine the priority
21  of payments of items when a payment is received from a
22  borrower?
23    A.  Meaning --
24    Q.  If Ms. Hudson makes her normal direct mortgage
25  payment this month, how does your company determine what

**Daphne Mosley**                                    October 14, 2009

Page 69

1   amounts are applied to what categories?
2          MS. BEARDSLEY:  Assuming she's not in --
3   when you say this month --
4      Q.  (BY MR. WOOTEN)  Well, let's just say
5   hypothetically --
6          MS. BEARDSLEY:  Okay.
7      Q.  (BY MR. WOOTEN)  -- when a mortgage borrower
8   makes a normal monthly payment --
9      A.  Uh-huh.
10     Q.  -- how does Litton determine how those moneys
11  are applied as they are received, what items they're
12  credited to:  escrow, fees, interest, principal?  How do
13  you make that determination?
14     A.  Well, actually the system makes that
15  determination.
16     Q.  The computer system?
17     A.  Yes.
18     Q.  And that computer system is programmed to make
19  that determination based on how it's programmed?
20     A.  Based on the information for that particular
21  loan, yes.
22     Q.  Which is a function of, at some point and at
23  some level, operator input from some human being at
24  Litton, right?
25     A.  It could be a manual process.

Page 70

1      Q.  I'm not asking if each individual loan payment
2   is manually entered and applied.
3      A.  Uh-huh.
4      Q.  I'm saying that when Litton sets up a pool of
5   loans --
6      A.  Uh-huh.
7      Q.  -- and they say these loans go with this trust
8   for this investor --
9      A.  Uh-huh.
10     Q.  -- I'm assuming somewhere along in there,
11  there are rules about how the normal payments are
12  applied to that borrower's account for that group of
13  loans, right?
14     A.  Not to my knowledge.  The loans are set up
15  according to the terms of the note, and so the payments
16  are applied in accordance thereof.  It has nothing to do
17  with a pool, per se.  It's based on whatever information
18  is in the note.
19     Q.  Okay.  Have you reviewed the note in this
20  file?
21     A.  I have.
22     Q.  Is there a portion of the note in this case
23  that addresses the application of payments?
24     A.  I believe it does.
25     Q.  What about the mortgage?

Page 71

1      A.  I can't recall.
2      Q.  Do you agree that in a typical mortgage loan
3   transaction that there are two parts:  There is the
4   promissory note and the security instrument, which we
5   refer to as the mortgage or deed of trust.
6      A.  Uh-huh.  Yes.
7      Q.  And you would agree that typically those two
8   items are read in conjunction as part of that loan
9   agreement, correct?
10     A.  Yes.
11     Q.  So in other words, when you sign a note and
12  mortgage, those two documents are read as one merged
13  contract.
14          MS. BEARDSLEY:  Object to the form.
15     Q.  (BY MR. WOOTEN)  If you know what that means.
16     A.  Yes.
17     Q.  So wherever in that contract it defines how
18  payments will be applied, that is the law of that loan
19  with respect to that contract, right?
20     A.  Yes.
21     Q.  And you would agree that Litton is required to
22  honor that agreement with respect to the application of
23  payments, right?
24     A.  Yes.
25     Q.  Another document that y'all brought this

Page 72

1   morning is -- I'm marking as Plaintiff's Exhibit 5.
2          (Plaintiff's Exhibit No. 5
3          marked for identification.)
4      Q.  (BY MR. WOOTEN)  It says that it is a
5   recapitulation of the escrow account activity for my
6   client's loan.
7          MS. BEARDSLEY:  Nick, I have those
8   clipped together.
9          MR. WOOTEN:  Sure.
10          MS. BEARDSLEY:  It doesn't mean that
11  they're a collective document, so --
12     Q.  (BY MR. WOOTEN)  Let's do this.  I'm going to
13  let you -- since Robin made that representation, I'm
14  going to unclip these and ask you to look through them
15  and you identify what documents go together and I'll
16  mark them accordingly.
17          The first one I marked as No. 5, and it's
18  headed as an escrow account.
19          MR. WOOTEN:  Is that two copies of that?
20          MS. BEARDSLEY:  Yeah.  Here you go.
21          MR. WOOTEN:  Thanks.
22     Q.  (BY MR. WOOTEN)  And is No. 5 a recapitulation
23  of the activity in the escrow account for Ms. Hudson?
24     A.  Yes.
25     Q.  All right.  And should that be a stand-alone

**Daphne Mosley**                                                    **October 14, 2009**

---

Page 73

1  document?  Are there other documents there that belong
2  with that document?
3      A.  No.
4      Q.  Okay.  All right.  What is the next document
5  in that grouping that is -- or the next grouping of
6  documents that belong together?
7      A.  These are screen prints from the LSAMS
8  software of various screens for the account.
9      Q.  All right.  Are each of those individual
10 screen prints?
11     A.  Yes.
12     Q.  What is the first one that you're holding?
13     A.  The first is an escrow inquiry.
14     Q.  All right.  And is that one document alone?
15     A.  It's two.
16     Q.  So the first two pages are the escrow inquiry?
17     A.  Yes.
18     Q.  All right.  And tell me what information I
19 should be able to glean from this document.  I'm going
20 to mark this as 6, and you're looking like you might
21 want to look back at it.  I understand there's a pretty
22 good amount on there.
23          (Plaintiff's Exhibit No. 6
24          marked for identification.)
25     A.  This document tells us what escrow lines have

Page 74

1  been created and the amount that we should be collecting
2  for homeowner's insurance and/or taxes.
3      Q.  (BY MR. WOOTEN)  All right.  And all that
4  information is available from that form?
5      A.  Yes.
6      Q.  On the second page of that document, I noticed
7  as I was stapling that there was an entry that says
8  Comment/Legal Description and it says MaxMillion.  What
9  is that?
10     A.  That is a software that I think the insurance
11 department uses.
12     Q.  Okay.  Are you aware if that is a software
13 program provided by LPS to your company?
14     A.  I don't know.
15     Q.  Okay.  What information would you be able to
16 gather from MaxMillion?
17     A.  I have no idea.
18     Q.  Who would know?
19     A.  Jennifer Shannon.
20     Q.  Who is Jennifer Shannon?
21     A.  She's the -- she's over the insurance group.
22     Q.  Is that another department within servicing?
23     A.  Yes.
24     Q.  Would she be able to tell me whether or not
25 there are certain rules with respect to when your

Page 75

1  company places or is forced to place insurance on a
2  borrower's loan?
3      A.  Yes.
4      Q.  And would she be able to tell me whether that
5  is in any way related to whether or not there is a
6  present default on the borrower's loan?
7      A.  Say that again.
8      Q.  Would she also be able to tell me whether or
9  not the choice to place forced placed insurance is based
10 upon in any fashion whether or not the borrower is in
11 default?
12     A.  She may be able to provide that information.
13     Q.  You would not have that information, would
14 you?
15     A.  No.
16     Q.  Okay.  What is the next document in that
17 grouping?
18     A.  On the second page of Exhibit 6?
19     Q.  Both of those go together, right?
20     A.  Yes.
21     Q.  Was there anything else in that document that
22 I should be able to learn from looking at it other than
23 what you have already told me about?
24     A.  Well, the purpose of providing the document
25 was to reflect the insurance information as provided by

Page 76

1  the borrower.
2      Q.  Okay.  And what's the next document in that
3  grouping?
4      A.  It's the change filed inquiry.
5      Q.  And what does that mean?
6      A.  It --
7      Q.  Go ahead.  I'm sorry.
8      A.  This is where if there is any changes made to,
9  say, the payment, P and I payment amount, interest rate,
10 escrow payment, things of that nature, it would be
11 identified on this screen.
12     Q.  Okay.  Is that also something that's printed
13 from your software?
14     A.  Yes.
15     Q.  Okay.  Let me mark that as Exhibit 7 just so
16 we have identification of what that is.
17          (Plaintiff's Exhibit No. 7
18          marked for identification.)
19     Q.  (BY MR. WOOTEN)  What is the next document,
20 please, ma'am?
21     A.  It's the loan payment inquiry.
22     Q.  And what is that information -- what's that
23 supposed to provide us?
24     A.  It provides a snapshot of the loan, such as
25 the current payment amount, the principal balance.  If

**Daphne Mosley**                                              October 14, 2009

Page 77

1    there is any amounts in suspense, it will identify the
2    amount in suspense as well as any charges, such as late
3    charges and insufficient fund charges, that may have
4    been assessed to the loan.
5        Q.   Okay.  Let me took a look at that form.
6        A.   (Witness hands document to counsel.)
7        Q.   This form I'm going to mark as Exhibit 8.
8            (Plaintiff's Exhibit No. 8
9            marked for identification.)
10       Q.   (BY MR. WOOTEN)  And it indicates that -- I
11   believe that even though the page seems to have sort of
12   blended together, it looks like you ran that off
13   yesterday?
14       A.   Yes.
15       Q.   And it indicates that there's interest due of
16   $8,631.64, correct?
17       A.   Yes.
18       Q.   What date is the interest figured from on the
19   borrower's loan based on this document?
20       A.   Can I see the document?
21       Q.   Sure.  (Counsel hands document to witness.)
22           MS. BEARDSLEY:  And you may already know
23   this.  I know you mentioned it just a minute ago.  It's
24   skewed because of the way the screen prints.
25           MR. WOOTEN:  It's skewed, yeah.

Page 78

1        A.   May 1, 2007.
2        Q.   (BY MR. WOOTEN)  Would that be what your
3    company currently recognizes as the contractual due
4    date?
5        A.   No.
6        Q.   What is the contractual due date according to
7    your company today?
8        A.   June 1, 2007.
9        Q.   Is the difference between those two because
10   interest is figured 30 days behind?
11       A.   Yes.
12       Q.   Is it fair to say that when a loan is in
13   default, your company will pay fees due on the loan from
14   regular payments which are received by the borrower?
15       A.   No.
16       Q.   For the purpose of assessing late fees, is it
17   fair to say that a late fee will be assessed to the
18   borrower's loan based upon the contractual due date?
19           MS. BEARDSLEY:  Object to the form.
20       A.   Yes.  That may occur.
21       Q.   (BY MR. WOOTEN)  Okay.  Does that occur in
22   this case?
23       A.   That appears to be correct.
24       Q.   And is it fair to say that the reason a late
25   fee is being charged monthly is because your system is

Page 79

1    tracking the contractual due date based upon the way
2    that your system accounts for these loans through its
3    programming?
4        A.   That could be one reason why, yes.
5        Q.   Are you familiar at all with the industry
6    standard respecting the application of late charges to
7    borrowers' accounts as a collection tool?
8        A.   Am I familiar with what?
9        Q.   The mortgage servicing industry standards for
10   recommended procedures for the assessment of late
11   charges to a borrower's account as a collection tool.
12           MS. BEARDSLEY:  Object to the form.
13       A.   No.
14       Q.   (BY MR. WOOTEN)  Is it fair to say that any
15   money collected by your company as a fee is treated as
16   fee income by your company?
17       A.   No, I don't agree with that statement.
18       Q.   With respect to late fees, is it fair to say
19   that any late fees collected are treated as fee income
20   by your company?
21           MS. BEARDSLEY:  Object to the form.
22       A.   Yes.
23           (Plaintiff's Exhibit No. 9
24           marked for identification.)
25       Q.   (BY MR. WOOTEN)  I'm going to mark this

Page 80

1    particular document as Exhibit 9 and ask you if you can
2    take a look at it and ask you whether that document
3    should stand alone or whether it goes with some of the
4    other documents in that grouping that you brought today?
5        A.   It goes with additional documents.
6        Q.   Okay.  Would that be the stack of documents
7    that it was with, before I asked you to provide it to
8    me, dealing with where your company paid various vendors
9    for services which were performed?
10       A.   Yes.
11       Q.   So if you will, I'll hand this clip to you and
12   ask you to clip together all of the documents that
13   belong with the document I've marked as Exhibit 9.
14       A.   (Witness complies.)
15           MS. BEARDSLEY:  Just for the record, this
16   spreadsheet has a listing of what's attached, and then
17   we actually separated the ones that I have to redact so
18   that you can tell which ones have been produced and
19   which ones --
20           MR. WOOTEN:  All right.  So the top of
21   the spreadsheet, what you're saying, Robin, is the ones
22   that are attached --
23           MS. BEARDSLEY:  Uh-huh, attached.
24           MR. WOOTEN:  -- and the ones below you're
25   saying need redaction and you're going to get them to me

Page 81

1  after they're redacted.
2       MS. BEARDSLEY: Yes, uh-huh. Yes.
3       Q. (BY MR. WOOTEN) And it's fair to say what
4  those documents are purported to represent are payments
5  to vendors for services provided with respect to my
6  client's loan?
7       A. Yes.
8       Q. And the actual check amounts are much
9  different than the charges because you're paying the
10 vendor for what they did for you on a billing cycle
11 versus an individual check for my client, right?
12      A. Correct.
13      Q. With respect to the vendors identified in
14 Exhibit 9, do you have contractual arrangements with any
15 of those vendors?
16      A. That is likely.
17      Q. Okay. Who in those vendors would you think it
18 is likely you have a contractual relationship with?
19      A. It is possible that there's a contractual
20 relationship with all of them.
21      Q. And would that contractual arrangement set
22 forth what those vendors agreed to provide those
23 services for, the price that they would be paid for
24 providing those services?
25      A. I don't know if it provides a price.

Page 82

1       Q. Is it a -- what is your understanding
2  involving that agreement then?
3       A. It's just, to my knowledge, to spell out the
4  service that they are to provide us, giving them the
5  authorization to provide certain services upon request.
6       Q. Okay. And those services identified in those
7  documents deal with broker price opinions and property
8  inspections.
9       A. Correct.
10      Q. Are the provision of either of those services
11 related to the date of delinquency under the contract?
12      A. That is possible.
13      Q. Once that trigger is reached with the date of
14 delinquency, is there an additional trigger that
15 requires the same service to be performed again?
16      A. Say that again.
17      Q. For instance, with broker price opinions --
18      A. Uh-huh.
19      Q. -- you typically seek to perform a broker
20 price opinion when a loan is contractually delinquent
21 for about 90 days; is that right?
22      A. That could be a requirement.
23      Q. Would that be typically about what is
24 recommended by entities such as Fannie Mae and
25 Freddie Mac?

Page 83

1       MS. BEARDSLEY: Object to the form.
2       A. I don't know what their specific requirements
3  are.
4       Q. (BY MR. WOOTEN) Does that sound about right
5  based upon your training and experience?
6       MS. BEARDSLEY: Object to the form.
7       A. Yeah, that could be -- that could happen, yes.
8       Q. (BY MR. WOOTEN) After the initial broker
9  price opinion is completed, what triggers or causes any
10 further broker price opinions to be conducted?
11      A. In my experience, it may depend on the age of
12 the previous valuation and the status of the loan in the
13 delinquency, or it may not have anything to do with
14 either of those, per se. It could be requested, say,
15 for instance, if the borrower wanted to do a loan
16 modification or a certain service like that. Then an
17 updated valuation would be required depending on the age
18 of the previous.
19      Q. With respect to the vendors that are
20 identified on Plaintiff's Exhibit 9, are any of those
21 vendors subsidiaries of your company?
22      A. No.
23      Q. Are any of those vendors owned by your
24 company?
25      A. No.

Page 84

1       Q. Does any owner or subsidiary of your company
2  own any interest in any of those vendors?
3       A. No, not to my knowledge.
4       Q. Did you make any inquiry as to whether or not
5  that is the case, or is that just based upon your
6  personal knowledge?
7       A. I did not make an inquiry based for this
8  particular case, but I have inquired in the past.
9       Q. Okay. And your inquiry would have consisted
10 of asking a supervisor or an officer for that
11 information?
12      A. Yes.
13      Q. And were you just simply verbally told that
14 that was not the case or did someone provide you with
15 documentation or did you do anything other than that to
16 investigate it?
17      A. No, I believe I was just told.
18      Q. Okay. Are you aware as to whether or not the
19 vendors who provide these services pay any portion of
20 the moneys paid to them back to Litton as part of the
21 agreement to provide these services?
22      A. No.
23      Q. Have you made inquiry as to whether or not
24 that might be the case?
25      A. Yes, I believe I have in the past.

**Daphne Mosley**                                   **October 14, 2009**

---

Page 85

1    Q.  Have you made any inquiry specifically to the
2  vendors identified on this loan?
3    A.  Yes, in the past.
4    Q.  Were any of those vendors recommended or is
5  your company steered to use any of those vendors by
6  either Promise Solutions or LPS Default?
7    A.  No.
8    Q.  Do either Promise Solutions or LPS Default
9  have the right to direct that these vendors provide
10  these services?
11    A.  No.  If required, the vendor has to make a
12  request upon Litton.
13    Q.  And Litton then authorizes the request?
14    A.  If it's necessary, yes.
15    Q.  With respect to a broker price opinion, is it
16  fair to say that the broker price opinion is typically
17  an item that is requested by the investor or the owner
18  of the loan?
19    A.  Yes.
20    Q.  Is it also fair to say that the broker price
21  opinion is an item that is contained in a separate
22  contract between the investor and the owner of the loan
23  and Litton and is commonly referred to as a servicing
24  agreement?
25        MS. BEARDSLEY:  Object to the form.

---

Page 86

1    A.  I'm not sure if I understand what you said.
2    Q.  (BY MR. WOOTEN)  Okay.  Let me try to
3  rephrase.
4    A.  Okay.
5    Q.  Is it fair to say that there is a separate
6  contract between the owner or investor of the loan and
7  Litton that places the obligation upon Litton to secure
8  a broker price opinion that is independent of the
9  promissory note and the mortgage?
10        MS. BEARDSLEY:  Object to the form.
11    A.  I don't know.
12    Q.  (BY MR. WOOTEN)  In other words, what I'm
13  asking you, Ms. Mosley, is:  The party who is interested
14  in having the broker price opinion is typically the
15  owner or investor in that mortgage loan, right?
16    A.  Yes.
17    Q.  And Litton provides that service based on
18  their desire to have it done?
19    A.  Yes.
20    Q.  And that is based on a contract between Litton
21  and that owner or investor?
22    A.  I would say I don't -- I don't know if there
23  is a contract that exists that specifically states that
24  we are to obtain the BPOs on their behalf.
25    Q.  But that is not necessary as between Litton

---

Page 87

1  and the borrower to service the borrower's loan, is it?
2    A.  Is it required?  Probably not.
3    Q.  So BPO benefits the investor and the owner of
4  the mortgage, right?
5    A.  And the borrower.
6    Q.  Well, to the extent that the BPO is imposed as
7  a consequence of a delinquency, the purpose of that is
8  because the investor requires that a property be valued
9  because there is a delinquency.
10    A.  Yes.
11    Q.  And again, that is because of the agreement
12  between the investor and Litton.
13    A.  Yes.
14    Q.  Do you know if the amount charged by the
15  vendor is the actual cost of the BPO or if that is in
16  any way marked up or inflated?
17    A.  I don't know what the vendor's true cost is.
18    Q.  What about the cost of the drive-by
19  inspection?
20    A.  I don't know what the vendor's true cost is.
21    Q.  Do you know if there's any portion of the
22  mortgage instrument where the borrower agrees for the
23  investor or the servicer to make a profit off of fees
24  related to default?
25    A.  No.

---

Page 88

1    Q.  Is it your understanding that most of the
2  mortgage instruments say that the borrower agrees to pay
3  the reasonable and necessary cost of providing a
4  service?
5    A.  Yeah, there is verbiage similar to that.
6    Q.  And that's pretty standard in the uniform
7  mortgage instruments.
8    A.  Yes.
9    Q.  So if Litton or the investor is profiting off
10  of the provision of these services, the borrower has not
11  made any agreement to pay that profit to Litton or to
12  the investor, have they?
13    A.  Well, I disagree that these are profits to
14  Litton or the investor.
15    Q.  To the extent that they're treated as such,
16  the borrow hasn't agreed to pay it, have they?
17        MS. BEARDSLEY:  Object to the form.
18    A.  The borrower agreed to pay reasonable fees,
19  yes.
20    Q.  (BY MR. WOOTEN)  And you would agree that
21  marking up a fee to more than what it cost is more than
22  what it would be reasonable and necessary for the
23  servicer or investor to expend, right?
24    A.  It hasn't been established that the cost of
25  the service has been marked up.  I only know that Litton

---

**Daphne Mosley**                                      October 14, 2009

Page 89

1    pays the invoice as billed on behalf of the investor.
2        Q.   And actually, there is a provision in the
3    agreements between the investor and Litton whereby
4    Litton can be reimbursed for the cost of that service
5    that it provides to the investor, right?
6        A.   Yes.
7        Q.   Do you know what the amount of that
8    reimbursement is?
9        A.   No.
10       Q.   Do you know if it's a hundred percent?
11       A.   Typically, it is, if it's a service that is --
12   if it's an expectation of the investor that that is
13   something that -- a service that we obtain per their
14   request, then yes.
15       Q.   So if they ask you to get it, they agree to
16   pay for it, right?
17       A.   That or if it is a fee that has been charged
18   or obtained with the normal course of servicing.
19       Q.   Okay.  But with respect to a fee for a charge
20   that the investor specifically requested be performed
21   and they specifically agreed to pay, Litton would be
22   reimbursed 100 percent for that charge, right?
23           MS. BEARDSLEY:  Object to the form.
24       A.   Yes, to my knowledge.
25       Q.   (BY MR. WOOTEN)  Is there any entry on any of

Page 90

1    Ms. Hudson's account records which indicate that any of
2    the charges were taken off of her account when they were
3    reimbursed by the investor?
4        A.   Not to my knowledge.
5        Q.   And if they had been, there would be an entry
6    in Exhibit 1 that you brought with you today, right?
7        A.   No.
8        Q.   If a charge that had previously been assessed
9    to Ms. Hudson's account which the servicer had been
10   reimbursed for incurring --
11       A.   Uh-huh.
12       Q.   -- such that the servicer had been paid in
13   full --
14       A.   Uh-huh.
15       Q.   -- is it your testimony that her records would
16   not indicate if that charge had been taken off of her
17   account?
18           MS. BEARDSLEY:  Object to the form.
19       A.   My testimony is that will not be reflected in
20   Exhibit 1.
21       Q.   (BY MR. WOOTEN)  Which is the payment history.
22       A.   Which is the payment history.
23       Q.   And that is allegedly the history of every
24   transaction on her account since Litton began servicing.
25       A.   I think I previously testified that it was a

Page 91

1    reflection of the payments received on the account.
2        Q.   Take a minute and look at Exhibit 1, if you
3    want to.  I think you might be confused, and I don't
4    want to confuse you.  You can flip through it.  Do
5    whatever you need to do.
6        A.   Uh-huh.
7        Q.   Is Exhibit 1 a complete payment history or a
8    complete history of all of the transactions for Lorraine
9    Hudson's account since Litton began to service this
10   loan?
11       A.   Well, it's all of a certain type of
12   transactions, but in regards to the advancement of
13   inspection fees and BPO fees, that does not appear on
14   this particular ledger.
15       Q.   Are you saying that the amounts charged to
16   Ms. Hudson's account for certain types of fees are not
17   included on that Exhibit 1?
18       A.   Correct.
19       Q.   Is there another document that you've produced
20   in this case which would indicate every fee that was
21   charged to her loan and whether or not any portion of
22   that fee was ever refunded?
23       A.   No, not to my knowledge.
24       Q.   You would agree that there is a portion of
25   your servicing software which would contain that

Page 92

1    information?
2        A.   Yes.
3        Q.   And you would agree that in your position, you
4    would have ready access to it?
5        A.   I don't know if I have ready access to that.
6        Q.   You would be able to obtain that information
7    as part of this lawsuit, wouldn't you?
8        A.   Yes, I would.
9        Q.   And it would be a function of going to the
10   appropriate area of the software and identifying those
11   entries or that field and basically pressing print,
12   right?
13       A.   If I have access to it, yes.
14       Q.   Would you agree that within your department,
15   whether it's your manager or an officer in charge of
16   your department, someone has the ability to sit down at
17   a computer terminal and print that information off,
18   right?
19       A.   Yes.
20       Q.   And it would tell us if Litton had ever
21   refunded any portion of anything that was charged as a
22   fee or an advance to Ms. Hudson's loan?
23       A.   I don't know exactly what information would be
24   on the document, but it's possible to be able to obtain
25   such information.

Page 93

1    Q.  You would agree that if you had assessed a fee
2  to Ms. Hudson's account for a charge which the investor
3  requested for service that they asked to be performed,
4  that even if that entry was made to Ms. Hudson's
5  account, if that charge was ultimately paid by the
6  investor, that Ms. Hudson should have been entitled to a
7  removal from her account of that charge.  Is that fair?
8    A.  I don't know how that works, so I don't know
9  if that's a fair statement or not.
10    Q.  Okay.  You would agree that it would not be
11  fair for Litton to be paid both by the investor and the
12  borrower for the same service?
13    A.  Again, I don't know how that works.
14    Q.  It's more of a general question.
15        Litton doesn't expect to be paid twice
16  for the same fee, does it?
17    A.  I surely hope not.
18    Q.  So if a fee is paid by someone other than the
19  borrower, then is it a fair statement that that fee
20  should be removed from the borrower's account?
21    A.  Yes.
22    Q.  And so if it is not and Litton collects that
23  fee, that is profit, money paid to Litton, owed to no
24  one else, which Litton can put in its bank and spend,
25  right?

Page 94

1    A.  Yeah.
2    Q.  And is it also fair to say that it is common
3  in Litton's servicing practices to have arrangements to
4  provide certain services for investors which they pay
5  Litton to perform?
6        MS. BEARDSLEY:  Object to the form.
7    A.  I don't know if I understand.
8    Q.  (BY MR. WOOTEN)  Well, specifically with
9  respect to a broker price opinion --
10    A.  Okay.
11    Q.  -- when the investor requests a valuation of
12  the property, that is a service Litton's agreed to
13  perform --
14    A.  Uh-huh.
15    Q.  -- for a fee, and the investor has agreed to
16  pay, right?
17    A.  Right.
18    Q.  And it is common in Litton's servicing to
19  provide services such as a BPO for an investor for a
20  fee?
21    A.  I didn't hear that last part.  I'm sorry.
22    Q.  I'm sorry.
23        It's common for Litton to provide BPOs
24  for investors, isn't it?
25    A.  Yes.

Page 95

1    Q.  And some of those BPOs are provided pursuant
2  to an agreement between the investor and Litton.  It has
3  nothing to do with the borrower.
4    A.  Yes.
5    Q.  And when Litton is paid for those fees, the
6  borrower should not have to pay for that fee again.
7        MS. BEARDSLEY:  Object to the form.
8    A.  Again, I don't know how that process works,
9  but no, the borrower should not be billed twice and
10  collected on multiple times, no.
11    Q.  (BY MR. WOOTEN)  And if there is an agreement
12  to provide the service to the investor for less than the
13  amount that's billed to the borrower, it would also not
14  be proper to ask the borrower to pay more money than the
15  investor agreed to pay for that service.
16        MS. BEARDSLEY:  Object to the form.
17        THE WITNESS:  Was that a question?
18        MS. BEARDSLEY:  I think so.  I don't know
19  if she understood.
20    A.  It sounded like a statement.  I don't know if
21  you were asking me a question.
22    Q.  (BY MR. WOOTEN)  I'm sorry.  Let me rephrase
23  it.
24        It would not be proper for Litton to
25  charge a borrower more for a fee than Litton or its

Page 96

1  vendor had agreed to provide that service to the
2  investor, correct?
3    A.  Correct.
4    Q.  Other than the documents that we ended up with
5  by marking Exhibit 9, are there any other documents that
6  you brought today to produce?
7    A.  No.
8        MR. WOOTEN:  I'm going to try to make a
9  little headway about identifying some of these other
10  documents before we try to break for lunch.
11        MS. BEARDSLEY:  Okay.
12    Q.  (BY MR. WOOTEN)  I'm going to hand you these
13  documents, and they are marked Litton slash Hudson 173
14  through 178.  And I'll represent to you that this was
15  presented to me as a copy of the promissory note along
16  with any endorsements or attachments thereto.  I'll ask
17  you to flip through that.
18        Do you recognize that as apparently a
19  copy of the promissory note executed by my client?
20    A.  Yes.
21    Q.  And Bates stamped with the Bates stamp system
22  that your attorneys used to produce these documents to
23  us?
24    A.  Yes.
25    Q.  And if we requested that you produce the

---

Page 97

1  promissory note in your files along with all of its
2  endorsements and attachments thereto, you have no reason
3  to believe that you produced less than the entire set of
4  documents responsive to that request, do you?
5      A.  No.
6      Q.  Are you aware of whether or not there are any
7  other documents anywhere related to Ms. Hudson's file
8  with respect to her promissory note other than the
9  documents produced that I've shown you there?
10     A.  Like, such as --
11     Q.  Any other allonges to the note?
12     A.  No, not to my knowledge.
13     Q.  Any other endorsements to the note?
14     A.  Not to my knowledge.
15     Q.  Okay.  Will you paper clip those back
16  together, please.
17     A.  Uh-huh.  (Witness complies.)
18     Q.  Is it fair to say that this is a complete copy
19  of all the documents in Litton's possession referencing
20  all the changes in the ownership of this note prior to
21  the time that Litton began to service this note or this
22  loan on behalf of the investor?
23     A.  No, I can't say it's all the documents.
24     Q.  With respect to the note.
25     A.  Yes.

---

Page 98

1      Q.  Okay.  We know that there are other documents,
2  but I'm talking about with respect to the promissory
3  note, there are no other endorsements, no other
4  allonges?
5      A.  Not to my knowledge.
6      Q.  And, of course, if you filed a document with
7  the Bankruptcy Court in the Middle District of Alabama,
8  you would have filed a true and correct copy of those
9  documents also, right?
10     A.  Yes.
11     Q.  I'm going to mark that as Plaintiff's
12  Exhibit 10, and we'll come back to that in a minute.
13          (Plaintiff's Exhibit No. 10
14          marked for identification.)
15     Q.  (BY MR. WOOTEN)  With respect to our request
16  that you produce to us a complete copy of our client's
17  mortgage along with every assignment of that mortgage,
18  I'm going to show you documents -- I won't clip them
19  together until you review them -- 172, 159, 160, 161,
20  149, 150, 151, 152, 153, 154, 142, 144, 145, 146, 155,
21  156, 157, 158, 147, and 148.  And I'll represent to you
22  that each of those documents appears to be an assignment
23  of my client's mortgage.
24          I'll ask you to review that and see if
25  you recognize those documents to be as represented to

---

Page 99

1  you.
2          Does that appear to be assignments of the
3  mortgage dealing with my client's mortgage?
4      A.  Yes.
5      Q.  Okay.  Let me mark that cumulatively as
6  Exhibit 11.
7          (Plaintiff's Exhibit No. 11
8          marked for identification.)
9      Q.  (BY MR. WOOTEN)  I'll mark as Exhibit 12 a
10  document that was filed in Bankruptcy Court with the
11  Middle District of Alabama.
12          Before I show you this document, I wanted
13  to ask you, is Nicole Kennebeck still an employee of
14  Litton Loan Servicing?
15     A.  No.
16     Q.  Okay.  Do you know approximately when her
17  employment ended?
18     A.  It was this year.
19     Q.  Okay.  What about Bertha Castillo,
20  C-A-S-T-I-L-L-O?
21     A.  Yes.
22     Q.  She is still employed?
23     A.  Yes.
24     Q.  And what is her job description, please,
25  ma'am?

---

Page 100

1      A.  Lead bankruptcy specialist.
2      Q.  Okay.  And she is apparently also a Notary
3  Public for the State of Texas?
4      A.  Yes.
5      Q.  A portion of what she does is notarize
6  affidavits filed in support of motions filed for relief
7  from stay?
8      A.  That's correct.
9      Q.  What was Nicole Kennebeck's job before her
10  employment ended?
11     A.  Vendor relationship manager.
12     Q.  She was no longer in the bankruptcy
13  department, right?
14     A.  Excuse me?
15     Q.  She was no longer working in the bankruptcy
16  department before her termination or employment ended?
17     A.  Yes, she was.
18     Q.  When you say vendor relationship manager, is
19  that a person who communicates with people like LPS
20  Default and Promise?
21     A.  That's correct.
22     Q.  Is that also a person that prepares documents
23  or assists in preparing documents for those outsourced
24  vendors?
25     A.  She had at one time.

**Daphne Mosley**                                    **October 14, 2009**

Page 101

1    Q.  Was she doing that in November of 2007?
2    A.  Yes.
3    Q.  Do you know why her employment came to an end?
4    A.  Relocated.
5    Q.  Okay.  Do you know approximately where she
6    relocated to?
7    A.  The Midwest.
8    Q.  More specific than that?  State, city, area?
9    A.  Wisconsin, Chicago area, Illinois.
10   Q.  She was not employed by any of these other
11   vendors; she was a Litton employee?
12   A.  Correct.
13          (Plaintiff's Exhibit No. 12
14          marked for identification.)
15   Q.  (BY MR. WOOTEN)  I'm going to show you -- and
16   I've got a copy for you too, Robin -- what I've marked
17   as Exhibit 12, which is the Notice of Filing Affidavit
18   in the bankruptcy of my client.  The first page
19   indicates that you are acting as the servicing agent for
20   Deutsche Bank National Trust Company as Trustee for the
21   holders of Finance America Mortgage Loan Trust 2003-1;
22   is that correct?
23   A.  Yes.
24   Q.  And this information also indicates that MERS,
25   which is Mortgage Electronic Registration Systems, Inc.,

Page 102

1    is the nominee.  And I'm not able to tell from that
2    affidavit if they were the nominee for Deutsche Bank or
3    Litton.  Do you know?
4    A.  No.
5    Q.  Is Litton a MERS member?
6    A.  I'm -- I don't know.
7    Q.  What is your understanding of MERS?
8    A.  My understanding of MERS is that it acts as an
9    agent when loans are originated, theoretically so -- to
10   track the assignments.  They act as an agent when the
11   loans are originated, and they will track the ownership
12   of the loan through its course as long as the loan is
13   registered with MERS.
14   Q.  Okay.
15   A.  I think that's right.
16   Q.  And you would agree with me that MERS is an
17   electronic system and that even if a loan is tracked on
18   its system, the actual paper documents control who
19   actually has the rights to the note and the mortgage,
20   right?
21   A.  Correct.
22   Q.  So even if a system -- even if someone is
23   registered as the owner of a loan on the MERS system, it
24   does not mean that the paperwork has been transferred
25   such that ownership has actually changed hands, does it?

Page 103

1    A.  That's correct.
2    Q.  With respect to the attachments to this motion
3    for relief from stay, there is what appears to be a copy
4    of my client's note, which we've just previously marked
5    as Plaintiff's Exhibit 10, correct?
6    A.  Yes.
7    Q.  And, again, you would have filed a true and
8    correct copy of the documents that existed in your loan
9    file with the Court on November 6 of 2007, correct?
10   A.  Yes.
11   Q.  Are there any alonges to this note with this
12   filing?
13   A.  No.
14   Q.  And I want to show you Exhibit 10 and ask you
15   to flip to the last two pages.  There are two alonges
16   present on Exhibit 10, are there not?
17   A.  Yes.
18   Q.  Is there an allonge to Deutsche Bank National
19   Trust Company as Trustee for the holders of Finance
20   America Mortgage Loan Trust 2003-1, Asset-Backed
21   Certificates, Series 2003-1?
22   A.  So are you asking me is there an allonge
23   attached to a name?
24   Q.  I'm asking you is there an allonge attached to
25   Exhibit 10 which appears to transfer the promissory note

Page 104

1    to this particular mortgage loan trust?
2    A.  You said Exhibit 10?
3    Q.  Uh-huh.
4    A.  Yes, there is an allonge there.
5    Q.  Does it transfer this mortgage note to the
6    mortgage loan trust identified in Exhibit 12?
7    A.  No.
8    Q.  It is, in fact, a blank endorsement, isn't it?
9    A.  Yes.
10   Q.  And it is not a document that is attached or
11   affixed to that promissory note, is it?
12   A.  No.
13   Q.  In other words, it is a separate sheet of
14   paper produced that has no indicia or indication that it
15   was ever attached to that promissory note in any manner
16   in which it could not be removed, does it?
17   A.  It doesn't.
18          MS. BEARDSLEY:  Object to the form.  I'm
19   sorry.  Go ahead.
20          MR. WOOTEN:  We're going to stop in just
21   a couple of minutes and take lunch.  I just want to get
22   a few more documents identified before we break.
23   Q.  (BY MR. WOOTEN)  With respect to the mortgage,
24   which is attached to Exhibit 12 and is the -- begins on
25   page 7 of 24 of Exhibit 12, it indicates at the top a

Page 105

1    request to return to Global Lending Group in Clearwater,
2    Florida; is that correct?
3        A. Yes.
4        Q. And the lender in that case is Global Lending
5    Group?
6        A. Yes.
7        Q. And if you flip to the end of this filing, the
8    page 18 of 24 is the signature page of my client; is
9    that correct?
10       A. Yes.
11       Q. Page 19 of 24 appears to be a recorded copy of
12   a mortgage loan assignment from Global Lending Group to
13   Finance America; is that correct? Page 19 of 24.
14       A. That appears to be the case.
15       Q. Do you know who actually owns or owned Finance
16   America?
17       A. No, I don't.
18       Q. What is the date indicated on the -- what we
19   commonly refer to as the side strip of that mortgage
20   assignment on page 19, the date and time on the left
21   side of the document?
22       A. The date is not clear to me, but it's
23   October 2003 --
24       Q. Okay.
25       A. -- at 8:04 a.m.

Page 106

1        Q. And then there is on page 21 what appears to
2    be an additional assignment from Finance America to
3    MERS, and it appears to be dated 10/24 of '03 at
4    8:05 a.m.; is that correct?
5        A. Wait. You said that this -- you said it was
6    from Finance America to MERS?
7        Q. Correct.
8        A. Okay. Yes, it is at 8:05 a.m.
9        Q. So it appears at least that those two
10   documents were sent for recording in Chambers County
11   together, and they were recorded apparently from Global
12   Lending to Finance America and from Finance America to
13   MERS, correct?
14       A. I don't interpret it as Finance America is
15   assigning it to MERS.
16       Q. Okay. Tell me how you interpret it.
17       A. Well, it says -- it looks like it states MERS
18   as nominee for Finance America.
19       Q. Okay. Is the document titled an assignment of
20   mortgage?
21       A. Yes.
22       Q. And does it say that "For value received, the
23   undersigned holder of a mortgage (herein 'Assignor'),
24   whose address is 16802 Ashton Street, Irvine, California
25   92605 -- or 606, does hereby grant, sell, assign,

Page 107

1    transfer, and convey unto Mortgage Electronic
2    Registration Systems, Inc., ('MERS'), organized and
3    existing under the laws of Delaware, a corporation whose
4    address is P.O. Box" -- hard to make that out; looks
5    like -- "2026, Flint, Michigan," and then there's a ZIP
6    code I'm having a problem figuring out. And it says, "A
7    certain mortgage dated July 1st, '03, made and executed
8    by Lorraine Hudson, a single woman, whose address is
9    6603 24th Avenue, Valley, Alabama 36854-4054, to and in
10   favor of Finance America, LLC, upon the following
11   described property situated in Chambers County, State of
12   Alabama"?
13       A. Oh, I see it now.
14       Q. So is that, in fact, apparently an assignment
15   from Finance America to MERS?
16       A. Yes.
17       Q. And then the next page says that it is page 2
18   of 3, and then the next page says that it is page -- I'm
19   sorry.
20          The previous page said 2 of 4, correct,
21   page 22?
22       A. Yes.
23       Q. The Probate Judge's seal or strip at the
24   bottom of the page says page 2 of 4, right?
25       A. Yes.

Page 108

1        Q. And then the next page appears to have a
2    notarization from California by a person named Tuesday
3    Atkins, who says that Susan Martinez appeared before her
4    and executed this assignment, and that's 3 of 4,
5    correct?
6        A. Yes.
7        Q. And there is no 4 of 4 attached to that
8    document, is there?
9        A. No.
10       Q. The last page of that exhibit appears to me to
11   be an assignment from MERS, as nominee for Finance
12   America, to the Deutsche Bank trust that we were just
13   discussing earlier; is that correct?
14       A. Yes.
15       Q. And that document is dated 6/21 of 2007, is it
16   not?
17       A. Yes.
18       Q. Have you had any training or do you have any
19   knowledge or experience about who has the right to make
20   a mortgage assignment?
21       A. No, I don't have any training in that.
22       Q. Does it make sense to you that an entity can
23   only assign what it owns?
24       A. Does it make sense?
25       Q. (Counsel nods head.)

**Daphne Mosley**                                    **October 14, 2009**

Page 109

1    A.  Yes.
2    Q.  Seem pretty simple?
3    A.  Yes.
4    Q.  And wouldn't it seem to require ownership of a
5    mortgage to be able to assign it?
6    A.  Yes.
7    Q.  And you would agree that a mortgage is
8    incident to the promissory note, correct?
9    A.  Correct.
10    Q.  So when you see a mortgage assignment, does it
11    indicate to you that the person who is making the
12    assignment is the owner of the debt at the time the
13    assignment is made?
14        MS. BEARDSLEY:  Object to the form.
15    A.  Can you restate, please.
16    Q.  (BY MR. WOOTEN)  Sure.  I understand you don't
17    have any legal training, and I'm not asking you to make
18    a legal judgment.
19        I'm simply stating that when you see an
20    assignment of mortgage on a given date at a given time,
21    do you interpret that document to mean that on that
22    date, the owner of the mortgage and all that went with
23    it assigned it to the entity that's indicated in the
24    assignment?
25        MS. BEARDSLEY:  Object to the form.

Page 110

1    A.  Yes, it would -- yes, you would assume that
2    the holder of the note is assigning the mortgage.
3    Q.  (BY MR. WOOTEN)  Are you familiar with MERS'
4    rules and regulations at all?
5    A.  No.
6    Q.  Okay.  If MERS' rules and regulations state
7    that the only person who can assign a mortgage in MERS'
8    name is the owner of the debt instrument, you would not
9    have a quibble with that, would you?
10        MS. BEARDSLEY:  Object to the form.  She
11    said she didn't know what their regulations are.
12    Q.  (BY MR. WOOTEN)  I'm asking you if I show you
13    the documents that say that only the owner of the debt
14    may assign the mortgage in MERS' name, you wouldn't
15    quibble with that authority, would you?
16        MS. BEARDSLEY:  Object to the form.
17    Q.  (BY MR. WOOTEN)  You can answer.
18    A.  I mean, no, if that's what their rules are.
19    Q.  Right.  The persons making this assignment in
20    the name of MERS for Finance America on this day,
21    they're all employees of Litton, aren't they?
22    A.  Which one?
23    Q.  The last one, page 24 of 24.
24    A.  Marti Noriega is employed by Litton.
25    Q.  Is that a female or a male?

Page 111

1    A.  That's a female.
2    Q.  She's currently employed by Litton?
3    A.  Yes.
4    Q.  What is her job function?
5    A.  Foreclosure manager.
6    Q.  Foreclosure manager.  Is she an officer of
7    Litton?
8    A.  She's assistant vice president.
9    Q.  Of Litton?
10    A.  Of Litton.
11    Q.  Okay.  What about Monica Hardaway?
12    A.  And what about her?
13    Q.  Do you know if she's still employed with
14    Litton?
15    A.  She is not an employee of Litton.
16    Q.  Okay.  Do you know who Monica Hardaway is?
17    A.  Yes, I know who she is.
18    Q.  Is she a former employee of Litton?
19    A.  I don't know if she has ever been an employee
20    of Litton.
21    Q.  What is your understanding of her employment
22    situation?
23    A.  She works on site at Litton.  For whom, I do
24    not know.
25    Q.  Is it possible she's an LPS employee?

Page 112

1    A.  That could be possible.
2    Q.  Is there a segregated portion of your facility
3    dedicated to LPS employees?
4    A.  No.
5    Q.  Do you know if Monica Hardaway works in the
6    same general part of your building or business that
7    Marti Noriega works in?
8    A.  Yes.
9    Q.  So they are more or less in the same
10    department?
11    A.  That probably is an accurate statement.
12    Q.  Do you know if Marti Noriega is employed by
13    MERS or receives any compensation from MERS?
14    A.  No.
15    Q.  You don't know or she's not?
16    A.  To my knowledge, she is not an employee of
17    MERS.
18    Q.  Is she one of those people that sign one of
19    those forms so she can sign things in the name of MERS?
20    A.  There is documentation giving her authority to
21    sign on behalf of MERS.
22    Q.  And all that documentation says it's subject
23    to the rules of membership of MERS; is that correct?
24    A.  I don't recall what it states, but yes.
25    Q.  Okay.  With respect to -- let me ask you

Page 113

1  generally, the plain language of Exhibit 12 says that
2  Litton is acting as agent for Deutsche Bank in their
3  capacity as trustee for this trust, right?
4      A.  Yes.
5      Q.  So the right to foreclose and enforce a debt
6  would depend on the ownership of the debt, right?
7      A.  Right.
8      Q.  And Litton certainly doesn't claim ownership
9  of the debt.
10     A.  Correct.
11     Q.  Litton is acting in the classic capacity of
12 servicer, right?
13     A.  Yes.
14     Q.  And so all the actions of Litton and Deutsche
15 Bank in this case depend upon Deutsche Bank's contention
16 that they own this loan, right?
17     A.  Correct.
18     Q.  Is there anything in the motion for relief
19 from stay filed that I've marked as Exhibit 12 that
20 indicates that this trust owns this particular mortgage
21 note?
22     A.  No, not -- not as displayed here, no.
23     Q.  And you testified earlier that you had given
24 me everything that you had with respect to any
25 endorsements or alonges to this note, right?

Page 114

1      A.  I said to my knowledge.
2      Q.  Sure.  And if you were requested under legal
3  process to produce those documents, you wouldn't hold
4  any back, especially if they proved you owned the debt,
5  would you?
6      A.  No.
7      Q.  So is it fair to say if they're not present,
8  you don't have them?
9      A.  Not in my custody, no.
10     Q.  Well, custody is an interesting term, isn't
11 it?  Because you have Deutsche Bank in this case acting
12 as the trustee and the custodian, right?
13     A.  Well, I don't know who the custodian is.
14     Q.  Well, we'll talk about that in a minute, but
15 for purposes of this question, just assume that they are
16 the custodian, okay?  There's a real simple form that
17 you can send to the custodian for any of these documents
18 related to the loan, right?  As a matter of fact, it's
19 an electronic request, isn't it?
20         MS. BEARDSLEY:  Object to the form.
21     A.  A request can be made upon custodians for
22 documents, yes.
23     Q.  (BY MR. WOOTEN) And it's not a complicated
24 form, and Litton uses them all the time, right?
25     A.  I have never done it, so I don't know what the

Page 115

1  process is.
2      Q.  So if legal process was served upon Litton
3  asking you to produce these documents, you would produce
4  not only the documents that you had, but whatever
5  documents your principal had reflecting their ownership
6  of this loan, right?
7          MS. BEARDSLEY:  Object to the form.
8      A.  Well, that would depend on what was requested.
9      Q.  (BY MR. WOOTEN)  Proof of ownership of the
10 debt and the form of all endorsements and all allonges,
11 right?
12     A.  Right.
13     Q.  So if the custodian or the trustee had
14 additional documents that tended to support or prove
15 their ownership, you would also be able to access that
16 information by making a request on a form for a release
17 of that information, or your company?
18     A.  Yes.
19     Q.  And everyone in your department knows how to
20 do that or knows someone who knows how to do that,
21 right?
22     A.  Yes.
23     Q.  And Litton certainly doesn't make it a habit
24 of not complying with legal process, right?
25     A.  Correct.

Page 116

1      Q.  So is it fair to say that if you made an
2  inquiry and you requested those documents, you got
3  everything there was?
4      A.  Yes.
5      Q.  One more general question.  If you want to
6  foreclose on a borrower, isn't it a requirement that you
7  have a valid and enforceable mortgage lien?
8      A.  That's correct.
9      Q.  And what is your understanding of the
10 situation where your mortgage lien reflects a different
11 property description than the deed?
12     A.  What is my understanding of that?
13     Q.  Is there any right to foreclose upon a
14 defective legal description?
15     A.  No.
16     Q.  Okay.  You have rights or the lender has
17 rights to seek to have that cured if there's a problem,
18 right?
19     A.  Yes.
20     Q.  They call it a reformation, right?  Is that
21 right?  You reform the description to make it conform to
22 the proper description if it's an honest mistake?
23     A.  Uh-huh.
24         (Plaintiff's Exhibit No. 13
25          marked for identification.)

Page 117

1    Q.  (BY MR. WOOTEN)  Let me show you what I've
2  marked as 168, 169, 170, and 171.  It's a letter from
3  Colleen McCullough of the Sirote firm dated May 8th,
4  2007.
5        And I'll ask you to turn to the second
6  page.  I've highlighted some entries made by her.  Would
7  you please read that into the record.
8    A.  "Documents in Book 2003, Page 3922; Book 2003,
9  Page 3924; Book 2003, Page 2923; and Book 339, Page 132
10  do not fully describe the property."
11        "Also, we will need an assignment from
12  MERS as nominee for Finance America into Deutsche Bank
13  National Trust Company, as trustee.  The assignment will
14  need to include the full name of the applicable trust."
15    Q.  Okay.  And that's in May of 2007, correct?
16    A.  Correct.
17    Q.  And that document says that your legal
18  description is not accurate, doesn't it?
19    A.  Yes, it does.
20    Q.  Do you have any records which indicate that
21  the legal description was ever corrected legally and
22  enforceably after that date?
23    A.  I have not seen any records.
24    Q.  Okay.  Are you aware whether any litigation
25  was commenced in the name of Litton or any party, be it

Page 118

1  Deutsche Bank or Finance America, seeking to reform the
2  description in the mortgage to conform to the
3  description in the deed?  Are you aware of any
4  litigation to that effect?
5    A.  No.
6    Q.  Are you aware of any documents executed by the
7  borrower which would correct the legal description?
8    A.  No, I am not.
9    Q.  What typically happens in a scenario where a
10  closing agent messes up a description such as that and
11  the lien is voided or the lien is unenforceable for some
12  reason?
13    A.  What happens?
14    Q.  (Counsel nods head.)
15    A.  And you say who made the mistake?
16    Q.  The closing agent or attorney who closed the
17  loan, someone other than you.
18    A.  We will make a demand upon the title insurer.
19    Q.  And under the securitization agreements, you
20  would also have the right to have the originator
21  repurchase the loan, wouldn't you?
22    A.  Under what agreement?
23    Q.  Under the trust agreement which formed the
24  Deutsche Bank National Trust Company as trustee mortgage
25  trust called the Finance America Mortgage Loan Trust

Page 119

1  2003-1 --
2    A.  Uh-huh.
3    Q.  -- the trust agreement is referred to as a
4  Pooling and Servicing Agreement.  And within that
5  agreement, there are certain rights to request a loan be
6  repurchased.
7    A.  Uh-huh.
8    Q.  One of those is an impairment to the lien.
9    A.  Uh-huh.
10    Q.  So if there is a contractual agreement
11  authorizing Deutsche Bank or Litton to request the loan
12  be repurchased because of an impairment of title, that
13  would also be a remedy for Litton and Deutsche Bank
14  short of suing Lorraine Hudson to try to have that title
15  reformed, right?
16    A.  Yes.
17    Q.  And you would have the right to claim on the
18  title insurance, right?
19    A.  Yes.
20    Q.  But you wouldn't have the right to foreclose,
21  would you?
22    A.  No.
23        MR. WOOTEN:  Let's break for lunch
24  because of where we are.  And if y'all want to take a
25  short lunch, like 30 minutes or so, and then we'll try

Page 120

1  to move on to some of the other stuff, okay?
2        (Recess taken from 11:46 a.m. to
3        12:32 p.m.)
4        (Plaintiff's Exhibit No. 14
5        marked for identification.)
6    Q.  (BY MR. WOOTEN)  I'm going to show you what
7  I've marked as Plaintiff's Exhibit 14 and ask if you can
8  tell me what the contents of that document are, what
9  that's supposed to represent.
10    A.  It looks like it's a screen shot of a
11  bankruptcy page.
12    Q.  Okay.  Is that a complete representation of
13  all the data that's available to Litton on that screen
14  shot?
15    A.  No, it isn't.
16    Q.  What else is available to Litton that's not
17  present there?
18    A.  Well, there should be some data here regarding
19  the filing, but it's not here.
20    Q.  Okay.  Are there some attachments to that
21  document?
22    A.  Yes.
23    Q.  Are those attachments numbered sequentially to
24  the first page?
25    A.  Yes.

**Daphne Mosley**                                    **October 14, 2009**

Page 121

1    Q.  What is contained in the pages following that
2  first page of that exhibit?
3    A.  It looks like it's a modified version of the
4  payment history.
5    Q.  Okay.  And tell me every way it is modified.
6    A.  Well, it's not as -- in detail as the detailed
7  transaction history.
8    Q.  I'm going to hand you back -- this is
9  Exhibit 12 and a copy, if you'll take a look at that.  I
10  want to talk to you about the terms of this mortgage.
11        Just a minute.  Let me dig around and
12  find my forms.  There we go.
13        If you would -- and I'm going to mark
14  this as Plaintiff's Exhibit 15.
15        (Plaintiff's Exhibit No. 15
16        marked for identification.)
17    Q.  (BY MR. WOOTEN)  I'll just ask you to verify
18  that this is a true and exact copy of my client's
19  mortgage.  And I'll -- we'll go over that stuff in a
20  minute.  I just want to make sure that you agree that's
21  all the pages of the mortgage and it agrees with the
22  number of pages and things that are contained in the
23  previously marked exhibit.  I believe it's No. 12.
24    A.  Yes.
25    Q.  All right.  If you would, would you flip over

Page 122

1  to page 3 of 12 under the uniform instrument markings,
2  which would start with -- it says Uniform Covenants
3  about the fourth paragraph down.
4    A.  Okay.
5    Q.  Are you able to see that okay?  If you're like
6  me, you'll need to put your glasses on.  That's why I
7  had to highlight mine.
8        The first sentence of that paragraph
9  says -- under No. 1, says, "The borrower shall pay when
10  due the principal of, and interest on, the debt
11  evidenced by the note and any prepayment charges and
12  late charges due under the note."
13        Is that right?
14        Are you able to see that from that
15  document?
16    A.  Barely.
17    Q.  Okay.  Let me see if I have another copy of
18  this that might be more visible.  It's kind of hard to
19  make out, I know.  That's the bad thing about these
20  depositions.  There's so many documents in them, it's
21  hard to keep up.  Let me see if my copy is any better.
22        Just a second and I will go over these
23  piece by piece.  I apologize.  I didn't anticipate this
24  problem, or I would have already had these copied.
25        Did your company ever have any

Page 123

1  communications about defects in the actual documents as
2  far as conveyancing documents between parties such as
3  sellers and purchasers?
4        MS. BEARDSLEY:  Object to the form.
5    A.  Do we have what?
6    Q.  (BY MR. WOOTEN)  Do you ever have any
7  conversations, notes, communications addressing defects
8  in the transfer of ownership of documents between the
9  sellers of mortgages and the owners of mortgages?
10    A.  You mean on this particular loan or on any
11  loans?
12    Q.  Just in general.
13    A.  That --
14        (Plaintiff's Exhibit No. 15 re-marked
15        for identification.)
16    Q.  (BY MR. WOOTEN)  I'm going to let you take
17  that one.  I'm sorry.  I didn't mean to interrupt you.
18    A.  Yeah, that -- there is generally some type of
19  document memorializing that.
20    Q.  If you find a problem such as what we found
21  earlier, the defect in a legal description, right?
22    A.  Right.
23    Q.  And typically the servicer has a protocol on
24  how to handle that, right?
25    A.  Right.

Page 124

1    Q.  I want to hand you the document that I marked
2  up so we can talk about these in a particular order.
3  The first paragraph under Uniform Covenants numbered 1,
4  the first sentence says, "Borrower shall pay when due
5  the principal of, and interest on, the debt evidenced by
6  the note and any prepayment charges and late charges due
7  on the note," right?
8    A.  Yes.
9    Q.  Okay.  Other than that sentence in that
10  paragraph, is there reference made to any other amounts
11  that the borrower will pay under the note or under the
12  mortgage?
13    A.  No, not in that sentence.
14    Q.  Okay.  What about the rest of that paragraph?
15    A.  No.
16    Q.  Okay.  The second paragraph -- I think it
17  starts with maybe the first sentence highlighted in
18  green; is that correct?
19    A.  Yes.
20    Q.  And that sentence says, "Payments are deemed
21  received by lender when received at the location
22  designated in the note or at such other location as may
23  be designated by lender in accordance with the notice
24  provisions in Section 15," correct?
25    A.  Yes.

**Daphne Mosley**                                    October 14, 2009

Page 125

1    Q.  So under the contract, when a client pays a
2   mortgage payment, such as Ms. Hudson, it is deemed
3   received when it is received in the mail, even if it is
4   not the date it is posted to the account, right?
5    A.  Yes.  Well, it states that it's deemed
6   received by lender when received at the location, so --
7    Q.  So wherever you tell the borrower to mail,
8   when it's received in the mail, it's deemed received,
9   right?
10       (Interruption.)
11       MR. WOOTEN:  Off the record for a minute.
12       (Discussion off the record.)
13    Q.  (BY MR. WOOTEN)  Does your company track
14  independently when payments are received versus when
15  payments are posted to mortgage accounts?
16    A.  Yes, I believe so.
17    Q.  Okay.  Any of the records that you presented
18  today, such as Plaintiff's Exhibit 1, indicate when a
19  payment is received versus when a payment is posted?
20       Let me take a look at this.  I just want
21  to check something.  Why don't you take a look at that.
22    A.  It's not on here.
23    Q.  Okay.  And that is the internal accounting
24  records or the internal life of the loan transaction
25  history generated by your software, right?

Page 126

1    A.  Yes.
2    Q.  And it does not indicate any distinction
3   between the date in which a transaction is received and
4   the date on which it's posted.
5    A.  Exhibit 1 does not reflect that.
6    Q.  Where in Litton's records would you be able to
7   ascertain that information?
8    A.  It would be available in LSAMS.
9    Q.  LSAMS?
10    A.  Yes.
11    Q.  Is there a special field for that?
12    A.  I don't know if there's a special field.  I
13  guess it's a view -- I guess, how you
14  look at the loan.  It kind of depends on what you see,
15  so there may be -- I think there's a different view on
16  the system that displays that information.
17    Q.  Okay.  Is there anything in any of the
18  documents you've produced today regarding a payment
19  history that would show us when my client's payments
20  were received versus when they were actually posted to
21  her account?
22    A.  Not that I know of.
23    Q.  Are you familiar with whether or not a
24  borrower's payments are credited when received or
25  credited when applied?

Page 127

1    A.  They are credited as of the date of receipt.
2    Q.  Okay.  Irrespective of how long they are held
3   unapplied by your company?
4    A.  That's correct.
5    Q.  Does your company assess to the account
6   charges, either late fees or any other type of fee,
7   where money is held but not applied?
8       MS. BEARDSLEY:  Object to the form.
9    Q.  (BY MR. WOOTEN)  In other words, if the 15th
10  is the late payment -- it's late on the 15th, and that's
11  the day you're supposed to charge your late fee and the
12  borrower's payment is received on the 10th, but you
13  don't post until the 18th, would the borrower be charged
14  a late fee in that circumstance?
15    A.  They should not be.
16    Q.  Do you know if that occurs or not?
17    A.  Not to my knowledge.
18    Q.  Are you the person who would know that
19  information?
20    A.  Well, I routinely review payment histories,
21  so --
22    Q.  Are you familiar with how software that your
23  company uses is programmed to manage that situation?
24    A.  No.
25    Q.  Do you know who's actually in charge of

Page 128

1   programming the software for those types of functions?
2       MS. BEARDSLEY:  Object to the form.
3    A.  No.
4    Q.  (BY MR. WOOTEN)  Do you know what department
5   would be responsible for that?
6       MS. BEARDSLEY:  Object to the form.
7    A.  Regarding -- regarding programming, period,
8   that would be done within the information technology
9   group.
10    Q.  (BY MR. WOOTEN)  Who's in charge of that
11  group?
12    A.  Jeff Roberts.
13    Q.  Jeff Roberts?
14    A.  Yes.
15    Q.  Do you know what his title is?
16    A.  Chief technology officer.
17    Q.  Okay.  The second sentence of that
18  paragraph -- I've -- it's highlighted in orange -- says,
19  "Lender may return any payment or partial payment if the
20  payment or partial payments are insufficient to bring
21  the loan current.  Lender may accept any payment or
22  partial payment insufficient to bring the loan current,
23  without waiver of any rights hereunder or prejudice to
24  its rights to refuse such payment or partial payments in
25  the future, but lender is not obligated to apply such

Page 129

1  payments at the time such payments are accepted."
2        Is that where that orange highlighting
3  ends?
4      A.  Yes.
5      Q.  Okay.  I read that to say that if you get an
6  irregular payment, something that's short, something
7  that's over, you can pretty much do what you want to
8  with it.  Is that more or less how you read that?
9        MS. BEARDSLEY:  Object to the form.
10     A.  That's a good assessment of it.
11     Q.  (BY MR. WOOTEN)  It gives you flexibility.  Is
12  that fair?
13     A.  Yes.
14     Q.  Would you agree that your flexibility might be
15  further limited by either your servicing agreement or
16  industry standards?
17        MS. BEARDSLEY:  Object to the form.
18     A.  No, I'm not really qualified to speak to that.
19     Q.  (BY MR. WOOTEN)  Okay.  What about compliance
20  with law?  If the law says that you must do certain
21  things with respect to partial payments, you would agree
22  that that would be binding on your company irrespective
23  of that clause in the contract?
24        MS. BEARDSLEY:  I'm going to object to
25  the form.  She's not going to be able to give you a

Page 130

1  legal opinion.
2      Q.  (BY MR. WOOTEN)  Well, your company will
3  follow the law with respect to the application of
4  payments, right?
5        MS. BEARDSLEY:  I still object to the
6  form.
7      A.  Do you want me to answer?
8      Q.  (BY MR. WOOTEN)  (Counsel nods head.)
9      A.  I guess that would depend on if the law,
10  whoever or whatever that is, supersedes this document
11  here.
12        (Plaintiff's Exhibit No. 16
13         marked for identification.)
14     Q.  (BY MR. WOOTEN)  Let me show you what I've
15  marked as Plaintiff's Exhibit 16, and I'll represent to
16  you that this is a copy of Regulation AB, which is
17  promulgated by the Securities and Exchange Commission --
18     A.  Okay.
19     Q.  -- dealing with the administration of
20  securitized assets, okay?
21     A.  Okay.
22     Q.  I ask you to turn to the page numbered 1613 of
23  that document, and that page number will be found at the
24  upper right.
25        Okay.  There is a subheading in the left

Page 131

1  column numbered Section 229.1122, and it says,
2  "Compliance with applicable servicing criteria."  Do you
3  see that heading?
4      A.  Uh-huh.
5      Q.  In the bottom of the middle column, at the
6  very bottom with the number 2, it says, "Cash Collection
7  and Administration."  Do you see that heading?
8      A.  Yes.
9      Q.  Would you read the item numbered 1 in that
10  heading.
11     A.  "Payments on pool assets are deposited into
12  the appropriate custodial bank accounts and related bank
13  clearing accounts no more than two business days of
14  receipt, or such other number of days specified in the
15  transaction agreements."
16     Q.  Okay.  With respect to -- if you will flip
17  over to the next page.  Do you see the number in the
18  first column on the left numbered 4?  It says, "Pool
19  asset administration."
20     A.  Can you confirm the page number, please.
21     Q.  1614.
22     A.  Okay.
23     Q.  Do you see that item?
24     A.  No.  Can you repeat.
25     Q.  Yeah.  It's in the first column, the left

Page 132

1  column.  Item No. 4 right above midway down, it says,
2  "Pool asset administration."
3      A.  Yes.
4      Q.  And right under No. 1, what does that heading
5  say?  The Roman numeral I.  I'm sorry.  Right after the
6  "Pool asset administration" title.
7        MS. BEARDSLEY:  There's not a heading.
8        MR. WOOTEN:  There's a Roman numeral I.
9        MS. BEARDSLEY:  There's not a Roman
10  numeral I.
11     Q.  (BY MR. WOOTEN)  Page 1614, you see No. 4 that
12  says "Pool asset administration"?
13     A.  Uh-huh.
14     Q.  Let me look at that.  I'm sorry.
15        MS. BEARDSLEY:  There's a little 1.  It's
16  not a Roman numeral.
17     Q.  (BY MR. WOOTEN)  This is where I'm at, right
18  there (indicating), No. 1.  Looking at that paragraph
19  right there, it says, "Collateral."
20     A.  Okay.
21     Q.  If you will, what does that entry besides that
22  small number 1, i, whatever you want to call that -- I
23  called it a Roman numeral I.  I apologize.  It begins
24  with "Collateral or security."
25        What does that paragraph say?

**Daphne Mosley**                                    **October 14, 2009**

Page 133

1     A.   "Collateral or security on pool assets is
2   maintained as required by the transaction agreements or
3   related pool asset documents."
4     Q.   Okay.  And then under the section, it says,
5   (iv), which I would have interpreted as Roman numeral
6   IV, what does that paragraph say?
7     A.   "Payments on pool assets, including any
8   payoffs, made in accordance with the related pool asset
9   documents are posted to the applicable servicer's
10   obligor records maintained no more than two business
11   days after receipt, or such other number of days
12   specified in the transaction agreements, and allocated
13   to principal, interest, or other items (e.g., escrow) in
14   accordance with the related pool asset documents."
15     Q.   Okay.  And then in the middle column, a little
16   below halfway down, there is a paragraph that begins
17   with (xiii), which I would interpret as Roman numeral
18   XIII.  Can you read that paragraph, please.
19     A.   "Disbursements made on behalf of an obligor
20   are posted within two business days to the obligor's
21   records maintained by the servicer, or such other number
22   of days specified in the transaction agreements."
23     Q.   Okay.  With respect to those activities
24   regarding the management of securitized assets, do you
25   have an opinion or do you know whether or not your

Page 134

1   company complies with those criteria?
2         MS. BEARDSLEY:  I'm going to object.
3   Nick, she's not going to give you an answer on a legal
4   conclusion.  I mean --
5         MR. WOOTEN:  I'm just asking her if she
6   has any information, Robin.  I'm certainly not --
7         MS. BEARDSLEY:  You asked if she has an
8   opinion about it.
9         MR. WOOTEN:  -- certainly not asking her
10   if she knows if -- well, let me rephrase the question.
11         MS. BEARDSLEY:  Yeah.  I'm not going to
12   allow her to answer questions interpreting legal
13   documents.
14     Q.   (BY MR. WOOTEN)  Do you know if your company
15   has any systems or procedures in place to comply with
16   those requirements?
17     A.   To my knowledge, they do.
18     Q.   Okay.  And that is just based on your general
19   understanding of the company's business?
20     A.   Yes.
21     Q.   And you would agree that those sections
22   mentioned require payments to be posted within two days
23   of receipt; is that right?
24         MS. BEARDSLEY:  I'm not going to allow
25   her to interpret what's said in these documents, Nick.

Page 135

1   I mean, it says what it says, but I'm not going to allow
2   her to answer questions interpreting it.
3     Q.   (BY MR. WOOTEN)  Do you know anyone in your
4   company who would have any familiarity with these types
5   of legal requirements for the servicing operations?
6     A.   Yes.
7     Q.   Who would that be?
8     A.   Kathryn Bartz.
9     Q.   Can you spell her name -- her last name for
10   us.
11     A.   B-A-R-T-Z.
12     Q.   And what's her position?
13     A.   She's the vice president of compliance.
14     Q.   Do you know if she's an attorney?
15     A.   I do not know.
16     Q.   And she currently holds that position?
17     A.   Yes, she does.
18     Q.   Do you know how long she's held that position?
19     A.   I know at least three years.
20     Q.   Okay.  Other than Ms. Bartz, is there anyone
21   you know who might have information about how the
22   company -- what steps and actions they take to comply
23   with those requirements?
24     A.   No.
25     Q.   Does your company recognize any document

Page 136

1   custodial procedures as authoritative or industry
2   standards?
3         MS. BEARDSLEY:  Object to the form.
4     A.   I don't know if I know what that -- what
5   you're asking.
6     Q.   (BY MR. WOOTEN)  Are you aware of any industry
7   standards regarding document custodial procedures or the
8   requirements of a document custodian?
9         MS. BEARDSLEY:  Object to the form.
10     A.   No.
11     Q.   (BY MR. WOOTEN)  In the absence of a specific
12   agreement regarding those actions, would your company
13   typically refer to guidance provided by entities such as
14   Fannie Mae and Freddie Mac?
15     A.   Yes, that is possible.
16     Q.   Is it true that Fannie Mae and Freddie Mac are
17   typically considered industry standards with respect to
18   the activities of mortgage lending and servicing?
19         MS. BEARDSLEY:  Object to the form.
20     A.   Can you repeat the question, please.
21     Q.   (BY MR. WOOTEN)  Sure.  Is it -- are the
22   entities commonly referred to as Fannie Mae and Freddie
23   Mac typically considered to be publishers of the
24   industry standards for the activities related to
25   mortgage lending and mortgage servicing?

Case 10-01172-DWH   Doc 22-2   Filed 11/01/10   Entered 11/01/10 15:55:35   Desc
Deposition of Daphne Mosley   Page 35 of 104
**Daphne Mosley**                                    **October 14, 2009**

35 (Pages 137 to 140)

Page 137

1      MS. BEARDSLEY: Object to the form.
2      A. Yeah, I don't -- I don't know.
3      Q. (BY MR. WOOTEN) Okay. Do you know who in
4  your firm or business would be able to identify any
5  source of industry standards that they believe would
6  apply in the absence of specific instructions?
7      A. I would say that would be Kathryn Bartz.
8      Q. Okay. Back to the mortgage document, there's
9  another paragraph, I think a portion of that paragraph
10  that's highlighted in yellow, and I think that last
11  sentence of that section deals with the statement -- or
12  last two sentences, which says, "Lender may hold such
13  unapplied funds until borrower makes payment to bring
14  the loan current. If borrower does not do so within a
15  reasonable period of time, lender shall either apply
16  such funds or return them to borrower."
17      Is that where the highlighting ended on
18  that statement?
19      A. Yes.
20      Q. Do you know if there are any standards that
21  your company sets as a reasonable time for a cure by a
22  borrower?
23      A. No.
24      Q. Do you know who would have that information?
25      A. No, I don't.

Page 138

1      Q. Look at paragraph No. 2 for me, please. The
2  title of that paragraph is: Application of payments or
3  proceeds. Is that correct?
4      A. Yes.
5      Q. Does that paragraph set forth the priority for
6  which money is applied to a loan when it is paid under
7  this agreement?
8      A. Yes.
9      Q. And what is the order, according to this
10  mortgage, by which funds should be applied?
11      A. Interest due under the note, principal due
12  under the note, amounts due under Section 3.
13      Q. Okay. Jump down, if you will, to Section 3.
14  And what is the heading of that paragraph?
15      A. "Funds for escrow items."
16      Q. And does that paragraph indicate what items
17  are considered escrow items?
18      A. Yes.
19      Q. Okay. And what items are considered escrow
20  items under paragraph 3?
21      A. "Taxes and assessments and other items which
22  can attain priority over this security instrument as a
23  lien or encumbrance on the property; leasehold payments
24  or ground rents on the property, if any; premiums for
25  any and all insurance required by lender under

Page 139

1  Section 5; and mortgage insurance premiums, if any, or
2  any sums payable by borrower to lender in lieu of the
3  payment of mortgage insurance premiums."
4      Q. Okay. Is there any portion of paragraph 3
5  that deals with the assessment or application of any
6  type of fee or charge other than those specifically
7  delineated?
8      And let me ask a better question. Does
9  paragraph 3 provide any mechanism to apply any charge or
10  fee not specifically listed to the escrow account of the
11  borrower?
12      A. Can you say that again. Does it --
13      Q. In other words, no item such as late charges
14  BPO fees, property inspections, anything like that,
15  should ever be applied to an escrow account, right?
16      A. Correct.
17      Q. And we talked about earlier today that escrow
18  accounts are governed and controlled by the federal law
19  that's commonly referred to as RESPA, right?
20      A. Yes.
21      Q. And that also sets forth the limitations on
22  what can be included in an escrow account, right?
23      A. Yes.
24      Q. With respect to any other amounts -- when it
25  talks about amounts which can attain priority, those are

Page 140

1  things like condo association fees, homeowner dues,
2  things of that nature, which the borrower has granted
3  someone the right to come in and foreclose if it's
4  unpaid, correct?
5      A. Yes.
6      Q. And those are items that you can and do in
7  instances include in escrow, right?
8      A. Yes.
9      Q. Okay. With respect to -- going back to
10  paragraph 2 for a minute, after the sentence that ended
11  with the heading of C that says, "Amounts due under
12  Section 3," the rest of that paragraph says, "Such
13  payments shall be applied to each periodic payment in
14  the order in which it became due. Any remaining" --
15  tell me what that word is, because mine's a little
16  blurred. "Any remaining amounts" --
17      A. Yes.
18      Q. -- "shall be applied first to late charges,
19  second to any other amounts due under this security
20  instrument, and then to reduce the principal balance of
21  the note"; is that correct?
22      A. Correct.
23      Q. Is there anything in that paragraph that
24  allows that payment priority to be changed from those
25  items specifically set forth therein?

**Daphne Mosley**                                    October 14, 2009

36 (Pages 141 to 144)

Page 141

1    A.   No, not in this paragraph.
2    Q.   Okay.  On the next page of the mortgage on the
3  uniform -- it's page No. 4 of 12 of the uniform
4  instrument, the first full paragraph about halfway down
5  the page is a highlighted sentence that says, "Lender
6  may, at any time, collect and hold funds in an amount
7  sufficient to permit lender to apply the funds at the
8  time specified under RESPA, and not to exceed the
9  maximum amount a lender can require under RESPA,"
10  correct?
11    A.   Yes.
12    Q.   Okay.  That basically addresses the -- your
13  right to set an annual escrow amount to cover the
14  ordinary and necessary expenses that you're escrowing
15  for, correct?
16    A.   Correct.
17    Q.   On the next page, there is a paragraph 5
18  dealing with property insurance.  And is it fair to say
19  the first portion of that paragraph deals with types of
20  insurance that the lender's able to require the borrower
21  to keep in place?
22    A.   Yes.
23    Q.   And that includes loss by fire and then other
24  things like earthquakes and floods, depending on the
25  location of the property?

Page 142

1    A.   Correct.
2    Q.   The next paragraph deals with what happens if
3  a borrower fails to provide that coverage; is that
4  correct?
5    A.   Yes.
6    Q.   And in the first sentence of that paragraph,
7  it gives you the right to obtain that coverage for the
8  borrower if it's absent; is that correct?
9    A.   Correct.
10    Q.   With respect to the forced placed insurance
11  that was placed on Ms. Hudson's account, is there any
12  relationship between your firm and the companies which
13  provided that insurance?
14    A.   Can you define relationship?
15    Q.   Well, I've heard it characterized a lot of
16  ways in these cases, but I guess the primary thing I'm
17  concerned about is whether or not your firm has any
18  compensation arrangement with these entities for placing
19  this insurance.
20    A.   No.
21    Q.   Your firm does not have anyone on staff who is
22  an agent of any of these companies?
23    A.   Not that I know of.
24    Q.   Okay.  Did you already tell me who managed the
25  insurance department for your firm?

Page 143

1    A.   Yes, I did.
2    Q.   All right.  And would she know more about the
3  relationships between your firm and those insurance
4  companies than you do as we sit here today?
5    A.   Yes, she will.
6    Q.   Are you certain that no one in your firm is an
7  agent of any of these providers, or is that just your
8  best information?
9    A.   That's my best information.
10    Q.   Do you know whether or not any commissions are
11  paid either to your firm or any person affiliated with
12  your firm for the placement of this insurance?
13    A.   Not to my knowledge.
14    Q.   Later on in that paragraph, there's another
15  highlighted section down toward the bottom.  Does it
16  begin with "Any amounts distributed by lender -- or
17  disbursed by lender"?
18    A.   Yes.
19    Q.   And it basically -- those couple of sentences
20  say, "Any amounts disbursed by lender under this
21  Section 5 shall become additional debt of the borrower
22  secured by this security instrument.  These amounts
23  shall bear interest at the note rate from the date of
24  disbursement and shall be payable, with such interest,
25  upon notice from the lender to the borrower requesting

Page 144

1  payment," right?
2    A.   Right.
3    Q.   Okay.  Are you familiar at all with RESPA law?
4         MS. BEARDSLEY:  I'm going to -- she's --
5    Q.   (BY MR. WOOTEN) I mean, just --
6         MS. BEARDSLEY:  Object to the form.
7    Q.   (BY MR. WOOTEN) -- are you familiar with the
8  requirements of RESPA dealing with forced placed
9  insurance?
10    A.   No.
11    Q.   This instrument indicates that you can request
12  payment from the borrower pretty much at any time for
13  the amount due with interest, right?
14    A.   Right.
15    Q.   And that would be the lump sum amount of
16  what's due, correct?
17    A.   Well, I don't know if it's lump sum, but --
18    Q.   In the accounting history you provided to us,
19  it's charged as lump sum to the borrower's account,
20  correct?
21    A.   You mean the disbursement?
22    Q.   Right.
23    A.   Yes.
24    Q.   Okay.  And this paragraph indicates that it
25  becomes additional debt, right?

**Daphne Mosley**                                    **October 14, 2009**

Page 145

1    A.  Yes.
2    Q.  With respect to escrow items, isn't it a fact
3  that those escrow items are required to be financed or
4  paid out over a 12-month period?
5    A.  I'm not sure I understand what you're saying.
6    Q.  RESPA generally requires that you take the
7  amounts that are due and spread it out over 12 monthly
8  installments so that the borrower pays the amounts due
9  for that year in that 12-month window, correct?
10      MS. BEARDSLEY:  Object to the form.
11    A.  Yes.
12    Q.  (BY MR. WOOTEN)  Okay.  So amounts charged for
13  forced placed insurance under your agreement become
14  additional debt, right?
15    A.  Yes.
16    Q.  And it says you can demand full payment with
17  interest, right?
18    A.  Yes.
19    Q.  RESPA does not allow you to charge interest to
20  a borrower for items being escrowed, does it?
21    A.  Not to my knowledge.
22    Q.  So is it fair to say that forced placed
23  insurance, according to the terms of this paragraph,
24  should be included in fees and charges to the borrower
25  rather than RESPA -- or escrow items?

Page 146

1      MS. BEARDSLEY:  Object to the form.
2    A.  Can you repeat that.
3    Q.  (BY MR. WOOTEN)  Sure.  We talked about the
4  fact that RESPA does not allow you to charge interest to
5  the borrower for the terms that are paid out over 12
6  months, right?
7    A.  Right.
8    Q.  And so if you are charging interest and making
9  a demand for full payment of this charge, that is a fee;
10  it is not an amount included in escrow, right?
11    A.  Well, I don't know.
12    Q.  But your firm does treat forced placed
13  insurance as an escrow item in its accounting, correct?
14    A.  Yes, it does.
15    Q.  Do you know what the escrow balance of
16  Lorraine Hudson's loan would be if forced placed
17  insurance was not charged to her escrow account?
18    A.  No, I don't.
19    Q.  Do you know how many years' premium of forced
20  placed insurance have been charged to her escrow
21  account?
22    A.  Four or five.
23    Q.  Do you know how much interest has been charged
24  to her account as a result of those charges?
25    A.  None.

Page 147

1    Q.  So you are not charging interest per the
2  contractual agreement for those amounts?
3    A.  No.
4    Q.  Do you know if you have ever told Ms. Hudson
5  in writing pursuant to RESPA that she has the right to
6  pay that insurance out over 12 months?
7    A.  Yes, I believe we have.
8    Q.  The forced placed insurance.
9    A.  I know Ms. Hudson was provided escrow
10  analysis.
11    Q.  Okay.
12    A.  And so those statements are going to reflect
13  whatever -- you know, the calculation is going to
14  include whatever advance is due on the loan.
15    Q.  Sure.  Do you know if those statements
16  provided to Ms. Hudson a description of why her escrow
17  was in a negative balance and why the escrow amount was
18  the amount -- let me back up and break that down.  It's
19  a little bit too complex even for me.
20      Do you know why -- if the escrow analysis
21  provided annually pursuant to RESPA, if it broke out all
22  the charges that made up the balance of her escrow
23  deficiency?
24    A.  I can't answer that.  I don't recall.
25    Q.  Typically your escrow analysis would show the

Page 148

1  amount of deficiency plus the amount to pay the next
2  year, and that would be divided by 12, right?
3    A.  Yes.
4    Q.  Isn't it true under RESPA that when the escrow
5  changes significantly that you are required to provide a
6  written notice to the borrower explaining the change in
7  the escrow terms so that they can adjust their payment?
8      MS. BEARDSLEY:  Object to the form.
9    A.  I don't know what RESPA states in that regard.
10    Q.  (BY MR. WOOTEN)  Are you familiar with your
11  company's practices in that regard?
12    A.  Somewhat.
13    Q.  Do you know if they do that?
14    A.  I know prior to us obtaining lender placed
15  insurance, the customer is notified that such insurance
16  is necessary.  They also provide a letter advising what
17  their premium amount will be should Litton purchase such
18  insurance prior to the policy actually being obtained.
19    Q.  All right.  Once it's obtained and you charge
20  this amount to their escrow account, is there a writing
21  issued that says "Your old escrow payment was X; your
22  new payment is Y, and here's the reason that your escrow
23  changed"?
24    A.  I don't -- to my knowledge, there isn't a
25  standard notification that goes out in that regard other

**Daphne Mosley**                                              **October 14, 2009**

Page 149

1    than the analysis.
2         Q.  And if we requested all of your correspondence
3    in your system with our -- with my client and you
4    responded that you'd provided that, it would include any
5    documents that you had sent of that nature regarding
6    RESPA compliance and that sort of thing, right?
7         A.  Yes.
8         Q.  And you have not withheld any documents
9    related to that for this case, have you?
10        A.  I have not.
11        Q.  Or your company has not?
12        A.  No.
13        Q.  Would you flip over to -- I think it's the
14   next page under paragraph No. 7.  That deals with the
15   heading called Preservation, Maintenance, and Protection
16   of the Property; is that correct?
17        A.  Yes.
18        Q.  And that says that the borrower covenants not
19   to destroy, damage, or impair the property or allow the
20   property to deteriorate or commit waste on the property.
21   Is that a fair statement?
22        A.  Yes.
23        Q.  And it also says, the next paragraph, that the
24   "Lender or its agent may make reasonable entries upon
25   and inspections of the property.  If it has reasonable

Page 150

1    cause, lender may inspect the interior of the
2    improvements on the property.  Lender shall give
3    borrower notice at the time of or prior to such an
4    interior inspection specifying such reasonable cause,"
5    right?
6         A.  Yes.
7         Q.  Is there anything in this paragraph
8    authorizing inspections of the property merely because
9    the borrower's in default?
10        A.  No.
11        Q.  Are you aware of any industry standards
12   regarding when a servicer should inspect a property?
13        A.  No.
14        Q.  Are you aware of whether or not there are any
15   agreements between Litton Loans and the investor to be
16   reimbursed for the cost of any inspections?
17        A.  No.
18        Q.  You are not aware of any?
19        A.  No.
20        Q.  Do you know if there may be agreements of that
21   nature that you just have not seen or reviewed?
22        A.  That's correct.  They may be available.  I
23   just don't have knowledge nor have I reviewed them.
24        Q.  Sort of a similar issue to the broker price
25   opinion, if these inspections are at the request of the

Page 151

1    investor and the investors agree to pay for them, would
2    it be proper to ask the borrower to pay for them a
3    second time?
4         A.  No.
5         Q.  Take a look down at paragraph 9 for me,
6    please.  That is a paragraph dealing with the lender's
7    rights in property under the mortgage in the event of a
8    breach of covenant or a default, right?
9         A.  Right.
10        Q.  What does the first highlighted portion of
11   that paragraph say?
12        A.  "If (a) borrower fails to perform the
13   covenants and agreements contained in this security
14   instrument" -- keep going?
15        Q.  Sure.
16        A.  -- "there is a legal proceeding that might
17   significantly affect lender's interest in the property
18   and/or rights under this security instrument (such as a
19   proceeding in bankruptcy, probate, for condemnation or
20   forfeiture, for enforcement of a lien which may attain
21   priority over this security instrument or to enforce
22   laws or regulations."
23        Q.  Okay.  With respect to -- the next section
24   deals with whether or not the borrower has abandoned the
25   property; is that correct?

Page 152

1         A.  Yes.
2         Q.  So under that section, it sets forth three
3    specific areas where you're authorized to act to protect
4    your interests, right?
5         A.  Right.
6         Q.  And with respect to Ms. Hudson's loan, you
7    would agree that we're dealing merely with a proceeding
8    in bankruptcy, right?
9         A.  Right.
10        Q.  And you would agree that your actions with
11   respect to things done on your behalf would arise only
12   out of protecting your interest in the lien, which is
13   securing payment for your note, right?
14        A.  Yes.
15        Q.  So what you'd be looking for is things like
16   statements in the bankruptcy plan that says "I don't owe
17   you any money; you don't have a lien," right?  I mean,
18   as a threshold matter, you want to make sure that the
19   borrower is not doing anything to say that you don't
20   have the right to a lien, correct?
21        A.  Yes.
22        Q.  And then the next thing you'd be looking for
23   is whether or not you were entitled to relief from stay
24   because of either a violation of the plan or failure to
25   make post-petition payments or something of that nature,

Case 10-01172-DWH    Doc 22-2    Filed 11/01/10    Entered 11/01/10 15:55:35    Desc
Deposition of Daphne Mosley    Page 39 of 104
**Daphne Mosley**                                    October 14, 2009

39 (Pages 153 to 156)

| Page 153 | Page 155 |
|---|---|

Page 153

1  right?
2      A.  Right.
3      Q.  There is nothing else in paragraph 9 with
4  respect to those three rationales other than the fact
5  that the client is in Chapter 13 that apply in
6  Ms. Hudson's situation, right?
7          And I'm talking about heading A, B, or C.
8      A.  Right.
9      Q.  With respect to the next portion of that
10  paragraph dealing with what your rights are in the event
11  that one of those three areas of authority come up,
12  would you agree that basically that clause then states
13  that you have the right to step in and do -- it sets
14  forth subheadings under A, B, and C in that next
15  sentence; is that correct?
16      A.  Yes.
17      Q.  And that includes the right to pay off, for
18  instance, a homeowner's dues that's not paid so that
19  they don't foreclose on your property, right?
20      A.  Right.
21      Q.  Or to show up in court and explain why you
22  have a lien, right?
23      A.  Right.
24      Q.  Or to pay costs for an attorney to appear in
25  court, and that deals with things like we talked about

Page 154

1  earlier; if the client says -- or the borrower says,
2  "Hey, you don't have a lien because I filed bankruptcy,"
3  right?  Is that fair?
4      A.  Yes.
5      Q.  The next sentence deals with a definition of
6  securing the property, right?
7      A.  Yes.
8      Q.  None of those things apply to Ms. Hudson, do
9  they?
10          MS. BEARDSLEY:  Object to the form.
11      Q.  (BY MR. WOOTEN)  With respect to the sentence
12  that says, "Securing the property includes but is not
13  limited to" -- what's the rest of that sentence right
14  there?
15      A.  "...entering the property to make repairs,
16  change locks, replace or board up doors and windows,
17  drain water from pipes, eliminate building or other code
18  violations or dangerous conditions, and have utilities
19  turned on or off."
20      Q.  None of those things apply to Ms. Hudson, do
21  they?
22      A.  What do you mean, do they apply to her?  In
23  what regard?
24      Q.  In the present case.  I mean, she hasn't
25  abandoned her home.  You haven't had to enter it, lock

Page 155

1  it up, secure it, or anything like that, right?
2      A.  No.
3      Q.  And y'all have known that throughout the
4  entire time she's been in bankruptcy and you have
5  serviced the loan, right?
6      A.  Yes.
7      Q.  She's always communicated that she was living
8  in the home and wanted to keep the home, right?
9      A.  I know we have had those communications with
10  her, yes.
11      Q.  Sure.  And you've never had a communication
12  indicating that the home was abandoned, have you?
13      A.  No.
14      Q.  And none of your inspections at any time have
15  ever indicated that the home was in disrepair or
16  otherwise being wasted; is that correct?
17      A.  Correct.
18      Q.  Nothing in any court filing that Ms. Hudson's
19  ever made indicated that she wanted to abandon or
20  surrender her home or that it wasn't being taken care
21  of, right?
22      A.  No, I haven't seen such documents.
23      Q.  Nothing in her bankruptcy plan claimed that
24  she didn't have a mortgage or you didn't have a right to
25  payment, did it?

Page 156

1      A.  No.
2      Q.  The next paragraph of that section says that
3  "Any amounts disbursed by lender under this Section 9
4  shall become additional debt of borrower secured by this
5  security instrument.  These amounts shall bear interest
6  at the note rate from the date of disbursement and shall
7  be payable, with such interest, upon notice from lender
8  to borrower requesting payment," right?
9      A.  Yes.
10      Q.  Is there anything in that paragraph that says
11  the right to payment of those amounts takes priority
12  over the payment covenant contained in paragraph 2 of
13  this mortgage?
14      A.  No.
15      Q.  And, in fact, that paragraph says that you are
16  protected if the borrower doesn't pay because you now
17  get to charge interest on those amounts and it becomes
18  part of the indebtedness, right?
19      A.  Yes.
20      Q.  Are you familiar with the term called
21  capitalization?
22      A.  Yes.
23      Q.  What does that mean?
24      A.  That means that a payment or a debt be either
25  deferred or it could be added to an existing balance.

**Daphne Mosley**                                        **October 14, 2009**

Page 157

1    Q.  So in the event that Ms. Hudson weren't able
2  to pay an amount under Section 9, you have a right to
3  add that to her balance and assess interest to it,
4  right?
5    A.  Yes.
6    Q.  In the documents that you presented in this
7  case, have you capitalized any of those amounts or are
8  you seeking that that be paid rather than be
9  capitalized?
10    A.  Repeat that again.
11    Q.  Have you capitalized any amount that you have
12  paid as a result of Ms. Hudson's default to the
13  principal of her loan?
14    A.  Any of the amounts -- you're --
15    Q.  Any amount that you have incurred as a result
16  of her default, have you capitalized any of those
17  amounts?
18    A.  That is possible there has been a
19  capitalization of the loan prior to.  The exact nature
20  of that I don't know off the top of my head.
21    Q.  That deals with a prior loan modification
22  entered into by Ms. Hudson, right?
23    A.  Yes.
24    Q.  I'm talking about with respect to this
25  litigation and the amounts that you claim are due.

Page 158

1  You've made a demand for payment and she's been unable
2  to pay.  Have you exercised your right to capitalize any
3  of the amounts under this loan?
4    A.  I don't know exactly what that means by if
5  we've exercised our right.
6    Q.  Well, it says right here that they shall bear
7  interest at the note rate from the date of disbursement
8  and shall be payable with such interest upon notice from
9  lender to borrower requesting payment.  And the sentence
10  before that says that any amount disbursed under this
11  paragraph shall become additional debt of the borrower,
12  right?
13    A.  Yes.
14    Q.  So it is, in effect, added to whatever her
15  principal balance is, correct?
16    A.  Yes.
17    Q.  And so you could demand payment now or you
18  could add it to the principal balance and increase what
19  she owes, right?
20    A.  Yes.
21    Q.  And my question is:  Have you added it to the
22  principal balance to increase the amount that she owes
23  you?
24    A.  It has not been added to the principal
25  balance.

Page 159

1    Q.  Right.  It is the basis of the default by
2  which you seek to foreclose, right?
3       MS. BEARDSLEY:  Object to the form.  What
4  is the basis?
5    Q.  (BY MR. WOOTEN) The delinquency, the amount
6  of arrears.
7    A.  Okay.  Start over.  I'm sorry.  You lost me.
8  You said the basis for the default was --
9    Q.  I said the basis of the attempt to foreclose
10  and have relief from stay entered is at least in part
11  amounts that you claim are due as a result of her
12  default, correct?
13    A.  Post-petition?  Yes.
14    Q.  And prepetition, right?
15    A.  The motion for relief is post-petition.
16    Q.  Okay.  But you had a prepetition amount due
17  also, right?
18    A.  Yes, she did.
19    Q.  And, again, those amounts are the basis of why
20  you sought relief and seek to foreclose, right?
21       MS. BEARDSLEY:  Object to the form.  The
22  post-petition default is the basis for the motion for
23  relief from stay.
24       MR. WOOTEN:  Okay.
25       MS. BEARDSLEY:  I just don't want to -- I

Page 160

1  don't want us to mix the post and prepetition debt,
2  because that's --
3       MR. WOOTEN:  Sure.  That's fair.
4       MS. BEARDSLEY:  -- you know that's
5  important.
6       MR. WOOTEN:  And that's fair.  Let's be
7  clear.
8    Q.  (BY MR. WOOTEN) You filed a motion for
9  relief, that we've already talked about, with a note
10  that doesn't show that this trust owns this loan, right?
11       MS. BEARDSLEY:  Object to the form.
12    Q.  (BY MR. WOOTEN) I mean, we talked about that.
13  No allonges to the note in your motion for relief,
14  right?
15    A.  No, there was not.
16    Q.  No endorsements, right?
17    A.  No, there wasn't.
18    Q.  Nothing in your motion for relief indicating
19  that this trust had any specific endorsement of this
20  note or an allonge even, just a separate sheet of paper,
21  saying that this trust obtained ownership of this note,
22  right?
23    A.  Right.
24    Q.  And we talked about the fact that the mortgage
25  that you've attached -- that there is a discrepancy

Page 161

1  between the mortgage legal description and the deed
2  legal description, right?
3      A. Yes.
4      Q. Which affects your lien, right?
5      A. Yes.
6      Q. Which affects your entitlement to foreclose.
7      A. Yes.
8      Q. And it affects your status as a secured
9  creditor in bankruptcy.
10     A. Yes, it does.
11     Q. None of this has ever been disclosed to the
12 Bankruptcy Court, has it?
13     A. I have not seen any documentation of such.
14     Q. And the letter from the Sirote firm to you was
15 prior to November 6, 2007, correct?
16     A. Yes.
17     Q. So on that day, Ms. Kennebeck filed an
18 affidavit under oath in front of our Bankruptcy Judge
19 saying that you were entitled to relief from stay when
20 your company knew that it did not have an enforceable
21 lien at that time, right?
22         MS. BEARDSLEY: I'm going to object to
23 the form.
24         You know, the letter from Colleen is
25 privileged, which we -- me and you can talk about that

Page 162

1  at a different time. But the representations in that
2  letter are not entirely what drives the motion for
3  relief from stay, that period of time between those two.
4          MR. WOOTEN: And I'm not saying that it
5  is, Robin.
6          MS. BEARDSLEY: Yes. Well --
7          MR. WOOTEN: My point is this: Someone
8  chose to disclose that letter. I don't know who. It's
9  got your Bates stamp.
10         MS. BEARDSLEY: It's probably my -- I
11 mean, I'm the one who did the disclosures.
12         MR. WOOTEN: Sure.
13         MS. BEARDSLEY: So it was probably just a
14 mistake or oversight on my part, which will likely be
15 corrected here pretty soon.
16     Q. (BY MR. WOOTEN) But irrespective, your
17 company had knowledge that there was a problem, right?
18     A. Yeah, someone did.
19     Q. And your company filed an affidavit, sworn
20 testimony under oath, because we try to do things in
21 bankruptcy in an expedited fashion, right?
22     A. Yes.
23     Q. And you have a lady who you've said is Bertha
24 Castillo who notarized the signature. You said her job
25 title was what?

Page 163

1      A. It currently is lead bankruptcy specialist.
2      Q. Was it that same title on November 6 of 2007?
3      A. I don't know.
4      Q. And on that date, you said to our Bankruptcy
5  Court and our Judge that you had the right to foreclose
6  when you knew or your company knew that there was an
7  issue with the lien.
8          MS. BEARDSLEY: I'm going to object to
9  the form.
10     Q. (BY MR. WOOTEN) That's okay. You can answer
11 it.
12     A. Yes. An affidavit was signed, yes.
13     Q. Prior to today, has anyone from Litton or any
14 of your attorneys ever said to the Bankruptcy Court that
15 there was an issue in an attempt to correct this filing?
16     A. Not to my knowledge.
17     Q. Is it your intention to file a document
18 correcting this filing?
19         MS. BEARDSLEY: I mean, I'm going to
20 object. That's not a decision that she would be making.
21 That would be a legal decision. So she's not going to
22 be able to answer the question.
23     Q. (BY MR. WOOTEN) You don't know?
24     A. (Witness shakes head.) No.
25     Q. When you take a mortgage loan pool for

Page 164

1  servicing, is it fair to say that you receive a batch of
2  electronic documents or a tape or something of that
3  nature which sets forth what loans are allegedly
4  included in that pool?
5      A. Yes.
6      Q. Is it your understanding that the actual
7  documents which underlay these transactions which
8  purport to transfer ownership typically rest either with
9  the trustee or the custodian of the trust?
10     A. The originals?
11     Q. Right. Is that correct?
12     A. Yes.
13     Q. And is it also a fair statement that
14 irrespective of the fact that you receive an e-mail
15 saying that the particular loan is in a particular
16 trust, that question is determined by whether or not
17 those documents are actually legally transferred into
18 that trust?
19     A. Are you asking?
20     Q. Yes, ma'am.
21     A. Repeat it.
22     Q. Sure. An electronic tape or a spreadsheet
23 saying to Litton that that particular loan is in a
24 particular trust does not prove that that particular
25 loan was purchased by that particular trust, does it?

**Daphne Mosley**                                    **October 14, 2009**

Page 165

1     A.  No.
2     Q.  That would depend on the actual transfers of
3  that particular loan according to various purchase and
4  sale agreements, right?
5     A.  Right.
6     Q.  And you would have no idea whether or not that
7  occurred when you get that electronic tape, right?
8     A.  No.
9     Q.  So if you discover that there is a problem
10 somewhere down the road, at that point is when your
11 company would try to find out if there were other
12 documents or if there was a cure or if there were a
13 problem that could be fixed, right?
14    A.  Yes.
15    Q.  Okay.  And with respect to that, we talked
16 about earlier that if the trust agreement says that if
17 there is a problem, the trustee and the servicer have a
18 right to demand the seller repurchase the loan, that's
19 one way to divest yourself of that problem, right?
20    A.  Right.
21    Q.  And you previously testified that your
22 activities in this loan with respect to this loan
23 account was based upon Deutsche Bank's representation to
24 you that they are the owner of this particular mortgage
25 loan, right?

Page 166

1     A.  Right.
2     Q.  Have you ever seen the filings with the
3  Securities and Exchange Commission dealing with the
4  trust that is alleged to own this loan?
5     A.  Yes, I've seen it.
6     Q.  Is that something that you looked at after I
7  produced the information to your attorneys?
8     A.  Yes.
9     Q.  I'm going to mark this cumulative exhibit, and
10 I'll go ahead and tell you that it's 313 pages.  And I
11 promise you we won't read every one of them.
12         (Plaintiff's Exhibit No. 17
13          marked for identification.)
14    Q.  (BY MR. WOOTEN)  And because it's so long, I'm
15 going to make a stack in the middle of the table and go
16 through the important parts.
17         MS. BEARDSLEY:  I printed what you sent
18 me, and mine is 308 pages.  So what I'm handing her is
19 technically different than what you had.
20         MR. WOOTEN:  If there is a difference, it
21 probably has to do with the exhibits.
22         MS. BEARDSLEY:  Okay.
23         MR. WOOTEN:  And so I'll -- we'll
24 compare, and if there's a discrepancy, we'll go by
25 yours.

Page 167

1         MS. BEARDSLEY:  It's close.
2         MR. WOOTEN:  The important parts won't
3  change.
4     Q.  (BY MR. WOOTEN)  I'm going to hand you what's
5  been marked previously as 17.  I'm going to hand you
6  this page, which on my document says that is the 7th
7  page of 304.
8         MR. WOOTEN:  I think the reason I had
9  313, Robin, has to do with some of the preliminary
10 pages.
11         MS. BEARDSLEY:  Did you say 7?
12         MR. WOOTEN:  It says 7 of 304, and it
13 begins with the preliminary statement.  Do you see where
14 we're at?
15         MS. BEARDSLEY:  Yes.
16    Q.  (BY MR. WOOTEN)  If you will read into the
17 record what the preliminary statement says.
18    A.  "The depositor intends to sell pass-through
19 certificates (collectively, the 'certificates'), to be
20 issued hereunder in multiple classes, which in the
21 aggregate will evidence the entire beneficial ownership
22 interest in the trust fund created hereunder."
23    Q.  Does it identify those parties?
24    A.  Yes.  It identifies 12 classes of
25 certificates.

Page 168

1     Q.  And the preliminary statement -- I'm sorry.
2  The very top part in orange, is that what you read?
3     A.  No.
4     Q.  Read the top part in orange if you don't mind.
5     A.  "This pooling and services agreement is dated
6  as of November 1, 2003, (the 'agreement'), among
7  Financial Asset Securities Corp., as depositor (the
8  'depositor'), Litton Loan Servicing LP, as servicer (the
9  'servicer'), and Deutsche Bank National Trust Company,
10 as trustee (the 'trustee')."
11    Q.  All those parties line up with what we've been
12 talking about today?  I mean, you're serving as the
13 servicer.
14    A.  Yeah.
15    Q.  Deutsche Bank is the trustee.  The party I
16 think we're missing is Financial Asset Securities
17 Corporation.  Does that sound right?
18    A.  Yes.
19    Q.  Do you know what role Financial Asset
20 Securities Corporation would play in this
21 securitization?
22    A.  No, I don't.
23    Q.  Other than the definition set forth there,
24 which is depositor, right?
25    A.  Yeah.  No, I don't.

**Daphne Mosley**                                        **October 14, 2009**

Page 169

1    Q.   Okay.
2         (Plaintiff's Exhibit No. 18
3         marked for identification.)
4    Q.   (BY MR. WOOTEN)  I'm going to show you what
5    I've marked as Plaintiff's Exhibit 18.  And I'll
6    represent to you that it is a copy of an Amended and
7    Restated Certificate of Corporation for Financial Asset
8    Securities Corporation, okay?
9         Does that indicate that Financial Asset
10   Securities Corporation has some affiliation with a
11   company, either Greenwich Capital Holdings or Greenwich
12   Capital Financial Markets?
13   A.   Restate your question.
14   Q.   Does that indicate that Financial Asset
15   Securities Corporation is affiliated with a company
16   called Greenwich Capital Holdings or Greenwich Capital
17   Markets or Greenwich Capital Financial Products?
18   A.   Yes.
19   Q.   Okay.  Does that explain the relationship?
20   A.   It don't to me.
21   Q.   Okay.  I'm going to mark this document as
22   17-A.
23        (Plaintiff's Exhibit No. 17-A
24        marked for identification.)
25   Q.   (BY MR. WOOTEN)  And I'll explain why I'm

Page 170

1    marking it as that.  This is a portion of document 17.
2    It's called Exhibit C, and it says that it is the form
3    of the Mortgage Loan Purchase Agreement, all right?  And
4    it says Greenwich Capital Financial Products, as seller,
5    and Financial Asset Securities Corporation, as
6    purchaser, and it is a Mortgage Loan Purchase Agreement
7    dated November 12th, 2003, okay?
8         And I'll let you look at that and see if
9    you agree.
10        That's probably going to be in the first
11   page.  I think you're on the second page.
12        MS. BEARDSLEY:  And I think it's
13   backwards.
14   Q.   (BY MR. WOOTEN)  I stapled it on the wrong
15   side.  Did I mess you up?
16        MS. BEARDSLEY:  It's on the other side,
17   Robin.  I apologize.
18   Q.   (BY MR. WOOTEN)  Do you see that is page 265
19   and that is page 266?  I'm sorry.  I was printing front
20   and back.
21        And that's the information I was
22   referring to, okay?
23   A.   Okay.
24   Q.   And does that document also indicate that it's
25   a purchase agreement for the sale of loans between those

Page 171

1    two entities?
2    A.   Yes.
3    Q.   All right.  And if you'll hand that document
4    back to me for a second.
5         MR. WOOTEN:  Once again, you'd think you
6    spend four days looking at something, you'd get all the
7    copies you need, but I had problems with that.  Let me
8    do this, because this is becoming too much trouble.  I
9    stapled it because I'm left-handed, and it messes
10   everybody up.  I'm going to restaple this on the other
11   side so it flows correctly.
12        If you don't mind, I'll walk over here.
13   I don't have but one copy, and I don't want y'all to
14   strain ourselves.
15   Q.   (BY MR. WOOTEN)  This is the first page of
16   that Mortgage Loan Purchase Agreement.  Is it dated
17   November 12, 2003?
18   A.   Yes.
19   Q.   Is that the same date as the Pooling and
20   Servicing Agreement?
21   A.   Yes.
22   Q.   Actually, the Pooling and Servicing Agreement
23   is November 1st, right?
24   A.   Yeah.  I'm sorry.
25   Q.   I'm sorry.  I was wrong about that too.

Page 172

1         And it says that the -- it says here in
2    17-A that the seller, who is Greenwich, is the owner of
3    the notes or other evidence of indebtedness so indicated
4    on Schedule I hereto, all right?
5    A.   Okay.
6    Q.   And it says -- it also says, "The other
7    documents or instruments constituting the mortgage file
8    (collectively, the 'mortgage loans')"; is that right?
9    A.   Yes.
10   Q.   And it says that as of November 12th,
11   Greenwich -- it says, "As of the date hereof, owns the
12   mortgages on the properties securing such mortgage
13   loans"; is that right?
14   A.   Yes.
15   Q.   And this says that the parties desire that
16   Greenwich, the seller, sell the mortgage loans to
17   Financial Assets Securities Corporation, right?
18   A.   Right.
19   Q.   And it says that this is pursuant to the terms
20   of a Pooling and Servicing Agreement dated November 1st,
21   2003, right?
22   A.   Yes.
23   Q.   And that concurs with the document that we've
24   shown as page 12 of 313 at the top of this document,
25   right?

**Daphne Mosley**                    October 14, 2009

Page 173

1    A.  Yes.
2    Q.  And it also says that Financial Asset
3  Securities Corporation will be the purchaser, Litton
4  will be the servicer, Deutsche Bank will be the trust
5  company, right?
6    A.  Yes.
7    Q.  And it says that the purchaser, which is -- I
8  think they abbreviate it as FASCO -- Financial Asset
9  Securities Corporation will convey the mortgage loans to
10  Finance America Mortgage Loan Trust 2003-1; is that
11  right?
12    A.  Yes.
13    Q.  So that indicates that on November 12th,
14  Greenwich owned all those loans and sold them to FASCO,
15  right?
16    A.  Yes.
17    Q.  Or all the loans that made up this trust,
18  correct?
19    A.  Correct.
20    Q.  And then it says under definitions that "All
21  capitalized terms used but not defined have the same
22  meaning assigned in the Pooling and Servicing
23  Agreement," right?
24    A.  Yes.
25    Q.  The next page deals with the actual sale and

Page 174

1  it's Section 2.01 and it says, "The seller" -- which was
2  Greenwich, right?
3    A.  Yes.
4    Q.  -- "does hereby sell, assign, set over, and
5  convey to the purchaser," which was FASCO, "without
6  recourse," and then it lists "all of its right, title,
7  and interest in and to each mortgage loan, including the
8  related cut-off date principal balance, all interest
9  accruing, and all collections in respect of interest and
10  principal," right?
11    A.  Yes.
12    Q.  And then the next section says that in
13  connection with the transfer pursuant to this, that
14  Greenwich at its own expense on or prior to the closing
15  date -- "to cause its books and records to indicate that
16  mortgage loans have been sold to the purchaser," which
17  is FASCO, "pursuant to this agreement," right?
18    A.  Yes.
19    Q.  And to deliver to FASCO and the trustee a
20  computer file containing a true and complete list of all
21  such mortgage loans specifying for each such mortgage
22  loan, as of the cut-off date, its account number and its
23  principal balance, right?
24    A.  Yes.
25    Q.  And it says that "Such file, which forms a

Page 175

1  part of Exhibit D to the Pooling and Servicing
2  Agreement, shall also be marked as Schedule I to this
3  agreement and is hereby incorporated into and made a
4  part of this agreement," right?
5    A.  Yes.
6    Q.  And it says in connection with this
7  conveyance, the seller, which is Greenwich, on behalf of
8  the purchaser, will deliver to and deposit with Deutsche
9  Bank, the trustee, documents or instruments with respect
10  to each mortgage loan, right?
11    A.  Yes.
12    Q.  And it says that they will deliver the
13  original mortgage note with all riders thereto, endorsed
14  either -- what does that say?
15    A.  "In blank."
16    Q.  And it also says that if it is in blank, that
17  the trustee will do what?
18    A.  "Shall cause the endorsement to be completed."
19    Q.  And then it says what the form is, right?
20    A.  Right.
21    Q.  And what is the form?
22    A.  "Pay to the order of Deutsche Bank National
23  Trust Company, as trustee, without recourse."
24    Q.  Right.  In any of the documents that you have
25  or that you have produced with respect to this loan is

Page 176

1  there any endorsement or any allonge that says "Pay to
2  the order of Deutsche Bank National Trust Company, as
3  trustee, without recourse"?
4    A.  No.
5    Q.  The next section is Section (ii), right?
6    A.  Right.
7    Q.  And it says, "The original mortgage, with all
8  riders thereto, noting the presence of the MIN," which
9  is the number assigned by MERS, right?
10    A.  Right.
11    Q.  -- "of the mortgage loan and language
12  indicating that the mortgage loan is a MOM loan" -- what
13  is a MOM loan for those not familiar with the parlance?
14    A.  MERS originated mortgage.
15    Q.  Right.
16      And "...if the mortgage loan is a MOM
17  loan, with evidence of recording thereon," right?
18    A.  Right.
19    Q.  And then it says, "Unless the mortgage loan is
20  registered on the MERS system, an original assignment,
21  in form and substance acceptable for recording,
22  assigning the related mortgage loan either in blank or
23  to Deutsche Bank National Trust Company, as trustee,
24  without recourse," right?
25    A.  Yes.

**Daphne Mosley**                                    **October 14, 2009**

Page 177

1    Q.  Is there a mortgage assignment to Deutsche
2  Bank National Trust Company, as trustee, without
3  recourse?
4          MS. BEARDSLEY:  Object to the form.
5  Well, it says "in blank or."
6    A.  What was your question?
7    Q.  (BY MR. WOOTEN)  The mortgage assignment -- it
8  says in blank, and we've already talked about all the
9  mortgage assignments, remember?
10    A.  No.
11    Q.  All right.  But then (B) it says, "...either
12  in blank or to Deutsche Bank National Trust Company, as
13  trustee, without recourse," right?
14    A.  Uh-huh.
15    Q.  And then it says that "...an original copy of
16  any intervening assignment of mortgage showing a
17  complete chain of assignments to the trustee," right?
18    A.  Correct.
19    Q.  Is there an assignment to Greenwich?
20    A.  No.
21    Q.  Is there an assignment to FASCO?
22    A.  No.
23    Q.  Is there an assignment from FASCO to the
24  trust?
25    A.  What was FASCO?

Page 178

1    Q.  FASCO was the depositor, Financial -- they
2  were the purchaser under this agreement --
3    A.  No.
4    Q.  -- Financial Asset Securities Corporation.
5    A.  No, there wasn't.
6    Q.  Okay.  This goes on to say that the seller
7  confirms to the purchaser, which is FASCO, and the
8  trustee, which is Deutsche Bank, that it has caused the
9  appropriate entries to be made in its general accounting
10  records to indicate that such mortgage loans have been
11  transferred to the trustee and constitute part of the
12  trust; is that right?
13    A.  Yes.
14    Q.  Down here at the bottom of that page, which
15  this is page 270 of 313 on the Exhibit 17-A, I've got
16  some of that highlighted too, right?
17    A.  Yes.
18    Q.  And it says, "Upon discovery or receipt of
19  notice of any materially defective document in, or that
20  a document is missing from, a mortgage file, the
21  seller" -- which is Greenwich, right?
22    A.  Yes.
23    Q.  -- "shall have 90 days to cure such defect or
24  deliver such missing document to the purchaser" -- which
25  is FASCO, right?

Page 179

1    A.  Yes.
2    Q.  -- "and if the seller does not cure or deliver
3  such missing document within such time period, the
4  seller shall either repurchase or substitute for that
5  mortgage loan"; is that right?
6    A.  Yes.
7    Q.  And it says that the mortgage loan, if there's
8  a substitution, will be made pursuant to the Pooling and
9  Servicing Agreement, okay?
10    A.  (Witness nods head.)
11    Q.  And then it says that "The seller" -- which is
12  Greenwich -- "shall cause the assignments which were
13  delivered in blank to be completed and, except with
14  respect to any mortgage loan for which MERS is
15  identified on the mortgage or on a properly recorded
16  assignment of the mortgage as the mortgagee of record,
17  shall cause all assignments referred to in Section 2.02
18  to the extent necessary in Section 2.02(iv) to be
19  recorded"; is that right?
20    A.  Yes.
21    Q.  And in this file, there is a recorded
22  assignment from the original lender out of Florida,
23  right, to Finance America?  Do you remember that?
24          We can look back at it.  I think you may
25  actually have those in the last couple of pages.  Look

Page 180

1  at the back of the mortgage.  There's going to be some
2  before that.  Come on back.  Keep coming back this way.
3          This is from -- we talked about this
4  being from Global Lending to Finance America, right?
5    A.  Right.
6    Q.  And that's recorded 10/24/03.
7    A.  Yes.
8    Q.  And then we talked about a recording from
9  Finance America to MERS, 10/24/03, right?
10    A.  Yes.
11    Q.  And that's all in 2003, right?
12    A.  Yeah, that's correct.
13    Q.  And then the next recording is from MERS, and
14  it says Deutsche Bank National Trust Company as trustee
15  for the holders of Finance America Mortgage Loan Trust
16  2003-1 Asset-Backed Certificates Series 2003-1, right?
17    A.  Yes.
18    Q.  And it says Finance America, right?
19    A.  Right.
20    Q.  And that is on June 21st of 2007, right?
21    A.  Yes.
22    Q.  Okay.  This document indicates that in 2003
23  that Greenwich Capital Markets was the owner of this
24  loan, right?
25    A.  Yes.

**Daphne Mosley**                                    **October 14, 2009**

Page 181

1    Q.  And that they then sold it to FASCO in 2003,
2   right?
3    A.  Yes.
4    Q.  And then Deutsche Bank became the owner
5   according to the loans that were sold to this, right?
6    A.  Correct.
7    Q.  So is there any way that Finance America could
8   assign a note that they didn't own in 2007 that you are
9   aware of?
10       MS. BEARDSLEY:  Object to the form.
11    A.  No.
12    Q.  (BY MR. WOOTEN) I'm sorry.  I'll pull up a
13   chair if you want me to.
14       This section dealing with -- let me make
15   sure I didn't skip something.
16       It says here that in the event -- in this
17   paragraph, it says, "In connection with the assignment
18   of any mortgage loan registered on the MERS system" --
19   which this one was, right?
20    A.  Yes.
21    Q.  It says that Greenwich further agrees that it
22   will cause, within 30 business days after the closing
23   date, the MERS system to indicate that such mortgage
24   loans have been assigned to FASCO to Deutsche Bank,
25   right?

Page 182

1    A.  Yes.
2    Q.  The assignments in this case are from Finance
3   America to Deutsche Bank, right?
4    A.  Right.
5    Q.  And then it says, "In accordance with the
6   Pooling and Servicing Agreement for the benefit of the
7   certificate holders by including in such computer files
8   the code in the field which identifies the trustee."
9       You have that, right?
10    A.  No.
11    Q.  It tells you from this document that's No. 14
12   your investor code, the acquisition date, and the
13   investor loan number, right?
14    A.  Right.
15    Q.  And then it says, "The code in the field pool
16   field which identifies the series of the certificates
17   issued in connection with the mortgage loan," right?
18       So two things would go to MERS.  One is
19   identification of the trustee, and two is the pool
20   field.
21       And then it says, "In the event that a
22   mortgage note is endorsed in blank as of the closing
23   date, promptly following the closing date, the trustee,
24   at the expense of the seller" -- which is Greenwich --
25   "shall cause to be completed such endorsements 'Pay to

Page 183

1   the order of Deutsche Bank National Trust Company as
2   Trustee, without recourse,'" right?
3    A.  Right.
4    Q.  And we talked about the fact that that
5   endorsement is not present anywhere.
6    A.  Yes, we did.
7    Q.  And then, again, it talks about the fact that
8   if anything is missing -- and it says specifically in
9   this paragraph, "Notwithstanding the foregoing, with
10   respect to any materially defective document in, or any
11   document missing from, a mortgage file, if the
12   seller" -- which is Greenwich, right?
13    A.  (Witness nods head.)
14    Q.  -- "would not be in breach of any obligation
15   pursuant to this Section 2.01 but for a breach by
16   Finance America," right?
17    A.  Yes.
18    Q.  -- "pursuant to the Master Mortgage Loan
19   Purchase Agreement and Interim Servicing Agreement dated
20   June 1st, 2003, between Greenwich and Finance America,"
21   right?
22    A.  Right.
23    Q.  -- "of an obligation of the originator" -- who
24   is Finance America, right?
25    A.  Right.

Page 184

1    Q.  -- "then the originator thereunder, in the
2   manner and to the extent set forth therein, and not the
3   seller" -- which is Greenwich -- "shall be required to
4   remedy the breach," right?
5    A.  Right.
6    Q.  And then it says in pink that "The
7   purchaser" -- who is FASCO -- "acknowledges its
8   acceptance of all right, title, and interest to the
9   mortgage loans and other property, now existing and
10   hereafter created, conveyed to it pursuant to
11   Section 2.01," right?
12    A.  Right.
13    Q.  And then it says here that the parties intend
14   that the transaction be a sale by Greenwich to FASCO of
15   all Greenwich's right to the mortgage loans in the
16   property described herein, right?
17    A.  Right.
18    Q.  And it says that Greenwich grants to FASCO a
19   security interest in all of Greenwich's right, title,
20   and interest to the mortgage loans, right?
21    A.  Yes.
22    Q.  And then it says under 3.01 that Greenwich and
23   FASCO understand, acknowledge, and agree that the
24   representations and warranties set forth in this section
25   are made as of the closing date or as of the date

## Page 185

1   specifically provided herein, right?
2       A.  Right.
3       Q.  And it says, "Pursuant to Section 24 of the
4   master agreement, Greenwich assigns to FASCO all of its
5   right, title, and interest under the master agreement to
6   the extent of the mortgage loans set forth on the
7   mortgage loan schedule, including, but not limited to,
8   any representations and warranties of the originator,"
9   who is Finance America --
10      A.  (Witness nods head.)
11      Q.  -- "concerning the mortgage loans.  In
12  addition, Greenwich represents and warrants with respect
13  to the mortgage loans to FASCO that as of the closing
14  date or as of such date specifically provided for
15  herein," the following -- and it talks about A, B, and
16  C, and those are some conditions dealing with predatory
17  lending laws, right?
18          MS. BEARDSLEY:  She hasn't had a chance
19  to read that, so she can't --
20          MR. WOOTEN:  Sure.
21      Q.  (BY MR. WOOTEN)  But here on the next page, it
22  says, "The seller" -- which is Greenwich -- "has the
23  full power and authority to hold each mortgage loan, to
24  sell each mortgage loan, to execute, deliver and
25  perform, and to enter into and consummate, all

## Page 186

1   transactions contemplated by this agreement," right?
2       A.  Yes.
3       Q.  And it says, "Immediately prior to the payment
4   of the purchase price for each mortgage loan, the
5   seller" -- which is Greenwich -- "was the owner of the
6   related mortgage and the indebtedness evidenced by the
7   related mortgage note and upon the payment of the
8   purchase price by the purchaser" -- which is FASCO --
9   "in the event that the seller retains record title, the
10  seller shall retain such record title to each mortgage,
11  each related mortgage note, and the related mortgage
12  files with respect thereto in trust for the purchaser as
13  the owner thereof," right?
14          MS. BEARDSLEY:  And that's what it says.
15  I mean, I don't have any dispute with you reading what
16  it says in there, but I do have to object to the fact
17  that you're skipping different paragraphs.  I mean, you
18  and I both know that reading a contract like that, you
19  can't --
20          MR. WOOTEN:  Sure.
21          MS. BEARDSLEY:  -- skip paragraphs around
22  and expect it to make sense.
23          MR. WOOTEN:  You're welcome to
24  cross-examine her about any of that.
25          MS. BEARDSLEY:  But I'm just saying I

## Page 187

1   don't know if -- I mean, you're not really asking her a
2   question.  You're just reading on the record.
3           MR. WOOTEN:  I'm just asking her if this
4   is what the documents say.
5           MS. BEARDSLEY:  If you read it correctly?
6           MR. WOOTEN:  Yeah.  If that's what the
7   document says.
8           MS. BEARDSLEY:  Okay.
9           MR. WOOTEN:  Okay?
10          MS. BEARDSLEY:  Okay.  We'll stipulate
11  that the document says what it says.  I mean, she can't
12  verify anything that it says in the document.  If you
13  just want to sit here and read for us on the record,
14  though --
15      Q.  (BY MR. WOOTEN)  And then it says -- I'm going
16  to skip to this right here, because this deals with
17  repurchase agreements again.  And it says --
18          MS. BEARDSLEY:  Nick, I'm sorry.  I have
19  to object to you skipping between different paragraphs.
20  You can't read things like that --
21          MR. WOOTEN:  Sure.  And I'll identify
22  what I'm --
23          MS. BEARDSLEY:  -- out of context.
24          MR. WOOTEN:  I'll identify what I'm
25  reading from.

## Page 188

1           MS. BEARDSLEY:  But you're not actually
2   asking a question.  We're just reading piecemeal from a
3   document that's --
4           MR. WOOTEN:  Sure.  And any time --
5           MS. BEARDSLEY:  -- unidentifiable on the
6   record.
7           MR. WOOTEN:  Well, we know what we're
8   reading from.  We're reading from 17-A on the record.
9           MS. BEARDSLEY:  But you're not reading
10  the whole document.  You're jumping --
11          MR. WOOTEN:  Sure.  I'm reading the parts
12  that are important for my examination.  And --
13          MS. BEARDSLEY:  But you --
14          MR. WOOTEN:  -- anybody who wants to sit
15  and read the whole thing, they can.
16          MS. BEARDSLEY:  Nick, you're not asking
17  questions.  You're just reading.
18          MR. WOOTEN:  I'm asking her if that's
19  what the document says.
20          MS. BEARDSLEY:  Well, I haven't heard you
21  say that yet, so -- I mean, you can ask her that right
22  now.  We don't have to read anything.  We don't dispute
23  that the document says what it says, but just skipping
24  from a sentence to a different page --
25      Q.  (BY MR. WOOTEN)  Under Section 7.03 of this

**Daphne Mosley**                                    **October 14, 2009**

Page 189

1   agreement -- it's on page 275 -- or 278 of
2   Exhibit 17-A -- it indicates that Greenwich Capital
3   Financial Markets and Financial Asset Securities
4   Corporation are both entities located in Greenwich,
5   Connecticut; is that right?
6        MS. BEARDSLEY:  Are you asking if that's
7   what it says?
8        Q.  (BY MR. WOOTEN)  Is that what it says?
9        A.  Yes.
10       Q.  Okay.  And you don't have any independent
11  knowledge of these documents because you haven't seen
12  them before, have you?
13       A.  I've seen the document.  I haven't read the
14  documents.
15       Q.  And does Section 7.07 indicate that these
16  parties intend -- the purchaser intends to purchase and
17  the seller intends to sell these mortgage loans rather
18  than pledging them as part of a -- to secure a loan by
19  the purchaser to the seller?  Is that the first portion
20  of the highlighted part of that paragraph?
21       A.  Yes.
22       Q.  Let me sit back down.
23           Now, I know that took some time and I
24  hated to bore y'all with that, but it's important to the
25  fact that -- the allegation that this trust is the

Page 190

1   particular owner of this particular loan.  In the
2   context of having seen the Mortgage Loan Purchase
3   Agreement and us having walked through it together, I'm
4   going to ask you a couple of more questions about the
5   actual Pooling and Servicing Agreement.
6        MS. BEARDSLEY:  Well, unless you want to
7   give her a chance to sit here and read the whole
8   document, I mean, I'm not going to allow her to answer
9   questions about analyzing what this document says in
10  relation to the Pooling and Servicing Agreement.
11       MR. WOOTEN:  It's going to be real
12  similar, Robin, to what we just did.  There are portions
13  that are highlighted.  And, you know, if she -- if you
14  want to rebut what the documents say, which are filed
15  under oath with the SEC and the IRS --
16       MS. BEARDSLEY:  What I'm telling you
17  is --
18       MR. WOOTEN:  -- your clients are welcome
19  to do that.
20       MS. BEARDSLEY:  Nick, what I'm saying is
21  we're not going to dispute that it says what it says,
22  but she -- you're not actually asking questions about
23  the document.
24       MR. WOOTEN:  Okay.  Well --
25       MS. BEARDSLEY:  So can we get to

Page 191

1   questions?
2        MR. WOOTEN:  Sure.  And we have to ask
3   those questions that way because it is --
4        MS. BEARDSLEY:  You didn't ask a
5   question.
6        MR. WOOTEN:  We have to establish what
7   the contents of the documents are so we can put it in
8   context.
9        MS. BEARDSLEY:  The document speaks for
10  itself.
11       MR. WOOTEN:  Sure, but I need her to have
12  enough information from the documents to be able --
13       MS. BEARDSLEY:  You didn't give her
14  enough information.  Then she needs to sit here and read
15  the whole document.
16       MR. WOOTEN:  Okay.  Do you want to
17  continue the deposition until she's had time to review
18  it, or do you want to designate someone else to review
19  it?  Because the contents of the documents are not going
20  to change, Robin, nor are the contents of the discovery.
21       MS. BEARDSLEY:  Right.  And I'm just
22  asking if you'll get to a question --
23       MR. WOOTEN:  Sure.
24       MS. BEARDSLEY:  -- as opposed to reading
25  the content of the documents.

Page 192

1        MR. WOOTEN:  And I'm doing my best.
2        MS. BEARDSLEY:  Okay.
3        Q.  (BY MR. WOOTEN)  The actual Pooling and
4   Servicing Agreement -- we talked about -- the document I
5   just went through with you, 17-A, is a portion of that
6   document, okay?  And, again, the document's a public
7   record.  If anybody wants to contest the contents of it,
8   they can do so.  I'm just reading what's filed with the
9   Government under oath, okay?
10       MS. BEARDSLEY:  Well, I'll object.
11  You're reading what you selected to read.
12       MR. WOOTEN:  Sure.
13       MS. BEARDSLEY:  Okay.
14       MR. WOOTEN:  And you're welcome to read
15  anything you think contradicts --
16       MS. BEARDSLEY:  I'm not going to read
17  anything.  I just want the record to be clear that you
18  did not read the whole document.  You're only referring
19  to the portions that you want to refer to.
20       MR. WOOTEN:  That's right.
21       MS. BEARDSLEY:  Okay.  Just so we're
22  clear.
23       MR. WOOTEN:  I'm referring to the parts
24  that matter.
25       Q.  (BY MR. WOOTEN)  There is a section under

**Daphne Mosley**                                    October 14, 2009

Page 193

1   page 20, and you can refer to the table of contents in
2   Robin's document if you'd like to, that deals with
3   definitions of this trust.
4           Now, you don't contend or dispute any of
5   the definitions that are contained in this trust
6   document, do you?
7           MS. BEARDSLEY: She's not going to be --
8   I mean, she's really not qualified to testify about
9   whether or not she disputes them or not. We don't
10  dispute that it's a public record.
11          MR. WOOTEN: You don't dispute that it's
12  filed under oath with the SEC?
13          MS. BEARDSLEY: Right. That it is a
14  public record. Absolutely.
15          MR. WOOTEN: Sure.
16      Q. (BY MR. WOOTEN) You don't dispute that your
17  company is a party to this agreement?
18      A. No.
19      Q. Okay. And you don't dispute that this
20  agreement is the basis by which your company has been
21  acting with respect to Lorraine Hudson's loan, right?
22      A. That's correct.
23      Q. And so whatever this document says about your
24  obligations, rights, duties, whatever, you agree that's
25  binding, right?

Page 194

1       A. Yes.
2       Q. Do you have any idea as to why these
3   particular documents are filed with the SEC, made a part
4   of the public record?
5       A. No, not particularly.
6       Q. Are you aware as to whether or not these
7   documents exist for the purpose of creating investment
8   vehicles in the form of REMIC certificates?
9       A. No.
10      Q. Do you know what a REMIC is?
11      A. Huh-uh.
12          MS. BEARDSLEY: Is that a no?
13      A. No.
14      Q. (BY MR. WOOTEN) You don't know?
15      A. No.
16      Q. A REMIC is a Real Estate Mortgage Investment
17  Conduit, and that is a term defined by the IRS tax code,
18  okay?
19      A. Okay.
20      Q. Are you aware of any of the legal requirements
21  for forming a REMIC trust?
22      A. No.
23      Q. So you would not have an opinion as to whether
24  or not the purpose of filing documents such as this
25  under oath would be to comply with that law?

Page 195

1       A. No.
2       Q. Are you aware of whether or not there exists
3   any limitations upon how, when, and by what method a
4   trust may acquire an asset?
5       A. I do not know.
6       Q. Are you aware of what law or what jurisdiction
7   governs the creation of this trust?
8       A. No.
9       Q. If the document says it's New York law, you
10  would not dispute that?
11      A. No.
12      Q. Do you know who in your firm would certify the
13  accuracy of these types of documents to the SEC and the
14  IRS?
15          MS. BEARDSLEY: Object to the form.
16      A. I do not know.
17      Q. (BY MR. WOOTEN) Is that -- that page
18  highlighted in front of you, is that page 11 and 12 in
19  the top right corner?
20      A. Yes.
21      Q. Okay. If you will, let me take a look at
22  that. I'll put that back in the stack since I asked you
23  what I thought I needed to.
24          MR. WOOTEN: Do y'all want to stop and
25  take a break? I don't want anybody's eyes to glaze

Page 196

1   over. It's 2:30. Do you want to take about 20 minutes?
2   Is that okay?
3           THE WITNESS: That's fine.
4           MR. WOOTEN: Let's do that.
5           (Recess taken from 2:28 p.m. to
6           2:39 p.m.)
7       Q. (BY MR. WOOTEN) Ms. Mosley, we've been here a
8   long time today, and I try to be as direct as I can,
9   okay? But there's some documents we have to get through
10  to finish this up. So bear with me, all right?
11          With respect to this particular trust, do
12  you have any idea as to the date identified as the
13  closing date for this trust?
14      A. You mean like off the top of my head?
15      Q. Right. Other than me showing you the
16  document, do you have any idea?
17      A. No.
18      Q. Do you have any idea why a closing date is
19  relevant to this trust?
20      A. No, not particularly.
21      Q. I'll show you page 29, which indicates the
22  closing date is November 14th, 2003.
23          MS. BEARDSLEY: The closing date of the
24  Pooling and Servicing Agreement?
25          MR. WOOTEN: Which is the trust.

**Daphne Mosley**                                    **October 14, 2009**

Page 197

1    Q.  (BY MR. WOOTEN)  And I asked you earlier if
2  you had any idea as to what the relevance of that
3  closing date is or why they designate a date as a
4  closing date.
5    A.  To my -- I know to my knowledge, it -- there
6  can't be any loans originated included in the pool that
7  were originated after the closing date of a pool.
8    Q.  Is that based on an inquiry that you made or
9  is that just based on your general understanding?
10   A.  It's just based on my general understanding.
11   Q.  Makes a lot of sense too, doesn't it, when
12  you're opening and closing a trust, that the closing
13  date would be kind of the final date, right?
14   A.  Right.
15       MR. WOOTEN:  If you will, I'm going to
16  put this -- I'm going to try to keep this in order for
17  the court reporter, because she's going to have to make
18  copies of all this for us.
19       MS. BEARDSLEY:  Are you marking that as a
20  certain exhibit?
21       MR. WOOTEN:  No.  It's -- the whole PSA
22  is 17.  I pulled out 17-A for the Mortgage Loan Purchase
23  Agreement.
24       MS. BEARDSLEY:  Okay.
25       MR. WOOTEN:  Right.  And the reason being

Page 198

1  because that is actually a separate contract, which is
2  an exhibit.
3       MS. BEARDSLEY:  Okay.  I mean, is it fair
4  to stipulate on the record -- I mean, you're
5  piecemealing through these documents.
6       MR. WOOTEN:  Sure.
7       MS. BEARDSLEY:  I mean, we're not
8  reading --
9       MR. WOOTEN:  No, we're not reading
10  through all the documents.
11       MS. BEARDSLEY:  -- through all these
12  documents --
13       MR. WOOTEN:  No, no, no.
14       MS. BEARDSLEY:  -- like 17-A is not a
15  document that we read through all of.  17 is not one
16  that we're going to --
17       MR. WOOTEN:  No.
18       MS. BEARDSLEY:  -- read through the
19  entire document.  And she can't verify other than
20  stipulating that this is public record.
21       MR. WOOTEN:  Sure.
22       MS. BEARDSLEY:  I'm just saying as much
23  as I know you're fixing to attach this whole document to
24  the deposition, I mean, she can't verify as to what's in
25  the documents collectively.

Page 199

1       MR. WOOTEN:  Right.  She can look at the
2  portions that are relevant and indicate whether they say
3  what they say and whether they mean what -- well, she
4  can't say what they mean, but --
5       MS. BEARDSLEY:  Well, and, I mean, I
6  would object to those portions being classified as
7  relevant.  The portions you're directing to her is what
8  I would call them.
9       MR. WOOTEN:  Certainly.  And we're going
10  to deal with all that.
11    Q.  (BY MR. WOOTEN)  I'm trying -- like I said,
12  I'm trying to cut it down to what we do have to go over,
13  but there are certain parts of this that -- one of these
14  deals with the definition of a qualified substitute
15  mortgage loan, and it's on page 51 of this exhibit.
16    A.  Uh-huh.
17    Q.  Rather than have you read that into the
18  record, I'll ask you if you would agree that whatever
19  definition the parties chose for the definition of a
20  qualified substitute mortgage loan is what the
21  controlling definition of that loan is for purposes of
22  this agreement and the administration of this trust,
23  right?
24    A.  Yeah, I agree with that.
25    Q.  If you will, let me --

Page 200

1    A.  (Witness hands document to counsel.)
2    Q.  This is a long definition.  I'll represent to
3  you that it comes basically out of the IRS or Internal
4  Revenue Service Code.  I want to find one portion of
5  this.
6       You know what?  I'll just skip over that.
7  That will save us a moment.
8       And you would agree with me as a general
9  statement that whatever definitions the parties chose
10  with respect to this agreement for those terms are the
11  definitions that are binding on the parties to the
12  trust, right?
13    A.  Yes.
14    Q.  Page 61 of the exhibit is a definition of the
15  term "trust."  And does that indicate that the trust --
16  does that tell us what the name of the trust is for this
17  Pooling and Servicing Agreement?
18    A.  Yes.
19    Q.  And what is that, please, ma'am?
20    A.  Finance America Mortgage Loan Trust 2001-3.
21    Q.  Was that 2003-1?
22       MS. BEARDSLEY:  2003-1, yeah.
23    A.  Oh, yeah.  Sorry.
24    Q.  (BY MR. WOOTEN)  And is that the same name
25  that is present in Exhibit 12 to the motion for relief

**Daphne Mosley**                                    **October 14, 2009**

---

Page 201

1    from stay in this case?
2         And I can just show you the copy I've
3    been working off of.
4         A.  Yes.
5         Q.  Okay.  Let me put that form back in the stack.
6         The subsection dealing with the
7    conveyance of mortgage loans is Section 2.01 of the
8    trust agreement.
9         MR. WOOTEN:  That is page 65, Robin, if
10   you want to go to it.
11        Q.  (BY MR. WOOTEN)  The portion highlighted in
12   orange, what does that say?
13        A.  "The depositor, concurrently with the
14   execution and delivery hereof, does hereby transfer,
15   assign, set over, and otherwise convey in trust to the
16   trustee without recourse for the benefit of the
17   certificate holders all the right, title, and interest
18   of the depositor, including any security interest
19   therein for the benefit of the depositor."
20        Q.  Who is -- do you remember who the depositor
21   was in this trust agreement?
22        A.  Is it Greenwich?
23        Q.  Financial Asset Securities Corporation?
24        A.  Which -- I'm confused.
25        Q.  Look at -- there it is right there in front of

---

Page 202

1    you, this portion of 17-A.  That's the deal with the
2    Mortgage Loan Purchase Agreement, and you also have the
3    definition under the trust agreement in the preamble.
4         A.  Okay.
5         Q.  So that is Financial Asset Securities
6    Corporation?
7         A.  Yes.
8         Q.  They were the purchaser under the Mortgage
9    Loan Purchase Agreement, right?
10        A.  Yes.
11        Q.  And that says that Financial Asset Securities
12   Corporation conveys to the trust, right?
13        A.  Yes.
14        MS. BEARDSLEY:  I'm sorry.  What says?
15        MR. WOOTEN:  Section 2.01.
16        MS. BEARDSLEY:  Okay.  Sorry.
17        Q.  (BY MR. WOOTEN)  And it says that they convey
18   to the trust all their right, title, and interest to
19   these mortgage loans, right?
20        MS. BEARDSLEY:  Object to the form.
21        Q.  (BY MR. WOOTEN)  Is there any other entity
22   identified as conveying any interest in a mortgage loan
23   to that trust in that section?
24        A.  No.
25        MS. BEARDSLEY:  This section goes on for

---

Page 203

1    four pages.
2         Q.  (BY MR. WOOTEN)  Let's talk about it in that
3    first paragraph, okay?  Does any portion of that
4    document indicate in that first paragraph that any other
5    entity deposits to the trust?
6         A.  No.
7         Q.  What does the portion that's highlighted in
8    purple say?
9         A.  "Each mortgage loan identified on the mortgage
10   loan schedule, including the related cut-off date
11   principal balance, all interest accruing thereon on and
12   after the cut-off date, and all collections in respect
13   of interest and principal due after the cut-off date."
14        Q.  We talked about the cut-off date being
15   November 14th, 2003, right -- or actually the --
16        MS. BEARDSLEY:  That was the closing
17   date.
18        Q.  (BY MR. WOOTEN)  -- cut-off date is June 1st,
19   2003.  Closing date is November 14th.
20        MS. BEARDSLEY:  We haven't talked about a
21   cut-off date, so let me object to the form of that.
22        MR. WOOTEN:  We can go back to the
23   definitions and look at that so we can make sure we're
24   clear on that.
25        MS. BEARDSLEY:  Well, if it's --

---

Page 204

1    whatever's in the document says what it says.
2         Q.  (BY MR. WOOTEN)  It says the cut-off date
3    is -- there's the definition of cut-off date right
4    there, the second yellowed definition.  Do you see that?
5         A.  Yes.
6         Q.  And actually what does it say the cut-off date
7    is?
8         A.  November 1st, 2003.
9         Q.  Okay.  And that is the same date as the
10   Pooling and Servicing Agreement, right?
11        A.  Yes.
12        Q.  Okay.  So it says that as of the date of the
13   Pooling and Servicing Agreement, the depositor is
14   conveying its interest, right?
15        MS. BEARDSLEY:  Object to the form.  I
16   mean, it says what it says.
17        Q.  (BY MR. WOOTEN)  Well, we've established that
18   the cut-off date is the same date as the Pooling and
19   Servicing Agreement, right?
20        A.  Right.
21        Q.  And we talked about the closing date being
22   November 14th, '03, right?
23        A.  I don't remember what the date was.
24        Q.  Okay.  Well, again, it's in the definitions,
25   so you're comfortable with whatever that is, right?

---

**Daphne Mosley**                                    October 14, 2009

Page 205

1      A.   Right.
2      Q.   What does that portion of that document say --
3  let me walk back around, because this is going to take a
4  lot longer the other way.
5           MS. BEARDSLEY:  Nick, I mean, I can see
6  that you have a lot to go through, but if we're just
7  reading the document, can we please get to questions.
8           MR. WOOTEN:  Sure.
9      Q.   (BY MR. WOOTEN)  The portion in pink here
10  indicates that in connection with such transfer and
11  assignment, the depositor, which is FASCO, does hereby
12  deliver to, and deposit with the custodian, or its
13  designated agent, who is the custodian, the following
14  documents or instruments with respect to each mortgage
15  loan; is that correct?
16      A.   Yes.
17      Q.   And does that also --
18           MS. BEARDSLEY:  And that's what it says.
19      A.   That's what it says.
20      Q.   (BY MR. WOOTEN)  Right.  And does that also
21  indicate that those documents under this heading -- I
22  would call that Roman numeral I -- part of the documents
23  are the original mortgage note with all riders, correct?
24      A.   Yes.
25      Q.   And it says it will be endorsed either in

Page 206

1  blank, in which case the trustee shall cause the
2  endorsement to be completed, or in the following form.
3  And it says, "Pay to the order of Deutsche Bank National
4  Trust Company, as Trustee, without recourse," correct?
5      A.   Yes.
6      Q.   And that is the same endorsement called for
7  under 17-A in Article II right here on page 269; is that
8  correct?
9      A.   Yes.
10      Q.   And, in fact, it appears that article -- or
11  Item No. 1 in the Pooling and Servicing Agreement and
12  Item No. 2 in the Pooling and Servicing Agreement read
13  identical to Item No. 1 and Item No. 2 with respect to
14  the documents that are required; is that correct?
15           I think you can probably actually read on
16  if you want to, but I think the same information about
17  the documents being required on 270 corresponds with the
18  documents being required on 66 with request to the
19  mortgage loan and whether it's registered on MERS,
20  whether it's assigned in blank.
21           This is right here.  2 and 2 go together.
22           MS. BEARDSLEY:  Your question is -- is
23  just that those are the same numbered paragraphs?
24           MR. WOOTEN:  No.
25      Q.   (BY MR. WOOTEN)  My question is:  Do they say

Page 207

1  the same thing, require the same documents?
2           MS. BEARDSLEY:  Well, I'm going to object
3  to whether they require the same documents.  I mean,
4  that they say the same thing -- but these are in very
5  different sections.
6      Q.   (BY MR. WOOTEN)  Does it appear that the items
7  requested that are supposed to be present in paragraph 1
8  here is the same as the items that are supposed to be
9  present in paragraph 1 of 17 of Exhibit 17-A on
10  page 269?
11           MS. BEARDSLEY:  Object to the form.
12      A.   The paragraph states the same thing in both
13  documents.
14      Q.   (BY MR. WOOTEN)  Okay.  That was my question.
15           On page 67 of Exhibit 17 -- well, I'll
16  just withdraw that question.
17           Under Subsection 2.02, that heading is
18  Acceptance by the Trustee; is that correct?
19      A.   Yes.
20      Q.   And under that subsection, does it indicate
21  that the trustee will certify both to the servicer and
22  the depositor the receipt of certain documents?
23           MS. BEARDSLEY:  Nick, I'm going to
24  object.  It says what it says, and that's all she can
25  answer to.

Page 208

1           MR. WOOTEN:  Sure.  That's all I asked
2  her.
3      Q.   (BY MR. WOOTEN)  Does it say that --
4           MS. BEARDSLEY:  No, you didn't say -- I
5  mean, you're asking her a question to interpret what it
6  says, you know.
7      Q.   (BY MR. WOOTEN)  Well, let's do this.  Read
8  the part in pink there on that page, please, ma'am.
9      A.   "The trustee agrees to execute and deliver (or
10  cause the custodian to execute and deliver) to the
11  depositor and the servicer on or prior to the closing
12  date an acknowledgment of receipt of the related
13  original mortgage note for each mortgage loan (with any
14  exceptions noted), substantially in the form attached as
15  Exhibit F-3 hereto."
16      Q.   Let me show you a document that I'm going to
17  mark as Exhibit 17-B, which is also an exhibit to the
18  Pooling and Servicing Agreement.
19           (Plaintiff's Exhibit No. 17-B
20           marked for identification.)
21      Q.   (BY MR. WOOTEN)  And it is page 287.  And I'll
22  ask you if that is a form of Exhibit F-3.
23      A.   Yes.
24      Q.   Was a copy of that document present in any of
25  the documents produced to my client as part of discovery

**Daphne Mosley**

Page 209

1　in this case?
2　　　　MS. BEARDSLEY: Object to the form.
3　　Q. (BY MR. WOOTEN) To your knowledge.
4　　A. No.
5　　Q. Have you ever seen a copy of a document such
6　as that prior to today?
7　　　　MS. BEARDSLEY: Object to the form.
8　　A. No.
9　　Q. (BY MR. WOOTEN) When does it say in that
10　document that Exhibit F-3, which I have marked as
11　Plaintiff's Exhibit 17-B, will be delivered?
12　　A. On or prior to the closing date.
13　　Q. And that was November 14th, 2003, right?
14　　A. Whatever the closing -- I don't recall what
15　the date was, but whatever the closing date is in the
16　document, yeah.
17　　Q. All right. And the paragraph immediately
18　beneath that in yellow, do you see a portion that
19　discusses an Exhibit F-1?
20　　A. Yes, I see some context regarding Exhibit F-1.
21　　Q. Okay. Does that text indicate that that is
22　another certification by the trustee both to FASCO and
23　to Litton that all of the documents related to the
24　mortgage files have been delivered to the trustee as of
25　the date of that certification?

Page 210

1　　A. Okay. What was your question again?
2　　Q. Does that portion of the trust agreement
3　indicate that Exhibit F-1 will be delivered to Financial
4　Asset Securities Corporation and Litton Loans within a
5　certain amount of time after the trust is closed through
6　the closing date?
7　　A. Yes.
8　　Q. Okay. And does it say that that will occur
9　within 90 days?
10　　A. It says in 45 days.
11　　Q. 45 days?
12　　A. After the closing date.
13　　Q. All right.
14　　　　(Plaintiff's Exhibit No. 17-C
15　　　　marked for identification.)
16　　Q. (BY MR. WOOTEN) I'm going to show you a
17　document I've marked as Plaintiff's Exhibit C. It is a
18　front and back. It is two documents, Exhibit F-1 and
19　Exhibit F-2.
20　　　　Exhibit F-1 is an initial certification,
21　which we were just discussing. Exhibit F-2 is a final
22　certification, which I'll hand you the form in just a
23　second. That says it will be done within a year or on
24　the first anniversary of the trust closing date.
25　　　　Have you ever seen either of those

Page 211

1　documents before?
2　　A. No.
3　　Q. In your work with Litton, have you ever seen a
4　document of that type?
5　　　　MS. BEARDSLEY: Object to the form.
6　　A. No.
7　　Q. (BY MR. WOOTEN) Okay. If you will, let's put
8　17-C on the stack right here with 17-B. And I'm going
9　to let you hand me back 68, and I'm going to hand you
10　69.
11　　　　The portion in green on page 69, that
12　discusses Exhibit F-2 and the final certification; is
13　that correct?
14　　A. Yes.
15　　Q. And it does say that that final certification
16　will take place on the one-year anniversary; is that
17　correct?
18　　A. Yes, prior to the first anniversary.
19　　Q. All right. So according to the trust
20　agreement, there were one instance where only the
21　possession of the note with proper endorsement should
22　have been verified, and that was Exhibit F-3, which we
23　marked as 17-B, right?
24　　　　MS. BEARDSLEY: Object to the form.
25　　A. Could you repeat your question.

Page 212

1　　Q. (BY MR. WOOTEN) Sure. The trust document
2　said that the trustee will certify both to Litton and to
3　FASCO possession of the note in Exhibit F-3, which we
4　have marked as 17-B, correct?
5　　A. Yes.
6　　Q. And then Exhibit F-1 was to certify that all
7　the documents, including the note and the mortgage, were
8　in the possession of the trustee within 45 days of
9　November 14th, 2003, correct?
10　　　　And if you want to flip back to this part
11　of the trust agreement to look at that, you can do that.
12　　　　MS. BEARDSLEY: You're asking if the
13　trust agreement refers to this Exhibit F-1, F-2, and
14　F-3, right?
15　　Q. (BY MR. WOOTEN) Do you see this part that I
16　highlighted there -- I underlined what was already
17　highlighted? That deals with Exhibit F-1 being provided
18　within 45 days of the closing date, right?
19　　A. Right.
20　　　　MS. BEARDSLEY: That's what it says.
21　　Q. (BY MR. WOOTEN) And then Exhibit F-2 deals
22　with a certification prior to the one-year anniversary
23　of the same information, right?
24　　　　MS. BEARDSLEY: Nick, we will agree that
25　the document says what it says. I mean --

**Daphne Mosley**                                          **October 14, 2009**

Page 213

1     A.  I don't know.
2         MS. BEARDSLEY:  She is not going to be
3  able to answer those questions, but the document says
4  what it says.  And we don't dispute that.
5     Q.  (BY MR. WOOTEN)  Let me see if I can
6  short-circuit this a little bit for you, okay?
7         You agree with me that the trust required
8  certain acts to have taken place by certain times,
9  correct?
10    A.  Yes.
11    Q.  And you agree that the trust required that
12 Financial Asset Securities Corporation convey the loan
13 to the trust, correct?
14    A.  Yes.
15    Q.  And you agree that there is no evidence that
16 Financial Asset Securities Corporation ever had any
17 ownership in this mortgage note, based upon the
18 documents that you have produced in this lawsuit.
19        MS. BEARDSLEY:  I'll object to the form,
20 because I don't think she can answer that question
21 without having reviewed all those documents as to what
22 was required under the trust.  I mean --
23    Q.  (BY MR. WOOTEN)  We've talked about the
24 Mortgage Loan Purchase Agreement, right?
25    A.  Yes.

Page 214

1     Q.  And we've talked about the Pooling and
2  Servicing Agreement, right?
3     A.  Right.
4     Q.  Both of those documents indicated that
5  Greenwich Capital Products bought the loans from someone
6  else.  We identified Finance America as that someone
7  else, as the originator, correct?
8     A.  I believe so.
9     Q.  Okay.  Would you like for me to show you where
10 it's at in the document?
11    A.  No.  I just don't remember all the names, so
12 when we keep going back, it's just all running together
13 at this point.
14    Q.  I understand, and I'm trying not to make you
15 stay any longer than necessary.  And I understand it's
16 dense for the first time you've ever seen any of it.
17    A.  Right.
18    Q.  But the Mortgage Loan Purchase Agreement says
19 that Finance America is the originator, correct?
20    A.  Right.
21    Q.  And that is Exhibit 17-A.
22        MS. BEARDSLEY:  I'm going to object.  It
23 does not say that Finance America is the originator.
24    A.  That's a separate document.
25        MS. BEARDSLEY:  Finance America is the

Page 215

1  purchaser.  This is 17-A.  I mean --
2         MR. WOOTEN:  Okay.  Well, hand it to me
3  and I'll show you where it says that, Robin.  17-A deals
4  with three parties:  the originator, the purchaser, and
5  the seller.
6         MS. BEARDSLEY:  It says seller and
7  purchaser.  Purchaser is Finance America.  It's on the
8  front page.
9         MR. WOOTEN:  Financial Asset Securities
10 Corporation is not Finance America.
11        MS. BEARDSLEY:  Okay.
12        MR. WOOTEN:  So hold on just a second.  I
13 want to be real clear about this, because I'm not going
14 to hear this when I go back to court with the Judge
15 about these questions.
16        MS. BEARDSLEY:  These are not questions,
17 Nick.  You have not asked a question in about an hour.
18 We're just reading public record documents.
19    Q.  (BY MR. WOOTEN)  I'm going to highlight
20 page 271 of Exhibit 17-A and ask you, does that say that
21 Finance America, LLC is the originator?
22    A.  Yes.
23    Q.  Okay.  And I'm going to show you page 45
24 highlighted in green in the definition section of the
25 PSA and ask you, does that say that the originator is

Page 216

1  Finance America, LLC?
2     A.  Yes.
3     Q.  It does not say that the originator is
4  Financial Asset Securities Corporation, does it?
5     A.  No.
6     Q.  That is the depositor under the Pooling and
7  Servicing Agreement and the purchaser under the Mortgage
8  Loan Purchase Agreement; is that correct?
9     A.  Yes.
10    Q.  And they are not the same entity, are they?
11    A.  No.
12    Q.  Okay.  If you'll let me have that page back,
13 I'll put that back in order, please, ma'am.
14    A.  (Witness hands document to counsel.)
15    Q.  Thank you.
16        Now, having established who the
17 originator is, we can agree that in the documents
18 produced in this case, there is no endorsement of the
19 promissory note from Finance America to Greenwich
20 Capital Markets or Financial Assets Securities
21 Corporation, is there?
22    A.  No.
23    Q.  And we can agree that there is no endorsement
24 of the promissory note from Finance America, LLC to
25 Deutsche Bank National Trust Company, without recourse,

Page 217

1    as required in both the Mortgage Loan Purchase Agreement
2    and the Pooling and Servicing Agreement?
3            MS. BEARDSLEY:  I'm going to object to
4    your statement that it's required, because --
5            MR. WOOTEN:  Okay.  Well, we'll address
6    that when the time comes, but I promise you it's
7    required.
8            MS. BEARDSLEY:  I mean, she can't answer
9    that it's required without having read the full extent
10   of these documents.  So, I mean, she's not qualified to
11   answer that question with respect to these documents.
12           MR. WOOTEN:  If we need to go ask
13   Greenwich Capital, we will, but the documents are right
14   there.
15           MS. BEARDSLEY:  The documents speak for
16   themselves, so --
17       Q.  (BY MR. WOOTEN)  And the documents are
18   missing, aren't they?  The last endorsement is a blank
19   endorsement by Finance America, is it not?
20       A.  Where is it?
21       Q.  Here is the note that's marked as Exhibit 10.
22       A.  Okay.  Can you repeat your question, please.
23       Q.  Sure.  The question is:  In the documents you
24   have produced to us evidencing ownership of this
25   promissory note, there is no endorsement to the Deutsche

Page 218

1    Bank National Trust, is there?
2        A.  No.
3        Q.  The last quote, unquote endorsement is an
4    allonge, which is a separate sheet of paper, unattached
5    to the note in blank in the name of Finance America,
6    right?
7        A.  Correct.
8        Q.  And so if you assume that the two allonges you
9    have attached are true, they show a transfer from Global
10   Lending or Global Lenders to Finance America and then a
11   blank endorsement, correct?
12       A.  Correct.
13       Q.  And those allonges are not even present on
14   your motion for relief from stay in November of 2007,
15   are they?
16       A.  No, they were not.
17       Q.  The fact of the matter is there is nothing on
18   those two pieces of paper that tell us anything about
19   who, when, or why they were created, do they?
20           MS. BEARDSLEY:  Which paper are you
21   referring to?
22           MR. WOOTEN:  The allonges.
23           MS. BEARDSLEY:  Well, there was
24   information on those documents about their dates and
25   creation -- I mean, I don't -- object to the form.

Page 219

1        Q.  (BY MR. WOOTEN)  And you agree that those
2    allonges are not permanently affixed to or attached to
3    the promissory note in this case, correct?  They are not
4    glued, stapled, taped to the promissory note, are they?
5            MS. BEARDSLEY:  You mean to the original
6    note?  They're stapled right here.  I don't understand
7    what your question is.
8        Q.  (BY MR. WOOTEN)  I just stapled those, right?
9    I stapled those.
10           MS. BEARDSLEY:  Well, if you're claiming
11   that I didn't send them to you stapled -- I don't
12   understand your question, Nick.  I'm sorry.
13       Q.  (BY MR. WOOTEN)  Back up and let's explain it.
14   Do you know the purpose of an allonge under the law,
15   ma'am?
16       A.  It's to -- I thought it was to reflect the
17   endorsement -- the transfer from one party to the next.
18       Q.  Do you know when the law says to use an
19   endorsement?
20           MS. BEARDSLEY:  She's -- object to
21   requesting a legal conclusion.  She can't answer that
22   question.
23       Q.  (BY MR. WOOTEN)  I mean, you've been at this
24   eight years.
25           MS. BEARDSLEY:  She's not going to answer

Page 220

1    a legal question, Nick.
2        Q.  (BY MR. WOOTEN)  I'm asking what you know
3    about why and when you use an allonge.
4        A.  I don't know.
5        Q.  Okay.  Is it fair to say that there's plenty
6    of room on the front or the back of that promissory note
7    for a stamped endorsement?
8        A.  Yeah, that's a fair statement.
9        Q.  And is it fair to say that there's nothing
10   that would have prevented anybody from putting the same
11   information that's on the allonges on either the front
12   or the back of the promissory note?
13       A.  Not that I know of.
14       Q.  Okay.  So if the law requires that the
15   promissory note be permanently affixed -- an allonge be
16   permanently affixed to the promissory note in such a way
17   that it cannot be separated, that is not how those
18   documents were produced in discovery, is it?
19           MS. BEARDSLEY:  Nick, you're talking
20   about the actual note, which we didn't produce the
21   actual note.  I know you understand why we don't produce
22   the actual note.  So this is a copy of the note and the
23   allonges that go with it.
24           So however they're affixed from the copy
25   that you got in production was in a CD of documents that

**Daphne Mosley**                                    **October 14, 2009**

56 (Pages 221 to 224)

Page 221

1  I produced to you. I mean --
2  Q. (BY MR. WOOTEN) And my only question about
3  that was they were not attached as one continuous
4  document so that the alonges would have the same page
5  number as the end of the promissory note, right?
6      MS. BEARDSLEY: Object to the form.
7  A. I don't understand what you're saying.
8  Q. (BY MR. WOOTEN) Here's what I'm saying,
9  ma'am. There is nothing about that promissory note that
10  prevented those endorsements from being made to the
11  front or the back in any blank available space regarding
12  a change in the ownership of that note.
13  A. Yeah, there's space for an endorsement on the
14  actual third page of the note.
15  Q. Right.
16  A. Yes.
17  Q. And when you made or filed your motion for
18  relief from stay in November 2007, those alonges were
19  not present.
20  A. Correct.
21  Q. And you were looking at the same information
22  in 2007 that you were looking at when you responded to
23  our discovery, right?
24      MS. BEARDSLEY: I don't think she can
25  answer the question, because she wouldn't have known

Page 222

1  what they looked at in 2007.
2  Q. (BY MR. WOOTEN) The same information would
3  have been available to Litton employees in 2007 when
4  this discovery was responded to, correct?
5      MS. BEARDSLEY: Object to the form.
6  A. I don't know the answer to that.
7  Q. (BY MR. WOOTEN) Under paragraph No. 1 under
8  Section 2.01, we talked about earlier the fact that that
9  says that the mortgage loan, the mortgage note will be
10  endorsed either in blank or to the trustee, pay to the
11  order of Deutsche Bank National Trust Company, as
12  Trustee, without recourse, right?
13      MS. BEARDSLEY: Are you referring to the
14  very first paragraph?
15  Q. (BY MR. WOOTEN) Right down under the part
16  where it talks about what documents will be provided to
17  the trustee. It's highlighted. We were comparing it to
18  the Mortgage Loan Purchase Agreement.
19  A. Uh-huh.
20  Q. Right?
21  A. Yes.
22  Q. You will agree that there is no endorsement to
23  the name of Deutsche Bank National Trust Company, as
24  trustee, without recourse, right?
25  A. Huh?

Page 223

1  Q. You will agree that in none of the documents
2  produced to us, which you've represented as Plaintiff's
3  Exhibit 10 were all the documents responsive related to
4  the ownership of the note and the endorsements and
5  alonges thereto, that there is not a document which
6  says "Pay to the order of Deutsche Bank National Trust
7  Company, as Trustee, without recourse"?
8  A. I have not seen -- I have not seen such a
9  document with that language.
10  Q. And if there were such a document, it would be
11  included as part of what you've produced to us with
12  respect to the mortgage note and endorsements and
13  alonges thereto.
14  A. Yeah. If it was within Litton's possession,
15  yes.
16  Q. And when you say "within Litton's possession,"
17  that also encompasses the documents that Litton has
18  access to, right?
19      MS. BEARDSLEY: Object to the form.
20  A. No. That means documents readily available.
21  Q. (BY MR. WOOTEN) Okay. Are documents
22  evidencing the ownership of the debt readily available
23  to Litton through a request to the trustee or custodian?
24  A. Yeah, I can't verify that that request was
25  made, so I don't know.

Page 224

1  Q. I just want to make sure I understand what
2  you're saying, ma'am, because we've come all the way to
3  Houston to depose Litton Loans about the ownership of
4  this debt. And I just want to make sure we're not
5  leaving any wiggle room here.
6      Is it your testimony that somewhere there
7  may be some other documents other than those in
8  Exhibit 10 which might have this magic language in it
9  that you think would cure this problem?
10  A. What I'm saying is the documents that were
11  available to me for viewing I have seen being produced
12  here. I cannot verify if there was a request made upon
13  custodian to produce their files, because I was not
14  involved with the production of documents.
15      (Plaintiff's Exhibit No. 17-D
16      marked for identification.)
17  Q. (BY MR. WOOTEN) I'll represent to you that
18  this is again another copy of the Pooling and Service
19  Agreement. It is also a form exhibit. It is page 283
20  of Exhibit 17. And it is entitled Exhibit E, Request
21  for Release of Documents.
22      I ask you if you've seen that document
23  before.
24  A. I've seen a document similar to this before.
25  Q. Okay. And that's a pretty standard form in

**Daphne Mosley**                                          October 14, 2009

## Page 225

1  your line of business, isn't it?
2      A.  Yes.
3      Q.  And that would allow Litton to obtain any
4  documents that it needed from the custodian or trustee
5  with respect to this mortgage loan account, correct?
6      A.  Yeah, it should.
7      Q.  And you also have the ability to make that
8  request electronically also, don't you?
9      A.  More than likely.
10     Q.  So, again, I just want to be real sure I hear
11  what you're saying.
12         Are you testifying that there are
13  documents that are responsive to the ownership of this
14  loan that are not produced here for this deposition
15  today?
16     A.  As I previously stated, the documents that
17  were available to me that I could view have been
18  produced here today.  I did not verify if a request was
19  made upon the custodian to provide us the documents that
20  they have in their possession, as I was not involved
21  with the production of documents.
22     Q.  You are aware that someone from Litton signed
23  your interrogatories and request for production under
24  oath certifying they were accurate, right?
25     A.  I know that occurs, yes.

## Page 226

1      Q.  You are aware they certified it was complete,
2  right?
3      A.  No.
4      Q.  Part of the certification is the accuracy of
5  the production, right?
6      A.  Yes.
7      Q.  Flip back in Exhibit 10 for a minute.  Look at
8  those allonges.
9         How hard would it be for an individual,
10  who had a mind to do so, to type up a form like that and
11  say, "Whoops, I found it"?
12     A.  That I don't know.
13     Q.  I mean, with a word processor, five minutes?
14     A.  Yeah, that's possible.
15     Q.  Is there anything on that document that
16  indicates when it was produced, who produced it, or
17  anything else?
18         MS. BEARDSLEY:  When you say produced, do
19  you mean by me?
20         MR. WOOTEN:  No.  I'm talking about where
21  that document came from.
22         MS. BEARDSLEY:  Okay.  Object to the
23  form.
24         MR. WOOTEN:  I understand it was given to
25  you.

## Page 227

1         MS. BEARDSLEY:  Right.
2      Q.  (BY MR. WOOTEN)  It's supposed to be part of
3  the mortgage file, but what I'm saying is the document
4  there, somebody with a word processor and a printer can
5  have one whipped off in five minutes, can't they?
6      A.  I guess they could.
7      Q.  Right.  So, I mean, what's to keep a person,
8  who had a mind to, from just typing up a form that has
9  this language in it and showing up in court in two weeks
10  and saying, "Oh, look, we found it"?
11     A.  I guess there wouldn't be anything.
12     Q.  Right.  And if that document were to magically
13  appear in court and somebody was willing to raise their
14  right hand and say, "Whoops, we found it," then you
15  could stand there and argue, "Oh, we had it the whole
16  time; we just don't know how to get it," right?
17         MS. BEARDSLEY:  Object to the form.
18  She's explained to you that they would have to request
19  this from someone else, Nick.  Me and you can battle
20  over custody later, but to the extent --
21         MR. WOOTEN:  Well, the problem is --
22         MS. BEARDSLEY:  -- it's in their custody,
23  we have produced the documents in their custody.  Making
24  a request and getting additional documents from a third
25  party is not within their --

## Page 228

1         MR. WOOTEN:  They're not a third party.
2         MS. BEARDSLEY:  -- requirements.
3         MR. WOOTEN:  They're not a third party.
4  They're a party to the securitization agreement.
5  They're a party to the trust agreement.  They're the
6  agent of the trustee and custodian.  They have a
7  one-paragraph form to get whatever documents the
8  custodian and trustee have.
9         And, I mean, I would think, you know,
10  that we would be concerned with what we're facing about
11  the possibility it would be real simple for somebody to
12  commit fraud.
13         MS. BEARDSLEY:  Well, I mean --
14         MR. WOOTEN:  Go ahead.  I mean, if you
15  want to put something else on the record, go ahead.
16         MS. BEARDSLEY:  No, I don't need to.
17     Q.  (BY MR. WOOTEN)  Isn't it true, ma'am, that if
18  there were stamped endorsements on the promissory note
19  reflecting these changes of ownership, that would be
20  awful hard to fake after you produced three or four
21  copies?
22         MS. BEARDSLEY:  Object to the form.
23  Nick, there is no excuse for you asking questions --
24         MR. WOOTEN:  I'm not saying she had
25  anything to do with that.

Page 229

1    MS. BEARDSLEY: -- as though she's
2 created or trying to imply that these documents are
3 fraudulent in some form, okay? Not at this time,
4 there's not. Until you have some reason to make those
5 allegations, don't do it now.
6    MR. WOOTEN: Okay. Well, then stipulate
7 that those are all the documents, and we'll go forward
8 under that.
9    MS. BEARDSLEY: I'm not stipulating to
10 anything.
11    MR. WOOTEN: Okay. Well, that's fine.
12 We'll go straight back --
13    MS. BEARDSLEY: I'm just saying don't ask
14 your questions in a manner as though you're accusing
15 someone of creating documents that have been produced to
16 you during the course of this case.
17    MR. WOOTEN: That's right. They have
18 been produced as a full and complete production of all
19 the documents that your client has. And what I just
20 said is true.
21    Q. (BY MR. WOOTEN) Do you know -- are you
22 familiar with the term "fraud paper"? Have you ever
23 heard that?
24    MS. BEARDSLEY: Object to the form.
25    Q. (BY MR. WOOTEN) I'm just asking about your

Page 230

1 personal knowledge. Have you ever heard anybody use
2 that term?
3    A. Kind of.
4    Q. Okay. And is that a term that sometimes is
5 used in conjunction with mortgage lending and servicing
6 practices by what some people have sometimes done with
7 respect to documents?
8    MS. BEARDSLEY: Object to the form.
9 We're not going to talk about what just someone in the
10 mortgage industry may have done. That has no relevance
11 here.
12    MR. WOOTEN: You have a right to object
13 to the form.
14    MS. BEARDSLEY: Object to the form.
15    MR. WOOTEN: You don't have a right to
16 instruct her not to answer or control her testimony.
17    Q. (BY MR. WOOTEN) I'm asking you, have you
18 heard the term "fraud paper" before?
19    A. Yes.
20    Q. And what do you understand that term to mean?
21    A. That people state that there may have been
22 documents that they may not have seen or executed.
23    Q. Okay. And with respect to documents where
24 there are alleged changes of ownership, particularly
25 with something as valuable as a promissory note, other

Page 231

1 than an allonge, are there typically ways in which the
2 parties certify one to the other the transfer of those
3 documents?
4    A. No, not other than through the preparation and
5 filing of an assignment that I know of.
6    Q. And when you see an assignment, it says to
7 you, as you testified earlier, that on that day, the
8 owner of the debt changed, the possession of the debt,
9 to some other party, and so they filed a mortgage
10 assignment to memorialize that transfer of ownership,
11 right?
12    A. Right.
13    Q. So when we look at a mortgage assignment dated
14 2007 from Finance America to a trust, your logical
15 assumption would be that in 2007 Finance America owned
16 that note, right?
17    A. Right.
18    Q. And we both agree that nothing in these
19 securitization documents other than a 2003 sales
20 agreement says that Finance America had any part in this
21 securitization.
22    MS. BEARDSLEY: Well, based on --
23    MR. WOOTEN: Let her answer.
24    MS. BEARDSLEY: Object to the form.
25    MR. WOOTEN: Let her answer.

Page 232

1    Q. (BY MR. WOOTEN) What was the answer, ma'am?
2 Is that where they're at, 2003, as the originator,
3 right?
4    A. November.
5    Q. November 12th, 2003, right?
6    A. I don't know the exact date, but
7 November 2003, right.
8    Q. Okay. And we all agree that nothing in this
9 trust, nothing anywhere in any of these hundreds of
10 pages, says anything about anybody acquiring ownership
11 in 2007, does it?
12    A. No.
13    Q. Okay. And we both agree that these documents
14 in 2003 said that there are at least two parties,
15 Greenwich Capital and Financial -- FASCO, Financial
16 Asset Securities Company, that don't appear anywhere in
17 your mortgage loan file as ever having any interest in
18 that loan, either by an assignment or an endorsement to
19 that note, right?
20    A. That's correct.
21    Q. And you could assume as someone with years of
22 experience that if they were in the chain of ownership,
23 they would appear there in these records, right?
24    A. Correct.
25    Q. And is it fair to say if you had documents

**Daphne Mosley**                                      October 14, 2009

Page 233

1  evidencing that, you would have produced them if they
2  were requested?
3      A.  That's correct.
4      Q.  Again, Litton Loans would not withhold
5  documents and say to the Court in the Middle District of
6  Alabama that it had given the Court everything when it
7  had other documents, right?
8      A.  Right.
9      Q.  Have you ever had any training with something
10 called the alphabet problem?
11     A.  Not that I know of.
12     Q.  Have you ever had training with respect to
13 breaks in the chain of assignments and endorsements of a
14 promissory note?
15     A.  No.
16     Q.  Do you have a page of the PSA over there,
17 No. 65 and 66, in front of you?
18     A.  (Witness hands document to counsel.)
19     Q.  I'm trying to keep this together.
20         Are you familiar with whether or not
21 either the IRS tax code or New York trust law places
22 limitation on the right of these trusts to acquire
23 assets?
24         MS. BEARDSLEY:  I'm going to object to
25 that as a legal question she can't answer.

Page 234

1      Q.  (BY MR. WOOTEN)  I'm just asking you if you
2  have any idea.
3      A.  No.
4      Q.  You've probably never been to a class on
5  securitization, have you?
6      A.  Yes.
7      Q.  You had to?  Did they ever talk about changing
8  ownership and true sales and things like that?
9      A.  Yes.
10     Q.  What's your understanding of a true sale?
11     A.  I don't have one.  It was many years ago.
12     Q.  Okay.  Are you familiar with the concept of
13 bankruptcy remoteness?
14     A.  No.
15     Q.  Do you remember reading the portion when we
16 first started talking about this trust instrument that
17 said that they were creating REMIC certificates, a REMIC
18 trust with this Pooling and Servicing Agreement?
19     A.  Yes.
20     Q.  And we talked about the fact that a REMIC was
21 a term of art from the IRS tax code and was a type of
22 investment.
23     A.  Yes.
24     Q.  And you know that much about that process,
25 right?  You're familiar with that concept?

Page 235

1      A.  No.
2      Q.  Article IX of the trust agreement deals with
3  REMIC administration.  That subsection, what is the
4  heading of 9.01?
5      A.  REMIC Administration.
6      Q.  Does the first portion that I highlighted in
7  orange restate the preliminary statement that the trust
8  is formed to create a REMIC interest in the corpus of
9  the trust or the assets of the trust?
10     A.  I don't get that out of this, but --
11     Q.  Okay.  It says in subparagraph (a) that "REMIC
12 elections as set forth in the preliminary statement" --
13 which was the part we read at the beginning -- "shall be
14 made by the trustee on Form 1066 or other appropriate
15 federal tax or information return"; is that right?
16     A.  Yes.
17     Q.  Okay.  And does the next paragraph deal with
18 the trustee's obligation to file tax returns?  What does
19 the next highlighted portion say?
20     A.  "The closing date is hereby designated as the
21 startup day of each REMIC within the meaning of
22 Section 860G(a), Section 9, of the code."
23     Q.  Okay.  And what's the next highlighted portion
24 of that document?
25     A.  "The trustee shall prepare, sign, and file all

Page 236

1  of the REMICs' federal and state tax and information
2  returns (including Form 8811) as the direct
3  representative each REMIC created hereunder."
4      Q.  And remember we talked about 12 classes of
5  certificates and 12 interests in the beginning, which
6  you read from the first section?
7      A.  Yes.
8      Q.  If you will, I'd like for you to look at
9  page 150 of that document.  You have a subpart there.  I
10 believe it's identified as subpart (f); is that correct?
11     A.  Yes.
12     Q.  And does that -- the summary of the portion
13 highlighted in blue and orange, does that indicate that
14 the parties to the securitization, of which Litton is
15 one, will do basically whatever they need to do to
16 preserve the REMIC status of the trust and not do
17 anything that would jeopardize the REMIC status of the
18 trust?
19         MS. BEARDSLEY:  Object to the form.
20     A.  Can you restate your question, please.
21     Q.  (BY MR. WOOTEN)  Sure.  What I said was a
22 summary of that paragraph basically was that the trustee
23 and servicer and depositor will basically do what was
24 necessary to preserve and maintain the REMIC status of
25 the trust.

**Allied Advanced Reporting, Inc.**                    713.524.6777

**Daphne Mosley**                                    **October 14, 2009**

Page 237

1    A.  Yes, that's what it states.
2    Q.  Okay.  And that's dealing with the compliance
3  with the REMIC provisions of the tax code?  Is that your
4  understanding?
5        MS. BEARDSLEY:  Object to the form.
6    Q.  (BY MR. WOOTEN)  From reading that paragraph,
7  is that your understanding?  It's dealing with
8  compliance of -- with the REMIC provisions of the tax
9  code?
10       MS. BEARDSLEY:  Object to the form.
11   A.  That's what it states.  I don't have an
12  understanding one way or the other.
13   Q.  (BY MR. WOOTEN)  Under this paragraph, there's
14  a portion that's highlighted in pink, and it talks about
15  prohibited contributions or prohibited transactions.
16  Those terms are defined either by the Pooling and
17  Servicing Agreement or IRS tax code.  Do you have any
18  knowledge of what a prohibited contribution or
19  prohibited transaction is?
20       MS. BEARDSLEY:  Object to the form.
21   A.  No.
22   Q.  (BY MR. WOOTEN)  Okay.  Down below that
23  portion highlighted in pink, there's a portion
24  highlighted in yellow, I believe.  What does that
25  highlighted portion say?

Page 238

1    A.  "No additional contributions of assets shall
2  be made to any REMIC created hereunder, except as
3  expressly provided in this agreement with respect to
4  eligible substitute mortgage loans."
5    Q.  Do you remember we looked at that big
6  definition of a qualified substitute mortgage loan
7  earlier in the definition section?
8    A.  I do not remember.
9    Q.  You'll agree that that definition is the
10  party's definition for purposes of this agreement,
11  right?
12   A.  Yes.
13   Q.  And if there is a time limit under which a
14  qualified substitute mortgage loan can be placed into
15  the trust, you agree that the parties have to comply
16  with that, right?
17   A.  Yes.
18   Q.  Section 9.02, would you read into the record
19  the heading of that section.
20   A.  "Prohibited Transactions and Activities."
21   Q.  There's a portion highlighted in pink in that
22  section.  What does the portion highlighted in pink say?
23       MS. BEARDSLEY:  Object to the form.
24   Q.  (BY MR. WOOTEN)  Let's do this.  That's a
25  short paragraph.  Just read the whole paragraph into the

Page 239

1  record, please.
2        MS. BEARDSLEY:  Paragraph 9.02?  The
3  paragraph says what it says.  There's no need to have
4  the court reporter type all of 9.02.  It's already typed
5  right there.
6    Q.  (BY MR. WOOTEN)  You and I talked about the
7  closing date earlier.
8    A.  Right.
9    Q.  And you say it makes sense that you couldn't
10  acquire assets after the closing date, right?
11   A.  Right.
12   Q.  Is that a summary of what the portion in pink
13  says?
14       MS. BEARDSLEY:  Object to the form.
15   A.  Yes.
16   Q.  (BY MR. WOOTEN)  And the first indication of
17  an official record that that note was transferred into
18  this trust would be the assignment in 2007 from Finance
19  America directly to the trust, right?
20   A.  Correct.
21   Q.  Page 70 of Exhibit 17, there's an orange
22  highlighted portion at the bottom of that page.  What
23  does it say?
24   A.  "Any substitution of qualified substitute
25  mortgage loans for deleted mortgage loans made pursuant

Page 240

1  to Section 2.03(a) must be effected prior to the last
2  business day that is within two years after the closing
3  date.  As to any deleted mortgage loan for which the" --
4    Q.  You need page 71?
5    A.  -- "for which the originator or the seller, as
6  applicable, substitutes a qualified substitute mortgage
7  loan or loans" -- how far do you want me to read?
8    Q.  That's fine.  That's a period, isn't it?
9    A.  No.  I don't think there is one until the very
10  end.
11   Q.  You can just pause.
12   A.  Okay.
13   Q.  The main thing I was looking at is that in the
14  orange section that you began at, it says if there is a
15  substitute and it meets the definition, it has to occur
16  within two years of the trust closing date, right?  The
17  orange highlighted part.
18   A.  Uh-huh.
19   Q.  Okay.  An assignment in 2007, assuming all
20  things else are equal and that the owner in 2007 of the
21  note was Finance America and they were trying to assign
22  to the trust in 2007 --
23   A.  Uh-huh.
24   Q.  -- we all agree is more than two years from
25  November 12th or 14th of 2003, right?

Page 241

1        MS. BEARDSLEY:  I have to object to the
2    form.  This was a MERS loan, so to say that the
3    assignment was from Finance America -- it's actually
4    from MERS.  So I don't know if you -- just to --
5        MR. WOOTEN:  Well, it's interesting.  Not
6    that long ago, I got through taking a deposition of the
7    CEO of MERS, and we talked about those things.
8        MS. BEARDSLEY:  I just wanted to be
9    accurate for the record when you're referring to an
10    assignment of mortgage.
11        MR. WOOTEN:  Sure.
12        Q.  (BY MR. WOOTEN)  And when you read that
13    assignment of mortgage in the way that it's written, it
14    says to you that MERS is assigning on behalf of Finance
15    America, right?
16        A.  Yes.
17        Q.  And you've already testified earlier that you
18    agree that the owner of the debt is the person who has
19    the right to assign, correct?
20        A.  Right.
21        Q.  So I'm deposing you from Litton.  Obviously we
22    don't have anybody here from Finance America, but based
23    on your experience and training, that assignment says to
24    you that on that day, Finance America owned that
25    promissory note, right?

Page 242

1        A.  Yes.
2        Q.  And that's based on your understanding of what
3    the authorities and rights are of a MERS member to
4    assign a mortgage in MERS' name, right?
5        A.  Right.
6        Q.  Now, it seems fairly logical to me, but I just
7    want to make sure you and I agree that if this trust
8    became the owner of this loan in 2003, that it would be
9    impossible for Finance America to make an assignment of
10    the same note in 2007, wouldn't it?
11        MS. BEARDSLEY:  Object to the form.
12        A.  Can you restate, please.
13        Q.  (BY MR. WOOTEN)  Sure.  I said it seems fairly
14    logical to me that if this loan were sold to this trust
15    in 2003, that it would be impossible for Finance America
16    to be the owner of this note in 2007 and be assigning it
17    to this trust.
18        A.  Yeah.  That's questionable.
19        MS. BEARDSLEY:  Object to the form.
20        Q.  (BY MR. WOOTEN)  That's questionable?  Why do
21    you say that's questionable?
22        A.  Based on the information that you've presented
23    here today, it's questionable.
24        Q.  Whether the trust owns the loan?
25        A.  Right.

Page 243

1        Q.  Okay.  There is nothing that I presented here
2    today that says that this trust owns this loan, is
3    there, other than that assignment in 2007?
4        A.  That's correct.
5        Q.  And the plain language of all the documents
6    that I've shown you say that not only did this trust not
7    acquire this loan in 2003, but the attempted assignment
8    to this trust in 2007 was out of time, right?
9        MS. BEARDSLEY:  Object to the form.
10        Q.  (BY MR. WOOTEN)  Well, she can object to the
11    form, but you have the right to answer.
12        MS. BEARDSLEY:  I mean, she has not had a
13    chance to review the entire --
14        MR. WOOTEN:  Sure.
15        MS. BEARDSLEY:  -- Pooling and Servicing
16    Agreement, so based upon the select things that you have
17    chosen to read -- but the references to MERS throughout
18    the Pooling and Servicing Agreement --
19        MR. WOOTEN:  Do you think that cures an
20    ownership problem with a note?
21        MS. BEARDSLEY:  I'm just saying that --
22        Q.  (BY MR. WOOTEN)  Well, let me ask you
23    because --
24        MS. BEARDSLEY:  I'm just objecting to the
25    form.  I'm sorry.

Page 244

1        Q.  (BY MR. WOOTEN)  -- Robin's not being deposed
2    and --
3        MS. BEARDSLEY:  I'm objecting to the
4    form.
5        Q.  (BY MR. WOOTEN)  -- and we always have
6    philosophical differences about documents.  It's nothing
7    personal.  I don't want you to think it is.
8        My point being you're familiar with MERS
9    generally.
10        A.  Yes.
11        Q.  And generally speaking, a requirement of
12    exercising signing authority in MERS' name of an
13    assignment of mortgage is that you are exercising that
14    authority on behalf of the note owner.
15        A.  Yes.
16        Q.  And I have the transcript of Mr. Arnold here
17    if you want to compare what he says about it.
18        MS. BEARDSLEY:  I object.  We're not
19    going to compare testimony.
20        MR. WOOTEN:  In fact, I think just to be
21    safe, I want to offer it as an exhibit.
22        MS. BEARDSLEY:  Whose testimony?
23        MR. WOOTEN:  The CEO of MERS.
24        (Plaintiff's Exhibit No. 19
25        marked for identification.)

**Daphne Mosley**                                    October 14, 2009

62 (Pages 245 to 248)

---

Page 245

1    Q.  (BY MR. WOOTEN)  And I'll represent to you
2  that I took this deposition in Washington, D.C., on
3  September 25th, 2009.  We began at 10:10 a.m.  And that
4  is Mr. Arnold's deposition transcript.
5           And since that's been questioned, I want
6  to refer you to a couple of points.
7           MS. BEARDSLEY:  Nick, the deposition says
8  whatever it says.
9           MR. WOOTEN:  Sure.
10          MS. BEARDSLEY:  She's not going to be
11  able to testify to anything as it relates to another
12  lawsuit and another deposition from someone that's
13  unrelated to this case.
14          MR. WOOTEN:  Sure.
15    Q.  (BY MR. WOOTEN)  We're talking about the CEO
16  of MERS, okay, the person who designed the system, the
17  person who came up with the concept.  Do you think he
18  has a pretty good idea of how it's supposed to work?
19          MS. BEARDSLEY:  Nick, she has no
20  knowledge of that.  This is so far outside the scope.
21          MR. WOOTEN:  Well, she's talking --
22  you're saying that you can execute a MERS assignment in
23  2007 when ownership of the note allegedly transferred in
24  2003.  And she is saying what Mr. Arnold said, which is
25  the owner of the debt is the person who has the right to

---

Page 246

1  use MERS' name to transfer a mortgage out of MERS'
2  system.
3    Q.  (BY MR. WOOTEN)  Is that your understanding of
4  how the system works?
5    A.  Yes.
6    Q.  So, again, if you saw a mortgage assignment
7  from MERS in 2007 from anyone's name to someone else's
8  name, the person that MERS was signing for, you would
9  interpret that to mean they owned the debt that day,
10  right?
11    A.  Yes.
12    Q.  Do you know whether this trust, Finance
13  America Mortgage Loan Trust 2003-1, is a MERS member?
14    A.  I do not know.
15    Q.  Okay.  Are you familiar with MERS' rules which
16  require that when the ownership of a debt leaves the
17  ownership of a MERS member that the mortgage be assigned
18  out of the MERS system?
19    A.  Yes.
20    Q.  So in reading the assignment from 2007 from
21  MERS on behalf of Finance America to this trust, is that
22  another indication that the ownership went from Finance
23  America on that day to this particular trust so that it
24  went off of the MERS system?
25    A.  I don't know.  It would be purely a guess.

---

Page 247

1    Q.  And is it fair to say that if Finance America
2  did not own the note on that day, that that assignment
3  would be meaningless?
4    A.  Yeah, that's possible.
5    Q.  Because we talked about, very early on, you
6  can't assign what you don't own, can you?
7    A.  Not supposed to.
8    Q.  When I deposed Mr. Arnold in September -- if
9  you want to pick up that transcript that's marked
10  No. 19, Ms. Mosley, and look at page 21 of the condensed
11  version.  There are four pages.  It's the top right
12  page.  On that fourth page, you'll see page No. 83
13  indicated.
14    A.  Uh-huh.  Okay.
15    Q.  It says that -- the question to Mr. Arnold
16  was:  "You won't go beyond what your membership
17  agreement says you can do, will you?
18          And he answered no.
19          Is that correct?
20    A.  Yes.
21    Q.  And then I asked Mr. Arnold:  "I mean, in
22  fact, you say that you will take your instructions from
23  the owner of the debt, right?"
24          And he answered yes.
25          Correct?

---

Page 248

1    A.  Yes.
2    Q.  Now, he then went off and talked about
3  obligations to the public, but your understanding of the
4  MERS system agrees with that testimony, that MERS takes
5  their instructions from the owner of the debt, right?
6    A.  Right.
7    Q.  And if a membership agreement says that you
8  cannot assign a debt unless you own it, that would be at
9  least a part of the reason that you believe Finance
10  America would have owned the debt based on the 2007
11  assignment, right?
12    A.  Right.
13    Q.  Are you familiar with Finance America at all?
14    A.  I am not.
15    Q.  Do you have any idea how many millions of
16  dollars of mortgages they might have originated in 2003?
17    A.  No.
18    Q.  Is it possible, Ms. Mosley, that maybe Finance
19  America did mean to send this loan to this trust but
20  just didn't do it?
21    A.  I have no knowledge to be able to know that
22  one way or the other.
23    Q.  With respect to the documents we've gone over
24  today, other than the 2007 assignment, is there any
25  document in your file or in any of the documents in the

---

**Daphne Mosley**                                    October 14, 2009

## Page 249

1    securitization agreements that indicate that this trust
2    acquired this loan in 2003?
3            MS. BEARDSLEY: Object to the form.
4        A.  Say that again.  Is there --
5        Q.  (BY MR. WOOTEN)  Excluding the 2007
6    assignment --
7        A.  Okay.
8        Q.  -- which is from Finance America to the
9    trust --
10       A.  Uh-huh.
11       Q.  -- in MERS' name --
12       A.  Okay.
13       Q.  -- is there any document that we've gone over
14   today that says that this trust became the owner of this
15   loan in compliance with these documents that we've gone
16   over?
17       A.  No.
18           MR. WOOTEN:  Okay.  Ms. Mosley, I think
19   I'm going to go ahead and stop now so that you can rest,
20   unless Ms. Beardsley wants to ask you some questions.
21           MS. BEARDSLEY:  I mean, I don't have any
22   questions for her.
23           (Off the record at 4:08 p.m.)
24               * * * * * *
25

## Page 250

1            REPORTER'S CERTIFICATION
2            ORAL DEPOSITION OF
3            DAPHNE MOSLEY,
4       ON BEHALF OF LITTON LOAN SERVICING
5            October 14, 2009
6
7    STATE OF TEXAS       :
8    COUNTY OF HARRIS     :
9
10           I, Melodie I. Thompson, a Certified
11   Shorthand Reporter and Notary Public in and for the
12   State of Texas, do hereby certify that the facts stated
13   by me in the caption hereto are true; that the foregoing
14   deposition of DAPHNE MOSLEY, ON BEHALF OF LITTON LOAN
15   SERVICING, the witness hereinbefore named, was taken by
16   me in machine shorthand, the said witness having been by
17   me first duly cautioned and sworn to tell the truth, the
18   whole truth, and nothing but the truth, and later
19   transcribed from my machine shorthand notes to
20   typewritten form by me.
21           I further certify that the above and
22   foregoing deposition, as set forth in typewriting, is a
23   full, true and correct transcript of the proceedings had
24   at the time of taking said deposition.
25           I further certify that the deposition

## Page 251

1    transcript was not submitted to the witness for
2    examination and signature, examination and signature
3    having been waived by the witness and all parties
4    present at the time of the deposition.
5            I further certify that I am neither
6    attorney or counsel for, nor related to or employed by
7    any of the parties to the action in which this
8    deposition is taken, and further that I am not a
9    relative or employee of any attorney or counsel employed
10   by the parties hereto, or financially interested in the
11   action.
12           I further certify that charges for the
13   preparation of the foregoing completed deposition were
14   $        for the original thereof, charged to
15   Attorney(s) for Plaintiff.
16           Certified to by me this 19th day of
17   October, 2009.
18
19
20           Melodie I. Thompson
                 CSR No. 7039, Expires 12/31/2009
                 Notary Public, State of Texas
21               Commission Expires 7/16/2012
22   Allied Advanced Reporting, Inc.
     Texas CRCB Firm Registration No. 252
23   1647 Colquitt
     Houston, Texas  77006
24   713.524.6777
     1.800.223.9409
25   AlliedAdvancedReporting.com

## Page 252

1                  INDEX
2          FOR THE DEPOSITION OF
3            DAPHNE MOSLEY,
4       ON BEHALF OF LITTON LOAN SERVICING
5            October 14, 2009
6
7                  Page
8    APPEARANCES.....................................2
9    EXAMINATION BY MR. WOOTEN.......................3
10   REPORTER'S CERTIFICATION.......................250
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Daphne Mosley**                          **October 14, 2009**

| Page 253 |
|---|

```
 1              INDEX OF EXHIBITS
 2          FOR THE DEPOSITION OF
 3            DAPHNE MOSLEY,
 4     ON BEHALF OF LITTON LOAN SERVICING
 5              October 14, 2009
 6
 7   Plaintiff's
 8   Exhibit No.      Description      Page
 9    1    Litton Loan Servicing LP Detail
10         Transaction History.................. 38
11    2    Litton Loan Servicing Payment
12         Ledger, Lorraine Hudson............... 39
13    3    Code Sheet dated December 5, 2007
14         (Litton v. Floyd LITTON00007-00015)... 57
15    4    Amortization Schedule................. 68
16    5    Escrow Account Activity............... 72
17    6    Escrow Inquiry Screen Print........... 73
18    7    Change File Inquiry Screen Print...... 76
19    8    Loan Payment Inquiry Screen Print..... 77
20    9    Vendor Invoice Listing, Check
21         Copies, Supplier Payment History
22         Reports, and Invoice Detail........... 79
23   10    Note dated July 1, 2003, with
24         Attachments
25         (Litton/Hudson LL00173-00178)......... 98
```

| Page 254 |
|---|

```
 1          INDEX OF EXHIBITS, Continued
 2   Plaintiff's
 3   Exhibit No.      Description      Page
 4   11    Assignments of Mortgage
 5         (Litton/Hudson LL00172, 159, 160,
 6         161, 149, 150, 151, 152, 153, 154,
 7         142, 144, 145, 146, 155, 156, 157,
 8         158, 147, and 148).................... 99
 9   12    Notice of Filing Affidavit with
10         Attachments filed November 6, 2007.... 101
11   13    Letter dated May 8, 2007, from
12         Colleen McCullough, Attorney at Law,
13         to Litton Loan Servicing
14         (Litton/Hudson LL00168-171)........... 116
15   14    Composite Report dated April 13,
16         2009 (Litton/Hudson LL00015-00020).... 120
17   15    Mortgage dated July 1, 2003
18         (Litton/Hudson LL00130-00141)......... 121
19   16    Excerpt from Federal Register dated
20         January 7, 2005, Part II, Securities
21         and Exchange Commission, 17 CFR
22         Parts 210, 228, et al.  Asset-Backed
23         Securities; Final Rule................ 130
24
25
```

| Page 255 |
|---|

```
 1          INDEX OF EXHIBITS, Continued
 2   Plaintiff's
 3   Exhibit No.      Description      Page
 4   17    Securities and Exchange Commission
 5         Information, Financial Asset
 6         Securities Corp. Finance America
 7         Trust (Pages 1 through 313 of 313).... 166
 8   17-A   Excerpt from Plaintiff's Exhibit
 9          No. 17, Exhibit C, Form of Mortgage
10          Loan Purchase Agreement
11          (Pages 265 through 280 of 313)........ 169
12   17-B   Excerpt from Plaintiff's Exhibit
13          No. 17, Exhibit F-3, Form of Receipt
14          of Mortgage Note
15          (Pages 287 and 288 of 313)............ 208
16   17-C   Excerpt from Plaintiff's Exhibit
17          No. 17, Exhibit F-1, Form of
18          Trustee's Initial Certification and
19          Exhibit F-2, Form of Trustee's Final
20          Certification
21          (Pages 285 and 286 of 313)............ 210
22   17-D   Excerpt from Plaintiff's Exhibit
23          No. 17, Exhibit E, Request for
24          Release of Documents
25          (Pages 283 and 284 of 313)............ 224
```

| Page 256 |
|---|

```
 1          INDEX OF EXHIBITS, Continued
 2   Plaintiff's
 3   Exhibit No.      Description      Page
 4   18    Securities and Exchange Commission
 5         Information, Amended Restated
 6         Certificate of Incorporation of
 7         Financial Asset Securities Corp.
 8         (Pages 2 through 9 of 9).............. 169
 9   19    Transcript of Deposition of R.K.
10         Arnold dated September 25, 2009....... 244
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Daphne Mosley                                      October 14, 2009

**A**

**AACER** 5:24
**AB** 130:16
**abandon** 155:19
**abandoned**
151:24 154:25
155:12
**abbreviate**
173:8
**ability** 52:17
62:16 92:16
225:7
**able** 22:3 42:3
45:13 61:4,7
62:3 64:2
67:18 73:19
74:15,24 75:4
75:8,12,22
92:6,24 102:1
109:5 115:15
122:5,14 126:6
129:25 137:4
141:20 157:1
163:22 191:12
213:3 245:11
248:21
**above-styled**
1:19
**absence** 136:11
137:6
**absent** 142:8
**Absolutely**
193:14
**accept** 128:21
**acceptable**
176:21
**acceptance**
184:8 207:18
**accepted** 129:1
**access** 26:14,21
29:4 47:4
62:16 92:4,5
92:13 115:15
223:18
**accessible** 59:15
**account** 6:1 8:9

12:7,9 16:21
16:25 17:4,6,7
17:8 18:19
19:6 33:5 38:8
41:22 44:13
46:25 53:7,17
63:9,19,25
65:11,17,17
67:16,17 70:12
72:5,18,23
73:8 79:11
90:1,2,9,17,24
91:1,9,16 93:2
93:5,7,20
125:4 126:21
127:5 139:10
139:15,22
142:11 144:19
146:17,21,24
148:20 165:23
174:22 225:5
253:16
**accounting**
14:21 15:7
17:23 18:4,5,8
64:14 125:23
144:18 146:13
178:9
**accounts** 3:22
5:17 10:7
11:11,14 12:5
67:22 79:2,7
125:15 131:12
131:13 139:18
**accruing** 16:12
174:9 203:11
**accuracy** 195:13
226:4
**accurate** 33:9,18
49:14 57:25
112:11 117:18
225:24 241:9
**accusing** 229:14
**acknowledge**
184:23
**acknowledges**

184:7
**acknowledgm...**
208:12
**acquire** 24:8
195:4 233:22
239:10 243:7
**acquired** 24:8
48:10 249:2
**acquiring**
232:10
**acquisition**
182:12
**acronym** 38:4
**act** 23:21 26:10
27:4 32:23
67:23 102:10
152:3
**acting** 101:19
113:2,11
114:11 193:21
**action** 251:7,11
**actions** 11:12
17:6 64:9
113:14 135:22
136:12 152:10
**activities** 18:10
20:21 63:24
64:4 133:23
136:18,24
165:22 238:20
**activity** 72:5,23
253:16
**acts** 23:19 102:8
213:8
**actual** 26:14
37:5 81:8
87:15 102:18
123:1 164:6
165:2 173:25
190:5 192:3
220:20,21,22
221:14
**add** 62:16 157:3
158:18
**added** 44:13
156:25 158:14

158:21,24
**addition** 13:18
185:12
**additional** 16:12
25:17 56:3
66:24 80:5
82:14 106:2
115:14 143:21
144:25 145:14
156:4 158:11
227:24 238:1
**address** 106:24
107:4,8 217:5
**addresses** 70:23
141:12
**addressing**
123:7
**adjust** 22:3,6
148:7
**adjustment** 66:9
67:7,9
**administration**
130:19 131:7
131:19 132:2,6
132:12 199:22
235:3,5
**advance** 92:22
147:14
**Advanced** 2:19
251:22
**advancement**
91:12
**advising** 148:16
**affect** 151:17
**affidavit** 101:17
102:2 161:18
162:19 163:12
254:9
**affidavits** 100:6
**affiliated** 9:15
9:16,24 143:11
169:15
**affiliation**
169:10
**affixed** 104:11
219:2 220:15

220:16,24
**age** 83:11,17
**agent** 28:24
101:19 102:9
102:10 113:2
118:10,16
142:22 143:7
149:24 205:13
228:6
**agents** 47:7
**aggregate**
167:21
**ago** 9:20 34:23
77:23 234:11
241:6
**agree** 12:20
15:23 17:3
23:18 24:4,7
25:18,25 26:7
26:13,18,23
36:19 46:23
47:2 71:2,7,21
79:17 88:20
89:15 91:24
92:3,14 93:1
93:10 102:16
109:7 121:20
129:14,21
134:21 151:1
152:7,10
153:12 170:9
184:23 193:24
199:18,24
200:8 212:24
213:7,11,15
216:17,23
219:1 222:22
223:1 231:18
232:8,13 238:9
238:15 240:24
241:18 242:7
**agreed** 34:6
81:22 88:16,18
89:21 94:12,15
95:15 96:1
**agreement** 24:9

Daphne Mosley                                        October 14, 2009

Page 258

| | | | | |
|---|---|---|---|---|
| 26:24 27:4 | 133:12,22 | 219:2 220:11 | **amortized** 68:15 | **annually** 147:21 |
| 32:23 33:16 | 150:15,20 | 220:23 221:4 | **amount** 7:12 | **answer** 7:17,19 |
| 47:1 71:9,22 | 151:13 165:4 | 221:18 223:5 | 13:5,8,10 15:9 | 8:25 19:5 |
| 82:2 84:21 | 187:17 249:1 | 223:13 226:8 | 16:9,10 17:11 | 29:18 110:17 |
| 85:24 87:11 | **agrees** 87:22 | **allow** 67:17 | 18:10 38:23 | 130:7 134:3,12 |
| 88:11 95:2,11 | 88:2 121:21 | 134:12,24 | 40:11 42:12,16 | 135:2 147:24 |
| 118:22,23 | 181:21 208:9 | 135:1 145:19 | 42:20 43:5,13 | 163:10,22 |
| 119:3,4,5,10 | 248:4 | 146:4 149:19 | 44:5 50:25 | 190:8 207:25 |
| 129:15 136:12 | **ahead** 76:7 | 190:8 225:3 | 63:10 66:19 | 213:3,20 217:8 |
| 138:7 145:13 | 104:19 166:10 | **allowances** | 67:13 73:22 | 217:11 219:21 |
| 147:2 165:16 | 228:14,15 | 14:22 | 74:1 76:9,25 | 219:25 221:25 |
| 168:5,6 170:3 | 249:19 | **allows** 140:24 | 77:2 87:14 | 222:6 230:16 |
| 170:6,25 | **Airport** 1:23,23 | **alphabet** 233:10 | 89:7 95:13 | 231:23,25 |
| 171:16,20,22 | **al** 1:9 254:22 | **Alpharetta** 11:5 | 141:6,9,13 | 232:1 233:25 |
| 172:20 173:23 | **Alabama** 1:1 2:6 | **Amended** 169:6 | 144:13,15 | 243:11 |
| 174:17 175:2,3 | 2:10 8:13 | 256:5 | 146:10 147:17 | **answered** |
| 175:4 178:2 | 25:22 98:7 | **America** 101:21 | 147:18 148:1,1 | 247:18,24 |
| 179:9 182:6 | 99:11 107:9,12 | 103:20 105:13 | 148:17,20 | **anticipate** |
| 183:19,19 | 233:6 | 105:16 106:2,6 | 157:2,11,15 | 122:23 |
| 185:4,5 186:1 | **allegation** | 106:12,12,14 | 158:10,22 | **anybody** 188:14 |
| 189:1 190:3,5 | 189:25 | 106:18 107:10 | 159:5,16 210:5 | 192:7 220:10 |
| 190:10 192:4 | **allegations** | 107:15 108:12 | **amounts** 6:5,5 | 230:1 232:10 |
| 193:17,20 | 229:5 | 110:20 117:12 | 65:19,20 69:1 | 241:22 |
| 196:24 197:23 | **alleged** 23:15,24 | 118:1,25 | 77:1 81:8 | **anybody's** |
| 199:22 200:10 | 27:3 166:4 | 173:10 179:23 | 91:15 124:10 | 195:25 |
| 200:17 201:8 | 230:24 | 180:4,9,15,18 | 138:12 139:24 | **anyone's** 246:7 |
| 201:21 202:2,3 | **allegedly** 12:22 | 181:7 182:3 | 139:25 140:11 | **AP** 1:8 |
| 202:9 204:10 | 90:23 164:3 | 183:16,20,24 | 140:16,19 | **apologize** 39:9 |
| 204:13,19 | 245:23 | 185:9 200:20 | 143:16,20,22 | 39:23 57:9 |
| 206:11,12 | **Allied** 2:19 | 214:6,19,23,25 | 145:7,8,12 | 122:23 132:23 |
| 208:18 210:2 | 251:22 | 215:7,10,21 | 147:2 156:3,5 | 170:17 |
| 211:20 212:11 | **AlliedAdvanc...** | 216:1,19,24 | 156:11,17 | **apparently** 42:8 |
| 212:13 213:24 | 2:22 251:25 | 217:19 218:5 | 157:7,14,17,25 | 60:14 96:18 |
| 214:2,18 216:7 | **allocated** 133:12 | 218:10 231:14 | 158:3 159:11 | 100:2 106:11 |
| 216:8 217:1,2 | **allonge** 103:18 | 231:15,20 | 159:19 | 107:14 |
| 222:18 224:19 | 103:22,24 | 239:19 240:21 | **analysis** 147:10 | **appear** 44:11 |
| 228:4,5 231:20 | 104:4 160:20 | 241:3,15,22,24 | 147:20,25 | 57:13 59:5 |
| 234:18 235:2 | 176:1 218:4 | 242:9,15 | 149:1 | 91:13 99:2 |
| 237:17 238:3 | 219:14 220:3 | 246:13,21,23 | **analyzing** 190:9 | 153:24 207:6 |
| 238:10 243:16 | 220:15 231:1 | 247:1 248:10 | **and/or** 67:19 | 227:13 232:16 |
| 243:18 247:17 | **allonges** 26:2,3 | 248:13,19 | 74:2 151:18 | 232:23 |
| 248:7 255:10 | 97:11 98:4 | 249:8 255:6 | **Ann** 30:23 31:3 | **appearance** 4:9 |
| **agreements** | 103:11,15 | **amortization** | **anniversary** | 4:10 |
| 26:10 63:5,7 | 113:25 115:10 | 15:14 16:13 | 210:24 211:16 | **APPEARANC...** |
| 89:3 118:19 | 160:13 218:8 | 68:11,13 | 211:18 212:22 | 2:1 252:8 |
| 131:15 133:2 | 218:13,22 | 253:15 | **annual** 141:13 | **appeared** 57:24 |

Daphne Mosley                                    October 14, 2009

108:3
**appears** 60:18
78:23 98:22
103:3,25
105:11,14
106:1,3,9
108:1,10
206:10
**applicable**
117:14 131:2
133:9 240:6
**application**
12:14 27:10
70:23 71:22
79:6 130:3
138:2 139:5
**applied** 14:23
15:8,13 21:24
43:23 44:6,12
68:14,17 69:1
69:11 70:2,12
70:16 71:18
126:25 127:7
138:6,10
139:15 140:13
140:18
**apply** 18:2
128:25 137:6
137:15 139:9
141:7 153:5
154:8,20,22
**apprised** 37:15
**appropriate**
26:9 62:22
92:10 131:12
178:9 235:14
**approval** 64:9
**approved** 16:2
**approximately**
43:23 99:16
101:5
**April** 254:15
**area** 11:3 92:10
101:8,9
**areas** 51:1 152:3
153:11

**argue** 227:15
**arises** 26:24
**Arnold** 244:16
245:24 247:8
247:15,21
256:10
**Arnold's** 245:4
**arrangement**
12:2 33:1
81:21 142:18
**arrangements**
34:20 81:14
94:3
**arrear** 21:17
22:4
**arrearage** 6:6
13:8,10,14
14:1,8,18,23
15:7,9 17:11
21:19,24
**arrears** 159:6
**art** 234:21
**article** 206:7,10
235:2
**ascertain** 126:7
**Ashton** 106:24
**asked** 80:7 93:3
134:7 195:22
197:1 208:1
215:17 247:21
**asking** 63:13
70:1 84:10
86:13 95:21
103:22,24
109:17 110:12
115:3 134:5,9
136:5 164:19
187:1,3 188:2
188:16,18
189:6 190:22
191:22 208:5
212:12 220:2
228:23 229:25
230:17 234:1
**assess** 63:9,14,20
127:5 157:3

**assessed** 19:4,5
63:18 77:4
78:17 90:8
93:1
**assessing** 78:16
**assessment**
58:21 79:10
129:10 139:5
**assessments**
138:21
**asset** 131:19
132:2,6,12
133:3,8,14
168:7,16,19
169:7,9,14
170:5 173:2,8
178:4 189:3
195:4 201:23
202:5,11 210:4
213:12,16
215:9 216:4
232:16 255:5
256:7
**assets** 130:20
131:11 133:1,7
133:24 172:17
216:20 233:23
235:9 238:1
239:10
**Asset-Backed**
103:20 180:16
254:22
**assign** 10:7 12:7
106:25 108:23
109:5 110:7,14
174:4 181:8
201:15 240:21
241:19 242:4
247:6 248:8
**assigned** 8:11,12
8:13 14:17
33:25 109:23
173:22 176:9
181:24 206:20
246:17
**assigning** 106:15

110:2 176:22
241:14 242:16
**assignment** 25:7
98:17,22
105:12,20
106:2,19
107:14 108:4
108:11,20
109:10,12,13
109:20,24
110:19 117:11
117:13 176:20
177:1,7,16,19
177:21,23
179:16,22
181:17 205:11
231:5,6,10,13
232:18 239:18
240:19 241:3
241:10,13,23
242:9 243:3,7
244:13 245:22
246:6,20 247:2
248:11,24
249:6
**assignments**
25:17,18,20
99:2 102:10
177:9,17
179:12,17
182:2 233:13
254:4
**Assignor** 106:23
**assigns** 31:8
185:4
**assist** 4:7
**assistant** 111:8
**assists** 100:23
**association**
140:1
**assume** 19:21
21:7 33:24
50:18 110:1
114:15 218:8
232:21
**assumes** 12:9

**assuming** 52:10
52:15 53:17
59:21 68:16
69:2 70:10
240:19
**assumption**
231:15
**Atkins** 108:3
**Atlanta** 11:2,3,7
**attach** 198:23
**attached** 80:16
80:22,23
103:23,24
104:10,15,24
108:7 160:25
208:14 218:9
219:2 221:3
**attachments**
96:16 97:2
103:2 120:20
120:23 253:24
254:10
**attain** 138:22
139:25 151:20
**attempt** 159:9
163:15
**attempted** 243:7
**attorney** 8:11
12:3 33:12,15
33:16,25 34:21
35:9,14 118:16
135:14 153:24
251:6,9 254:12
**attorneys** 8:20
25:2 28:24
29:15,21 34:6
34:12,13 35:5
36:2 54:10
96:22 163:14
166:7
**Attorney(s)**
251:15
**attorney-client**
54:1
**attributable**
15:6

Daphne Mosley                                    October 14, 2009

**Auburn** 2:6
**audit** 20:12
**August** 58:10
**authoritative**
  136:1
**authorities** 45:5
  242:3
**authority** 12:11
  12:12 63:19,20
  63:22 110:15
  112:20 153:11
  185:23 244:12
  244:14
**authorization**
  82:5
**authorized**
  32:23 65:16
  152:3
**authorizes** 85:13
**authorizing**
  119:11 150:8
**automatic** 22:18
**automatically**
  30:10
**automatics**
  22:15
**available** 25:10
  26:15 29:7,8
  34:12 36:10,14
  36:22,23 40:7
  45:3 46:24
  62:5 67:12
  74:4 120:13,16
  126:8 150:22
  221:11 222:3
  223:20,22
  224:11 225:17
**Avenue** 2:10
  107:9
**aware** 16:24
  27:22 31:8,11
  32:1,5 35:21
  35:23,24 36:4
  36:5,8 44:19
  44:23,25 45:2
  45:7 48:2 49:2

67:25 74:12
84:18 97:6
117:24 118:3,6
136:6 150:11
150:14,18
181:9 194:6,20
195:2,6 225:22
226:1
**awful** 228:20
**a.m** 1:20 56:17
  56:18 105:25
  106:4,8 120:2
  245:3

————————
**B**
**B** 153:7,14
  177:11 185:15
**back** 45:21 54:9
  54:24 66:5
  73:21 84:20
  97:15 98:12
  114:4 121:8
  137:8 140:9
  147:18 170:20
  171:4 179:24
  180:1,2,2
  189:22 195:22
  201:5 203:22
  205:3 210:18
  211:9 212:10
  214:12 215:14
  216:12,13
  219:13 220:6
  220:12 221:11
  226:7 229:12
**backwards**
  170:13
**bad** 14:24
  122:19
**balance** 40:11,14
  41:1,18 44:14
  58:23 66:12,15
  76:25 140:20
  146:15 147:17
  147:22 156:25
  157:3 158:15

158:18,22,25
174:8,23
203:11
**balances** 44:17
**ballpark** 3:19
**Banco** 5:24
**bank** 30:5 93:24
  101:20 102:2
  103:18 108:12
  113:2,15
  114:11 117:12
  118:1,24
  119:11,13
  131:12,12
  168:9,15 173:4
  175:9,22 176:2
  176:23 177:2
  177:12 178:8
  180:14 181:4
  181:24 182:3
  183:1 206:3
  216:25 218:1
  222:11,23
  223:6
**bankruptcy** 1:1
  5:15,18 6:21
  7:13,24 8:4,9
  9:4,5,14 11:18
  12:10,17,21
  14:10,10,17
  15:5,6,25 16:8
  17:18 19:14,15
  19:22 21:4,7
  25:22 28:11,18
  35:2 37:16
  41:17 42:3,23
  43:21 47:19
  48:6 49:15
  51:22 52:1
  60:25 61:4,9
  61:20 62:4
  64:15 65:3
  98:7 99:10
  100:1,12,15
  101:18 120:11
  151:19 152:8

152:16 154:2
155:4,23 161:9
161:12,18
162:21 163:1,4
163:14 234:13
**Bank's** 113:15
  165:23
**Barely** 122:16
**Bartz** 135:8,20
  137:7
**based** 6:13,17,20
  7:6,23 10:12
  16:21,25 17:14
  18:18 19:10
  20:21 21:23
  23:2 24:8
  27:12,15,17
  32:8 40:6
  46:13,17 59:13
  69:19,20 70:17
  75:9 77:19
  78:18 79:1
  83:5 84:5,7
  86:17,20
  134:18 165:23
  197:8,9,10
  213:17 231:22
  241:22 242:2
  242:22 243:16
  248:10
**basic** 62:21
**basically** 5:22
  13:10 33:4
  92:11 141:12
  143:19 153:12
  200:3 236:15
  236:22,23
**basis** 13:16
  14:18 22:20
  68:15 159:1,4
  159:8,9,19,22
  193:20
**batch** 164:1
**Bates** 96:21,21
  162:9
**battle** 227:19

**bear** 143:23
  156:5 158:6
  196:10
**Beardsley** 2:9
  8:23 13:21,24
  14:3,7,11,15
  15:17,22 17:2
  17:16 19:19
  20:15 22:12
  24:14 26:5
  32:14 33:7,22
  34:10,17 39:5
  46:15 51:2,16
  53:24 54:7,11
  54:15,23 55:1
  55:11 56:2,8
  56:13,16,25
  61:14 62:11
  64:5,20 69:2,6
  71:14 72:7,10
  72:20 77:22
  78:19 79:12,21
  80:15,23 81:2
  83:1,6 85:25
  86:10 88:17
  89:23 90:18
  94:6 95:7,16
  95:18 96:11
  104:18 109:14
  109:25 110:10
  110:16 114:20
  115:7 123:4
  127:8 128:2,6
  129:9,17,24
  130:5 132:7,9
  132:15 134:2,7
  134:11,24
  136:3,9,19
  137:1 144:4,6
  145:10 146:1
  148:8 154:10
  159:3,21,25
  160:4,11
  161:22 162:6
  162:10,13
  163:8,19

Daphne Mosley                                    October 14, 2009

Page 261

166:17,22
167:1,11,15
170:12,16
177:4 181:10
185:18 186:14
186:21,25
187:5,8,10,18
187:23 188:1,5
188:9,13,16,20
189:6 190:6,16
190:20,25
191:4,9,13,21
191:24 192:2
192:10,13,16
192:21 193:7
193:13 194:12
195:15 196:23
197:19,24
198:3,7,11,14
198:18,22
199:5 200:22
202:14,16,20
202:25 203:16
203:20,25
204:15 205:5
205:18 206:22
207:2,11,23
208:4 209:2,7
211:5,24
212:12,20,24
213:2,19
214:22,25
215:6,11,16
217:3,8,15
218:20,23
219:5,10,20,25
220:19 221:6
221:24 222:5
222:13 223:19
226:18,22
227:1,17,22
228:2,13,16,22
229:1,9,13,24
230:8,14
231:22,24
233:24 236:19

237:5,10,20
238:23 239:2
239:14 241:1,8
242:11,19
243:9,12,15,21
243:24 244:3
244:18,22
245:7,10,19
249:3,20,21
**becoming** 171:8
**began** 90:24
91:9 97:21
240:14 245:3
**beginning** 42:9
42:11 235:13
236:5
**begins** 104:24
132:23 133:16
167:13
**behalf** 1:13,17
32:24 62:23
67:20 86:24
89:1 97:22
112:21 133:19
152:11 175:7
241:14 244:14
246:21 250:4
250:14 252:4
253:4
**believe** 12:1
29:25 38:16
50:11 61:1
70:24 77:11
84:17,25 97:3
121:23 125:16
137:5 147:7
214:8 236:10
237:24 248:9
**belong** 73:1,6
80:13
**beneath** 209:18
**beneficial**
167:21
**beneficiary**
23:11,12
**benefit** 182:6

201:16,19
**benefits** 87:3
**Bertha** 99:19
162:23
**best** 8:18 45:11
143:8,9 192:1
**better** 38:2
48:17 49:10
55:18 122:21
139:8
**beyond** 247:16
**big** 55:9,11 57:9
238:5
**billed** 89:1 95:9
95:13
**billing** 81:10
**binding** 129:22
193:25 200:11
**Birmingham**
2:10
**bit** 12:18 39:15
62:13 147:19
213:6
**Blackwell** 30:23
**blank** 104:8
175:15,16
176:22 177:5,8
177:12 179:13
182:22 206:1
206:20 217:18
218:5,11
221:11 222:10
**blended** 77:12
**blue** 236:13
**blurred** 140:16
**Blvd** 1:23
**board** 20:24
154:16
**bonds** 24:1
**Book** 117:8,8,9,9
**books** 174:15
**bore** 189:24
**borrow** 88:16
**borrower** 11:18
12:22 14:4,6,9
19:13 52:11,18

63:9 64:3,21
68:22 69:7
75:10 76:1
78:14 83:15
87:1,5,22 88:2
88:10,18 93:12
93:19 95:3,6,9
95:13,14,25
116:6 118:7
122:9 124:4,11
125:7 127:13
137:13,14,16
137:22 139:2
139:11 140:2
141:20 142:3,8
143:21,25
144:12 145:8
145:20,24
146:5 148:6
149:18 150:3
151:2,12,24
152:19 154:1
156:4,8,16
158:9,11
**borrowers** 79:7
**borrower's**
14:13 63:24
65:17 70:12
75:2,6 77:19
78:18 79:11
87:1 93:20
126:24 127:12
144:19 150:9
**bottom** 107:24
131:5,6 143:15
178:14 239:22
**bought** 214:5
**bounce** 49:12
**Box** 2:5 107:4
**BPO** 87:3,6,15
91:13 94:19
139:14
**BPOs** 86:24
94:23 95:1
**breach** 151:8
183:14,15

184:4
**break** 12:17
56:15 96:10
104:22 119:23
147:18 195:25
**breaks** 233:13
**Brice** 9:16,19
10:2
**briefly** 4:3
**bring** 53:11
56:23 128:20
128:22 137:13
**broke** 147:21
**broken** 47:24
48:1 51:18
**broker** 36:2 82:7
82:17,19 83:8
83:10 85:15,16
85:20 86:8,14
94:9 150:24
**brought** 22:2
38:10 68:9
71:25 80:4
90:6 96:6
**building** 112:6
154:17
**business** 55:10
112:6 131:13
133:10,20
134:19 137:4
181:22 225:1
240:2
**B-A-R-T-Z**
135:11

_____
        C
_____
**C** 3:1 140:11
153:7,14 170:2
185:16 210:17
255:9
**calculation**
147:13
**California**
106:24 108:2
**call** 9:6 116:20
132:22 199:8

Daphne Mosley                                    October 14, 2009

205:22
**called** 13:7 23:25
  28:2,22 35:21
  53:20 118:25
  132:23 149:15
  156:20 169:16
  170:2 206:6
  233:10
**calling** 40:25
**calls** 52:22
**capacity** 11:10
  113:3,11
**Capital** 169:11
  169:12,16,16
  169:17 170:4
  180:23 189:2
  214:5 216:20
  217:13 232:15
**capitalization**
  156:21 157:19
**capitalize** 158:2
**capitalized**
  157:7,9,11,16
  173:21
**caption** 250:13
**car** 14:13
**card** 14:14
**care** 155:20
**case** 1:4 8:11,12
  8:15 26:16
  31:18,21 57:22
  61:2 62:1
  70:22 78:22
  84:5,8,14,24
  91:20 105:4,14
  113:15 114:11
  149:9 154:24
  157:7 182:2
  201:1 206:1
  209:1 216:18
  219:3 229:16
  245:13
**cases** 142:16
**Cash** 66:9 131:6
**cashiering** 52:3
**Castillo** 99:19

162:24
**categories** 69:1
**cause** 1:19 64:3
  150:1,4 174:15
  175:18 179:12
  179:17 181:22
  182:25 206:1
  208:10
**caused** 178:8
**causes** 83:9
**cautioned**
  250:17
**CCP** 2:19
**CD** 65:8,13
  66:23 220:25
**CEO** 241:7
  244:23 245:15
**certain** 11:12
  13:11 16:20
  17:6 18:10,10
  18:19 20:20
  22:10,14,19,22
  74:25 82:5
  83:16 91:11,16
  94:4 107:7
  119:5 129:20
  143:6 197:20
  199:13 207:22
  210:5 213:8,8
**certainly** 113:8
  115:23 134:6,9
  199:9
**certificate** 169:7
  182:7 201:17
  256:6
**certificates**
  103:21 167:19
  167:19,25
  180:16 182:16
  194:8 234:17
  236:5
**certification**
  209:22,25
  210:20,22
  211:12,15
  212:22 226:4

250:1 252:10
  255:18,20
**certified** 1:21
  226:1 250:10
  251:16
**certify** 195:12
  207:21 212:2,6
  231:2 250:12
  250:21,25
  251:5,12
**certifying**
  225:24
**CFR** 254:21
**chain** 177:17
  232:22 233:13
**chair** 181:13
**Chambers**
  106:10 107:11
**chance** 185:18
  190:7 243:13
**change** 62:16
  76:4 148:6
  154:16 167:3
  191:20 221:12
  253:18
**changed** 102:25
  140:24 148:23
  231:8
**changes** 76:8
  97:20 148:5
  228:19 230:24
**changing** 234:7
**chapter** 7:8,8,10
  12:21 13:15
  15:25 17:12,18
  17:21 19:22
  21:4,7 153:5
**characterized**
  142:15
**charge** 16:21
  17:7 18:18
  19:5 23:3
  27:12,14 47:21
  49:15 50:22
  58:13 59:3
  63:9,10,15,18

89:19,22 90:8
  90:16 92:15
  93:2,5,7 95:25
  127:11,25
  128:10 139:6,9
  145:19 146:4,9
  148:19 156:17
**charged** 16:25
  17:4 23:2
  78:25 87:14
  89:17 91:15,21
  92:21 127:13
  144:19 145:12
  146:17,20,23
  251:14
**charges** 16:12
  22:10,15,20,25
  36:1,3 45:23
  63:24 64:2
  77:2,3,3 79:6
  79:11 81:9
  90:2 122:11,12
  124:6,6 127:6
  139:13 140:18
  145:24 146:24
  147:22 251:12
**charging** 146:8
  147:1
**Charlotte** 2:14
**check** 81:8,11
  125:21 253:20
**Chicago** 101:9
**Chief** 128:16
**choice** 34:15
  75:9
**chooses** 10:7
  33:15
**chose** 162:8
  199:19 200:9
**chosen** 243:17
**circumstance**
  127:14
**city** 11:6 101:8
**Civil** 1:25
**claim** 5:21 6:2,5
  13:7 15:9 16:1

16:10 17:11
  64:6 113:8
  119:17 157:25
  159:11
**claimed** 155:23
**claiming** 219:10
**clarify** 63:11
**class** 234:4
**classes** 167:20
  167:24 236:4
**classic** 113:11
**classified** 199:6
**clause** 129:23
  153:12
**clear** 6:25 12:18
  48:14 105:22
  160:7 192:17
  192:22 203:24
  215:13
**clearing** 131:13
**Clearwater**
  105:1
**client** 12:16 15:5
  41:17,22 42:2
  44:12 61:5
  81:11 96:19
  101:18 105:8
  125:1 149:3
  153:5 154:1
  208:25 229:19
**clients** 190:18
**client's** 22:2
  61:20 72:6
  81:6 98:16,23
  99:3 103:4
  121:18 126:19
**clip** 80:11,12
  97:15 98:18
**clipped** 72:8
**clockwork** 20:5
**close** 167:1
**closed** 118:16
  210:5
**closing** 118:10
  118:16 174:14
  181:22 182:22

Daphne Mosley                                    October 14, 2009

182:23 184:25
185:13 196:13
196:18,22,23
197:3,4,7,12
197:12 203:16
203:19 204:21
208:11 209:12
209:14,15
210:6,12,24
212:18 235:20
239:7,10 240:2
240:16
**code** 38:23 56:23
56:23 57:13,15
57:20 58:7,14
58:16,23 59:2
59:6,14 60:15
65:23 66:3
107:6 154:17
182:8,12,15
194:17 200:4
233:21 234:21
235:22 237:3,9
237:17 253:13
**coded** 47:6 60:14
**codes** 57:25 59:9
59:19 60:10,19
61:23 62:22
**coding** 66:24
**Collateral**
132:19,24
133:1
**collect** 67:18
141:6
**collected** 79:15
79:19 95:10
**collecting** 74:1
**collection** 51:19
52:21,21 79:7
79:11 131:6
**collections** 48:4
50:9,22 51:4
174:9 203:12
**collective** 72:11
**collectively**
167:19 172:8

198:25
**collects** 93:22
**Colleen** 117:3
161:24 254:12
**Colquitt** 2:20
251:23
**column** 40:17,20
40:22 58:3,22
65:6,9,10,21
131:1,5,18,25
132:1 133:15
**columns** 40:10
40:12
**come** 8:10 13:1
49:4 98:12
140:3 153:11
180:2 224:2
**comes** 15:12
200:3 217:6
**comfortable**
59:9 204:25
**coming** 24:24
180:2
**commenced**
117:25
**comment** 53:25
56:4
**comments** 52:25
54:9
**Comment/Legal**
74:8
**Commission**
130:17 166:3
251:21 254:21
255:4 256:4
**commissions**
143:10
**commit** 149:20
228:12
**common** 94:2,18
94:23
**commonly** 85:23
105:19 136:22
139:19
**communicate**
37:13

**communicated**
155:7
**communicates**
100:19
**communication**
155:11
**communicatio...**
28:23 31:19
123:1,7 155:9
**companies**
142:12,22
143:4
**company** 5:24
6:15 9:3,10
10:7 11:24
23:19 28:2,13
29:7,14 34:5
36:19 43:6,12
44:16 45:2,6
46:1,6,9 49:7
53:18 55:19
60:24 68:20,25
74:13 75:1
78:3,7,13
79:15,16,20
80:8 83:21,24
84:1 85:5
101:20 103:19
115:17 117:13
118:24 122:25
125:13 127:3,5
127:23 129:22
130:2 134:1,14
135:4,22,25
136:12 137:21
149:11 161:20
162:17,19
163:6 165:11
168:9 169:11
169:15 173:5
175:23 176:2
176:23 177:2
177:12 180:14
183:1 193:17
193:20 206:4
216:25 222:11

222:23 223:7
232:16
**company's**
37:21 55:10
134:19 148:11
**compare** 166:24
244:17,19
**comparing**
222:17
**compensation**
112:13 142:18
**complete** 41:12
91:7,8 97:18
98:16 120:12
174:20 177:17
226:1 229:18
**completed** 20:12
32:20 83:9
175:18 179:13
182:25 206:2
251:13
**complex** 147:19
**compliance**
45:16 129:19
131:2 135:13
149:6 237:2,8
249:15
**complicated**
114:23
**complies** 80:14
97:17 134:1
**comply** 45:11
134:15 135:22
194:25 238:15
**complying**
115:24
**Composite**
254:15
**computer** 6:14
21:20 24:12
62:16,18 69:16
69:18 92:17
174:20 182:7
**concept** 234:12
234:25 245:17
**concerned**

142:17 228:10
**concerning**
185:11
**conclusion** 134:4
219:21
**concurrently**
201:13
**concurs** 172:23
**condemnation**
151:19
**condensed**
247:10
**condition** 46:5
**conditions** 46:8
154:18 185:16
**condo** 140:1
**conduct** 63:23
**conducted** 83:10
**Conduit** 194:17
**confirm** 62:25
131:20
**confirmed** 16:1
**confirms** 178:7
**conform** 116:21
118:2
**confuse** 7:3 91:4
**confused** 40:21
91:3 201:24
**conjunction**
71:8 230:5
**Connecticut**
189:5
**connection**
174:13 175:6
181:17 182:17
205:10
**consequence**
87:7
**consider** 11:7
43:6
**considered**
136:17,23
138:17,19
**consisted** 84:9
**consolidated**
53:21

Case 10-01172-DWH    Doc 22-2    Filed 11/01/10    Entered 11/01/10 15:55:35    Desc
Deposition of Daphne Mosley    Page 72 of 104
Daphne Mosley                                          October 14, 2009

Page 264

constant 18:4
constantly 51:14
constitute
  178:11
constituting
  172:7
consultant 4:13
consummate
  185:25
contacted 52:12
contacts 52:17
  53:22
contain 91:25
contained 62:17
  85:21 121:1,22
  151:13 156:12
  193:5
containing
  174:20
contemplated
  186:1
contend 193:4
content 191:25
contention
  113:15
contents 120:8
  191:7,19,20
  192:7 193:1
contest 192:7
contested 4:6,16
context 187:23
  190:2 191:8
  209:20
continue 20:20
  191:17
continued 12:22
  254:1 255:1
  256:1
continues 13:1
  15:13
continuous
  221:3
contract 8:19
  11:20,23 27:5
  35:1,4,8 71:13
  71:17,19 82:11

85:22 86:6,20
86:23 125:1
129:23 186:18
198:1
contractual
  16:22,25 17:14
  17:24 18:6
  19:11 22:6,9
  23:2 34:20
  35:13 45:15
  68:14 78:3,6
  78:18 79:1
  81:14,18,19,21
  119:10 147:2
contractually
  17:5 18:11,19
  19:4 20:14
  82:20
contradicts
  192:15
contribution
  237:18
contributions
  237:15 238:1
control 12:9
  102:18 230:16
controlled
  139:18
controlling
  199:21
conversations
  123:7
convert 40:4
convey 25:19
  107:1 173:9
  174:5 201:15
  202:17 213:12
conveyance
  175:7 201:7
conveyancing
  123:2
conveyed 184:10
conveying
  202:22 204:14
conveys 202:12
copied 122:24

copies 29:15
  35:25 36:6
  39:4,5 72:19
  171:7 197:18
  228:21 253:21
copy 39:15 62:10
  96:15,19 97:18
  98:8,16 101:16
  103:3,8 105:11
  121:9,18
  122:17,21
  130:16 169:6
  171:13 177:15
  201:2 208:24
  209:5 220:22
  220:24 224:18
corner 195:19
Corp 168:7
  255:6 256:7
corporation
  107:3 168:17
  168:20 169:7,8
  169:10,15
  170:5 172:17
  173:3,9 178:4
  189:4 201:23
  202:6,12 210:4
  213:12,16
  215:10 216:4
  216:21
corpus 235:8
correct 8:1 9:7
  11:19 13:19,20
  14:20 15:9,15
  16:14,16,22
  17:21,22,25
  18:6,20 19:11
  21:24 22:11
  23:14,17 24:2
  24:6,9 25:11
  26:16 27:8
  32:9,10,21
  38:24 40:7
  41:6,9,19,23
  41:24 48:12
  52:18 53:19

54:21 55:3
59:5,17,23
60:8,13,21
66:9,16 67:14
68:19 71:9
77:16 78:23
81:12 82:9
91:18 96:2,3
98:8 100:8,21
101:12,22
102:21 103:1,5
103:8,9 105:2
105:9,13 106:4
106:7,13
107:20 108:5
108:13 109:8,9
112:23 113:10
113:17 115:25
116:8 117:15
117:16 118:7
124:18,24
127:4 138:3
139:16 140:4
140:21,22
141:10,15,16
142:1,4,8,9
144:16,20
145:9 146:13
149:16 150:22
151:25 152:20
153:15 155:16
155:17 158:15
159:12 161:15
163:15 164:11
173:18,19
177:18 180:12
181:6 193:22
205:15,23
206:4,8,14
207:18 211:13
211:17 212:4,9
213:9,13 214:7
214:19 216:8
218:7,11,12
219:3 221:20
222:4 225:5

232:20,24
233:3 236:10
239:20 241:19
243:4 247:19
247:25 250:23
corrected
  117:21 162:15
correcting
  163:18
correctly 171:11
  187:5
correspond
  58:24
correspondence
  149:2
corresponds
  206:17
cost 87:15,17,18
  87:20 88:3,21
  88:24 89:4
  150:16
costs 34:9
  153:24
counsel 4:7,8
  62:9 77:6,21
  108:25 118:14
  130:8 200:1
  216:14 233:18
  251:6,9
County 106:10
  107:11 250:8
couple 104:21
  143:19 179:25
  190:4 245:6
course 89:18
  98:6 102:12
  229:16
court 1:1 4:4
  7:20 14:10
  15:6 18:3
  25:22 98:7
  99:10 103:9
  153:21,25
  155:18 161:12
  163:5,14
  197:17 215:14

Case 10-01172-DWH    Doc 22-2    Filed 11/01/10    Entered 11/01/10 15:55:35    Desc
Deposition of Daphne Mosley    Page 73 of 104
Daphne Mosley                                              October 14, 2009

Page 265

227:9,13 233:5
233:6 239:4
**covenant** 151:8
156:12
**covenants** 122:2
124:3 149:18
151:13
**cover** 60:5
141:13
**coverage** 142:3,7
**Crandall** 49:19
**CRCB** 251:22
**create** 40:18
235:8
**created** 24:9
40:11 74:1
167:22 184:10
218:19 229:2
236:3 238:2
**creates** 31:13
**creating** 194:7
229:15 234:17
**creation** 65:16
195:7 218:25
**credit** 14:13 66:9
**credited** 41:22
69:12 126:24
126:25 127:1
**creditor** 161:9
**creditors** 14:13
**criteria** 23:8
131:2 134:1
**cross-examine**
186:24
**CRR** 2:19
**CSR** 2:19 251:20
**cumulative** 60:6
166:9
**cumulatively**
99:5
**cure** 137:21
165:12 178:23
179:2 224:9
**cured** 22:21
116:17
**cures** 243:19

**current** 4:1
23:10 59:14
76:25 128:21
128:22 137:14
**currently** 30:1
57:22 78:3
111:2 135:16
163:1
**custodial** 131:12
136:1,7
**custodian**
114:12,13,16
114:17 115:13
136:8 164:9
205:13 208:10
223:23 224:13
225:4,19 228:6
228:8
**custodians**
114:21
**custody** 114:9,10
227:20,22,23
**customer** 44:5
67:19 148:15
**cut** 199:12
**cut-off** 174:8,22
203:10,12,13
203:14,18,21
204:2,3,6,18
**cycle** 81:10
**C-A-S-T-I-L-...**
99:20
**C-R-A-N-D-A...**
49:21

_____
**D**
**D** 3:1 175:1
**damage** 149:19
**dangerous**
154:18
**Daphne** 1:12,16
3:2,8,9 250:3
250:14 252:3
253:3
**data** 6:16 8:3
29:6 36:10,14

38:22 39:2,2
40:2,6 41:12
59:11 62:17
120:13,18
**date** 13:11 16:8
16:22 17:1,24
18:6 19:11,25
21:10,20 22:3
22:6,9 23:2
31:13 41:23,25
42:1,23 46:17
58:8 59:25
61:19 65:25
77:18 78:4,6
78:18 79:1
82:11,13
105:18,20,22
109:20,22
117:22 125:4
126:3,4 127:1
143:23 156:6
158:7 163:4
171:19 172:11
174:8,15,22
181:23 182:12
182:23,23
184:25,25
185:14,14
196:12,13,18
196:22,23
197:3,3,4,7,13
197:13 203:10
203:12,13,14
203:17,18,19
203:21 204:2,3
204:6,9,12,18
204:18,21,23
208:12 209:12
209:15,15,25
210:6,12,24
212:18 232:6
235:20 239:7
239:10 240:3
240:16
**dated** 58:10
106:3 107:7

108:15 117:3
168:5 170:7
171:16 172:20
183:19 231:13
253:13,23
254:11,15,17
254:19 256:10
**dates** 62:3
218:24
**day** 16:9 20:5
41:18 110:20
127:11 161:17
231:7 235:21
240:2 241:24
246:9,23 247:2
251:16
**days** 18:20 19:10
19:13,16,25
20:8,13 21:11
21:15 23:5
78:10 82:21
131:13,14
133:11,11,20
133:22 134:22
171:6 178:23
181:22 210:9
210:10,11
212:8,18
**deal** 54:25 82:7
199:10 202:1
235:17
**dealing** 23:9
28:10 41:2
44:17 80:8
99:3 130:19
141:18 144:8
151:6 152:7
153:10 166:3
181:14 185:16
201:6 237:2,7
**deals** 49:8 51:11
59:2 137:11
139:5 141:19
142:2 149:14
151:24 153:25
154:5 157:21

173:25 187:16
193:2 199:14
212:17,21
215:3 235:2
**Debbie** 50:6
**Debra** 49:23
**Debra's** 49:24
**debt** 23:16
109:12 110:8
110:13 113:5,6
113:9 114:4
115:10 122:10
124:5 143:21
144:25 145:14
156:4,24
158:11 160:1
223:22 224:4
231:8,8 241:18
245:25 246:9
246:16 247:23
248:5,8,10
**debtor** 1:5 15:24
16:4,11,12
19:22 20:13
21:12 64:3
**December** 57:23
253:13
**decision** 7:4,22
8:5 163:20,21
**decisions** 6:6,20
33:10
**dedicated** 55:19
55:20 112:3
**deducted** 42:8
42:12
**deed** 30:1 71:5
116:11 118:3
161:1
**deemed** 124:20
125:2,5,8
**default** 9:6,9
12:24 16:3
28:9 29:17,22
30:3 32:17
49:9 62:15
63:2,8 75:6,11

Daphne Mosley                                    October 14, 2009

Page 266

78:13 85:6,8
87:24 100:20
150:9 151:8
157:12,16
159:1,8,12,22
**defaulted** 55:20
**defaulting** 55:12
**defect** 123:21
178:23
**defective** 116:14
178:19 183:10
**defects** 123:1,7
**DEFENDANT**
2:8
**Defendants** 1:10
**deferred** 156:25
**deficiency**
147:23 148:1
**define** 142:14
**defined** 173:21
194:17 237:16
**defines** 71:17
**definition** 66:6
154:5 168:23
199:14,19,19
199:21 200:2
200:14 202:3
204:3,4 215:24
238:6,7,9,10
240:15
**definitions**
173:20 193:3,5
200:9,11
203:23 204:24
**Delaware** 107:3
**deleted** 239:25
240:3
**delineated** 139:7
**delinquency**
17:6,9,10,15
17:21 20:21
21:8,21 22:3
22:19,21,22,24
23:3 45:24
46:17,18,20
51:9 82:11,14

83:13 87:7,9
159:5
**delinquent** 16:9
17:5 18:11,19
19:4,10,13,17
20:1,8,14
21:11,15 23:6
51:9 82:20
**deliver** 174:19
175:8,12
178:24 179:2
185:24 205:12
208:9,10
**delivered** 179:13
209:11,24
210:3
**delivery** 201:14
**demand** 118:18
145:16 146:9
158:1,17
165:18
**dense** 214:16
**department**
47:19,24 48:2
48:9 49:8,11
49:16,22 50:3
50:5,10 51:4
52:1,1,12,21
74:11,22 92:14
92:16 100:13
100:16 112:10
115:19 128:4
142:25
**departments**
48:1,25 49:2,3
49:7,13 51:18
51:25 52:10,15
53:6,18
**depend** 22:24
23:8,10 46:10
83:11 113:6,15
115:8 130:9
165:2
**depending** 22:22
22:23 49:13
83:17 141:24

**depends** 23:7
51:7,8,9
126:13,14
**depose** 224:3
**deposed** 34:23
244:1 247:8
**deposing** 241:21
**deposit** 175:8
205:12
**deposited**
131:11
**deposition** 1:12
1:16 3:9 24:20
36:11 59:16
191:17 198:24
225:14 241:6
245:2,4,7,12
250:2,14,22,24
250:25 251:4,8
251:13 252:2
253:2 256:9
**depositions**
122:20
**depositor** 167:18
168:7,8,24
178:1 201:13
201:18,19,20
204:13 205:11
207:22 208:11
216:6 236:23
**deposits** 203:5
**describe** 117:10
**described**
107:11 184:16
**describing** 7:23
**description** 4:4
6:11 7:6 74:8
99:24 116:11
116:14,21,22
117:18,21
118:2,3,7,10
123:21 147:16
161:1,2 253:8
254:3 255:3
256:3
**designate** 191:18

197:3
**designated**
124:22,23
205:13 235:20
**designed** 245:16
**desire** 86:18
172:15
**Desktop** 28:3,23
29:4,7,10,13
31:20,24 35:20
36:7,10,14,24
37:10
**Desktop's** 31:5
**destroy** 149:19
**detail** 38:16
121:6 253:9,22
**detailed** 121:6
**details** 24:3
**deteriorate**
149:20
**determination**
69:13,15,19
**determinations**
12:13 62:1
**determine** 3:15
14:25 43:1
61:17 62:3
64:13 65:3
68:20,25 69:10
**determined**
164:16
**determines**
33:12,14
**detour** 68:5
**Deutsche** 30:5
101:20 102:2
103:18 108:12
113:2,14,15
114:11 117:12
118:1,24
119:11,13
165:23 168:9
168:15 173:4
175:8,22 176:2
176:23 177:1
177:12 178:8

180:14 181:4
181:24 182:3
183:1 206:3
216:25 217:25
222:11,23
223:6
**difference** 43:24
44:7 78:9
166:20
**differences**
244:6
**different** 7:8,10
7:11,13 16:17
23:21 51:5,8
81:9 116:10
126:15 162:1
166:19 186:17
187:19 188:24
207:5
**differently** 35:12
**dig** 121:11
**direct** 12:22 14:6
15:11,20,21
35:13 68:24
85:9 196:8
236:2
**directing** 199:7
**direction** 8:8
12:9
**directions** 8:16
**directly** 8:19
239:19
**disagree** 88:13
**disbursed**
143:17,20
156:3 158:10
**disbursement**
143:24 144:21
156:6 158:7
**disbursements**
67:20 133:19
**disclose** 162:8
**disclosed** 161:11
**disclosures**
162:11
**discontinued**

Daphne Mosley                                              October 14, 2009

59:19
**discover** 165:9
**discovery** 24:19
  31:18 178:18
  191:20 208:25
  220:18 221:23
  222:4
**discrepancy**
  160:25 166:24
**discusses** 209:19
  211:12
**discussing** 45:21
  108:13 210:21
**Discussion**
  125:12
**displayed**
  113:22
**displays** 126:16
**dispute** 186:15
  188:22 190:21
  193:4,10,11,16
  193:19 195:10
  213:4
**disputes** 193:9
**disrepair** 155:15
**distinction** 126:2
**distributed**
  143:16
**District** 1:1 8:13
  25:22 98:7
  99:11 233:5
**divest** 165:19
**divided** 148:2
**DIVISION** 1:2
**document** 29:9
  29:14,15,20
  30:1,4 38:9
  41:11 57:10,11
  60:17 62:9,25
  67:12 68:9,12
  71:25 72:11
  73:1,2,4,14,19
  73:25 74:6
  75:16,21,24
  76:2,19 77:6
  77:19,20,21

80:1,2,13
91:19 92:24
98:6 99:10,12
104:10 105:21
106:19 108:8
108:15 109:21
117:17 120:8
120:21 122:15
123:19 124:1
130:10,23
135:25 136:7,8
137:8 163:17
167:6 169:21
170:1,24 171:3
172:23,24
178:19,20,24
179:3 180:22
182:11 183:10
183:11 187:7
187:11,12
188:3,10,19,23
189:13 190:8,9
190:23 191:9
191:15 192:4,6
192:18 193:2,6
193:23 195:9
196:16 198:15
198:19,23
200:1 203:4
204:1 205:2,7
208:16,24
209:5,10,16
210:17 211:4
212:1,25 213:3
214:10,24
216:14 221:4
223:5,9,10
224:22,24
226:15,21
227:3,12
233:18 235:24
236:9 248:25
249:13
**documentation**
84:15 112:20
112:22 161:13

**documents** 4:9
24:19,25 26:9
26:18,19 29:21
29:25 30:5,6
31:19 37:10
55:24 56:20
61:25 68:6
71:12 72:15
73:1,6 80:4,5,6
80:12 81:4
82:7 96:4,5,10
96:13,22 97:4
97:7,9,19,23
98:1,9,18,22
98:25 100:22
100:23 102:18
103:8 104:22
106:10 110:13
114:3,17,22
115:3,4,5,14
116:2 117:8
118:6 122:20
123:1,2,8
126:18 133:3,9
133:14 134:13
134:25 149:5,8
155:22 157:6
164:2,7,17
165:12 172:7
175:9,24 187:4
189:11,14
190:14 191:7
191:12,19,25
194:3,7,24
195:13 196:9
198:5,10,12,25
205:14,21,22
206:14,17,18
207:1,3,13,22
208:25 209:23
210:18 211:1
212:7 213:18
213:21 214:4
215:18 216:17
217:10,11,13
217:15,17,23

218:24 220:18
220:25 222:16
223:1,3,17,20
223:21 224:7
224:10,14,21
225:4,13,16,19
225:21 227:23
227:24 228:7
229:2,7,15,19
230:7,22,23
231:3,19
232:13,25
233:5,7 243:5
244:6 248:23
248:25 249:15
255:24
**document's**
192:6
**doing** 37:16
101:1 152:19
192:1
**dollar** 38:23
66:18 67:13
**dollars** 248:16
**doors** 154:16
**double** 45:21
**drain** 154:17
**Drive** 2:5
**drives** 162:2
**drive-by** 18:15
18:18 23:3
27:11 87:18
**due** 13:1 16:22
17:1,5,24 18:6
19:11 20:5
22:6,9 43:14
43:17 58:23
77:15 78:3,6
78:13,18 79:1
122:10,12
124:4,6 138:11
138:11,12
140:11,14,19
144:13,16
145:7,8 147:14
157:25 159:11

159:16 203:13
**dues** 140:1
153:18
**duly** 1:18 3:3
250:17
**duties** 26:8
193:24
**D-E-B-R-A** 50:1
50:2
**D.C** 245:2

_____

**E**

**E** 3:1,1 224:20
255:23
**earlier** 28:6
45:21 108:13
113:23 123:21
139:17 154:1
165:16 197:1
222:8 231:7
238:7 239:7
241:17
**early** 51:18
247:5
**earthquakes**
141:24
**East** 2:5
**effect** 118:4
158:14
**effected** 240:1
**effort** 25:2 54:18
**eight** 5:4,7 51:21
219:24
**either** 25:10
26:20 36:21
40:20,23 46:25
61:20,21 62:20
63:8 64:9
82:10 83:14
85:6,8 127:6
129:15 137:15
143:11 152:24
156:24 164:8
169:11 175:14
176:22 177:11
179:4 205:25

210:25 220:11
222:10 232:18
233:21 237:16
**elections** 235:12
**electronic** 30:7
101:25 102:17
107:1 114:19
164:2,22 165:7
**electronically**
11:15 225:8
**eligible** 238:4
**eliminate** 154:17
**else's** 246:7
**employed** 3:24
3:25 4:24 5:3,7
99:22 101:10
110:24 111:2
111:13 112:12
251:6,9
**employee** 30:25
99:13 101:11
111:15,18,19
111:25 112:16
251:9
**employees** 30:15
30:20 110:21
112:3 222:3
**employment**
5:11,12 99:17
100:10,16
101:3 111:21
**encompassed**
17:10
**encompasses**
223:17
**encumbrance**
138:23
**ended** 96:4
99:17 100:10
100:16 137:17
140:10
**endorsed** 175:13
182:22 205:25
222:10
**endorsement**
104:8 160:19

175:18 176:1
183:5 206:2,6
211:21 216:18
216:23 217:18
217:19,25
218:3,11
219:17,19
220:7 221:13
222:22 232:18
**endorsements**
26:1,3 96:16
97:2,13 98:3
113:25 115:10
160:16 182:25
221:10 223:4
223:12 228:18
233:13
**ends** 129:3
**enforce** 113:5
151:21
**enforceable**
116:7 161:20
**enforceably**
117:22
**enforcement**
151:20
**engage** 4:7
**entails** 4:6
**enter** 8:3 154:25
185:25
**entered** 29:16
40:9 58:25
70:2 157:22
159:10
**entering** 154:15
**Enterprises** 45:6
**entire** 4:15 19:15
97:3 155:4
167:21 198:19
243:13
**entirely** 162:2
**entities** 62:21
63:1 82:24
136:13,22
142:18 171:1
189:4

**entitled** 93:6
152:23 161:19
224:20
**entitlement**
161:6
**entity** 108:22
109:23 202:21
203:5 216:10
**entries** 53:16
62:22 63:21
64:12 92:11
117:6 149:24
178:9
**entry** 41:15
58:11,13 61:18
63:13,17 66:18
66:23 67:7,10
74:7 89:25
90:5 93:4
132:21
**equal** 240:20
**escrow** 67:16,17
67:21 68:2,3
69:12 72:5,18
72:23 73:13,16
73:25 76:10
133:13 138:15
138:17,19
139:10,15,17
139:22 140:7
141:13 145:2,3
145:25 146:10
146:13,15,17
146:20 147:9
147:16,17,20
147:22,25
148:4,7,20,21
148:22 253:16
253:17
**escrowed** 145:20
**escrowing**
141:14
**especially** 114:4
**establish** 191:6
**established**
88:24 204:17

216:16
**establishes** 46:6
**estate** 48:7 67:23
194:16
**et** 1:9 254:22
**event** 151:7
153:10 157:1
181:16 182:21
186:9
**everybody**
171:10
**evidence** 167:21
172:3 176:17
213:15
**evidenced**
122:11 124:5
186:6
**evidencing**
217:24 223:22
233:1
**exact** 11:6 43:1
121:18 157:19
232:6
**exactly** 29:11
33:23 37:14
42:6 43:5,13
47:8 55:5
92:23 158:4
**examination** 3:4
188:12 251:2,2
252:9
**exceed** 141:8
**exception** 48:24
**exceptions**
208:14
**Excerpt** 254:19
255:8,12,16,22
**excess** 43:16
**Exchange**
130:17 166:3
254:21 255:4
256:4
**Excluding** 249:5
**excuse** 18:9
100:14 228:23
**execute** 185:24

208:9,10
245:22
**executed** 96:19
107:7 108:4
118:6 230:22
**execution**
201:14
**exercised** 158:2
158:5
**exercising**
244:12,13
**exhibit** 38:12,15
39:17,18 40:3
40:4,10 41:11
41:12,16 57:3
57:4 58:5,9,12
59:7,10,11,15
59:21 60:2,6
60:15 61:3,8
61:15,16,19,24
62:6,8 63:22
64:13,18,23,24
65:2,7,24 66:6
68:7,10 72:1,2
73:23 75:18
76:15,17 77:7
77:8 79:23
80:1,13 81:14
83:20 90:6,20
91:2,7,17 96:5
98:12,13 99:6
99:7,9 101:13
101:17 103:5
103:14,16,25
104:2,6,24,25
108:10 113:1
113:19 116:24
120:4,7 121:2
121:9,14,15,23
123:14 125:18
126:5 130:12
130:15 166:9
166:12 169:2,5
169:23 170:2
175:1 178:15
189:2 197:20

Case 10-01172-DWH    Doc 22-2    Filed 11/01/10    Entered 11/01/10 15:55:35    Desc
Deposition of Daphne Mosley    Page 77 of 104
Daphne Mosley                                          October 14, 2009

Page 269

198:2 199:15
200:14,25
207:9,15
208:15,17,17
208:19,22
209:10,11,19
209:20 210:3
210:14,17,18
210:19,20,21
211:12,22
212:3,6,13,17
212:21 214:21
215:20 217:21
223:3 224:8,15
224:19,20,20
226:7 239:21
244:21,24
253:8 254:3
255:3,8,9,12
255:13,16,17
255:19,22,23
256:3
**exhibited** 59:10
**exhibits** 166:21
253:1 254:1
255:1 256:1
**exist** 44:20 194:7
**existed** 103:8
**existing** 107:3
156:25 184:9
**exists** 86:23
195:2
**expect** 25:14
93:15 186:22
**expectation**
45:17 89:12
**expedited**
162:21
**expend** 88:23
**expense** 174:14
182:24
**expenses** 141:14
**experience** 3:16
83:5,11 108:19
232:22 241:23
**expert** 32:12

**Expires** 251:20
251:21
**explain** 4:3 44:3
68:11 153:21
169:19,25
219:13
**explained**
227:18
**explaining** 148:6
**expressly** 238:3
**extent** 87:6
88:15 179:18
184:2 185:6
217:9 227:20
**extra** 62:10
**eyes** 195:25
**e-mail** 164:14
**e.g** 133:13

**F**

**f** 236:10
**facility** 47:15
112:2
**facing** 228:10
**fact** 21:3 36:5
44:9 104:8
107:14 114:18
145:2 146:4
153:4 156:15
160:24 164:14
183:4,7 186:16
189:25 206:10
218:17 222:8
234:20 244:20
247:22
**facts** 250:12
**fails** 142:3
151:12
**failure** 152:24
**fair** 12:8 16:5,23
22:16,17,21
32:13,15,16,22
33:4,15 34:3
36:13 38:21
39:1 41:13
42:9 64:17

78:12,17,24
79:14,18 81:3
85:16,20 86:5
93:7,9,11,19
94:2 97:18
114:7 116:1
129:12 141:18
145:22 149:21
154:3 160:3,6
164:1,13 198:3
220:5,8,9
232:25 247:1
**fairly** 242:6,13
**fake** 228:20
**fall** 47:18 51:10
**familiar** 24:11
27:18,20,21
28:1,6,22 29:6
29:9,12 31:5
31:14,23,25
33:1 34:19
37:24 44:18
58:1 79:5,8
110:3 126:23
127:22 144:3,7
148:10 156:20
176:13 229:22
233:20 234:12
234:25 244:8
246:15 248:13
**familiarity**
61:25 135:4
**Fannie** 45:6
82:24 136:14
136:16,22
**far** 40:12,24
58:1,22 123:2
240:7 245:20
**FASCO** 173:8
173:14 174:5
174:17,19
177:21,23,25
178:1,7,25
181:1,24 184:7
184:14,18,23
185:4,13 186:8

205:11 209:22
212:3 232:15
**fashion** 21:5
75:10 162:21
**favor** 107:10
**federal** 1:24
67:22 139:18
235:15 236:1
254:19
**fee** 19:3 27:11,12
58:21,22,23
63:10,14 78:17
78:25 79:15,16
79:19 88:21
89:17,19 91:20
91:22 92:22
93:1,16,18,19
93:23 94:15,20
95:6,25 127:6
127:11,14
139:6,10 146:9
**feel** 45:12
**fees** 12:3 36:1,2
63:21 69:12
78:13,16 79:18
79:19 87:23
88:18 91:13,13
91:16 95:5
127:6 139:14
140:1 145:24
**female** 110:25
111:1
**Fidelity** 9:3 28:7
33:21 34:1,11
**field** 92:11
126:11,12
182:8,15,16,20
**figure** 34:9
**figured** 19:11
77:18 78:10
**figuring** 107:6
**file** 4:15,20
12:20 17:20
21:12 25:4,16
26:6 33:25
37:17 49:12

70:20 97:7
103:9 163:17
172:7 174:20
174:25 178:20
179:21 183:11
227:3 232:17
235:18,25
248:25 253:18
**filed** 7:11,14 8:9
15:24 25:21
41:17 42:3
60:24 61:2,4
61:25 76:4
98:6,8 99:10
100:6,6 103:7
113:19 154:2
160:8 161:17
162:19 190:14
192:8 193:12
194:3 221:17
231:9 254:10
**filer** 7:11
**files** 11:18 17:18
19:22 25:10
97:1 182:7
186:12 209:24
224:13
**filing** 6:21 7:25
8:4 13:6,12
16:8 19:14,25
41:23 42:1,23
43:21 60:25
61:9,9,20 62:4
64:6 101:17
103:12 105:7
120:19 155:18
163:15,18
194:24 231:5
254:9
**filings** 166:2
**final** 32:4 197:13
210:1 211:12
211:15 254:23
255:19
**Finance** 101:21
103:19 105:13

Daphne Mosley                                          October 14, 2009

| | | | | |
|---|---|---|---|---|
| 105:15 106:2,6 | **firm** 2:4 8:13,19 | **Floyd** 57:18 | 34:17 46:15 | 238:23 239:14 |
| 106:12,12,14 | 8:20 9:19 | 253:14 | 51:2,16 64:5 | 241:2 242:11 |
| 106:18 107:10 | 33:20 35:14 | **follow** 8:6,15 | 64:18 71:14 | 242:19 243:9 |
| 107:15 108:11 | 57:21 117:3 | 39:15 130:3 | 74:4 77:5,7 | 243:11,25 |
| 110:20 117:12 | 137:4 142:12 | **following** 107:10 | 78:19 79:12,21 | 244:4 249:3 |
| 118:1,25 | 142:17,21,25 | 121:1 182:23 | 83:1,6 85:25 | 250:20 255:9 |
| 173:10 179:23 | 143:3,6,11,12 | 185:15 205:13 | 86:10 88:17 | 255:13,17,19 |
| 180:4,9,15,18 | 146:12 161:14 | 206:2 | 89:23 90:18 | **formed** 118:23 |
| 181:7 182:2 | 195:12 251:22 | **follows** 3:3 | 94:6 95:7,16 | 235:8 |
| 183:16,20,24 | **first** 3:3 32:4 | **footnote** 57:17 | 104:18 109:14 | **former** 111:18 |
| 185:9 200:20 | 40:10 41:16,16 | **forbearance** | 109:25 110:10 | **forming** 194:21 |
| 214:6,19,23,25 | 42:3,11,14,23 | 66:8,11 67:7,9 | 110:16 114:16 | **forms** 112:19 |
| 215:7,10,21 | 46:20 60:4 | **forced** 56:6,10 | 114:20,24 | 121:12 174:25 |
| 216:1,19,24 | 63:17 72:17 | 75:1,9 142:10 | 115:7,10,16 | **forth** 11:23 12:3 |
| 217:19 218:5 | 73:12,13,16 | 144:8 145:13 | 123:4 127:8 | 54:10 81:22 |
| 218:10 231:14 | 101:18 120:24 | 145:22 146:12 | 128:2,6 129:9 | 138:5 139:21 |
| 231:15,20 | 121:2 122:8 | 146:16,19 | 129:17,25 | 140:25 152:2 |
| 239:18 240:21 | 124:3,4,17 | 147:8 | 130:6 136:3,9 | 153:14 164:3 |
| 241:3,14,22,24 | 131:18,25 | **foreclose** 34:8 | 136:19 137:1 | 168:23 184:2 |
| 242:9,15 | 140:18 141:4 | 113:5 116:6,13 | 144:6 145:10 | 184:24 185:6 |
| 246:12,21,22 | 141:19 142:6 | 119:20 140:3 | 146:1 148:8 | 235:12 250:22 |
| 247:1 248:9,13 | 151:10 170:10 | 153:19 159:2,9 | 154:10 159:3 | **forward** 16:2 |
| 248:18 249:8 | 171:15 189:19 | 159:20 161:6 | 159:21 160:11 | 229:7 |
| 255:6 | 203:3,4 210:24 | 163:5 | 161:23 163:9 | **found** 53:1 |
| **financed** 145:3 | 211:18 214:16 | **foreclosing** | 170:2 175:19 | 123:20 130:23 |
| **Financial** 168:7 | 222:14 234:16 | 35:15 | 175:21 176:21 | 226:11 227:10 |
| 168:16,19 | 235:6 236:6 | **foreclosure** 9:4 | 177:4 181:10 | 227:14 |
| 169:7,9,12,14 | 239:16 250:17 | 17:20 28:11,20 | 194:8 195:15 | **four** 146:22 |
| 169:17 170:4,5 | **five** 146:22 | 28:25 32:2,5 | 201:5 202:20 | 171:6 203:1 |
| 172:17 173:2,8 | 226:13 227:5 | 32:18,20,25 | 203:21 204:15 | 228:20 247:11 |
| 178:1,4 189:3 | **fixed** 35:5 | 33:6,11,25 | 206:2 207:11 | **fourth** 7:12 |
| 189:3 201:23 | 165:13 | 34:6,21 35:1 | 208:14,22 | 122:3 247:12 |
| 202:5,11 210:3 | **fixing** 198:23 | 35:18,25 48:6 | 209:2,7 210:22 | **fraud** 228:12 |
| 213:12,16 | **flexibility** | 48:11,21 49:22 | 211:5,24 | 229:22 230:18 |
| 215:9 216:4,20 | 129:11,14 | 51:14 111:5,6 | 213:19 218:25 | **fraudulent** |
| 232:15,15 | **Flint** 107:5 | **foregoing** 183:9 | 221:6 222:5 | 229:3 |
| 255:5 256:7 | **flip** 58:20 62:12 | 250:13,22 | 223:19 224:19 | **Freddie** 45:6 |
| **financially** | 91:4 96:17 | 251:13 | 224:25 226:10 | 82:25 136:14 |
| 251:10 | 103:15 105:7 | **forfeiture** | 226:23 227:8 | 136:16,22 |
| **find** 53:2 121:12 | 121:25 131:16 | 151:20 | 227:17 228:7 | **frequency** 22:24 |
| 123:20 165:11 | 149:13 212:10 | **form** 8:23,24 | 228:22 229:3 | 27:16 |
| 200:4 | 226:7 | 15:18 17:2,16 | 229:24 230:8 | **front** 161:18 |
| **fine** 54:16 196:3 | **floods** 141:24 | 19:19 20:15 | 230:13,14 | 170:19 195:18 |
| 229:11 240:8 | **Florida** 105:2 | 22:12 24:14 | 231:24 235:14 | 201:25 210:18 |
| **finish** 196:10 | 179:22 | 26:5 32:14 | 236:2,19 237:5 | 215:8 220:6,11 |
| **fire** 141:23 | **flows** 171:11 | 33:7,22 34:10 | 237:10,20 | 221:11 233:17 |

Case 10-01172-DWH   Doc 22-2   Filed 11/01/10   Entered 11/01/10 15:55:35   Desc
Deposition of Daphne Mosley   Page 79 of 104
Daphne Mosley                                        October 14, 2009

Page 271

**full** 3:6 12:11
90:13 117:14
141:4 145:16
146:9 185:23
217:9 229:18
250:23
**fully** 117:10
**function** 29:10
47:18,20 52:16
69:22 92:9
111:4
**functionality**
29:12
**functions** 128:1
**fund** 77:3 167:22
**funds** 41:21
44:20,24 65:10
67:18 137:13
137:16 138:10
138:15 141:6,7
**further** 83:10
129:15 181:21
250:21,25
251:5,8,12
**future** 128:25
**F-1** 209:19,20
210:3,18,20
212:6,13,17
255:17
**F-2** 210:19,21
211:12 212:13
212:21 255:19
**F-3** 208:15,22
209:10 211:22
212:3,14
255:13

**G**

**G** 3:1
**Gallegos** 50:12
50:16
**gather** 74:16
**gathering** 24:18
**general** 93:14
112:6 116:5
123:12 134:18

178:9 197:9,10
200:8
**generally** 3:21
13:6,7 113:1
123:18 145:6
244:9,11
**generate** 38:19
**generated**
125:25
**gentleman** 50:21
**geographically**
10:12
**Georgia** 11:2
**getting** 227:24
**give** 7:18 8:14
39:15 129:25
134:3 150:2
190:7 191:13
**given** 3:9 25:3
109:20,20
113:23 226:24
233:6
**gives** 129:11
142:7
**giving** 58:8 82:4
112:20
**glasses** 122:6
**glaze** 195:25
**glean** 73:19
**Global** 105:1,4
105:12 106:11
180:4 218:9,10
**glued** 219:4
**go** 8:8 34:8
36:24 42:6,13
70:7 72:15,20
75:19 76:7
104:19 121:12
121:19 122:22
166:10,15,24
182:18 199:12
201:10 203:22
205:6 206:21
215:14 217:12
220:23 228:14
228:15 229:7

229:12 247:16
249:19
**goes** 80:3,5
148:25 178:6
202:25
**going** 12:21
15:17 19:16
38:3,10 45:21
50:25 57:3,24
68:5 72:12,14
73:19 77:7
79:25 80:25
92:9 96:8,12
98:11,18
101:15 104:20
120:6 121:8,13
123:16 129:24
129:25 134:2,3
134:11,24
135:1 140:9
144:4 147:12
147:13 151:14
161:22 163:8
163:19,21
166:9,15 167:4
167:5 169:4,21
170:10 171:10
180:1 187:15
190:4,8,11,21
191:19 192:16
193:7 197:15
197:16,17
198:16 199:9
205:3 207:2,23
208:16 210:16
211:8,9 213:2
214:12,22
215:13,19,23
217:3 219:25
230:9 233:24
244:19 245:10
249:19
**good** 7:20 40:1
73:22 129:10
245:18
**governed** 139:18

**Government**
45:5 192:9
**governments**
45:5
**governs** 195:7
**grant** 106:25
**granted** 140:2
**grants** 184:18
**Greater** 11:3
**green** 124:18
211:11 215:24
**Greenwich**
169:11,11,16
169:16,17
170:4 172:2,11
172:16 173:14
174:2,14 175:7
177:19 178:21
179:12 180:23
181:21 182:24
183:12,20
184:3,14,18,22
185:4,12,22
186:5 189:2,4
201:22 214:5
216:19 217:13
232:15
**Greenwich's**
184:15,19
**ground** 138:24
**group** 51:11,13
52:3,6 70:12
74:21 105:1,5
105:12 128:9
128:11
**grouping** 73:5,5
75:17 76:3
80:4
**groups** 51:6,7,8
55:15
**GSE** 45:5
**guess** 35:11
63:16 126:13
126:13 130:9
142:16 227:6
227:11 246:25

**guesstimate**
48:17
**guidance** 136:13
**guides** 47:5
**G-A-L-L-E-G...**
50:19

**H**

**H** 2:4
**habit** 115:23
**halfway** 133:16
141:4
**hand** 33:4 80:11
96:12 121:8
124:1 167:4,5
171:3 210:22
211:9,9 215:2
227:14
**handing** 166:18
**handle** 8:9,15
123:24
**handles** 5:17
49:9
**handling** 28:25
44:20
**hands** 62:9 77:6
77:21 102:25
200:1 216:14
233:18
**happen** 83:7
**happens** 118:9
118:13 142:2
**hard** 107:4
122:18,21
226:9 228:20
**Hardaway**
111:11,16
112:5
**HARRIS** 250:8
**hated** 189:24
**head** 7:15 42:24
43:11 54:5
58:4 108:25
118:14 130:8
157:20 163:24
179:10 183:13

Case 10-01172-DWH    Doc 22-2    Filed 11/01/10    Entered 11/01/10 15:55:35    Desc
Deposition of Daphne Mosley    Page 80 of 104
Daphne Mosley                                           October 14, 2009

Page 272

185:10 196:14
**headed** 72:18
**heading** 65:7
  131:3,7,10
  132:4,7 138:14
  140:11 149:15
  153:7 205:21
  207:17 235:4
  238:19
**headings** 40:16
**headquarters**
  10:25
**heads** 7:18
**headway** 96:9
**hear** 94:21
  215:14 225:10
**heard** 43:9,10
  142:15 188:20
  229:23 230:1
  230:18
**heavily** 67:22
**held** 44:20 127:2
  127:7 135:18
**help** 39:14
**hereinbefore**
  250:15
**hereof** 172:11
  201:14
**hereto** 172:4
  208:15 250:13
  251:10
**hereunder**
  128:23 167:20
  167:22 236:3
  238:2
**Hey** 154:2
**Highland** 2:10
**highlight** 122:7
  215:19
**highlighted**
  117:6 124:17
  128:18 137:10
  141:5 143:15
  151:10 178:16
  189:20 190:13
  195:18 201:11

203:7 212:16
  212:17 215:24
  222:17 235:6
  235:19,23
  236:13 237:14
  237:23,24,25
  238:21,22
  239:22 240:17
**highlighting**
  129:2 137:17
**Hilton** 1:23
**hiring-in** 5:14
**Hispanic** 50:18
**histories** 127:20
**history** 38:16
  90:21,22,23
  91:7,8 121:4,7
  125:25 126:19
  144:18 253:10
  253:21
**Hobby** 1:23
**hold** 114:3
  137:12 141:6
  185:23 215:12
**holder** 106:23
  110:2
**holders** 101:21
  103:19 180:15
  182:7 201:17
**holding** 44:24
  73:12
**Holdings** 169:11
  169:16
**holds** 135:16
**home** 17:19
  154:25 155:8,8
  155:12,15,20
**homeowner**
  140:1
**homeowner's**
  74:2 153:18
**honest** 116:22
**honor** 71:22
**hope** 55:12
  93:17
**Hopefully** 55:11

**hoping** 53:1
**hour** 215:17
**Houston** 1:23,24
  2:20 224:3
  251:23
**HUD** 45:6
**Hudson** 1:4,6
  15:25 61:5
  68:24 72:23
  93:6 96:13
  107:8 119:14
  125:2 147:4,9
  147:16 154:8
  154:20 157:1
  157:22 253:12
**Hudson's** 53:6
  53:17 60:24
  90:1,9 91:9,16
  92:22 93:2,4
  97:7 142:11
  146:16 152:6
  153:6 155:18
  157:12 193:21
**Huh** 222:25
**Huh-uh** 194:11
**human** 69:23
**hundred** 89:10
**hundreds** 23:19
  232:9
**hypothetically**
  69:5

──────────

**I**

**idea** 3:18 30:24
  66:25 74:17
  165:6 194:2
  196:12,16,18
  197:2 234:2
  245:18 248:15
**identical** 206:13
**identifiable**
  13:11
**identification**
  31:9 38:13
  39:19 57:5
  68:8 72:3

73:24 76:16,18
  77:9 79:24
  98:14 99:8
  101:14 116:25
  120:5 121:16
  123:15 130:13
  166:13 169:3
  169:24 182:19
  208:20 210:15
  224:16 244:25
**identified** 76:11
  81:13 82:6
  83:20 85:2
  104:6,22
  179:15 196:12
  202:22 203:9
  214:6 236:10
**identifies** 4:19
  31:12 167:24
  182:8,16
**identify** 6:4 61:4
  61:8,19 65:10
  68:6 72:15
  77:1 137:4
  167:23 187:21
  187:24
**identifying**
  92:10 96:9
**ii** 176:5 206:7
  254:20
**Illinois** 101:9
**image** 31:5,9,13
  31:13
**immediately**
  186:3 209:17
**impair** 149:19
**impairment**
  119:8,12
**imply** 229:2
**important** 160:5
  166:16 167:2
  188:12 189:24
**impose** 67:25
**imposed** 87:6
**impossible** 242:9
  242:15

**improvements**
  150:2
**incident** 109:8
**include** 6:5,6
  54:3 117:14
  140:7 147:14
  149:4
**included** 13:6
  68:3 91:17
  139:22 145:24
  146:10 164:4
  197:6 223:11
**includes** 141:23
  153:17 154:12
**including** 27:19
  36:1 67:22
  133:7 174:7
  182:7 185:7
  201:18 203:10
  212:7 236:2
**income** 79:16,19
**incorporated**
  175:3
**Incorporation**
  256:6
**increase** 58:22
  158:18,22
**increased** 66:15
**increases** 66:11
**incurred** 64:3
  157:15
**incurring** 90:10
**indebtedness**
  156:18 172:3
  186:6
**independent**
  34:15 86:8
  189:10
**independently**
  125:14
**INDEX** 252:1
  253:1 254:1
  255:1 256:1
**indicate** 66:15
  67:8 90:1,16
  91:20 109:11

117:20 125:18
126:2 138:16
169:9,14
170:24 174:15
178:10 181:23
189:15 199:2
200:15 203:4
205:21 207:20
209:21 210:3
236:13 249:1
**indicated** 28:13
58:2 105:18
109:23 155:15
155:19 172:3
214:4 247:13
**indicates** 24:5
41:16 42:1
77:10,15
101:19,24
104:25 113:20
144:11,24
173:13 180:22
189:2 196:21
205:10 226:16
**indicating**
132:18 155:12
160:18 176:12
**indication**
104:14 239:16
246:22
**indicia** 104:14
**individual** 70:1
73:9 81:11
226:9
**industry** 43:7
44:19 79:5,9
129:16 136:1,6
136:17,24
137:5 150:11
230:10
**inflated** 87:16
**information**
6:13,15,17 7:6
7:24 8:10 9:4
25:3,9 34:13
37:19 40:3

42:4 46:1,23
47:3,16 54:20
61:13 62:5,21
67:11 69:20
70:17 73:18
74:4,15 75:12
75:13,25 76:22
84:11 92:1,6
92:17,23,25
101:24 115:16
115:17 126:7
126:16 127:19
128:8 134:6
135:21 137:24
143:8,9 166:7
170:21 191:12
191:14 206:16
212:23 218:24
220:11 221:21
222:2 235:15
236:1 242:22
255:5 256:5
**initial** 5:14
45:25 46:19
83:8 210:20
255:18
**input** 6:15,20,21
7:24 69:23
**inquired** 84:8
**inquiry** 31:17
36:9,11 53:4
73:13,16 76:4
76:21 84:4,7,9
84:23 85:1
116:2 197:8
253:17,18,19
**inspect** 150:1,12
**inspection** 18:16
18:18,21,23
19:1,3,10 23:3
27:11 36:3
45:23,25 46:2
46:3,9,21
87:19 91:13
150:4
**inspections**

46:13 56:4
82:8 139:14
149:25 150:8
150:16,25
155:14
**installments**
145:8
**instance** 1:18
7:11 18:15
21:1 24:15
27:11 82:17
83:15 153:18
211:20
**instances** 20:24
20:25 22:13
140:7
**instruct** 230:16
**instructions**
137:6 247:22
248:5
**instrument**
65:15 71:4
87:22 110:8
122:1 138:22
140:20 141:4
143:22 144:11
151:14,18,21
156:5 234:16
**instruments**
88:2,7 172:7
175:9 205:14
**insufficient** 77:3
128:20,22
**insurance** 56:7
56:10 67:19
74:2,10,21
75:1,9,25
119:18 138:25
139:1,3 141:18
141:20 142:10
142:13,19,25
143:3,12 144:9
145:13,23
146:13,17,20
147:6,8 148:15
148:15,18

**insurer** 118:18
**intend** 184:13
189:16
**intends** 167:18
189:16,17
**intention** 163:17
**interest** 69:12
76:9 77:15,18
78:10 84:2
122:10 124:5
133:13 138:11
143:23,24
144:13 145:17
145:19 146:4,8
146:23 147:1
151:17 152:12
156:5,7,17
157:3 158:7,8
167:22 174:7,8
174:9 184:8,19
184:20 185:5
201:17,18
202:18,22
203:11,13
204:14 232:17
235:8
**interested** 86:13
251:10
**interesting**
114:10 241:5
**interests** 152:4
236:5
**Interim** 183:19
**interior** 150:1,4
**interject** 53:25
**internal** 48:20
125:23,24
200:3
**interpret** 59:10
61:8 67:13
106:14,16
109:21 133:17
134:25 208:5
246:9
**interpreted**
133:5

**interpreting**
134:12 135:2
**interrogatories**
4:9 225:23
**interrupt** 13:22
48:13 123:17
**Interruption**
125:10
**intervals** 52:13
**intervening**
177:16
**investigate**
84:16
**investigation**
59:14
**investment** 24:1
194:7,16
234:22
**investor** 10:13
23:13 27:13,15
27:17 46:10
70:8 85:17,22
86:6,15,21
87:3,8,12,23
88:9,12,14,23
89:1,3,5,12,20
90:3 93:2,6,11
94:11,15,19
95:2,12,15
96:2 97:22
150:15 151:1
182:12,13
**investors** 23:20
26:25 94:4,24
151:1
**invoice** 35:22,25
37:5 89:1
253:20,22
**invoices** 36:1,6
36:25
**invoicing** 37:3
**involved** 4:18,19
24:18 28:16,19
60:20 224:14
225:20
**involving** 82:2

Daphne Mosley                                      October 14, 2009

**irregular** 43:8
  129:6
**irrespective** 18:2
  127:2 129:22
  162:16 164:14
**IRS** 190:15
  194:17 195:14
  200:3 233:21
  234:21 237:17
**Irvine** 106:24
**issue** 27:10
  45:20 54:14
  150:24 163:7
  163:15
**issued** 148:21
  167:20 182:17
**item** 85:17,21
  131:9,23 132:1
  139:13 146:13
  206:11,12,13
  206:13
**items** 68:2,2,2,3
  68:21 69:11
  71:8 133:13
  138:15,16,17
  138:19,20,21
  140:6,25 145:2
  145:3,20,25
  207:6,8
**iv** 133:5,6
**IX** 235:2

**J**

**January** 41:17
  254:20
**Jeff** 128:12,13
**Jennifer** 74:19
  74:20
**jeopardize**
  236:17
**job** 4:4,6 5:1,14
  6:10 7:5,22
  99:24 100:9
  111:4 162:24
**jobs** 51:24
**John** 49:19

**Judge** 161:18
  163:5 215:14
**Judge's** 107:23
**judgment**
  109:18
**July** 41:8 44:1,3
  65:25 107:7
  253:23 254:17
**Jump** 138:13
**jumping** 188:10
**June** 78:8
  180:20 183:20
  203:18
**jurisdiction**
  195:6

**K**

**Kathryn** 135:8
  137:7
**keep** 7:20 37:15
  122:21 141:21
  151:14 155:8
  180:2 197:16
  214:12 227:7
  233:19
**Kennebeck**
  99:13 161:17
**Kennebeck's**
  100:9
**kind** 34:8 47:6
  49:5 51:9
  122:18 126:14
  197:13 230:3
**knew** 51:17
  161:20 163:6,6
**know** 3:13 4:19
  8:25 10:10,11
  10:18,25 11:6
  12:2,6,11,12
  12:13 14:3,7
  24:3,10 25:8
  25:16,17 29:1
  29:8,17,18
  30:17,19 31:3
  33:12,19,23
  34:7,11 36:16

36:23 42:21,22
46:19 47:8,14
47:17,21 49:15
50:9 51:3 52:5
54:7,8 55:5,5
56:22 58:1
59:2 60:23
61:11 62:24
65:9,13,14,15
65:18 66:19
67:2 71:15
74:14,18 77:22
77:23 81:25
83:2 86:11,22
87:14,17,20,21
88:25 89:7,10
92:5,23 93:8,8
93:13 94:7
95:8,18,20
98:1 99:16
101:3,5 102:3
102:6 105:15
110:11 111:13
111:16,17,19
111:24 112:5
112:12,15
114:13,25
122:19 126:12
126:22 127:16
127:18,25
128:4,15
133:25 134:14
135:3,14,15,18
135:19,21
136:4,4 137:2
137:3,20,24
142:23 143:2
143:10 144:17
146:11,15,19
146:23 147:4,9
147:13,15,20
148:9,13,14
150:20 155:9
157:20 158:4
160:4 161:24
162:8 163:3,23

168:19 186:18
187:1 188:7
189:23 190:13
194:10,14
195:5,12,16
197:5 198:23
200:6 208:6
213:1 219:14
219:18 220:2,4
220:13,21
222:6 223:25
225:25 226:12
227:16 228:9
229:21 231:5
232:6 233:11
234:24 241:4
246:12,14,25
248:21
**knowledge** 8:19
  10:5 28:5
  30:12 34:12
  37:2,11 45:12
  46:16 47:5
  55:22 59:20
  70:14 82:3
  84:3,6 89:24
  90:4 91:23
  97:12,14 98:5
  108:19 112:16
  114:1 127:17
  134:17 143:13
  145:21 148:24
  150:23 162:17
  163:16 189:11
  197:5 209:3
  230:1 237:18
  245:20 248:21
**known** 9:3,5
  34:7 155:3
  221:25
**knows** 115:19,20
  115:20 134:10

**L**

**lack** 48:16 49:9
  55:18

**lady** 162:23
**landmarks** 61:8
**language** 113:1
  176:11 223:9
  224:8 227:9
  243:5
**late** 51:12,18
  58:13 59:3
  77:2 78:16,17
  78:24 79:6,10
  79:18,19
  122:12 124:6
  127:6,10,10,11
  127:14 139:13
  140:18
**law** 2:4 9:19
  45:16 57:21
  67:22 71:18
  129:20,20
  130:3,9 139:18
  144:3 194:25
  195:6,9 219:14
  219:18 220:14
  233:21 254:12
**laws** 67:25 107:3
  151:22 185:17
**lawsuit** 92:7
  213:18 245:12
**layperson** 61:7
  64:13 67:12
**lead** 100:1 163:1
**learn** 75:22
**leasehold** 138:23
**leaves** 246:16
**leaving** 224:5
**ledger** 91:14
  253:12
**left** 58:3,3
  105:20 130:25
  131:18,25
**left-handed**
  171:9
**legal** 26:9 52:1
  109:17,18
  114:2 115:2,24
  116:14 117:17

Daphne Mosley                                    October 14, 2009

117:21 118:7
123:21 130:1
134:3,12 135:5
151:16 161:1,2
163:21 194:20
219:21 220:1
233:25
**legally** 117:21
164:17
**Leigh** 30:23 31:3
**lender** 8:21 9:5
105:4 116:16
124:21,23
125:6 128:19
128:21,25
137:12,15
138:25 139:2
141:5,7,9
143:16,17,20
143:25 148:14
149:24 150:1,2
156:3,7 158:9
179:22
**Lenders** 218:10
**lender's** 141:20
151:6,17
**lending** 105:1,4
105:12 106:12
136:18,25
180:4 185:17
218:10 230:5
**letter** 117:2
148:16 161:14
161:24 162:2,8
254:11
**let's** 12:17 19:21
21:7 55:7
63:16 69:4
72:12 119:23
160:6 196:4
203:2 208:7
211:7 219:13
238:24
**level** 3:15 10:15
12:12 22:19
69:23

**liabilities** 68:1
**lien** 116:7,10
118:11,11
119:8 138:23
151:20 152:12
152:17,20
153:22 154:2
161:4,21 163:7
**lieu** 139:2
**life** 21:15 125:24
**limit** 238:13
**limitation**
233:22
**limitations**
139:21 195:3
**limited** 129:15
154:13 185:7
**limits** 44:24
**Lindsey** 52:7
67:3,4
**line** 44:3 54:2
168:11 225:1
**lines** 32:7 73:25
**list** 56:24 174:20
**listed** 139:10
**listing** 80:16
253:20
**lists** 174:6
**litigating** 57:22
**litigation** 4:2,4
4:12 5:2
117:24 118:4
157:25
**little** 12:17 18:14
39:14 56:15
62:13 96:9
132:15 133:15
140:15 147:19
213:6
**Litton** 1:9,13,17
3:25 4:24 5:8
5:11,17 7:22
27:4 29:23,24
30:6,7,15 31:1
32:22 33:10,12
33:14,15 34:12

37:19 38:15
46:25 47:19,22
47:25 48:10
49:2 51:21,24
52:3 55:3
57:14,16,18,18
57:22 58:21
59:18 62:20
63:3,15 64:13
69:10,24 70:4
71:21 84:20
85:12,13,23
86:7,7,17,20
86:25 87:12
88:9,11,14,25
89:3,4,21
90:24 91:9
92:20 93:11,15
93:22,23,24
94:5,23 95:2,5
95:24,25 96:13
97:21 99:14
101:11 102:3,5
110:21,24
111:2,7,9,10
111:14,15,18
111:20,23
113:2,8,11,14
114:24 115:2
115:23 117:25
119:11,13
120:13,16
148:17 150:15
163:13 164:23
168:8 173:3
209:23 210:4
211:3 212:2
222:3 223:17
223:23 224:3
225:3,22 233:4
236:14 241:21
250:4,14 252:4
253:4,9,11,14
254:13
**Litton's** 32:24
62:17,23 64:9

94:3,12,18
97:19 126:6
223:14,16
**Litton/Hudson**
253:25 254:5
254:14,16,18
**LITTON0000...**
253:14
**living** 155:7
**LLC** 107:10
215:21 216:1
216:24
**LL00015-00020**
254:16
**LL00130-00141**
254:18
**LL00168-171**
254:14
**LL00172** 254:5
**LL00173-00178**
253:25
**loan** 1:9,13,17
3:22,25 10:19
11:18 16:2
17:25 18:11
19:4 21:3
22:19 23:5,9
23:13,23,25
24:5,8,8 25:4,4
25:7 26:24,25
27:2,8,22
28:17,19 29:16
32:2,17,24
33:4,11 35:12
37:7 38:15
45:17 49:12
51:10 65:15,24
69:21 70:1
71:2,8,18 72:6
75:2,6 76:21
76:24 77:4,19
78:12,13,18
81:6 82:20
83:12,15 85:2
85:18,22 86:6
86:15 87:1

91:10,21 92:22
97:22 99:14
101:21 102:12
102:12,17,23
103:8,20 104:1
104:6 105:12
113:16 114:18
115:6 118:17
118:21,25
119:5,11
123:10 125:24
126:14 128:21
128:22 137:14
138:6 146:16
147:14 152:6
155:5 157:13
157:19,21
158:3 160:10
163:25 164:15
164:23,25
165:3,18,22,22
165:25 166:4
168:8 170:3,6
171:16 173:10
174:7,22
175:10,25
176:11,12,12
176:13,16,17
176:19,22
179:5,7,14
180:15,24
181:18 182:13
182:17 183:18
185:7,23,24
186:4 189:18
190:1,2 193:21
197:22 199:15
199:20,21
200:20 202:2,9
202:22 203:9
203:10 205:15
206:19 208:13
213:12,24
214:18 216:8
217:1 222:9,18
225:5,14

Daphne Mosley                                        October 14, 2009

232:17,18
238:6,14 240:3
240:7 241:2
242:8,14,24
243:2,7 246:13
248:19 249:2
249:15 250:4
250:14 252:4
253:4,9,11,19
254:13 255:10
**loans** 4:24 5:8,11
5:17 27:4
28:10,14 45:13
49:5,8 57:14
70:5,7,13,14
79:2 102:9,11
123:11 150:15
164:3 170:25
172:8,13,16
173:9,14,17
174:16,21
178:10 181:5
181:24 184:9
184:15,20
185:6,11,13
189:17 197:6
201:7 202:19
210:4 214:5
224:3 233:4
238:4 239:25
239:25 240:7
**local** 4:7,7 8:11
8:19
**located** 11:1
32:8 189:4
**location** 55:16
124:21,22
125:6 141:25
**Loch** 4:23 24:22
**lock** 154:25
**locks** 154:16
**log** 52:21 53:21
56:4
**logical** 231:14
242:6,14
**logs** 53:5,25

**long** 5:3 102:12
127:2 135:18
166:14 196:8
200:2 241:6
**longer** 100:12,15
205:4 214:15
**look** 24:12 57:6
57:17 65:2,24
72:14 73:21
77:5 80:2 91:2
121:9 125:20
125:21 126:14
132:14 138:1
151:5 170:8
179:24,25
195:21 199:1
201:25 203:23
212:11 226:7
227:10 231:13
236:8 247:10
**looked** 25:5
54:11,18 166:6
222:1 238:5
**looking** 46:1
66:14 73:20
75:22 132:18
152:15,22
171:6 221:21
221:22 240:13
**looks** 43:23 44:6
57:11 77:12
106:17 107:4
120:10 121:3
**Lorraine** 1:4,6
53:6 61:5 91:8
107:8 119:14
146:16 193:21
253:12
**loss** 50:3 141:23
**lost** 159:7
**lot** 47:23 55:13
142:15 197:11
205:4,6
**lower** 57:17 58:3
**LP** 1:9 38:16
168:8 253:9

**LPS** 9:6,9 27:24
28:2,7,9,9,22
28:24 29:4,7
29:10,13,15,17
29:22 30:3,15
30:25 31:5,20
31:24 32:11,17
32:23,23 33:11
33:16,21 34:4
34:16,16,20,21
34:23 35:1,4
35:17,20 36:7
36:10,14,24
37:3,10 54:3
62:15 63:2,8
74:13 85:6,8
100:19 111:25
112:3
**LSAMS** 37:24
38:19 73:7
126:8,9
**lump** 144:15,17
144:19
**lunch** 96:10
104:21 119:23
119:25
**Lyman** 49:23
**Lynn** 52:7 67:3
67:4
**L-I-N-D-S-E-Y**
52:8
**L-Y-M-A-N**
49:25

**M**
**Mac** 82:25
136:14,16,23
**machine** 1:22
250:16,19
**Mae** 82:24
136:14,16,22
**magic** 224:8
**magically**
227:12
**mail** 125:3,7,8
**main** 240:13

**maintain** 36:6
63:2 236:24
**maintained**
133:2,10,21
**maintains** 35:24
**Maintenance**
149:15
**making** 7:22 8:5
109:11 110:19
115:16 146:8
163:20 227:23
**male** 110:25
**manage** 32:2
48:19 127:23
**managed** 12:10
142:24
**management**
28:10 29:10,14
29:20 30:4
31:6,23 32:18
32:24 35:22
133:24
**manager** 52:5
92:15 100:11
100:18 111:5,6
**managers** 51:1
**manages** 32:7
48:9
**managing** 32:12
38:8 46:24
47:8
**manner** 32:3
104:15 184:2
229:14
**manual** 69:25
**manually** 30:12
70:2
**March** 42:9,11
**mark** 38:11
39:16 57:3
72:16 73:20
76:15 77:7
79:25 98:11
99:5,9 121:13
166:9 169:21
208:17

**marked** 38:13
39:19 41:11
57:5 68:8,10
72:3,17 73:24
76:18 77:9
79:24 80:13
87:16 88:25
96:13 98:14
99:8 101:14,16
103:4 113:19
116:25 117:2
120:5,7 121:16
121:23 124:1
130:13,15
166:13 167:5
169:3,5,24
175:2 208:20
209:10 210:15
210:17 211:23
212:4 217:21
224:16 244:25
247:9
**market** 48:18
**Markets** 169:12
169:17 180:23
189:3 216:20
**marking** 72:1
88:21 96:5
170:1 197:19
**markings** 122:1
**Marti** 110:24
112:7,12
**Martinez** 108:3
**master** 183:18
185:4,5
**materially**
178:19 183:10
**matrix** 7:22 8:5
**matter** 4:7,16
60:20 61:19
114:18 152:18
192:24 218:17
**maximum** 141:9
**MaxMillion**
74:8,16
**ma'am** 3:6 5:3

Case 10-01172-DWH   Doc 22-2   Filed 11/01/10   Entered 11/01/10 15:55:35   Desc
Deposition of Daphne Mosley   Page 85 of 104
Daphne Mosley                                        October 14, 2009

Page 277

15:24 50:5
76:20 99:25
164:20 200:19
208:8 216:13
219:15 221:9
224:2 228:17
232:1
**McCalla** 9:24
10:1,20,23
11:21
**McCullough**
117:3 254:12
**mean** 12:15
13:21,22 15:18
19:1 22:18
37:14 38:1
55:17 72:10
76:5 102:24
109:21 110:18
123:10,17
134:4 135:1
144:5,21
152:17 154:22
154:24 156:23
160:12 162:11
163:19 168:12
186:15,17
187:1,11
188:21 190:8
193:8 196:14
198:3,4,7,24
199:3,4,5
204:16 205:5
207:3 208:5
212:25 213:22
215:1 217:8,10
218:25 219:5
219:23 221:1
226:13,19
227:7 228:9,13
228:14 230:20
243:12 246:9
247:21 248:19
249:21
**meaning** 65:13
68:23 173:22

235:21
**meaningless**
247:3
**means** 16:8
18:13 33:23
71:15 156:24
158:4 223:20
**mechanism**
139:9
**meets** 240:15
**Melodie** 1:20
2:19 250:10
251:19
**member** 33:20
102:5 242:3
246:13,17
**membership**
112:23 247:16
248:7
**memorialize**
231:10
**memorializing**
123:19
**mentioned** 49:1
77:23 134:22
**merely** 150:8
152:7
**merged** 71:12
**MERS** 101:24
102:5,7,8,13
102:16,23
106:3,6,13,15
106:17 107:2
107:15 108:11
110:3,6,7,14
110:20 112:13
112:13,17,19
112:21,23
117:12 176:9
176:14,20
179:14 180:9
180:13 181:18
181:23 182:18
206:19 241:2,4
241:7,14 242:3
242:4 243:17

244:8,12,23
245:16,22
246:1,1,7,8,13
246:15,17,18
246:21,24
248:4,4 249:11
**mess** 170:15
**messes** 118:10
171:9
**method** 195:3
**Michigan** 107:5
**middle** 1:1 8:12
25:22 98:7
99:11 131:5
133:15 166:15
233:5
**midway** 132:1
**Midwest** 101:7
**millions** 248:15
**MIN** 176:8
**mind** 49:4 62:12
168:4 171:12
226:10 227:8
**mine** 122:7
166:18
**mine's** 140:15
**minute** 77:23
91:2 98:12
114:14 121:11
121:20 125:11
140:10 226:7
**minutes** 22:1
104:21 119:25
196:1 226:13
227:5
**mischaracterize**
33:3
**missed** 20:1
**misses** 16:4,11
**missing** 168:16
178:20,24
179:3 183:8,11
217:18
**misstate** 56:22
**mistake** 116:22
118:15 162:14

**mitigation** 50:3
**mix** 160:1
**modification**
83:16 157:21
**modified** 121:3,5
**modify** 62:17
**MOM** 176:12,13
176:16
**moment** 45:22
200:7
**money** 15:12
42:6,12 64:18
65:3 79:15
93:23 95:14
127:7 138:6
152:17
**moneys** 69:10
84:20
**Monica** 111:11
111:16 112:5
**monitor** 11:10
**monitoring** 47:7
**month** 51:12
68:25 69:3
**monthly** 13:16
13:19 14:18
15:5,11 16:13
20:4 43:5 69:8
78:25 145:7
**months** 20:1,3,7
34:23 43:22
146:6 147:6
**morning** 38:10
38:17 56:9
60:18 72:1
**Morris** 9:25
**mortgage** 3:22
5:17 6:1 13:2
13:19 14:6,14
14:17 15:6,8
15:12,14 18:9
20:4 21:8 23:9
23:19 25:3,7
25:19,19 26:16
27:19,23 45:7
49:10 53:6

55:3,20,21
65:15 68:18,24
69:7 70:25
71:2,5,12 79:9
86:9,15 87:4
87:22 88:2,7
98:17,17,23
99:3,3 101:21
101:25 102:19
103:20 104:1,5
104:6,23
105:12,19
106:20,23
107:1,7 108:20
109:5,7,10,20
109:22 110:2,7
110:14 113:20
116:7,10 118:2
118:24,25
121:10,19,21
124:12 125:2
125:15 136:18
136:25,25
137:8 138:10
139:1,3 141:2
151:7 155:24
156:13 160:24
161:1 163:25
165:24 170:3,6
171:16 172:7,8
172:12,16
173:9,10 174:7
174:16,21,21
175:10,13
176:7,11,12,14
176:16,19,22
177:1,7,9,16
178:10,20
179:5,7,14,15
179:16 180:1
180:15 181:18
181:23 182:17
182:22 183:11
183:18 184:9
184:15,20
185:6,7,11,13

185:23,24
186:4,6,7,10
186:11,11
189:17 190:2
194:16 197:22
199:15,20
200:20 201:7
202:2,8,19,22
203:9,9 205:14
205:23 206:19
208:13,13
209:24 212:7
213:17,24
214:18 216:7
217:1 222:9,9
222:18 223:12
225:5 227:3
230:5,10 231:9
231:13 232:17
238:4,6,14
239:25,25
240:3,6 241:10
241:13 242:4
244:13 246:1,6
246:13,17
254:4,17 255:9
255:14
**mortgagee**
179:16
**mortgages** 123:9
123:9 172:12
248:16
**Mosley** 1:12,16
3:2,8 39:21
55:4 57:7
86:13 196:7
247:10 248:18
249:18 250:3
250:14 252:3
253:3
**motion** 25:21
61:1,9 64:6
103:2 113:18
159:15,22
160:8,13,18
162:2 200:25

218:14 221:17
**motions** 60:23
100:6
**move** 120:1
**MSP** 27:23
**multiple** 53:17
95:10 167:20

———————
**N**
**N** 3:1
**name** 3:6 16:24
37:21 39:24,25
49:17,20,24
50:13 103:23
110:8,14,20
112:19 117:14
117:25 135:9,9
200:16,24
218:5 222:23
242:4 244:12
246:1,7,8
249:11
**named** 49:4
108:2 250:15
**names** 30:19
39:20 214:11
**national** 9:4,14
9:19 33:20
101:20 103:18
117:13 118:24
168:9 175:22
176:2,23 177:2
177:12 180:14
183:1 206:3
216:25 218:1
222:11,23
223:6
**nature** 22:16
36:3 53:21
76:10 140:2
149:5 150:21
152:25 157:19
164:3
**near** 51:14
**necessarily** 21:6
**necessary** 4:10

85:14 86:25
88:3,22 141:14
148:16 179:18
214:15 236:24
**need** 7:17 80:25
91:5 117:11,14
122:6 171:7
191:11 217:12
228:16 236:15
239:3 240:4
**needed** 195:23
225:4
**needs** 191:14
**negative** 147:17
**neither** 251:5
**network** 33:20
34:5,11,21
**never** 7:14 12:23
13:2 35:8 43:9
43:10,19 55:2
114:25 155:11
234:4
**new** 8:4 148:22
195:9 233:21
**newest** 59:22
**Nicholas** 2:4
**Nick** 13:21 53:24
72:7 134:3,25
187:18 188:16
190:20 205:5
207:23 212:24
215:17 219:12
220:1,19
227:19 228:23
245:7,19
**Nicole** 99:13
100:9
**nod** 7:17
**nods** 7:15 54:5
58:4 108:25
118:14 130:8
179:10 183:13
185:10
**nominee** 102:1,2
106:18 108:11
117:12

**nondefaulted**
49:10 55:7,19
**Noriega** 110:24
112:7,12
**norm** 20:23
**normal** 13:2
15:14,18 16:13
42:22 46:7
55:6 68:24
69:8 70:11
89:18
**normally** 8:10
**notarization**
108:2
**notarize** 100:5
**notarized**
162:24
**Notary** 100:2
250:11 251:20
**notate** 52:17,22
52:23
**note** 25:19 26:1
26:2,15 65:16
68:17 70:15,18
70:19,22 71:4
71:11 86:9
96:15,19 97:1
97:8,11,13,20
97:21,24 98:3
102:19 103:4
103:11,25
104:5,11,15
109:8 110:2
113:21,25
122:11,12
124:6,7,11,22
138:11,12
140:21 143:23
152:13 156:6
158:7 160:9,13
160:20,21
175:13 181:8
182:22 186:7
186:11 205:23
208:13 211:21
212:3,7 213:17

216:19,24
217:21,25
218:5 219:3,4
219:6 220:6,12
220:15,16,20
220:21,22,22
221:5,9,12,14
222:9 223:4,12
228:18 230:25
231:16 232:19
233:14 239:17
240:21 241:25
242:10,16
243:20 244:14
245:23 247:2
253:23 255:14
**noted** 41:4,15
208:14
**notes** 53:5,21
123:7 172:3
250:19
**notice** 4:6 65:6
101:17 124:23
143:25 148:6
150:3 156:7
158:8 178:19
254:9
**noticed** 40:9
41:25 74:6
**notification**
148:25
**notified** 148:15
**noting** 176:8
**Notwithstandi...**
183:9
**November** 101:1
103:9 161:15
163:2 168:6
170:7 171:17
171:23 172:10
172:20 173:13
196:22 203:15
203:19 204:8
204:22 209:13
212:9 218:14
221:18 232:4,5

232:7 240:25
254:10
**number** 3:13
13:11 18:19
31:9 50:24
58:2 66:19
121:22 130:23
131:6,14,17,20
132:22 133:11
133:21 174:22
176:9 182:13
221:5
**numbered** 1:19
58:21 120:23
124:3 130:22
131:1,9,18
206:23
**numbers** 32:3
**numeral** 132:5,8
132:10,16,23
133:5,17
205:22

**O**

**O** 3:1
**oath** 161:18
162:20 190:15
192:9 193:12
194:25 225:24
**object** 8:23
15:17 17:2,16
19:19 20:15
22:12 24:14
26:5 32:14
33:7,22 34:10
34:17 46:15
51:2,16 64:5
71:14 78:19
79:12,21 83:1
83:6 85:25
86:10 88:17
89:23 90:18
94:6 95:7,16
104:18 109:14
109:25 110:10
110:16 114:20

115:7 123:4
127:8 128:2,6
129:9,17,24
130:5 134:2
136:3,9,19
137:1 144:6
145:10 146:1
148:8 154:10
159:3,21
160:11 161:22
163:8,20 177:4
181:10 186:16
187:19 192:10
195:15 199:6
202:20 203:21
204:15 207:2
207:11,24
209:2,7 211:5
211:24 213:19
214:22 217:3
218:25 219:20
221:6 222:5
223:19 226:22
227:17 228:22
229:24 230:8
230:12,14
231:24 233:24
236:19 237:5
237:10,20
238:23 239:14
241:1 242:11
242:19 243:9
243:10 244:18
249:3
**objecting** 8:24
243:24 244:3
**obligated** 128:25
**obligation** 86:7
183:14,23
235:18
**obligations**
45:15 68:1
193:24 248:3
**obligor** 133:10
133:19
**obligor's** 133:20

**obtain** 86:24
89:13 92:6,24
142:7 225:3
**obtained** 27:16
89:18 148:18
148:19 160:21
**obtaining**
148:14
**obviously** 38:4
48:5 241:21
**occupancy** 46:4
**occupied** 46:7
**occur** 20:24,25
21:2 63:4 64:1
78:20,21 210:8
240:15
**occurred** 165:7
**occurs** 127:16
225:25
**October** 1:14,19
60:1 105:23
250:5 251:17
252:5 253:5
**offended** 39:24
**offer** 244:21
**office** 13:15 14:2
20:4
**officer** 84:10
92:15 111:6
128:16
**official** 239:17
**Oh** 14:7 56:8
107:13 200:23
227:10,15
**okay** 3:12,21,24
4:3,12 5:16 8:8
8:18 9:13,15
10:2,18,21
12:13,19 13:14
15:11 16:7,24
17:9,14 18:17
19:13,24 20:1
22:14,18 23:1
23:4,18,23
24:4,18 25:6,9
26:7,13 28:1

28:19 29:2,9
29:24 30:3,7
33:19 34:3,14
34:19,24 35:3
35:11,17 37:4
37:8,21,24
39:11 40:20
41:25 42:8
43:19 44:3,8
44:16 46:12
47:3,24 48:20
48:25 49:12,22
50:21 51:20
53:9 54:16
55:14 57:19
58:11 60:17
61:3,7 64:2,8
64:12 65:1
67:1,6 69:6
70:19 73:4
74:12,15 75:16
76:2,12,15
77:5 78:21
80:6 81:17
82:6 84:9,18
86:2,4 89:19
93:10 94:10
96:11 97:15
98:1 99:5,16
99:19 100:2
101:5 102:14
105:24 106:8
106:16,19
110:6 111:11
111:16 112:25
114:16 116:16
117:15,24
120:1,12,20
121:5 122:4,5
122:17 124:9
124:14,16
125:17,23
126:17 127:2
128:17 129:5
129:19 130:18
130:20,21,25

131:16,22
132:20 133:4
133:15,23
134:18 135:20
137:3,8 138:13
138:19 139:4
140:9 141:2,12
142:24 144:3
144:24 145:12
147:11 151:23
159:7,16,24
163:10 165:15
166:22 169:1,8
169:19,21
170:7,22,23
172:5 178:6
179:9 180:22
187:8,9,10
189:10 190:24
191:16 192:2,6
192:9,13,21
193:19 194:18
194:19 195:21
196:2,9 197:24
198:3 201:5
202:4,16 203:3
204:9,12,24
207:14 209:21
210:1,8 211:7
213:6 214:9
215:2,11,23
216:12 217:5
217:22 220:5
220:14 223:21
224:25 226:22
229:3,6,11
230:4,23 232:8
232:13 234:12
235:11,17,23
237:2,22
240:12,19
243:1 245:16
246:15 247:14
249:7,12,18
**old** 148:21
**older** 59:22

Daphne Mosley                                          October 14, 2009

**once** 8:3 15:24
22:18 32:19
33:6,11 45:24
46:6 82:13
148:19 171:5
**ones** 37:6 49:4
80:17,18,19,21
80:24
**one-paragraph**
228:7
**one-year** 211:16
212:22
**ongoing** 15:12
**OPELIKA** 1:2
**open** 58:6
**opening** 197:12
**operations** 135:5
**operator** 8:6
69:23
**operators** 6:20
**opinion** 82:20
83:9 85:15,16
85:21 86:8,14
94:9 130:1
133:25 134:8
150:25 194:23
**opinions** 36:2
82:7,17 83:10
**opposed** 191:24
**ORAL** 1:12,16
250:2
**orange** 128:18
129:2 168:2,4
201:12 235:7
236:13 239:21
240:14,17
**order** 23:5 46:9
67:19 124:2
138:9 140:14
175:22 176:2
183:1 197:16
206:3 216:13
222:11 223:6
**ordered** 46:21
**ordinary** 141:14
**organized** 107:2

**original** 6:10 7:5
175:13 176:7
176:20 177:15
179:22 205:23
208:13 219:5
251:14
**originals** 164:10
**originated** 102:9
102:11 176:14
197:6,7 248:16
**originator**
118:20 183:23
184:1 185:8
214:7,19,23
215:4,21,25
216:3,17 232:2
240:5
**Oscar** 50:11
**outfit** 9:25 10:3
**outside** 8:21
245:20
**outsource** 9:1,2
9:10 10:3,8,18
12:7,8 46:25
63:5,7
**outsourced**
100:23
**overage** 44:13
**oversight** 162:14
**owe** 152:16
**owed** 93:23
**owes** 158:19,22
**owned** 48:7
83:23 105:15
114:4 173:14
231:15 241:24
246:9 248:10
**owner** 23:15
84:1 85:17,22
86:6,15,21
87:3 102:23
109:12,22
110:8,13
165:24 172:2
180:23 181:4
186:5,13 190:1

231:8 240:20
241:18 242:8
242:16 244:14
245:25 247:23
248:5 249:14
**owners** 123:9
**ownership** 24:16
26:15 97:20
102:11,25
109:4 113:6,8
115:5,9,15
123:8 160:21
164:8 167:21
213:17 217:24
221:12 223:4
223:22 224:3
225:13 228:19
230:24 231:10
232:10,22
234:8 243:20
245:23 246:16
246:17,22
**owns** 24:5
105:15 108:23
113:20 160:10
172:11 242:24
243:2

_____
**P**
_____
**P** 3:1 76:9
**page** 40:13,20
41:16 57:23
58:20 60:2,4,5
60:5 65:24
74:6 75:18
77:11 101:18
104:25 105:8,8
105:11,13,20
106:1 107:17
107:17,18,18
107:20,21,24
107:24 108:1
108:10 110:23
117:6,8,9,9,9
120:11,24
121:2 122:1

130:22,23
131:17,20
132:11 141:2,3
141:5,17
149:14 167:6,7
170:11,11,18
170:19 171:15
172:24 173:25
178:14,15
185:21 188:24
189:1 193:1
195:17,18
196:21 199:15
200:14 201:9
206:7 207:10
207:15 208:8
208:21 211:11
215:8,20,23
216:12 221:4
221:14 224:19
233:16 236:9
239:21,22
240:4 247:10
247:12,12,12
252:7 253:8
254:3 255:3
256:3
**pages** 39:10 60:9
73:16 103:15
121:1,21,22
166:10,18
167:10 179:25
203:1 232:10
247:11 255:7
255:11,15,21
255:25 256:8
**paid** 12:3,4
13:14,18,22
14:1,6,18
20:10 21:19
41:22 43:17
80:8 81:23
84:20 90:12
93:5,11,15,18
93:23 95:5
138:6 143:11

145:4 146:5
153:18 157:8
157:12
**paper** 97:15
102:18 104:14
160:20 218:4
218:18,20
229:22 230:18
**paperwork**
102:24
**paragraph**
122:3,8 124:3
124:10,14,16
128:18 132:18
132:25 133:6
133:16,18
137:9,9 138:1
138:2,5,14,16
138:20 139:4,9
140:10,12,23
141:1,4,17,19
142:2,6 143:14
144:24 145:23
149:14,23
150:7 151:5,6
151:11 153:3
153:10 156:2
156:10,12,15
158:11 181:17
183:9 189:20
203:3,4 207:7
207:9,12
209:17 222:7
222:14 235:17
236:22 237:6
237:13 238:25
238:25 239:2,3
**paragraphs**
186:17,21
187:19 206:23
**parlance** 176:13
**part** 6:10 7:21
16:10 23:24
27:3 31:17
35:21 36:7
55:9,12 63:5,7

Daphne Mosley                                    October 14, 2009

Page 281

71:8 84:20
92:7 94:21
112:6 156:18
159:10 162:14
168:2,4 175:1
175:4 178:11
189:18,20
194:3 205:22
208:8,25
212:10,15
222:15 223:11
226:4 227:2
231:20 235:13
240:17 248:9
254:20
**partial** 128:19
128:20,22,24
129:21
**particular** 10:19
23:9,23 28:4
35:12 46:17
48:18 49:11
52:18 67:10
69:20 80:1
84:8 91:14
104:1 113:20
123:10 124:2
164:15,15,23
164:24,24,25
165:3,24 190:1
190:1 194:3
196:11 246:23
**particularly**
194:5 196:20
230:24
**parties** 23:22
123:2 167:23
168:11 172:15
184:13 189:16
199:19 200:9
200:11 215:4
231:2 232:14
236:14 238:15
251:3,7,10
**parts** 71:3
166:16 167:2

188:11 192:23
199:13 254:22
**party** 27:4 86:13
117:25 168:15
193:17 219:17
227:25 228:1,3
228:4,5 231:9
**party's** 238:10
**passage** 46:13
**pass-through**
167:18
**pause** 33:13
240:11
**pay** 11:24 17:21
19:17 20:3
21:16 36:6
67:19 78:13
84:19 88:2,11
88:16,18 89:16
89:21 94:4,16
95:6,14,15
122:9 124:4,11
147:6 148:1
151:1,2 153:17
153:24 156:16
157:2 158:2
175:22 176:1
182:25 206:3
222:10 223:6
**payable** 139:2
143:24 156:7
158:8
**paying** 81:9
**payment** 12:16
13:19 14:10,12
14:17 15:4,5,8
15:12 16:5,11
16:14 19:17
20:4,9 21:16
42:15,16,19,23
43:2,6,8,13,13
43:15,16,22,24
44:5,6,12,12
64:19,20 65:1
68:14,21,25
69:8 70:1 76:9

76:9,10,21,25
90:21,22 91:7
121:4 125:2,19
125:19 126:18
127:10,12,20
128:19,19,20
128:21,22,24
129:6 137:13
139:3 140:13
140:24 144:1
144:12 145:16
146:9 148:7,21
148:22 152:13
155:25 156:8
156:11,12,24
158:1,9,17
186:3,7 253:11
253:19,21
**payments** 12:14
12:23 14:4,5
14:23 15:21
18:3 20:1,12
21:17,24 22:4
22:4 40:18,23
41:2 43:4,7
56:12,13 64:14
64:24 68:16,21
70:11,15,23
71:18,23 78:14
81:4 91:1
124:20 125:14
125:15 126:19
126:24 128:20
128:24 129:1,1
129:21 130:4
131:11 133:7
134:22 138:2
138:23 140:13
152:25
**payoffs** 133:8
**pays** 14:9 89:1
125:1 145:8
**PC** 2:9
**penny** 13:3
**people** 47:23
48:16 51:12

55:12 100:19
112:18 230:6
230:21
**percent** 89:10,22
**perfectly** 19:18
**perform** 82:19
94:5,13 151:12
185:25
**performed** 12:4
18:22,24 19:2
19:6 22:10,23
80:9 82:15
89:20 93:3
**period** 15:15
128:7 137:15
145:4 162:3
179:3 240:8
**periodic** 140:13
**permanently**
219:2 220:15
220:16
**permit** 141:7
**Permutt** 2:9
**person** 17:18
23:15 31:12
49:17 67:1
100:19,22
108:2 109:11
110:7 127:18
143:11 227:7
241:18 245:16
245:17,25
246:8
**personal** 84:6
230:1 244:7
**personally** 36:16
**persons** 4:19
46:24 110:19
**petition** 16:9
41:17 42:3
**petitions** 61:21
62:4
**philosophical**
244:6
**physical** 26:14
**pick** 247:9

**picked** 41:5
**piece** 122:23,23
**piecemeal** 188:2
**piecemealing**
198:5
**pieces** 218:18
**pin** 3:14
**pink** 184:6 205:9
208:8 237:14
237:23 238:21
238:22 239:12
**pipes** 154:17
**place** 26:10
45:13 56:10
60:25 75:1,9
134:15 141:21
211:16 213:8
**placed** 43:25
44:7 56:6,10
65:11,19 75:9
142:10,11
144:8 145:13
145:22 146:12
146:16,20
147:8 148:14
238:14
**placement**
143:12
**places** 75:1 86:7
233:21
**placing** 142:18
**plain** 113:1
243:5
**Plaintiff** 1:7,18
2:3 251:15
**Plaintiff's** 38:12
38:15 39:18
57:3,4 58:5
59:7,10,11,15
59:21 60:15
61:3,18,24
62:6,8 64:12
64:17 65:7
66:5 68:7,10
72:1,2 73:23
76:17 77:8

Daphne Mosley                                    October 14, 2009

79:23 83:20
98:11,13 99:7
101:13 103:5
116:24 120:4,7
121:14,15
123:14 125:18
130:12,15
166:12 169:2,5
169:23 208:19
209:11 210:14
210:17 223:2
224:15 244:24
253:7 254:2
255:2,8,12,16
255:22 256:2
plan 5:21,23
13:15 16:1
17:12 19:23
20:10,12,13,19
21:5,15 152:16
152:24 155:23
play 168:20
please 3:7 7:1
15:3 19:20
39:24 44:4
50:5 76:20
97:16 99:24
109:15 117:7
131:20 133:18
136:20 138:1
151:6 200:19
205:7 208:8
216:13 217:22
236:20 239:1
242:12
pledging 189:18
plenty 220:5
plus 148:1
point 6:4 16:2
37:9 54:25
69:22 162:7
165:10 214:13
244:8
points 34:4
245:6
policies 45:13

policy 44:17
148:18
pool 23:9 70:4
70:17 131:11
131:18 132:2,6
132:12 133:1,3
133:7,8,14
163:25 164:4
182:15,19
197:6,7
pooling 119:4
168:5 171:19
171:22 172:20
173:22 175:1
179:8 182:6
190:5,10 192:3
196:24 200:17
204:10,13,18
206:11,12
208:18 214:1
216:6 217:2
224:18 234:18
237:16 243:15
243:18
portal 28:23
portion 5:16
6:19 7:4 14:16
15:4 26:8
29:14 31:24
55:19 70:22
84:19 87:21
91:21,24 92:21
100:5 112:2
137:9 139:4
141:19 151:10
153:9 170:1
189:19 192:5
200:4 201:11
202:1 203:3,7
205:2,9 209:18
210:2 211:11
234:15 235:6
235:19,23
236:12 237:14
237:23,23,25
238:21,22

239:12,22
portions 190:12
192:19 199:2,6
199:7
position 4:1 5:5
5:20 7:23 92:3
135:12,16,18
possession 26:14
26:21 97:19
211:21 212:3,8
223:14,16
225:20 231:8
possibility
228:11
possible 52:11
52:14 66:22
67:15 81:19
82:12 92:24
111:25 112:1
136:15 157:18
226:14 247:4
248:18
post 127:13
160:1
posted 125:4,15
125:19 126:4
126:20 133:9
133:20 134:22
post-discharge
20:11
post-petition
12:23 15:19,20
16:3,5,11
19:17 21:16
42:14,17,19,22
43:2 152:25
159:13,15,22
power 185:23
Practically
16:17
practices 94:3
148:11 230:6
preamble 202:3
predatory
185:16
prejudice

128:23
preliminary
167:9,13,17
168:1 235:7,12
premium 146:19
148:17
premiums
138:24 139:1,3
preparation 4:8
231:4 251:13
prepare 39:2
235:25
prepared 59:16
prepares 100:22
preparing 6:2
100:23
prepayment
122:11 124:6
prepetition
40:13,14,19,25
41:1 159:14,16
160:1
presence 42:1
176:8
present 2:13 5:5
18:3 26:1,2
75:6 103:16
114:7 120:17
154:24 183:5
200:25 207:7,9
208:24 218:13
221:19 251:4
presented 96:15
125:17 157:6
242:22 243:1
presently 3:24
Preservation
149:15
preserve 236:16
236:24
president 111:8
135:13
pressing 92:11
pretty 17:19
73:21 88:6
109:2 129:7

144:12 162:15
224:25 245:18
prevented
220:10 221:10
previous 83:12
83:18 107:20
previously 49:4
90:8,25 103:4
121:23 165:21
167:5 225:16
price 36:2 81:23
81:25 82:7,17
82:20 83:9,10
85:15,16,20
86:8,14 94:9
150:24 186:4,8
primarily 46:3
primary 142:16
principal 69:12
76:25 115:5
122:10 124:5
133:13 138:11
140:20 157:13
158:15,18,22
158:24 174:8
174:10,23
203:11,13
print 36:24
53:14 92:11,17
253:17,18,19
printed 76:12
166:17
printer 227:4
printing 170:19
prints 73:7,10
77:24
prior 9:25 24:24
64:9 97:20
148:14,18
150:3 157:19
157:21 161:15
163:13 174:14
186:3 208:11
209:6,12
211:18 212:22
240:1

Daphne Mosley                                              October 14, 2009

priority 68:20
  138:5,22
  139:25 140:24
  151:21 156:11
privileged 54:1
  54:20 161:25
probably 67:3
  87:2 112:11
  162:10,13
  166:21 170:10
  206:15 234:4
probate 107:23
  151:19
problem 107:6
  116:17 122:24
  123:20 162:17
  165:9,13,17,19
  224:9 227:21
  233:10 243:20
problems 171:7
Procedure 1:25
procedures
  67:23 79:10
  134:15 136:1,7
proceeding
  64:15 151:16
  151:19 152:7
proceedings
  250:23
proceeds 138:3
process 7:5 9:6
  12:10 24:10
  30:8 31:23
  32:19,25 35:9
  36:1 48:11
  69:25 95:8
  114:3 115:1,2
  115:24 234:24
processed 30:13
processes 32:12
processing 8:21
  9:18
processor 4:2,4
  4:14,15 5:2
  51:22 226:13
  227:4

produce 36:13
  36:20 37:10
  54:19 96:6,22
  96:25 98:16
  114:3 115:3,3
  220:20,21
  224:13
produced 1:17
  24:25 25:7
  26:19,20 36:21
  37:6 55:25
  56:20 57:21
  59:6 60:18
  80:18 91:19
  97:3,9 104:14
  126:18 166:7
  175:25 208:25
  213:18 216:18
  217:24 220:18
  221:1 223:2,11
  224:11 225:14
  225:18 226:16
  226:16,18
  227:23 228:20
  229:15,18
  233:1
production 4:8
  220:25 224:14
  225:21,23
  226:5 229:18
Products 169:17
  170:4 214:5
professional
  45:7
profit 87:23
  88:11 93:23
profiting 88:9
profits 88:13
program 27:24
  35:21 74:13
programmed
  69:18,19
  127:23
programming
  6:14 79:3
  128:1,7

prohibited
  237:15,15,18
  237:19 238:20
promise 9:22
  10:2,22,23
  11:21,24 37:12
  37:13 62:15
  63:2,6,8 85:6,8
  100:20 166:11
  217:6
Promise's 10:25
promissory 26:1
  26:2 65:16
  68:17 71:4
  86:9 96:15,19
  97:1,8 98:2
  103:25 104:11
  104:15 109:8
  216:19,24
  217:25 219:3,4
  220:6,12,15,16
  221:5,9 228:18
  230:25 233:14
  241:25
prompt 7:19,20
  17:7
promptly 182:23
promulgated
  130:17
proof 5:21 6:2,5
  13:7 15:9
  16:10 17:11
  56:9 64:6
  115:9
proper 95:14,24
  116:22 151:2
  211:21
properly 179:15
properties 48:10
  48:23 172:11
property 32:8
  45:24,25 46:2
  46:3,4,5,7,9,20
  48:17 56:4,11
  82:7 87:8
  94:12 107:11

  116:11 117:10
  138:23,24
  139:14 141:18
  141:25 149:16
  149:19,20,20
  149:25 150:2,8
  150:12 151:7
  151:17,25
  153:19 154:6
  154:12,15
  184:9,16
protect 152:3
protected
  156:16
protecting
  152:12
Protection
  149:15
protocol 123:23
prove 115:14
  164:24
proved 114:4
provide 29:21,24
  33:17 34:5,7
  75:12 76:23
  80:7 81:22
  82:4,5 84:14
  84:19,21 85:9
  94:4,19,23
  95:12 96:1
  139:9 142:3
  148:5,16
  225:19
provided 25:16
  26:6 27:24
  29:14 35:5
  36:18 57:24
  62:24 63:15
  74:13 75:25
  81:5 95:1
  136:13 142:13
  144:18 147:9
  147:16,21
  149:4 185:1,14
  212:17 222:16
  238:3

provider 8:21
  9:10 10:18
  12:8,8
providers 9:1,3
  10:4,8 143:7
provides 76:24
  81:25 86:17
  89:5
providing 75:24
  81:24 88:3
provision 15:8
  82:10 88:10
  89:2
provisions 1:25
  124:24 237:3,8
PSA 197:21
  215:25 233:16
public 100:3
  192:6 193:10
  193:14 194:4
  198:20 215:18
  248:3 250:11
  251:20
published 45:4
publishers
  136:23
pull 181:12
pulled 197:22
purchase 148:17
  165:3 170:3,6
  170:25 171:16
  183:19 186:4,8
  189:16 190:2
  197:22 202:2,9
  213:24 214:18
  216:8 217:1
  222:18 255:10
purchased
  164:25
purchaser 170:6
  173:3,7 174:5
  174:16 175:8
  178:2,7,24
  184:7 186:8,12
  189:16,19
  202:8 215:1,4

Daphne Mosley                                          October 14, 2009

Page 284

215:7,7 216:7
**purchasers**
123:3
**purely** 246:25
**purple** 203:8
**purport** 25:19
164:8
**purported** 81:4
**purpose** 24:1
65:8 67:6,16
67:17 75:24
78:16 87:7
194:7,24
219:14
**purposes** 114:15
199:21 238:10
**pursuant** 1:24
26:10 95:1
147:5,21
172:19 174:13
174:17 179:8
183:15,18
184:10 185:3
239:25
**pursue** 6:7
**put** 7:7 93:24
122:6 191:7
195:22 197:16
201:5 211:7
216:13 228:15
**putting** 220:10
**P.C** 2:4
**p.m** 1:20 120:3
196:5,6 249:23
**P.O** 2:5 107:4

_____

**Q**

**qualified** 4:11
34:6 129:18
193:8 199:14
199:20 217:10
238:6,14
239:24 240:6
**question** 6:24
8:24 14:24
35:11 93:14

95:17,21
114:15 116:5
134:10 136:20
139:8 158:21
163:22 164:16
169:13 177:6
187:2 188:2
191:5,22
206:22,25
207:14,16
208:5 210:1
211:25 213:20
215:17 217:11
217:22,23
219:7,12,22
220:1 221:2,25
233:25 236:20
247:15
**questionable**
242:18,20,21
242:23
**questioned**
245:5
**questions** 134:12
135:2 188:17
190:4,9,22
191:1,3 205:7
213:3 215:15
215:16 228:23
229:14 249:20
249:22
**quibble** 110:9,15
**quote** 218:3

_____

**R**

**R** 3:1
**RADAR** 37:23
**raise** 227:13
**ran** 38:17 77:12
**random** 10:16
58:6
**randomly** 58:25
**rarely** 51:12
**rate** 34:7 76:9
143:23 156:6
158:7

**rates** 35:6
**rationales** 153:4
**raw** 38:22 39:2,2
**Raymer** 10:1,20
10:23 11:21
**Raymer's** 9:25
**reached** 45:24
82:13
**reaches** 22:19
**read** 71:8,12
117:7 129:5,8
131:9 133:18
166:11 167:16
168:2,4 185:19
187:5,13,20
188:15,22
189:13 190:7
191:14 192:11
192:14,16,18
198:15,18
199:17 206:12
206:15 208:7
217:9 235:13
236:6 238:18
238:25 240:7
241:12 243:17
**readily** 46:24
59:15 223:20
223:22
**reading** 186:15
186:18 187:2
187:25 188:2,8
188:8,9,11,17
191:24 192:8
192:11 198:8,9
205:7 215:18
234:15 237:6
246:20
**ready** 92:4,5
**real** 12:18 48:7
67:23 114:16
190:11 194:16
215:13 225:10
228:11
**really** 24:10 55:9
66:25 129:18

187:1 193:8
**reason** 10:6,13
19:9 43:20
78:24 79:4
97:2 118:12
148:22 167:8
197:25 229:4
248:9
**reasonable** 88:3
88:18,22
137:15,21
149:24,25
150:4
**rebut** 190:14
**recall** 71:1
112:24 147:24
209:14
**recapitulation**
41:12 72:5,22
**receipt** 127:1
131:14 133:11
134:23 178:18
207:22 208:12
255:13
**receive** 5:23 6:14
7:25 30:2
164:1,14
**received** 64:18
64:25 68:21
69:11 78:14
91:1 106:22
124:21,21
125:3,3,6,6,8,8
125:14,19
126:3,20,24
127:12
**receives** 112:13
**Recess** 56:17
120:2 196:5
**recognize** 96:18
98:25 135:25
**recognized**
20:22
**recognizes** 18:5
78:3
**recommendati...**

8:14
**recommended**
79:10 82:24
85:4
**record** 1:25 3:7
7:20 48:14
80:15 117:7
125:11,12
167:17 179:16
186:9,10 187:2
187:13 188:6,8
192:7,17
193:10,14
194:4 198:4,20
199:18 215:18
228:15 238:18
239:1,17 241:9
249:23
**recorded** 105:11
106:11 179:15
179:19,21
180:6
**recording**
106:10 176:17
176:21 180:8
180:13
**recordings**
52:23
**records** 25:15
26:4,15 37:18
57:24 62:23
63:2 90:1,15
117:20,23
125:17,24
126:6 133:10
133:21 174:15
178:10 232:23
**recourse** 174:6
175:23 176:3
176:24 177:3
177:13 183:2
201:16 206:4
216:25 222:12
222:24 223:7
**recur** 46:13
**redact** 54:13,19

Case 10-01172-DWH   Doc 22-2   Filed 11/01/10   Entered 11/01/10 15:55:35   Desc
Deposition of Daphne Mosley   Page 93 of 104
Daphne Mosley                                          October 14, 2009

Page 285

56:1 80:17
**redacted** 81:1
**redaction** 56:3
80:25
**reduce** 140:20
**refer** 13:7 32:11
38:22 66:5
71:5 105:19
136:13 192:19
193:1 245:6
**reference** 124:10
**references**
243:17
**referencing**
97:19
**referral** 33:6
35:18
**referrals** 5:21
35:2
**referred** 22:15
29:17 32:19
33:11 85:23
119:3 136:22
139:19 179:17
**referring** 61:15
61:16 65:23
170:22 192:18
192:23 218:21
222:13 241:9
**refers** 43:7
212:13
**reflect** 68:13
75:25 126:5
147:12 219:16
**reflected** 65:21
90:19
**reflecting** 115:5
228:19
**reflection** 91:1
**reflective** 64:24
**reflects** 116:10
**reform** 116:21
118:1
**reformation**
116:20
**reformed** 119:15

**refunded** 91:22
92:21
**refuse** 128:24
**regard** 148:9,11
148:25 154:23
**regarding** 25:4
63:21 120:18
126:18 128:7,7
133:24 136:7
136:12 149:5
150:12 209:20
221:11
**regards** 91:12
**Register** 254:19
**registered**
102:13,23
176:20 181:18
206:19
**Registration**
101:25 107:2
251:22
**regular** 42:19
78:14
**regulated** 67:22
**Regulation**
130:16
**regulations**
110:4,6,11
151:22
**regulatory** 45:4
**reimbursed** 89:4
89:22 90:3,10
150:16
**reimbursement**
89:8
**related** 3:21 25:7
37:3,7,10 38:6
53:6 66:23
75:5 82:11
87:24 97:7
114:18 131:12
133:3,8,14
136:24 149:9
174:8 176:22
186:6,7,11,11
203:10 208:12

209:23 223:3
251:6
**relates** 245:11
**relation** 12:4
190:10
**relationship**
33:24 34:1,16
34:16 35:13
81:18,20
100:11,18
142:12,14
169:19
**relationships**
62:14 143:3
**relative** 251:9
**relatively** 52:12
**release** 115:16
224:21 255:24
**relevance** 197:2
230:10
**relevant** 36:11
55:24 196:19
199:2,7
**relief** 6:7 25:21
60:23 61:1,10
64:7 100:6
103:3 113:18
152:23 159:10
159:15,20,23
160:9,13,18
161:19 162:3
200:25 218:14
221:18
**relocated** 101:4
101:6
**rely** 34:13
**relying** 25:20
59:9
**remained** 42:7
**remaining**
140:14,16
**remedy** 119:13
184:4
**remember** 39:25
177:9 179:23
201:20 204:23

214:11 234:15
236:4 238:5,8
**REMIC** 23:25
194:8,10,16,21
234:17,17,20
235:3,5,8,11
235:21 236:3
236:16,17,24
237:3,8 238:2
**REMICs** 236:1
**remittances** 36:6
**remoteness**
234:13
**removal** 93:7
**removed** 65:11
93:20 104:16
**rents** 138:24
**REO** 48:6,7,24
**repair** 46:8
**repairs** 154:15
**repeat** 62:2
131:24 136:20
146:2 157:10
164:21 211:25
217:22
**repeating** 22:20
**rephrase** 21:11
63:6 86:3
95:22 134:10
**replace** 154:16
**report** 38:18
254:15
**reported** 1:22
2:18
**reporter** 1:21
197:17 239:4
250:11
**REPORTER'S**
250:1 252:10
**reporting** 2:19
5:23 7:25
251:22
**Reports** 253:22
**represent** 27:2
57:20 81:4
96:14 98:21

120:9 130:15
169:6 200:2
224:17 245:1
**representation**
72:13 120:12
165:23
**representations**
162:1 184:24
185:8
**representative**
236:3
**represented**
98:25 223:2
**represents** 32:11
185:12
**repurchase**
118:21 165:18
179:4 187:17
**repurchased**
119:6,12
**request** 20:20
25:13 30:4,6
82:5 85:12,13
89:14 97:4
98:15 105:1
114:19,21
115:16 119:5
119:11 144:11
150:25 206:18
223:23,24
224:12,20
225:8,18,23
227:18,24
255:23
**requested** 22:20
22:23 24:19
26:19 31:14
36:17 56:9
83:14 85:17
89:20 93:3
96:25 114:2
115:8 116:2
149:2 207:7
233:2
**requesting** 63:18
143:25 156:8

Daphne Mosley                                        October 14, 2009

158:9 219:21
**requests** 19:10
  22:10 31:21
  46:10 94:11
**require** 61:23
  62:5 64:8
  67:11 109:4
  134:22 141:9
  141:20 207:1,3
  246:16
**required** 26:9
  71:21 83:17
  85:11 87:2
  133:2 138:25
  145:3 148:5
  184:3 206:14
  206:17,18
  213:7,11,22
  217:1,4,7,9
**requirement**
  82:22 116:6
  244:11
**requirements**
  23:11 27:13,15
  27:17 83:2
  134:16 135:5
  135:23 136:8
  144:8 194:20
  228:2
**requires** 82:15
  87:8 145:6
  220:14
**RESPA** 139:19
  141:8,9 144:3
  144:8 145:6,19
  145:25 146:4
  147:5,21 148:4
  148:9 149:6
**respect** 5:10
  15:11 16:7
  24:15 26:24
  27:6,7,10
  28:18,20 29:25
  35:20 37:12,16
  40:16 41:15
  43:4 44:20

45:20 46:1
  60:20 67:6
  68:1 71:19,22
  74:25 79:18
  81:5,13 83:19
  85:15 89:19
  94:9 97:8,24
  98:2,15 103:2
  104:23 112:25
  113:24 129:21
  130:3 131:16
  133:23 136:17
  139:24 140:9
  142:10 145:2
  151:23 152:6
  152:11 153:4,9
  154:11 157:24
  165:15,22
  174:9 175:9,25
  179:14 183:10
  185:12 186:12
  193:21 196:11
  200:10 203:12
  205:14 206:13
  217:11 223:12
  225:5 230:7,23
  233:12 238:3
  248:23
**respecting** 26:15
  79:6
**responded** 149:4
  221:22 222:4
**response** 31:18
**responses** 4:8
**responsibility**
  32:18
**responsible** 47:7
  128:5
**responsive** 31:20
  97:4 223:3
  225:13
**rest** 124:14
  140:12 154:13
  164:8 249:19
**restaple** 171:10
**restate** 15:2

19:20 109:15
  169:13 235:7
  236:20 242:12
**Restated** 169:7
  256:5
**result** 63:24
  146:24 157:12
  157:15 159:11
**retain** 186:10
**retains** 186:9
**return** 105:1
  128:19 137:16
  235:15
**returns** 235:18
  236:2
**Revenue** 200:4
**review** 5:21 18:4
  59:6 98:19,24
  127:20 191:17
  191:18 243:13
**reviewed** 70:19
  150:21,23
  213:21
**reviewing** 43:1
  67:12
**re-marked**
  123:14
**rhyme** 10:6
**riders** 175:13
  176:8 205:23
**right** 5:10,22
  6:22 7:7,8,14
  9:20 10:13,14
  10:23 11:8
  12:24 13:3,4,8
  13:12,16 14:9
  14:11,19,23
  17:12,15 18:12
  19:7,18 20:5
  20:14,22 22:3
  23:13 24:5,13
  26:23,25 27:12
  28:11,12,18,25
  36:20,24 37:10
  38:5 39:12,15
  39:21 40:4,12

40:14 41:2
  45:8,9,18 46:6
  48:5,7,11,18
  49:18 51:15
  53:2,14,18,22
  58:22 60:7
  63:9,14 65:7
  66:3,6,12
  68:18 69:24
  70:13 71:19,23
  72:25 73:4,9
  73:14,18 74:3
  75:19 80:20
  81:11 82:21
  83:4 85:9
  86:15 87:4
  88:23 89:5,16
  89:22 90:6
  92:12,18 93:25
  94:16,17 98:9
  100:13 102:15
  102:20 107:24
  108:19 110:19
  113:3,5,6,7,12
  113:16,25
  114:12,18,24
  115:6,11,12,21
  115:24 116:13
  116:18,20,21
  118:20 119:15
  119:17,18,20
  121:25 122:13
  123:21,22,24
  123:25 124:7
  125:4,9,25
  130:4,24 132:1
  132:4,5,17,19
  134:23 139:15
  139:19,22
  140:3,7 141:13
  142:7 143:2
  144:1,2,13,14
  144:22,25
  145:14,17
  146:6,7,10
  147:5 148:2,19

149:6 150:5
  151:8,9 152:4
  152:5,8,9,13
  152:17,20
  153:1,2,6,8,13
  153:17,19,20
  153:22,23
  154:3,6,13
  155:1,5,8,21
  155:24 156:8
  156:11,18
  157:2,4,22
  158:2,5,6,12
  158:19 159:1,2
  159:14,17,20
  160:10,14,16
  160:22,23
  161:2,4,21
  162:17,21
  163:5 164:11
  165:4,5,7,13
  165:18,19,20
  165:25 166:1
  168:17,24
  170:3 171:3,23
  172:4,8,13,17
  172:18,21,25
  173:5,11,15,23
  174:2,6,10,17
  174:23 175:4
  175:10,19,20
  175:24 176:5,6
  176:9,10,15,17
  176:18,24
  177:11,13,17
  178:12,16,21
  178:25 179:5
  179:19,23
  180:4,5,9,11
  180:16,18,19
  180:20,24
  181:2,5,19,25
  182:3,4,9,13
  182:14,17
  183:2,3,12,16
  183:21,22,24

183:25 184:4,5
184:8,11,12,15
184:16,17,19
184:20 185:1,2
185:5,17 186:1
186:13 187:16
188:21 189:5
191:21 192:20
193:13,21,25
195:19 196:10
196:15 197:13
197:14,25
199:1,23
200:12 201:17
201:25 202:9
202:12,18,19
203:15 204:3
204:10,14,19
204:20,22,25
205:1,20 206:7
206:21 209:13
209:17 210:13
211:8,19,23
212:14,18,19
212:23 213:24
214:2,3,17,20
217:13 218:6
219:6,8 221:5
221:15,23
222:12,15,20
222:24 223:18
225:24 226:2,5
227:1,7,12,14
227:16 229:17
230:12,15
231:11,12,16
231:17 232:3,5
232:7,19,23
233:7,8,22
234:25 235:15
238:11,16
239:5,8,10,11
239:19 240:16
240:25 241:15
241:19,20,25
242:4,5,25

243:8,11
245:25 246:10
247:11,23
248:5,6,11,12
**rights** 27:6,6,14
63:12 102:19
116:16,17
119:5 128:23
128:24 151:7
151:18 153:10
193:24 242:3
**right-hand**
40:24
**road** 165:10
**Roberts** 128:12
128:13
**Robin** 2:9 7:19
55:23 56:22
72:13 80:21
101:16 134:6
162:5 167:9
170:17 190:12
191:20 201:9
215:3
**Robin's** 193:2
244:1
**role** 168:19
**Roman** 132:5,8
132:9,16,23
133:5,17
205:22
**room** 220:6
224:5
**roughly** 3:18
**routinely** 127:20
**RPR** 2:19
**Rule** 254:23
**rules** 1:24 70:11
74:25 110:4,6
110:18 112:23
246:15
**run** 33:5
**running** 214:12
**runs** 41:4,8 50:5
50:9
**R.K** 256:9

| S |
| --- |

**S** 1:4,6 3:1
**safe** 244:21
**sale** 48:21 165:4
170:25 173:25
184:14 234:10
**sales** 231:19
234:8
**sampled** 58:25
60:10
**save** 17:19 62:13
200:7
**saw** 246:6
**saying** 15:1 17:3
21:19 29:20
30:3 34:14
35:12 54:17
70:4 80:21,25
91:15 145:5
160:21 161:19
162:4 164:15
164:23 186:25
190:20 198:22
221:7,8 224:2
224:10 225:11
227:3,10
228:24 229:13
243:21 245:22
245:24
**says** 27:5 40:13
57:18,18 58:21
58:22 65:8
66:8,11 68:10
72:4 74:7,8
106:17 107:6
107:17,18,24
108:3 112:22
113:1 117:17
122:2,9,9
124:4,20
128:18 129:20
131:1,6,18
132:1,12,19
133:4 135:1,1
137:12 140:11
140:12 141:5

145:16 148:21
149:18,23
152:16 154:1,1
154:12 156:2
156:10,15
158:6,10
165:16 167:6
167:12,17
170:2,4 172:1
172:1,6,6,10
172:11,15,19
173:2,7,20
174:1,12,25
175:6,12,16,19
176:1,7,19
177:5,8,11,15
178:18 179:7
179:11 180:14
180:18 181:16
181:17,21
182:5,15,21
183:8 184:6,13
184:18,22
185:3,22 186:3
186:14,16
187:7,11,11,12
187:15,17
188:19,23,23
189:7,8 190:9
190:21,21
193:23 195:9
202:11,14,17
204:1,1,2,12
204:16,16
205:18,19,25
206:3 207:24
207:24 208:6
210:10,23
212:20,25,25
213:3,4 214:18
215:3,6 219:18
222:9 223:6
231:6,20
232:10 235:11
239:3,3,13
240:14 241:14

241:23 243:2
244:17 245:7,8
247:15,17
248:7 249:14
**scale** 21:23
**scan** 37:6
**scenario** 20:16
118:9
**schedule** 68:11
68:13 172:4
175:2 185:7
203:10 253:15
**Schneider** 9:25
**scope** 245:20
**screen** 24:12
73:7,10 76:11
77:24 120:10
120:13 253:17
253:18,19
**screens** 73:8
**se** 70:17 83:14
**seal** 107:23
**SEC** 190:15
193:12 194:3
195:13
**second** 58:20
60:5 68:5 74:6
75:18 117:5
122:22 124:16
128:17 140:19
151:3 170:11
171:4 204:4
210:23 215:12
**section** 124:24
131:1 133:4
137:11 138:12
138:13 139:1
140:12 143:15
143:21 151:23
152:2 156:2,3
157:2 174:1,12
176:5,5 179:17
179:18 181:14
183:15 184:11
184:24 185:3
188:25 189:15

Daphne Mosley                                    October 14, 2009

192:25 201:7
202:15,23,25
215:24 222:8
235:22,22
236:6 238:7,18
238:19,22
240:1,14
**sections** 134:21
207:5
**secure** 86:7
155:1 189:18
**secured** 143:22
156:4 161:8
**securing** 152:13
154:6,12
172:12
**Securities**
130:17 166:3
168:7,16,20
169:8,10,15
170:5 172:17
173:3,9 178:4
189:3 201:23
202:5,11 210:4
213:12,16
215:9 216:4,20
232:16 254:20
254:23 255:4,6
256:4,7
**securitization**
26:25 118:19
168:21 228:4
231:19,21
234:5 236:14
249:1
**securitized** 27:3
130:20 133:24
**security** 71:4
132:24 133:1
138:22 140:19
143:22 151:13
151:18,21
156:5 184:19
201:18
**see** 22:3,5 40:17
40:20,21 43:19

62:8 66:1
77:20 98:24
107:13 109:10
109:19 122:5
122:14,17,21
126:14 131:3,7
131:17,23
132:11 167:13
170:8,18 204:4
205:5 209:18
209:20 212:15
213:5 231:6
247:12
**seek** 82:19
116:17 159:2
159:20
**seeking** 118:1
157:8
**seen** 56:21 57:10
57:11 117:23
150:21 155:22
161:13 166:2,5
189:11,13
190:2 209:5
210:25 211:3
214:16 223:8,8
224:11,22,24
230:22
**segregate** 55:14
**segregated**
112:2
**select** 243:16
**selected** 192:11
**selection** 34:13
**sell** 106:25
167:18 172:16
174:4 185:24
189:17
**seller** 165:18
170:4 172:2,16
174:1 175:7
178:6,21 179:2
179:4,11
182:24 183:12
184:3 185:22
186:5,9,10

189:17,19
215:5,6 240:5
**sellers** 123:3,9
**selling** 24:1 34:4
**send** 114:17
219:11 248:19
**senior** 4:2,4,12
5:2
**sense** 108:22,24
186:22 197:11
239:9
**sent** 106:10
149:5 166:17
**sentence** 122:8
124:4,9,13,17
124:20 128:17
137:11 140:10
141:5 142:6
153:15 154:5
154:11,13
158:9 188:24
**sentences** 137:12
143:19
**separate** 64:14
85:21 86:5
104:13 160:20
198:1 214:24
218:4
**separated** 80:17
220:17
**September** 41:5
245:3 247:8
256:10
**sequential** 32:3
**sequentially**
120:23
**series** 8:4 103:21
180:16 182:16
**serious** 51:14
**served** 115:2
**service** 5:24 7:25
9:11,18 17:24
19:6 21:4,8
26:23 27:16
45:13,16 63:10
63:15 82:4,15

83:16 86:17
87:1 88:4,25
89:4,11,13
91:9 93:3,12
94:12 95:12,15
96:1 97:21
200:4 224:18
**serviced** 27:23
45:18 155:5
**servicer** 23:19
23:21 26:8,11
27:5 29:21
34:21 35:1,9
35:14 45:7
87:23 88:23
90:9,12 113:12
123:23 133:21
150:12 165:17
168:8,9,13
173:4 207:21
208:11 236:23
**servicers** 32:12
67:18
**servicer's** 133:9
**services** 8:20,22
9:5,6,14 11:20
11:23,25 12:4
22:22 33:17
34:7 35:5 47:8
80:9 81:5,23
81:24 82:5,6
82:10 84:19,21
85:10 88:10
94:4,19 168:5
**servicing** 1:9,13
1:17 3:22,25
5:17 6:1 14:22
18:9 23:8 27:6
27:7,19,23
28:24 38:6,16
41:6 47:18,20
47:21,24 48:3
49:5,5,10 55:3
55:6,7,20,21
62:21 74:22
79:9 85:23

89:18 90:24
91:25 94:3,18
99:14 101:19
119:4 129:15
131:2 135:5
136:18,25
164:1 168:8
171:20,22
172:20 173:22
175:1 179:9
182:6 183:19
190:5,10 192:4
196:24 200:17
204:10,13,19
206:11,12
208:18 214:2
216:7 217:2
230:5 234:18
237:17 243:15
243:18 250:4
250:15 252:4
253:4,9,11
254:13
**serving** 168:12
**set** 8:5 11:23
16:21 20:20
40:10,12 46:13
48:16 70:14
81:21 97:3
138:5 140:25
141:13 168:23
174:4 184:2,24
185:6 201:15
235:12 250:22
**sets** 70:4 137:21
139:21 152:2
153:13 164:3
**setting** 12:2
**Settlement**
67:23
**severity** 46:18
**shakes** 43:11
163:24
**Shannon** 74:19
74:20
**share** 62:20

Daphne Mosley                                    October 14, 2009

sheet 42:4 56:23
57:13,15,21
58:3 59:6,14
104:13 160:20
218:4 253:13
short 7:12 43:15
52:13 119:14
119:25 129:6
238:25
shorthand 1:21
1:22 250:11,16
250:19
shortly 43:20,21
short-circuit
213:6
shot 120:10,14
show 19:16 20:8
20:13 21:14
38:9,14 57:2
98:18 99:12
101:15 103:14
110:12 117:1
120:6 126:19
130:14 147:25
153:21 160:10
169:4 196:21
201:2 208:16
210:16 214:9
215:3,23 218:9
showing 177:16
196:15 227:9
shown 60:15
97:9 172:24
243:6
side 40:24
105:19,21
170:15,16
171:11
sign 71:11
112:18,19,21
235:25
signature 105:8
162:24 251:2,2
signed 163:12
225:22
significantly

148:5 151:17
signifies 66:20
signing 244:12
246:8
similar 57:11
88:5 150:24
190:12 224:24
simple 55:3
109:2 114:16
228:11
simply 64:18
84:13 109:19
single 20:9 107:8
Sirote 2:9 8:13
33:19 34:15
117:3 161:14
sit 92:16 143:4
187:13 188:14
189:22 190:7
191:14
site 30:15,25
111:23
situated 107:11
situation 111:22
116:10 127:23
153:6
skewed 77:24,25
skip 181:15
186:21 187:16
200:6
skipping 186:17
187:19 188:23
slash 65:8,13
66:23 96:13
sliding 21:23
small 132:22
snapshot 76:24
software 6:14
14:21,22 15:7
16:20 18:4,5,8
18:9 19:9
20:19,22 22:11
27:18,19 28:4
37:2 38:6,19
52:16 73:8
74:10,12 76:13

91:25 92:10
125:25 127:22
128:1
sold 23:25
173:14 174:16
181:1,5 242:14
Solutions 9:22
11:21,24 37:12
37:13 62:15
63:8 85:6,8
somebody 7:13
30:13 51:13
227:4,13
228:11
somebody's
39:25
somewhat 10:15
148:12
soon 162:15
sorry 10:22
14:24 18:23
19:20 48:13
56:8 76:7
94:21,22 95:22
104:19 107:19
123:17 132:5
132:14 159:7
168:1 170:19
171:24,25
181:12 187:18
200:23 202:14
202:16 219:12
243:25
sort 6:7 11:12
52:23 53:2
63:16 77:11
149:6 150:24
sought 159:20
sound 83:4
168:17
sounded 95:20
source 137:5
South 2:10
Southall 50:11
50:13
space 221:11,13

speak 47:6
129:18 217:15
speaking 36:25
244:11
speaks 191:9
special 126:11
126:12
specialist 5:15
100:1 163:1
specific 18:14
83:2 101:8
136:11 137:6
152:3 160:19
specifically
63:21 85:1
86:23 89:20,21
94:8 139:6,10
140:25 183:8
185:1,14
specified 131:14
133:12,22
141:8
specifying 150:4
174:21
spell 49:20,24
50:1,13 82:3
135:9
spelling 50:18
spend 93:24
171:6
split 14:12 39:8
spoke 21:1
Sponsored 45:5
spread 145:7
spreadsheet
18:3 22:2 39:3
40:4 42:25
80:16,21
164:22
spreadsheets
40:17
stack 80:6
166:15 195:22
201:5 211:8
staff 50:24
142:21

stage 51:18,19
51:19
stamp 96:21
162:9
stamped 96:21
220:7 228:18
stand 38:1 80:3
227:15
standard 44:16
79:6 88:6
148:25 224:25
standards 44:20
45:14 79:9
129:16 136:2,7
136:17,24
137:5,20
150:11
stands 48:7
stand-alone
72:25
stapled 170:14
171:9 219:4,6
219:8,9,11
stapling 74:7
start 6:2 122:2
159:7
started 9:19
51:21 234:16
starts 124:17
startup 235:21
state 1:22 3:6
20:23 32:8
34:22 45:15
46:8 100:3
101:8 107:11
110:6 230:21
236:1 250:7,12
251:20
stated 1:25 19:3
27:15 225:16
250:12
statement 16:23
33:9 49:14
79:17 93:9,19
95:20 112:11
137:11,18

Case 10-01172-DWH   Doc 22-2   Filed 11/01/10   Entered 11/01/10 15:55:35   Desc
Deposition of Daphne Mosley   Page 98 of 104
Daphne Mosley                                          October 14, 2009

Page 290

149:21 164:13
167:13,17
168:1 200:9
217:4 220:8
235:7,12
**statements**
147:12,15
152:16
**states** 1:1 86:23
106:17 112:24
125:5 148:9
153:12 207:12
237:1,11
**static** 13:11
**stating** 109:19
**status** 46:4 49:13
83:12 161:8
236:16,17,24
**stave** 17:20
**stay** 6:7 25:21
60:24 61:10
64:7 100:7
103:3 113:19
152:23 159:10
159:23 161:19
162:3 201:1
214:15 218:14
221:18
**steered** 85:5
**step** 32:2,19
153:13
**steps** 32:6,7
135:22
**stipulate** 187:10
198:4 229:6
**stipulating**
198:20 229:9
**stop** 104:20
195:24 249:19
**store** 37:7
**straight** 229:12
**strain** 171:14
**Street** 106:24
**strict** 68:1
**strip** 105:19
107:23

**structured** 49:6
51:4
**stuff** 36:24 54:4
120:1 121:19
**subheading**
130:25
**subheadings**
153:14
**subject** 112:22
**submitted** 35:25
251:1
**subparagraph**
235:11
**subpart** 236:9
236:10
**subsection** 201:6
207:17,20
235:3
**subsidiaries**
83:21
**subsidiary** 28:9
84:1
**substance**
176:21
**substantially**
208:14
**substitute** 179:4
199:14,20
238:4,6,14
239:24 240:6
240:15
**substitutes**
240:6
**substitution**
179:8 239:24
**subtract** 44:8
**sufficient** 141:7
**suing** 119:14
**Suite** 2:5
**sum** 144:15,17
144:19
**summary**
236:12,22
239:12
**sums** 139:2
**supersedes**

130:10
**supervisor** 52:5
84:10
**Supplier** 253:21
**support** 100:6
115:14
**supposed** 76:23
120:9 127:11
207:7,8 227:2
245:18 247:7
**sure** 6:23 19:21
27:2 28:4 37:1
54:22 56:5,16
72:9 77:21
86:1 109:16
114:2 121:20
136:21 145:5
146:3 147:15
151:15 152:18
155:11 160:3
162:12 164:22
181:15 185:20
186:20 187:21
188:4,11 191:2
191:11,23
192:12 193:15
198:6,21
203:23 205:8
208:1 212:1
217:23 224:1,4
225:10 236:21
241:11 242:7
242:13 243:14
245:9,14
**surely** 93:17
**surrender**
155:20
**Susan** 108:3
**suspense** 40:11
40:14,18,23
41:1,18 42:7
43:25 44:7,13
44:17,21,24
65:8,11,12,17
65:20,20 66:9
66:12,15 67:14

77:1,2
**sworn** 1:18 3:3
162:19 250:17
**system** 6:16,18
6:21 7:7,24 8:3
8:6 16:21
17:23 19:9,14
19:16 20:7,20
20:22 21:14,20
24:4 29:1,12
29:16 30:4,14
31:6,8,10,20
32:1 34:2
35:20,24 36:7
36:11,15 37:7
37:18,20,22
38:8 40:7 47:6
47:13 52:16
58:21 62:18
63:18 69:14,16
69:18 78:25
79:2 96:21
102:17,18,22
102:23 126:16
149:3 176:20
181:18,23
245:16 246:2,4
246:18,24
248:4
**systems** 27:18,20
62:16 101:25
107:2 134:15
**S-O-U-T-H-A-...**
50:14

---

## T

**table** 57:9
166:15 193:1
**take** 5:23 11:11
18:15 32:18
33:5 37:5 39:2
39:16 40:2,3
56:14 58:5
63:17 80:2
91:2 104:21
119:24 121:9

123:16 125:20
125:21 135:22
145:6 151:5
163:25 195:21
195:25 196:1
205:3 211:16
247:22
**taken** 1:18 17:7
32:2 56:17
90:2,16 120:2
155:20 196:5
213:8 250:15
251:8
**takes** 156:11
248:4
**talk** 7:18 11:11
23:1 24:25
114:14 121:10
124:2 161:25
203:2 230:9
234:7
**talked** 17:10
28:6 45:23
55:25 61:24
139:17 146:3
153:25 160:9
160:12,24
165:15 177:8
180:3,8 183:4
192:4 203:14
203:20 204:21
213:23 214:1
222:8 234:20
236:4 239:6
241:7 247:5
248:2
**talking** 14:8
23:12 56:19
64:22 98:2
153:7 157:24
168:12 220:19
226:20 234:16
245:15,21
**talks** 139:25
183:7 185:15
222:16 237:14

Daphne Mosley                                          October 14, 2009

| | | | | |
|---|---|---|---|---|
| **tape** 164:2,22 165:7 | **terms** 13:2 70:15 121:10 145:23 | 149:6 152:22 188:15 207:1,4 | **thought** 195:23 219:16 | 201:17 202:18 **titled** 106:19 |
| **taped** 219:4 | 146:5 148:7 | 207:12 240:13 | **thousands** 23:20 | **Toby** 50:11 |
| **tax** 194:17 | 172:19 173:21 | **things** 3:16 7:18 | **three** 20:1 39:7 | **today** 22:2 23:24 |
| 233:21 234:21 | 200:10 237:16 | 7:21 12:21 | 39:12 51:8 | 24:24 37:6 |
| 235:15,18 | **terrible** 39:20 | 16:20 17:4 | 135:19 152:2 | 53:11 56:21,23 |
| 236:1 237:3,8 | **testified** 3:3 | 23:1,3 29:8 | 153:4,11 215:4 | 60:19 78:7 |
| 237:17 | 35:17 90:25 | 36:3 45:8 | 228:20 | 80:4 90:6 96:6 |
| **taxes** 67:19 74:2 | 113:23 165:21 | 56:21 57:8 | **threshold** 46:11 | 125:18 126:18 |
| 138:21 | 231:7 241:17 | 76:10 112:19 | 152:18 | 139:17 143:4 |
| **teach** 39:25 | **testify** 193:8 | 121:22 129:21 | **throwing** 57:8 | 163:13 168:12 |
| **technically** | 245:11 | 140:1,2 141:24 | **tied** 18:10 22:9 | 196:8 209:6 |
| 166:19 | **testifying** 225:12 | 152:11,15 | **time** 4:15 7:12 | 225:15,18 |
| **technology** | **testimony** 22:7 | 153:25 154:8 | 7:12 11:11,17 | 242:23 243:2 |
| 128:8,16 | 25:6 34:25 | 154:20 162:20 | 13:6 17:21,24 | 248:24 249:14 |
| **tell** 7:1 19:1 25:1 | 45:1,10 46:12 | 182:18 187:20 | 18:11 19:14,15 | **told** 29:13 56:8 |
| 42:4 48:2 58:6 | 59:13,18 63:1 | 234:8 240:20 | 20:4 21:16 | 57:1 75:23 |
| 58:7 73:18 | 65:19 90:15,19 | 241:7 243:16 | 31:13 32:7 | 84:13,17 147:4 |
| 74:24 75:4,8 | 162:20 224:6 | **think** 22:17 33:8 | 42:9 44:24 | **tool** 79:7,11 |
| 80:18 92:20 | 230:16 244:19 | 38:17 48:15 | 46:14 54:19 | **top** 42:24 57:23 |
| 102:1 106:16 | 244:22 248:4 | 49:5 50:16 | 62:13 97:21 | 80:20 104:25 |
| 120:8 121:5 | **Texas** 1:22,24 | 51:5 55:24 | 100:25 105:20 | 157:20 168:2,4 |
| 125:7 140:15 | 2:20 100:3 | 56:25 58:2 | 109:12,20 | 172:24 195:19 |
| 142:24 166:10 | 250:7,12 | 62:10 66:22 | 114:24 129:1 | 196:14 247:11 |
| 200:16 218:18 | 251:20,22,23 | 67:1 74:10 | 137:15,21 | **totaling** 44:6 |
| 250:17 | **text** 209:21 | 81:17 90:25 | 141:6,8 144:12 | **track** 17:23 18:5 |
| **telling** 190:16 | **Thank** 216:15 | 91:3 95:18 | 150:3 151:3 | 102:10,11 |
| **tells** 24:12 73:25 | **Thanks** 72:21 | 102:15 124:16 | 155:4,14 | 125:13 |
| 182:11 | **Thayer** 50:6 | 126:15 137:9 | 161:21 162:1,3 | **tracked** 102:17 |
| **ten** 3:17,18,20 | **theoretically** | 137:10 149:13 | 179:3 188:4 | **tracking** 79:1 |
| **tend** 7:17 | 16:15 102:9 | 167:8 168:16 | 189:23 191:17 | **tracks** 32:1,5 |
| **tended** 115:14 | **theory** 15:13 | 170:11,12 | 196:8 210:5 | **training** 83:5 |
| **tendered** 21:18 | **thereof** 70:16 | 171:5 173:8 | 214:16 217:6 | 108:18,21 |
| 44:5 | 186:13 251:14 | 179:24 192:15 | 227:16 229:3 | 109:17 233:9 |
| **term** 20:19 21:5 | **thereon** 176:17 | 206:15,16 | 238:13 243:8 | 233:12 241:23 |
| 37:24 43:9,10 | 203:11 | 213:20 221:24 | 250:24 251:4 | **Tran** 58:9 |
| 43:12,17 48:17 | **thereto** 96:16 | 224:9 228:9 | **times** 3:12 95:10 | **transaction** 32:3 |
| 49:10 55:18 | 97:2 175:13 | 240:9 243:19 | 213:8 | 32:4,4 38:16 |
| 114:10 156:20 | 176:8 186:12 | 244:7,20 | **title** 5:1,14 | 38:23 44:1 |
| 194:17 200:15 | 223:5,13 | 245:17 249:18 | 118:18 119:12 | 58:2,6,7,9,24 |
| 229:22 230:2,4 | **thereunder** | **third** 7:12 | 119:14,18 | 59:19,22,24,25 |
| 230:18,20 | 184:1 | 221:14 227:24 | 128:15 132:6 | 60:12,15,19 |
| 234:21 | **thing** 6:8 7:16 | 228:1,3 | 138:2 162:25 | 62:21 65:23,25 |
| **terminal** 92:17 | 11:12 39:6 | **Thompson** 1:21 | 163:2 174:6 | 66:14 71:3 |
| **termination** | 52:23 53:2 | 2:19 250:10 | 184:8,19 185:5 | 90:24 121:7 |
| 100:16 | 122:19 142:16 | 251:19 | 186:9,10 | 125:24 126:3 |

Case 10-01172-DWH    Doc 22-2    Filed 11/01/10    Entered 11/01/10 15:55:35    Desc
Deposition of Daphne Mosley    Page 100 of 104
Daphne Mosley                                          October 14, 2009

Page 292

131:15 133:2
133:12,22
184:14 237:19
253:10
**transactions**
60:7 63:23
91:8,12 164:7
186:1 237:15
238:20
**transcribed**
250:19
**transcript**
244:16 245:4
247:9 250:23
251:1 256:9
**transfer** 103:25
104:5 107:1
123:8 164:8
174:13 201:14
205:10 218:9
219:17 231:2
231:10 246:1
**transferred**
11:14,17
102:24 164:17
178:11 239:17
245:23
**transfers** 165:2
**transmitted**
37:19 63:3
**treat** 7:7,10,13
146:12
**treated** 16:3
21:4 35:12
67:8 79:15,19
88:15
**tree** 8:5
**trigger** 45:24,25
47:12 82:13,14
**triggers** 47:9,12
83:9
**trouble** 171:8
**true** 10:16 87:17
87:20 98:8
103:7 121:18
136:16 148:4

174:20 218:9
228:17 229:20
234:8,10
250:13,23
**truly** 68:2
**trust** 23:25,25
24:5,7,9,9
25:20 27:3,4
70:7 71:5
101:20,21
103:19,20
104:1,6 108:12
113:3,20
117:13,14
118:23,24,25
118:25 119:3
160:10,19,21
164:9,16,18,24
164:25 165:16
166:4 167:22
168:9 173:4,10
173:17 175:23
176:2,23 177:2
177:12,24
178:12 180:14
180:15 183:1
186:12 189:25
193:3,5 194:21
195:4,7 196:11
196:13,19,25
197:12 199:22
200:12,15,15
200:16,20
201:8,15,21
202:3,12,18,23
203:5 206:4
210:2,5,24
211:19 212:1
212:11,13
213:7,11,13,22
216:25 218:1
222:11,23
223:6 228:5
231:14 232:9
233:21 234:16
234:18 235:2,7

235:9,9 236:16
236:18,25
238:15 239:18
239:19 240:16
240:22 242:7
242:14,17,24
243:2,6,8
246:12,13,21
246:23 248:19
249:1,9,14
255:7
**trustee** 13:23,24
14:4,18,23
15:4 21:24
30:5 40:18,23
41:2 64:14
65:1,3 101:20
103:19 113:3
114:12 115:13
117:13 118:24
164:9 165:17
168:10,10,15
174:19 175:9
175:17,23
176:3,23 177:2
177:13,17
178:8,11
180:14 182:8
182:19,23
183:2 201:16
205:12 206:1,4
207:18,21
208:9 209:22
209:24 212:2,8
222:10,12,17
222:24 223:7
223:23 225:4
228:6,8 235:14
235:25 236:22
**trustee's** 13:15
14:2 30:1
235:18 255:18
255:19
**trusts** 233:22
**truth** 250:17,18
250:18

**try** 6:25 12:17
67:13 86:2
96:8,10 119:14
119:25 162:20
165:11 196:8
197:16
**trying** 3:14,15
14:25 17:19
39:25 54:18
199:11,12
214:14 229:2
233:19 240:21
**Tuesday** 108:2
**turn** 117:5
130:22
**turned** 154:19
**twice** 93:15 95:9
**two** 12:21 39:4,5
39:7,10 40:12
50:21,25 51:5
51:25 55:15
56:3 71:3,7,12
72:19 73:15,16
78:9 103:15,15
106:9 131:13
133:10,20
134:22 137:12
162:3 171:1
182:18,19
210:18 218:8
218:18 227:9
232:14 240:2
240:16,24
**type** 9:10 12:24
38:18 66:24
91:11 123:18
127:6 139:6
211:4 226:10
234:21 239:4
**typed** 239:4
**types** 3:16 45:8
91:16 128:1
135:4 141:19
195:13
**typewriting**
250:22

**typewritten**
250:20
**typical** 34:20
35:18 71:2
**typically** 13:14
13:18 17:17
37:13 38:22
39:1 43:6
52:20 59:2
71:7 82:19,23
85:16 86:14
89:11 118:9
123:23 136:13
136:17,23
147:25 164:8
231:1
**typing** 227:8
**T-H-A-Y-E-R**
50:7

---

**U**
**uh-huh** 21:9,13
35:7 54:15
67:5 69:9 70:3
70:6,9 71:6
80:23 81:2
82:18 90:11,14
91:6 94:14
97:17 104:3
116:23 119:2,7
119:9 131:4
132:13 177:14
199:16 222:19
240:18,23
247:14 249:10
**ultimately** 93:5
**unable** 158:1
**unapplied** 40:10
40:13,25 41:21
127:3 137:13
**unattached**
218:4
**unclip** 72:14
**underlay** 164:7
**underlined**
212:16

**undersigned** 106:23
**understand** 6:23 7:2 14:25 18:13 54:22 73:21 86:1 94:7 109:16 145:5 184:23 214:14,15 219:6,12 220:21 221:7 224:1 226:24 230:20
**understanding** 35:10 67:21 82:1 88:1 102:7,8 111:21 116:9,12 134:19 164:6 197:9,10 234:10 237:4,7 237:12 242:2 246:3 248:3
**understood** 95:19
**undertaking** 64:10
**unenforceable** 118:11
**unidentifiable** 188:5
**uniform** 88:6 122:1,2 124:3 141:3,3
**unique** 31:9
**UNITED** 1:1
**University** 2:5
**unpaid** 140:4
**unquote** 218:3
**unrelated** 245:13
**update** 21:20 37:18 38:10 62:17
**updated** 83:17
**updating** 63:3

**upload** 30:13
**uploaded** 30:11 31:10,14 37:19
**uploads** 31:12
**upper** 130:24
**use** 9:1,13,22 10:4 28:13 34:1 37:2 39:2 48:19 59:19 60:19,20 61:23 65:16 85:5 219:18 220:3 230:1 246:1
**user** 29:1,11 36:23
**uses** 5:24 6:15 9:10 28:2 74:11 114:24 127:23
**utilities** 154:18

_____ V _____
**v** 253:14
**valid** 116:7
**Valley** 107:9
**valuable** 230:25
**valuation** 83:12 83:17 94:11
**valuations** 48:15
**value** 48:15,23 106:22
**valued** 87:8
**values** 48:19,20 48:21,21
**valuing** 48:22,23
**Vanderlinden** 9:16,19 10:3
**various** 10:8 48:1 52:10 73:8 80:8 165:3
**vehicles** 194:8
**vendor** 81:10 85:11 87:15 96:1 100:11,18 253:20

**vendors** 80:8 81:5,13,15,17 81:22 83:19,21 83:23 84:2,19 85:2,4,5,9 100:24 101:11
**vendor's** 87:17 87:20
**verbal** 7:17,19
**verbally** 84:13
**verbiage** 88:5
**verified** 211:22
**verify** 5:25 24:24 25:2 26:8 46:4 57:15 121:17 187:12 198:19 198:24 223:24 224:12 225:18
**version** 121:3 247:11
**versus** 51:1 55:20 57:18 68:2 81:11 125:14,19 126:20
**vice** 111:8 135:13
**view** 126:13,15 225:17
**viewing** 224:11
**violation** 152:24
**violations** 154:18
**visible** 122:18
**voided** 118:11
**VS** 1:8

_____ W _____
**Wait** 106:5
**waiting** 56:1
**waived** 251:3
**waiver** 128:23
**walk** 171:12 205:3
**walked** 190:3
**want** 7:2 33:3

39:8 56:14,22 73:21 91:3,4 103:14 104:21 116:5 119:24 121:10,20 124:1 125:20 129:7 130:7 132:22 152:18 159:25 160:1 171:13 181:13 187:13 190:6 190:14 191:16 191:18 192:17 192:19 195:24 195:25 196:1 200:4 201:10 206:16 212:10 215:13 224:1,4 225:10 228:15 240:7 242:7 244:7,17,21 245:5 247:9
**wanted** 48:13 83:15 99:12 155:8,19 241:8
**wants** 188:14 192:7 249:20
**warranties** 184:24 185:8
**warrants** 185:12
**Washington** 245:2
**wasn't** 6:25 36:17,18,21,22 155:20 160:17 178:5
**waste** 149:20
**wasted** 155:16
**water** 154:17
**way** 7:3 17:20 38:2 55:15 61:12,17 75:5 77:24 79:1 87:16 121:5 165:19 180:2 181:7 191:3

205:4 220:16 224:2 237:12 241:13 248:22
**ways** 142:16 231:1
**weeks** 227:9
**welcome** 186:23 190:18 192:14
**went** 20:17 42:14 67:13 109:22 192:5 246:22,24 248:2
**weren't** 157:1
**Wernick** 9:17
**we'll** 22:2 98:12 114:14 119:25 121:19 166:23 166:24 187:10 217:5 229:7,12
**we're** 23:23 61:16 104:20 152:7 167:14 168:16 188:2,7 188:8 190:21 192:21 198:7,9 198:16 199:9 203:23 205:6 215:18 224:4 228:10 230:9 244:18 245:15
**we've** 55:25 103:4 158:5 160:9 168:11 172:23 177:8 196:7 204:17 213:23 214:1 224:2 248:23 249:13,15
**whatever's** 204:1
**whipped** 227:5
**Whoops** 226:11 227:14
**wife** 39:24
**wiggle** 224:5

Daphne Mosley                                      October 14, 2009

| | | | | |
|---|---|---|---|---|
| **willing** 227:13 | 76:19 77:10,25 | 191:23 192:1,3 | 244:20,23 | 54:15 67:15 |
| **window** 145:9 | 78:2,21 79:14 | 192:12,14,20 | 245:1,9,14,15 | 72:20 77:25 |
| **windows** 154:16 | 79:25 80:20,24 | 192:23,25 | 245:21 246:3 | 83:7 88:5 94:1 |
| **Wisconsin** 101:9 | 81:3 83:4,8 | 193:11,15,16 | 249:5,18 252:9 | 123:18 131:25 |
| **withdraw** | 86:2,12 88:20 | 194:14 195:17 | **word** 140:15 | 134:11 137:2 |
| 207:16 | 89:25 90:21 | 195:24 196:4,7 | 226:13 227:4 | 162:18 168:14 |
| **withdrawn** | 94:8 95:11,22 | 196:25 197:1 | **words** 7:7 17:17 | 168:25 171:24 |
| 65:20 | 96:8,12 98:15 | 197:15,21,25 | 71:11 86:12 | 180:12 187:6 |
| **withheld** 149:8 | 99:9 101:15 | 198:6,9,13,17 | 104:13 127:9 | 199:24 200:22 |
| **withhold** 233:4 | 104:20,23 | 198:21 199:1,9 | 139:13 | 200:23 209:16 |
| **witness** 1:17 | 109:16 110:3 | 199:11 200:24 | **work** 8:20 37:15 | 220:8 221:13 |
| 7:15 39:4,7,10 | 110:12,17 | 201:9,11 | 50:25 62:23 | 223:14,24 |
| 39:13,22 43:11 | 114:23 115:9 | 202:15,17,21 | 211:3 245:18 | 225:6 226:14 |
| 54:5 56:6,12 | 117:1 119:23 | 203:2,18,22 | **worked** 51:25 | 242:18 247:4 |
| 58:4 62:9 77:6 | 120:6 121:17 | 204:2,17 205:8 | 55:2 | **year** 99:18 145:9 |
| 77:21 80:14 | 123:6,16 | 205:9,20 | **working** 100:15 | 148:2 210:23 |
| 95:17 97:17 | 125:11,13 | 206:24,25 | 201:3 | **years** 5:4,7 9:20 |
| 163:24 179:10 | 127:9 128:4,10 | 207:6,14 208:1 | **works** 93:8,13 | 51:21 135:19 |
| 183:13 185:10 | 129:11,19 | 208:3,7,21 | 95:8 111:23 | 146:19 219:24 |
| 196:3 200:1 | 130:2,8,14 | 209:3,9 210:16 | 112:5,7 246:4 | 232:21 234:11 |
| 216:14 233:18 | 132:8,11,17 | 211:7 212:1,15 | **worth** 48:18 | 240:2,16,24 |
| 250:15,16 | 134:5,9,14 | 212:21 213:5 | **wouldn't** 15:24 | **yellow** 40:10,12 |
| 251:1,3 | 135:3 136:6,11 | 213:23 215:2,9 | 25:23 33:18 | 137:10 209:18 |
| **woman** 107:8 | 136:21 137:3 | 215:12,19 | 92:7 109:4 | 237:24 |
| **Wooten** 2:4,4,14 | 144:5,7 145:12 | 217:5,12,17 | 110:14 114:3 | **yellowed** 204:4 |
| 3:5 9:2 13:23 | 146:3 148:10 | 218:22 219:1,8 | 118:21 119:20 | **yesterday** 77:13 |
| 14:1,5,9,12,16 | 154:11 159:5 | 219:13,23 | 221:25 227:11 | **York** 195:9 |
| 15:20,23 17:9 | 159:24 160:3,6 | 220:2 221:2,8 | 242:10 | 233:21 |
| 17:17 19:21 | 160:8,12 162:4 | 222:2,7,15 | **writing** 147:5 | **y'all** 54:13,18 |
| 20:16 22:14 | 162:7,12,16 | 223:21 224:17 | 148:20 | 55:24 56:14,20 |
| 24:15 26:7 | 163:10,23 | 226:20,24 | **writings** 52:22 | 56:23 71:25 |
| 32:16 33:10 | 166:14,20,23 | 227:2,21 228:1 | **written** 148:6 | 119:24 155:3 |
| 34:3,14,19 | 167:2,4,8,12 | 228:3,14,17,24 | 241:13 | 171:13 189:24 |
| 38:14 39:8,11 | 167:16 169:4 | 229:6,11,17,21 | **wrong** 38:3 | 195:24 |
| 39:14,20,23 | 169:25 170:14 | 229:25 230:12 | 39:24 170:14 | |
| 40:2 46:19 | 170:18 171:5 | 230:15,17 | 171:25 | **Z** |
| 51:3,20 54:3,9 | 171:15 177:7 | 231:23,25 | | **ZIP** 107:5 |
| 54:13,16,17,24 | 181:12 185:20 | 232:1 234:1 | **X** | |
| 55:2,14,23 | 185:21 186:20 | 236:21 237:6 | **X** 148:21 | **$** |
| 56:5,14,19 | 186:23 187:3,6 | 237:13,22 | **xiii** 133:17,18 | **$700** 43:22 44:5 |
| 57:2,6 61:16 | 187:9,15,21,24 | 238:24 239:6 | | 44:12 |
| 62:12,14 64:8 | 188:4,7,11,14 | 239:16 241:5 | **Y** | **$8,631.64** 77:16 |
| 64:22 68:9 | 188:18,25 | 241:11,12 | **Y** 148:22 | |
| 69:4,7 71:15 | 189:8 190:11 | 242:13,20 | **yeah** 7:15 14:15 | **0** |
| 72:4,9,12,19 | 190:18,24 | 243:10,14,19 | 16:23 29:18 | **0007** 57:18 |
| 72:21,22 74:3 | 191:2,6,11,16 | 243:22 244:1,5 | 38:8 45:3 | **03** 106:3 107:7 |
| | | | | 204:22 |

Daphne Mosley                                              October 14, 2009

**05** 42:9,11
**07-80806-WR...**
  1:4
**08** 41:8 58:21
**08-08023** 1:8

---

**1**

**1** 38:12,15 40:3
  41:12 58:5,9
  58:12 59:7,11
  59:21 60:2
  61:3,8,15,16
  61:19 62:6,8
  63:22 64:13,18
  64:23,24 65:2
  65:7 78:1,8
  90:6,20 91:2,7
  91:17 122:9
  124:3 125:18
  126:5 131:9
  132:4,15,18,22
  168:6 206:11
  206:13 207:7,9
  222:7 253:9,23
  254:17 255:7
**1st** 107:7 171:23
  172:20 183:20
  203:18 204:8
**1.800.223.9409**
  2:21 251:24
**10** 59:24 98:12
  98:13 103:5,14
  103:16,25
  104:2 217:21
  223:3 224:8
  226:7 253:23
**10th** 127:12
**10/24** 106:3
**10/24/03** 180:6,9
**10:10** 245:3
**100** 89:22
**101** 254:10
**105** 2:5
**1066** 235:14
**11** 99:6,7 195:18
  254:4

**11:46** 120:2
**116** 254:14
**12** 99:9 101:13
  101:17 104:6
  104:24,25
  113:1,19 121:9
  121:23 122:1
  141:3 145:7
  146:5 147:6
  148:2 167:24
  171:17 172:24
  195:18 200:25
  236:4,5 254:9
**12th** 170:7
  172:10 173:13
  232:5 240:25
**12-month** 145:4
  145:9
**12/31/2009**
  251:20
**12:32** 120:3
**120** 254:16
**121** 254:18
**13** 7:8 12:21
  13:15 15:25
  17:12,18,21
  19:22 21:4
  116:24 153:5
  254:11,15
**13s** 7:10
**130** 254:23
**132** 117:9
**1399** 58:18
**14** 1:14,19 120:4
  120:7 182:11
  250:5 252:5
  253:5 254:15
**14th** 196:22
  203:15,19
  204:22 209:13
  212:9 240:25
**14-99** 59:2
**142** 98:20 254:7
**144** 98:20 254:7
**145** 98:20 254:7
**146** 98:20 254:7

**147** 98:21 254:8
**148** 98:21 254:8
**149** 98:20 254:6
**1499** 58:17,19,20
**15** 121:14,15
  123:14 124:24
  254:17
**15th** 127:9,10
**150** 98:20 236:9
  254:6
**151** 98:20 254:6
**152** 98:20 254:6
**153** 98:20 254:6
**154** 98:20 254:6
**155** 98:20 254:7
**156** 98:21 254:7
**157** 98:21 254:7
**158** 98:21 254:8
**159** 98:19 254:5
**16** 130:12,15
  254:19
**16th** 58:10
**160** 98:19 254:5
**161** 98:19 254:6
**1613** 130:22
**1614** 131:21
  132:11
**1647** 2:20 251:23
**166** 58:9,10
  255:7
**168** 117:2
**16802** 106:24
**169** 117:2 255:11
  256:8
**1695** 2:5
**17** 166:12 167:5
  170:1 197:22
  198:15 207:9
  207:15 224:20
  239:21 254:21
  255:4,9,13,17
  255:23
**17-A** 169:22,23
  172:2 178:15
  188:8 189:2
  192:5 197:22

198:14 202:1
  206:7 207:9
  214:21 215:1,3
  215:20 255:8
**17-B** 208:17,19
  209:11 211:8
  211:23 212:4
  255:12
**17-C** 210:14
  211:8 255:16
**17-D** 224:15
  255:22
**170** 117:2
**171** 117:2
**172** 98:19
**173** 96:13
**178** 96:14
**18** 105:8 169:2,5
  256:4
**18th** 127:13
**19** 105:11,13,20
  244:24 247:10
  256:9
**19th** 251:16

---

**2**

**2** 39:17,18 40:4
  40:10,20 41:11
  41:16 107:17
  107:20,24
  131:6 138:1
  140:10 156:12
  206:12,13,21
  206:21 252:8
  253:11 256:8
**2nd** 60:1
**2.01** 174:1
  183:15 184:11
  201:7 202:15
  222:8
**2.02** 179:17
  207:17
**2.02(iv)** 179:18
**2.03(a)** 240:1
**2:28** 196:5
**2:30** 196:1

**2:39** 196:6
**20** 193:1 196:1
**2001-3** 200:20
**2003** 41:5 60:1
  105:23 117:8,8
  117:9 168:6
  170:7 171:17
  172:21 180:11
  180:22 181:1
  183:20 196:22
  203:15,19
  204:8 209:13
  212:9 231:19
  232:2,5,7,14
  240:25 242:8
  242:15 243:7
  245:24 248:16
  249:2 253:23
  254:17
**2003-1** 101:21
  103:20,21
  119:1 173:10
  180:16,16
  200:21,22
  246:13
**2004** 44:1,3
**2005** 41:18 61:21
  62:4 254:20
**2006** 58:10
**2007** 57:23 60:25
  61:2,21 62:4
  78:1,8 101:1
  103:9 108:15
  117:4,15
  161:15 163:2
  180:20 181:8
  218:14 221:18
  221:22 222:1,3
  231:14,15
  232:11 239:18
  240:19,20,22
  242:10,16
  243:3,8 245:23
  246:7,20
  248:10,24
  249:5 253:13

Allied Advanced Reporting, Inc.                              713.524.6777

Daphne Mosley                                    October 14, 2009

254:10,11
**2008** 65:25 66:16
**2009** 1:14,20
  60:12 245:3
  250:5 251:17
  252:5 253:5
  254:16 256:10
**2026** 107:5
**208** 255:15
**21** 106:1 247:10
**21st** 180:20
**210** 254:22
  255:21
**22** 107:21
**224** 255:25
**228** 254:22
**229.1122** 131:1
**2311** 2:10
**238.44** 42:12,16
**24** 66:3,6,8,19,19
  104:25 105:8
  105:11,13
  110:23,23
  185:3
**24th** 44:1,3,11
  107:9
**244** 256:10
**25** 66:3,6,8
  256:10
**25th** 41:17 245:3
**250** 252:10
**252** 251:22
**254.37** 44:7,9
**265** 170:18
  255:11
**266** 170:19
**269** 65:25 206:7
  207:10
**270** 178:15
  206:17
**271** 215:20
**275** 189:1
**278** 189:1
**280** 255:11
**283** 224:19
  255:25

**284** 255:25
**285** 255:21
**286** 255:21
**287** 208:21
  255:15
**288** 255:15
**29** 196:21
**2923** 117:9

---
**3**

**3** 57:3,4 59:10,15
  60:15 61:24
  65:24 66:6
  107:18 108:4
  122:1 138:12
  138:13,20
  139:4,9 140:12
  252:9 253:13
**3.01** 184:22
**30** 78:10 119:25
  181:22
**30-year** 15:14
**304** 167:7,12
**304.01** 66:15
**304.96** 41:19,21
  42:1,2
**308** 166:18
**31st** 41:8 65:25
**313** 166:10 167:9
  172:24 178:15
  255:7,7,11,15
  255:21,25
**3389** 2:5
**339** 117:9
**35205** 2:10
**36831** 2:6
**36854-4054**
  107:9
**38** 253:10
**39** 253:12
**3922** 117:8
**3924** 117:9

---
**4**

**4** 68:7,10 107:20
  107:24 108:4,7

108:7 131:18
  132:1,11 141:3
  253:15
**4:08** 1:20 249:23
**445.63** 43:23,25
  44:6,8
**45** 210:10,11
  212:8,18
  215:23

---
**5**

**5** 72:1,2,17,22
  139:1 141:17
  143:21 253:13
  253:16
**5th** 57:23
**51** 199:15
**57** 253:14

---
**6**

**6** 73:20,23 75:18
  103:9 161:15
  163:2 253:17
  254:10
**6/21** 108:15
**60** 20:3,7
**60-month** 19:23
**606** 106:25
**61** 200:14
**65** 201:9 233:17
**66** 206:18 233:17
**6603** 107:9
**67** 207:15
**68** 211:9 253:15
**69** 211:10,11

---
**7**

**7** 7:8 76:15,17
  104:25 149:14
  167:11,12
  253:18 254:20
**7th** 42:11 167:6
**7.03** 188:25
**7.07** 189:15
**7/16/2012**
  251:21
**7/31** 66:16

**70** 239:21
**700** 43:24 44:8
**7039** 251:20
**71** 240:4
**713.524.6777**
  2:21 251:24
**72** 253:16
**73** 253:17
**76** 253:18
**77** 253:19
**77006** 2:20
  251:23
**77061** 1:24
**79** 253:22

---
**8**

**8** 77:7,8 253:19
  254:11
**8th** 117:3
**8:04** 105:25
**8:05** 106:4,8
**8:18** 1:20
**8181** 1:23
**83** 247:12
**860G(a)** 235:22
**8811** 236:2

---
**9**

**9** 79:23 80:1,13
  81:14 83:20
  96:5 151:5
  153:3 156:3
  157:2 235:22
  253:20 256:8,8
**9.01** 235:4
**9.02** 238:18
  239:2,4
**9:40** 56:17
**9:52** 56:18
**90** 19:13,16,25
  20:8,13 82:21
  178:23 210:9
**90-day** 20:21
**92605** 106:25
**98** 253:25
**99** 254:8