## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

**In re:**

| | |
|---|---|
| **JONATHAN R. THORNE and** | **BANKRUPTCY** |
| **DARLENE S. THORNE, Debtors** | **CASE:** |
| | |
| | **09-11763-DWH** |
| | **CHAPTER 13** |

====================================================

**JONATHAN R. THORNE and**
**DARLENE S. THORNE, Debtors**
**LOCKE BARKLEY, Chapter 13 Trustee for the Northern**
**District of Mississippi**

       **Plaintiffs,**

**vs.**

                **Adversary Proceeding Number:**

                **10-01172-DWH**

**PROMMIS SOLUTIONS HOLDING CORPORATION,**
**GREAT HILL PARTNERS, LLC**
**MORRIS, SCHNEIDER AND PRIOR, now known as**
**JOHNSON & FREEDMAN,**
**LENDER PROCESSING SERVICES, INC.,**
**LPS DEFAULT SOLUTIONS, LLC**

       **Defendants,**

====================================================

## THIRD AMENDED COMPLAINT

The plaintiffs individually and on behalf of all other persons similarly situated bring this, their third amended class action complaint against the previously named defendants Prommis Solutions Holding Corporation, Morris Schneider and Prior, Johnson and Freedman, and Lender Processing Services, Inc. and LPS Default Solutions, LLC for the purpose of adding additional defendants, adding further factual allegations to their complaint and adding additional causes of action as follows:

## I.    JURISDICTION AND VENUE

1.    This court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) as to all claims and causes of action asserted in this complaint.

2.    All causes of action are based on the Bankruptcy Code of the United States.

3.    Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## II.   PARTIES

4.     Plaintiffs Jonathan R. Thorne and Darlene S. Thorne

(hereinafter "The Thornes") are resident citizens of the State of Mississippi

and are debtors in Case No. **09-11763-DWH** filed in this Court.

5.     The additional plaintiff added by this amendment is Locke

Barkley, the standing Chapter 13 Trustee for the Northern District of

Mississippi who is joined as an additional plaintiff and who sues on behalf

of herself and a class of persons defined as all Chapter 13 Trustees in the

United States of America.

6.     The defendant Prommis Solutions Holding Corporation is a

publicly traded company with its principal place of business located at 400

Northridge Road Atlanta, Georgia 30350.  Throughout the balance of this

complaint this defendant will be referred to as "Prommis Holdings".  This

defendants' proposed stock ticker symbol is PRMS.  This Defendant may be

served with process by serving its CEO, Denis A. Brosnan, Jr. at the address

listed above.

7.     The defendant Great Hill Partners, LLC is a venture capital

company who owns the majority interest in Prommis Holdings.   Great Hill

Partners, LLC's principal place of business is One Liberty Square Boston,

Massachusetts 02109.  This Defendant may be served with process by

serving one of its Managing partners, who is also a director of Prommis

Holdings, Matthew T. Vettel at the address listed above.  This defendant will

be referred to throughout the balance of this complaint as "Great Hill

Partners" or "Great Hill".

8.      The defendant Morris, Schneider and Prior was a law firm

based principally in the State of Georgia.  This defendant is now known as

Johnson and Freedman.  This Defendant represents to the public that it

provides legal services throughout the southeastern United States with

respect to bankruptcy and foreclosure services to various national creditors.

This defendant is alleged, upon information and belief, to be owned by the

defendant Prommis Holdings.  Johnson & Freedman's principal place of

business is 1587 Northeast Expressway, Atlanta, Georgia 30329.  This

defendant may be served with process by serving its Senior Managing

Partner, Larry W. Johnson, at the address listed above.

9.      The defendant Lender Processing Services, Inc. (hereinafter

"LPS") is a publicly traded corporation that provides mortgage services to

various parties in the mortgage industry.  LPS has its principal place of

business at 601 Riverside Avenue Jacksonville, Florida 32204.  LPS does

business in every bankruptcy court in the United States of America by agent

or employee including this Court.  This company's stock symbol is also

LPS.  This defendant may be served by delivering service of process to Jeffery S. Carbiener, President and CEO, at the address of this Defendant listed above.

10.    The defendant LPS Default Solutions is a wholly owned subsidiary of LPS.  LPS Default Solutions has its principal place of business at 601 Riverside Avenue Jacksonville, Florida 32204.  LPS Default Solutions provides management of mortgage loans as a subservicer to various national mortgage servicers when a consumer's loan reaches a predetermined state of default under the contracts which are in place between LPS Default Solutions and its clients the mortgage servicers as will be more fully set out herein.  LPS Default Solutions may be served by serving process upon Jeffery S. Carbiener, President and CEO, at the address of this Defendant listed above.  This defendant will be referred to hereinafter as "LPS Default".

11.    The first added defendant, Prommis Solutions, LLC (hereinafter "Prommis Solutions") is a limited liability company whose principal place of business is located at 400 Northridge Road Atlanta, Ga. 30350.  This Defendant may be served with process by serving its CEO, Denis A. Brosnan, Jr. at the address listed above.

12.    The second added defendant, Mr. Daniel D. Phelan (hereinafter "Dan Phelan" or "Mr. Phelan" or "Phelan") is an attorney licensed to practice law in the State of Georgia with the firm of McCalla Raymer, LLC. Mr. Phelan is also the chairman of the Board of Prommis Holdings.  Mr. Phelan may be served with process at the following address 1544 Old Alabama Road Roswell, GA 30076.

### III.    NATURE OF THE CASE

13.    This case is brought as a class action complaint to address the wrongdoing of the defendants.

14.    The plaintiffs allege that the defendants to this action are involved in serious systemic abuses of the bankruptcy rules, code and process in their roles as attorneys and vendors to creditors.

15.    The Plaintiff class representatives and the Class members consist of those persons other than the Court who have been harmed by the conduct set out herein.

16.    The Thornes' seek to represent a class of persons consisting of those natural persons who were debtors in Chapter 13 proceedings where the defendants engaged in the unlawful conduct complained of herein causing injury to the class as more fully set out below.

17.    Locke Barkley seeks to represent a subclass consisting of all Chapter 13 Trustees in the United States of America as more fully set out herein.

18.    There are three categories of defendants. The first is comprised of LPS and LPS Default.

19.    The second includes Prommis Holdings, Prommis Solutions and Great Hill Partners.

20.    The third category is the law firm Johnson & Freedman (hereinafter "Johnson").

## IV.    FACTUAL ALLEGATIONS OF WRONFUL CONDUCT BY THE DEFENDANTS

### a.    EXPLANATION OF THE ROLE PLAYED BY LPS AND LPS DEFAULT

21.    LPS provides technology and related services to mortgage servicers through its umbrella of wholly owned subsidiaries.

22.    Through this group of subsidiaries LPS attempts to provide as many services as possible for a fee to its mortgage servicing clients, a noble corporate ambition.[1]

23.    A typical home loan secured by a mortgage is made by a loan "originator;" i.e., a lender such as a bank or correspondent mortgage lender.

---

[1] See attached Exhibit 1 an LPS investment presentation to Shareholders

24.     Many loan originators promptly sell their loans into the secondary markets. This point of origination is where LPS attempts to enter its relationship with mortgage related companies through the licensing of its products.

25.     One of LPS' most successful products is a "cradle to grave" software system which LPS refers to as MSP.[2]

26.     One of the functionalities of this software product is an "onboarding" service which allows newly originated loans to immediately be input to the MSP software system which places new mortgage loans onto MSP "at the cradle of its birth".

27.     Because MSP is the dominant software product in this marketplace LPS uses this base product as an opportunity to sell or provide additional services to companies involved in the mortgage marketplace.

28.     Within the mortgage marketplace the LPS software product MSP holds a dominant portion of market share for mortgage servicing software used by mortgage servicers.[3]

29.     Unlike originators of mortgages who often simply "make loans" and then transfer them into the secondary mortgage market, mortgage servicers actually administer the day to day management of loans for a fee.

[2] See attached exhibit 2 the 2009 Annual Report filed with the SEC.
[3] See generally exhibit 2 to this complaint.

30.     Mortgage servicers are charged with the duty to collect payments, interact with borrowers, or take action when buyers default on loans.

31.     The largest mortgage servicer manages in excess of $2 trillion in loans.

32.     Some mortgage servicers, in addition to contracting with LPS for licenses to use the MSP software to manage the day to day servicing functions of the loans it manages, contract with LPS Default to perform specific mortgage servicing tasks related to delinquent, defaulted or bankrupted mortgage loans.[4]

33.     LPS claims that its subsidiary, LPS Default, is the nation's leading provider of "default solutions" to the mortgage servicing industry.

34.     LPS has stated in a filing with the Securities & Exchange Commission that:

> "We have numerous customers in each category of service that we offer across the mortgage continuum. A significant focus of our marketing efforts is on the top 50 U.S. banks, although we also provide our services to a number of other financial institutions, mortgage lenders, mortgage loan servicers, attorneys, trustees and real estate professionals."[5]

---

[4] See generally exhibits 1 and 2 to the complaint.

[5] Exhibit 2 infra.

35.    As stated earlier, LPS' MSP software program has been highly profitable and hugely successful as a mortgage servicing platform. According to LPS' own SEC filings, half of all loans by volume in the United States are managed on the MSP software program.

36.    This remarkable market share for LPS' servicing platform has provided it with the opportunity to have business relationships with the largest mortgage servicers by volume in the United States.  However, from this opportunity springs the beginnings of the problems that give rise to this litigation.

**b.    SO LPS SAYS TO A LAW FIRM "HELLO FAUST, MY NAME IS MEPHISTOPHELES"**

37.    As the Court will hear in this case, the fee income for default services is billions of dollars annually to the industry's top players.

38.    Because LPS had existing contracts with mortgage servicers who manage millions of loans through its MSP software, LPS was and is in a position of close connectedness to its mortgage servicing clients.

39.    LPS' largest competitor for default services (First American), by its own estimations, is approximately one-quarter the size of LPS' subsidiary LPS Default.

40.     As with most other great monopolistic business models LPS' huge advantage in market share springs from an unfair competitive advantage.

41.     Unfair competitive advantages generally take one of two structures (1) those advantages which spring from innovation or (2) those advantages which spring from unfair business practices.  LPS' advantages spring from the second structure.

42.     The guidelines for mortgage servicing published by the GSE's (Fannie and Freddie) generally take a dim view regarding referring work or services for a fee or a kickback.

43.     However, the business structure created by LPS Default with the mortgage servicing clients of LPS, its parent, created just such an arrangement.

44.     To gain its incredible market share in the default servicing industry LPS had one thing it could offer that its competitors could not, the ability to perform its services for free.

45.     In its own sworn testimony LPS Default acknowledges that it does not charge the mortgage servicer clients of its parent, LPS, any fee of any type for the services LPS Default provides to them through its contract with the mortgage servicers called a "Default Services Agreement" or DSA.

46.    This testimony is directly quoted from the 30(b)6 deposition testimony[6] of LPS Default by William Newland:

> newland61609 - Vol. I, (Pages 155:3 to 155:23)
> 3      Q    So I just want to be sure.  What you're
> 4    testifying to is that there is no compensation ever
> 5    paid by the servicer to LPS Default Solutions for all
> 6    this work that it does on behalf of the servicer with
> 7    respect to the foreclosure?
> 8      A    No.
> 9      Q    There is compensation or there is not
> 10   compensation?
> 11     A    No, there's no compensation.
> 12     Q    Is it your testimony then that the only fees
> 13   which LPS Default Solutions collects with respect to
> 14   the foreclosure of any given loan is the
> 15   administrative support fee charged to the network
> 16   attorneys?
> 17     A    Yes.
> 18     Q    And the division of LPS Default Solutions
> 19   which we are here about today and which you are
> 20   testifying as a 30(b)(6) representative, the only
> 21   source of income it derives for its work with respect
> 22   to foreclosure is the administrative support fee?
> 23     A    That's my understanding.

47.    The standard language in the DSA sets forth that LPS Default will manage all loans for the servicer which reach a certain level of delinquency or where a borrower files a bankruptcy petition.[7]

---

[6] Attached as exhibit 3 to the complaint

48.     The DSA is a form contract which, upon information and belief, contains standard language, definitions, terms and conditions.

49.     One of the standard definitions in the DSA defines the term "Fidelity Network" (LPS Default is formerly known as Fidelity National Foreclosure & Bankruptcy Solutions).

50.     That definition states that the servicer *is required to select* attorneys involved in the "Fidelity Network" at the servicer's discretion, who are *retained and managed by LPS Default* to handle foreclosures "or otherwise provide services in accordance with the DSA".

51.     The DSA also provides in Section 2.1(a)(i) that LPS Default will "provide the services to the servicer in accordance with this Agreement".

52.     Section 2.5 of the DSA requires the servicer to select a law firm who has executed a "network agreement" with LPS Default and "LPS Default shall be responsible for managing Fidelity Network Law Firms". This section goes on to provide that "Prior to performing any services, all Network Firms must have entered into the Network Agreement, and the servicer Local Counsel Agreement (the "LCA") directly with the servicer. The LCA is attached to the DSA as Exhibit B.

---

[7] Lead Counsel for the Plaintiffs has personal knowledge of the contents of the DSA through his litigation with LPS and LPS Default in other cases.

53.     In Schedule B to the DSA there is a document titled "The servicer Addendum to the Fidelity Network Agreement" and states in pertinent part that "Fidelity (LPS) and the Network Firm have entered into a network agreement" and "Fidelity has entered into an agreement (the "agreement") with the servicer whereby Fidelity (LPS) has agreed to perform various ***legal services*** (emphasis supplied) for the servicer ***that include mortgage foreclosures, bankruptcies and other loan default services*** (the "services").

54.     Section 3.3 of the DSA states that both the servicer and LPS Default agree not to disclose the DSA outside of their respective organizations without the prior, written permission of the other party.

55.     Section 5.4(e) of the DSA is a representation and warranty of LPS Default to the servicer that it is not the subject of investigation or litigation relating to claims that LPS Default is involved in (i) the unlawful referral of foreclosure, bankruptcy, or eviction matters, (ii) the unauthorized practice of law, and / or (iii) unfair or deceptive trade practices in the provision of the services set forth in the agreement.

56.     In schedule A of the DSA Fidelity agrees that it shall perform the following non-exhaustive list of tasks for the servicer related to foreclosures:

       a.  Refer imaged documents and cover sheet to local counsel

          (which initiates the foreclosure proceeding).

       b.  Execute standard documents on the servicer's behalf.

       c.  Provide timeline management.

       d.  Prepare bids per the servicer's instructions.

57.    LPS Default has previously given sworn testimony to the effect that there is a DSA between each mortgage servicer and LPS Default for whom LPS Default provides services.

58.    In addition to the DSA, there is another central contract in this arrangement.   This agreement is called a network agreement and it is executed between LPS Default and their "network law firms" such as the defendant Johnson and Freedman.

59.    The network agreement sets forth the services LPS Default provides to the lawyers and the fees that the lawyers pay LPS Default.[8]

60.    The attorney's fees that the servicer agrees to pay the network firms negotiated by LPS Default for the network firms and listed in the DSA under Schedule D.

---

[8] Attached as exhibit 4 to the complaint is an exemplar network agreement which is not subject to any confidentiality agreements or protective orders.

61.     From those fees negotiated for the network firms by LPS Default in the DSA, the network firms agree to pay LPS Default two fees, a technology fee and an administrative support fee.

62.     The amount of the administrative support fee is determined by LPS Default and is due from the lawyers "at the time of referral" of a bankruptcy matter for which the administrative support fees are due.

63.     The servicers pay no money to LPS Default for the provision of these services under the DSA.

64.     Instead, LPS earns all of its income from the fees paid to it by network firms from the attorney's fees charged by the network firms to the servicers.  William Newland 61609 - Vol. I, (Pages 150:21 to 152:4) and (Pages 154:8 to 156:9)

65.     This would include of course, those fees associated with a motion for relief from stay, a plan review fee and a proof of claim fee in the Bankruptcy Court.

66.     Because LPS Default made the offer to provide these services for free to mortgage servicers, the vast majority of national mortgage servicers were faced with the proverbial "offer they could not refuse".

67.     As one would logically expect, the national mortgage servicers leapt at the chance to dump all their problem loans on LPS Default for free.

68.     The result of the contractual arrangements found in the DSA left LPS Default with the lion's share of the market for "default services" as attested to by LPS in its SEC filings.

69.     The effective use of the DSA's between LPS Default and the national mortgage servicers resulted in LPS Default having under its control and concurrent access the vast majority of the multibillion dollar default services fee market in the entire country.

70.     This effectively put LPS Default in the position of Mephistopheles to its "Network Firms" role of Faust.

71.     LPS Default used its offer to the national mortgage servicers to manage these defaulted loans "for free" to capture the lion's share of the default mortgage servicing market for its LPS Desktop software product.

72.     LPS Default then extended its Faustian deal to the various creditor's rights law firms who executed the aforementioned "Network Agreements".

73.     According to the Plaintiffs' best information approximately 200 law firms accepted this offer nationally fully understanding that they were agreeing to split fees with non-lawyers for the referral of legal matters.

74.     LPS Default's offer to the firms such as Johnson & Freedman was simple.   LPS would provide a large volume of legal work on the

condition that the firms become "Network Firms" and execute "Network Agreements" whereby they would illegally share fees with the law firms that LPS Default made referrals to in violation of law.

75.    The deleterious effects of this arrangement in retrospect are likely already apparent to the Court when it considers the numbers of firms who no longer represent creditors and the consolidation of creditor representation in just a few high volume firms.

76.    Under a typical LPS Default "Network Agreement" there is an express fee splitting arrangement such as the following (the actual fees in a particular Network Agreement depend on factors such as the fees permitted by such quasi-governmental entities such as Fannie Mae at any particular time in addition to the fees negotiated in the DSA by LPS Default for the Network Firms which become "exhibits" to the Network Agreements):

| Bankruptcy Fees (a similar fee arrangement exists for foreclosure fees) | Fee billed to "Client" (i.e., the mortgage servicer) | Fees paid by attorney to LPS |
|---|---|---|
| Objection to Plan/Defense of Proof of Claim<br>  a.  Objection Resolved<br>  b.  File Review | $200.00<br>$100.00 | $50.00<br>$50.00 |

| | | |
|---|---|---|
| Motion for Relief (Mfr):<br>  a.  Mfr Complete<br>  b.  Mfr prepped or<br>     filed<br>  c.  File Review | $600.00<br>$400.00<br>$200.00 | $150.00<br>$100.00<br>$100.00 |
| Motion for Relief<br>(FHLMC Chapter 7)<br>(MFR)<br>  a.  MFR Complete<br>  b.  MFR prepped or<br>     filed<br>  c.  File Review | $400.00<br>$300.00<br>$200.00 | $150.00<br>$100.00<br>$100.00 |
| Ex Parte Order | $0.00 | $0.00 |

77.    In its Network Agreements, LPS Default and the Network Firms attempt to disguise what are in fact an attorneys' fee sharing and referral agreements by characterizing the fees paid by the attorneys to LPS Default as "administrative fees."

78.    The implication is that the "administrative fees" are paid to LPS Default for administrative services it provides the Network Firms.

79.    However, the Network Agreements make clear that the "administrative services" performed by LPS Default are for LPS Default's benefit or are the services that a mortgage servicer provides to the *loan owners* as agents for the owners.

80.    The Network Agreements state that LPS Default shall be considered the agent of each servicer/investor client of LPS Default.

81.    As the agent for loan owners and mortgage servicers, LPS Default performs tasks required of any lender interacting and communicating with an attorney representing the lender after a debtor has defaulted, such as providing the attorney with a copy of the loan file.

82.    The specific "services" LPS Default promises to provide in the Network Agreements are the following:

A.    LPS DEFAULT shall maintain a national network ("Network") of service oriented attorneys who handle Referrals; i.e., default matters referred by LPS DEFAULT to a law firm.

B.    LPS DEFAULT shall develop and implement marketing services to obtain clients for the Network:

C.    LPS DEFAULT shall prepare and deliver complete Referral packages to the Firm (i.e., a Network Firm);

D.    LPS DEFAULT shall monitor the Referrals for compliance with investor and client due diligence guidelines;

E.    LPS DEFAULT shall facilitate client communication and provide per event, per loan and portfolio specific reports to clients regarding Referral status;

F.    LPS DEFAULT shall maintain loan data and documentation in client files and computer systems;

G.    LPS DEFAULT shall facilitate judgment figure calculations as applicable;

H.    LPS DEFAULT shall calculate and process the VA 567 form and maintain the responsibility on providing this to the VA in the appropriate timeframes, when applicable;

I.    LPS DEFAULT shall facilitate the calculations of all bids and provide them to the Firm in a timely manner;

J.    LPS DEFAULT shall prepare and mail all HUD Occupancy letters to the mortgagor, mortgagee and HUD, as applicable;

K.    LPS DEFAULT shall facilitate the ordering of all broker's price opinions and appraisals, and provide them to the appropriate parties, when applicable;

L.    LPS DEFAULT shall maintain all direct contact with the loan servicing customer and work with the customer on processing appropriate information requested by the mortgagor. Such cases

would include working with the collection/loss mitigation department on approval for Deed in Lieu's, short pays and repayment plans and the like;

M.    LPS DEFAULT shall maintain contact with investors, agencies, mortgage insurance companies and other appropriate signatory offices to obtain executed documents needed in the foreclosure, bankruptcy, or other action'

N.    LPS DEFAULT shall request all VA cut off extensions if advised by the Firm that we are unable to meet the required timeframes, when applicable;

O.    LPS DEFAULT shall request all HUD first action extensions if advised by the Firm that we are unable to meet the required timeframe, when applicable;

P.    LPS DEFAULT shall prepare and track the filing of any Proof of Claim required in an applicable bankruptcy;

Q.    LPS DEFAULT shall oversee the plan review process in connection with an applicable bankruptcy;

R.    LPS DEFAULT shall compile figures and financials for any bankruptcy Referral;

S.    LPS DEFAULT shall assemble the loan documents or any bankruptcy Referral;

T.    LPS DEFAULT shall compile, scan, and email all necessary information to the Firm;

U.    LPS DEFAULT shall monitor the status of an applicable motion for relief from stay;

V.    LPS DEFAULT shall assist in the research of billing inquiries and breakdowns;

W.    LPS DEFAULT shall order valuations, as applicable;

X.    LPS DEFAULT shall facilitate the calculation of post petition and contractual reinstatement figures;

Y.    LPS DEFAULT shall approve agreed order terms;

Z.    LPS DEFAULT shall track and monitor agreed order payments.

AA.    LPS DEFAULT shall track and review the final bankruptcy order;

BB.    LPS DEFAULT shall when requested close the client's bankruptcy tracking system;

CC.    LPS DEFAULT shall provide direction to the Firm for institution or reinstitution of a foreclosure action after the appropriate

bankruptcy issues have been resolved to permit same, when applicable;

DD.   LPS DEFAULT shall monitor the status of a replevin action, when applicable;

EE.   LPS DEFAULT shall endeavor to standardize all processes and procedures requisite to managing defaulted loans form its multi-loan servicer, multi-platform customer base to provide operational and communication efficiencies to the Firm.[9]

83.    The attorney fee splitting and referral agreements between attorneys and a company that is not licensed to practice law are illegal under the laws of every state in the country.

84.    The attorney fee splitting and referral agreements are also a violation of Rule 2016 of the U.S. Bankruptcy Code.

85.    The attorney fee splitting and referral agreements are also a violation of Section 504 of U.S. Bankruptcy Code.

86.    The attorney fee fixing provisions of the Network Agreement are a criminal violation of 18 U.S.C. § 155.

87.    These agreements also constitute a violation of 11 U.S.C. § 1362(a).

---

[9] See generally exhibit 4 to the complaint.

88.    Creditors routinely recover attorneys' fees for legal services performed in Chapter 13 bankruptcy proceedings, including motions for relief from stay.

89.    Those fees are paid from the estate of the bankrupt.

90.    In the underlying bankruptcy proceeding the creditor brought a motion for relief from stay and was awarded attorneys' fees of $600.00.[10]

91.    Pursuant to the Network Agreement LPS Default received a portion of these fees.

92.    When Network Firms, including Johnson & Freedman, apply for attorneys' fees in bankruptcy proceedings, those firms do not disclose to the courts that a substantial portion of the fees requested will be paid to LPS Default.

93.    This fee sharing arrangement is intentionally concealed and the Network Agreement requires both sides to keep the fee sharing arrangement confidential.

94.    The net result is that LPS Default and its network firms intentionally and fraudulently mislead the Bankruptcy Courts, the bankrupts and their attorneys as well as the Bankruptcy Trustees as to the actual amount of attorneys' fees incurred by the creditors.

---

[10] The Motion for Relief from Stay filed by Johnson and Freedman is ECF Doc 22 in the main bankruptcy case.

95.    Further, LPS Default and its network firms intentionally and fraudulently mislead the Court, the debtors, their attorneys and the United States Trustees about the reasonableness and necessity of these fees.

96.    Furthermore, LPS and its Network Firms assiduously maintain the Network Agreements under a cloak of secrecy.

97.    When debtors request copies of any such agreements during attempts to contest the reasonableness or necessity of these fees and charges, LPS Default and the Network Firms claim that they contain business proprietary secrets and thus are protected by a privilege of privacy, when in fact these defendants' intention in keeping the agreements secret is to prevent disclosure of their illegal practices.

### c.    PROMMIS HOLDING, PROMMIS LLC, AND GREAT HILL PARTNERS ILLEGALLY SPLIT LEGAL FEES AND PRACTICE LAW IN AN ARRANGEMENT GREATLY FACILITATED BY DAN PHELAN

98.    According to information published by Great Hill Partners, the investment firm began seeking an opportunity to capitalize on the expected collapse of the American housing market as early as 2005.[11]

99.    Apparently, Great Hill Partners became enamored with the business model of their co-defendants LPS and LPS Default.

---

[11] See exhibit 5 to the complaint, a cached post to Great Hill Partners' website describing this deal.

100.   Great Hill Partners determined that the best way to capitalize on the coming housing downturn was to engage in the illegal practice of law through the purchase of four major national creditor's firms who all also happened to be "network firms" of LPS Default.[12]

101.   To this end, Great Hill Partners along with Dan Phelan created an arrangement where Great Hill Partners would buy the "non-legal" assets of McCalla Raymer for $137 million dollars in what these parties termed a "spinout" from the law firm.

102.   These parties described the operations which became Prommis Solutions as being "co-mingled" inside a working law firm.

103.   This "spinout" was actually the operations of the law firm which were being carried on by law firm employees.

104.   The primary purpose of this transaction was to provide Mr. Phelan with liquidity for the national business expansion of Prommis.

105.   These parties defined the non-legal assets as approximately "everything but the lawyers and their licenses" and set forth several interrelated agreements including "contribution agreements" which the parties did not file with the SEC containing more complete descriptions of those things actually purchased by Prommis from the law firms.

---

[12] See generally Exhibit 6 to the complaint, the registration statement filed with the Securities and Exchange Commission by Prommis Holdings dated June 21, 2010.

106.   Great Hill purchased the employees, the phones, the computers, the client contacts, the furniture, the fixtures and the "goodwill", etc. of the firm.

107.   In exchange for this purchase McCalla Raymer agreed to use this new company (which consisted of McCalla Raymer's entire non-legal staff) as the exclusive service provider of all mortgage processing services for a term of 20 years with options to renew the agreement further.

108.   Apparently this proved to be such a successful arrangement that this original purchase which had been named "MR Default Services" was renamed Prommis Solutions and Great Hill, along with Mr. Phelan's help, negotiated the purchase of three other "Network firms" including the defendant Johnson & Freedman.

109.   The purchase of these four "Network firms" was the direct and proximate result of Great Hill Partners investing over $250 million in the purchase of these four law firms "non-legal assets".

110.   These parties freely admit that there are structural problems with this transaction where the law firms were purchased by these defendants.[13]

---

[13] See generally the Risk Factors discussed in Exhibit 6 to the complaint.

111.   In the registration statement filed by Prommis Holdings related to its proposed initial public offering Prommis Holdings states that the services that Prommis Solutions provides to its purchased law firms have been deemed to be the practice of law in many instances.

112.   Nevertheless, the incredible cash flows and profit opportunities presented by this "high-speed and high-volume" default servicing business caused all of these parties to cast aside the concerns over the illegality of this arrangement.

113.   In its desire to shield Great Hill from the liability its actions were bringing on itself, Great Hill sought to create a corporate structure which would provide the requisite control over this transaction but would appear to be a legitimate corporate shell for this otherwise illegal conduct.

114.   Great Hill Partners hoped that structuring the Prommis transaction in this manner would protect it from legal liability for its intentional conduct and actions in the creation of this illegal enterprise.

115.   Great Hill Partners intent in structuring this transaction in this manner was to manufacture for itself "cover" in the form a controlled corporation which could be easily cast aside in the event legal or regulatory authorities came after this transaction.

116.   In effect Great Hill needed absolute control but in the form of a separate corporate structure which could be discarded in a quick and dirty bankruptcy filing if the deal went bad without Great Hill being subjected to liability directly for its wrongful conduct.

117.   To accomplish this illicit purpose, Great Hill structured the Prommis transaction in a holding company fashion.

118.   Great Hill Partners created Prommis Holdings for the purposes of being the holding company which first purchased the law firms[14] and then as a condition of that purchase required the law firms to contract with its subsidiary Prommis Solutions for an exclusive twenty year term.[15]

119.   Prommis Solutions is the subsidiary entity which has executed the contracts to perform the services described herein for the purchased law firms.

120.   Prommis Solutions is actively and constantly engaging in the unauthorized practice of law.

121.   As a result of these contractual relationships Prommis Solutions is engaged in the systemic violation of the Rules and Code of the Bankruptcy Court.

---

[14] See ECF Doc 26-1 to this action which is a Bill of Sale to MR Processing Holding Corp. now known as Prommis Solutions Holding Corporation.  The Plaintiffs adopt and incorporate this document as if fully set out herein.
[15] See ECF Doc 26-3 to this action section 4.1. The Plaintiffs adopt and incorporate this document as if fully set out herein.

122.   Prommis Solutions is also actively engaging in fraud on the Court in the filings and pleadings prepared and filed by Prommis Solutions and Johnson & Freedman.

123.   Great Hill Partners structured the ownership and control of Prommis Holdings and Prommis Solutions in such a fashion that Great Hill dominates and controls both of these entities.

124.   This domination and control is so complete that Great Hill has de facto control over both of these entities employing the Rockefeller corporate mantra of "control everything".

125.   This structure was created as a corporate sham for an illegal purpose in an effort to make these companies appear independent when in fact Great Hill maintains complete control over its quarter billion dollar investment.

126.   This structure gives Great Hill Partners complete control over these entities while attempting to shield Great Hill Partners from the liability for these entities facially illegal actions.

127.   The entire business purpose and model of Prommis Holdings and Prommis Solutions is rooted in illegality in that the primary business purpose of these corporations is threefold:

    a.  Have these corporations purchase law firms.

31

    b.  Have these corporations undertake the practice of law.

    c.  Illegally split fees with its purchased law firms.

128.   By use of this "spinout" mechanism Great Hill and Prommis Holdings were able to add another layer of undisclosed fee-splitting and fee-sharing to an industry already familiar with the existing fee-splitting scenario involving the typical network firm agreement and LPS Default.

129.   The flow of work and money that transpires as a result of these contractual relationships can be explained by the following subparts of this paragraph as follows:

    a.  LPS Default automatically and without human involvement "pushes" mortgage loan accounts from its mortgage servicer client's servicing software to its Desktop software product when the loan reaches a predetermined state of default.  This activity occurs pursuant to the terms of the DSA between LPS Default and the mortgage servicer.

    b.  LPS Default's software product referred to as "Desktop" then automatically compiles a "referral package" from the documents pushed from the servicer to Desktop and electronically refers the matter (in this case a bankruptcy matter) to the Network firm for the State where the property

is located.   The Network firm is selected by the mortgage servicer at the time of executing the DSA from a list of law firms who have executed a Network agreement with LPS Default.

c.  Pursuant to the terms of the Network Agreement, the Network Firm becomes obligated to pay a referral fee in the form of an "administrative support fee" at the time of the referral.   Such fee is due and payable 30 days from the date of the referral.

d.  The express terms of the Network Agreement describe the fees to be charged by the Network firm to the mortgage servicing client in a two column format.

e.  These first column heading is titled "Fees Billed to Client" above this parenthetical (Client Amount).

f.  The second column heading is titled "Fees paid by Atty to Fidelity" above the parenthetical (Admin Fees).

g.  From the moment that the matter is referred to the network firm from Desktop everything that happens on that matter is tracked by LPS Default.

h. This tracking is so extreme that LPS Default actually monitors how much time it takes the network firm to accept the referral and thereby become obligated to pay the fees to LPS Default.

i. In the case of a motion for relief from stay, for many mortgage servicers and network firms, LPS Default actually prepares this pleading and delivers it to the network firm through its Image Management module.

j. In cases where LPS Default prepares the pleading and delivers it to the network firm LPS Default monitors how long it takes the network firm to actually file the pleading.

k. LPS Default's ranking system for its network firms (called an APR score) rewards only how fast the firm works.[16]

l. Thereby this structure financially incentivizes the firm to accept the pleadings prepared by LPS Default and file them as their own.

m. Once the pleading is filed LPS Default monitors the Court file to determine the date of hearing and LPS Default

---

[16] See generally exhibit 3 hereto.

approves the contents of the agreed Order that is submitted
to the Court.

n.   LPS Default then monitors the payments after the future
default order and instructs the network firm when to declare
a default under the terms of the agreed Order and begin
foreclosure proceedings.

o.   It is important to note that when LPS Default and its
network firms push a debtor out of bankruptcy through the
post petition management of the bankruptcy account that
LPS Default and the network firms get to charge an
additional round of fees for the foreclosure which
immediately follows their activities in forcing the debtor out
from under the protection of the Bankruptcy Court.

130.   The import of the prior paragraph and its subparts is that in the
typical industry relationship between LPS Default and the other
approximately 200 network firms who are not owned by an intervening
corporation the flow of work and money looks like this:

LPS Default Solutions (automatically receives referrals via terms of
DSA) →(refers legal matter to) → Network Firm → (payment of referral
fees by network firm to) → LPS Default Solutions

131.   This model of automated and computerized efficiency has been fine-tuned to make LPS Default a multibillion dollar subsidiary of LPS wherein every dollar in revenue earned by LPS Default is the proximate result of an illegal fee splitting relationship with its network firms.[17]

132.   However, the relationship created by Great Hill's founding and funding of Prommis Holding and Prommis Solutions skews this picture further and creates another level of fee splitting and undisclosed sharing of compensation that while modeled after LPS Default's relationship is even more blatant and brazen.

133.   The scenario created by Prommis' interjection into the equation is now further slanted as follows:

LPS → (referral of legal matter) → Prommis Solutions→ (referral to Prommis Solutions firm which is also a network firm) → Johnson & Freedman → (Payment of Referral Fees by Johnson & Freedman) → Prommis Solutions → (Payment of Referral fees to LPS Default by Prommis Solutions)

134.  Upon information and belief, the referral fees paid by the network firm in the standard network agreement to LPS Default approximate 1/3 of the total fees in the example of the motion for relief from stay fee.

---

[17] See generally exhibit 3 to the complaint

135.   It is believed and therefore contended and alleged by the Plaintiffs that with the introduction of the Prommis entity into this transaction that the lawyers in the network firms now actually retain less than 1/3 of the fees which they seek approval for from the Court without disclosing these sharing arrangements to the Court.

136.   The plaintiffs believe and allege that under the present relationship the fees of the defendants in this litigation the $450 MFR fee approved in the Thorne's motion for relief from stay is split with $150 to LPS Default, at least $150 to Prommis Solutions and no more than $150 to Johnson and Freedman.

137.   The Plaintiffs' note that the SEC filings of Prommis Holdings provide that Prommis Solutions will review its fee structure with the law firms every six months during the term of the 20 year agreement for any adjustments to the fee structure.

138.   One can logically surmise that since even the attorneys working for Johnson and Freedman get their pay checks from Prommis Solutions that the necessary conclusion from this contractual language is that the Prommis contract with the law firms is skewed to draw the maximum amount of money from the firms as is possible to increase the profitability of Prommis

Solutions and Prommis Holdings and increase the returns to Great Hill
Partners.

139.   Prommis Holdings, Prommis Solutions, and Great Hill will
sometimes be referred to collectively as the non-attorney law firm equity
owners.

140.   Prommis Holdings described itself thus in a June 21, 2010, S-1
filing with the Securities and Exchange Commission:

> "We are a leading provider of technology-enabled processing
> services for the default resolution sector of the residential
> mortgage industry in the United States based on our 2009
> revenue. We combine the people, processes and technologies
> necessary to quickly and accurately process default resolution
> transactions in large volumes. Our solutions support the full
> lifecycle of mortgage loans in default and include foreclosure,
> bankruptcy, loss mitigation, REO settlement processing and
> other related loan services, such as posting and publication, tax
> examination and title search. For these services we earn
> processing fees on a per transaction basis. We estimate that the
> market for residential mortgage default resolution processing
> services in the United States was approximately $4.0 billion in
> 2009, and that we are one of the largest service providers with
> approximately 6% of the market based on revenue. In 2009 we
> generated $254.9 million of revenue, an increase of 32.1% from
> 2008."

141.   As set forth in the SEC filing, defendants view the exercise of a
creditor's statutory *legal* remedies as merely one sector ("the default
resolution sector") of an industry begging for the involvement of businesses

like defendants, rather than a distinctly separate legal process that remains the exclusive province of courts and attorneys.

142. Thus, the non-attorney equity owners such as Prommis Holdings employ "people, processes, and technologies" to achieve the economies of mass production or, as Prommis Holding phrases it, to "process default resolution transactions in large volumes." As Prommis Holdings also boasts, its mass production business model is a highly lucrative one.

143. In metamorphosing a legal process into simply one sector of the residential mortgage industry, defendants have confronted a major hurdle – the representation of creditors seeking legal remedies is restricted to attorneys, and only one of the defendants in this action is a law firm.

144. But on the other side of the hurdle is the lure of a major financial opportunity – a share of the aggregate attorneys' fees for representing creditors in default related legal proceedings.

145. Prommis Holdings estimated those fees to be $4 billion in 2009.

146. Defendant Great Hill Partners thus concocted the present business model which is under attack in this case.

147. This business model had Prommis Holdings purchase "everything but the law licenses" from the law firms who then contracted

with Prommis Solutions exclusively for 20 years to do the law firms work and also granted Prommis Solutions the right to increase their fees charged to the firm twice a year.

148.    The services provided by Prommis Solutions are called "foreclosure administrative services".

149.    "Bankruptcy Administrative Services" are part of the "foreclosure administrative services" and are provided by Prommis Solutions using "Bankruptcy Management Software" and the "Bankruptcy Management System" (hardware, data networks, and systems) owned or leased by Prommis Solutions.

150.    The hardware and software produce, among other things:

a.    a Fair Debt Collection Practices Act notice letter and demand letters to the borrower on law firm letterhead;

b.    all information required to complete the data entry into the Foreclosure Management System from the mortgage servicer or other third parties;

c.    preparation of an advertisement package showing the law firm as foreclosing attorney;

  d. "eviction support services," including the "administrative and paralegal services required in connection with an eviction;"

  e. generating correspondence to debtors or opposing counsel;

  f. scheduling hearings;

  g. "coordination with authorities to arrange for removal of occupants and personal effects from property;"

  h. "Foreclosure Administrative Services," including data entry of "customer' (i.e., client) information packages onto Prommis Solutions' "automated Foreclosure Management System."

  i. Prommis Solutions mails the letters and other documents it has generated with its automated systems after the attorneys sign them.

151. Thus, Prommis Holdings, Prommis Solutions and Great Hill Partners recast professional services performed by attorneys into "default resolution transactions" performed principally by computers, the people who operate them, and paralegals employed by Prommis Solutions, none of whom are licensed to practice law.

152.   Further, Prommis Solutions is listed on LPS' website as a "default services provider" in the same category as LPS' network firms such as Johnson and Freedman.

153.   Prommis Holdings also indicates on its web-site that it is integrated with LPS Desktop.

154.   LPS lists Prommis Solutions as a "Default Services Provider" on its website.[18]

155.   The import of these representations is that LPS Default is treating Prommis Solutions as a "Network Firm" and these two entities have executed a "Network Agreement" and have agreed to split legal fees earned even though neither is a law firm.

156.   The Court can reach this logical conclusion by considering the deposition testimony of LPS Default's 30(b)6 Corporate representative William Newland.

157.   Newland previously testified that the only default services providers who had access to LPS desktop (which contains the "Process Management" module where work is coordinated and reported by the attorneys and LPS Default staff) were those providers who had executed a network agreement and agreed to share fees.

---

[18] See Exhibit 7 to the Plaintiffs complaint.

158.   This testimony is quoted herein as follows:

newland61609 - Vol. I, (Page 95:2 to 95:16)
                                              95
2   Q   Sure.  Are there any attorneys who are not
3   members of the Fidelity -- or the LPS attorney network
4   who can access your Process Management system?
5     A   Not that I'm aware of.
6     Q   And is it a fact that the only attorneys who
7   are using Process Management are attorneys who have
8   signed a referral agreement with LPS?
9     A   That would be correct.
10     Q   So, while your clients are free to choose
11   whomever as a foreclosing attorney, if they are an MSP
12   user and they are an LPS -- they have an LPS agreement
13   with you for Default Solutions, the only attorneys
14   available on LPS system are attorneys who have signed
15   a contract with LPS?
16     A   That have signed a contract with LPS, yes.

159.   The import of this evidence is that Prommis Solutions is paying

LPS Default referral fees so that it may interject itself between LPS Default

and the network firms it purchased including Johnson & Freedman.

160.   This is logically necessary so that Prommis Solutions may

recover the money paid to LPS Default for the benefit of the law firms

purchased by Prommis Holdings.

161.   It is also logically necessary so that Prommis Solutions may

intercept the fee income of the purchased law firms and send it upstream to

Prommis Holdings and Great Hill Partners.

162.   This is also rationally inferred from the structure of the "foreclosure services agreement" which sets forth that Prommis Solutions will be paid on a per transaction basis for each action it undertakes for the law firms.

163.   This means that each professional legal service ("transaction") that an attorney bills for the non-attorney equity owners receive a portion of the fees received by the attorney.

164.   The contracts specify the attorneys' fees for various legal services and the portion of such fees that are paid to Prommis Solutions.

165.   While the plaintiffs do not yet have the actual fee schedule for these services, the list of services for which Prommis charges its law firms is listed in the SEC filings of Prommis with the actual charges redacted as "confidential".

166.   The attorney fee splitting agreements between law firms, including Johnson & Freedman, and their non-attorney equity owners are illegal under the laws of every state in the country.

167.   Prommis Holding discussed the risk of violating state laws in its SEC filing, admitting:

> *"Regulation of the legal profession may constrain the operations of our business, and could impair our ability to provide services to our customers and adversely affect our revenue and results of operations*

Each state has adopted laws, regulations and codes of ethics that grant attorneys licensed by the state the exclusive right to practice law. The practice of law other than by a licensed attorney is referred to as the unauthorized practice of law. What constitutes or defines the boundaries of the "practice of law," however, is not necessarily clearly established, varies from state to state and depends on authorities such as state law, bar associations, ethics committees and constitutional law formulated by the U.S. Supreme Court. Many states define the practice of law to include the giving of advice and opinions regarding another person's legal rights, the preparation of legal documents or the preparation of court documents for another person. In addition, all states and the American Bar Association prohibit attorneys from sharing fees for legal services with non-attorneys.

Pursuant to services agreements between us and our law firm customers, we provide mortgage default processing services, including foreclosure- and bankruptcy-related processing services, to law firms, and in trustee states we provide foreclosure processing services directly to mortgage lenders and loan servicers through our trustee subsidiary, Cal-Western. Current laws, regulations and codes of ethics related to the practice of law pose the following principal risks:

- state or local bar associations, state or local prosecutors or other persons may challenge the services provided by us as constituting the unauthorized practice of law. Any allegation regarding the unauthorized practice of law could have a disruptive effect upon the operations of our business, including the diversion of significant time and attention of our senior management. We may also incur significant expenses in connection with a claim regarding the unauthorized practice of law, including substantial fees for attorneys and other professional advisors. If this type of claim were successful, we may need to materially modify our operations in a manner that could adversely affect our revenue and profitability and we could be subject to a range of penalties that could damage our reputation in the markets we serve. In addition, any similar challenge to the operations

of our law firm customers could adversely impact their
mortgage default business, which would in turn adversely
affect our revenue and results of operations;

- the services agreements to which we are a party with our law
firm customers could be deemed to be unenforceable if a
court were to determine that our agreements constituted an
impermissible fee sharing arrangement between the law firm
and us; and

- applicable laws, regulations and codes of ethics, including
their interpretation and enforcement by courts and state bar
associations, could change in a manner that restricts our
operations."

168.   Because the fee sharing agreement between Prommis Solutions
and firms such as Johnson & Freedman are not disclosed to the bankruptcy
courts during applications for compensation or when courts grant Orders for
Relief and include an award of attorneys' fees to the secured creditor, the
non-attorney equity owners and Johnson & Freedman are in violation of
Rule 2016(a) of the Bankruptcy Code and Section 504 of the Bankruptcy
Code.

169.   The non-attorney equity owners and the law firms that they
own, including Johnson & Freedman, have repeatedly violated section 18
U.S.C.155, which makes it criminally illegal to fix fees in a bankruptcy
proceeding.

170.   Furthermore, when Johnson & Freedman and other firms
owned by Great Hill Partners, Prommis Holdings and Prommis Solutions

apply for attorneys' fees in bankruptcy proceedings, those firms do not disclose to the courts that a substantial portion of the fees requested will be paid to the non-attorney equity partners for administrative services, thus intentionally and fraudulently misleading both the courts and bankrupts as to the actual amount of attorneys' fees incurred by the creditors.

171.   Furthermore, the attorneys represent to the Court that the fees sought are "reasonable and necessary" which also indicates that the fees are sought for time spent on the work by the attorney.

172.   Both the representation that the fees are reasonable and necessary and that the fees are being paid for the attorneys work on the case are untrue.

173.   The actual structure of the arrangements in these transactions is such that with the advent of electronic filings and "e-signatures" most of the filings made in the cases are from documents produced by non-lawyers and filed by non-lawyers without the actual involvement of the attorneys in the filings until such time as a matter is contested or a hearing is needed.

174.   Depending upon how much time the Court wishes the parties to spend "mining" the electronic data of the transactions between the parties, the plaintiffs expect to demonstrate that a substantial majority of the law firm filings are undertaken in such a compressed timeframe from referral by

LPS Default to Prommis Solutions to the law firms that meaningful review or involvement by the attorneys who have electronically signed the filings is either clearly absent or highly suspect.

175.   This is because the business model created by the defendants stresses two things and two things only, speed of processing and volume of processing.

176.   LPS Default expressly acknowledges this in its corporate testimony where it discusses what it calls the "APR rating" which stands for "Attorney Performance Rating".

177.   Mr. Newland testified regarding the APR ratings as follows:

> newland61609 - Vol. I, (Page 167:4 to 167:19)
>
> 167
>
> 4  Q   What is the APR score or ranking with
> 5  respect to your foreclosure attorneys?
> 6     A   What is the APR ranking?
> 7     Q   Or score, attorney performance review or
> 8  attorney performance ranking, APR?
> 9     A   Uh-huh.
> 10    Q   What is that?
> 11    A   It's a scoring mechanism we utilize to show
> 12  where the attorneys are performing in relation to the
> 13  other attorneys within the state.
> 14    Q   Within the state?
> 15    A   Yes.
> 16    Q   Does that extend at all beyond the state to
> 17  the region or to the country?
> 18    A   Well, there are service levels that are also
> 19  in the national.

newland61609 - Vol. I, (Page 172:2 to 172:7)

                                          172
2  Q    So the APR consists of how fast they
3  complete the initial assignment; if the assignment is
4  reprojected, whether they complete it on time; and
5  whether they respond to a request for costs in a
6  timely fashion?
7     A    That is correct.

newland61609 - Vol. I, (Page 275:2 to 275:5)

                                          275
2  Q    Right.  But there was a time when Fidelity
3  paid incentives for their high APR firms?
4     A    There were times that we did pay incentives,
5  yes.

178.   Mr. Newland's testimony reveals that in addition to splitting

fees with its network firms which LPS Default refers to as "Default Services

Providers" that LPS Default also paid incentive awards to the firms who

were the fastest at their work.

179.   LPS Default gives no consideration to accuracy or legality in

the formulation of the APR score.

180.   As part of the constant pressure created by the APR system LPS

implemented to rate attorney performance LPS Default rates not only its

network firms, but every attorney who accesses LPS Default as Green,

Yellow or Red within the desktop system.

181.   The colored scoring system is analogized as a traffic light.

182.   Under the coding green means all is clear, yellow means the attorney or firm needs to work faster and red means the attorney or firm is in jeopardy of losing business and must dramatically to increase the speed within which tasks are completed.

183.   This scoring system and "traffic light" indicator depends entirely upon how fast the network firms and lawyers process the transactions referred by LPS Default.

184.   LPS Default's obsession with speed of action by its attorneys led to the implementation of technology which makes it possible for LPS to measure how quickly the firm responds to its "communiqués" which are described as "secure" e-mails.

185.   LPS Default documents how quickly a firm accepts its referral (and thereby becomes obligated to pay the administrative support fee) and how quickly the attorneys file documents provided by LPS Default for the cases LPS Default manages.

186.   This includes measuring how quickly the attorneys and firms file documents such as motions for relief from stay which are prepared and provided by LPS Default, or possibly in this case by Prommis Solutions, who then provides it to the Network firm.

187.   LPS Default tracks how much time transpires between when the communiqué is opened by the network firm containing a pleading and when it is filed by the firm using the ECF system's time stamp.

188.   LPS Default tracks how quickly firms file the documents prepared by LPS Default and improves the APR score of the network firms and lawyers who file these documents the fastest.

189.   The fastest firms receive financial incentives from LPS Default.

190.   LPS Default also rewards faster firms with more work.

191.   These two very important financial incentives create tremendous pressure for the lawyers involved to go to the golf course and ignore the documents provided by LPS Default and just let the non-lawyer staff at Prommis Solutions file the documents electronically for them until there is a problem.

192.   This perverse system may be the most crystal clear example of the colloquialism "time is money" that the Court may ever see.

193.   This incentive system begs the logical inference that the pressure to perform quickly destroys any reasonable or meaningful involvement of the attorneys and firms subject to the network agreement.

194.   Another patently logical conclusion of this system is that the higher the APR score of a given network firm or lawyer the less actual involvement the firms and attorneys have in the documents.

195.   The use of this business model creates so much financial pressure on the lawyers to perform actions rapidly that it should be clear that there can be no meaningful attorney involvement in the vast majority of these filings.  However, that does not mean this model is not highly profitable.

196.   Prommis Holdings SEC filings indicate that the firm generated $254.9 million dollars in revenue in 2009.

197.   That figure means on average the firm generated more than $21 million dollars per month in fees.

198.   Every fee was derived by the sharing of fees from the performance of a "legal activity" that relied upon the signature of an attorney certifying their involvement in the preparation and filing of the pleadings which generated this fee income.

199.   Given the earlier example of the breakdown of fee splitting in this case it appears that Prommis Solutions is paying LPS Default approximately $6-7 million dollars per month in referral fees.

200.   This kickback thereby enables Prommis Solutions to access the remaining legal fees minus the pittance shared with the namesake law firm so that Prommis Solutions may continue to use the law firm's name to harvest the enormous cash flow represented by these fees.

201.   From these financial reports it appears that the monster born by the $250 million dollar investment of Great Hill Partners is nothing if not a financial juggernaut.

202.   In fact, from Prommis Holdings SEC filings it appears that Great Hill's investment in these law firms was at least premised upon the value of its McCalla Raymer purchase based on its revenue reporting from 2005.

203.   As shown in ECF Doc 59-1 page 36 McCalla reported a net income of $21 million dollars for 2005.

204.   Great Hill purchased the "spinout" in 2006 for $137 million dollars.

205.   This included the 20 year agreement with the new entity by McCalla Raymer to exclusively provide services to McCalla Raymer.

206.   A logical interpretation of these numbers would indicate that Great Hill expected to gain control of a business that would generate

approximately $444 million over twenty years for its investment of $137 million.  A healthy return for sure.

207.   However, these parties own writings indicate that at the time of this purchase the plan was already made to expand nationally.

208.   By purchasing the four law firms through the Prommis structure it is clear that Great Hill intended to reap a much higher return on its investment by controlling a national operation with much higher income.

209.   Assuming the same planned profit level as the McCalla Raymer transaction noted above, the Court could readily deduce that Great Hill expected to get a ***net return*** of approximately $750 million from its $250 million dollar investment in these firms over the next twenty years.

210.   Again, a healthy return.  However, this also ignores the level of control built into the transaction by Great Hill.

### III.d.  THE PROMMIS TRANSACTION WAS STRUCTURED SO THAT GREAT HILL COULD DOMINATE PROMMIS AND REAP A WINDFALL FROM THE ILLEGAL OPERATIONS

211.   The SEC filings by Prommis Holdings lay out in keen detail the clear fact that Great Hill structured the Prommis transaction as a vehicle for Great Hill to control this illegal business model while attempting to protect Great Hill from financial penalty in the event that the scheme was uncovered.

54

212.   From the Registration Statement filed with the SEC by

Prommis Holdings (Doc 59-1) the following statements provide:

a. ***Following this offering, investment funds managed by Great Hill Partners, LLC will own a substantial percentage of our equity, which may prevent new investors from influencing significant corporate decisions.***

*Great Hill will, for the foreseeable future, have significant influence over our reporting and corporate management and affairs, and will be able to control virtually all matters requiring stockholder approval.* Great Hill is able to, subject to applicable law, designate a majority of the members of our board of directors and control actions to be taken by us and our board of directors, including amendments to our certificate of incorporation and bylaws and approval of significant corporate transactions, including mergers and sales of all or substantially all of our assets. The directors so elected will have the authority, subject to the terms of our indebtedness and the rules and regulations of the New York Stock Exchange, to issue additional stock, implement stock repurchase programs, declare dividends and make other decisions. These actions may be taken even if other stockholders oppose them. Great Hill's ownership of a large amount of our voting power may have an adverse effect on the price of our common stock. The interests of Great Hill may not be consistent with your interests as a stockholder. After the lock-up period expires, Great Hill will be able to transfer control of us to a third-party by transferring their common stock, which would not require the approval of our board of directors or our other stockholders.

b. Prommis Holdings also states, with respect to its certificate of

incorporation that:

our restated certificate of incorporation will provide that the Delaware General Corporate Law doctrine of *"corporate opportunity"* will not apply against Great Hill, or any of our directors who are employees of, or affiliated with, Great Hill, in a manner that would prohibit them from investing in competing businesses or doing business with our customers. *It is possible that the interests of Great Hill may conflict with our interests and the interests of our other stockholders, including you.*

c.   Amazingly, another portion of the registration statement says

this regarding Great Hill's domination of Prommis Holdings:

**We will be a controlled company within the meaning of the New York Stock Exchange rules, and, as a result, we will be excused from compliance with certain corporate governance requirements that apply to other listed companies.**

Because Great Hill owns a majority of our voting equity, we will qualify as a *"controlled company"* for the purposes of the New York Stock Exchange listing requirements. As such, we will be exempt from the New York Stock Exchange corporate governance requirements that our board of directors, our Compensation Committee and our Nominating and Corporate Governance Committee meet the standard of independence established by those corporate governance requirements. The New York Stock Exchange independence standards are intended to ensure that directors who meet the independence standard are free of any conflicting interest that could influence their actions as directors. *Accordingly, for so long as we are a controlled company, holders of our common stock will not have the same protections afforded to stockholders of companies that are subject to all of the New York Stock Exchange corporate governance requirements.*

d.  Under the Heading **"Corporate governance"** discussing Board composition the filings also provide this information:

> **Our board of directors currently consists of six members**, all of whom were elected as directors under the board composition provisions of our stockholders agreement. *The stockholders agreement entitles Great Hill to nominate four members of our board, entitles certain of our stockholders who were affiliated with McCalla Raymer at the time of the Great Hill acquisition to nominate one member of our board and provides that our Chief Executive Officer will be a member of the board.* Messrs. Anderson, Stevens, Vettel and Yates were nominated to our board by Great Hill. Mr. Phelan was nominated to our board by our stockholders who were affiliated with McCalla Raymer at the time of the Great Hill acquisition.

e.  *Upon completion of this offering, Great Hill will continue to control a majority of the voting power of our outstanding common stock. As a result, we will be a "controlled company" under the corporate governance standards.* As a controlled company, exemptions under the standards will free us from the obligation to comply with certain corporate governance requirements, including the requirements:

> i.  that a majority of our board of directors consists of *"independent directors,"* as defined under the rules of the [citation omitted in original];
>
> ii.  that we have a corporate governance and nominating committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;
>
> iii.  that we have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and
>
> iv.  for an annual performance evaluation of the nominating and governance committees and compensation committee.

    f.  The portion of the registration statement addressing ownership and beneficial ownership of the shares of stock of the company indicate that Great Hill controls 66.7% of the pre-offering stock of Prommis Holdings.

213.   These admissions by these parties demonstrate clearly that while Great Hill Partners seeks to play the role of "innocent investor" Great Hill Partners, along with Dan Phelan, masterminded this corrupt business model.

214.   According to Prommis Holdings SEC Filings, Great Hill's financing of this transaction made the illegal business model a reality.

215.   Great Hill made this investment with the full intention of reaping a spectacular windfall from the creation, domination and control of Prommis Holdings and Prommis Solutions.

216.   The structure of this arrangement begs the logical questions:

    a.  May a non-lawyer entity create, finance, control and dominate another non-lawyer entity for the purpose of:

        1.  Purchasing law firms;

        2.  Engaging in the unauthorized practice of law;

        3.  Illegally splitting attorneys fees and

        4.  escaping liability by virtue of placing the intermediate non-legal entity between itself and the

illegal activity to give the appearance that the

"mastermind entity" is not directly involved in the

illegality?

217.   The plaintiffs think not and contend that Great Hill has direct

legal liability for its actions in this case which led to formation of Prommis

Holdings and Prommis Solutions and its creation of this business model.

218.   Through the business model Great Hill Partners is directly

engaged in the unauthorized practice of law and illegal fee splitting by

exercising dominant control over Prommis Holdings, Prommis Solutions

and the law firms "purchased" by Prommis Holdings.

219.   Because Great Hill structured, financed and birthed this

business model in conjunction with Mr. Phelan it is directly liable for the

actions of the entities and firms it controls.

220.   Great Hill Partners is also directly liable for the creation of the

business model to the extent the business model operates illegally.

221.   Further, Great Hill and Mr. Phelan structured the transaction so

that between them they would control six of the seven seats on the board of

directors of Prommis Holdings.

222.   This control gave these co-defendants the ability to dictate

everything done by Prommis Holdings and to engage in a "control fraud"

whereby they could run Prommis Holdings as their own shell for the illegal

purposes for which it was formed.

223.   This structure was created in an effort to maximize the profits

of their illegal enterprise while shielding themselves from any potential

liability by hiding within the operations of corporations designed as shams

and frauds to operate the illegal enterprise.

### d.   THE ROLE OF THE LAWYERS IN THIS MORASS

224.   The law firm defendants Johnson & Freedman, and every other

network firm who has executed such an agreement, owe this Court and the

profession an apology.

225.   The embarrassment that their conduct has already caused and

will undoubtedly cause the entire legal profession when fully brought to

light in this proceeding will have a negative impact on the public perception

of the profession for years to come.

226.   The conduct which the plaintiffs have set forth and will set out

further herein will have the unfortunate effect of calling the entire legal

profession into disrepute and scorn.

227.   Only this Court and the appropriate Bar associations can

determine the proper professional sanction for this conduct which is both

scandalous and shameful.  The Plaintiffs can only seek their remedies at law.

228.   By the execution of a network agreement with LPS Default, or its predecessor in interest, Fidelity National Foreclosure and Bankruptcy Solutions, many formerly reputable creditor's rights firms throughout the national legal community entered into a proverbial deal with the devil.

229.   These firms and these attorneys entered into an explicit quid pro quo wherein they contractually agreed to split legal fees with non-lawyers in exchange for a high volume of work related to both bankruptcy and foreclosure matters.

230.   The execution of these agreements by these attorneys, including Johnson & Freedman was and is the gateway by which these corporations came to dominate the default services market in a monopolistic fashion.

231.   LPS Default and its predecessors may have built the financial castle but until the law firms such as Johnson & Freedman executed the network agreements LPS Default had no key to the door of that financial castle.

232.   As detailed in exemplar network agreement attached hereto as exhibit 4, the express terms of the contract between LPS Default and the law firms such as Johnson & Freedman set forth the mechanism by which LPS Default will control the referrals of work to the network firms and the network firms will pay LPS Default for these services.

233.   The network agreement provides that LPS Default will provide services which are demonstrably legal services to the law firms and details the level of control exerted by LPS Default over the network firms and their actions.

234.   Specifically, section 5 of the exemplar network agreement sets forth that the firm will submit its invoices to the mortgage servicing client through the LPS Desktop system.

235.   This reason for this requirement becomes clear when the Court recalls that the DSA states that LPS Default is ***providing legal services*** to the mortgage servicer.

236.   This section 5 also details that within 30 days following each referral, the firm will be invoiced separately by LPS Default for each referral ***for the administrative fees set forth Exhibits B, C and D*** to the network agreement.

237.   Section 5 also provides that the administrative fees are then due within 30 days of receipt by the firm.

238.   This billing and payment window describes a situation where the referral is made to the law firms, the bills for the referrals are sent 30 days later and then the firms have 30 days to pay LPS.

239.   This creates a 60 day window from referral to payment due from the network firm.

240.   The terms of the DSA between the mortgage servicers and LPS requires that the servicers pay the network firms within 30 days of the receipt of invoices from LPS Default through the Desktop software.

241.   In the motion for relief from stay example, and upon information and belief, most types of transactions handled by LPS Default for the mortgage servicers, this means that the network firms will not be required to pay the referral fees until such time as the servicers have remitted payments to the network firms for the work they did under the referral from LPS Default.

242.   Upon information and belief, the plaintiffs allege that LPS Default and the network firms intended this arrangement to make the monies due to LPS Default from the network firms payable at approximately the same time as the firms were paid by the mortgage servicer clients of LPS Default.

243.   Section 7 of the network agreement provides that for purposes of the network agreement that the mortgage servicer will be considered the "mutual clients" of LPS Default and the network firms.

244.   This statement is consistent with LPS Default's statement in the DSA that it is providing legal services for the mortgage servicers.

245.   Section 7 also designates LPS Default as the agent of each mortgage servicer client.

246.   Section 8 of the network agreement discusses communications between the parties and places time limitations on the Firm's responsibilities to LPS Default.

247.   Section 8 in subpart (b) also introduces to the relationship between these parties the concept of a policy and procedure manual managed by LPS default.

248.   This subpart implies that the network firms are required to comply with LPS Default's existing policies and procedures without respect to any legal or ethical issues which might arise thereunder and to incorporate any further changes made by LPS Default into the network firm's practices.

249.   Within these "policies and procedures" lies the mechanism by which LPS Default exerts its influence and control over the firm and its practices.

250.   These policies and procedures coupled by LPS Default's obsession with speed and volume of processing and the constant flashing traffic light on the screen of every LPS Desktop user in the nation renders

the attorneys subject to the network agreement nothing more than an automatons being driven by the machine.

251.   The network firms financial success or failure, growth or decline, depends entirely upon its strict adherence to the constant flow of communiqués pounding the inbox of these network firms like the neverending waves crashing against a broken ocean shore constantly asking and  constantly scoring:

a.  How fast does the network firm accept the referral?

b.  How fast does the network firm file the document?

c.  How fast does the network firm set the hearing?

d.  How fast does the network firm respond to our questions?

e.  How fast does the network firm get the Order signed?

f.  How fast does the network firm get our fees approved?

g.  How fast does the network firm file a plan default?

h.  How fast does the network firm file its invoices in desktop?

i.  How fast does the network firm get the debtor out of bankruptcy?

j.  How fast does the network firm foreclose?

k.  How fast does the network firm kick evict the borrower?

l.  And on and on and on ad nauseum………..

252.   Against this constant pressure, the constant flashing traffic light always on the screen, constantly threatening to go from green to yellow to red and thereby deny the firm its only source of revenue, these law firms claim to exercise professional judgment and fulfill their ethical obligations to the Court and the profession.

253.   Yet these very firms such as Johnson & Freedman were ethically compromised at the outset when they entered into these express fee-splitting agreements.

254.   These firms mortgaged their firm's very financial future to LPS Default in this Faustian arrangement.

255.   These firms sold out their professional obligations in exchange for the flood of default related work controlled by LPS Default through its monopolistic control of the default services market.

256.   In furtherance of, and in full blown demonstration of, their professional failings to the Bench and the Bar, these network firms, including Johnson & Freedman, shirked their ethical obligations and began to repeatedly seek fees from this Court and others without disclosing the existence of these agreements and these express arrangements to share compensation.

257.   This network firm defendant Johnson & Freedman, and likewise all other network firms, have, by now, committed these acts so often that those involved likely do not even contemplate the nature of their conduct anymore.

258.   The network firms like Johnson & Freedman likely fail to consider that they are the very "getaway car" that LPS Default and the other non-lawyer equity owners of Johnson & Freedman use to rob the bank, or in this case, defraud the Court.

259.   The network agreement then goes on to list in its attachments the details of this relationship including the services that the network firms will provide to LPS Default and the services LPS Default will provide to the firms.

260.   Of particular interest to the Court are the headings of the columns in Exhibit B which unequivocally state that the attorney's are paying referral fees to LPS Default.

261.   Upon information and belief, the Plaintiffs assert that every exhibit to every network agreement detailing financial arrangements on a per mortgage servicer basis has these identical two column headings.

262.   The extent of wrongdoing and ethical compromise contained in this agreement is shocking in and of itself, but for Johnson & Freedman the

story becomes even more sordid by the explanation of its relationship to

Great Hill Partners, Prommis Solutions and Prommis Holdings.

263.   After having had its collective professional conscious seared by

years of direct involvement and fee-splitting with LPS Default, Johnson &

Freedman apparently realized no ethical difficulties with the notion of the

firm being purchased by a non-lawyer corporation.

264.   After all, this "purchase" was premised upon the sale of "non-

legal assets" of the firm to Prommis Holdings.

265.   The quid pro quo of this transaction was that in exchange for

the cash lump sum payment to the partners of Johnson & Freedman, the firm

would sell its "non-legal assets" to Prommis Holdings and agree to use

Prommis Solutions exclusively to provide its "services" to Johnson &

Freedman for a term of twenty years.

266.   The effect of this transaction was to introduce another level of

fee splitting into its firm activities.

267.   After all, there has been no sanction for all the years the firm

has previously split fees with LPS Default and its predecessors.

268.   Within this supposedly "arms-length" transaction between these

two allegedly independent parties was inserted a provision which gave

Prommis Solutions the right to access the "independent" law firm's unaudited monthly financials.

269.   The purpose of the grant of this right was so that Prommis Solutions could adjust the costs of the services it provided based on the Firm's cash flows.

270.   This contractual term is allegedly part of an arms length transaction with an allegedly "independent" service provider but grants the service provider the opportunity to increase its charges every six months during the entire twenty year term.

271.   This agreement also authorized Prommis Solutions to begin to pay "all sums" due to LPS Default for referrals made on their system to the "independent" law firm.

272.   The plaintiffs allege and contend that these transactions represent nothing less than the blatantly illegal sale of a law firm to a non-lawyer corporation to facilitate the active, open and notorious engagement in the unauthorized practice of law by that corporation.

273.   The ethical failings of the partners of this firm and their cooperation in this scheme to engage in the unauthorized practice of law has facilitated a massive fraud not only on this Bankruptcy Court but Courts all over the Country.

274.    This arrangement is illegal and in violation of the Rules and

Code of the Bankruptcy Court.

275.    These actions and this conduct by Johnson & Freedman are

worthy and deserving of an appropriate judicial sanction which will set a

standard that will inform the entire legal profession of the seriousness of this

wrongdoing and guide other Courts who might be faced with this conduct in

the future.

276.    The plaintiffs' contend that "but for" the active involvement of

this network firm and its attorneys in this conduct this scheme would not

have been possible.

## IV.    CLASS ACTION ALLEGATIONS

277.    The plaintiffs bring this action as a class action individually and

on behalf of a class and a subclass which is defined as follows:

> All individuals who have filed a bankruptcy petition under
> chapter 13 of the Bankruptcy Code in which these defendants
> filed, or caused to be filed, a proof of claim, a motion for relief
> from stay or where these defendants sought and received a plan
> review fee in which these defendants unlawfully and illegally
> split fees and sought fees which were not disclosed to the
> bankruptcy court in violation of the bankruptcy code and
> controlling law.

> The Subclass is defined as:

> All Chapter 13 Trustees in the United States of America who
> have paid out monies to secured creditors as a result of the
> filing of a proof of claim, a motion for relief from stay or a plan

review fee where these defendants sought and received fees
which they failed to disclose to the Bankruptcy Court and
which were unlawfully and illegally split in violation of the
bankruptcy code and controlling law.

Excluded from the class and subclass are any employees,
officers or directors of any of the defendants or any of their
subsidiaries or affiliates, and any of the legal representatives,
heirs, successors and assigns of any such employees, officers or
directors.

278.   This action may properly be maintained as a class action

pursuant to the Bankruptcy Rule 7023 and Rule 23 of the Federal Rules of

Civil Procedure.

279.   The members of the class are so numerous that the joinder of all

individual claims is impracticable or impossible.

280.   The Plaintiffs believe and allege that every bankruptcy case

wherein the defendants Johnson & Freedman f/k/a Morris, Schneider and

Prior have been involved were subject to the conduct complained of herein.

281.   That is, in every case involving this firm or its predecessor, the

conduct of this firm and its attorneys facilitated and actively contributed to

the illegal and improper conduct described in this complaint where illegal

and improper fees were charged to debtors in violation of the bankruptcy

code and controlling law.

282.    The precise number of class members and their addresses are presently unknown but can be easily obtained from the defendants' files, records and databases.

283.    Class members can be notified of the pendency of the action by mail and/or published notice.

284.    Common questions of law and fact exist as to all members of the class.

285.    These common questions predominate over questions affecting any individual class members.

286.    These common legal and factual questions include but are not limited to:

    a.    The propriety of defendants' practice of filing requests for the approval of fees where the existence of fee splitting relationships have not been disclosed.

    b.    The propriety of defendants' practice of requesting attorney's fees without disclosing the existing of fee splitting agreements.

    c.    The propriety of defendants' requesting payment of an amount of attorney's fees in excess of the amount of fees for which the attorneys actually agreed to provide the services.

    d.    Whether the defendants' practices constitute an abuse of the bankruptcy process.

    e.    Whether defendants' practices constitute fraud on the court.

f.      Whether the defendants' conduct violates the Rules of the Bankruptcy Court.

g.      Whether the defendants' conduct violates the Bankruptcy Code.

h.      The nature of any injunctive relief which should be afforded to the class to prevent the continuation of the wrongful conduct of the defendants.

i.      Whether the defendants should be required to disgorge the benefits obtained from its wrongful conduct.

j.      The nature and amount of civil damages that should be paid.

k.      The nature and amount of civil sanctions that should be assessed.

l.      The nature and amount of punitive damages that should be assessed.

287.   The plaintiffs' claims are typical of the claims of members of the class.

288.   The plaintiffs and each member of the class have been charged fees which have been inflated, which are not reasonable, and which are the result of declarations or certifications of the defendants that the fees were proper and reasonable, which were the result of the defendants failure to disclose the nature and existence of its fee splitting contracts and

agreements, and which were the result of the authorized practice of law by the defendants.

289.   The class representatives and each member of the class have sustained damages resulting from these defendants illegal and fraudulent practices.

290.   The actual damages are readily ascertainable and are not subject to any individualized inquiry.

291.   The Court will not be called upon to make any individualized fact inquiries as to any class members actual damages.

292.   The total actual damages of the class as well as each class member may be readily determined from the records of the defendants without any individual inquiry.

293.   The Plaintiffs' allege that if the defendants are not enjoined from engaging in these illegal and fraudulent practices in the future additional members of the class will suffer.

294.   The plaintiffs are adequate representatives as to class because their interest does not conflict with the interest of the individual members of the class they seek to represent and the plaintiffs have retained counsel who are competent and experienced in complex class action litigation and who have specialized knowledge of the practices of these defendants through

their involvement in other litigation involving the same parties or the same

conduct.

295.   Further, the plaintiffs and counsel intend to prosecute this

action vigorously.

296.   The interest of the members of the class is fairly and accurately

protected by plaintiffs and their counsel.

297.   The class action device is superior to any other available means

for the fair and efficient adjudication of the claims of plaintiffs in the class.

298.   Absent a class action most members of the class would be

unaware of these illegal practices.

299.   Absent a class action most members of the class would find the

cost of litigating their individual claims prohibitive and would not have an

effective remedy to vindicate their rights.

300.   Because of the size of the individual class members claims few

class members could afford to seek legal redress for the wrongs which they

have suffered due to the defendants' conduct.

301.   Without a class action the class members will continue to suffer

harm and the defendants' violation of law will continue to occur and will

occur without a remedy.

302.   Furthermore, because of the accumulation of these factors class treatment is the only method by which all class members common claims can be economically and expeditiously adjudicated in one proceeding which will preclude the possibility of multiple trials and inconsistent judgments.

303.   The plaintiffs submit that the factual allegations herein are sufficient in depth and scope to describe a fact pattern where class treatment is the only viable method to address the massive systemic fraud and abuses described herein.

## V.   CAUSES OF ACTION ASSERTED

## FIRST CAUSE OF ACTION ASSERTED AGAINST ALL DEFENDANTS

## ABUSE OF THE BANKRUPTCY PROCESS

304.   Plaintiffs adopt and reallege all prior paragraphs of this complaint as if fully set out herein.

305.   The conduct described in the preceding paragraphs by the defendants violates the bankruptcy code and rules and constitutes an abuse of the bankruptcy process.

306.   The plaintiffs and the class invoke the court's inherent powers and the court's powers under Section 105 of the Bankruptcy Code to address the systemic abuse of the bankruptcy code and its rules.

## SECOND CAUSE OF ACTION ASSERTED AGAINST ALL DEFENDANTS

## FRAUD ON THE COURT

307.   The plaintiffs adopt and reallege all prior paragraphs as if set out fully herein.

308.   The defendants' actions violate the bankruptcy code and rules and constitute a fraud on the bankruptcy court which is being perpetrated on a systemic and continuing basis and which is ongoing resulting in damages to thousands of debtors.

309.   The plaintiffs and the class invoke the court's inherent powers and the court's powers under Section 105 of the Bankruptcy Code to address the fraud that has been perpetrated upon the court in this action.

## THIRD CAUSE OF ACTION ASSERTED AGAINST ALL DEFENDANTS

## DECLARATORY AND INJUNCTIVE RELIEF

310.   The plaintiffs adopt and reallege all prior paragraphs as if set out fully herein.

311.   The plaintiffs and all class members whom they seek to represent are entitled to a civil relief order declaring the defendants' actions and practices described herein violate the bankruptcy code and rules.

312.   The plaintiffs and all class members are entitled to a civil relief order declaring the defendants' actions and practices constitute an abuse of the bankruptcy process.

313.   The plaintiffs and all class members are entitled to a civil relief order declaring the defendants' actions and practices constitute a fraud on the bankruptcy court.

314.   The plaintiffs and all class members are entitled to a civil relief order permanently enjoining the defendants from engaging in said actions and practices in the future with respect to any debtor who is a member of the class described herein.

315.   The plaintiffs and all class members are entitled to a civil relief order declaring defendants' actions and practices violate the bankruptcy code.

316.   The plaintiffs and all class members whom they seek to represent request that the Court invoke its inherent authority and its powers under Section 105 of the Bankruptcy Code to enter appropriate equitable and declaratory Orders and Judgments designed to remedy the abuses described in the Plaintiffs complaint.

## FOURTH CAUSE OF ACTION ASSERTED AGAINST ALL DEFENDANTS

## VIOLATION OF THE AUTOMATIC STAY

317.    The plaintiffs reallege all prior paragraphs as if set out fully herein.

318.    The defendants had actual notice of the plaintiffs' petitions under the bankruptcy code.

319.    The defendants intended their action whereby they collected undisclosed, unapproved, and illegal fees in violation of the bankruptcy code and controlling law.

320.    The defendants' collection of the unauthorized, undisclosed, unapproved, and illegal fees from the plaintiffs in the class constitutes an exercise of control over estate property.

321.    The defendants' collection of these fees from estate property were never disclosed to the court nor authorized by the court.

322.    The defendants' actions violate the automatic stay as defined at 11 U.S.C. § 362(a).

323.    The defendants' actions including seeking and collecting the undisclosed, unauthorized, unapproved and illegal fees is and was at all times material hereto a willful act.

324.   The plaintiffs in the class allege that they have suffered injury as a result of the defendants' violation of the automatic stay and their exercise of control over estate property.

## FIFTH CAUSE OF ACTION ASSERTED AGAINST ALL DEFENDANTS

## CONTEMPT OF THE BANKRUPTCY CODE

325.   The plaintiffs adopt and restate all prior paragraphs as if fully set out herein.

326.   The plaintiffs and class request that the Honorable Court invoke its statutory contempt powers as provided for by 11 U.S.C. § 105(a) to remedy the contemptuous action of the defendants.

327.   The contemptuous actions of the defendants pertaining to and arising out of the defendants' complete and utter disregard for the orderly and systematic administration of the bankruptcy code and the payment of the valid debts of the debtors which is contemplated by Title 11 of the United States Code.

328.   The defendants' contemptuous conduct implicates 11 U.S.C. § 1015(a); 501; 502(a) and (c); 1322(b)(5) and (8) (with respect to Chapter 13 plans); and 1327(a).

80

329.    Among other things, the defendants' contemptuous conduct consists of:

a.    Adding undisclosed, unapproved, and illegal fees;

b.    Charging and collecting undisclosed, unapproved, and illegal fees;

c.    Exercising control over estate property;

d.    Failing to seek bankruptcy court approval for reasonableness of undisclosed fees;

e.    Failing to subject additional fees to the claim review process;

f.    Thwarting the orderly and systematic payment scheme contemplated by the bankruptcy code;

g.    Affirmatively misrepresenting to the court the reasonableness of the fees sought;

h.    Affirmatively failing to disclose to the court the known existence of the fee splitting agreements;

i.    Failing to seek approval of payment of compensation;

j.    Failing to disclose agreements to pay compensation;

k.    Failing to disclose the existence of agreements which contemplate or implicate the unauthorized practice of law; and

l.      Failure to disclose the existence of fee splitting relationships by law firms with non-lawyers.

330.   By engaging in the conduct set forth above and by charging and collecting unapproved fees and other amounts, and by exercising control over the fixing, charging, and collecting of fees without benefit of a review by debtors, debtors' counsel, and trustees for the court, these defendants have engaged in conduct which thwarts the fair and efficient administration of the bankruptcy process.

331.   This conduct has allowed the defendants to charge and collect unapproved fees without having those fees and charges tested for reasonableness through the mechanisms in place under the bankruptcy code.

332.   The actions of the defendants are contemptuous in that they knowingly and willfully violated the various bankruptcy code provisions.

333.   The defendants had actual knowledge of their conduct and willfully chose to continue the conduct in violation of the bankruptcy code and the court's authority.

334.   The defendants intended these actions for the purpose of being unjustly enriched.

335.   The actions of the defendants have injured the plaintiffs and the class and continue to injure the plaintiffs and the class.

336.   The actions of the defendants described herein have had the effect of thwarting class members bankruptcy plan under 1322 of the Code and thereby depriving the class members of the benefits contemplated by the Code of the completion of an orderly Chapter 13 plan.

337.   As a result of this conduct the defendants are liable to the plaintiffs and the class for actual damages, punitive damages, and legal fees.

## SIXTH CAUSE OF ACTION ASSERTED AGAINST ALL DEFENDANTS

## CONTEMPT OF FEDERAL RULES OF BANKRUPTCY PROCEDURE

338.   The Plaintiffs reallege all prior paragraphs as if set out here in full.

339.   The plaintiffs request that this Honorable Court invoke its statutory contempt powers as provided for by 11 U.S.C. § 105(a).

340.   The contemptuous action pertains to Rule 2016(a) of the Federal Rules of Bankruptcy Procedure.

341.   Specifically, the defendants have never obtained approval for sharing of fees with non-lawyers.

342.   The defendants have never disclosed to the court the existence of the fee splitting arrangements.

343.   The defendants have represented to the court that their fees were reasonable when the defendants had full knowledge that they agreed to perform legal services for an amount less than the fees they requested from the court.

344.   The defendants have never disclosed to the court their arrangement for compensation amongst themselves which is to be paid from fees that the law firm defendants in this case sought from the court.

345.   These defendants together, acting in concert, have obtained fees from the bankruptcy estates of the class members to the detriment of the debtors and unsecured creditors by paying themselves unapproved fees in contravention of Rule 2016(a).

346.   The defendants by charging and collecting the unapproved, undisclosed, improper and illegal fees are in contempt of Rule 2016(a) of the Federal Rules of Bankruptcy Procedure.

347.   The defendants' actions in filing a request for the subject fees and in particular the standard $450 fee for the "Motion for Relief from Stay" constitute the filing of a false fee petition.

348.   The defendants had actual knowledge of the class members' bankruptcy filings at the time of their actions.

349.   In fact, it was by virtue of the class members' bankruptcy filings that the defendants were actually able to charge these fees.

350.   The defendants intended their actions and engaged in misconduct in collecting these fees with full knowledge of the rules of the bankruptcy procedure including Rule 2016(a).

351.   The plaintiffs and the class have been injured as a result of the defendants' contemptuous conduct.

352.   As a result of the defendants' contemptuous conduct, the defendants are liable to the plaintiffs and the class for actual damages, punitive damages, and legal fees.

## SEVENTH CAUSE OF ACTION ASSERTED AGAINST ALL DEFENDANTS

## BREACH OF THE UNIFORM MORTGAGE COVENANTS

353.   The plaintiffs reallege all prior paragraphs as if set out here in full.

354.   The defendants' actions in seeking these improper fees are a breach of the uniform mortgage covenants which authorizes the defendants to charge fees which are "reasonable and necessary".

355.   The Uniform covenants are in each class members' mortgage and are identical to those published by Fannie Mae and Freddie Mac.

356.   As a direct result of the defendants' actions the class members have been injured and damaged.

357.   The plaintiffs on behalf of themselves and the class members seek all appropriate damages as a result of this breach of contract.

## EIGHTH CAUSE OF ACTION ASSERTED AGAINST ALL DEFENDANTS

## UNAUTHORIZED PRACTICE OF LAW

358.   The plaintiffs reallege all prior paragraphs as if set out here in full.

359.   The actions of the defendants and the agreements between the law firms and the non-law firm defendants reveal that all of the defendants are engaged in the practice of law.

360.   The non-law firm defendants Prommis Solutions and LPS Default are specifically preparing pleadings and documents which affect an interest in either real estate or contested matters through the preparation of mortgage assignments, chain of title documentation, allonges to promissory notes, affidavits, affidavits of indebtedness and other documents including claims and pleadings in the bankruptcy Court.

361.   Because of the terms of the defendants' agreements and because of the duties and rights set out in these agreements various actions and legal judgments usually reserved for lawyers and the legal profession are specifically delegated to the non-lawyer defendants by contract.

362.   By virtue of these agreements the law firm defendants are assisting the non-law firm defendants in engaging in the unauthorized practice of law in violation of their ethical duties.

363.   By virtue of the purchase agreements between Johnson & Freedman and Prommis Holdings this defendant has become the owner of this law firm and at least three others.

364.   The contracts structured by Great Hill Partners, Prommis Holdings and Prommis Solutions to purchase law firms, including Johnson & Freedman have the net result that these non-lawyer corporations are engaged in the unauthorized practice of law.

365.   As a result of these actions the plaintiffs and the class members have been injured and damaged.

366.   The plaintiffs and the class members seek all damages allowed by law as a result of the wrongful actions of the defendants.

## NINTH CAUSE OF ACTION ALLEGED AGAINST ALL DEFENDANTS

## CIVIL CONSPIRACY

367.  The plaintiffs adopt and reallege all prior paragraphs as if set out here in full.

368.  The defendants have engaged in an unlawful conspiracy to do the following:

1) Make fraudulent misrepresentations and engage in fraudulent concealment as alleged herein;

2)  Fail to disclose an attorneys' fee sharing agreement in violation of Bankruptcy Rule 2016(a);

3)  Illegally fix attorneys' fees in violation of 18 U.S.C. 155;

4)  Violate the automatic stay in the above-entitled Chapter 13 proceeding and in the Chapter 13 proceedings of all class members;

5) Violate federal rules governing the practice of law in bankruptcy courts;

6)  To breach the class members' mortgage covenants for the purpose of unlawful gain for each of the defendants; and

7)  To commit fraud upon this Bankruptcy Court and upon every Bankruptcy Court before whom these defendants appear through their law firm co-conspirators.

369.   As a result of the conspiracy between these parties the plaintiffs have suffered damages as alleged herein.

370.   As a further result of the conspiracy between the defendants, plaintiffs are entitled to damages for sake of example and by way of punishment.

## TENTH CAUSE OF ACTION ASSERTED AGAINST ALL DEFENDANTS

## VIOLATION OF 18 U.S.C. §155
## PROSCRIPTION AGAINST FIXING ATTORNEYS' FEES IN A BANKRUPTCY PROCEEDING

371.   The plaintiffs adopt and reallege all prior paragraphs as if set out here in full.

372.   18 U.S.C. § 155 provides that any party in interest commits a crime when that entity *or its representative* "knowingly and fraudulently enters into an agreement" for the purpose of fixing the fees or other compensation to be paid to any party in interest or to *any attorney for any party in interest for services rendered in connection therewith*, from the assets of the estate."

373.   The proscribed conduct is punishable by both fines and prison.

374.   By virtue of the terms of the various agreements including the Network Agreements, Default Services Agreements, Purchase and Sale

Agreements, and Services Agreements by and between the defendants all of the defendants have engaged in a common plan or scheme or contract whereby they have repeatedly violated 18 U.S.C. section 155 in fixing fees to be paid from bankrupts' estates to Network Firms for the benefit of all defendants to this action, including the estate in the above-entitled bankruptcy proceeding.

375.   As an officer of the Court, plaintiff Locke Barkley, on behalf of herself and all other Chapter 13 trustees, requests that the Court fine the Defendants in an amount sufficient for the sake of example and by way of punishment to deter other entities from engaging in similar conduct ever again in the future.

376.   The plaintiffs request on behalf themselves and the purported class(es) and subclass(es) they purport to represent that the Court award appropriate relief to remedy the wrongdoing described herein.

## ELEVENTH CAUSE OF ACTION ASSERTED AGAINST ONLY GREAT HILL PARTNERS AND DAN PHELAN

## FRAUD UPON THE BANKRUPTCY COURT BY CONTROL FRAUD

377.   The Plaintiffs reallege all prior paragraphs as if set out here in full.

378.   The plaintiffs allege that Great Hill Partners, along with Dan Phelan, a founder of McCalla Raymer and the Chairman of the Board of Prommis Holdings, engaged in "control fraud" as that term has been defined to control the actions of Prommis Holdings, Prommis Solutions and Johnson & Freedman for the purposes of engaging in an otherwise illegal course of conduct.

379.   The person credited with coining the phrase "control fraud" is William K. Black.[19]   Mr. Black in his own writings defines the term as follows:

   a.   Control frauds are crimes led by the head of state or CEO that use the nation or company as a fraud vehicle. In the private sector, the individual that controls the company (in practice) is typically the CEO.

   b.   One can classify private sector control frauds by the nature of the primary intended victim of the fraud. In anti-customer control frauds the CEO can use the company as a weapon in three distinct manners.

      i.   He can join with other firms in a cartel. Not all cartels are unlawful – the ultimate success in control fraud is for the government to make one's action lawful. Most cartels, however, are unlawful and have to be kept hidden through deceit – fraud.

      ii.   Another way to use the company as a weapon against consumers is the "scam." The seller defrauds the consumer about the quality, existence, or delivery of the good or service.

---

[19] See Exhibit 8, *When Fragile becomes Friable: Endemic Control Fraud as a Cause of Economic Stagnation and Collapse,* William K. Black, December 19-20, 2005, IDEAS Workshop: Delhi, India, Financial Crime and Fragility under Financial Globalization.

   iii. The other means of defrauding the consumer is procurement fraud. Such frauds rely on bribery the customer's agent in order to defraud. Procurement fraud can be used against both buyers and sellers.

c. These forms of control fraud are all similar in several respects. Each is predatory. Each creates and betrays trust…. In each form of control fraud the gain to the CEO is far smaller than the loss to the victims.

d. Each form of control fraud materially increases economic inefficiency.

e. In each case the losses are far greater because the CEO rather than a more junior official runs the fraud.

   i. The CEO has unique ability to optimize the company for control fraud,
   ii. unique capacity to shape the external environment to aid the fraud,
   iii. unique apparent legitimacy,
   iv. and can secure a larger gain in status from the fraud than any junior officer.

f. private control frauds produce real economic profits, indeed, they are undertaken in order to reap supra normal profits. Anti-consumer and anti-public control frauds frequently endanger public safety.

g. Whenever fraud creates real cost savings an additional problem arises. Analogous to Gresham's law (hyperinflations causes "bad money to drive good money out of circulation"), frauds that produce a competitive advantage must be vigorously prevented by public authorities or they will create an incentive for rivals to emulate the fraud.

h. Control frauds are a disaster on many different levels. They produce enormous losses that society (already poor in many instances) must bear. They corrupt the government and

discredit it. They inherently distort the market and make it less
efficient.

    i.   Control fraud also creates a sharp increase in economic
inequality.

380.   Each of the elements elicited in the description of control fraud
by Mr. Black are present in the case before the Court and are being wielded
by Mr. Phelan and Great Hill through the Prommis entities and the law firms
they "purchased" to commit an ongoing fraud on the Bankruptcy Court.

381.   For instance, Mr. Phelan is the Chairman of the Board of
Prommis and Great Hill controls five of the remaining six seats on the
Board.

382.   The fraud is anti-consumer.  It is in effect a "tax" on those less
fortunate souls who find themselves in difficult economic straits and who
seek protection under the Bankruptcy Code.

383.   Mr. Phelan and Great Hill have formed a cartel of ethically
compromised law firms and "vendors" (LPS Default) who are working
together to maximize the fraud.

384.   The Cartel is defrauding consumers through a scam about the
veracity of the fees being sought by the cartel members in official Court
proceedings.

385.   There is procurement fraud by the Cartel because the Court as the "buyer" of the false representations of the Cartel is unwittingly approving fees which the Court would never authorize with full knowledge of the fraud.

386.   The control fraud is predatory in that it exacts predatory fees for its profits from our nations most economically distressed population.

387.   The Fraud creates and betrays trust by hinging upon the misrepresentations of officers of the Court who, unbeknownst to the Court, have become members of the Cartel and are actively facilitating the Fraud for their own economic benefit.

388.   The gain to the Cartel is far smaller than the loss to the victims because the innocent users of the Court system become unwitting victims of plunder and the Court is misled into allowing predatory practices to go on in its very presence thereby degrading and debasing the very Halls of Justice for the advancement of a fraud.

389.   The Fraud has created economic inefficiency because the fraud has limited those officers of the Court representing these Creditors to only those attorneys and firms who are susceptible of being ethically compromised rather than choosing Counsel on merit and ability and other natural economic forces.

390. The fraud and resulting losses to the Court and the class members is far greater because Mr. Phelan and Great Hill are in control of and utilizing all of the resources of the Prommis entities including the law firms to further the fraud.

391. This fraud has enabled the Cartel to reap "supra-normal" profits through its fraud conduct and endangers public safety by undermining the integrity of the Court and the Court system.

392. Perhaps no clearer validation of Mr. Black's definition could be had than his statements from paragraph 379(g) herein "Whenever fraud creates real cost savings an additional problem arises…..frauds that produce a competitive advantage must be vigorously prevented by public authorities or they will create an incentive for rivals to emulate the fraud."

393. This statement is validated by the examination of the members of the Cartel before the Court.

394. LPS Default has created its own fraudulent cartel of "network firms" which has gone unpunished with its monopolistic competitive advantage for a number of years.

395. Mr. Phelan and Great Hill witnessed this competitive advantage at work through Mr. Phelan's law firm McCalla Raymer.

396.   Because Mr. Phelan was aware of and familiar with LPS Default's network agreement as one of the founders of McCalla Raymer he enjoyed particularized knowledge of how LPS Default dominated the marketplace through this illegal agreement.

397.   In fact, as a founder of McCalla Raymer, it is likely that Mr. Phelan even took part in the execution of the network agreement between McCalla Raymer and LPS Default which set out the fee splitting relationship between McCalla Raymer as a network firm and LPS Default.

398.   Through this relationship Mr. Phelan witnessed LPS Default grow to dominate the default services market through their competitive advantage gained by their contractual relationships with their Cartel of network firms.

399.   This growth likely convinced Mr. Phelan that the concept of creating the Prommis entities to emulate the actions of LPS could be equally successful with the strategic acquisition of large regional "network firms" like his own firm McCalla Raymer so that the Prommis entities could piggyback off of the unfair competitive advantage of the LPS Default network agreement.

400.   Mr. Phelan sold this concept to Great Hill who agreed to became part of the control fraud through the creation, funding and control of the Prommis entities: Prommis Holdings and Prommis Solutions.

401.   This control fraud by Mr. Phelan and Great Hill has in fact resulted in a distorted and inefficient marketplace.

402.   As a result this control fraud has produced enormous losses to the members of the Class by imposing an unfair tax upon them by virtue of the class members having filed bankruptcy.

403.   This control fraud has also corrupted and defiled the Court by virtue of the Cartel using the tool of fraud on the Court in its filings before the Court as a means to secure its illegal profits and impose its tax on the class members under the apparent authority of the Court.

404.   The actions of Mr. Phelan and Great Hill in this control fraud are the proximate cause of a continuing, systemic fraud on the Court being perpetrated by sophisticated market participants.

405.   The conduct described in the preceding paragraphs by the defendants violates the bankruptcy code and rules and constitutes an abuse of the bankruptcy process.

406.   The plaintiffs and the class invoke the court's inherent powers and the court's powers under Section 105 of the Bankruptcy Code to address the systemic abuse of the bankruptcy code and its rules and processes.

407.   The plaintiffs and class request that the Court enter such Orders and take such actions as are necessary, manifest and just to remedy the fraud on the Court perpetrated by these parties.

### PRAYER FOR RELIEF

WHEREFORE, the plaintiffs and the class pray this Honorable Court enter judgment against the defendants for the following:

I.      The plaintiffs and the class request the court enter an award of compensatory damages which includes a disgorgement of all fees and charges claimed by any of the defendants in any of these matters since the existence of these fee splitting contracts were made.

II.      The plaintiffs and the class request the court enter an award of punitive damages which will punish these defendants and deter others who would consider engaging in the behavior herein described given the enormity of the wrongfulness of the defendants' collective actions.

III.      The plaintiffs and the class request that the court invoke its inherent power and order a refund or credit of any fees charged and posted

to class members accounts or collected from class members in connection

with any of the illegally sought fees by any of the defendants plus interest,

sanctions, and punitive damages if available pursuant to Section 105 as

determined by the court.

IV.    The plaintiffs and class members request that the court award

all of their attorney's fees and costs in an amount to be determined by the

court with an order requiring the defendant to pay reasonable attorney's fees

and costs and expenses to the plaintiffs and the class and their counsel for

prosecution of this action.

V.    The plaintiffs and class members request any other civil relief

damages the court deems appropriate.

VI.    The plaintiffs and the class request the court enter appropriate

declaratory and equitable orders finding that the defendants' conduct is

illegal as set out herein and enjoining the defendants' conduct in the future.

VII.    The plaintiffs and the class request the court invoke any other

relief that is just and proper or necessary pursuant to Section 105 of the

Bankruptcy Code or any other provision in equity or law required to remedy

the conduct and make the class whole and to prevent the recurrence of the

conduct in the future.

VIII.   The plaintiffs and the class request any other relief which the

court deems appropriate.

Respectfully submitted this 5th day of February 2011.

/s/ Nick Wooten_____
Lead Counsel for the Plaintiffs
P.O. Box 3389
Auburn, Alabama 36831
334 887 3000
334 821 7720
nhwooten@gmail.com


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have served a copy of the foregoing upon
counsel of record for the parties and the US Trustee on this the 5th day of
February 2011 by use of the ECF system.

Representing

Johnson & Freedman & Freedman, LLC
1587 Northeast Expressway
Atlanta, GA 30329
(Defendant)

LEAD ATTORNEY

Kristina M. Johnson & Freedman
P.O. Box 427
Jackson, MS 39205-0427
601-949-4785
601-949-4804 (fax)
kjohnson@watkinsludlam.com

Jason Wilton Bailey
Watkins Ludlam Winter & Stennis, P.A.

P.O. Box 1456
Olive Branch, MS 38654
662-895-2996
jbailey@watkinsludlam.com

============================
Representing

Prommis Solutions Holding Corporation
400 Northridge Road
Atlanta, GA 30350
(Defendant)


LEAD ATTORNEY
Bill D. Bensinger
420 20th Street North
Wells Fargo Tower, Suite 1600
Birmingham, AL 35203
205-250-8359

John P. MacNaughton
1600 Atlanta Financial Center
3343 Peachtree St., N.E.
Atlanta, GA 30326-1044
404-504-7689

James H. White, IV
420 20th Street North
Wells Fargo Tower, Suite 1600
Birmingham, AL 35203
205-250-8369

John H. Williamson
1600 Atlanta Financial Center
3343 Peachtree St., N.E.
Atlanta, GA 30326-1044
404-495-3618

R. Spencer Clift, III
165 Madison Ave., Suite 2000
Memphis, TN 38103
901-526-2000
901-577-2303 (fax)
sclift@bakerdonelson.com


===========================

Representing

Great Hill Partners, LLC
One Liberty Square
Boston, MA 02109
(Defendant)

R. Spencer Clift, III
165 Madison Ave., Suite 2000
Memphis, TN 38103
901-526-2000
901-577-2303 (fax)
sclift@bakerdonelson.com


===========================
Representing

LPS Default Solutions
601 Riverside Avenue
Jacksonville, FL 32204
(Defendant)

 Lender Processing Services, Inc.
601 Riverside Avenue
Jacksonville, FL 32204
(Defendant)

James A. McCullough, II
P.O. Drawer 119
Jackson, MS 39205
601-960-6898
jmccullough@brunini.com
===========================

Representing

Darlene S. Thorne
1568 Central Trails Dr.
Southaven, MS 38671
(Plaintiff)

 Jonathan R. Thorne
1568 Central Trails Dr.
Southaven, MS 38671
(Plaintiff)

Locke D. Barkley
P.O. Box 55829
Jackson, MS 39296-5829
601-355-6661
sbeasley@barkley13.com
 (Trustee)

LEAD ATTORNEY
Nicholas Heath Wooten
Wooten Law Firm
Post Office Box 3389
Auburn, AL 36831
334-887-3000
334-821-7720 (fax)
nhwooten@gmail.com

Jimmy E. McElroy
3780 S. Mendenhall
Memphis, TN 38115
(901) 363-7283
mcelroylawms@hotmail.com

Robert G. Rikard
P.O. Box 5640
Columbia, SC 29250
(803)978-6111
============================


U. S. Trustee
100 West Capitol Street
Suite 706
Jackson, MS 39269
601-965-5241
USTPRegion05.AB.ECF@usdoj.gov


*/s/ Nick Wooten*_____
Lead Counsel for the Class