# PLAINTIFF'S EXHIBIT NUMBER:

## 3

**FREEDOM COURT REPORTING**

IN THE CIRCUIT COURT OF DEKALB COUNTY ALABAMA

CIVIL ACTION NO.:   08-183

LARRY DAVID WOOD, JR., and
KAREN WILBORN WOOD,
Individuals,

        Plaintiffs,

vs.

OPTION ONE MORTGAGE CORPORATION,
WELLS FARGO BANK, N.A.,
FIDELITY NATIONAL FORECLOSURE &
BANKRUPTCY SOLUTIONS,

        Defendants.

_____/

VIDEOTAPED DEPOSITION OF

BILL NEWLAND

Taken on behalf of the Plaintiffs

DATE TAKEN:         Tuesday, June 16, 2009

TIME:              9:10 a.m. - 5:30 p.m.

PLACE:            Fidelity National
                  601 Riverside Avenue
                  Jacksonville, Florida

REPORTED BY:       Cindy D. McClary, RPR, CRR

**FREEDOM COURT REPORTING**

Page 2

1

2            **APPEARANCES FOR THE PLAINTIFFS**
3                **NICK WOOTEN, ESQUIRE**
                 Post Office Box 3389
4                 Auburn, AL  36831
5

6

       **APPEARANCES FOR DEFENDANT OPTION ONE MORTGAGE**
7

          **WILLIAM P. LAWLER, JR., ESQUIRE**
8              Adams and Reese, LLP
             2100 Third Avenue North
9                 Suite 1100
            Birmingham, AL  35203-3367
10

11

12     **APPEARANCES FOR DEFENDANT FIDELITY NATIONAL**
13            **MICHAEL P. CASH, ESQUIRE**
             Gardere Wynne Sewell, LLP
14               1000 Louisiana
                   Suite 3400
15            Houston, TX  77002-5011
16

17

                  **ALSO PRESENT**
18

             **SHERYL L. NEWMAN, LPS**
19

           **ASHLEY HOLT, VIDEOGRAPHER**
20

21

22

23

24

25

**FREEDOM COURT REPORTING**

Page 3

1                           **INDEX**

2      Videotaped Deposition of Bill Newland

3                                                   **PAGE**

4      Direct Examination by Mr. Wooten . . . . . . . .6

5      Cross Examination by Mr. Cash. . . . . . . .256

6      Redirect Examination by Mr. Wooten . . . . .273

7      Certificate of Oath. . . . . . . . . . . . .281

8      Certificate of Reporter. . . . . . . . . . .282

9                             - - -

10                      **EXHIBITS INDEX**

11                                                  **PAGE**

12     Plaintiffs' Exhibit No. 1. . . . . . . . . . . 30

13     Plaintiffs' Exhibit No. 2. . . . . . . . . . .139

14     Plaintiffs' Exhibit No. 3. . . . . . . . . . .140

15     Plaintiffs' Exhibit No. 4. . . . . . . . . . .246

16     Plaintiffs' Exhibit No. 5. . . . . . . . . . .249

17     Plaintiffs' Exhibit No. 6. . . . . . . . . . .198

18     Plaintiffs' Exhibit No. 7. . . . . . . . . . .202

19     Plaintiffs' Exhibit No. 8. . . . . . . . . . .203

20     Plaintiffs' Exhibit No. 9. . . . . . . . . . . 32

21     Plaintiffs' Exhibit No. 10 . . . . . . . . . .205

22     Plaintiffs' Exhibit No. 11 . . . . . . . . . .218

23     Plaintiffs' Exhibit No. 12 . . . . . . . . . .219

24     Plaintiffs' Exhibit No. 13 . . . . . . . . . .220

25     Plaintiffs' Exhibit No. 14 . . . . . . . . . .224

**FREEDOM COURT REPORTING**

Page 4

1                    **EXHIBITS INDEX (Continued)**

2                                                        **PAGE**

3    Plaintiffs' Exhibit No. 15 . . . . . . . . . .229

4    Plaintiffs' Exhibit No. 16 . . . . . . . . . .232

5    Plaintiffs' Exhibit No. 17 . . . . . . . . . .236

6    Plaintiffs' Exhibit No. 18 . . . . . . . . . .237

7    Plaintiffs' Exhibit No. 19 . . . . . . . . . .240

8    Plaintiffs' Exhibit No. 20 . . . . . . . . . .243

9    Plaintiffs' Exhibit No. 21 . . . . . . . . . .242

10   Plaintiffs' Exhibit No. 22 . . . . . . . . . .242

11   Plaintiffs' Exhibit No. 23 . . . . . . . . . .245

12   Plaintiffs' Exhibit No. 24 . . . . . . . . . . 69

13   Plaintiffs' Exhibit No. 25 . . . . . . . . . .190

14   Plaintiffs' Exhibit No. 26 . . . . . . . . . .253

15   Plaintiffs' Exhibit No. 27 . . . . . . . . . .253

16   Plaintiffs' Exhibit No. 28 . . . . . . . . . .254

17   Plaintiffs' Exhibit No. 29 . . . . . . . . . .255

18

19   (Reporter's note:  Plaintiffs' Exhibit No. 15
     was withdrawn and retained by Plaintiffs' counsel.)

20

21

22

23

24

25

**FREEDOM COURT REPORTING**

Page 5

1       THE VIDEOGRAPHER:  This begins Videotape

2    No. 1 in the deposition of Bill Newland in the

3    matter of Larry David Wood, Jr., and Karen

4    Wilborn Wood versus Option One Mortgage

5    Corporation, et al., Case No. 08-183 in the Court

6    of DeKalb County, Alabama.

7       We are on the record at 9:10 a.m. on

8    Tuesday, June 16th, 2009.  This deposition is

9    taking place at Fidelity National in

10   Jacksonville, Florida.

11      My name is Ashley Holt, representing Freedom

12   Court Reporting.  Will counsel please identify

13   themselves and state whom you represent, and the

14   court reporter please swear in the witness.

15      MR. WOOTEN:  My name is Nick Wooten, and I

16   represent the plaintiffs in this action.

17      MR. CASH:  My name is Mike Cash, and I

18   represent Fidelity National Foreclosure &

19   Bankruptcy Solutions, a defendant in this action

20   currently.

21      MR. LAWLER:  My name is Will Lawler, and I

22   represent Option One Mortgage Corporation, a

23   defendant in this action.

24

25

FREEDOM COURT REPORTING

Page 6

1                    BILL NEWLAND,

2    having been produced and first duly sworn as a

3    witness, testified as follows:

4               THE WITNESS:  Yes.

5                    DIRECT EXAMINATION

6    BY MR. WOOTEN:

7         Q    Mr. Wooten, my -- Mr. Newland, my name is

8    Nick Wooten, I think you heard me introduce myself.  I

9    hadn't had the opportunity to meet you prior to today.

10   Have you ever given a deposition before today?

11        A    Yes, I have.

12        Q    Tell me about that.  How many times have you

13   been deposed, sir?

14        A    I've been deposed once.

15        Q    What was that in reference to?

16        A    Reference to a case here at Fidelity.

17        Q    Okay.  And was that where Fidelity was a

18   defendant in an action?

19        A    Yes, it was.

20        Q    Okay.  Did you serve as a 30(b)(6) witness

21   for Fidelity at that time?

22        A    I don't understand the question.

23        Q    Did you testify individually or as a

24   corporate representative of Fidelity?

25        A    Individually.

**FREEDOM COURT REPORTING**

Page 7

1    Q    Okay.  So you were a fact witness to that

2    specific case?

3    A    Yes.

4    Q    I understand that you've played some role in

5    this case up to this point with respect to answering

6    interrogatories and propounding affidavits; is that

7    correct?

8    A    Yes, it is.

9    Q    So I take it from that that you have

10   personally made yourself familiar with this litigation

11   and the allegations that have been made; is that

12   correct?

13   A    Yes, it is.

14   Q    If you will, sir, please tell me how long

15   you've been an employee of Fidelity National

16   Foreclosure Services.

17   A    Approximately five years.

18   Q    Okay.  How long have you been employed as a

19   vice president?

20   A    Approximately four years.

21   Q    The position that you currently hold,

22   exactly what is your title?

23   A    I'm first vice president of operations.

24   Q    What are your responsibilities with that

25   title, please, sir?

**FREEDOM COURT REPORTING**

Page 8

1      A    I have primary oversight for the

2   Jacksonville facility and also manage our attorney

3   management area and special assets for our foreclosure

4   department.

5      Q    What is a special asset in the foreclosure

6   department?

7      A    Basically, we handle title resolution,

8   assist in correspondence with title resolution,

9   probates, things of that nature.

10     Q    Have you held any other titles as an

11  employee of Fidelity?

12     A    I held a title primarily when I was hired on

13  here as assistant vice president.

14     Q    Okay.

15         MR. CASH:  Just for the record to be clear,

16      can we make an agreement that when we use the

17      term Fidelity, we're talking about the defendant

18      Fidelity National Foreclosure & Bankruptcy

19      Solutions?  Then we just don't have to repeat it

20      every time.

21         MR. WOOTEN:  It'll probably save my tongue,

22      so, frankly, that'll be fine with me.

23         MR. CASH:  Okay.

24  BY MR. WOOTEN:

25     Q    I think that's what the industry more or

**FREEDOM COURT REPORTING**

Page 9

1    less refers to you guys as anyway, right, Fidelity?

2        A      Not any longer, no.

3        Q      Actually, you're now LPS, right?

4        A      That is correct.

5        Q      And what does that stand for?

6        A      Lender Processing Solutions.

7        Q      And that is an entity which spun off of your

8    parent corporation; is that correct?

9        A      Yes.

10       Q      Okay.  And when did that spinoff take place?

11       A      July of '08.

12       Q      And do you have any understanding as to what

13   the motivation was to take LPS out from under the

14   broader umbrella as a separate company?

15       A      No, I do not.

16       Q      Were you involved in that decision at all?

17       A      No, I was not.

18       Q      Prior to coming -- well, let me just make

19   sure I'm clear about this.  You've only held two

20   positions with Fidelity, one is a vice president and

21   the other is first vice president of operations?

22       A      I've held three.  I was assistant vice

23   president, I was promoted to vice president then

24   promoted to first vice president.

25       Q      So your entry point was as assistant vice

FREEDOM COURT REPORTING

Page 10

1    president?

2          A     Yes, it was.

3          Q     And what year was that?

4          A     September of 2004.

5          Q     And when were you promoted to vice

6    president?

7          A     I want to say it was approximately March of

8    '05.

9          Q     Did you have a specific area of

10   responsibility with that description?

11         A     Which description?

12         Q     Vice president.

13         A     Primary responsibility stayed the same.

14         Q     Okay.  And that was what you set out

15   earlier?

16         A     Yes.

17         Q     And when were you promoted to first vice

18   president of operations?

19         A     I don't recall off the top of my head.

20         Q     Prior to working for Fidelity, where were

21   you previously employed?

22         A     Option One Mortgage.

23         Q     And did you leave Option One and come

24   directly to Fidelity?

25         A     After 30 days of being nonemployed, yes.

**FREEDOM COURT REPORTING**

Page 11

1        Q        How long were you employed by Option One,

2    sir?

3        A        Approximately 18 months.

4        Q        18 months?

5        A        Uh-huh.

6        Q        And how were you employed by Option One?

7        A        I held the title of assistant vice

8    president.

9        Q        Did you have a specific area that you were

10   assistant vice president to?

11       A        Loss mitigation, foreclosure, and

12   bankruptcy.

13       Q        Was Option One a Fidelity partner at that

14   time?

15       A        We had just become a partner approximately

16   two months prior to me leaving.

17       Q        And what was the term of your employment

18   with Option One?

19       A        18 months.

20       Q        So from February of 2005, previous 18

21   months?

22       A        No, I started here in September of 2004.

23       Q        I'm sorry.  I was looking at your -- wrong

24   date.  I apologize.  Looking at your vice president,

25   date you were promoted.

**FREEDOM COURT REPORTING**

Page 12

1          So you would've worked for Option One in

2     2003 and part of 2004?

3          A     That's correct.

4          Q     And your testimony is, is during that time,

5     you were not a Fidelity partner until approximately 60

6     days prior to your leaving?

7          A     For the -- that's correct.

8          Q     Prior to Option One, where did you work?

9          A     I worked for Ocwen Federal Bank.

10         Q     How long were you employed by Ocwen?

11         A     Five and a half years.

12         Q     What period of time was that, if you recall,

13    please, sir?

14         A     I want to say it was August of '97 through

15    February of 2003.

16         Q     Do you remember the position you were hired

17    on at at Ocwen?

18         A     That I was hired on at?  I was a team leader

19    over loss mitigation department.

20         Q     Because everybody who may eventually hear or

21    see this testimony doesn't understand what we mean

22    when we say loss mitigation, would you, please,

23    explain that for me.

24         A     We provided assistance to the borrowers in

25    attempting to resolve their delinquency through some

**FREEDOM COURT REPORTING**

Page 13

1    type of means of mitigation.

2        Q    So that was where you might work out a

3    forbearance or payment plan or modification, if the

4    circumstance were appropriate, that sort of thing?

5        A    That would be correct.

6        Q    And the goal of loss mitigation generally is

7    to prevent a foreclosure or loss of a home, is that

8    the general goal?

9        A    That's correct.

10       Q    Other than loss mitigation, at the time you

11   were hired, did you do any other -- or perform any

12   other function at Ocwen?

13       A    I also managed front-end collections, which

14   would be your zero to 90-day collections.

15       Q    Would it be fair to say that the front-end

16   collections are those borrowers who are not current

17   but have not been declared to be in default?

18       A    That would be correct.

19       Q    And so, in that regard, sort of more or less

20   a proactive loss mitigation approach to try to keep

21   those people from trying to go into default, right?

22       A    Yes.

23       Q    How long were you in that position with

24   Ocwen?

25       A    Approximately three years.

**FREEDOM COURT REPORTING**

Page 14

1    Q    So sometime in 1999 or early 2000 you

2    changed positions with respect to that?

3    A    Yes.

4    Q    Where did you go to from loss mitigation?

5    A    I went back to the -- well, I went from loss

6    mitigation to collections and then went back to loss

7    mitigation as the director.

8    Q    So when -- did you maintain the title of

9    team leader up until the time that you went to

10   collections?

11   A    No.

12   Q    Okay.  So what other titles did you hold in

13   loss mitigation?

14   A    I held the title of director of operations.

15   Q    So did you advance directly from team leader

16   to director of operations, or were there intermediate

17   advancements?

18   A    There was -- there were intermediate

19   promotions between that.

20   Q    I'm assuming that you would've gone from

21   team leader to either manager or vice president?

22   A    Yes.

23   Q    Okay.  Both or --

24   A    No.

25   Q    -- one?

FREEDOM COURT REPORTING

Page 15

1    A    No, I went from team lead, then I went to --

2  as a manager for the collections department, and then

3  to the senior manager of that department.  And then I

4  moved to director of operations for loss mitigation.

5    Q    The collections department is a different

6  department than loss mitigation, right?

7    A    Yes, it is.

8    Q    And the collection department at Ocwen, how

9  would that have been defined?  What was its function?

10   A    As I stated previously, it was basically to

11 collect on moneys owed that were delinquencies that

12 were zero to 90 days.

13   Q    So it is what you referenced earlier as

14 front-end collections?

15   A    Yes.

16   Q    Okay.  I'm sorry, I didn't realize that you

17 were not distinguishing between the two.

18        So at what point did you move from senior

19 manager of collections to director of operations of

20 loss mitigation?

21   A    It would've been -- I don't recall off the

22 top of my head, but it was about -- it was about a

23 year and a half prior to me leaving --

24   Q    Okay.

25   A    -- Ocwen, so, whatever that date is.

**FREEDOM COURT REPORTING**

Page 16

1    Q    So you would've been in collections from

2    sometime in '99 or 2000 until about 2000 -- late 2001,

3    early 2002?

4    A    Collections was -- when I started in

5    front-end collections, it was early 1998.

6    Q    All right.

7    A    And spent two years in early collections.

8    So, approximately, probably, late to mid -- mid 2000

9    is when I went into loss mitigation.

10   Q    And that's when you became the director of

11   operations --

12   A    Yes.

13   Q    -- there?  And you held that title until you

14   left that position?

15   A    That's correct.

16   Q    As part of your work as director of

17   operations in loss mitigation, were you ever deposed

18   as an employee of Ocwen Federal Bank?

19   A    No, I was not.

20   Q    Where was Ocwen Federal Bank?  Where was

21   your employment located with them during this period

22   of time?

23   A    Orlando, Florida.

24   Q    Are there any other titles or positions that

25   you held with Ocwen Federal Bank --

**FREEDOM COURT REPORTING**

Page 17

1      A      No.

2      Q      -- during this time?

3      A      No.

4      Q      During this period of time, was Ocwen

5   Federal Bank subject to any state or federal

6   investigation with respect to their lending or

7   mortgage service and practices?

8      A      I don't recall.

9      Q      Did you ever give any testimony with respect

10   to any state or federal investigation?

11      A      No, I did not.

12      Q      Is it your testimony today that you never

13   testified as an employee of Ocwen Federal Bank or as a

14   corporate representative in any litigation?

15      A      Not that I'm aware of.

16      Q      As part of your work, did you provide for

17   Ocwen Federal Bank any affidavits or any other type of

18   documents which would've been filed in any federal --

19   or any lawsuit or litigation involving Ocwen Federal

20   Bank?

21      A      I don't recall.

22      Q      Prior to Ocwen Federal Bank, where were you

23   employed, sir?

24      A      I was employed with a company called -- I'm

25   trying to think of the -- it was Premiere Credit was

**FREEDOM COURT REPORTING**

Page 18

1    the name of the company, but it's now, I believe,

2    Outsourcing Solutions, Incorporated.

3         Q    Is Outsourcing Solutions also commonly known

4    by the acronym OSI?

5         A    I believe so.

6         Q    Is it fair to say that OSI is a debt

7    collection agency?

8         A    Yes, it is.

9         Q    And they purchase delinquent account

10   receivables; is that correct?

11        A    I don't recall what they're purchasing.

12        Q    But you understand their business to be that

13   of debt collection?

14        A    Yes.

15        Q    And how were you employed by OSI?

16        A    I was a manager of a group there.

17        Q    Manager of a collection group?

18        A    Yes.

19        Q    When did your employment with OSI begin and

20   when did it end?

21        A    I don't recall off the top of my head.  I

22   know it ended in August of 1997.

23        Q    Why did your employment end with OSI?

24        A    I took an opportunity to go to Ocwen Federal

25   Bank.

FREEDOM COURT REPORTING

Page 19

1      Q      During your time at OSI, were you ever a

2  witness where you gave either deposition or live

3  testimony in any litigation?

4      A      No, I did not.

5      Q      Did you ever serve as a corporate

6  representative of OSI in any litigation?

7      A      No, I did not.

8      Q      At the time that you were employed with OSI

9  in managing its collections group, did OSI file

10  lawsuits to collect on their accounts receivable?

11      A      I don't recall.

12      Q      So your work there was limited to managing a

13  group of collectors which would call consumers to

14  collect on these account receivables, or write

15  consumers; is that correct?

16      A      That's correct.

17      Q      And is it your testimony that you don't

18  remember even approximately when your employment began

19  at OSI?

20      A      I -- I don't recall the exact date when I

21  started there.

22      Q      Do you have a recollection of how many years

23  you spent there?

24      A      I spent about three years.

25      Q      Did you have any other titles or positions

FREEDOM COURT REPORTING

Page 20

1    with OSI?

2        A     No, I did not.

3        Q     Prior to OSI, what was your employment,

4    please, sir?

5        A     Commercial Credit.

6        Q     Let me go back to OSI for just a second.

7    Where was your place of employment with OSI?

8        A     Atlanta, Georgia.

9        Q     Atlanta's a big city.  Were you in one of

10   the suburbs or were you in Atlanta proper?

11       A     I was in the Marietta location.

12       Q     Out near the Air Force base?

13       A     No, it was off of Windy Hill Road.

14       Q     Almost to the Air Force base?

15       A     Almost, not quite.

16       Q     You mentioned Commercial Credit.  Where was

17   your employment with Commercial Credit located?

18       A     Tucker, Georgia.

19       Q     And do you recall your period of employment

20   with them?

21       A     Approximately four years.

22       Q     Based upon my guesstimation, it appears that

23   you would've been employed there from approximately

24   1990 or '91 until approximately 1994.  Does that sound

25   about right?

**FREEDOM COURT REPORTING**

Page 21

1       A      Approximately.

2       Q      And what is the business of Commercial

3   Credit at that time, please, sir, as best you recall?

4       A      Consumer finance.

5       Q      Would this be one of those storefront

6   operations where people walk in off the street and get

7   small loans for consumer goods, that sort of thing?

8       A      Yes.

9       Q      And were you actually in that portion of the

10  business at that time?  Were you doing consumer

11  finance or were you in collections also there?

12      A      You basically do consumer finance and

13  collections.

14      Q      So that's, I guess, one of the early models

15  where you had people coming and making their weekly

16  payments of 28 bucks or whatever, and you're making

17  loans to them as they need and qualify for them, and

18  then if they're delinquent, you're picking up the

19  phone and calling people you've made loans to and say,

20  hey, why don't you come make a payment to me, that

21  sort of thing?

22      A      Yes, that's right.

23      Q      And is it safe to say that most of your

24  loans would've been for smaller amounts, under $5,000,

25  that type of thing?

Page 22

1        A     Primarily.

2        Q     Sure.  Did you make mortgage loans from that

3   location at that time?

4        A     Yes, we did.

5        Q     Were those first or second loans?

6        A     Second mortgages.

7        Q     Did not engage in the business of making

8   first mortgages at all?

9        A     No.

10       Q     And how long -- well, you've already told me

11  that, so strike that.  You worked there for about four

12  years?

13       A     About four years.

14       Q     Prior to Commercial Credit -- well, let me

15  back up and ask a couple more questions.

16             I'm assuming -- well, don't let me assume.

17  What position did you enter that business as?

18       A     A manager.

19       Q     Were you the manager in charge of that

20  branch or --

21       A     Yes.  Yes, I was.

22       Q     Okay.  Is that the first professional job

23  you had out of college?

24       A     No, it was not.

25       Q     Prior to Commercial Credit, where were you

Page 23

1   employed?

2       A    A company called Bomar Credit.

3       Q    I'm sorry?

4       A    Bomar, B-O-M-A-R.

5       Q    One I haven't heard of.  Were they also in

6   consumer finance?

7       A    No, they were actually a third-party

8   collection company.

9       Q    And where was your principal place of

10  employment with Bomar?

11      A    Atlanta, Georgia.  And it is Atlanta,

12  Georgia.

13      Q    Okay.  And what was your position with

14  Bomar?

15      A    I was a collector.

16      Q    And what were you primarily collecting at

17  Bomar?

18      A    Small balances.

19      Q    What type of accounts?

20      A    Charged off credit cards.

21      Q    Was Bomar bought out by someone?

22      A    I don't -- I don't recall.  I didn't spend

23  much time there.

24      Q    How long were you with them?

25      A    Six months.

**FREEDOM COURT REPORTING**

Page 24

1    Q    I'm assuming that you held no position other

2   than collector?

3    A    That's correct.

4    Q    And with Commercial Credit, you held no

5   position other than manager?

6    A    That's correct.

7    Q    Did you have a job prior to Bomar Credit?

8    A    Yes, I did.

9    Q    Where was that?

10    A    Household Finance Corporation.

11    Q    Do you remember the term of your employment?

12    A    Approximately six years.

13    Q    So that would've been mid to late '80s; is

14   that fair?

15    A    Yeah, it was -- I remember, because I

16   started out of college there, it was September of 1984

17   is when I started there.

18    Q    And worked there till sometime in '89?

19    A    Yes.

20    Q    And that was your first position out of

21   college?

22    A    Yes.

23    Q    And what position were you hired into,

24   please, sir?

25    A    As a branch representative.

**FREEDOM COURT REPORTING**

Page 25

1      Q      Can you tell me what that job involved?

2      A      Learning.

3      Q      Trying to find your way to work in the

4   morning?

5      A      Yeah, basically learning how to

6   lend/collect, primarily.

7      Q      So somewhat of an apprenticeship-type

8   position?

9      A      That would be correct.

10     Q      And how long did you serve in that capacity?

11     A      Oh, to be honest with you, I don't recall

12  how long I served in that capacity.

13     Q      Was that, for lack of a better term, a

14  program where they brought you in, you served in that

15  capacity for a period of time, and then they advanced

16  you or said you will never cut it here and let you go?

17     A      They would advance you, or if you weren't

18  doing the job, they would let you go, yes.

19     Q      And so, obviously, you advanced since you

20  were there five years?

21     A      Yeah, to an assistant manager.

22     Q      Okay.  At that time, was Household also more

23  or less a storefront type operation?

24     A      Yes, they were.

25     Q      So you would've went to work in an existing

**FREEDOM COURT REPORTING**

Page 26

1  facility with, I'm assuming, an experienced manager?

2      A    Yes.

3      Q    Okay.  And where would that employment have

4  been located?

5      A    That was in south DeKalb County, I believe

6  at the -- it was Decatur, Georgia.

7      Q    And how long did you serve as assistant

8  manager, if you recall?

9      A    Between the branch manager and -- or the

10  branch representative and assistant manager,

11  approximately two years.

12      Q    All right.  And after your assistant manager

13  position there, I'm assuming you received some other

14  sort of promotion?

15      A    Yes, I was promoted, branch manager.

16      Q    Were you sent to another store, or did you

17  stay in the Decatur, Georgia, area?

18      A    No, I was sent to the Tucker, Georgia,

19  location.

20      Q    Is it fair to say during this period of time

21  this type of business was expanding pretty rapidly,

22  opening new stores, that sort of thing?

23      A    I don't recall.

24      Q    Do you know if the Tucker store was a new

25  store that you took over?

Page 27

1       A     No, it was not.

2       Q     All right.  And how long were you branch

3    manager at Tucker?

4       A     Approximately three and a half years, almost

5    four.

6       Q     So is it fair to say you were there until

7    you left?

8       A     Yes.

9       Q     Okay.  And you did mention that that was

10   your first job out of college.  Where did you go to

11   college at?

12      A     Valdosta State College.

13      Q     Folks that go to Valdosta State usually only

14   go because they play some sport or they live nearby;

15   what was it for you?

16      A     I went down there to play baseball.

17      Q     All right.  Did you grow up in Georgia?

18      A     I grew up all over.

19      Q     Okay.  So you were there all four years, I

20   assume?

21      A     Yes.

22      Q     And you have a bachelor's degree?

23      A     No, I do not.

24      Q     Did you complete a degree from Valdosta

25   State?

FREEDOM COURT REPORTING

Page 28

1      A      Associate's.

2      Q      And what is that degree in?

3      A      Finance.

4      Q      Do you have any other college degrees?

5      A      No, I do not.

6      Q      Where did you graduate from high school

7  from?

8      A      Milton High School, Alpharetta, Georgia.

9      Q      With respect to Option One, where was your

10  employment principally located?

11      A      Jacksonville, Florida.

12      Q      And where in Jacksonville was Option One's

13  building located?

14      A      I -- I don't recall the exact address.  I

15  believe it was Touchton Road.

16      Q      You indicated with respect to Option One

17  that you were an assistant vice president for loss

18  mitigation, foreclosure and bankruptcy, correct?

19      A      Yes.

20      Q      Was all that work handled in-house at that

21  time?

22      A      Loss mitigation, foreclosure and bankruptcy,

23  we utilized Fidelity for two states, about half the

24  work, for the last two months that I was there.

25      Q      Is your testimony that Fidelity only had the

**FREEDOM COURT REPORTING**

Page 29

1  foreclosure and bankruptcy business of Option One for

2  the last two months that you were there?

3      A    Yes, it is.

4      Q    Did Option One use the MSP software platform

5  at that time?

6      A    Yes, they did.

7      Q    Did Ocwen use MSP?

8      A    No, they did not.

9      Q    What did they use?

10     A    It was an in-house product.

11     Q    Did you ever work in foreclosure and

12  bankruptcy at Ocwen?

13     A    No, I did not.

14     Q    Do you know anyone or have any relatives by

15  blood or marriage who live in DeKalb County, Alabama?

16     A    No, sir.

17     Q    Do you have any friends or acquaintances in

18  DeKalb County, Alabama?

19     A    No, sir.

20     Q    Have you ever been to DeKalb County,

21  Alabama?

22     A    No, sir.

23     Q    So then we can agree that your entire

24  professional life has been involved in finance or

25  collections?

**FREEDOM COURT REPORTING**

Page 30

1          A     That is correct.

2                (Plaintiffs' Exhibit No. 1 marked for

3     identification.)

4          Q     Let me show you what I've previously marked

5     as Plaintiffs' Exhibit 1.  I will represent to you

6     that that is a copy of a Plaintiffs' 30(b)(6) notice

7     for today which was filed with the court system in the

8     State of Alabama for DeKalb County.  Ask you to take a

9     look at that document.  Excuse me.

10               Have you reviewed that document prior to

11    coming to this deposition today?

12         A     Yes, I have.

13         Q     Are there any documents that you have

14    available today that are included in that deposition

15    notice that you have not previously produced?

16               MR. CASH:  Yeah, this is Mike Cash, I'm the

17               attorney for Fidelity.  There are a number of

18               categories that requested documents which are

19               either documents that don't exist or the

20               definition is inaccurate.  What we've done is

21               gone back and pulled all documents associated --

22               that Fidelity has that are associated with this

23               file, and I'm producing those now to plaintiffs'

24               counsel.

25               MR. WOOTEN:  Now, have these documents been

FREEDOM COURT REPORTING

Page 31

1    previously Bates stamped or marked in any way?

2          MR. CASH:  They have not.  And what we

3    probably want to do is go ahead and produce them

4    and have the reporter make Bates stamp copies

5    and -- and then we'll get them with copies of the

6    deposition, if that's acceptable.

7          MR. WOOTEN:  Going to be lots of copies with

8    this deposition.

9  BY MR. WOOTEN:

10     Q    Is it your testimony that these are all of

11   Fidelity's documents with respect to this loan?

12         MR. CASH:  Again, my statement is those are

13   all the documents which would've been responsive

14   to the request with respect to this loan.

15         MR. WOOTEN:  Okay.

16   BY MR. WOOTEN:

17     Q    Let me see that document, if you will,

18   please, sir.  Because I didn't make copies of it.  I'm

19   working off of this.

20         What is a MSP P309 form, Mr. Newland?

21     A    I don't know.

22     Q    Is it fair to say that an MSP P309 form is

23   actually a data archive which shows each time that

24   Fidelity or a user of MSP changes any data with

25   respect to any loan?

**FREEDOM COURT REPORTING**

Page 32

1      A     I -- I don't recall.

2      Q     And it's your testimony that you previously

3  reviewed my deposition notice, correct?

4      A     Uh-huh.

5      Q     You are the first vice president of

6  operations of Fidelity, correct?

7      A     That is correct.

8      Q     LPS, I'm sorry.  Is it your testimony that

9  you don't know what a P309 form is?

10     A     No, I do not.

11     Q     Do you know what a P309 screen is?

12     A     I've seen the screen, but I don't know what

13  it entails.

14           (Plaintiffs' Exhibit No. 9 marked for

15  identification.)

16     Q     Okay.  Let me show you a document I

17  previously marked as Plaintiffs' Exhibit 9, and I'll

18  represent to you that that is a copy of a web page

19  from LPS's training software with respect to MSP.

20  Does that appear to be a web-based training document

21  from your MSP software, Mr. Newland?

22     A     From LPS software?

23     Q     Uh-huh.

24     A     Looks to be, yes.

25     Q     Okay.  And does that indicate a P309 screen?

**FREEDOM COURT REPORTING**

Page 33

1      A     Yes, it indicates as far as approximately

2  what a P309 screen is, yes.

3      Q     Okay.  Does it explain what a P309 is, what

4  information's available from a P309 --

5      A     Yes, it does.

6      Q     -- screen?

7            Okay.  What information is available

8  according to that document from a P309 screen?

9      A     Are you asking for me to read the -- what's

10  over here on the right side?

11     Q     Well, we can start with that.

12     A     Sure.  P309 provides loan activity detail;

13  past activity which equals history; files storing

14  history and equals history of files; history initiated

15  at the loan boarding, new loan setup or acquisition

16  and merger; transactions generate details.

17     Q     I'm going to ask you again, Mr. Newland,

18  does that document indicate that a P309 form will give

19  you the history of all the data transactions and the

20  changes that have been made with respect to your MSP

21  software for any given loan?

22           MR. CASH:  Object to the form of the

23           question and the term "your".  We're here for

24           Fidelity, for the defendant in this case, which

25           is Fidelity Foreclosure & Bankruptcy Solutions.

**FREEDOM COURT REPORTING**

Page 34

1          MR. WOOTEN:  Okay.

2          MR. CASH:  To the extent it's a different

3    entity, I'm going to -- we're going to have to be

4    a little more specific on the term "your"

5    software.

6          MR. WOOTEN:  Well, Mr. Cash, your defendant

7    runs MSP software.

8          MR. CASH:  Actually, Mr. Wooten --

9          MR. WOOTEN:  It's owned by the parent

10   company.

11         MR. CASH:  -- you're misinformed.  You're

12   misinformed.  So you -- I'm going to ask that you

13   not testify.  If you want to ask him questions,

14   that's fine, but if that's the basis you're

15   asking these questions on, you are misinformed.

16         MR. WOOTEN:  Okay.  Well, we're going to ask

17   him these questions, Mr. Cash.

18         MR. CASH:  Feel free.  But we're going to

19   have to make it specific.

20         MR. WOOTEN:  Well, that'll be fine --

21         MR. CASH:  So when you say your --

22         MR. WOOTEN:  -- we'll do that.

23         MR. CASH:  We're here as a 30(b)(6)

24   representative of this defendant, not affiliates

25   of this company.

FREEDOM COURT REPORTING

Page 35

1      MR. WOOTEN:  And I'm going to ask you not to

2  make speaking objections and not to direct him

3  how to testify by your objections.

4      MR. CASH:  I'm not going to do that, but I'm

5  going to -- my objection -- my only objection

6  was:  Objection, "your" is not specific.  You

7  went into the speaking, and I responded so you

8  can understand what my objection is.

9      MR. WOOTEN:  Sure.  And that's fine.

10      MR. CASH:  So, I object to the use of the

11  term "your."  That was my objection and it's not

12  a speaking objection.

13  BY MR. WOOTEN:

14      Q    Well, let me ask you this, Mr. Newland,

15  isn't it a fact, sir, that the client that you are

16  here -- the defendant that you're here as a corporate

17  rep of, Fidelity National Foreclosure Services, or

18  LPS, uses MSP, the software platform, for its work?

19      A    Our client uses this and we do have the

20  ability to access their system, yes.

21      Q    That is correct, you do have the ability to

22  access their system, right?

23      A    That's correct.

24      Q    And, in fact, you had the ability to enter

25  the data fields in their system and make changes,

FREEDOM COURT REPORTING

Page 36

1    don't you?

2         A    I don't know the answer to that question.

3         Q    You are the person in charge of LPS; is that

4    fair to say?

5         A    No, it's not.

6         Q    Okay.  Are you in charge of the day-to-day

7    operations?

8         A    I run a portion of the day-to-day

9    operations.

10        Q    Okay.  Is it your testimony today,

11   Mr. Newland, that you are unfamiliar with whether or

12   not employees who work for you can enter client data

13   fields and alter that data and make changes to that

14   data through their access through MSP?

15        A    They can make changes to certain portions of

16   the client's system, but specifically, I don't know

17   what portions those are.

18        Q    And isn't it true, Mr. Newland, that a P309

19   form will indicate all the data changes that have been

20   made on any given loan?

21        A    That's what it states in this screen shot,

22   yes.

23        Q    And isn't it true, Mr. Newland, that you can

24   walk out to any computer that is currently locked out

25   of MSP and use your log-in and access the P309 field

**FREEDOM COURT REPORTING**

Page 37

1    and print all the forms associated with that field

2    with a simple push of a button?

3        A    I don't recall.

4        Q    I would assume with your seniority that you

5    have certain rights to access documents and data

6    commensurate with your seniority; is that correct?

7        A    No, it's not.

8        Q    Oh.  So who at LPS would have that

9    information as to who could enter MSP and print off a

10   P309 form?

11       A    I don't recall.

12       Q    So before we get too deep into this, I want

13   to back up just a little bit.  Please tell the Court

14   and whoever else might view this testimony exactly

15   what MSP is.

16       A    MSP is a mortgage service platform.

17       Q    It's a software system, isn't it?

18       A    I don't know whether it's a software system

19   or not.

20       Q    With respect to a mortgage transaction, sir,

21   is it true that MSP basically handles a loan file from

22   origination to the termination of the loan either by

23   payoff or foreclosure once it's in the MSP system,

24   assuming that it remains on the system with Fidelity

25   partners?

FREEDOM COURT REPORTING

Page 38

1        A     I don't know.

2        Q     Okay.  With respect to the MSP software,

3    isn't it true, sir, that there are different modules

4    with respect to that software?

5        A     That I don't know either.

6        Q     Tell me what particular portions of the MSP

7    system the employees who work for you at LPS have

8    access to, please, sir.

9        A     I do not know off the top of my head.

10       Q     Who is the person who you either work for or

11   who works for you who would know that information,

12   please, sir?

13       A     That would probably be our securities

14   department.

15       Q     Okay.  Your securities department?

16       A     Uh-huh, security department.

17       Q     So that would be your information technology

18   security department?

19       A     Yes.

20       Q     So you're telling me that there are no other

21   employees in your direct supervision line, either

22   above or below you, who can tell me what the various

23   modules of MSP are?

24       A     Not -- well, not in my direct supervision,

25   no.

Page 39

1      Q     And you cannot tell me what modules of that

2   software your employees who work for you at LPS can

3   access, can you?

4      A     No.

5      Q     So you don't know whether somebody who's an

6   entry level employee who's just received their

7   clearance can go into the MSP software and print off

8   all the P309 forms or not, do you?

9      A     I do not know specifically what screens

10  they're available to go to.

11     Q     Okay.  Now, you've had this deposition

12  notice for a period of time, haven't you, sir?

13     A     Yes.

14     Q     It's dated the 4th day of June of 2009,

15  isn't it?

16     A     Yes, it is.

17     Q     And I'm assuming, as you said, you had

18  reviewed this prior to coming here this morning,

19  right?

20     A     Yes.

21     Q     And being that it was the first topic on

22  which examination was requested, I'm assuming that you

23  asked someone what a P309 form was if you didn't know?

24     A     Well, you said P309 forms.  I do not know

25  what an MSP P309 form is.

**FREEDOM COURT REPORTING**

Page 40

1      Q      Okay.  MSP is your software, is it not?

2      A      It's not my software.

3      Q      It's Fidelity's software, is it not?

4             MR. CASH:  Again, objection.  Unless we're

5      defining Fidelity as Fidelity National

6      Foreclosure & Bankruptcy Solutions.  Given that

7      definition, you can answer.

8   BY MR. WOOTEN:

9      Q      Let me be clear.  I'm going to refer to your

10  entity as LPS from now on, so we can be real distinct

11  about what we're saying.  Is it your testimony that

12  LPS does not use MSP in its operations?

13     A      No, LPS does utilize some of MSP, yes.

14     Q      Okay.

15     A      For different clients.

16     Q      And MSP is a loan product of -- or a

17  servicing platform which is owned by LPS's parent

18  company; is it not?

19     A      That would be correct.

20     Q      And we're in the parent company building

21  this morning, right?

22     A      That is correct.

23     Q      And I've shown you Exhibit 9 and you've read

24  what this form says, correct?

25     A      Uh-huh.

**FREEDOM COURT REPORTING**

Page 41

1      Q    And is it your testimony that you did not

2   inquire as to what a P309 -- you didn't do any inquiry

3   at all into that?

4      A    That's correct.

5      Q    Okay.  So it's your testimony that because

6   it said MSP P309 form, that you did no inquiry

7   whatsoever into that area of examination?

8      A    That's correct.

9      Q    And the next sentence of that line of

10   inquiry said:  This should include all history files

11   archived on your system, whether they are delineated

12   as history, past activity or file storing history.  Is

13   that correct?

14      A    Yes.

15      Q    And is it your testimony that you cannot go

16   onto any loan on which LPS is active and find the

17   history, the past activity, or the file storing

18   history?

19      A    I don't know.  Based off of this information

20   that you provided me, yes, it stipulates in this that

21   we can do that.

22      Q    Okay.  And I'm asking you, did you make any

23   inquiry, beyond the first sentence of that area of

24   examination, into whether or not you could provide me

25   the history files on your system with respect to my

FREEDOM COURT REPORTING

Page 42

1   client's loan, whether they were delineated as

2   history, past activity, or file storing history?

3        A     No.

4        Q     So you made no inquiry whatsoever?

5        A     No, I did not.

6        Q     Okay.  And isn't it a fact, sir, that you or

7   someone under your control could log into their work

8   station and print you off whatever documents are there

9   as history, past activity, or file storing history

10  with a simple push of a button?

11       A     That is correct.

12       Q     And it would take less than ten minutes to

13  do so, wouldn't it?

14       A     I don't know.

15       Q     It would simply be a matter of entering my

16  client's loan information and going to that field and

17  pressing print, wouldn't it?

18       A     I don't know.

19       Q     Would you be surprised if other people

20  testifying about your software system -- or not your

21  software system, but Fidelity's software system, said

22  that any information in any field could be printed

23  with the press of a button?

24       A     I'm sure they may say that.

25       Q     Is your employment principally located in

**FREEDOM COURT REPORTING**

Page 43

1    Jacksonville, Florida?

2         A    Yes, it is.

3         Q    Do you have employees in this very building

4    where we sit who would have access to that

5    information?

6         A    I do not have employees in this building.

7         Q    Do you have employees in this compound?

8         A    Yes, I do.

9         Q    Okay.  Because there are about, what -- how

10   many buildings are in the compound?

11        A    Five.

12        Q    Okay.  So you have employees who work

13   directly for you who could easily gather this

14   information in a matter of moments, right?

15        A    I don't know whether it's a matter of

16   moments or not.

17        Q    Well, it's 10:00 local time, and I can go

18   ahead and represent to you we're going to be here for

19   a while.  Do you want to take a break now and find an

20   employee and ask them if they can access that

21   information?

22        A    No, that's okay.

23             MR. CASH:  No, we're here ready to testify.

24   We'll testify to what we're here with.

25   BY MR. WOOTEN:

FREEDOM COURT REPORTING

Page 44

1      Q    The next thing that I asked you for with

2    respect to this deposition are:  All correspondence,

3    images, documents, notes or communications, in

4    whatever form and by whatever medium contained in the

5    client services notes of the Fidelity software for the

6    subject loan.  As well as, if not previously provided,

7    a definitional code sheet for any codes used to

8    explain or describe this data.

9         MR. CASH:  If we're going to go through

10        these one at a time, we would lodge an objection

11        to this request, that it's overly broad, it's

12        unclear, it's vague.  There is no definition as

13        to, quote, Fidelity software.  There is no

14        definition as to the term, quote, Fidelity.

15        There is no definition of what client services

16        notes are.  Based upon those objections, there

17        are no documents that are responsive to this

18        specific request.  However, and in trying to

19        interpret the vague request, we have provided all

20        notes regarding this loan, which are one of the

21        first exhibits.

22        MR. WOOTEN:  Mr. Cash, I just want to

23        clarify something.  You have not appeared of

24        counsel in this lawsuit in DeKalb County,

25        Alabama, have you?

FREEDOM COURT REPORTING

Page 45

1      MR. CASH:  Yes, I have.  And I have -- my

2  pro hac vice has been granted.

3      MR. WOOTEN:  And you have local counsel

4  who's also involved in this lawsuit, correct?

5      MR. CASH:  That is correct.

6      MR. WOOTEN:  And that's the firm of Huie

7  Fernambucq in Birmingham, Alabama?

8      MR. CASH:  I believe that's correct.

9      MR. WOOTEN:  Did anyone acting on behalf of

10  your client file any objections to this 30(b)(6)

11  deposition notice?

12      MR. CASH:  We're making our objections on

13  the record as to the specific document requests,

14  which we received within about the past ten days.

15      MR. WOOTEN:  Okay.  Today is June the 16th,

16  correct?

17      MR. CASH:  That is correct.  This was filed

18  on the 4th.  And I received it on about the 6th

19  or the 7th.  So within less than ten days.  And

20  I'm making my objections on the record.

21      MR. WOOTEN:  I'm aware that you're making

22  your objection on the record.  My question is,

23  did anybody make a filed written objection to the

24  areas of inquiry in this 30(b)(6) notice?

25      MR. CASH:  Not as far as I know.

**367 VALLEY AVENUE**

FREEDOM COURT REPORTING

Page 46

1      MR. WOOTEN:  Did you direct anyone on your

2  behalf or on your client's behalf to file an

3  objection in court with respect to this

4  deposition notice?

5      MR. CASH:  Nick, I'm not the one being

6  deposed here, so I will make my objections on the

7  record.

8      MR. WOOTEN:  Okay.  I'm just --

9      MR. CASH:  And the record speaks for itself.

10      MR. WOOTEN:  -- making my record also, Mr.

11  Cash, so I'm just asking you, did you direct

12  anyone --

13      MR. CASH:  And I'm not answering your

14  questions, Nick.  I'm not being deposed here.  I

15  will state my objections on the record, as I'm

16  entitled to do.

17      MR. WOOTEN:  And I just want to make sure I

18  understand something, because I just want to be

19  real clear about this.  Your testimony is --

20      MR. CASH:  It's not my testimony, I'm going

21  to tell you again.

22      MR. WOOTEN:  Your offering is --

23      MR. CASH:  I'm not under oath here and I'm

24  not testifying.  I've been clear on the record

25  and I will make my record.  So if you have more

Page 47

1       questions of the witness, feel free to ask him,

2       and I'll make my objections as we go.

3  BY MR. WOOTEN:

4       Q    Here's my question.  Mr. Newland, take all

5  the time you need and look at those documents, and I

6  want this answer from you.  I want you to tell me

7  under oath, sir, that that's all the documents on your

8  client's system with respect to this loan.

9       MR. CASH:  I'm going to object to the form

10      of the question.  That's not what was indicated

11      previously.  What was indicated previously is

12      it's all documents which were responsive to

13      non-objectionable questions in the 30(b)(6).  We

14      will state our objections on the record one by

15      one, if we need to go through them, but these are

16      all of the notes back and forth and these are the

17      documents which are on the Fidelity, as we

18      defined that in the beginning of this, not on any

19      affiliate or parent, on the Fidelity system,

20      which was asked for.

21      MR. WOOTEN:  Okay.  You're defining Fidelity

22      as LPS.

23      MR. CASH:  No.  I'm defining Fidelity as

24      they are in the lawsuit.  Fidelity is, and the

25      30(b)(6) is too, defendant, Fidelity National

**FREEDOM COURT REPORTING**

Page 48

1        Foreclosure & Bankruptcy Solutions, period.

2        There is no other Fidelity defendant in this

3        case.  That is Fidelity for the purposes of this

4        case.  And that is all that Fidelity is for the

5        purpose of this case.

6   BY MR. WOOTEN:

7        Q    Okay.  Mr. Newland, Fidelity National

8   Foreclosure & Bankruptcy Solutions is now known as

9   what?

10       A    Lender Processing Solutions.

11       Q    Okay.  And when did that name change take

12  place?

13       A    LPS -- well, it's LPS Default Solutions.

14       Q    And when did that take place, sir?  When was

15  that name change?

16       A    I want to say it was March or February of

17  this year.

18       Q    Okay.  So as Fidelity National Foreclosure &

19  Bankruptcy Solutions is known today, they would not be

20  known as Fidelity, they would be known as LPS or

21  Lender Processing Solutions, right?

22       A    LPS Default Solutions.

23       Q    Okay.  So I'm going to ask you, Mr. Newland,

24  this question.  Is it your testimony that the

25  documents which your counsel has handed to me today

**FREEDOM COURT REPORTING**

Page 49

1  are all of the documents with respect to my client's

2  loans which are available or may easily be accessed

3  through use of the software known as MSP, which is

4  owned by your parent company, Fidelity, with respect

5  to my client's loan?

6       MR. CASH:  Object to the form of the

7       question.  It's beyond the scope of the 30(b)(6).

8       If you know the answer to that, you can answer

9       it.

10       THE WITNESS:  I don't know.

11  BY MR. WOOTEN:

12       Q    Who's the person who is in your employ who

13  has the most knowledge about what documents, images,

14  notes, and information are available through the MSP

15  software which LPS employs?

16       A    I don't know off the top of my head, sir.

17       Q    Do you have a manager of technology or a

18  vice president of technology?

19       A    Yes, we do.

20       Q    And that's with LPS?

21       A    Yes.

22       Q    And they are in this compound that we're

23  here at today?

24       A    I don't know whether they're in this

25  compound or up in our Minnesota location.

**FREEDOM COURT REPORTING**

Page 50

1    Q    And --

2         THE VIDEOGRAPHER:  Excuse me.  I'm sorry,

3    can I take a moment to change tape?

4         MR. WOOTEN:  Certainly.

5         THE VIDEOGRAPHER:  Off record at 10:07.

6         (Off the record discussion.)

7         THE VIDEOGRAPHER:  Going back on record at

8    10:10, beginning of Videotape No. 2.

9    BY MR. WOOTEN:

10   Q    The next area of inquiry that we delineated

11   in our 30(b)(6), Mr. Newland, was:  Testimony and

12   documents regarding all correspondence, images,

13   documents, notes or communications, in whatever form

14   and by whatever medium contained in the foreclosure

15   notes of the Fidelity software for the subject loan.

16   As well as a definitional code sheet for any codes

17   used to explain or describe this data.

18        Now, we've established that Fidelity

19   software means MSP.  I'm assuming that LPS only uses

20   MSP; is that correct?

21   A    No, that's not correct.

22   Q    What other software platforms does LPS use

23   other than MSP, please, sir?

24   A    We have Fiserv that we utilize for -- I

25   mean, all clients are different as far as different

FREEDOM COURT REPORTING

Page 51

1    mortgage services software.

2         Q    Let me stop you, because I hear what you're

3    saying, you're talking about some other issues.  I'm

4    talking about with respect to the foreclosure work

5    that LPS does, are there any other software platform

6    that your employees at LPS utilize other than your

7    parent company software, MSP?

8         A    Yes, there other -- there is other platforms

9    that we utilize.

10        Q    Okay.  Tell me the names of each of those

11   other platforms, please, sir.

12        A    For different clients, we utilize our

13   updated Fiserv MortgageServ.

14        Q    Let me just -- slow down just a second for

15   me.  Fiserv, F-I-S-E-R-V?

16        A    I believe.

17        Q    And what exactly does that software do,

18   please, sir?

19        A    It's known as -- well, it's basically a

20   mortgage servicing platform, if that's what you're

21   asking, if we update other mortgaging servicing

22   platforms, yes, we do.

23        Q    What do you do with Fiserv?

24        A    We just update different screens.

25        Q    You update different screens?

**FREEDOM COURT REPORTING**

Page 52

1    A    Uh-huh.

2    Q    Is that a vehicle by which you provide data

3    to your clients?

4    A    Yes.

5    Q    Tell me what screens you are aware of Fiserv

6    updates.

7    A    I do not know.

8    Q    Who in your employ would be the person with

9    the most knowledge about that?

10   A    Probably our securities area.

11   Q    Who is that person?

12   A    I don't know off the top of my head.

13   Q    Would Fiserv also be the vehicle by which

14   your firm delivered bills to its customers?

15   A    No.

16   Q    Is Fiserv the vehicle by which your company

17   would add fee charges to customer accounts?

18   A    We do not add --

19        MR. CASH:  Objection to the form.

20   Q    You can answer if you know.

21   A    We do not add fees.

22   Q    Okay.  When LPS provides services to its

23   clients, does it charge fees?

24   A    No.

25   Q    I'm sorry?

**FREEDOM COURT REPORTING**

Page 53

1          A     To our clients, no.

2          Q     Okay.  Let me ask it another way.  When you

3    provide services to the mortgage servicers which hire

4    you to do foreclosure work, do you charge fees for

5    that work?

6          A     No, we don't.

7          Q     Okay.  Tell me what you charge, how you get

8    paid for the work that you do, please, sir.

9          MR. CASH:  I'm going to object to that

10         question.  That's proprietary, and there's no

11         reason to go into it based upon the allegations

12         set forth in this lawsuit.  There's no relevance

13         based upon any claim being made in this lawsuit.

14         Unless, Nick, you can point me to one of the

15         allegations in here that supports that question.

16         MR. WOOTEN:  Well, let's do this, Mr. Cash.

17         We'll come back to that question in a few

18         minutes.  I don't want to get too far out of

19         order.

20         MR. CASH:  Okay.  The objection will be the

21         same later, but --

22         MR. WOOTEN:  That'll be fine.  You'll be

23         welcome to make it.

24   BY MR. WOOTEN:

25         Q     Make sure I understand this, Mr. Newland.

Page 54

1  LPS have contracts with the attorneys who provide

2  services with respect to foreclosures and bankruptcies

3  who are partners of LPS?

4      A    Yes.

5      Q    And do those contracts set forth the fees

6  which those attorneys will charge for standard

7  services?

8      A    No.

9      Q    Do those contracts provide for the payment

10 of a referral fee from those attorneys to LPS?

11     A    No.

12     Q    Does LPS have contracts with those mortgage

13 servicers for which it provides default services?

14     A    Yes.

15     Q    How many mortgage servicers does LPS provide

16 default services for, please, sir?

17     A    Approximately 34.

18     Q    And 34 servicers, what percentage of the

19 mortgage servicers existing in America today is

20 represented by that 34?

21     MR. CASH:  Objection.  That's not relevant.

22 You don't have to answer it.  Unless you can show

23 me how that's supported in any way by your

24 complaint in this case, Nick.

25     MR. WOOTEN:  Mr. Cash --

**FREEDOM COURT REPORTING**

Page 55

1          MR. CASH:  Yes, sir.

2          MR. WOOTEN:  -- are the rules with respect

3     to deposition question objections different in

4     Texas than they are in Alabama?

5          MR. CASH:  Not materially.  So, for

6     something to be discoverable, it must be relevant

7     or it must be reasonably likely to lead -- and it

8     must be reasonably likely to lead to discovery of

9     admissible evidence.  So the first threshold is

10    relevance.  If something is irrelevant --

11         MR. WOOTEN:  So I just want to make sure,

12    you're making a legal ruling --

13         MR. CASH:  I just want to make sure that I

14    get it on the record.

15         MR. WOOTEN:  -- with respect to whether or

16    not your client can answer a deposition question.

17         MR. CASH:  No, sir, I'm not making a legal

18    ruling.  What I'm saying is that the question

19    you're asking is not relevant, and I'm not going

20    to let you go on a fishing expedition, because

21    it's harassing and it's not relevant to any issue

22    in this case.

23         If you will point out to me any way in which

24    it is relevant based upon the complaint on file,

25    I may withdraw or reconsider the objection.

FREEDOM COURT REPORTING

Page 56

1    That's what I'm saying.

2         MR. WOOTEN:  So what I want to make clear

3    is, is that we've all traveled to Jacksonville,

4    Florida, to take this deposition.

5         MR. CASH:  Yes, sir, we have.

6         MR. WOOTEN:  And you're making an objection

7    and specifically instructing your witness not to

8    answer the question rather than making your

9    objection and allowing him to answer the question

10   and preserving the issue for the Court.

11        MR. CASH:  What I am saying is, that we are

12   not going to go far afield and do a fishing

13   expedition here.  I am more than happy to call

14   the Court, if you want to do that.  If you want

15   to call the Court and get guidance ahead of

16   time --

17        MR. WOOTEN:  Sure, why don't you run out

18   there and call the Court, that'll be fine.  We'll

19   keep taking the deposition.

20        MR. CASH:  They're your questions.  If you

21   would like the Court to get involved, I'm happy

22   to do so.

23        MR. WOOTEN:  No, I just want to make sure we

24   have a record, that you are here and you're

25   telling your client not to answer.  That's all I

**FREEDOM COURT REPORTING**

Page 57

1    want to make a record of.

2            MR. CASH:  What I am telling my client to

3    do, and the record is very clear and you don't

4    have to repeat it, I'm telling my client not to

5    answer irrelevant fishing expedition questions.

6    And I'm also at the same time giving you every

7    opportunity to show me anywhere in your complaint

8    that makes that question relevant and I will

9    reconsider that instruction.  You have declined

10   to do so.

11           MR. WOOTEN:  I don't have to show you where

12   it's relevant.  You have a right to object --

13           MR. CASH:  Then --

14           MR. WOOTEN:  -- he can answer and the Court

15   can rule whether the question is relevant or not

16   when we can go back in front of the Court.

17           MR. CASH:  I also have the right to object.

18   And if I feel that it is harassment and it is far

19   afield, then I have the right to instruct him not

20   to answer under the Alabama rules and the federal

21   rules.

22           MR. WOOTEN:  Well, that'll be fine, but the

23   next time we take this deposition it'll be in

24   DeKalb County, Alabama, it won't be in

25   Jacksonville.  Okay?

**FREEDOM COURT REPORTING**

Page 58

1          MR. CASH:  I didn't know you had that kind

2     of power.

3          MR. WOOTEN:  Well, you just keep doing this

4     and you'll see.

5          MR. CASH:  Well, I'm trying to -- Nick, if

6     you will ask questions that are supported by this

7     complaint --

8          MR. WOOTEN:  I'm going to ask the

9     questions --

10          MR. CASH:  -- I will absolutely sit here and

11     be quiet.

12          MR. WOOTEN:  -- I want to ask, and you can

13     object to them.

14          MR. CASH:  Well, see, therein lies the

15     problem --

16          MR. WOOTEN:  And if you don't like them --

17          MR. CASH:  -- you don't get to ask anything

18     and everything.

19          MR. WOOTEN:  If you don't like the

20     questions, object to them and the Court can rule.

21          MR. CASH:  I have.  And I will tell my --

22          MR. WOOTEN:  But to sit here and tell your

23     client not to answer questions --

24          MR. CASH:  Here's what you don't get to do,

25     Nick, what you don't get to do is to go into this

**FREEDOM COURT REPORTING**

Page 59

1     entire fishing expedition that has nothing to do

2     with this lawsuit and gather all this information

3     and then later have the Court rule, well, all of

4     it was irrelevant, but it really doesn't matter

5     to you, because you've gone ahead and gathered it

6     for your purposes.  We're not going to do that

7     here today.

8          MR. WOOTEN:  You know what --

9          MR. CASH:  And you know what, if we have to

10    come to DeKalb County and take the deposition

11    again, so be it, that is an expense that I will

12    incur.

13         MR. WOOTEN:  Well, that'll be fine.

14         MR. CASH:  All right, then.  Why don't you

15    quit fussing at me and just ask your questions.

16         MR. WOOTEN:  Well, why don't you quit

17    interfering with my deposition.

18         MR. CASH:  I'm not interfering, I'm just

19    making my objections and making my instructions.

20    I haven't engaged you at all, Nick.  I've just

21    made my objections for the record.

22         MR. WOOTEN:  No, but you're instructing your

23    witness not to answer.

24         MR. CASH:  I know what I'm doing, I'm not

25    engaging you, so why don't you --

**FREEDOM COURT REPORTING**

Page 60

1          MR. WOOTEN:  That's fine.

2          MR. CASH:  -- just pay attention to your

3     deposition and take it, and I'll do my job, you

4     do yours.

5          MR. WOOTEN:  Okay.  If you won't interfere

6     with my deposition, I'll --

7          MR. CASH:  I'm not interfering with it,

8     brother, I'm just making objections to

9     objectionable questions.  Stop asking

10    objectionable questions and we will sail along.

11    I didn't say a word for the first hour of this

12    deposition.

13         MR. WOOTEN:  Yeah, well, we were talking

14    about where your client worked --

15         MR. CASH:  Nothing objectionable.

16         MR. WOOTEN:  -- before he got here.

17         MR. CASH:  Nothing objectionable.

18         MR. WOOTEN:  That's right.

19         MR. CASH:  I don't object if it's not

20    objectionable, Nick.

21         MR. WOOTEN:  You know what, I hope you enjoy

22    this veil of secrecy as long as you can, because

23    it ain't going to last.

24         MR. CASH:  It's not a veil of secrecy, I'm

25    happy to tell you things that are relevant to

**FREEDOM COURT REPORTING**

Page 61

1          this lawsuit.  But if you want to go fishing, you

2          ought to be in the Gulf, not in this conference

3          room.

4      BY MR. WOOTEN:

5          Q    Mr. Newland, have you testified or been

6      requested to testify in front of a grand jury with

7      respect to the practices of LPS with regards to its

8      foreclosure and bankruptcy practices?

9          A    No, I have not.

10         Q    Are you aware of a pending federal

11     investigation by the United States Department of

12     Justice or the United States bankruptcy trustee office

13     regarding your business's foreclosure and bankruptcy

14     practices?

15         A    No, I'm not.

16         Q    So your testimony's that you have not

17     received any notification that there is an active

18     federal investigation of your company's practices?

19         A    No.

20              MR. CASH:  Objection to form.  Go ahead.

21              THE WITNESS:  No, I have not.

22     BY MR. WOOTEN:

23         Q    Are you aware that there is an active

24     investigation by the State of Connecticut with regard

25     to similar issues?

FREEDOM COURT REPORTING

Page 62

1    A    No, I'm not.

2    Q    Have you been asked to testify or produce

3 any documents from your client with respect to these

4 issues?

5    A    No, I have not.

6    Q    And your testimony here today is, is that

7 you cannot tell me the person in your employ who can

8 tell me what exactly the data is that is provided to

9 your clients through the Fiserv software?

10    A    No, I cannot.

11    Q    Tell me each person who is directly

12 answerable to you on a day-to-day basis with respect

13 to management.  Do you have vice presidents who work

14 for you?

15    A    Yes, I do.

16    Q    Okay.  How many of them?

17    A    I have two vice presidents that work for me.

18    Q    Okay.  And who are they, please, sir?

19    A    Charles -- or, I'm sorry, Tara Engle.

20    Q    Can you spell that for me, please, sir?

21    A    T-A-R-A, last name Engle, E-N-G-L-E.

22    Q    What is her title, please, sir?

23    A    Vice president of special assets.

24    Q    And does LPS have a definition of special

25 assets, please, sir?

FREEDOM COURT REPORTING

Page 63

1        A     I believe I told you that earlier.

2        Q     Okay.  This -- what you mentioned earlier,

3   that was not with respect to a different client?

4        A     No.

5        Q     Or different employment?

6        A     No.

7        Q     Who is the other vice president who works

8   for you, please, sir?

9        A     James Richards.  Would you like me to spell

10  that?

11       Q     I think I can handle that one, Mr. Newland.

12       A     All right.  Okay.

13       Q     And what is his title, please, sir?

14       A     He is vice president of special assets also.

15       Q     And are both of those individuals who are in

16  your employ located here in Jacksonville?

17       A     One is located here in Jacksonville and the

18  other one is located in West Palm Beach, work at home.

19       Q     Okay.  Are there any vice presidents who are

20  not directly answerable to you who also work in LPS,

21  either in this facility or in the Mendota Heights

22  facility?

23       A     Are there any other vice presidents in

24  Lender Processing Services?

25       Q     Who answer directly to you --

FREEDOM COURT REPORTING

Page 64

1       A      No.

2       Q      -- either here or in Mendota Heights,

3   Minnesota?

4       A      No, not vice presidents.

5       Q      Okay.  What other persons answer directly to

6   you with respect to day-to-day activities of LPS?

7       A      Can you clarify the question one more time,

8   please.

9       Q      I'm assuming that you have a management team

10  of some sort that answers to you?

11      A      Yes, I do.

12      Q      Okay.  On more or less a daily, weekly type

13  basis?

14      A      Yes.

15      Q      Okay.  And I'm assuming that Tara Engle and

16  James Richards are not the only members of that

17  management team?

18      A      No, there's two other members.

19      Q      Who else is there?

20      A      Charles Martisek.

21      Q      I can handle, Charles, but will you try

22  Martisek --

23      A      Sure.

24      Q      -- for me?

25      A      M-A-R-T-I-S-E-K.

**FREEDOM COURT REPORTING**

Page 65

1      Q      And what is his title, please?

2      A      Assistant vice president, attorney

3 management.

4      Q      And what does his job involve?

5      A      He basically manages our attorney network.

6      Q      Okay.

7      A      Or part of our attorney network.

8      Q      What part does he manage?

9      A      Basically the Court foreclosure steps, which

10 basically means provides a conduit for our clients'

11 communications with the attorneys.

12      Q      Is that accomplished through a particular

13 portion of the software employed by LPS known as MSP?

14      A      No.

15      Q      Is it accomplished through some other

16 software portal which is employed by LPS?

17      A      Yes.

18      Q      And what is the name of that portal, please,

19 sir?

20      A      Process Management.

21      Q      And please tell me everything which Process

22 Management provides to your attorney network.

23      A      Basically it's the communication work flow

24 process, in which we help manage the attorneys as far

25 as it goes, as far as the foreclosure or bankruptcy

**FREEDOM COURT REPORTING**

Page 66

1    action.

2         Q    Is the Process Management system -- is

3    compliance with the Process Management system by your

4    attorney network the measure by which your attorney

5    network receives their APR rating with your company?

6         A    Can you clarify that question again?

7         Q    Sure.  I understand that your Process

8    Management system sets forth guidelines or time lines

9    within which your attorneys must complete certain

10   actions; is that correct?

11        A    That is correct.

12        Q    Okay.  And those guidelines are set forth by

13   Fidelity to your attorney members; is that correct?

14        A    No, it's not correct.

15        Q    Okay.  Tell me how those guidelines are

16   determined please, sir.

17        A    They are guidelines that are determined by

18   the clients.

19        Q    And in this respect, who are the clients,

20   please, sir?

21        A    Servicers.

22        Q    Is it your testimony here today that

23   Fidelity does not set the guidelines within which

24   certain tasks must be accomplished by your attorney

25   network?

Page 67

1      A     No, we do not.

2      Q     And you have 34 servicers who use your

3 network, correct?

4      A     That is correct.

5      Q     You have 34 --

6      A     Approximately.

7      Q     You have 34 different sets of guidelines?

8      A     Yes, we do.

9      Q     And 34 different sets of time lines, I

10 assume then?

11      A     Not necessarily.

12      Q     The time line aspect of this issue, is it

13 your testimony that Fidelity does not control that?

14      A     That is correct.

15      Q     Excuse me.  Let me rephrase that.  Is it

16 your testimony that LPS does not control the time line

17 process?

18      A     That is correct.

19      Q     Besides work flow management, what other

20 information is provided to your attorneys through the

21 Process Management?

22      A     In what respect?

23      Q     Work flow management, please explain to me

24 everything you understand the work flow management

25 portion of Process Management to entail.

**FREEDOM COURT REPORTING**

Page 68

1      A      Basically what we do is, we provide the

2   mechanism as far as steps that need to be completed by

3   the attorneys in reference to the actions that they're

4   taking.  If they need some type of information, we

5   have the ability for the attorneys to open up what is

6   called issues or processes to request those items, and

7   then we will go out and look for those items and/or

8   work with the clients in reference to obtaining that

9   information.

10           MR. CASH:  Nick, for the record, all the

11      Process Management notes are this top group of

12      back and forth that have been produced.

13           MR. WOOTEN:  These were previously produced.

14           MR. CASH:  And those are on this loan on the

15      Process Management.

16           MR. WOOTEN:  This is -- these are the

17      process notes, which is Page 1 of 25.

18           MR. CASH:  Correct.

19           MR. WOOTEN:  And I have those marked in

20      another exhibit.

21           MR. CASH:  Okay.

22           MR. WOOTEN:  I'm going to mark this

23      cumulatively, give me just a second, I'm going

24      to -- I'm not going to try to go back through and

25      pull that apart for us to look at it.

**FREEDOM COURT REPORTING**

Page 69

1    I'm going to mark what you produced today as

2    a cumulative exhibit, Plaintiffs' Exhibit 24.

3    And just again, so that it's on the record with

4    this marking, please tell me again for the record

5    exactly what that represents.

6         MR. CASH:  These are documents that were

7    responsive to the request for documents served

8    with the 30(b)(6).  They are the documents that,

9    subject to the objections that we made and will

10   continue to make as specific issues are directed,

11   that we could ascertain were responsive to that

12   request, to those requests.

13        MR. WOOTEN:  Fine.  I'm going to leave that

14   sitting right there.

15        And I apologize, Madam Court Reporter, for

16   marking this stuff out of order.  I didn't intend

17   to do it that way.

18        (Plaintiffs' Exhibit No. 24 marked for

19   identification.)

20   Q    Issues.  If an attorney is trying to

21   foreclose on a house and he says, hmm, LPS, these

22   folks say they paid this loan off with the insurance

23   proceeds, that would come up as an issue, right?

24   A    Yes, it would.

25   Q    So your lawyer out in the world, in this

**FREEDOM COURT REPORTING**

Page 70

1  case, Birmingham, if they were told by my client's

2  lawyer or other lawyer that they paid the loan off

3  with insurance proceeds, he would come back and he

4  would create an issue and say, oh, by the way, this

5  loan is supposed to be paid off, tell me what I'm

6  supposed to do, right?

7       A    That is correct.

8       Q    And then who would respond to that issue?

9       A    Somebody based off of the issue would

10 respond accordingly, whatever the issue would be.  In

11 this case, probably be an insurance claim issue that

12 would be raised, and which at that time, we would

13 provide that information over to the client.

14      Q    All right.  And so, your testimony is, is

15 that LPS would then receive the issue from the

16 attorney and then relay the issue to, in this case,

17 Option One?

18      A    That would be correct.

19      Q    And LPS would not take any initiative to

20 make any decision, they would simply wait on Option

21 One to tell them what to tell the attorney?

22      A    That is correct.

23      Q    Other than Process Management, are there any

24 other software or software modules or devices which

25 are used to communicate with your attorney network?

Page 71

1       A       Not software, no.

2       Q       In what other ways do you communicate with

3  your attorney network?

4       A       Primarily through the Process Management

5  system.

6       Q       Okay.  What is NewTrak?

7       A       Process Management.

8       Q       Is that also called FIS Desktop now?

9       A       No, it's not.

10      Q       Is there another term for NewTrak other than

11  NewTrak?

12      A       Process Management.

13      Q       Is it safe to say that what I refer to as

14  NewTrak is basically a sectioned off or separate

15  portion of software that deals strictly with

16  communications between LPS and the attorneys?

17      A       No.

18      Q       Other than the attorneys and the LPS

19  employees, who else accesses Process Management?

20      A       Our clients, servicers.

21      Q       Okay.  So whatever information is in the

22  Process Management system is accessed by any user of

23  the servicer, as well as any employee of LPS assigned

24  to work on the loan, as well as the attorney and

25  anybody designated by the attorney to use that

**FREEDOM COURT REPORTING**

Page 72

1  software?

2      A    That would be correct.

3      Q    What is New Image?

4      A    New Image is an imaging platform.

5      Q    Does LPS still refer to New Image by that

6  name?

7      A    Does -- can you clarify the question one

8  more time?

9      Q    Has New Image been renamed as part of the

10  LPS spinoff?

11      A    Yes, it has.

12      Q    What is it now referred to as?

13      A    Document Management.

14      Q    Is there an iteration of Document Management

15  that you're operating out of now?

16      A    Yes.

17      Q    What is that?

18      A    I don't recall what the name is.

19      Q    What is your understanding of Document

20  Management, what does it do?

21      A    Document Management is just part of the

22  system that we go in and review documents that are

23  imaged.

24      Q    I'm sorry, what documents?

25      A    What documents?

FREEDOM COURT REPORTING

Page 73

1     Q     You said you --

2           MR. CASH:  He didn't hear the end of your

3     sentence.

4     Q     I'm sorry.

5     A     Oh.  Just -- it's the platform that we

6     utilize to view documents associated with the loans.

7     Q     Are there any word processing functions

8     within Document Management?

9     A     Not that I know of.

10    Q     Is Document Management also a platform by

11    which documents are provided to both attorneys who are

12    part of your network and clients?

13    A     Yes.

14    Q     And isn't it true that each time a document

15    is uploaded into MSP, there is a record made of what

16    the document's identity is and when it was uploaded?

17    A     I don't know that.

18    Q     If the documents you have produced indicate

19    that, you would not dispute it, would you?

20    A     I don't know.

21    Q     Would Mr. Martisek be a person more

22    knowledgeable about what is involved with Document

23    Management and what its capacities and capabilities

24    are than you, Mr. Newland?

25    A     I don't believe so.

**FREEDOM COURT REPORTING**

Page 74

1    Q    So, again, is it your testimony that someone

2    in security would be the person to talk to about that?

3    A    I don't know that answer.

4    Q    Is it possible that someone on the floor

5    interacting with files on a daily basis would know

6    more about what the Document Management capacities and

7    abilities are than you do as you sit here today?

8    A    I don't know.

9    Q    Have you made any inquiry?

10    A    No, I have not.

11    Q    Are you familiar with whether or not there

12    is a section of the software which LPS employs which

13    provides a list of all the images associated with a

14    loan account?

15    A    What software?

16    Q    MSP.

17    A    No, I do not.

18    Q    What about Document Management?

19    A    Yes.

20    Q    And there is a screen which sets forth every

21    document associated with a loan file; is that correct?

22    A    That is correct in Document Management.

23    Q    And it is a matter of simply going in and

24    selecting those documents to view them or to print

25    them, isn't it?

FREEDOM COURT REPORTING

Page 75

1        A     Yes, we can print those documents.

2        Q     Have you produced those documents with

3   respect to Larry David Wood and Karen Wilborn Wood's

4   loan today as part of your document that I've

5   marked --

6        A     Yes, we have.

7        Q     -- as Plaintiffs' Exhibit 24?

8        A     Yes, we have.

9        Q     Okay.  So it's your testimony that every

10  document associated with this loan that is part of the

11  Document Management system has been produced as part

12  of what you brought today?

13       A     Yes, it has.

14       Q     Do you know if every document associated

15  with this loan was produced previously through written

16  discovery?

17       A     I don't know the answer to that question.

18       Q     If a member of an attorney network requests

19  an assignment of a mortgage for purposes of the

20  foreclosure, is that the type of document which would

21  be uploaded into Document Management and provided to

22  the attorney?

23       A     Yes, it would.

24       Q     If an attorney requests an affidavit in

25  support of a motion for relief from stay, is that the

Page 76

1  type of document that would be executed and uploaded

2  into Document Management and provided to the attorney?

3      A    Yes, it would.

4      Q    Is it your understanding that those

5  documents contain information about when they were

6  created and by whom?

7      A    Repeat that question again.

8      Q    Is it your understanding that the

9  origination of that electronic data in the form of a

10  document file would contain the information about when

11  those documents were created or when those documents

12  were uploaded into the system?

13      A    Yes, it would.

14      Q    If an LPS employee executed an affidavit or

15  an assignment and uploaded it into Document

16  Management, that electronic document would contain the

17  information about what employee prepared that document

18  and when they prepared it, would it not?

19      A    The upload would -- would state the time

20  stamp for that, yes.

21      Q    And if that document which was uploaded by

22  the employee of LPS were received from some other

23  entity, it would also indicate that as well, wouldn't

24  it?

25      A    Yes, it should.

**FREEDOM COURT REPORTING**

Page 77

1      Q    So if an employee of Fidelity requested an

2  assignment of a mortgage from a servicer and the

3  servicer provided that document to the employee of

4  LPS, the electronic data would show when that took

5  place?

6      A    Yes.

7      Q    And it would show who was responsible for

8  obtaining or providing that mortgage assignment?

9      A    It would basically track when the assignment

10 would go out for signature and when it would come back

11 and then transfer over to the attorney.

12     Q    You said it would track when the document

13 went out for signature.

14     A    Date and time stamp.

15     Q    Okay.  Explain that for me, please, sir.

16 You said it would go -- it would track when it went

17 out.  Are you indicating that if an assignment was

18 requested, that an employee of LPS might prepare the

19 assignment and then send it to be signed?

20     A    We don't -- we don't prepare the

21 assignments.

22     Q    Okay.  When you say it goes out, explain

23 what you mean.

24     A    We funnel that either to the client or the

25 investor for signature.

FREEDOM COURT REPORTING

Page 78

1     Q    Okay.  So it's your testimony that employees

2  of LPS never sign mortgage assignments?

3     A    I did not testify to that.

4     Q    Mortgage assignment is requested by an

5  attorney for foreclosure or bankruptcy purposes.  The

6  records in the Process Management notes would indicate

7  when that request was made, would it not?

8     A    Yes, it would.

9          MR. CASH:  Nick, I've already asked a lot of

10         these questions.  Is there an allegation about

11         mortgage assignments in this case?

12         MR. WOOTEN:  There is an issue with respect

13         to that, yes.

14         MR. CASH:  Okay.  I thought there was, I

15         just wanted to make sure, because I hadn't seen

16         it in the allegations.

17  BY MR. WOOTEN:

18     Q    With respect to the request for the document

19  which would've been made by the attorney or the

20  client, there would be a concomitant entry in the LPS

21  system indicating that that request had been received,

22  right?

23     A    That's correct.

24     Q    And then there would be entries regarding

25  what action was taken to procure that document?

FREEDOM COURT REPORTING

Page 79

1      A     That would be correct.

2      Q     And then that document would then -- you

3  said it would be sent out for execution?

4      A     Well, it depends -- depends on if we have

5  power of attorney from, or corporate resolution from

6  the client based off of the entity involved.

7      Q     That's interesting that you mention that.

8  Your employees at LPS and part of your process is that

9  you seek to obtain these powers of attorney from your

10  various clients for just such an occasion as this,

11  correct, preparing documents for their foreclosure and

12  work?

13     A     We don't -- we don't prepare the documents.

14     Q     Or executing documents?

15     A     If we have corporate resolution or power of

16  attorney, we can exercise the document.

17     Q     And that would be based off of a form

18  provided by the client?

19     A     That's correct.

20     Q     Okay.  It would not be based off of the data

21  provided to your LPS employees by the client?

22     A     What do you mean by the data provided by the

23  client?  I don't understand that question.

24     Q     Okay.  Let's say that in this particular

25  case that a particular securitized trust was supposed

**FREEDOM COURT REPORTING**

Page 80

1    to be the owner of this particular mortgage.  Okay?

2         A     Uh-huh.

3         Q     And I think your position in this case is,

4    is Option One asked Mr. Humphrey to foreclose on this

5    property, correct?

6              MR. LAWLER:  Objection.  I don't want to get

7         into any kind of conversations between

8         Mr. Humphrey and Fidelity or Option One.

9    BY MR. WOOTEN:

10        Q     Someone at some point requested Mr. Humphrey

11   foreclose on the Wood property, right?

12        A     That would be correct.

13        Q     And so if the mortgage were not assigned to

14   the specific securitized trust at that time, it would

15   have been necessary to obtain an assignment allowing

16   that securitized trust to foreclose, correct?

17             MR. CASH:  Object to the extent it calls for

18        a legal conclusion.  But if you know, you can

19        answer.

20        A     I don't know.

21        Q     Is it -- is it safe to say that your

22   understanding is that the only person who can

23   foreclose is the owner of the debt secured by the

24   mortgage?

25        A     I don't know.

Page 81

1      Q     You've been in collection and finance your

2  whole professional career?

3      A     That's correct.

4      Q     And you are in charge of a company whose

5  business is to foreclose and manage bankruptcy and

6  foreclosure processes?

7      A     That is correct.

8      Q     And your testimony is, is that you do not

9  know generally who is entitled to foreclose?

10     A     No.

11     Q     Just wanted to be sure.  Have you ever asked

12 anyone that kind of question?

13     A     Yes.

14     Q     And did they provide you any information?

15     A     Different states have different...

16     Q     Right.  Like a deed -- a deed of trust

17 state, the trustee of the deed of trust has the right

18 to foreclose, right?

19     A     I don't know.

20     Q     So what you learned from your inquiry was

21 that different states have different rules?

22     A     Yes.

23     Q     Other than the Process Management and the

24 Document Management, how do you refer to those things

25 internally, do you call them platforms, modules?  I

**FREEDOM COURT REPORTING**

Page 82

1    mean, how do y'all talk about those things?  Do you

2    talk about them by name, what do you do?

3        A    I'm not sure I understand your question.

4        Q    Well, you say you had this Document

5    Management system and you've got this Process

6    Management system.

7        A    Uh-huh.

8        Q    Do you have names for those internally or do

9    you simply refer to it as Process Management, Document

10   Management?

11       A    We refer to them as Process Management and

12   Document Management systems.

13       Q    Then they're not considered to be products

14   or services offered by LPS to its clients in any way?

15       A    No, it is offered to the clients.

16       Q    Are there any other services or processes

17   that LPS provides, other than Document Management and

18   Process Management?

19       A    We offer invoice management.

20       Q    And what is the name of your invoice

21   management software?

22       A    Invoice Management.

23       Q    Simple enough.

24            MR. CASH:  We're not creative.  We don't

25       have any cool names.

**FREEDOM COURT REPORTING**

                                                    Page 83

1            MR. WOOTEN:  Corporations generally aren't.

2  BY MR. WOOTEN:

3       Q    With respect to Invoice Management, there is

4  also a screen within your software where you can go to

5  and review every invoice associated with any

6  particular loan file; is that correct?

7       A    That's associated with that file, yes.

8       Q    And so if a foreclosure attorney has

9  submitted a bill for fees, that would be available

10  through Invoice Management?

11      A    If the client utilizes Invoice Management,

12  yes.

13      Q    It's your testimony that some do and some do

14  not?

15      A    Yes.

16      Q    Okay.  Invoice Management, does your

17  company, LPS, charge any fee for that service?

18      A    To who?

19      Q    To anyone who utilizes that service, be it

20  the servicer or the attorney network?

21      A    Yes, there is a fee that is assessed to the

22  attorney network.

23      Q    Tell me about that fee.

24      A    I don't know what the fee is.

25      Q    So if the foreclosing attorney provides a

**FREEDOM COURT REPORTING**

Page 84

1    bill through Invoice Management for $500, Fidelity

2    then turns around and bills the attorney for using the

3    Invoice Management system; is that what happens?

4         A    You'd have to ask somebody with our Invoice

5    Management department.

6         Q    Okay.  Who is that?

7         A    Off the top of my head, I don't know.

8         Q    Does LPS not have a person involved with

9    Invoice Management?

10        A    Yes, we do.

11        Q    Do you have a manager of that department?

12        A    Yes, but I don't know who it is off the top

13   of my head.

14             MR. WOOTEN:  Mike, can you find that out for

15        me, please.

16             MR. CASH:  I'll find that out.

17             MR. WOOTEN:  And I'm going to ask this, and

18        I know you're going to say you don't know, but

19        what I'm interested in is the person who is most

20        knowledgeable about how that system works with

21        respect to your -- both your attorney network and

22        your servicer clients.  So if y'all will check on

23        that and let me know, I'd appreciate it.

24   BY MR. WOOTEN:

25        Q    Is it your understanding that the servicers

**FREEDOM COURT REPORTING**

Page 85

1    do not pay any fees for use of Invoice Management?

2        A    I don't know.  I don't know that question.

3        Q    If they utilize Invoice Management, would it

4    be part of their monthly billing rather than

5    separately billed?

6        A    I don't understand.  Monthly billed to who?

7        Q    Do your servicers not pay a monthly fee for

8    the use of your services with respect to LPS?

9        A    Which part of LPS?

10       Q    Foreclosure or bankruptcy.

11       A    I don't know.

12       Q    What other part of LPS is there other than

13   foreclosure and bankruptcy?

14       A    There is no other part for LPS Default

15   Solutions.

16       Q    Okay.  So you asked me what part of LPS I

17   was referring to, but you don't know with respect to

18   either one of them if the servicers pay a fee to use

19   that service?

20       A    That's correct.

21       Q    Do you have a contract with each of the

22   servicers who use your service?

23       A    Yes, we do.

24       Q    Is it safe to say that if they pay for your

25   services, that contract would set forth what and how

**FREEDOM COURT REPORTING**

Page 86

1    they pay you?

2         A    I don't know.

3         Q    Have you --

4         A    I don't know whether it's in the contract or

5    not.  I have not reviewed the contract.

6         Q    So you wouldn't know if your contract said

7    pay it in Swiss cheese, you've just never seen one?

8         A    No.

9         Q    Let me ask this question.  Who do you answer

10   to directly from your position?

11        A    I answer to Scott Barnes.

12        Q    And what is his title?

13        A    President, Default -- LPS Default Solutions.

14        Q    I just want to take a second to go back and

15   look at my notes.  I just want to make sure I

16   understand.

17             You said you're the first vice president of

18   operations, right?

19        A    That's correct.

20        Q    And your responsibility is the day-to-day

21   operations of LPS?

22        A    That's correct.

23        Q    Is there anyone in LPS who holds a higher

24   title or position than Scott Barnes?

25        A    For Default Solutions, no.

**FREEDOM COURT REPORTING**

Page 87

1    Q    What other departments are there of LPS than

2    Default Solutions?

3    A    There are a few other departments underneath

4    the LPS umbrella.

5    Q    Do you know what those are?

6    A    We have REO.

7    Q    What else?

8    A    Field Services.

9    Q    And what else?

10    A    We have a default title company.

11    Q    What's the name of that company or is it --

12    A    I don't know off the top of my head.

13    Q    Any other --

14    A    That's it.

15    Q    So is there a first vice president for each

16    of these divisions?

17    A    I don't know.

18    Q    Is there -- does Scott Barnes have a person

19    that he answers to every day who is employed by LPS?

20    A    Yes.

21    Q    And who is that?

22    MR. CASH:  Again, just object to the form of

23    the question.  Which LPS?

24    MR. WOOTEN:  Default Solutions.

25    MR. CASH:  Okay.

**FREEDOM COURT REPORTING**

Page 88

1          THE WITNESS:  No.

2     BY MR. WOOTEN:

3          Q    Okay.  So whomever he answers to is in

4     charge of the entire spinoff?

5          A    Not the entire spinoff, no.

6          Q    Well, tell me who he answers to.  Or who's

7     his boss?

8          A    Clay Cornett.

9          Q    And what is Clay's title?

10         A    I don't -- I don't know his title off the

11    top of my head.

12         Q    Would it be available from LPS's website or

13    information that's publicly available?

14         A    I believe so.

15         Q    Is LPS publicly traded?

16         A    Yes.

17         Q    What is its symbol?

18         A    LPS.

19         Q    And a glaring question of the obvious,

20    right?

21              Do you know if Clay Cornett has a boss in

22    LPS?

23         A    Yes, he does.

24         Q    And who is that?

25              MR. CASH:  Again, and I hate to be the

**FREEDOM COURT REPORTING**

Page 89

1        stickler, but there's LPS, Inc., and there's LPS

2        Default Solutions.  LPS Default Solutions is what

3        was once the defendant in this case, Fidelity

4        National Foreclosure & Bankruptcy Solutions.  So

5        when you say LPS, I just need us to define LPS,

6        whether you're talking about Inc. or the separate

7        entity LPS Default Solutions.

8    BY MR. WOOTEN:

9        Q    My question is much simpler.  I'm just

10   asking if Clay Cornett has a boss.  I mean, that's

11   what I'm trying to find out.  I mean, if it -- he's

12   already said that Scott Barnes doesn't have a boss in

13   LPS Default Solutions, haven't you?

14       A    Yes.

15       Q    So Clay Cornett is obviously working for

16   Inc.?

17       A    I believe so.

18       Q    Okay.  And who does Clay Cornett answer to?

19       A    That would be Eric Swenson.

20       Q    Is he the person who is overall in charge of

21   LPS, Inc.?

22       A    No.

23       Q    Who is over Eric Swenson?

24       A    That would be the CEO, Jeff Carbiener.

25            (Brief interruption.)

FREEDOM COURT REPORTING

Page 90

1          THE WITNESS:  Carbiener.

2          MR. CASH:  Why don't you spell that for her,

3     unless you don't know how, and I won't put you on

4     the spot since he's the boss.

5          THE WITNESS:  No.

6   BY MR. WOOTEN:

7     Q    Is it C-E-R-B-I-N-E-R?

8     A    C-A-R-B-I-N-E-R, I believe, I don't know.

9     Q    Okay.  So everything starts at Jeff

10  Carbiener and flows downhill on your side through Eric

11  Swenson, Clay Cornett, Scott Barnes and then to you?

12    A    That would be correct.

13    Q    And then you have your management team that

14  we talked about earlier, and we talked about three of

15  the four people on that team, right?

16    A    That's correct.

17    Q    Other than Invoice Management, Document

18  Management, and Process Management, are there any

19  other things which fall into that general category

20  with respect to your Attorney Management network?

21    A    No, that's it.

22    Q    Who is the fourth member of your team?

23    A    Christine Anderson.  She's the peer of Chuck

24  Martisek.

25    Q    Does she spell her name S-O-N or S-E-N?

Page 91

1        A      S-O-N.

2        Q      And you mentioned she was the peer of

3   Mr. Martisek?

4        A      That's correct.

5        Q      Does she have a separate responsibility than

6   him?

7        A      Primarily the same responsibility.

8        Q      Does she handle a different portion of the

9   country or --

10        A      Yes.

11        Q      And I -- let me double-check, did I ask you

12   what portion of the country Mr. Martisek was

13   responsible for?

14        A      I don't believe so.

15        Q      Okay.  And do you know?

16        A      I -- it's broken up differently by each

17   state.

18        Q      So it's not necessarily geographic?

19        A      No.  They only channel certain states, 50

20   states and the other two provinces.

21        Q      With respect to the work that Ms. Anderson

22   and Mr. Martisek do, are there separate divisions in

23   their department where different employees work with

24   different portions of this process?

25        A      No.

**FREEDOM COURT REPORTING**

Page 92

1      Q      So every LPS employee who is within the

2  attorney foreclosure referral network is available to

3  do all the same type of work, as far as --

4      A      Not -- not the referral network, no.

5      Q      Okay.

6      A      I don't quite understand your question in

7  reference to referral.

8      Q      Maybe I didn't ask it well.  Do you have --

9  you said these people are in charge of your attorney

10  management network?

11      A      Uh-huh.

12      Q      And that basically included your core

13  foreclosure steps?

14      A      That's correct.

15      Q      Where does your bankruptcy Process

16  Management fall in that?

17      A      Basically the foreclosure process begins

18  from the time that the attorneys receive their

19  referral.

20      Q      Okay.  And where does the referral come

21  from?

22      A      It comes from the client.

23      Q      And how does the client make the referral?

24      A      How do they make the referral?

25      Q      Sure.

Page 93

1          A      I don't know off the top of my head.

2          Q      Do they -- does Option One pick up the phone

3   and call Scott Humphrey in Birmingham and say, I want

4   you to foreclose for us?

5          A      No.

6          Q      Is that not run through LPS?

7          A      The client makes the decision on when to

8   refer the loan for foreclosure, which we get a file

9   from Option One, along with the necessary documents.

10         Q      So your testimony is, is that Option One

11  provides the referral package to LPS?

12         A      That is correct.

13         Q      And that LPS refers the foreclosure to the

14  attorney?

15         A      Electronically, we provide the information

16  to the attorneys.

17         Q      Again, you indicated that Option One would

18  be the entity which chose the attorney?

19         A      That's correct.

20         Q      I mean, are they free to select any attorney

21  or are they only allowed to select Fidelity referring

22  attorneys or --

23         A      They're free to choose any attorney they'd

24  like.

25         Q      Are you aware of whether or not there is a

Page 94

1    contractural provision within the agreement between

2    the servicers and LPS which requires them to use

3    attorneys within the attorney network of LPS?

4         A    No, I'm not.

5         Q    And again, you indicated you have not read

6    any of those contracts?

7         A    My understanding is that we do not choose

8    any of the attorneys.

9         Q    Your system is capable of harnessing a lot

10   of information, right?

11        A    That is correct.

12        Q    And you're capable of reporting features

13   about pretty much all that you do as an entity,

14   correct?  I mean, as far as how fast you meet your

15   time line goes, what percentage of foreclosures take

16   place within your time lines, you know, what

17   percentage of issues are resolved within the

18   appropriate amount of time, pretty much anything you

19   want to find out that's on your software, your MSP

20   software, you pretty much have a reporting function

21   for, don't you?

22        A    Not MSP, no.

23        Q    What about with respect to Process

24   Management?

25        A    We have the ability to produce reports based

FREEDOM COURT REPORTING

Page 95

1    off of Process Management, yes.

2         Q    Sure.  Are there any attorneys who are not

3    members of the Fidelity -- or the LPS attorney network

4    who can access your Process Management system?

5         A    Not that I'm aware of.

6         Q    And is it a fact that the only attorneys who

7    are using Process Management are attorneys who have

8    signed a referral agreement with LPS?

9         A    That would be correct.

10        Q    So, while your clients are free to choose

11   whomever as a foreclosing attorney, if they are an MSP

12   user and they are an LPS -- they have an LPS agreement

13   with you for Default Solutions, the only attorneys

14   available on LPS system are attorneys who have signed

15   a contract with LPS?

16        A    That have signed a contract with LPS, yes.

17        Q    So when you say that your servicing clients

18   are free to choose whomever, with respect to referring

19   it through LPS, that is illusory, isn't it?

20        A    I don't understand what you mean by

21   illusory.

22        Q    Well, there are 14,000 lawyers in the state

23   of Alabama approximately.

24        A    Uh-huh.

25        Q    And your testimony is, is that Option One

**FREEDOM COURT REPORTING**

Page 96

1   could've chosen any lawyer to foreclose on this loan

2   if they wanted to, but if they have a contract with

3   LPS to provide default solutions, does that contract

4   not require them to make a referral through LPS?

5        A    Not necessarily.

6        Q    Have you -- well, never mind.

7        A    Clients -- clients can choose to refer any

8   way they'd like.

9        Q    If they want the loan to stay on the MSP and

10  LPS system, don't they have to go through LPS and use

11  an attorney network member?

12       A    The clients?  Yes.  They need to use our

13  system at their choice.

14       Q    So, again, while you say that they can

15  choose whomever, if they keep the loan on your system,

16  they can only choose attorneys in your network?

17       A    No.  They can -- they can choose to use an

18  attorney outside the network and be able to update

19  that information through the client.  The client has

20  the ability to be able to update the system just like

21  an attorney.  If the attorney chooses not to sign the

22  agreement, then basically the updates can be provided

23  through the client into our LPS system.

24       Q    Well, let me ask you this.  Do you have any

25  statistics on whether or not any foreclosures which

Page 97

1    were referred to LPS or sent to an attorney who was

2    not a member of LPS's attorney network?

3        A    No, I do not have statistics on that.

4        Q    Is it because the number would be zero?

5        A    No.

6        Q    And there are no reporting functions in your

7    software that will give you that information?

8        A    I don't know.

9        Q    And you've never asked that question?

10       A    No, I have not.

11            THE VIDEOGRAPHER:  Excuse me.  May I change

12       videotape?

13            MR. WOOTEN:  Sure.

14            THE VIDEOGRAPHER:  Off record at 11:07.

15            (Brief recess.)

16            THE VIDEOGRAPHER:  Back on record at 11:19,

17       beginning of Videotape No. 3.

18            MR. WOOTEN:  I need to go ahead and tell

19       y'all, I've got a 2:30 that I'm going to have to

20       take a short break, 2:30 local time.  I've got to

21       call in a federal case that I've got to deal

22       with.  So --

23            MR. CASH:  Okay, whatever works for you.

24            MR. WOOTEN:  -- we'll try to structure

25       breaks around that, so -- but I wanted to give

**FREEDOM COURT REPORTING**

Page 98

1     y'all a heads-up.

2          MR. CASH:  Okay.

3  BY MR. WOOTEN:

4     Q    With respect to your operations, is there a

5  separate division within your company that deals

6  solely with bankruptcy issues, or a separate group of

7  people?

8          MR. CASH:  I'm going to object to that

9          question and tell you not to answer about

10         bankruptcy, unless, Nick, you can tell me -- this

11         case isn't even in bankruptcy.

12         MR. WOOTEN:  I'm just trying to clarify the

13         structure of this entity.

14         MR. CASH:  All right.  Go ahead and answer

15         the bankrupt -- that one bankruptcy question.

16         THE WITNESS:  Yes.

17  BY MR. WOOTEN:

18     Q    In our notice of deposition to you, we asked

19  for all the same categories of documents that we asked

20  for from your foreclosure department with respect to

21  your REO department, with respect to the software

22  called MSP employed by LPS.  Did you produce any

23  documents, images, notes, communications, with respect

24  to the note fields or the contents of the REO portion

25  of the MSP software?

**FREEDOM COURT REPORTING**

Page 99

1       A      No.

2       Q      Would that be the same answer with respect

3   to the area regarding bankruptcy?

4       A      I don't believe there was any bankruptcy

5   notes.

6       Q      Okay.

7       A      But no.

8       Q      Are you familiar with a note field called

9   the Consolidated Note Logs?

10      A      No, I'm not.  That would be an MSP, correct?

11      Q      That's correct.

12      A      No, I'm not.

13      Q      Have you had any training whatsoever with

14  respect to the capabilities of the MSP software which

15  your company employs?

16      A      I've had partial training back in 2002.

17      Q      Is that when you --

18      A      With Option One.

19      Q      With Option One?

20      A      Yes.

21      Q      With respect to the ability of the employees

22  who work for LPS to change the information contained

23  in your servicers' files, who are your clients, is it

24  your testimony that your employees at LPS have that

25  capacity?

**FREEDOM COURT REPORTING**

Page 100

1      A      We have the ability to change certain

2  screens within the MSP environment.

3      Q      Okay.  And are you familiar with whether or

4  not the MSP platform, or MSP, makes any record of

5  those changes and saves it anywhere within the MSP

6  system or any backup of the MSP system?

7      A      I don't know on the MSP system.

8      Q      What about with respect to either Process

9  Management or Document Management?

10     A      Process Management does document the notes

11 in our note screen, time stamped.

12     Q      Does it document the changes?

13     A      Yes.

14     Q      Would there be anything that you are aware

15 of which would be accessible by a user which would

16 indicate what data was changed, who changed it, and

17 when it was changed?

18     A      In which system?

19     Q      In -- let's begin with MSP.

20     A      That, I don't know.

21     Q      With Process Management.

22     A      We do have tracking mechanisms in MS -- or

23 in Process Management that identify and time stamp the

24 changes and/or notes that are inputted into the

25 system, event completions, everything.

**FREEDOM COURT REPORTING**

Page 101

1      Q     All right.  And with respect to that, would

2   it indicate in Process Management if any data fields

3   were altered in MSP?

4      A     That, I don't know.

5      Q     Do you know who might be the person who

6   might have that information?

7      A     No, I don't.

8      Q     Would that also -- if you were to have to

9   hazard a guess, would it be someone in data security?

10     A     I don't know.

11     Q     Are you familiar with the term a key

12  transaction report?

13     A     No, I'm not.

14     Q     Are you familiar with whether or not that is

15  an MSP report?

16     A     I'm not aware of that report at all.

17     Q     Are you familiar with a training database

18  known as The Learning Center?

19     A     No, I'm not.

20     Q     When you had your initial training with MSP

21  when you were employed by Option One, was that

22  training web based?

23     A     No, it was not.

24     Q     It was done on-site?

25     A     Side by side with one of my associates.

**FREEDOM COURT REPORTING**

Page 102

1    Q    When you say associate, what do you mean?

2    A    One of our associates that was in the

3   foreclosure and bankruptcy department back with Option

4   One.

5    Q    So when you say associates, you're not

6   talking about an employee of LPS --

7    A    No.

8    Q    -- or at that time Fidelity?

9    A    No, you asked me when my training was, I

10   told you it was back with Option One back in 2002.

11    Q    And I was just trying to verify --

12    A    Sure.

13    Q    -- because my understanding is, is that --

14   well, isn't it true that with certain servicers, LPS

15   places employees on-site?

16    A    Yes, we will place employees on-site.

17    Q    And isn't it true that part of what they do

18   is work with that servicer's employees about using

19   LPS's software, MSP --

20    A    Not for LPS Default Solutions, no.

21    Q    So they would use the Process Management

22   software?

23    A    They would use the Process Management

24   software.

25    Q    And they would be there to train those

**FREEDOM COURT REPORTING**

Page 103

1    employees about --

2        A    Not necessarily train those employees.  When

3    we place people on-site, it's basically to assist them

4    with whatever needs that the client may need at that

5    time that we cannot do in-house ourselves.

6        Q    What are some examples of the types of

7    things that would require an LPS employee to be

8    on-site?

9        MR. CASH:  I'm going to object to that

10       question unless we've got some evidence or some

11       issue here that -- I have no objection to you

12       answering with regard to this servicer and this

13       loan, but we're not going to just keep fishing on

14       everything.

15       MR. WOOTEN:  Are you instructing him again

16       not to answer the question?

17       MR. CASH:  I'm instructing him to answer any

18       questions regarding this transaction, this

19       servicer, this case, but I am instructing him not

20       to answer generally across the board in this

21       fishing expedition.  We're here on the Wood case,

22       and that's all we're here to testify about.

23       MR. WOOTEN:  Do you have any legal authority

24       that says that you have the right to limit my

25       discovery based on your whims?

**FREEDOM COURT REPORTING**

Page 104

1       MR. CASH:  It's not my whims, it's the rules

2   of procedure, including the rules of Alabama and

3   the federal rules, require that the first hurdle

4   in making something discoverable is that it must

5   be relevant.  That is step one.  After relevance,

6   it need not be admissible, but it must lead to

7   the discovery of admissible evidence.  But first

8   and foremost it may be relevant.

9       MR. WOOTEN:  Okay.  So your testimony or

10  your --

11      MR. CASH:  It's not my testimony.

12      MR. WOOTEN:  Your objection is --

13      MR. CASH:  My objection is it's irrelevant.

14      MR. WOOTEN:  Your objection is to relevance.

15  Let's make sure that we're clear about that.

16      MR. CASH:  It's irrelevant, it's harassing,

17  it's a fishing expedition, it's beyond the scope

18  of this case.  And as such, we're not going to go

19  into a fishing expedition on this stuff.  That's

20  my objection.

21      MR. WOOTEN:  Okay.  And --

22      MR. CASH:  And if the Court disagrees and

23  thinks you have free reign to ask about anything

24  and everything you want regardless of whether

25  it's associated with this case or not, that would

**FREEDOM COURT REPORTING**

Page 105

1    be different than the jurisprudence of every

2    state I've ever practiced in, but so be it and

3    we'll deal with that at that time.  But right

4    now, we're not going into this wide ranging

5    fishing expedition.  Again, Nick, unless you can

6    tie it somehow to this case; in which case, I

7    will reconsider.

8         MR. WOOTEN:  You know, Mike, the problem is,

9    is that it's not your decision.  It's my

10   deposition, it's my discovery.

11        MR. CASH:  But you don't have the right --

12        MR. WOOTEN:  I'm trying to understand the

13   process which LPS employs to provide these

14   services to their clients.  And I asked your

15   client to provide me examples of the types of

16   reasons why they would locate an employee on-site

17   with a servicer, as a hypothetical, as the person

18   most knowledgeable about why LPS does everything

19   that they do, which he is supposed to be

20   designated to be.

21        MR. CASH:  But he is not here to testify

22   about everything --

23        MR. WOOTEN:  And so --

24        MR. CASH:  -- LPS does, because this --

25        MR. WOOTEN:  -- please let me finish my

**FREEDOM COURT REPORTING**

Page 106

1    response to your objection.

2         MR. CASH:  Because this is not what this

3    case is about.

4         MR. WOOTEN:  I don't care.  The point

5    being --

6         MR. CASH:  I know.  And therein lies the

7    point, you don't care.

8         MR. WOOTEN:  The point being that I have a

9    right --

10         MR. CASH:  This isn't a --

11         MR. WOOTEN:  Okay.  You know what, you

12    should take up --

13         MR. CASH:  So he's going to answer his

14    questions with regard to this case --

15         MR. WOOTEN:  -- your problems with Mike

16    wherever you want to.  That doesn't have anything

17    to do with me.  I'm here about this case.

18         MR. CASH:  It has everything to -- okay,

19    then, fine, we will --

20         MR. WOOTEN:  The cases that I have with

21    Option One that involve LPS.

22         MR. CASH:  And other cases.  See, we're not

23    here for other cases.

24         MR. WOOTEN:  It doesn't matter.

25         MR. CASH:  We're here for one case, the Wood

Page 107

1       case.

2             MR. WOOTEN:  You're sitting here trying to

3       tell me --

4             MR. CASH:  And he will answer each and every

5       question you have about the Wood case --

6             MR. WOOTEN:  Sure.

7             MR. CASH:  -- or that's relevant to the Wood

8       case --

9             MR. WOOTEN:  Okay.  Well, let's --

10            MR. CASH:  -- without objection.

11            MR. WOOTEN:  Again, let's make sure we

12      understand each other.  I'm trying to ask a

13      question about why your client does what they do,

14      including putting employees on-site, as a general

15      rule, so that I can understand how your client's

16      business operates and where their employees might

17      be who might could sign documents in their name,

18      and you're telling your client not to answer.  So

19      I just want to be clear that that's what you're

20      doing, Mike.

21            MR. CASH:  Well, if you want to be clear,

22      then let me make it as clear as I can to you,

23      Nick.  You just said it, and I'm glad it's on the

24      record --

25            MR. WOOTEN:  Sure.

Page 108

1          MR. CASH:  -- you're here because you have

2    this case and other cases --

3          MR. WOOTEN:  You're right, I do.

4          MR. CASH:  -- involving Option One and LPS.

5    This lawsuit is not a vehicle for you to do

6    discovery in other cases.  This lawsuit is for

7    this lawsuit.  And this witness will answer each

8    and every question you have that has anything to

9    do with this lawsuit.  But we will not come here

10   and basically have an exposé on our company

11   because it suits your whim.  It is not relevant

12   to any issue in this case.  In this case, there

13   is no allegation that any LPS employee was put

14   on-site who did anything with regard to this

15   loan.  And that's why we're here.

16         So unless you have an allegation that

17   supports that or something that supports that,

18   we're not going to talk in generalities, we are

19   here to testify about this case.  It is

20   irrelevant, it is harassing, it is overreaching,

21   and I am instructing him not to answer questions

22   that don't deal with this case anymore.  And I've

23   given you wide range to do it so far.

24         MR. WOOTEN:  And, again, I'm going to

25   explain to you that the rules of procedure and

Page 109

1    evidence and discovery in Alabama don't allow you

2    as the defense counsel to limit my inquiry in a

3    deposition.  Everybody involved here, with the

4    exception of Mr. Newland and these court

5    reporters, has made a special trip down here to

6    take this deposition --

7         MR. CASH:  I'm one of them.

8         MR. WOOTEN:  -- and spent a lot of money

9    coming to take this deposition.

10        MR. CASH:  So have I.

11        MR. WOOTEN:  And rather than have an

12   objection which preserves your right to have that

13   limited, you're instructing the client not to

14   answer.

15        MR. CASH:  Yes.

16        MR. WOOTEN:  I just want to be real clear

17   about that.

18        MR. CASH:  We're real clear on that, Nick.

19   And the reason I'm doing that is you don't get to

20   use this case as a vehicle to gather your

21   information, which you couldn't care less whether

22   it's relevant or not, so you can go off and use

23   it in your other cases.  And what you would love

24   is for me to allow him to answer, make my

25   objections, which you could care less whether

**FREEDOM COURT REPORTING**

Page 110

1      they're sustained or overruled, because you've

2      gotten what you wanted, which is the information.

3      I am not going to play that game.  If the Court

4      disagrees with me, I will put this on the record,

5      and we have to redo any of the questions that

6      I've instructed him not to answer, we will do it

7      in Alabama and I will pay the costs for him to

8      come down, for me to come down, and I'll pay the

9      cost of the court reporter to redo the

10     deposition.

11          MR. WOOTEN:  And you'll pay my time for

12     having to retake it, right?

13          MR. CASH:  No, I'm not going to pay your

14     time, Nick, because I think you're the reason

15     that we're having the problem.  But I will do

16     all -- I will make all those other offers.

17          MR. WOOTEN:  Well, wait a minute, you just

18     said that if the Court disagrees with your narrow

19     construction of my right to discovery, that

20     you'll pay everybody else's costs associated with

21     having to redo this but mine.

22          MR. CASH:  If the Court tells me that I have

23     to pay you reasonable attorney's fees to reask

24     the questions I've instructed him not to answer,

25     I think there's four or five so far, for those

**FREEDOM COURT REPORTING**

Page 111

1    four or five questions, you bet.  You bet.  I

2    will pay your time for that one hour that it

3    takes to ask four or five questions.  You got it.

4         MR. WOOTEN:  You know what, again, Mike --

5         MR. CASH:  So there we go.

6         MR. WOOTEN:  -- you're not the person in

7    control of this case.

8         MR. CASH:  No, I'm not.

9         MR. WOOTEN:  The person who is elected by

10   the citizens of DeKalb County to control this

11   case --

12        MR. CASH:  I agree completely, but he's not

13   here.

14        MR. WOOTEN:  You don't have the right to

15   substitute your judgments for his.

16        MR. CASH:  Nor do you have right to run

17   roughshod because he's not here.  That's why this

18   is an adversarial process.

19        MR. WOOTEN:  You have the right to object.

20        MR. CASH:  And I will make my objections.

21        MR. WOOTEN:  And you don't have the right to

22   instruct your witness to limit his answers.

23        MR. CASH:  The objection -- well, I disagree

24   with you.  I have the right to instruct my

25   witness when the questioning is harassing, which

**FREEDOM COURT REPORTING**

Page 112

1    it becomes when it's completely irrelevant, I do

2    have the right to instruct him not to answer.

3    That's true under the federal rules and --

4        MR. WOOTEN:  If you're telling me --

5        MR. CASH:  -- it's true under my reading of

6    the Alabama rules.

7        MR. WOOTEN:  -- that you interpret

8    harassment as wanting to know why this corporate

9    defendant, who is involved in a vast majority of

10    all the foreclosures in this country, chooses to

11    locate employees with a servicer to support their

12    foreclosure efforts, if you're telling me that

13    that's your basis for saying that my question's

14    not relevant, I just want to be real clear about

15    that.  Now with respect to you instructing the

16    person not --

17        MR. CASH:  I mean, you keep saying you need

18    to be real clear.  I think I've made it clear.

19        MR. WOOTEN:  If you --

20        MR. CASH:  The record's clear.

21        MR. WOOTEN:  How about letting me finish

22    before you interrupt.

23        MR. CASH:  How about why don't you just ask

24    questions.  Because here's what you're not going

25    to do, you're not going to convince me and I am

**FREEDOM COURT REPORTING**

Page 113

1    not going to convince you.

2         MR. WOOTEN:  I'm not trying to convince you.

3    I could care less what you're convinced of.

4         MR. CASH:  Well, then quit preaching to me

5    and ask your questions.  I will do what I need to

6    do, which is object and instruct not to answer.

7    The record's clear what I'm saying --

8         THE REPORTER:  The record is not very clear

9    with you guys talking on top of each other, I'm

10   sorry.

11        MR. WOOTEN:  Sure.  And I'm trying to hold

12   off.  I apologize.

13        MR. CASH:  So I will make my objections and

14   my instructions.  You ask your questions, he will

15   give answers.

16        MR. WOOTEN:  Okay.  So let's --

17        MR. CASH:  That's where everybody is.

18        MR. WOOTEN:  Let's just go and make this

19   agreement then.  If you instruct him not to

20   answer all this stuff you just run through about

21   your right to control my discovery, that'll just

22   be part of that objection and your instruction

23   not to answer, okay?

24        MR. CASH:  I will state my grounds for my

25   objection so it's clear to the Court.  And I

Page 114

1  don't have any right to control your discovery.

2  The only thing I have the right to do is not have

3  my witness to testify to things that are

4  completely outside the scope of this case.  And

5  that's all I'm doing.

6      MR. WOOTEN:  And my only burden is to show

7  that it might lead to discovery of admissible

8  evidence.

9      MR. CASH:  That's where you're wrong.  You

10  have two burdens:  First, you must show it's

11  relevant, and then you must show that it's

12  reasonably likely to lead to the discovery of

13  admissible evidence; it's a two-prong test.

14      MR. WOOTEN:  So your statement it's not

15  relevant is based upon the fact that you have

16  determined that how your client does business in

17  a national foreclosure mill is not relevant to

18  what happened in a case involving a wrongful

19  foreclosure.

20      MR. CASH:  My objection on this particular

21  question is, there is no evidence, nor is there

22  any allegation that my client had an employee

23  placed at Option One who had anything to do with

24  this particular foreclosure.  As such, what our

25  policies are regarding placing employees at any

**FREEDOM COURT REPORTING**

Page 115

1    particular location are not relevant to any issue

2    raised in this lawsuit regarding this loan, which

3    is why we are here.  That is my objection, for

4    the third time, and it will not change.

5         MR. WOOTEN:  Okay.  And what I am trying to

6    do, Mike, is prevent you from continuing to coach

7    your witness through your objections and prevent

8    you from continuing to instruct your client not

9    to answer, so that when we go to court on these,

10   I'm not sitting here with a situation where every

11   time you do that, you create a situation where I

12   have to respond on the record.  So what I'm

13   asking you to do, to preserve time, because we're

14   going to need a lot of it to get through today,

15   is to agree with me that if you instruct your

16   client not to answer during the balance of the

17   time that we're here today, that we'll just agree

18   that what you're agreeing to is if the Court

19   finds that he should've answered, that you'll pay

20   the costs associated with retaking that

21   deposition.  So that that's on the record.  And

22   when you tell him not to answer, if that's your

23   choice, that'll be fine, and we'll go right up

24   there and we'll deal with it after the fact.

25        MR. CASH:  I've already agreed to that.

**FREEDOM COURT REPORTING**

Page 116

1          MR. WOOTEN:  Okay.  Well --

2          MR. CASH:  The only part that I don't agree

3    to is I can't pre-agree what the basis of the

4    deposition is until I -- of the objection is

5    until I hear the question, Nick.

6          MR. WOOTEN:  Okay.  Well, that wasn't what I

7    understood you to say.  So if I misunderstood

8    you, I apologize.  If you have a different

9    grounds for objection other than just telling him

10   not to answer it, absolutely, please make it.

11         MR. CASH:  I've never instructed him just

12   not to answer without making an objection first.

13         MR. WOOTEN:  Okay.  Well, that will be fine.

14   So whenever you tell him not to answer, rather

15   than us have a ten minute conversation about it,

16   we'll just have this agreement as a standing

17   agreement for the rest of this deposition, okay?

18         MR. CASH:  That is absolutely fine with me.

19         MR. WOOTEN:  That'll be fine.

20         Now, with respect to -- ma'am, I'm sorry, do

21   we need to take break and let you get caught up?  Are

22   you all right?  Okay.  Is everybody else okay?

23   BY MR. WOOTEN:

24   Q    With respect to Mr. Newland, we're still

25   looking at the very first thing I marked, which was

**FREEDOM COURT REPORTING**

Page 117

1    the deposition notice.  With respect to your Document

2    Management, that is also, as we talked about, called

3    NewTrak, correct?

4         A    No, it's not.

5         Q    New Document Management used to be called

6    NewTrak; is that right?

7         A    No.

8         Q    Okay.  What did Document Management used to

9    be called?  Is there a previous name for your Document

10   Management software?

11        A    I'm trying to remember what it was.  I don't

12   recall off the top of my head.

13        Q    Let me look back at my notes.  Imaging

14   Platform?

15        A    That's -- it was referenced as New Image, is

16   what the actual name was.

17        Q    Were there initials for that, something to

18   the effect of NIE?

19        A    Yes.

20        Q    And your testimony is, is that every

21   document with respect to the Woods' loan that we're

22   here about today you produced as part of Exhibit 24

23   that is contained in the Document Management or

24   imaging platform of the software that your client --

25   your company employs, LPS?

**FREEDOM COURT REPORTING**

Page 118

1        A     Yes.

2             MR. CASH:  Just for the record, we do need

3        to check on the Invoice Management that you had

4        mentioned, and I need to go back and see if

5        there's any Invoice Management documents.  And if

6        there are, after lunch, we'll produce those.  So

7        there may be invoices that aren't part of the

8        Exhibit 24.  But I will verify that.

9             MR. WOOTEN:  Are you also willing to verify

10       whether or not there are any of the P309

11       documents I referenced in Item No. 1 of this

12       case?

13            MR. CASH:  Here's what I want to explain,

14       Nick, that I don't think is fully understood.

15       MSP is not a default software, it's not one of

16       our softwares.  You keep asking about MPS, that's

17       a different Fidelity entity.  What we have, and

18       what he's tried to explain, is we have NewTrak,

19       which is Process Management, so that's -- we have

20       all the NewTrak, we have the imaging system,

21       which we talked about, and we have the invoice

22       system.  So those are the three systems that are

23       our documents that I can get you.  The others are

24       not default -- remember, we narrowly defined what

25       this defendant is, they are not this defendant's

**FREEDOM COURT REPORTING**

Page 119

1    documents, and the information contained in those

2    are the client's information.  So the best place

3    to get the MSP screens would be from Option, not

4    from us.  They're the ones that have their

5    information in that format.  So that's what I was

6    trying to --

7         MR. WOOTEN:  All right.

8         MR. CASH:  That's my explanation, if that

9    helps.

10        MR. WOOTEN:  I hear what you're saying.  And

11   all I'm trying to ask the question is, and you

12   can tell me, you're sitting there with your

13   corporate lawyer, are you able as LPS to produce

14   the documents that we marked as Exhibit 1 -- or

15   the first request that we made with respect to

16   the P309 fields, and that is an MSP field?

17        MS. NEWMAN:  Can we go off the record?

18        MR. CASH:  Sure, if it's okay with him, it's

19   Nick's deposition.

20        MR. WOOTEN:  Fine.

21        THE VIDEOGRAPHER:  Off record at 4:41 --

22   11:41, sorry.

23        (Off the record discussion.)

24        THE VIDEOGRAPHER:  Back on record at 11:48.

25        MR. CASH:  Just so it's clear, because I do

**FREEDOM COURT REPORTING**

Page 120

1  want this on the record.  I will allow my witness

2  to answer questions which I do not think are

3  relevant today, but it will have to be subject to

4  a confidentiality agreement that this deposition

5  will only be utilized in this case and for eyes

6  only in this case.  And, Nick, I understand off

7  the record you were unwilling to do that, but I

8  did want at least the Court to be clear that I'm

9  not just going to instruct him not to answer.  I

10  am worried about our confidentiality, and I would

11  be willing to allow him to answer even questions

12  that I think are irrelevant if it's limited to

13  use only in this case and it's kept confidential.

14      MR. WOOTEN:  Sure.  And with respect to

15  that, my position is, is that what's implicated

16  by this company and its processes is much too

17  serious to simply agree to wash it away with a

18  confidentiality order.  So, I'd rather you just

19  make the objections as you have, and we'll go

20  forward with the agreement.  If they're proper,

21  then you'll never have to answer them in this

22  case; if they're not proper, then eventually we

23  will.

24      MR. CASH:  All right.  Fair enough.  And I

25  obviously take objection to the implication of

**FREEDOM COURT REPORTING**

Page 121

1          it's far too big.  This is a $1300 case where we

2          did nothing wrong.  But save and except that, go

3          ahead.

4              MR. WOOTEN:  Sure.

5    BY MR. WOOTEN:

6          Q    And, Mr. Newland, with respect to our

7    request for life of loan transaction history, I

8    understand that would be an MSP document.  Is it your

9    testimony that you were or were not able to produce

10   that from -- with respect to what we brought here

11   today?

12         A    I was not able.

13         Q    Did you attempt to produce it?

14         A    I didn't even know what the life of the loan

15   transaction history was.

16         Q    Did you talk with anybody who --

17         A    No, I did not.

18         Q    -- works on the floor and deals with your

19   accounts on a day-to-day basis --

20         A    No.

21         Q    -- about that?

22             MR. CASH:  Let him answer his question, so

23         you get -- the record won't be complete if he's

24         still asking and you're starting your answer.

25             THE WITNESS:  Oh, okay.  Got it.

**FREEDOM COURT REPORTING**

Page 122

1    BY MR. WOOTEN:

2        Q    Did you make any inquiry as to whether or

3    not it was available through access to the software

4    programs that LPS uses?

5        A    No, I did not.

6        Q    With respect to Item 12, having to do with

7    corporate advances, were you able to provide that

8    information?

9        A    No.

10        Q    With respect to any property inspections,

11    including the invoices and payment advices, were you

12    able to provide that information?

13        A    I don't believe the invoices are in there at

14    this time.

15        Q    What about property inspections?

16        A    I'm aware of one property inspection, but I

17    do not believe the invoices are in that document.  I

18    think that's something we're going to be getting

19    later.

20        Q    Sure.  Okay.  So that's part of the imaging

21    platform that we talked about --

22        A    Yes, it is.

23        Q    -- or the Invoice Management platform --

24        A    Yes.

25        Q    -- that y'all are going to try to get during

FREEDOM COURT REPORTING

Page 123

1    lunch?

2         A    Yes.

3              MR. CASH:  Right.

4         Q    And so same with respect to a broker price

5    opinion with respect to this loan, and I believe the

6    records indicate there were at least one broker price

7    opinion.  Will y'all ever produce the information from

8    that?

9         A    Trying to remember if it's in there or not.

10   I don't recall if it's in that agreement.  I know we

11   produced all the documents, but I'm not...

12        Q    Sure.  And the broker price opinion is a

13   document that would be within the imaging portion or

14   the new document system, right?

15        A    If it was uploaded, yes, depending on the

16   company that was utilized.

17        Q    And -- okay.  Well, that's another -- I

18   guess something I want to clarify.  Can you tell us

19   exactly what a broker price opinion is?

20        A    Basically, it's just an opinion by a broker,

21   basically does a drive-by assessment of the property.

22        Q    Do they also take pictures and that sort of

23   thing normally?

24        A    Some do, yes.

25        Q    And I say that to draw the distinction

**FREEDOM COURT REPORTING**

Page 124

1    between a broker price opinion and a property

2    inspection, which is a true drive-by, where you're

3    just running by to see if the house is still standing

4    basically, right?

5         A    Yeah.  My understanding, the property

6    inspections is basically they'll go by and take a look

7    at the property.

8         Q    Sure.  Now, let me ask you this.  With

9    respect to property inspections and broker price

10   opinions, are those items, items that are ordered on a

11   recurring basis within your division?

12        A    That's all based off the client.

13        Q    Okay.

14        A    Client makes the determination on when they

15   order those.

16        Q    And so, that would be within the Process

17   Management, if the client said they wanted a property

18   inspection every 30 days, then that would upload in

19   the Process Management?

20        A    That's not in Process Management, that's

21   based off of their client system when they order the

22   property inspections.

23        Q    Now, do they make a request for property

24   inspections to LPS?

25        A    No, they do not.  Not through LPS Default

**FREEDOM COURT REPORTING**

Page 125

1    Solutions.

2         Q    Okay.  Is it another sub-entity of LPS,

3    Inc.?

4         A    It all depends on the client.  Clients can

5    use different companies.

6         Q    What about with respect to broker price

7    opinions, is that the same scenario?

8         A    Same scenario, yes.

9         Q    And so, are there companies which are either

10   related to or owned by LPS who handle broker price

11   opinions?

12        A    Yes.

13        Q    Okay.  And what are those companies?

14        A    It would be our Field Asset Services.

15        Q    Is that commonly referred to as FAS?

16        A    I don't -- all I know is Field Asset

17   Services, so...

18        Q    Is Field Asset Services a subsidiary of LPS

19   or otherwise owned by LPS?

20        A    Yes.

21             MR. CASH:  Just for clarity, by LPS you mean

22        LPS, Inc., not LPS Default Solutions.

23        Q    Sure.  Let's -- yeah, let me be clear.  FAS

24   falls under the LPS, Inc., structure?

25        A    Inc.

**FREEDOM COURT REPORTING**

Page 126

1    Q    Which is the same place that LPS Default

2   Solutions falls, right?

3    A    Yes.

4    Q    And Field Asset Services, do they only

5   provide broker price opinions?

6    A    It would be property inspections.  You asked

7   about the property inspections, I believe.

8    Q    Okay.  I'm sorry.  So Field Asset Services

9   deals only with property inspections?

10   A    That's correct.

11   Q    Do not perform broker price opinions at all?

12   A    No.  Not to my knowledge.

13   Q    And so, any invoices for property

14  inspections which indicated -- they would indicate who

15  actually was requested to make the inspection and who

16  was paid -- who invoiced it and who was paid for it,

17  right?

18   A    It would be in Invoice Management.

19   Q    Right.  Okay.  And with respect to broker

20  price opinions, I guess the same question, are there

21  any companies which are within the LPS, Inc., umbrella

22  who perform broker price opinions?

23   A    Yes.

24   Q    Okay.  And what are their names?

25   A    LSI.

**FREEDOM COURT REPORTING**

Page 127

1    Q    Do you know what LSI stands for?

2    A    No, I don't know.

3    Q    And is that -- just to be clear, that is

4  also a subsidiary of LPS, Inc.?

5    A    That's correct.

6    Q    Do you know if LPS Default Solutions has

7  contracts for the provision of broker price opinions

8  by LSI?

9    A    No, we do not.

10    Q    Would LPS Default Solutions' clients, the

11  mortgage servicers, potentially have contracts for

12  broker price opinions with LSI?

13    A    You would have to ask them.

14    Q    That would not be any information within

15  LPS's purview?

16    A    No.

17    Q    Okay.

18    A    LPS Default Solutions.

19    Q    Right.  LPS Default Solutions.  With respect

20  to the property inspections or the broker price

21  opinions, does LPS Default Solutions have any

22  discretion as to who they order these services from?

23    A    No.

24    Q    Okay.  That is purely a choice of the

25  servicer?

**FREEDOM COURT REPORTING**

Page 128

1      A    Yes, it is.

2      Q    And you do not know if there is a

3 contractual provision between LPS Default Solutions

4 and its servicing clients requiring them to use

5 companies which are under the LPS, Inc., umbrella for

6 these services?

7      A    No, I do not.

8      MR. WOOTEN:  Off the record again for a

9 minute.

10      THE VIDEOGRAPHER:  Off record at 11:57.

11      (Off the record discussion.)

12      THE VIDEOGRAPHER:  Back on record at 11:57.

13 BY MR. WOOTEN:

14      Q    In preparing for this deposition,

15 Mr. Newland, did you determine whether or not any

16 force placed insurance had been placed upon the Wood

17 loan?

18      A    We don't make a determination on the force

19 placed insurance, that's the client.

20      Q    So that's an Option One decision

21 according --

22      A    Yes, it is.

23      Q    -- to LPS?

24      A    Yes.

25      Q    The contracts that I referred to earlier as

**FREEDOM COURT REPORTING**

Page 129

1    between LPS Default Solutions and either Option One or

2    Scott Humphrey, the other defendants in this case,

3    they would be contracts between these three entities

4    which are defendants.  In other words, LPS Default

5    Solutions has a contract with Scott Humphrey, right?

6        A    That's correct.

7        Q    And then LPS Default Solutions has a

8    contract with Option One?

9        A    That is correct.

10       Q    And that contract would set forth the full

11   scope of the agreement for services which LPS Default

12   Solutions would provide to either of those entities?

13           MR. LAWLER:  Again, I just want to object on

14       attorney-client privilege of any communication

15       between -- whether it's contract or verbal

16       communication or otherwise between Scott Humphrey

17       and LPS or Option One.

18           MR. WOOTEN:  Okay.  Well, Chris, I don't

19       want to get into a big fight with you about this

20       either -- I'm sorry, Mr. Lawler.  But do you have

21       any authority that says that attorney-client

22       privilege is involved when you have three

23       codefendants, one of which happens to be an

24       attorney?

25           MR. LAWLER:  Again, objection's on the

Page 130

1    record.  Fight it out later.

2        MR. CASH:  I can't let you answer the -- not

3    my instruction, I can't let you answer the

4    question because it's their privilege.  I can't

5    let you waive it.

6        MR. LAWLER:  If you're speaking broadly in

7    terms of that there is one or not, then -- then I

8    don't have an issue with speaking broadly in that

9    situation.  If we're getting into any specifics

10   of the substance or terms or what is actually in

11   there, then I'm just going to have to object.

12       MR. WOOTEN:  I'm not asking him for hearsay,

13   Mr. Lawler.  What I'm asking him for is if the

14   general agreement, which they would provide to

15   any attorney who is part of their network, sets

16   forth all of the parties' relative rights and

17   responsibilities with respect to what services

18   they provide one to the other, what they will be

19   paid, if that is the complete agreement or if

20   there are any other agreements other than the one

21   we discussed.

22       MR. CASH:  I think he can answer that --

23       MR. LAWLER:  Yes, that's fine.

24       MR. CASH:  -- I don't think it's privileged.

25   I mean, to the extent you know, you can answer

FREEDOM COURT REPORTING

Page 131

1    that question.

2            THE WITNESS:  Okay.

3            MR. CASH:  Why don't you ask it again.

4            THE WITNESS:  Can you ask it again?

5    Because --

6            MR. WOOTEN:  Sure.

7            THE WITNESS:  -- there's a lot of going back

8    and forth here.

9    BY MR. WOOTEN:

10       Q    We've mentioned one agreement as between

11   Scott Humphrey, LLC, who handled the foreclosure in

12   this case, and Default Solutions -- or LPS Default

13   Solutions, and we mentioned one agreement as between

14   LPS Default Solutions and Option One.  And what I'm

15   asking you is, is that the only agreement existing

16   between LPS Default Solutions and Scott Humphrey?  Is

17   there any other agreement other than that agreement?

18       A    Not that I'm aware of.

19       Q    Okay.  And same question with respect to

20   Option One, is there simply one agreement which

21   defines all the parties' rights, including who will

22   pay who what and when and everything else?

23       A    Not that I'm aware of any other agreements.

24           MR. CASH:  Wait.  I just -- I don't think

25   those two match.  I think he said, is there only

**FREEDOM COURT REPORTING**

Page 132

1      one agreement, and I think you said, not that I'm

2      aware of.  I think we just want to make -- I just

3      want your record to be clear.

4              MR. WOOTEN:  Sure.

5              MR. CASH:  You're asking is there only the

6      one agreement, right?

7   BY MR. WOOTEN:

8          Q    My question is, is there -- there's one

9   contract that we have talked about, that I don't have

10  a copy of here today, between LPS Default Solutions

11  and each of the other codefendants, one with Scott

12  Humphrey and one with Option One.  And what I'm asking

13  is, is are there any other written agreements, other

14  than those individual agreements we just talked about,

15  with respect to any of the other defendants to this --

16  to this action?

17         A    Not that I'm aware of.

18         Q    Okay.  Have you reviewed the information

19  which you produced to us today in preparing for this

20  deposition with respect to the documents that were

21  produced and marked previously as document -- as

22  Plaintiffs' Exhibit 24?

23         A    Yes.

24         Q    You've gone through each of those documents

25  individually?

**FREEDOM COURT REPORTING**

Page 133

1          A      I've looked at them, yes.

2          Q      Okay.  Were you able to ascertain from those

3     documents that force placed insurance was actually in

4     place with respect to the Wood loan?

5          A      No, it was not.

6          Q      Okay.  Are there any companies which provide

7     force placed insurance who fall within the LPS, Inc.,

8     umbrella?

9          A      I don't know.

10         Q      You're not aware of any?

11         A      I don't know.

12         Q      Again, with respect to something that we

13    indicated as the DDCH screen, which I will represent

14    to you is a screen within MSP, did you make any

15    inquiry as to whether or not you could access that

16    screen and obtain copies of any images or

17    correspondence or data contained within that field?

18         A      No, I did not.

19         Q      Did you ask anyone on your behalf to make

20    any inquiry?

21         A      No, I did not.

22         Q      As we sit here today, do you have any idea

23    as to whether or not an employee of LPS Default

24    Solutions could readily access that information from

25    any terminal of LPS Default Solutions?

**FREEDOM COURT REPORTING**

Page 134

1      A    I don't know the answer to that question.

2      Q    And you made no inquiry?

3      A    Not at this time.

4      Q    With respect to the information in the field

5    called the Fee 1 screen, which I'll represent to you

6    is also an MSP field, did you make any inquiry as to

7    whether or not you could obtain any images or copies

8    from that field?

9      A    No, I have not.

10     Q    And would your response be the same with

11   respect to the DDCH, that you did not seek to have

12   anyone verify whether or not an LPS Default Solution

13   employee could get to that information?

14     A    No, I did not.  I don't know.  It would be

15   the same as the P309 screen.

16     Q    Actually, it's a little bit easier to get to

17   than the P309 screen.

18     A    Okay.

19     Q    With respect to the identification of each

20   and every user who input any information into the

21   Fidelity system regarding a client's loan, I think

22   y'all provided a fairly decent number of persons who

23   had been involved in that.  Did you make an effort to

24   obtain that information from the software?

25     A    The Fidelity system as being Process

**FREEDOM COURT REPORTING**

Page 135

1    Management?

2         Q    Well, and I guess because --

3         A    Because Process Management, we did, so...

4         Q    Sure.  And I guess that's where I need to

5    clarify.  What -- are you saying that what you

6    produced is that information with respect to Process

7    Management?

8         A    That is correct.

9         Q    Okay.  What about with respect to Document

10   Management?

11        A    No, we did not provide them with Document

12   Management.

13             MS. NEWMAN:  I'm sorry, I wasn't listening.

14             MR. WOOTEN:  Well, what I asked for had to

15        do with respect to the area of inquiry of No. 19,

16        which was information identifying each user who

17        inputted information into the system.  And I will

18        just tell the two of you that previous to today,

19        I had never had anybody try to distinguish

20        between the platforms that he's referenced with

21        Process Management, Document Management, invoice

22        billing as not being a part of MSP.  So that was

23        the reason that that request was phrased in that

24        way.

25             MR. CASH:  Okay.

Page 136

1          MR. WOOTEN:  So I'll adjust those requests

2      in the future.

3  BY MR. WOOTEN:

4      Q     So what you're saying is, is that you

5  provided Process Management --

6      A     That's correct.

7      Q     -- but you did not inquire as to whether

8  there were any different --

9      A     Document Management.

10     Q     -- users in Document Management?

11     A     Right.

12     Q     And with respect to the MSP fields, you did

13 not inquire at all?

14     A     No, I did not.

15     Q     And we talked previously about the actual

16 agreements for these services, and we -- and we don't

17 know where we are with respect to that dispute about

18 whether or not --

19         MR. CASH:  Well, on this -- on this question

20     I can't answer, because it's got three ands

21     instead of ors.  It says:  Agreements to provide

22     bankruptcy, foreclosure, servicing, data --

23     sorry, I'll slow down -- data, etc., services of

24     any nature between any defendants or any other

25     vendors who provide any services for a fee with

**FREEDOM COURT REPORTING**

Page 137

1    respect to the borrower's loan and, all caps, who

2    paid a fee for said services and, all caps, those

3    fees were charged to the borrower's loan.

4         Our response to that would be none, because

5    our fees aren't charged to the borrower's loan.

6    We have no agreements --

7         THE WITNESS:  Correct.

8         MR. CASH:  -- that would indicate the

9    borrower should ever be charged our fees.  So we

10   would have no agreements that would fall under

11   that category.

12        If that last "and" wasn't there, those would

13   be the contracts that we're talking about.

14        MR. WOOTEN:  Sure.  But with respect to

15   those contracts, I guess what I'm trying to

16   clarify is, is that at this point, we don't have

17   an agreement about producing those because,

18   obviously, y'all don't want to give those up

19   without being forced to or having a

20   confidentiality agreement.

21        MR. CASH:  Right.

22        MR. WOOTEN:  So, that's what I'm trying to

23   clarify.

24        MR. CASH:  Right.  And frankly, Nick, I'll

25   be honest with you, that may not be true.  If we

**FREEDOM COURT REPORTING**

Page 138

1     can agree to some redaction of very proprietary

2     stuff, specific fee things that we have with --

3     you know, so that we're not giving up what our

4     fee structure is to our competitors --

5          MR. WOOTEN:  And I'll --

6          MR. CASH:  -- we may be able to give you the

7     general --

8          MR. WOOTEN:  And I will say that I'm much

9     more concerned about the concept of how those

10    fees are passed along more so than how you

11    structure your fees.

12         MR. CASH:  Okay.

13         MR. WOOTEN:  So there might be a way that we

14    can look at that together and agree.

15         MR. CASH:  Okay.  Okay.

16         MR. WOOTEN:  I really don't care how you pay

17    the folks that work for you.

18         MR. CASH:  Right.

19         MR. WOOTEN:  That's y'all's business.

20         MR. CASH:  Okay.

21         MR. WOOTEN:  What I'm concerned about is if

22    things are marked up and added on and then passed

23    on to a consumer.

24         MR. CASH:  Absolutely.  I understand that.

25         MR. WOOTEN:  So that's my bigger concern

**FREEDOM COURT REPORTING**

Page 139

1    there.  And we're off to Exhibit 2.

2             (Plaintiffs' Exhibit No. 2 marked for

3    identification.)

4    BY MR. WOOTEN:

5         Q    I'm going to show you a document,

6    Mr. Newland, I've marked previously as Plaintiffs'

7    Exhibit 2, and ask you if you -- I'll represent to

8    you, I'm sorry, that that is a copy of the Complaint

9    that was filed originally in this action with respect

10   to my clients, the Woods, and I'll ask you if you

11   reviewed that complaint at all prior to coming here

12   today?

13        A    Yes, I have.

14        Q    So you've familiarized yourself with the

15   allegations made in the complaint, correct?

16        A    Uh-huh.

17        Q    All right.  That's fine.  I just wanted to

18   make sure that you had had a chance to take a look at

19   that.

20             Now, you indicated at the beginning of your

21   deposition that you were familiar with the litigation

22   and you had actually provided an affidavit as support

23   for a motion that had been filed in the case; is that

24   correct?

25        A    Yes.

**FREEDOM COURT REPORTING**

Page 140

1      Q     And that was filed by your Alabama attorneys

2    with Huie Fernambucq?  And I'll let you read that, I

3    won't try to spell it for you.  I can't even spell it.

4            I want to go over a couple of things with

5    you --

6      A     Sure.

7      Q     -- from your affidavit, and areas have been

8    highlighted with respect to the situation.  If you

9    want to take a moment and look through that, and I'll

10   come back and ask you some questions about it.  Or --

11     A     Which portion of it?  All of it or which

12   portion?

13           (Plaintiffs' Exhibit No. 3 marked for

14   identification.)

15           MR. WOOTEN:  Mike, do you have a copy of his

16       affidavit?

17           MR. CASH:  Yeah, I'm looking right now,

18       trying to find it, because I'm pretty sure I do.

19       Yes, I do.

20   BY MR. WOOTEN:

21     Q     Well, that's fine.  If you want to, you can

22   take a look at Mike's copy and just hand me back that

23   one I've highlighted, and I'll ask you questions.

24   That'll make us move a little bit faster.

25           Beginning at the Paragraph No. 3 -- tell me

**FREEDOM COURT REPORTING**

Page 141

1   when you're there -- with respect to your affidavit

2   now.

3       A     Uh-huh.

4       Q     You indicate that Fidelity, which we've

5   already talked about in this case, talking about

6   LPS --

7       A     LPS Default Solutions.

8       Q     -- manages data and communications within

9   its proprietary technology in foreclosure and

10  bankruptcy cases, enabling servicers and servicers'

11  law firms to efficiently and effectively manage

12  mortgage loans in default.

13      A     That's correct.

14      Q     And then in Paragraph 4, you indicate that

15  the services and technology included monitoring the

16  status of legal actions, tracking action items, and

17  providing reports to Option One, by LPS Default

18  Solutions, in regard to the Woods' loan.

19      A     That's correct.

20      Q     And you indicated that those services did

21  not include selecting a law firm to represent Option

22  One or determining what they should do with respect to

23  that loan?

24      A     That's correct.

25      Q     And then in Paragraph 6, you indicated that

**FREEDOM COURT REPORTING**

Page 142

1    LPS Default Solutions did not select, hire, or retain

2    Scott Humphrey.

3         A    That's correct.

4         Q    You indicated that decision was made by

5    Option One, right?

6         A    That is correct.

7         Q    In Paragraph 7, you indicated from reading

8    our complaint that your Process Management notes do

9    not show any charges or fees from Fidelity.

10        A    That's right.

11        Q    Are there other places within software

12   services that LPS Default Solutions uses which might

13   indicate that there were fees charged from Fidelity,

14   or from LPS Default Solutions?

15        A    No.

16        Q    So nowhere in the MSP software would it

17   indicate that there were fees which were charged which

18   should be ultimately paid to LPS Default Solutions?

19        A    No, we don't charge fees to the customers.

20             (Brief interruption.)

21             THE WITNESS:  To the customers.

22   BY MR. WOOTEN:

23        Q    In Paragraph 8, second sentence, you

24   indicated that LPS Default Solutions has not received

25   any moneys from Option One for services performed

FREEDOM COURT REPORTING

Page 143

1    regarding plaintiffs' mortgage loan.

2         A    That is correct.

3         Q    Now, are you speaking generally about any

4    payment at all from Option One, are you talking about

5    specifically the services provided regarding this

6    foreclosure that took place?

7         A    Specifically.

8         Q    Okay.  So we're dealing with -- your

9    testimony is that for the support and services that

10   you provide regarding a foreclosure, that Option One

11   does not pay you any money?

12        A    That is correct.

13        Q    Now, with respect to Scott Humphrey, he pays

14   you a referral fee for having this loan come to him

15   through the referral network of LPS Default Solutions?

16        A    He does not pay a referral fee, he pays an

17   administrative support fee.

18        Q    Okay.  Tell me what the administrative

19   support fee is.

20        A    Basically to help maintain the information

21   within the system of record.

22        Q    Okay.  And what is the fee?

23        A    I don't know off the top of my head what

24   the -- you're talking about the exact amount of the

25   fee?

**FREEDOM COURT REPORTING**

Page 144

1    Q    Well, how is that fee derived?  I mean, is

2  it a percentage or is it a set dollar amount, or how

3  do you arrive at that fee?

4    A    It's a dollar amount that's determined by

5  our executives, I believe.

6    Q    Okay.  Is it based on the dollar value of

7  the loan or is it --

8    A    No.

9    Q    -- based on the service to be provided?

10    A    It's -- it's a flat fee.

11    Q    Okay.  Do you know if Mr. Humphrey would

12  have added the amount of that support fee to the

13  attorney fees which he billed to Option One?

14    A    I don't know.

15    Q    Do you know if your agreement with

16  Mr. Humphrey's firm required him to perform the

17  foreclosure services for a set fee?

18    A    Yes.  I mean, it's all basically relative to

19  the fees that are incurred, that are set forth by the

20  client.

21    Q    All right.  And when you say they're set

22  forth by the client, there actually is a fee structure

23  for these types of services.  And this is a

24  generalization, Mike, but even with respect to

25  bankruptcies and foreclosures, most of those

**FREEDOM COURT REPORTING**

Page 145

1    guidelines come from either the government sponsored

2    enterprises or some entity like that, right?

3          A    That is my understanding.

4               (Brief interruption.)

5               THE WITNESS:  That is my understanding.

6               MR. WOOTEN:  Whose phone?  Oh.

7               THE VIDEOGRAPHER:  I'm sorry.

8               MR. WOOTEN:  Oh, okay.  I was just making

9    sure nobody was getting us.

10   BY MR. WOOTEN:

11         Q    But in general, the fee for a foreclosure is

12   more or less governed by those entities that had

13   dominated the market for so long, Fannie and Freddie;

14   is that correct?

15         A    That would be my understanding, that the fee

16   structures are set forth based off of those

17   assessments, and then the clients make the

18   determination as to whether they're going to look at

19   those fee structures or not.

20         Q    Do you know if the contract between Scott

21   Humphrey and LPS Default Solutions required him to

22   submit his invoices through your Invoice Management

23   system?

24         A    I don't know.  I don't know.

25         Q    So that is something that we cannot

**FREEDOM COURT REPORTING**

Page 146

1   ascertain without looking at the actual agreement?

2          A     That would be my understanding.

3          Q     Okay.  All right.  Do you know if the

4   contract between Option One and LPS Default Solutions

5   required that they communicate with the foreclosure

6   attorney through the document or the process solutions

7   portion of your business, Process Management?

8          A     Yes, they are required to go through Process

9   Management with their information.

10         Q     Okay.

11         A     As far as the updating events and requesting

12  of certain documents, those things.

13         Q     So is it your understanding that as between

14  the contract between LPS Default Solutions and Option

15  One, and LPS Default Solutions and Scott Humphrey,

16  that between the covenants in those agreements, Scott

17  Humphrey could not go directly to Option One and say,

18  pay my fee?

19         A     I don't know the answer to that question.

20  I -- Scott Humphrey could always go and request, if he

21  wanted to, through Option One, I just don't know.

22         Q     Okay.  So without seeing the agreement, you

23  don't know if he was required to submit invoices

24  through LPS Default Solutions and that they were

25  required to pay the invoices that he submitted through

Page 147

1   LPS Default Solutions?

2       A     That would be correct.

3       Q     Is not a portion of the benefit of the

4   bargain that your company provides that the servicers,

5   such as Option One, know what they will pay for these

6   services which are provided by the network attorneys?

7       A     Run that by me again.

8       Q     Okay.  Part of the benefit that LPS Default

9   Solutions provides to a servicer is that a servicer

10  knows that they can get an LPS network attorney who's

11  going to provide services for a certain fee.  Is that

12  part of the benefits you provide?

13      A     They -- they basically choose the attorney,

14  so it's up to them to make that decision.

15      Q     I didn't say that they didn't.

16      A     Okay.

17      Q     What I'm saying is, is that with respect to

18  your network attorneys, you can truthfully state to

19  any servicer, including Option One, that your network

20  attorneys are going to provide services for a certain

21  fee?

22      A     That is correct.

23      Q     And that's because of the agreement you have

24  with the network attorney?

25      A     We have an agreement with the attorneys.

FREEDOM COURT REPORTING

Page 148

1        Q        Right.  Okay.

2        A        But then again, Option One can utilize any

3    attorney that they wish.

4        Q        I understand.

5        A        Okay.

6        Q        I'm just saying that part of the benefit

7    that you're providing is that Option One, who's a

8    California corporation, can hire an attorney who's an

9    LPS Default Solutions network attorney in Alabama to

10   go to DeKalb County and foreclose without having to

11   prequalify them in any way, they know what those costs

12   are going to be?

13       A        That's -- that's strictly up to the client.

14       Q        My question is much more esoteric than that,

15   really.  I know -- I understand what you're saying.

16       A        Okay.

17       Q        I'm just saying that when you go out and

18   shop your services to a servicer, like Option One,

19   you're telling them that you provide a national

20   network of attorneys who will perform services for a

21   fixed amount of money, depending on what service

22   they're providing, don't you?

23       A        As far as the service provided, we basically

24   go out and discuss what attorneys we have within our

25   network, but all clients have the ability to choose

**FREEDOM COURT REPORTING**

Page 149

1   any attorney they wish to choose and utilize that they

2   want, period.

3          Q    Sure.  Again, I understand that answer.

4          A    Okay.

5          Q    And -- but my question is much more general.

6   What I'm saying to you is, is because Option One has

7   made this contract with LPS Default Solutions, that

8   they know that if they upload a foreclosure and it is

9   sent to a network attorney, that attorney is going to

10  perform those services for a set fee?

11         A    Determined by the client, yes.

12         Q    Okay.  And so, you ask them in their

13  agreements to set those fees that they will pay,

14  right?

15         A    Yes, we do.

16         Q    And is it your testimony, again, that fee

17  structure more or less comes straight from Fannie and

18  Freddie and the government sponsored enterprises,

19  right?

20         A    The clients utilize that.

21         Q    And most clients don't deviate from that, do

22  they?

23         A    I don't know.

24              THE VIDEOGRAPHER:  Excuse me.  Need to

25         change tape.

**FREEDOM COURT REPORTING**

Page 150

1        MR. WOOTEN:  Need another tape?  Sure.

2        THE VIDEOGRAPHER:  Off record at 12:23.

3        (Off the record discussion.)

4        (Lunch break.)

5        THE VIDEOGRAPHER:  Back on record at 1:05,

6   beginning of Videotape No. 4.

7   BY MR. WOOTEN:

8        Q    Mr. Newland, when we left off, we were

9   talking about Paragraph No. 8 of your affidavit.  You

10  said that Fidelity has not received any moneys from

11  Option One for services performed regarding

12  plaintiffs' mortgage loan.  We established that what

13  you were referring to there specifically were the

14  default services which were provided by LPS Default

15  Solutions with respect to the foreclosure case?

16       A    Uh-huh.

17       Q    And you indicated that Fidelity does not pay

18  LPS Default Solutions any money for the work it does

19  with respect to a foreclosure?

20       A    Fidelity does not pay --

21       Q    I'm sorry.  Option One does not pay --

22       A    That's correct.

23       Q    -- LPS Default Solutions any money?

24       A    That's correct.

25       Q    You did indicate that LPS Default Solutions

**367 VALLEY AVENUE**

**FREEDOM COURT REPORTING**

Page 151

1    charges an administrative support fee to the attorney

2    who is the network attorney assigned to the

3    foreclosure?

4         A    Yes.

5         Q    What we were trying to establish at the

6    point in time we had to take that break was how is

7    that fee determined, and I think you indicated that it

8    was a flat fee?

9         A    Yes.

10        Q    And that it was -- is it based upon the fee

11   that the attorney charges, or is it --

12        A    No.

13        Q    -- based upon some other factor?

14        A    It's just based on the services we provide

15   with the attorney.

16        Q    Okay.  And so is there a fee for separate

17   services which LPS Default Solutions provides?

18        A    No.  We're contracted with the attorney.

19        Q    So every fee which LPS Default Solutions

20   charges would be contained in the agreement between

21   LPS and Scott Humphrey?

22        A    That's correct.

23        Q    And every fee or payment due from Option One

24   to LPS Default Solutions would also be contained

25   within the contract that was executed between those

**FREEDOM COURT REPORTING**

Page 152

1   parties?

2       A    There's no fee between Option One and LPS.

3       Q    Never under any circumstances?

4       A    No.

5       Q    With respect to the remaining allegations of

6   that paragraph, it is your testimony that LPS Default

7   Solutions does not provide payoff figures to a

8   plaintiff or to a party who is in foreclosure?

9       A    No, we do not provide the payoff figures to

10  the customers -- or the plaintiff.

11      Q    And that is not just with respect to my

12  clients, the Woods, but with respect to your entire

13  business model?

14      A    That is correct.

15      Q    And if the Woods were to have contacted LPS

16  Default Solutions and requested verification of an

17  amount owed, your testimony is, is that LPS Default

18  Solutions would not have that information?

19      A    No, we would not -- we would not discuss the

20  information with the customer, we would refer the

21  customer back to either the attorney and/or the

22  client, which would be Option One in this case.

23      Q    And your testimony is, is that LPS Default

24  Solutions does not engage in any collection efforts

25  with -- is that generally or with respect only to my

**FREEDOM COURT REPORTING**

Page 153

1    client's loan?

2        A    Generally.  We do not discuss anything with

3    any customer.

4        Q    So no one from LPS Default Solutions in

5    either Mankato, Minnesota, or, Jacksonville, Florida,

6    ever calls a mortgage borrower who is in foreclosure

7    about collecting on the amount that's owed with

8    respect to the foreclosure?

9        A    Absolutely not.

10        Q    And it's your testimony that LPS does not

11    provide any information to any credit bureau?

12        A    Absolutely not.

13        Q    If Scott Humphrey uploaded an invoice for

14    services into the document or the -- I'm sorry,

15    Process Management database -- actually, that would go

16    into your invoicing system, wouldn't it?

17        A    That is correct.

18        Q    Would he make an entry with respect to the

19    amounts of the -- those attorney's fees?

20        A    He typically would.

21        Q    And would he provide in addition to the

22    invoice any images which supported those charges?

23        A    In most cases the attorney would.

24        Q    With respect to this loan, did that occur?

25        A    I don't know.  I know there was invoices

**FREEDOM COURT REPORTING**

Page 154

1  uploaded, but I do not know if those -- if there was

2  copies of anything behind those.

3      Q    Is it your testimony that LPS Default

4  Solutions does not increase the amount billed to any

5  consumer for any charge or service provided during the

6  time that it manages the foreclosure process?

7      A    That's correct, we do not.

8      Q    Does LPS Default Solutions have any

9  agreement with any provider of services who does

10  charge a fee to a consumer in the foreclosure process

11  whereby that fee is shared with LPS Default Solutions?

12      A    No.

13      Q    And your testimony is that never happens,

14  not with respect to any fee, including any attorney's

15  fee?

16      A    No.

17      Q    Does Fidelity charge to Option One -- I'm

18  sorry.

19          Does LPS Default Solutions charge to Option

20  One any amount of money at any time for referring a

21  foreclosure file for foreclosure services through the

22  LPS Default Solutions platform?

23      A    No.

24      Q    Does it receive any remuneration of any type

25  from any source for Option One uploading a foreclosure

**FREEDOM COURT REPORTING**

Page 155

1    to LPS Default Solutions?

2         A     No.

3         Q     So I just want to be sure.  What you're

4    testifying to is that there is no compensation ever

5    paid by the servicer to LPS Default Solutions for all

6    this work that it does on behalf of the servicer with

7    respect to the foreclosure?

8         A     No.

9         Q     There is compensation or there is not

10   compensation?

11        A     No, there's no compensation.

12        Q     Is it your testimony then that the only fees

13   which LPS Default Solutions collects with respect to

14   the foreclosure of any given loan is the

15   administrative support fee charged to the network

16   attorneys?

17        A     Yes.

18        Q     And the division of LPS Default Solutions

19   which we are here about today and which you are

20   testifying as a 30(b)(6) representative, the only

21   source of income it derives for its work with respect

22   to foreclosure is the administrative support fee?

23        A     That's my understanding.

24        Q     Other than the administrative support fee,

25   does it charge a fee for accessing documents on the

**FREEDOM COURT REPORTING**

Page 156

1    new document system?

2        A    No.

3        Q    So your testimony today is that the only

4    compensation of any type, of any nature, paid to LPS

5    Default Solutions is the administrative support fee,

6    and it funds all of the activities and makes all the

7    profit, pays all the overhead of LPS Default

8    Solutions?

9        A    That's my understanding, for the third time.

10       Q    Paragraph 11 of your affidavit says that LPS

11   Default Solutions has no record of receiving any

12   portion of funds received from any foreclosure of

13   plaintiffs' mortgage?

14       A    That is correct.

15       Q    And is that comment based upon the contents

16   of the Process Management system?

17       A    Yes.

18       Q    And it is your testimony that your employees

19   do have access to MSP as a portion of the work that

20   they do, correct?

21       A    They have access to certain screens within

22   MSP, correct.

23       Q    Would that be the foreclosure screens within

24   MSP?

25       A    It would be access to limited amounts of the

Page 157

1    foreclosure workstations.

2         Q    The next sentence of that affidavit says

3    that Fidelity, or LPS Default Solutions, did not

4    initiate foreclosure proceedings regarding the Woods'

5    mortgage.

6         A    That is correct.

7         Q    And that there was no direct contact with

8    the plaintiffs regarding their mortgage account.

9         A    That is correct.

10        Q    I'm going to just pull off these pages,

11   there's 25 pages here, they're Process Management

12   notes that are part of the cumulative Exhibit No. 24

13   in this case.

14        A    Uh-huh.

15        Q    This is, according to you, Mr. Newland, all

16   of the Process Management notes for this loan; is that

17   correct?

18        A    That is correct.

19        Q    Does this represent every entry of

20   information regarding the Woods' mortgage loan on the

21   LPS Default Solutions Process Management platform?

22        A    That is correct.

23        Q    So this is actually organized in a reverse

24   chronological fashion, correct?

25        A    That's correct.

Page 158

1      Q     So if we want to start at the beginning, we

2    really should turn over to the last page, which is

3    No. 157, right?

4      A     Uh-huh.

5      Q     And No. 157, that says written by.  What

6    does written by mean with respect to that entry?

7      A     That's who entered in the transaction.

8      Q     And who did that in this case?

9      A     It was basically done through an auto

10   process.

11     Q     Whose auto process?

12     A     Our auto process.

13     Q     LPS's, right?

14     A     That's correct.

15     Q     And then entry No. 156 says what?

16     A     It says a foreclosure, NIE ID No. 3550946,

17   was sent to Scott Humphrey at 6 -- on June 1st, 2007

18   at 9:07:50 a.m. by an automated task.

19     Q     And that was also done by LPS Default

20   Solutions automated process?

21     A     That's correct.

22     Q     And the NIE ID number is, in fact, a New

23   Image ID number which would identify the documents

24   which were sent to Scott Humphrey on June 1st, 2007,

25   correct?

**FREEDOM COURT REPORTING**

Page 159

1    A    That is correct.

2    Q    Document No -- or entry No. 154, please tell

3    me to the best of your understanding what that entry

4    indicates.

5    A    Basically it's an entry:  Process opened

6    June 1st, 2007, by user Fidelity AutoProc, process is

7    basically to obtain any type of imaged docs that are

8    currently out there.

9    Q    Where would those imaged docs be located?

10    A    Could be possibly located in the imaging

11    system for Option One Mortgage.

12    Q    Okay.  And I thought we just talked about

13    the fact that your folks didn't mess with Option One's

14    data.  Didn't you testify that --

15    A    Well, this is --

16    Q    -- LPS --

17    A    This actually -- this actually is an event

18    that's worked by the client, not by us.

19    Q    But --

20    A    We just -- the process was just

21    automatically opened, auto opened for the client to

22    basically look into their imaging system to see if any

23    other docs were available for referral.

24    Q    So whenever it says --

25    A    OS.

**FREEDOM COURT REPORTING**

Page 160

1     Q     -- written by at the top, whatever the entry

2     is there would tell us --

3     A     Who opened the process.

4     Q     -- who did it and what company, right?

5     A     Yes.

6     Q     Okay.  And so, what you're saying is, is

7     that after your company automatically processed a

8     foreclosure and sent it out to Scott Humphrey, that it

9     then went out and sought whatever image documents that

10    Option One might have?

11    A     This is based on the client.  Client has set

12    this process up.  All we are is the facilitator for

13    the opening of that process for the client.

14    Q     It doesn't say that Option One did this

15    though, does it?

16    A     No, but we're contracted by Option One to

17    facilitate the opening of this process.

18    Q     Sure.

19    A     That's their request.

20    Q     And you agree with me that that is done by

21    your system and your company?

22    A     Yes, it's done by our system.

23    Q     Entry No. 153, later that same day, appears

24    to be the entry where Scott Humphrey received that

25    file?

Page 161

1       A     That's correct.

2       Q     And then 152 is another automated process by

3   your company indicating -- acknowledging the time

4   which Scott Humphrey picked up these -- this

5   foreclosure and who within his office picked it up,

6   correct?

7       A     Yes.

8       Q     And then entry No. 151 appears to be an

9   Option One Mortgage Company entry; is that right?

10      A     That's correct.

11      Q     And does it indicate what images were

12  provided by Option One in that entry?

13      A     That's correct.

14      Q     And that indicates that there was a note and

15  a HUD and an RSI.  Do you know what that is?

16      A     No, I do not.  Probably a recorded security

17  instrument, is probably what it stands for.

18      Q     All right.

19      A     Stipulated up in No. 150.  If you look up at

20  150, there you go.

21      Q     All right.  Gotcha.  And do you know what

22  NOI is?

23      A     Notice -- notice of intent.

24      Q     Is that -- the notice of intent, is that the

25  letter notifying the client of the intention to

Page 162

1    foreclose?

2        A    That's my understanding.

3        Q    And then the MB NOI, what -- what does that

4    mean?

5        A    I don't know what the MB -- what that stands

6    for.

7        Q    And then, as we just talked about, the next

8    entry, 150, indicates the actual documents which

9    Option One Mortgage company --

10       A    Identified.

11       Q    -- identified, right?

12       A    Uh-huh.

13       Q    And then Entry 149 indicates that this same

14   user for Option One provided the imaged docs to the

15   attorney that same date?

16       A    Yeah, that's completion of the event.

17            (Brief interruption.)

18            THE WITNESS:   Completion of the event.

19   BY MR. WOOTEN:

20       Q    And the Entry No. 147, apparently, at the

21   top of that page is another automated process where

22   your system updates that that has been sent to Scott

23   Humphrey?

24       A    That Scott Humphrey picked up the documents.

25       Q    And the Entries 145 and 144 are again

**FREEDOM COURT REPORTING**

Page 163

1    automated entries by your company --

2         A    Yes.

3         Q    -- is that correct?

4         A    It's basically where the documents were

5    picked up in New Image at that time, which is an

6    imaging platform, and it's also time stamped when they

7    pick them up through that system also back into

8    Process Management, so we basically have dual entries.

9         Q    Have you ever looked at the New Image

10   software from the attorney side?  Are you familiar

11   with whether they have to go through authorization or

12   commitment screens or anything like that to pick up

13   these documents?

14        A    No, I have not.

15        Q    So you don't have any idea?

16        A    No.  I know they're picked up through the

17   user IDs.  We have user IDs for all three systems.

18        Q    Is a user ID the same for all three systems?

19        A    You can have the same log-in for all three

20   systems presently now.

21        Q    I'm sorry, at the present time --

22        A    At the present time.

23        Q    -- they have a different log-in for each

24   system?

25        A    I don't recall --

**FREEDOM COURT REPORTING**

Page 164

1        MR. CASH:  I'm going to instruct you not to

2    answer that.  We're getting into proprietary --

3        THE WITNESS:  Okay.

4        MR. CASH:  -- security stuff that has

5    nothing to do with this lawsuit.  So, objection,

6    relevance.  Instruct you not to answer.  Also

7    objection, proprietary.

8  BY MR. WOOTEN:

9        Q    On the entry that begins at the top of

10   Page 23 of those documents, right above 140, but it's

11   actually entry No. 139, which carries over onto

12   Page 22, it indicates that Karen Singleton with Scott

13   Humphrey's office completed the F119 Attorney Fees

14   Owed data form with the following entries, amount

15   outstanding $1300 estimated only.  That information

16   would have been provided to Fidelity -- or to LPS

17   Default Solutions at that time?

18        A    Yeah, that was completed by Karen Singleton

19   in Scott Humphrey's office for, in this case, it

20   would've been the bid process, which it was basically

21   stating what they believe the fees would be for the

22   bid.

23        Q    And then at Page 1 -- or Entry 136, you have

24   an issue crop up.

25        A    Uh-huh.

**FREEDOM COURT REPORTING**

Page 165

1    Q    And this is 6/18 of 2007.  Does that

2    indicate that the house had burned to the ground and

3    there was an insurance claim?

4    A    Yes, that the house had burned.

5    Q    And that the mortgage was supposed to have

6    been paid in full?

7    A    Yes.

8    Q    And does this indicate that the property

9    actually belongs to this gentleman who called in, a

10   Mr. Steele?

11   A    It says that this land is -- that this is

12   the land that Mr. Steele and his sister inherited from

13   their parents.

14   Q    And the last sentence says:  But he did want

15   us to inform client that there is nothing that belongs

16   to the mortgagee, because the property actually

17   belongs to him, Mr. Steele?

18   A    That's correct, that's what's stated in it.

19   Q    Who would this -- this issue would have gone

20   back to your company, correct?

21   A    That's correct.

22   Q    And when this issue went back to LPS, it

23   would've been your company's voluntary undertaking to

24   determine what Option One wished to do about this

25   issue, right?

**FREEDOM COURT REPORTING**

Page 166

1      A      No, we brought the issue to Option One's

2  attention.  As you can see in the note that's just

3  above it, in 134, on June 18th at 5:06 p.m.

4      Q      And it's -- and this involves Brandi Smith,

5  who is a Fidelity employee?

6      A      That's correct.

7      Q      And Ann Russo, who is an Option One Mortgage

8  Company employee, right?

9      A      That's correct.

10      Q      Does Brandi Smith work in Jacksonville or

11  does she work in Mankato?

12      A      Off the top of my head, I don't -- I don't

13  know which location she works at.  She may even be one

14  of our work-at-home representatives.

15      Q      Is there any way to tell from her entry --

16      A      Which location she is?

17      Q      -- where her location is?

18      A      No.

19      Q      Now, ultimately asked the question of this

20  lady at Option One as to whether or not her office has

21  any information regarding an insurance claim or action

22  on the property, right?

23      A      I'm sorry, repeat that again.

24      Q      At the bottom, the last sentence of Entry

25  134, it appears that your employee, Brandi Smith,

**FREEDOM COURT REPORTING**

Page 167

1    asked Ann Russo if her office had any info regarding a

2    possible insurance claim or action on this property?

3         A    That's correct.

4         Q    What is the APR score or ranking with

5    respect to your foreclosure attorneys?

6         A    What is the APR ranking?

7         Q    Or score, attorney performance review or

8    attorney performance ranking, APR?

9         A    Uh-huh.

10        Q    What is that?

11        A    It's a scoring mechanism we utilize to show

12   where the attorneys are performing in relation to the

13   other attorneys within the state.

14        Q    Within the state?

15        A    Yes.

16        Q    Does that extend at all beyond the state to

17   the region or to the country?

18        A    Well, there are service levels that are also

19   in the national.

20        Q    And how is that APR measured?

21             MR. CASH:  I have a better question.  How is

22        that relevant to this lawsuit?

23             MR. WOOTEN:  It's relevant to this lawsuit,

24        Mike, because what you will learn about the APR

25        ranking is that it requires the attorneys to

**FREEDOM COURT REPORTING**

Page 168

1    perform certain tasks and certain --

2         MR. CASH:  Trust me, I know all about the

3    APR ranking.

4         MR. WOOTEN:  And the reason it's relevant

5    is, is they are basically put in a position to

6    rush to get through these projects without being

7    concerned about accuracy.  So I'd like for the

8    Court to understand what the APR is and why it

9    affects the network attorneys.

10        MR. CASH:  So it's your allegation in this

11   case that the problem was rushed because of the

12   APR?  That -- I mean, if that's your allegation,

13   that's fine.

14        MR. WOOTEN:  It is -- my allegation, it is a

15   factor contributing to mistakes that were made.

16        MR. CASH:  Go ahead and answer.

17        THE WITNESS:  Can you repeat the question

18   one more time, please.

19   BY MR. WOOTEN:

20        Q    Sure.  What I'm looking for, Mr. Newland, is

21   an explanation so that the Court may understand what

22   the APR ranking is and how it translates to the

23   business model that your company employs.  And you

24   indicated that it is a scoring mechanism that ranks an

25   attorney's performance vis-a-vis the performance of

**FREEDOM COURT REPORTING**

Page 169

1   other attorneys within a state.

2           So is that to be assumed from that response

3   that a higher APR ranking means that that attorney, by

4   your measure, is doing better than a lower APR

5   ranking?

6       A    They could be performing better, yes.

7       Q    Okay.  And how do you determine the APR

8   ranking of a given attorney?

9       A    The APR ranking is based off of the

10  completion of events that are within the APR scoring

11  module.  These events are based off the data that's

12  inputted by the attorneys, then it's compared against

13  their peers within that state, based off of days to

14  complete the actions.

15      Q    So, for instance, there is a recommended

16  time frame from delivery of a foreclosure referral to

17  completion of the foreclosure sale, correct?

18      A    There is a time frame, yes.

19      Q    What is that time frame, sir?

20      A    Time frame for the state of Alabama?

21      Q    Uh-huh.

22      A    I believe it's 90 days.

23      Q    And that is from, in this case, June 1st of

24  2007, which -- when it was opened and sent to Scott

25  Humphrey, until the sale is complete?

**FREEDOM COURT REPORTING**

Page 170

1        A      That's correct.

2        Q      And your APR measures how the attorney does

3   in completing these events within those time frames,

4   correct?

5        A      That's correct.

6        Q      And so, that is based entirely upon the data

7   which is entered in the Process Management system,

8   correct?

9        A      Yes.

10       Q      And I'm assuming that there is a reporting

11  function within the Process Management system which

12  tracks these key events for each of these attorneys?

13       A      Yes, there is.

14       Q      Other than the time to complete the

15  foreclosure sale from beginning to end, what other

16  measures does your firm employ with respect to your

17  network attorneys who are engaged in foreclosure

18  practice?

19       A      What other measurements as far as the APR?

20  We also measure service levels.

21       Q      When you indicate service levels, can you

22  explain that for me?

23       A      Sure.  How often do they complete their

24  re-projections on time.

25       Q      A re-projection is when a date has to be

**FREEDOM COURT REPORTING**

Page 171

1  refigured?

2       A     When -- yeah, when an event comes due, they

3  need to go in and basically tell us what the reasoning

4  is behind not being able to complete that event and

5  then we will approve off on the re-projection.  Then

6  there's also service levels for fees and costs that

7  are incurred for the basically completion of the fees

8  and costs.

9       Q     Is that for the form F119 we mentioned

10 earlier?

11      A     Not necessarily that.  There's a fees and

12 costs module within Process Management that is

13 measured by when the attorney -- when we send out a

14 fees and costs request from the clients, how quickly

15 do they complete those fees and costs for the client.

16      Q     And does that require an exact cost or an

17 estimated cost?

18      A     There could be -- it depends on the client,

19 but it could be two different areas.  It could be

20 exact cost and/or possibility of future costs,

21 depending on the good through date.

22      Q     With respect to this measure of APR, are

23 there any other factors for an attorney engaging in

24 foreclosure practice as an LPS Default Solutions

25 network attorney which are considered?

**FREEDOM COURT REPORTING**

Page 172

1    A    No.

2    Q    So the APR consists of how fast they

3  complete the initial assignment; if the assignment is

4  reprojected, whether they complete it on time; and

5  whether they respond to a request for costs in a

6  timely fashion?

7    A    That is correct.

8    Q    And that is the entire basis of the APR for

9  attorneys in Alabama who are network attorneys?

10   A    Short version.

11   Q    Okay.  When you say "short version" --

12   A    Just condensing, I mean.

13   Q    Sure.  I'm assuming that -- are there other

14  measures under each of these three main headings?

15   A    No.

16   Q    Is there a financial incentive to be one of

17  the top APR firms in a given state?

18   A    No, there is not.

19   Q    Is it your testimony that your company does

20  not pay bonuses to attorneys who are considered to be

21  the highest performers in a given state?

22   A    Yes, it is my testimony.

23   Q    Is there any other non-monetary incentive to

24  be one of the highest ranking attorneys within the

25  state of Alabama?

**FREEDOM COURT REPORTING**

Page 173

1    A    No, there's not.

2    Q    There is not?

3    A    No.  Monetary, no.

4    Q    Are there any non-monetary incentives?

5    A    No.

6    Q    Do you award trips or --

7    A    No.

8    Q    -- prizes?

9    A    Absolutely not.

10   Q    Does Process Management import any

11   information regarding a loan account at the beginning

12   of a foreclosure process from MSP or any other source

13   from the servicer?

14   A    We do receive information when we do receive

15   the referral from, in this case, Option One Mortgage,

16   as to the unpaid principal balance, address, name,

17   let's see, last payment date.  We do receive that

18   information.  And that's from MSP.

19   Q    You said the unpaid principal balance, the

20   address and what else?

21   A    Last payment date, customer's name, address.

22   Q    Is there a name for this batch of

23   information which is received from MSP with respect to

24   a referred --

25   A    I don't know what the batch name is.

**FREEDOM COURT REPORTING**

Page 174

1       Q     -- account?  I'm sorry, you don't know what

2  the batch --

3       A     You're asking for a batch name?

4       Q     Yeah, do y'all have something you call it

5  when you get this information?

6       A     Just loan information.

7       Q     Does this loan information provide you with

8  the balance of any escrow corporate advance or

9  suspense accounts at the time a case is referred to

10  LPS for foreclosure?

11       A     Not in Process Management, no.

12       Q     Does that information come from some other

13  source?

14       A     It's provided to the attorneys through

15  basically a screen scrape program that we have for

16  the --

17       Q     I'm sorry, you said screen what?

18       A     We have a -- the ability to go out and

19  capture the screen and provide that to the attorney

20  for the information that they need to provide for

21  their financial figures.

22       Q     Did you refer to that as a screen scrape?

23       A     Yeah, basically all you're doing is pulling

24  the information out and basically just sending a

25  snapshot of the screen, which there's screen shots

**FREEDOM COURT REPORTING**

Page 175

1    right there for you in that package.

2         Q    So sort of like this document --

3         A    Yeah.

4         Q    -- I showed you earlier?

5         A    Similar to that, yes.

6         Q    Exhibit 9.  That would be a screen scrape,

7    is your term?

8         A    That would be a snapshot.

9         Q    Okay.  Entry No. 125, June 19th of 2007?

10        A    Uh-huh.

11        Q    Is Vicki Shelley an LPS Default Solutions

12   employee?

13        A    Yes, she is.

14        Q    And does that indicate that she has

15   submitted a bid to the client for approval and that

16   there is a restricted escrow balance greater than

17   $5,000?

18        A    That's correct.

19        Q    And she is privy to all of the issues and

20   comments prior to this date with respect to the fact

21   that there is an insurance claim on this case,

22   correct?

23        A    She's privy to the information; I don't know

24   whether she went back and checked to see that.

25        Q    There's no indication there that she knows

**FREEDOM COURT REPORTING**

Page 176

1    what the restricted escrow balance is, other than it

2    is greater than $5,000, right?

3        A    That's correct.

4        Q    Do you know, as you sit here today, if that

5    information would have been available to her to

6    indicate that there was $138,000 in a restricted

7    escrow account on that day?

8        A    I don't know.

9        Q    Is it your testimony that LPS Default

10   Solutions does not have the authority to cause funds

11   which are in any escrow or suspense account to be

12   applied to a mortgage loan --

13       A    That is correct.

14       Q    -- during the foreclosure process?

15       A    That is correct, we have no ability to

16   process those funds at all.

17       Q    You are hired by Option One Mortgage Company

18   in this case because your firm provides specialty

19   services with respect to foreclosure, correct?

20       A    Yes.

21       Q    And you market yourself as an entity with

22   particular expertise with respect to foreclosure and

23   default issues, correct?

24       A    Managing foreclosure processes, yes.

25       Q    Sure.  And you market yourself as having

**FREEDOM COURT REPORTING**

Page 177

1    particular expertise in that field, correct?

2              MR. CASH:  Which field?

3    BY MR. WOOTEN:

4        Q    Default solutions, foreclosure, bankruptcy,

5    foreclosure management?

6              MR. CASH:  Object to the question as

7         multivarious.

8    BY MR. WOOTEN:

9        Q    Your firm, LPS Default Solutions, only

10   provides services with respect to loans that are in

11   bankruptcy or foreclosure, correct?

12       A    That is correct.

13       Q    That is the specialty of your firm, is it

14   not?

15       A    Yes, it is.

16       Q    Would it be reasonable for your firm to

17   inquire as to why there was an escrow balance greater

18   than $5,000 when your firm's notes indicated that an

19   insurance claim had paid this mortgage off?

20       A    Basically -- based on the bid, we sent this

21   over to the client for approval, which has the

22   necessary information that says it is above a certain

23   balance.  And with our policies and procedures that

24   have been dictated down to us by the client, we

25   requested this go to the client for this approval for

Page 178

1    the bid, which at that time, the responsibility of the

2    client is to review this and provide us with their

3    approval for the bid amount.

4        Q    Okay.  So your testimony is that no matter

5    what's in that balance of that escrow account, you're

6    going to just send this bid on to the client and do

7    whatever they tell you to do, right?

8        A    That is correct.

9        Q    Even if the amount in escrow would pay off

10   the principal balance of the mortgage?

11       A    I don't know if that's the payoff or not,

12   sir.

13       Q    Well, we'll come back to that in a minute.

14   But let's assume for a minute that the principal

15   balance of the loan is less than $137,000.

16       A    I'm not going to assume that though.

17       Q    Okay.  All right.  What I'm doing is asking

18   you to assume, I'll show you the documents in a

19   minute, but if the -- if the principal balance of the

20   loan was less than $137,000 and the restricted escrow

21   contained more than $138,000, would it not have been

22   prudent, as the specialist in this area, to notify

23   this client that there were funds which would have

24   satisfied the principal balance of this mortgage?

25       A    Well, we've already notified the client

**FREEDOM COURT REPORTING**

Page 179

1    previously.  If you would've read in the previous note

2    back, I believe it was, like in the 150s, we did

3    notify the client that there was an issue.  Second of

4    all, if you notice in this line No. 125, based on the

5    policies and procedures that have been dictated down

6    to us by the client, any restricted escrow balance

7    greater than 5,000 needs to be sent to the client for

8    approval.

9          So, we followed our direction and provided

10   that to the client.  That's what I'm testifying to.

11        Q    Have you provided myself and my co-counsel

12   with all of these guidelines and directives which you

13   have received from Option One with respect to how your

14   firm should conduct foreclosures on behalf of Option

15   One?

16        MR. CASH:  I can speak to that.  It's my

17        understanding that we have offered to do so,

18        subject to entry into a confidentiality

19        agreement.  And at this point, there's been no

20        agreement to keep those confidential, which

21        clearly, they're Option One's policies and

22        they're policies dictated to us, so we can't give

23        confidential information without a

24        confidentiality agreement.

25   BY MR. WOOTEN:

**FREEDOM COURT REPORTING**

Page 180

1       Q      Well, when you indicate that you have been

2  given instructions and directives from Option One to

3  your firm with respect to how to conduct a foreclosure

4  sale on behalf of Option One or how to manage their

5  process, are you referring to a document generally

6  called a subservicing mortgage agreement?

7       A      That, I don't know.

8       Q      Would you agree with me that the industry

9  standards with respect to how to conduct a foreclosure

10 in the proper process is generally governed by either

11 Fannie or Freddie Mae regulations regarding that

12 activity, to the extent that those guidelines serve as

13 an industry standard?

14       MR. CASH:  Object.  That calls for both a

15       legal opinion and an expert opinion, neither of

16       which he's being presented here for today.

17       30(b)(6) representative.

18 BY MR. WOOTEN:

19       Q      Would you agree with me that the general

20 principles of mortgage servicing with respect to the

21 industry standards come from the guidelines put forth

22 by Fannie Mae and Freddie Mac?

23       MR. CASH:  Same objection.  Additionally,

24       we're not a mortgagor servicer, so it's asking

25       him to opine beyond his areas.

**FREEDOM COURT REPORTING**

Page 181

1          If you know, you can answer.

2          THE WITNESS:  No.

3    BY MR. WOOTEN:

4          Q    You don't agree or you don't know?

5          A    Repeat the question one more time.

6          Q    Yes, sir.  Let me try and do a little bit

7    better job.

8          A    Thank you.

9          Q    With respect to the guidelines which serve

10   as the industry standard regards to mortgage

11   servicing, would you agree that those are generally

12   considered to be those guidelines published by Fannie

13   or Freddie?

14         MR. CASH:  And if you'd just insert the same

15         objection as to the last two questions at this

16         point.  I repeat those objections.

17         THE WITNESS:  Generally.

18   BY MR. WOOTEN:

19         Q    Okay.  And, again, I understand that any

20   parties to a contract can modify those terms.  I'm

21   just talking about generally the industry accepts

22   those as the standard, and where they deviate, they

23   deviate by agreement generally; is that fair?

24         A    That's fair.

25         Q    Okay.  In a -- so a subservicing agreement

## FREEDOM COURT REPORTING

Page 182

1  with respect to default services is generally an

2  agreement to provide the types of services that your

3  firm is providing with respect to a mortgage loan that

4  has become delinquent and needs to foreclose; is that

5  correct?

6      A    Yes.

7      Q    And is there a subservicing agreement

8  between LPS Default Solutions and Option One Mortgage

9  Company for the provision of the services which you

10  have contracted to provide?

11      A    I don't know if it's a subservicing

12  agreement or not.

13      Q    Okay.  Is it in the nature of a subservicing

14  agreement, in that Option One provides to you the

15  guidelines they expect for you to follow?

16      A    I don't know if it's in the subservicing

17  agreement, but we do work with Option One in reference

18  to the guidelines that are provided to us.

19      Q    And is it your interpretation or

20  understanding that those guidelines generally follow

21  the industry standard?

22      A    Generally.

23      Q    So, generally, the industry standard would

24  apply, but there may be deviations as between your

25  specific agreement?

**FREEDOM COURT REPORTING**

Page 183

1      A      There could be.

2      Q      But you don't know?

3      A      I don't know.

4      Q      And you haven't reviewed that prior to

5   coming here today?

6      A      No, I have not.

7      Q      The entry at No. 118, dated June the 20th of

8   2007, indicates that a person by the name of Marques

9   Roberson made this entry?

10     A      Uh-huh.

11     Q      And that he is a Fidelity employee, which

12  would be an LPS employee?

13     A      That's correct.

14     Q      Do you know where Mr. Roberson's

15  employment --

16     A      No.

17     Q      -- is domiciled?

18     A      No, I do not.

19     Q      This indicates that it is a forward

20  intercom.  Can you explain the significance of that

21  type of message?

22     A      Sure.  Basically what he's doing is he's

23  sending the intercom request to Ann Russo, Karen

24  Singleton, and Robin Smith, just for a general update

25  and based off a payment dispute.  Says:  Ann, please

**FREEDOM COURT REPORTING**

Page 184

1   also forward the below to the loss mitigation high

2   risk team.  Please see under -- file under Attorney

3   Correspondence ASAP.

4           Do you want me to go through the whole

5   thing?

6       Q    Well, go ahead and read the rest of that

7   entry, please.

8       A    This debtor has an attorney and is getting

9   ready to file suit on this matter.  As you will see,

10  the debtor tried to pay the loan in full and

11  apparently was not accepted, check from insurance was

12  but personal check was not.  From our understanding on

13  this, there is no house on the property.  It burned to

14  the ground on November 2nd, 2006.  Please advise.

15      Q    And with respect to this entry, it indicates

16  that there is a file under the heading Attorney

17  Correspondence.  Where would that file be located?

18      A    What do you mean, the file under attorney --

19  basically it's the file, the electronic file.

20      Q    And is that part of the Process Management

21  system?

22      A    Yes.  What we do is we upload the --

23  whatever documents have been received, we'll upload

24  into Document Management for the client or attorney to

25  be able to review.  And it would be labeled underneath

**FREEDOM COURT REPORTING**

Page 185

1    Attorney Correspondence.

2        Q    Now, when you indicate Attorney

3    Correspondence, are you referring to --

4        A    That's just a --

5        Q    -- an attorney for the borrower?

6        A    Not necessarily.  It's just basically just

7    an upload document type that we utilize.

8        Q    Okay.  So this is not some file which

9    segregates your communications between your network

10   attorneys --

11       A    No.

12       Q    -- and your company?

13       A    That's correct.

14       Q    This is simply a file where any document

15   generated by an attorney, whether it be for the

16   borrower or from your network, is uploaded?

17       A    Yes.

18       Q    And under Process Management, is that

19   documents that were produced for this -- during this

20   discovery request and for this deposition?

21       A    Everything in Document Management was

22   produced.

23       Q    So that would include --

24       A    It would include this.

25       Q    -- everything in that category?

**FREEDOM COURT REPORTING**

Page 186

1      A      Yes.

2      Q      Is there any other method of communicating

3  between a network attorney and your company that has

4  not been talked about as we sit here today so far?

5      A      No.

6      Q      With respect to Entry 114, it indicates it

7  was written by an employee of Option One Mortgage

8  Company named Eldon Smith?

9      A      That's correct.

10     Q      Do you -- have you ever had any interaction

11 with Mr. Smith?

12     A      Have I personally, no.

13     Q      Do you know what his employment position is

14 with Option One?

15     A      No, I do not.

16     Q      At Entry 73, there's an entry by an Ann

17 Russo with Option One which indicates foreclosure was

18 restarted by Eldon Smith as an active foreclosure.

19 That would've simply been their instructions through

20 your system to continue on with the foreclosure sale?

21     A      Yeah, just basically restart the foreclosure

22 process.

23     Q      Does that involve a new publication?

24     A      I believe so.

25     Q      That entry was made at about 1:55 p.m.,

Page 187

1    looks like, on August the 20th of 2007.

2            There is an entry at No. 67 by a Mary

3    McNamee, who appears to be a Fidelity employee, or an

4    LPS employee; is that right?

5        A    Uh-huh.

6        Q    With a comment about the reason for the

7    restart with the foreclosure.  Apparently, she's

8    seeking that information from Option One; is that

9    correct?

10       A    Yes.

11       Q    Is there anywhere in your notes that ever

12   indicates or questions Option One as to the

13   application of these funds that it's holding regarding

14   this foreclosure?

15       A    We don't -- we don't -- we didn't question

16   the client.

17       Q    So whatever they tell you to do, you're

18   going to do, right?

19       A    That is correct.

20            THE VIDEOGRAPHER:  Excuse me.  Need to

21       change tape.

22            MR. WOOTEN:  Sure.

23            THE VIDEOGRAPHER:  Off record at 2:03.

24            (Off the record discussion.)

25            THE VIDEOGRAPHER:  Back on record at 2:04,

**FREEDOM COURT REPORTING**

Page 188

1          beginning Videotape No. 5.

2     BY MR. WOOTEN:

3          Q     Okay.  Moving on through this process with

4     your notes there, Mr. Newland.  Ying Hang is an

5     employee of yours?

6          A     Which line are you looking at?

7          Q     It's at 54.

8          A     Yes, she is.

9          Q     She is?

10         A     Yes, she's an employee of Fidelity -- or LPS

11    Default Solutions, sorry.

12         Q     Is she based in Mendota Heights?

13         A     Actually, she is based in Mendota Heights.

14         Q     Is she a member of what is commonly called a

15    document execution team?

16         A     No, she's not.

17         Q     What is her position in your company?

18         A     I believe she's within our referrals

19    department.

20         Q     What is a process FC, dash, RQA?

21         A     I believe that's reviewing of the

22    assignments.

23         Q     That doesn't mean request for assignment,

24    does it?

25         A     It could be.  I don't know off the top -- it

Page 189

1  could be review or request for assignment.  I don't

2  know off the top of my head.

3      Q    Every one of these little processes that are

4  entered in here, have these little codes by them, like

5  the one right below that says process FC, underscore,

6  AL, underscore, other, underscore, other, every one of

7  those processes have some written explanation of what

8  they mean somewhere on your system, don't they?

9      A    Yes, they do.

10     Q    And that is something that you can pull up

11 and print off relatively simply if you have access to

12 the system, isn't it?

13     A    You can pull it up and be able to view it,

14 yes.  I don't know about pulling it and -- I'm sure we

15 probably --

16     Q    Is it fair to say that there is somewhere a

17 library which details the meaning --

18     A    Yes, there is.

19     Q    -- of each of those processes?

20     A    Yes, there is.

21     Q    And those are codes for actions on a file,

22 right?

23     A    It -- basically, they're the event

24 processes.  So, in other words, the

25 FC_Alabama_Other_Other process is basically the core

**FREEDOM COURT REPORTING**

Page 190

1  foreclosure process.

2      Q    Right.  I assumed that FC meant foreclosure,

3  but I wanted to ask.

4           The next entry by this lady, which is 53,

5  indicates there's an update, and it says that there is

6  an initial review of assignment complete, it completed

7  on 8/21 of 2007; is that correct?

8      A    Yes.

9      Q    If there were a document associated with

10  that review, it would show up in this system somewhere

11  at that time, would it not?

12      A    Yes, it should.

13      Q    So there should be an entry on 8/21 of 2007

14  regarding that; is that fair?

15      A    There should be.

16      Q    Y'all brought in from lunch this imaging

17  information with respect to all the images that are

18  stored on your system; is that correct?

19      A    Yes.

20           (Plaintiffs' Exhibit No. 25 marked for

21  identification.)

22      Q    I'm going to mark that as Plaintiffs'

23  Exhibit 25, ask you to take a look at it.

24           Does it indicate anywhere on there that

25  there's some assignment in the system?

**FREEDOM COURT REPORTING**

Page 191

1          A     I don't see it on here.

2          Q     That's a pretty important document, isn't

3     it, Mr. Newland?

4          A     Sure, it is.

5          Q     Is that not the type of document that would

6     ordinarily be within your image records in this type

7     of process?

8          A     It could be, yes.  Could've also been sent

9     to the attorney directly.  Without looking at it, I

10    don't know.

11         Q     If it were sent to the attorney directly,

12    would it not also have passed through New Image or

13    image processing?

14         A     It should be uploaded, yes.

15         Q     Because, again, we talked about this

16    earlier, but the agreement is, is that your company

17    monitor and make this work flow happen, and Option One

18    hires you to do that, and then you deal with the

19    attorneys.  And so you serve as the intermediary for

20    the information and documents that are passing

21    through; is that safe and fair to say?

22         A     Yes.

23         Q     So if -- you agree with me if the assignment

24    is not for the correct entity or is not correct, it

25    would be impossible to foreclose with a bad

**FREEDOM COURT REPORTING**

Page 192

1  assignment, wouldn't it?

2         MR. CASH:  Objection.  Calls for a legal

3     conclusion.  If you know, you can answer.

4     A    That would be up to the attorney to make

5  that determination.

6     Q    Sure.  Part of -- your business, you would

7  not want to be sending out the door assignments that

8  were not correct or accurate, right?

9     A    Run that by me again.

10    Q    As part of your business in the value that

11 you provide to these two other defendants in this

12 case, you would not want to be reviewing assignments

13 and those assignments be in error, right?

14    A    That's correct.

15    Q    So normally, you would've preserved that

16 type of document in some manner, so that you could

17 have reviewed it, so that when you made an entry such

18 as No. 49 where you said that the review was complete,

19 you would have had some information there to show what

20 your employee reviewed, right?

21    A    That's correct.

22    Q    There is a second package of documents sent

23 to Mr. Humphrey's office on 8/21/07 at 11:52 a.m. at

24 Entry No. 44; is that correct?

25    A    That's correct.

**FREEDOM COURT REPORTING**

Page 193

1      Q    And that is about five minutes after the QA

2   review of the assignment was completed, correct?

3      A    Yes, it is.

4      Q    Have you provided to myself or my co-counsel

5   the documents contained in this NewTrak image ID No.

6   4137583?

7      A    Yes.

8      Q    And have you provided by a separate

9   production the documents included in New Image ID

10  No. 3550946?

11     A    Yes.

12     Q    Let me see that 25.

13     A    It would be the June 1st entry and also the

14  August 21st entry.

15     Q    I noticed -- oh, sorry, let me back up just

16  a second.  Does the ID number in the left column of

17  Plaintiffs' Exhibit 25 bear any correlation to the

18  NewTrak image ID numbers which are indicated in these

19  notes?

20     A    I don't know.

21     Q    I see that there is a June 1st, 2007, entry

22  involving 17 pages at 8:38 a.m.  And it is 1,335,168

23  bytes in size, it involves 17 pages.  And your process

24  notes indicate that ID No. 3550946 was uploaded at

25  9:17, or approximately 40 minutes later, for

**FREEDOM COURT REPORTING**

Page 194

1    Mr. Humphrey.  Does it appear to you that that entry

2    on Plaintiffs' Exhibit 25 would correlate to the entry

3    in No. 156 of your Process Management notes?

4        A    It would seem so.

5        Q    Okay.  On 8/21 of '07, there is an entry --

6    or actually two entries, one at 8:45 a.m. and one at

7    8:48 a.m., each bearing a different ID number.  The

8    first, August 20 -- or September 21st entry at 8:45

9    a.m. indicates that there are 1,453,112 bytes in 18

10   pages.

11            (Brief interruption.)

12            MR. WOOTEN:  There's my alarm for my call.

13       Okay.  I need to go take a break and get this

14       call handled.

15            MR. CASH:  Okay.

16            THE VIDEOGRAPHER:  Off record at 2:17.

17            (Off the record discussion.)

18            THE VIDEOGRAPHER:  Back on record at 2:17.

19   BY MR. WOOTEN:

20       Q    I'm sorry, we were talking about these

21   entries on August 21st of 2007, the first one,

22   1,453,112 bytes and 18 pages, and numbered in your

23   imaging documents as 71874430.  It says that it is a

24   screen print, dash, FC.  Assuming again that FC stands

25   for foreclosure?

**FREEDOM COURT REPORTING**

Page 195

1      A     That's correct.

2      Q     And then there is a second entry immediately

3   following, and its ID number is 71874554, and it also

4   says screen prints, dash, FC, is slightly larger at

5   1,468,858 bytes and 18 pages also and three minutes

6   later.

7            There is no entry that I have been able to

8   locate in your process notes indicating an assignment

9   was uploaded or identified separately.  Have you found

10   any in your review of it?

11      A     No.

12      Q     It appears that the only difference between

13   the June 1st, 2007 entry and the two entries on August

14   21st is one page; is that correct?

15      A     That's what it seems to be.

16      Q     And with respect to that, is it your belief

17   that the entry numbered 44, which is at 11:52 a.m.,

18   whatever time this is on this system, where you have

19   NewTrak image ID No. 4137583, represents the -- one of

20   the two entries that we identified on Plaintiffs'

21   Exhibit 25.  Is that correct?

22      A     That would be correct.

23      Q     And then at Entry 37, on August the 22nd of

24   2007, there is an intercom message from Ann Russo to

25   Karen Singleton on your system, indicating that Scott

**FREEDOM COURT REPORTING**

Page 196

1   Humphrey's office should deduct the $138,482 in

2   insurance proceeds from a total payoff of 149,045.72,

3   leaving a referral balance of $10,563.72.  Is that the

4   first indication that your company received of what to

5   do with the funds which were being held in the

6   restricted escrow account?

7        A    We did not receive that.  That was a

8   communication between Ann Russo of Option One and

9   Karen Singleton of Scott Humphrey's office.  Did not

10  go through an LPS associate.

11       Q    It does not pass through your system at all?

12       A    It passes through the system, but it does

13  not pass to any of my associates.

14       Q    Okay.  We've sat here and reviewed these

15  notes together.  Have there been any other entry that

16  you've seen in preparing to testify today that

17  indicated prior to August the 22nd of 2007 what should

18  be done with the funds in the restricted escrow

19  account?

20       A    Not prior to that time.

21       Q    Once that message passed from Option One to

22  Karen Singleton, that information would've been

23  available to every user in your company with respect

24  to that, correct?

25       A    They would've been able to view it, yes.

**FREEDOM COURT REPORTING**

Page 197

1       Q    With respect to the bidding instructions

2    indicated in Entry No. 25, which is an automated

3    process, that's NewTrak image ID 4368311, does that

4    appear to correlate with either one of the two entries

5    made by Ann Russo, which is in the imaging section, or

6    Plaintiffs' Exhibit 25, on that same date at either

7    10:54 a.m. or 2:10 p.m.?

8       A    That would be correct.

9       Q    And since --

10      A    Should say bidding instructions on it also.

11      Q    It does.

12      A    Okay.

13      Q    And since it also was at 10:54 a.m., does it

14   appear to correlate to Entry No. 25, which appears to

15   have been entered in your system of 10:55?  So the

16   first entry of bidding instructions on that date, your

17   document ID No. 73300397, does it appear to correlate

18   to Entry No. 25?

19      A    Yes.

20      Q    And would Entry No. 24 be apparently the

21   second entry in your document imaging system at

22   2:10 p.m., No. 73316049, also called bidding

23   instructions, where Mr. Humphrey's office picked up

24   those instructions?

25      A    I don't think that correlates with what's in

**FREEDOM COURT REPORTING**

Page 198

1    the Document Management system.  It's just basically

2    Line 24 basically correlates with Scott Humphrey

3    receiving the bidding instructions.

4         Q    Okay.  So there is a second set of bidding

5    instructions that go in at Entry 15 at 2:10, which

6    appear to correlate to this entry we previously

7    mentioned --

8         A    Yes.

9         Q    -- 73316049?

10             MR. CASH:  Nick, I have 1:25 (sic).

11             MR. WOOTEN:  Yeah.  Let me make this call.

12    Let's go off the record.

13             THE VIDEOGRAPHER:  Off record at 2:26.

14             (Brief recess.)

15             THE VIDEOGRAPHER:  Back on record at 3:03.

16    BY MR. WOOTEN:

17         Q    Let's see --

18             (Brief interruption.)

19             MR. WOOTEN:  Oh, we're off the record.

20             THE VIDEOGRAPHER:  Off the record at 3:03.

21             (Off the record discussion.)

22             THE VIDEOGRAPHER:  Back on record at 3:12.

23             (Plaintiffs' Exhibit No. 6 marked for

24    identification.)

25    BY MR. WOOTEN:

**FREEDOM COURT REPORTING**

Page 199

1    Q    Okay.  I apologize, Mr. Newland.  I don't

2    want to take any more of anybody's time than

3    necessary.  I'm going to try to move through some of

4    these documents that I need to identify pretty

5    quickly, just ask you if you can recognize them.  This

6    is a document I've marked previously as Plaintiffs'

7    Exhibit 6.  I'll represent to you that it is a

8    document received during discovery from your lawyers.

9    Ask you if you recognize that document?

10    A    Yes, I do.

11    Q    And is that a -- does it appear to be a copy

12    of the promissory note executed by my clients?

13    A    Yes.

14    Q    Okay.  Are there any attachments to the

15    actual promissory note in the case?

16    A    There is an addendum.

17    Q    Okay.  And what does the addendum entail,

18    please, sir?

19    A    For interest only payment period.

20    Q    So that's an interest only rider --

21    A    Yes.

22    Q    -- to a promissory note.  Are there any

23    other documents attached to that promissory note?

24    A    The allonge.

25    Q    Okay.  And what is an allonge, please, sir?

FREEDOM COURT REPORTING

Page 200

1      A     It's an assignment of the note.

2      Q     And what allonges appear to be present on

3 that note?

4      A     From H&R Block Mortgage to Option One

5 Mortgage.

6      Q     And is that the only allonge that's present?

7      A     There's another allonge that's attached here

8 in the back.

9      Q     Okay.  Would those documents that you

10 produced with respect to the mortgage note be exactly

11 as you received them from your client, Option One?

12      A     Yes.

13      Q     Does it appear to you from reviewing those

14 documents that the allonges to that promissory note

15 are, while with the note, not attached to the note?

16      A     Not attached to the note?

17      Q     Not physically connected to the promissory

18 note itself?

19      A     No.

20      Q     Appear to be separate pages, right?

21      A     That's correct.

22      Q     Are those allonges dated in any way?

23      A     The note doesn't look to be dated.

24      Q     And that would have been the documents which

25 you would've transmitted to Scott Humphrey for the

**FREEDOM COURT REPORTING**

Page 201

1   purpose of conducting a foreclosure on behalf of

2   Option One, correct?

3       A    That's correct.

4       Q    That would have been some of the documents

5   which would have been prepared or which would've been

6   retrieved through the automated processes of your

7   software, your Process Management software, right?

8       A    It would've been retrieved based off of the

9   push from Option One on the documents.

10      Q    So your software would've made the request

11  and they would've responded with their original

12  documents --

13      A    That's right.

14      Q    -- or scans --

15      A    They would push the documents to us.

16      Q    Sure.

17      A    To our imaging system.

18           (Brief interruption.)

19           THE WITNESS:  To our imaging system.

20  BY MR. WOOTEN:

21      Q    So those documents would've -- would be part

22  of what was identified, we would be able to look back

23  to your imaging system at the date in the documents

24  and pick that information out, right?

25      A    Yes.

**FREEDOM COURT REPORTING**

Page 202

1      Q     It looks like those documents would've been

2      pushed by Arvind Kumar on 6/4/07, at Entry 150 is

3      where they were explained.

4             You have a corresponding entry numbered

5      67471979 that says it is the note and says that it

6      consists of eight pages on 6/5/07 at 5:42 a.m., and it

7      says it was uploaded by an automated process.  Does

8      that sound right?

9      A     Sounds correct.

10     Q     Are there eight pages in that document?

11     A     Yes, there's eight pages.

12            (Plaintiffs' Exhibit No. 7 marked for

13     identification.)

14     Q     Okay.  With respect to Plaintiffs'

15     Exhibit 7, I'll hand it to you and represent to you

16     it's a copy of a recorded mortgage which was produced

17     by your attorneys during discovery.  Ask you if you

18     recognize that document as such?

19     A     Yes.

20     Q     I see two entries with respect to a security

21     instrument numbered sequentially in your imaging

22     software, one is 67471976, it says it is 11 pages, and

23     one is numbered 67471977, and it indicates it is 12

24     pages.  Is that document 12 pages or 11 pages?

25     A     I'd say it's 12.  It's 12 pages.

FREEDOM COURT REPORTING

Page 203

1    Q    All right.  12 pages in that situation,

2    there is a cover page which is proof of recording from

3    the local recording official --

4    A    Yes.

5    Q    -- is that correct?

6    A    That's correct.

7    Q    11 pages actually make up the security

8    instrument?

9    A    Yes.

10   Q    Does that document have any assignments of

11   mortgage attached to it?

12   A    No, I did not see any assignments attached

13   to it.

14   Q    Are you familiar with The Summit?

15   A    Uh-huh.

16        (Plaintiffs' Exhibit No. 8 marked for

17   identification.)

18   Q    I show you -- I'm sorry, Madam Court

19   Reporter, I knocked your microphone over again -- a

20   document I marked as Plaintiffs' Exhibit 8.  Can you

21   please explain what that document is?

22   A    Sure.  It was a newsletter that went out

23   from, at the time, Fidelity National Foreclosure &

24   Bankruptcy Solutions.

25   Q    Pre name change to LPS?

**FREEDOM COURT REPORTING**

Page 204

1      A    Yes.

2      Q    Is The Summit still published?

3      A    No, it's not.

4      Q    Do you publish a newsletter of a similar

5  name or type for the industry?

6      A    No.  LPS Default Solutions does not.

7      Q    Okay.  Is there a company that does that's

8  part of the Fidelity or the LPS, Inc., umbrella?

9      A    Not that I know of.

10     Q    That document has a short summary of the

11 modules or platforms within LPS Default Solutions'

12 protocols; is that right?

13     A    Yes.

14     Q    Highlighted with a pink highlighter?

15     A    Uh-huh.

16     Q    Does that accurately state in the capacities

17 of those platforms and programs with respect to what

18 they are capable of doing?

19     A    Yes, that's correct.

20     Q    Is there anything incorrect in that article?

21     A    In your highlighted portions?

22     Q    In that -- I've only highlighted portions of

23 that, but that's like just a little half page segment

24 there about your platform.  In that entire caption

25 there discussing basically your document solution,

FREEDOM COURT REPORTING

Page 205

1  your process management and your imaging solution and

2  invoicing, is there anything in that article that is

3  incorrect?

4        A    It's pretty concise.

5        Q    I understand that it's the three points and

6  a poem version of what you do --

7        A    Yes.

8        Q    -- and that that's sort of a glam thing for

9  your industry partners, but I'm just saying, there's

10 nothing inaccurate, is there?

11       A    Not that I see.

12       Q    Okay.  That was really all I needed out of

13 that document, please, sir.  And we talked about 9.

14             Did you review your answers to your

15 interrogatories and requests for production prior to

16 coming to the deposition today?

17       A    Yes, I did.

18             (Plaintiffs' Exhibit No. 10 marked for

19 identification.)

20             MR. WOOTEN:  Do you have that copy of that?

21 Okay.  Let him take a look at it.

22 BY MR. WOOTEN:

23       Q    At any time in this foreclosure process, was

24 Scott Humphrey ever representing LPS?

25       A    No, he was not.

# FREEDOM COURT REPORTING

Page 206

1     Q     In fact, he was a vendor to LPS as part of

2     the attorney network?

3     A     Yes.

4     Q     So he agreed to provide services to clients

5     who were referred to him for a flat fee?

6     A     That's correct.

7     Q     And the agreement to provide those services

8     at that fee was between LPS and Scott Humphrey?

9     A     That's correct.

10    Q     There is no independent contract for

11    employment between Scott Humphrey and Option One, is

12    there?

13    A     No, there's not.

14    Q     I asked a question regarding -- in my

15    interrogatories, regarding any contracts or agreements

16    between you and any other defendant in this case which

17    allows you to pursue collection and/or foreclosure

18    efforts on the plaintiffs' mortgage.  That question

19    was objected to, and I'm assuming based on the nature

20    of some of the objections today, that it was objected

21    to because of the clause which said -- or the phrase

22    which said "which allows you to pursue collection

23    and/or foreclosure efforts on the plaintiffs'

24    mortgage," right?

25    A     Yes.

**FREEDOM COURT REPORTING**

Page 207

1          MR. CASH:  Well, let me object to him

2      answering as to why it was objected to.

3      Obviously, the objections were legal decisions

4      made by the lawyers, not by the witness.

5          MR. WOOTEN:  Well, I'm just -- in reading

6      from the answer, it says that you don't have a

7      contractual agreement with any of the other

8      defendants which authorizes LPS Default to pursue

9      collection and/or foreclosure proceedings of the

10     plaintiffs' mortgage, so I -- I mean, is that the

11     basis of the objection, was that phrase?

12         MR. CASH:  Yeah.

13         MR. WOOTEN:  Okay.  So, with respect to the

14     actual contract, we've agreed that we've got to

15     figure out how to get that document into play,

16     whether it's protective order or whatever, right?

17         MR. CASH:  Yes.

18         MR. WOOTEN:  Or partial redaction, whatever

19     we need to do.

20  BY MR. WOOTEN:

21     Q     The invoicing system that you guys operate,

22  imaging or the -- what do you call it, the invoicing

23  system?

24     A     Invoice Management.

25     Q     Does that system also record images of the

FREEDOM COURT REPORTING

Page 208

1    bills which are submitted as well as the payment

2    advices which are made?  In other words, does it not

3    only copy the bill, but does it copy the check?

4        A    I don't know.

5        Q    Does that system indicate within that

6    portion of your system when the invoices submitted

7    were paid and by whom?

8        A    I'm not -- I'm not an expert on Invoice

9    Management.  I don't know.

10       Q    But you indicated earlier that you have a

11   manager who deals with that portion of the business,

12   right?

13       A    I have -- not a manager that deals with that

14   portion of the business, but we do have individuals

15   within Invoice Management that probably could answer

16   your questions.

17       Q    Is there like a team leader, supervisor,

18   vice president in charge of that?

19       A    Yes, there is, but I don't know who that is

20   off the top of my head.

21       Q    And that person is not a part of your normal

22   management team --

23       A    No, it's --

24       Q    -- that you meet with regularly?

25       A    No, they are not.

**FREEDOM COURT REPORTING**

Page 209

1      Q      Is there any portion of either Process

2  Management, Document Management, or Invoice Management

3  which would contain evidence of payments from your

4  partner or your network attorney back to LPS Default

5  Solutions?

6      A      No.

7      Q      When a foreclosure sale is conducted by a

8  network attorney, if a third-party buyer purchases at

9  the sale the particular parcel being foreclosed upon

10 and your network attorney receives those proceeds, do

11 they distribute those proceeds directly to the

12 servicer or do they distribute those proceeds to LPS

13 Default Solutions?

14     A      Directly to the servicer.

15     Q      Does LPS Default Solutions maintain records

16 with respect to how many sales are -- result in third

17 party sales and how many sales result in investor or

18 servicer repurchases or purchases?

19     A      Yes, we do.

20     Q      Do you know that -- what that percentage is

21 off the top of your head of loans which are

22 repurchased by either the investor or the servicer?

23     A      Not off the top of my head I do not.

24     Q      Is that a normal reporting function --

25     A      Yes, it is.

**FREEDOM COURT REPORTING**

Page 210

1    Q    -- that you have?  Is there a name for it?

2    A    The name for the --

3    Q    The report.

4    A    Yeah, third-party sale report.

5         MR. WOOTEN:  And, Mike, what I'm interested

6    in there, is not to have a bunch of information

7    about all their data, I'm really looking for the

8    percentage of sales that are conducted that

9    result in a third-party purchase versus a

10   repurchase by the investor or the servicer.  If

11   you can get that for me.  If I need to make a

12   separate request or whatever, I will.

13        MR. CASH:  I'm probably going to have you

14   make a request, because I'm probably going to

15   object to it.  It's not relevant to any issue in

16   this case.  But I don't want to fuss with you

17   about it right now.

18        But while we're talking to each other on the

19   record, just want the record to be clear that

20   after the break, we did produce the P -- 309?

21   The P309 screen for this case and the --

22        MR. WOOTEN:  I'm going to go back and --

23        MR. CASH:  -- Invoice Management documents.

24        MR. WOOTEN:  I'm going to go back through

25   those documents and identify them.

FREEDOM COURT REPORTING

Page 211

1          MR. CASH:  Okay.

2          MR. WOOTEN:  And we'll talk about that,

3     so...

4          MR. CASH:  Okay.

5          MR. WOOTEN:  Yeah.  I mean, I didn't see a

6     P309, but I was in a hurry, so we'll look back at

7     that.

8  BY MR. WOOTEN:

9     Q    In your responses to interrogatories with

10 respect to Item No. 3, there's a list of LPS employees

11 who were involved in inputting information or

12 interacting with this loan account.  Is it your

13 testimony that that is an exhaustive list of LPS

14 employees who were involved with this loan?

15    A    Yes.

16         (Brief interruption.)

17         MR. WOOTEN:  I'm sorry, I'm just in space.

18    I thought I was having a muscle twitch.  I didn't

19    even realize you were touching me.  It's been a

20    long night, so...  I didn't mean to just be

21    dozing off over here.  That's what two hours of

22    sleep will get you.

23 BY MR. WOOTEN:

24    Q    Other than the loan file number which you

25 identified in your response to No. 4, there is no

**367 VALLEY AVENUE**

**FREEDOM COURT REPORTING**

Page 212

1   other identification mechanism within LPS's system for

2   this particular loan account, is there?

3        A    That's correct.

4        Q    And that is information provided to you by

5   Option One?

6        A    That's correct.

7        Q    With respect to the administrative services

8   fees on your answer to the interrogatory, I believe

9   it's No. 5, it indicates that there were invoices

10   generated by Fidelity for technology and/or

11   administrative services.  We talked a little bit

12   earlier about the fee structure with respect to LPS.

13   You indicated that all the fees came from the attorney

14   network; is that right?

15        A    That's correct.

16        Q    Does LPS delineate between administrative

17   services fees and technology fees?

18        A    Yes, they do.

19        Q    Okay.  What exactly is a technology fee?

20        A    Utilization of our technology.

21        Q    Okay.  And can you tell me how that fee is

22   determined?

23        A    No, I cannot.

24        Q    Is that one of those proprietary items or

25   you just don't know?

**FREEDOM COURT REPORTING**

Page 213

1       A     I do not know.

2             MR. CASH:  It would be a proprietary item,

3       but I was pretty sure he didn't know, so I

4       figured I'd save an objection.  I figure I've

5       used a bunch already.

6             MR. WOOTEN:  Sure.  With respect to that,

7       Mike, that's going to obviously become an issue,

8       at least -- again, I'm not interested in exposing

9       how you structure your fees.  What I am

10      interested in doing is identifying what fees were

11      charged, how they were paid and what their life

12      cycle was.  So, again, I don't -- I don't care

13      what you're charging, I just need to know how it

14      got -- what happened to it, where it went, that

15      sort of thing.

16            MR. CASH:  How it got paid -- that it didn't

17      get passed on to the borrower, I understand.

18            MR. WOOTEN:  Right.  So --

19            MS. NEWMAN:  It's a different company.

20            MR. CASH:  Okay.  The other thing is, the

21      technology fee isn't charged by this defendant,

22      it's a different company.

23            MR. WOOTEN:  Okay.  So technology apparently

24      will be charged by MSP or another -- it's

25      entirely different?

**FREEDOM COURT REPORTING**

Page 214

1          MR. CASH:  A different entity.

2          MR. WOOTEN:  Okay.  Well, just so we can

3     clear this up, because that's what I'm trying to

4     do today, is eliminate as many issues as

5     possible.  Will we be able to get the information

6     about what constitutes the technology fee or at

7     least what the dollar amount is, that sort of

8     thing, so we can determine, try to follow the

9     trail, or will we be able to get the identity of

10    the entity who's charging that fee so we can

11    subpoena that information?

12         MR. CASH:  Yeah, you can get the identity of

13    the company.

14         MR. WOOTEN:  Sure.  And I'm assuming it is

15    another Fidelity entity, right?

16         MR. CASH:  I believe so, yeah.  And so if

17    you'll write me a letter, I'll write you a letter

18    back.  And then if you want to subpoena it,

19    we'll -- to the extent we think it's irrelevant,

20    we may move to quash the subpoena but, you know,

21    we'll do it, take all the steps.

22         MR. WOOTEN:  Sure.

23         MR. CASH:  But, yeah, I mean, I think we can

24    do that part.

25         MR. WOOTEN:  Can do the dance.  I

**FREEDOM COURT REPORTING**

Page 215

1    understand.

2    BY MR. WOOTEN:

3        Q    As you sit here today, Mr. Newland, being

4    the person that runs LPS, do you know what the

5    schedule is for the total attorney's fees for a

6    foreclosure in the state of Alabama?

7        A    In -- can you clarify the question?

8        Q    Sure.  Do you know what your network

9    attorneys in Alabama agree to charge as the total

10   amount of attorney's fees that they will charge for

11   conducting a foreclosure in the state of Alabama?

12       A    We have the information we supplied from the

13   clients as it has been agreed to, yes.

14       Q    So that information with respect to this

15   loan would come from your Option One agreement?

16       A    That's correct.

17       Q    How does a foreclosure get from a servicer

18   to a network attorney?  What's the vehicle?

19       A    The servicer will, in this case, Option One,

20   will provide the approval to begin the foreclosure

21   process through their MSP system, which would then

22   trigger the referral in a data tape that comes to us.

23   Then we would process the referral based off of them

24   sending the information to us.  And then we would

25   provide the mechanism or the electronic copies of the

**FREEDOM COURT REPORTING**

Page 216

1   documents to the attorney along with the referral.

2       Q    Okay.  So is it fair to say that the

3   servicer lets you know that a referral and a

4   foreclosure needs to take place and then your

5   processes create the referral package and send it to

6   the network attorney?

7       A    We don't create the referral package, we

8   merely send the information that's been provided to us

9   from Option One, in this case, to the attorney along

10  with the documents.

11      Q    Is it your testimony that your contractual

12  agreement with your servicers, in this case Option

13  One, does not give you the right to set the parameters

14  for foreclosure with respect to the initiation of the

15  foreclosure and the time lines within which it must

16  take place?

17      A    That is correct.

18      Q    You indicated that a foreclosure deed had

19  been prepared, in your interrogatory Response No. 28,

20  but that you did not have a copy of that deed.  Is

21  that because the deed was not submitted for a record

22  in DeKalb County, Alabama?

23      A    That is correct.

24      Q    Are your network attorneys required to

25  provide that type of documentation to you as part of

Page 217

1    their contractual obligations?

2        A    They are to provide a contract -- or a copy

3    of the deed, yes, uploaded.

4        Q    With respect to Option One Mortgage

5    Corporation, is it your understanding that American

6    Home Servicing purchased their mortgage servicing

7    rights?

8        A    That is my understanding.

9        Q    Do you know approximately when that took

10   place?

11       A    No, I don't know.

12       Q    Did you sign a new agreement with American

13   Home Servicing at or about the time that took place?

14       A    I do not know.

15       Q    If your servicer clients instruct you to

16   assess to a mortgage account on a regular basis a fee

17   or charge, such as a property inspection or a broker

18   price opinion, while a loan is in the foreclosure

19   process, do you follow those instructions without any

20   deviation?

21       A    We don't have the ability to assess those on

22   the mortgage servicing system.  That's up to the

23   client.

24       Q    So within LPS, your testimony is, is that

25   you do not make any changes to any data nor do you

**FREEDOM COURT REPORTING**

Page 218

1  provide a batch file of electronic data which provides

2  those types of charges to be updated to client loans?

3      A      Not those type of charges.

4      Q      Do you provide any data in any format to

5  your servicer clients which result in charges being

6  added to consumer loans?

7      A      No, we do not.

8      Q      Do you provide any data in any format to

9  your servicer clients with respect to the costs or

10 expenses incurred by LPS Default Solutions with

11 regards to any foreclosure process?

12     A      I'm sorry, I'm going to need for you to

13 repeat that, because I could barely hear you when you

14 were talking the other way.  I'm sorry.

15     Q      I'm sorry.  Do you or does LPS provide any

16 electronic data to any servicing client or, in this

17 case, Option One, which provides them information with

18 regards to any expenses or costs incurred in

19 association with a foreclosure proceeding?

20     A      No, we do not.

21            (Plaintiffs' Exhibit No. 11 marked for

22 identification.)

23     Q      Show you a document that's been marked as

24 Plaintiffs' Exhibit 11, and ask you if you've seen

25 that document before?

**FREEDOM COURT REPORTING**

Page 219

1      A      That's assignment of mortgage.

2      Q      All right.  And do you know if that document

3   is a document which is located on the system either

4   imaging or Process Management with respect to this --

5      A      I have not seen it in our imaging system,

6   but then, again, it could've been sent directly to the

7   attorney for processing and have bypassed our system.

8      Q      Is it your testimony that that is the first

9   time you've seen that mortgage assignment?

10      A      Yes, this is the first time I've seen it.

11      Q      Thank you.  Do you know what Option One's

12   principal place of business is with respect to its

13   mortgage servicing operation?

14      A      No, I don't.

15          (Plaintiffs' Exhibit No. 12 marked for

16   identification.)

17      Q      Show you a document that I marked as

18   Plaintiffs' Exhibit 12.  Can you please explain what

19   that document is?

20      A      Looks like it's an underwriting request from

21   First American.

22      Q      First American is a company that is not

23   affiliated with your -- with LPS Default Solutions,

24   correct?

25      A      That's correct.

**FREEDOM COURT REPORTING**

Page 220

1      Q     In fact, the First American family of

2   companies is a competitor to the Fidelity group of

3   companies; is that right?

4      A     In some cases, yes.

5      Q     And in some cases, they utilize your

6   services for certain things, correct?

7      A     I don't know if they utilize us or not.

8      Q     Would you take a look at the -- I believe

9   it's the second page of that document, please, sir.

10  Does that document indicate that there is a prior

11  recorded first position mortgage lien on that

12  property?

13     A     Yes, sure does.

14     Q     What's the date of that letter please, sir?

15     A     June 6th of 2007.

16           (Plaintiffs' Exhibit No. 13 marked for

17  identification.)

18     Q     Let me show you this document I've marked as

19  Plaintiffs' Exhibit 13.  Is that also an underwriting

20  request?

21     A     Yes, it is.

22     Q     What is the date of that --

23     A     Title search.

24     Q     -- of that request?

25     A     May 30th, 2007.

**FREEDOM COURT REPORTING**

Page 221

1      Q    May 30th?

2      A    As the date hereof:  May 30th, 2007.

3      Q    Does that document also indicate a prior

4  first position mortgage on this property?

5      A    It shows SunTrust Mortgage.

6      Q    Is that the mortgage dated --

7      A    July 22nd, 2004.

8      Q    Filed in Book 1235, Page 178?

9      A    That's correct.

10     Q    Does that document indicate that there's any

11  problem with the legal description between the

12  mortgage and title report?

13     A    Any indication?

14     Q    Uh-huh.

15     A    Not that I see.

16     Q    Let me refer you back to this June 6th

17  letter and point out this area that's highlighted

18  right here.

19          THE VIDEOGRAPHER:  Excuse me.  Can I have a

20      second to change tape.

21          MR. WOOTEN:  Sure.  Let's take a break to

22      change the tape for just a second.

23          THE VIDEOGRAPHER:  Off record at 3:49.

24      (Brief recess.)

25          THE VIDEOGRAPHER:  Back on record at 3:56,

**FREEDOM COURT REPORTING**

Page 222

1       beginning Videotape No. 6.

2    BY MR. WOOTEN:

3       Q    Okay.  Mr. Newland, we were talking about

4    these underwriting letters.  Looks like they're marked

5    as, what, 12 and 13?  13 and 14?

6       A    Yes, 12 and 13.

7       Q    12 and 13.  Both of those indicated there

8    was a previous filed first mortgage in the case; is

9    that right?

10      A    That's correct.

11      Q    And neither of those indicate that that was

12   ever satisfied, do they?

13      A    No, not here.

14      Q    Okay.  And they also indicate that there's a

15   defect in the title description in the June 6, 2007

16   letter; is that correct?

17      A    That's correct, by First American.

18      Q    Did you ever ascertain if that error in the

19   description was ever corrected?

20      A    No.

21      Q    Anything in your notes or your system that

22   indicate that those errors were straightened out?

23      A    No.

24      Q    Is there anything that indicates how the

25   issue of the prior first mortgage was ever addressed?

**FREEDOM COURT REPORTING**

Page 223

1     A     No, I assume that was addressed through

2    Scott Humphrey.

3     Q     All right.  Would he have normally notified

4    your firm, as a network attorney, if there was an

5    issue of a prior recorded mortgage?

6     A     Typically, there -- the attorneys will

7    notify us if there's any problems with chain of title.

8     Q     And that's something that a portion of the

9    fees that they charge to a consumer's account is paid

10   for in a foreclosure setting, right, is to check the

11   title?

12    A     That's something that would be probably

13   through the attorney.

14    Q     Sure.  But I'm saying the attorney would

15   normally -- that would be part of their fee, to check

16   the title on what they're about to foreclose on?

17    A     Part of the fee is to review the title.

18    Q     Sure.  And basically, what they're doing is,

19   I guess, you know, trying to make sure that there's no

20   prior existing liens and that there's nothing

21   intervening that would affect their ability to

22   foreclose, right?

23    A     That's correct.

24    Q     And they would also verify the legal

25   description, right?

**FREEDOM COURT REPORTING**

Page 224

1      A     They should.

2      Q     And nothing in the system indicates that

3   that took place with respect to this case at this

4   point, does it?

5      A     No, it's not identified to us.

6           (Plaintiffs' Exhibit No. 14 marked for

7   identification.)

8      Q     Sure.  Let me just have those two.With

9   respect to Exhibit 14, this is a portion of an

10  evidentiary submission from another case in another

11  part of the world having to do with the contract for

12  services between, I believe it was, Fidelity National

13  Foreclosure Services and Saxon Mortgage.  Let me just

14  ask you, and then --

15          MR. CASH:  You're not going to make me

16      object to testimony from other cases involving

17      other servicers.

18          MR. WOOTEN:  Oh, no, it's documents.  It's

19      documents.  I mean, I'm just -- I'm just trying

20      to establish more or less what the document's

21      like.  I mean, I know you probably want to put

22      your objection on the record --

23          MR. CASH:  Probably not going to have him

24      testify about any other documents from any

25      other --

**FREEDOM COURT REPORTING**

Page 225

1      MR. WOOTEN:  No, I just want to ask him if

2      he has seen documents that look like this before,

3      reviewed them, familiar with them, that sort of

4      thing.  Just general identification.  And, Mike,

5      if you want to look at that with him, I mean,

6      I'll represent to you that I think that came out

7      of Judge Baum's court over in your neck of the

8      woods in Texas.  So you probably have seen it.

9      And that's front and back copied, to save some

10     trees.

11     MR. CASH:  I'm going to object to these

12     documents and any testimony from these documents,

13     as they're from some cause number or case number

14     08-0314, apparently from the Southern District of

15     Texas, which -- apparently involving some other

16     servicer which has nothing to do with this case

17     or any issue in this case.

18  BY MR. WOOTEN:

19     Q    Well, and I hear you and want you to put

20  your objection on the record and make it.  And I'll

21  just represent that the purpose of bringing those

22  documents to the deposition today, Mr. Newland, is it

23  appears to contain at least a portion of the contract

24  with the Saxon Mortgage Company, which is a mortgage

25  servicer, right?

**FREEDOM COURT REPORTING**

Page 226

1      A     Yes, that's correct.

2      Q     And everybody knows they're a national

3  mortgage servicer that's familiar with this industry,

4  right?

5      A     That's correct.

6      Q     And it looks like that that's at least a

7  portion of the contract which indicates, at least to

8  some extent, a fee schedule that's set forth from that

9  contract with Saxon Mortgage and your company.  Does

10  that appear to be right?

11          MR. CASH:  Go ahead, if you know.

12  BY MR. WOOTEN:

13      Q     And take a minute and look at it.  I'm not

14  rushing you in any shape, form, or fashion.  I know

15  that you didn't make that production to me, so --

16      A     No, I mean, you know, I'm not -- I was not

17  privy to these documents, so, I don't know.

18      Q     Is there a division --

19          MR. CASH:  Hold on.  I'm going to object to

20          these documents in their entirety.  These come

21          out of the Harris bankruptcy case.  For the

22          record, the referral to the bankruptcy court was

23          withdrawn by United States District Judge Lynn

24          Hughes.  And Judge Lynn Hughes imposed a

25          protective order on all of the documents in that

**FREEDOM COURT REPORTING**

Page 227

1    case, which would include the contracts in that

2    case.  And the protective order was very specific

3    that all copies of these documents were to be --

4    were to be destroyed and that these documents

5    were not to be used by any person for any purpose

6    outside the Harris case, subject to sanctions in

7    the United States District Court for the Southern

8    District of Texas.  These are from the Harris

9    case, because I see the Harris cause number on

10   here, and we are --

11        MR. WOOTEN:  Sure, and I'll represent that

12   they are, but I'll tell you --

13        MR. CASH:  We are objecting to these and may

14   want to have a separate evidentiary hearing as to

15   the source of these documents, who gave them to

16   plaintiffs' counsel, where they came from, and

17   may have to have further proceedings before Judge

18   Hughes in the Southern District, subject to Judge

19   Hughes's protective order.

20        MR. WOOTEN:  Sure.

21        MR. CASH:  And we're going to give no

22   testimony on these documents.  And I'm

23   instructing you not to even talk about these,

24   because these aren't even supposed to be here.

25        MR. WOOTEN:  Okay.  And I'll represent to

**FREEDOM COURT REPORTING**

Page 228

1      you, Mike, those came off of the ECF system

2      through use of Pacer, so --

3          MR. CASH:  All I'm saying is, maybe -- I

4      don't know if the bankruptcy clerk didn't take

5      them down, but there is a protective order --

6          MR. WOOTEN:  Sure.

7          MR. CASH:  -- which I will forward to you.

8          MR. WOOTEN:  And I'd be glad to take a look

9      at it, I hadn't seen it.  So I pulled them off

10     the system through Pacer.  I had no idea they're

11     subject to a protective order.  So --

12         MR. CASH:  I'll send it to you.  And I'm not

13     fussing at you --

14         MR. WOOTEN:  Right.

15         MR. CASH:  -- I'm not saying -- and for the

16     record, I am not in any way implying that

17     Mr. Wooten did anything wrong or even had

18     knowledge of the protective order.  And if the

19     record seemed to imply that, that was not the

20     implication and there was certainly no accusation

21     directed at Mr. Wooten whatsoever.

22         MR. WOOTEN:  Sure.  And, again, I pulled

23     these documents from Pacer and been aware of this

24     litigation, more or less knew of it since it

25     started, so, I mean...

**FREEDOM COURT REPORTING**

Page 229

1              MR. CASH:  Sure.

2              MR. WOOTEN:  All I knew is that it was

3      ongoing.  But I pulled these documents a long

4      time ago.

5              But anyway, let's just set those to the

6      side, and if they're subject to protective order,

7      I'll shred them and we'll be done with it.  It's

8      no big deal with respect to that.

9              (Plaintiffs' Exhibit No. 15 marked for

10     identification.)

11     BY MR. WOOTEN:

12         Q    Exhibit 15 is an announcement with respect

13     to Fidelity -- hold on a minute.  Fidelity National

14     Financial is a parent company of LPS?

15         A    No, they're not.

16         Q    Separate company.  Are you familiar with a

17     company called DOCX LLC?

18         A    Yes, I'm familiar with the company.

19         Q    Do they serve as a vendor to LPS Default

20     Solutions?

21         A    No, not a vendor of us, no.

22         Q    You do not use them for mortgage lien

23     release issues?

24         A    No, I do not.

25         Q    Do not use them for assignment services?

**FREEDOM COURT REPORTING**

Page 230

1      A     No, we do not.

2      Q     Don't gain information from them from county

3   recording office requirements or fees?

4      A     No.

5      Q     You are aware they were purchased by

6   Fidelity National Financial, Inc., right?

7      A     No, I was not aware of that.

8      Q     And you're saying that there is no

9   relationship of any type between LPS Default services

10  and DOCX?

11      A     None that I know of.

12      Q     Is there anyone else in your firm who would

13  know if there were any relationship between your

14  entity and this entity?

15      A     Not that I know of.

16          MR. WOOTEN:  Just a second.  I'm not going

17      to offer 15, I'm going to pull that, because I

18      looked at the wrong company name.  So let me set

19      that off to the side.  Is that in your way?

20      That's fine.

21  BY MR. WOOTEN:

22      Q     Are you familiar with the missing document

23  process for Document Management?

24      A     I'm somewhat familiar with it, yes.

25      Q     What is it -- what is its purpose, what does

**FREEDOM COURT REPORTING**

Page 231

1   it do?

2       A    Basically what it does, the attorneys will

3   request a document that they might not have received,

4   and we will go out and -- basically what the document

5   process does, it opens up a tracking mechanism for our

6   associates, and/or if it's the clients, to try to

7   retrieve those documents and upload them back into

8   Document Management for the attorney.

9       Q    Okay.  So is there a separate set of records

10  where the attorney would request a missing document?

11      A    No, it's all Process Management.

12      Q    So in the event that an attorney or servicer

13  requested an affidavit or an assignment or any

14  document like that or a copy of a mortgage or a copy

15  of a note, to the extent they made that request, it

16  would show up in Process Management?

17      A    Yes, it should.

18      Q    And, again, we talked about, typically, if

19  there is a document that is located, there should be a

20  response in the Process Management notes indicating

21  that that document was found and imaged and brought

22  into the system, right?

23      A    That is correct.

24      Q    Or that it was delivered to the person

25  making the request, right?

**FREEDOM COURT REPORTING**

Page 232

1    A    That is correct.

2    Q    Does the Document Management system have a

3  word processing function where documents can be

4  altered or amended or changed prior to delivery to the

5  requester?

6    A    Not that I know of.

7    Q    Do you have any specific training with

8  respect to that?

9    A    As far as Document Management, I have

10  basically been trained on the ability to use it, but

11  there are no overriding functions that I know of where

12  you can change any document.

13    Q    And, again, if there were any way to alter

14  that document, there should be an archival system that

15  would create some record that it was changed; is that

16  your testimony?

17    A    I don't know.  I don't know if there's

18  anything like that in the system at all.

19        (Plaintiffs' Exhibit No. 16 marked for

20  identification.)

21    Q    Let me ask you if you've ever seen that

22  document or the contents of that document before?

23        MR. CASH:  Nick, I'm going to let you fish

24        for about 30 more minutes, and if we don't get to

25        the issues in this case, I'm going to shut this

**FREEDOM COURT REPORTING**

Page 233

1      down and we can talk to the Court about it,

2      because we're just wasting time now.

3            MR. WOOTEN:  Well --

4            MR. CASH:  I'm just telling you.

5            MR. WOOTEN:  I'm -- you know, whatever you

6      think you need to do, brother, that's fine.

7            MR. CASH:  All right.

8            MR. WOOTEN:  We are to the issues in this

9      case.

10           MR. CASH:  All right.  Well, you tell me

11     what this document you're having him review has

12     to do with our case at all, especially given that

13     it's a November 1st, 2008, document.

14           MR. WOOTEN:  I'm about to show you.

15           MR. CASH:  All right.

16           THE WITNESS:  Yeah, it looks -- it looks

17     like it was possibly an article that went into

18     The Summit back in, I guess, 2008.

19   BY MR. WOOTEN:

20     Q     Sure.  This foreclosure took place in 2007,

21   right?

22           Remember, we talked a little bit earlier

23   about incentive awards for being an APR winner?

24     A     Yes.

25     Q     And you indicated there are no incentives?

**FREEDOM COURT REPORTING**

Page 234

1        A     That's correct.

2        Q     Middle paragraph of that document, what's

3   the title of it?

4        A     Says APR Incentive Winners.

5        Q     Read that to me, please.

6        A     It says:  Each quarter FNFS distributes

7   financial incentive awards top ten performing firms in

8   foreclosure and bankruptcy in the form of $20 per

9   billable file, with the next ten firms receiving $10

10  per billable file.  To date, FNFS has distributed over

11  $402,000 to the top performing firms in quarterly

12  incentive payouts.

13       Q     Does that sound like a financial incentive

14  for being a high APR firm?

15           MR. CASH:  And, again, I'm going to ask what

16       is the relevance of that to any issue in this

17       lawsuit?  I mean, if you can show that this firm

18       was on that, if you can show that this firm

19       somehow was tied to this, fine; otherwise, it is,

20       again, a wide range fishing expedition which has

21       nothing to do with this case.

22  BY MR. WOOTEN:

23       Q     You said there were no payments for having a

24  high APR, there are no financial incentives?

25       A     You asked if presently if we were paying out

**FREEDOM COURT REPORTING**

Page 235

1    any incentives, and I said no.

2         Q    When did that end?

3         A    Do not know off the top of my head.

4         Q    And this article in November of 2008

5    indicates they're still being paid, right?

6         A    That could've been previously.

7         Q    Okay.  Well, you don't dispute the date of

8    the article's November 1st, 2008?

9         A    That's what's stated there, I have not seen

10   the actual Summit that was produced, no.  You do not

11   have a copy of that.

12        Q    Who did you tell me the vice president was

13   that was in charge of -- you had two of them that were

14   doing your attorney network?  One of them -- was Mark

15   Cardenas one of them?

16        A    No, it was not.

17        Q    Why don't you take a look through that, and

18   take a minute and see if you see anything in that

19   report that's inaccurate or appears in any way to be

20   incorrect.  If you do --

21             MR. CASH:  No, I'm going to object.  We're

22        not going to sit here and opine on that report.

23             MR. WOOTEN:  Well, hold on a minute.

24             MR. CASH:  Nick, you have -- I'm going to

25        instruct him not to answer.  Do you have any more

**FREEDOM COURT REPORTING**

Page 236

1    questions about the Wood case?

2         MR. WOOTEN:  Yeah, I do.

3         MR. CASH:  All right, then ask them, because

4    those are the only questions we're answering the

5    rest of the day.  I will take my chances that

6    this Judge will require discovery to be relevant

7    to the case in front of him.  I'm willing to take

8    that risk.

9         MR. WOOTEN:  Okay.  So we're -- you're

10   making your same objection on the same agreement

11   we made earlier today?

12        MR. CASH:  Yeah.  Absolutely.  If we have to

13   redo this, we can do it on my nickel down there,

14   but I'm not going to --

15        THE WITNESS:  That's wrong.  That's wrong.

16        MR. CASH:  -- to have him sit here and

17   generally testify.

18        He will answer all the questions you have

19   about the Wood case.

20        (Plaintiffs' Exhibit No. 17 marked for

21   identification.)

22   BY MR. WOOTEN:

23        Q    That document marked as Plaintiffs'

24   Exhibit 17, does it appear to be the August 2004

25   mortgage referenced in the earlier letters indicating

**FREEDOM COURT REPORTING**

Page 237

1  that your client's lien was not in first position?

2      A     This looks to be the July 22nd mortgage.

3      Q     Does it appear to be recorded on August the

4  11th?

5      A     Yes.

6      Q     Is there anything on that mortgage that

7  indicates it's been released?

8      A     I don't see any satisfaction on this

9  mortgage.

10            (Plaintiffs' Exhibit No. 18 marked for

11  identification.)

12      Q     Now, I'll show you a document, represent to

13  you that that is a copy of documents produced by

14  Option One to myself and my co-counsel in this case,

15  which are the Consolidated Note Logs from the MSP

16  software code.

17      A     Okay.

18      Q     Ask you if you've ever seen those documents

19  prior to today?

20      A     No, I have not.

21      Q     I notice that every entry that says FOR is

22  redacted.

23      A     Okay.

24      Q     Do you know what FOR stands for in the MSP

25  software?

**FREEDOM COURT REPORTING**

Page 238

1    A    I believe it stands for the foreclosure

2  notes.

3    Q    Okay.  And that would be the part of this

4  process that your company is in charge of, right?

5    A    Yes.

6    Q    And that would be the entries into the MSP

7  software made by the employees of LPS Default

8  Solutions; is that correct?

9    A    That, I don't -- I don't know if these, in

10  fact, are all from that, from our Process Management

11  system sent back to the MSP system.

12    Q    All right.  So, if you'll flip through there

13  and just verify for me that all of the entries marked

14  with FOR are redacted?

15    A    They look to be.  But this was a document

16  from Option One, correct?

17    Q    It's an MSP document but, yes, it did come

18  from Option One.

19    A    Okay.

20    MR. CASH:  Just so the record's clear, LPS

21    had nothing to do with any of the redactions or

22    the decisions to redact.

23    MR. WOOTEN:  No.  And if I inferred that

24    they did, I apologize, Mike, I wasn't doing that

25    at all.  I'm just drawing the correlation between

**FREEDOM COURT REPORTING**

Page 239

1          the two settings, okay?

2               MR. CASH:  Uh-huh.

3    BY MR. WOOTEN:

4          Q    You testified earlier that you are not

5    familiar with the various modules under MSP which

6    report to the software from which these Consolidated

7    Note Logs arrive, are you?

8          A    No, I'm somewhat familiar with the FOR, as

9    that's the foreclosure work screen.

10         Q    Sure.

11         A    From my old days at Option One.

12         Q    So, with respect to what's redacted, there

13   is no way to know, based on these redactions, if those

14   are entries between Mr. Humphrey and his firm and

15   Option One or if these are entries by LPS employees,

16   right?

17         A    I have no idea.

18         Q    Are you aware of whether or not LPS

19   employees may have made entries in the MSP software as

20   a part and parcel of the work that they did for your

21   entity, LPS Default Solutions?

22         A    Not that I'm aware of.

23         Q    Well, that kind of leaves me out in space,

24   Mr. Newland.  Do you know if your employees can access

25   MSP and enter notes under the foreclosure fields or

**FREEDOM COURT REPORTING**

Page 240

1    not?

2         A    I do not know whether they can enter those

3    fields or not.  I don't know if that's a field that we

4    can actually access and put notes in there.

5         Q    So I would need to talk to someone who is

6    more familiar about what capacities your employees

7    would have with respect to entering information into

8    MSP, right?

9         A    That would be correct.

10         Q    And, again, do you have anyone -- do you

11    know of anyone who might be knowledgeable about that,

12    who could explain that?

13         A    No.

14         Q    And you testified earlier that prior to me

15    presenting you these documents, you had not had any --

16    you had not made any review or investigation of the

17    information contained in these Consolidated Note Logs?

18         A    No, I have not seen anything in the note

19    logs.

20         Q    And you made no effort during your

21    preparation to testify today with respect to what

22    information might've been available to your business

23    through the MSP platform?

24         A    No, I did not look at it, no.

25              (Plaintiffs' Exhibit No. 19 marked for

FREEDOM COURT REPORTING

Page 241

1    identification.)

2         Q    This document marked as Exhibit 19, I'll

3    represent to you is a document provided to me as part

4    of Option One's discovery, which indicates

5    approximately 80 people had some interaction with the

6    Wood loan and provides identification for those

7    people.  You're not familiar with any of those people

8    unless they're an LPS employee, are you?

9         A    No, I'm not familiar with these people.

10        Q    So you would not be familiar with any

11   contractors from India or anything like that?

12        A    No, not at all.

13        Q    Would you be familiar with any of the

14   businesses which provide those contractors?

15        A    No, I'm not.

16        Q    Do you know if Option One is located in

17   Jacksonville, Florida?

18        A    Yes, they are.

19        Q    Within your software services, are they

20   assigned a vendor or client code?

21        A    Within our Process Management services?

22        Q    Right.

23        A    Yes, they are.

24        Q    So if a communication came through Option

25   One to Process Management, there would be an

**FREEDOM COURT REPORTING**

Page 242

1    indication that that came from Option One to Process

2    Management, correct?

3          A    It would be identified by the user ID, yes.

4          (Plaintiffs' Exhibit No. 21 marked for

5    identification.)

6          Q    Okay.  Let me ask you to take a look at

7    Exhibit 21, ask if you recognize that document.

8          A    I don't recognize this document, but it

9    looks like it comes from our LPS Field Services

10   company.

11         Q    Does that document appear to be either

12   property inspection or a broker price opinion?

13         A    It looks -- I don't know, it looks to me to

14   be a property inspection.

15         Q    Okay.  What's the date of that, please, sir?

16         A    June 15th, 2007.

17         Q    Do you know if any of your employees with

18   LPS Default Services enter any coding under loss

19   mitigation on the MSP software?

20         A    Not that I know of.

21         (Plaintiffs' Exhibit No. 22 marked for

22   identification.)

23         Q    Where's that list of employees.

24         I'd ask you to take a look at Plaintiffs'

25   Exhibit 22, though based on your testimony you may not

FREEDOM COURT REPORTING

Page 243

1    recognize those documents, I just want to ask you if

2    you do.  I'll represent to you that I believe them to

3    be documents from the MSP software system provided by

4    Option One.

5         A    They look to be just screen shots and then

6    notes and I guess at the top of the page it says

7    Consolidated Notes Log, so, I imagine it's

8    Consolidated Notes Log.

9         Q    Does that all, from what you're able to see,

10   appear to be documents which did come, in fact, from

11   MSP?

12        A    As far as what I can see, yes.

13             (Plaintiffs' Exhibit No. 20 marked for

14   identification.)

15        Q    Did I show you No. 20?  It's a corporate

16   advance sheet.

17        A    No.

18        Q    I'll represent to you the document was also

19   provided to me by Option One Mortgage Company.

20        A    Okay.

21        Q    That document indicates a series of

22   transactions with respect to corporate advances.  What

23   is the date that the first corporate advance occurred

24   that's listed there?

25        A    Looks like 3/29 of '07.

**FREEDOM COURT REPORTING**

Page 244

1    Q    Okay.  And when is the last one?

2    A    10/10 of '07.

3    Q    Does it appear that all those corporate

4    advances more or less had something to do with the

5    foreclosure process?

6    A    I don't know about the property inspection

7    fees or -- you know, whether those were associated

8    with the foreclosure or not.

9    Q    Sure.  And what was the date of the property

10   inspection?

11   A    That states July 5th of '07 and July 24th of

12   '07.

13   Q    Does the document I previously marked as 21,

14   it appears to be dated 6/15/2007 --

15   A    Okay.

16   Q    -- more or less coincide with the dates of

17   those inspections?

18   A    Possibility with the billing on July 5th, or

19   when it was paid, I guess, that's what it looks like

20   to me.

21   Q    Now, is this part of the segregation of

22   services in the -- on the one hand, you're over here

23   at LPS Default Solutions and you're providing

24   foreclosure consultation, or however y'all term it,

25   and you're getting paid by the attorney for the work

**FREEDOM COURT REPORTING**

Page 245

1   that you guys do.  But then over here, these costs are

2   being added by the servicer on the MSP software --

3       A    That's correct.

4       Q    -- for those relations?

5       A    That's what it looks like.

6       Q    And I notice in the payee category that you

7   had -- Scott Humphrey occupied one, two, three -- five

8   of those entries; and then FS, it looks like

9   F-I-D-E-L, which I'm assuming is a Fidelity entity,

10   there's one, two, three entries also there; and then

11   there is an entry for a BPO and an AVM valuation.  Do

12   you know if the -- you said earlier you couldn't

13   recognize 21 as to whether it was a BPO or property

14   inspection --

15       A    That's correct.

16       Q    -- right?  Fair enough.  I can't either.

17           The invoices which were submitted by Scott

18   Humphrey which are dated in here in October and August

19   of 2007, those invoices were a part of what y'all just

20   brought in here while ago after lunch also?

21       A    We brought you in the invoices.  I don't

22   know if they're associated exactly with those, I would

23   assume they are, but...

24           (Plaintiffs' Exhibit No. 23 marked for

25   identification.)

FREEDOM COURT REPORTING

Page 246

1      Q     Sure.  Let me show you a document I

2   previously marked as Plaintiffs' Exhibit 23, ask if

3   you recognize that document.

4      A     Looks to be an assignment of mortgage from,

5   looks like, H&R Block to Option One, dated

6   August 22nd, 2005.

7            (Plaintiffs' Exhibit No. 4 marked for

8   identification.)

9      Q     Let me show you a document I previously

10  marked as Plaintiffs' Exhibit 4.

11     A     Okay.

12     Q     Down at the bottom of that document it says

13  something about -- the notes appear to say foreclosure

14  request.  Are you able to interpret the field note

15  down at the bottom?

16     A     Yeah, I have no idea.  This is an Option One

17  entry.  I have no idea what that means.

18     Q     So that would've been entries made in the

19  MSP software again?

20     A     That's what -- yeah, looks to be MSP

21  software, and I don't recognize -- we did not get the

22  referral prior to June 1st.

23     Q     Now, I believe this document was in your

24  production.

25            MR. WOOTEN:  Mike, do you want to look at

**FREEDOM COURT REPORTING**

Page 247

1   it?  It doesn't have an Option One Bates stamp on

2   it.

3        MS. NEWMAN:  Yeah, I think it was probably

4   out of Document Management.

5        MR. WOOTEN:  Out of what?

6        MS. NEWMAN:  Document Management.

7        MR. WOOTEN:  Well --

8        MS. NEWMAN:  Sorry.

9        MR. WOOTEN:  Sure.

10        THE WITNESS:  It could've been -- could've

11   been part of the screen prints, the screen prints

12   that went out --

13        MS. NEWMAN:  Yeah, I think there's a packet

14   of screen prints in there, it probably was --

15        MR. CASH:  We may want to go off while we're

16   having this little discussion, so she doesn't

17   have to get it all.

18        MR. WOOTEN:  And the reason I said I believe

19   it came from y'all is because it doesn't have an

20   Option One Bates stamp on it.

21        MR. CASH:  Exactly.

22        MR. WOOTEN:  And I -- in going through these

23   documents, I went through your documents first

24   before I turned to the Option One documents.

25   BY MR. WOOTEN:

**FREEDOM COURT REPORTING**

Page 248

1    Q    So, your testimony is, is those documents

2    came from -- that was not part of your Process

3    Management, but would've come from Document

4    Management?

5    A    It's an MSP screen that looks to be

6    basically a screen scrape that we pulled off, possibly

7    part of the referral with the documents that were sent

8    out to the attorneys for them to make the assessment

9    in reference to financial figures.

10   Q    Sure.

11        MR. CASH:  Do we want -- oh, you're back on.

12        Okay.  We never went off.  Okay.  I was going to

13        say could we do all that all again on the record,

14        but we already were.

15   BY MR. WOOTEN:

16   Q    Sure.  And with respect to this document,

17   it's dated 5/25 of '07 and --

18   A    That's the notes that are on there, yes.

19   Q    Right.  And there's an MSP code for a KSS,

20   which is identified in Plaintiffs' Exhibit 19 as a

21   Sandeep Sharma with a company called, I guess, Pune,

22   P-U-N-E, and it says borrower assistance team.  And it

23   indicates in that code JX050 Jacksonville, I mean, I

24   read that to say request for FCL, or foreclosure.  Is

25   that -- do you have any understanding of what that

**FREEDOM COURT REPORTING**

Page 249

1   line means or --

2       A     No.

3       Q     -- is that all guesswork on my part?

4       A     No.  KSS, that company, has nothing to do

5   with LPS.  My understanding borrower's assistance --

6   borrower assistance team is a term that is used by now

7   American Home.

8       Q     Okay.  And with respect to this, where it

9   says request for foreclosure to JAX, it -- do you have

10  any idea what that means?

11      A     I have -- I have no idea.  But that is not

12  an LPS --

13      Q     Sure.

14      A     -- acronym.

15            (Plaintiffs' Exhibit No. 5 marked for

16  identification.)

17      Q     Show you what I previously marked as

18  Plaintiffs' Exhibit 5.  Is that what we would commonly

19  refer to as the foreclosure package that your system

20  would put together and sent to Mr. Humphrey for Option

21  One?

22      A     This looks to be the cover sheet that goes.

23      Q     Sure.

24      A     Now the documents behind it are not.

25      Q     Okay.  Explain to me what the documents

FREEDOM COURT REPORTING

Page 250

1   behind it are then, please, sir.

2       A    Sure.  The -- basically they're bidding

3   information that we send to the attorneys.

4       Q    So is that just bidding instructions?

5       A    Yes.

6       Q    Okay.  Is that all that's contained in that?

7       A    Yes.

8       Q    Is there anywhere on that front cover page

9   which indicates how many pages should follow that

10  cover page?

11      A    No, I don't see anything on the front page.

12      Q    And what is the date of that document, if

13  there is one on that front page?

14      A    Sure.  June 1st of 2007.

15      Q    So that would've been the -- apparently the

16  cover letter to the original foreclosure package that

17  we talked about --

18      A    Yes.

19      Q    -- earlier today?

20      A    (Nods head.)

21      Q    And with respect to that, who does it

22  indicate that it is to?

23      A    Scott Humphrey.

24      Q    Who does it indicate that it is from?

25      A    Fidelity National Foreclosure & Bankruptcy

**FREEDOM COURT REPORTING**

Page 251

1    Solutions.

2        Q    And that's now LPS, correct?

3        A    LPS Default Solutions, yes.

4        Q    Right.  I'm sorry, I should've made that

5    distinction.

6        A    No, that's okay.

7        Q    And so, I'm with you now that we've gone

8    through these documents together, I agree that that --

9    the documents attached to that, I don't know how they

10   got in order, but they obviously don't belong attached

11   to that.

12       A    No, they do not belong attached to this.

13       Q    So if you want to, snatch the top sheet off,

14   we'll just label No. 5, and the others we just won't

15   mark because they're bidding instructions, and I can

16   just put them back in my stack of things.

17           MR. CASH:  Okay.

18           MR. WOOTEN:  Or if you want me to tear it

19   off --

20           THE WITNESS:  You tear it off.

21           MR. WOOTEN:  Is she worried about tearing up

22   a hundred dollar bill or something?

23           MS. NEWMAN:  No, no, no.  Now, does that

24   second document go with it?

25           MR. WOOTEN:  Well --

**FREEDOM COURT REPORTING**

Page 252

1        THE WITNESS:  That just --

2        MR. WOOTEN:  The second sheet indicates that

3    it comes from Mendota Heights, and it says Option

4    One foreclosure documents, and it says:  The

5    official cover sheet --

6        THE WITNESS:  That's the cover sheet.

7        MR. WOOTEN:  -- and foreclosure documents

8    are forthcoming.

9    BY MR. WOOTEN:

10       Q    I think it might actually have been in

11   reverse.  Maybe it should have been --

12       A    Yeah.

13       Q    -- first and this one should've been second.

14       A    That's correct.

15       MR. WOOTEN:  Let's tear off those two.

16       And do we have a stapler, Ms. Court

17   Reporter.  Clip?  If we don't, we'll get one.

18   That'll be fine.  Let's just use that.

19       And we will detach these other documents

20   since they obviously don't belong.  We'll just

21   return that to my stack of things.

22   BY MR. WOOTEN:

23       Q    Y'all ran out at lunchtime, and, of course,

24   this is dated today's date and time and y'all got this

25   stuff pulled down by some employees, and this was with

**FREEDOM COURT REPORTING**

Page 253

1    respect to some of the screens within the MSP fields

2    that we talked about in our notice of deposition?

3         A    That's correct.

4         Q    I think y'all actually were able to

5    determine that you could figure out that you could

6    print those things from an LPS station; is that right?

7         A    Yes, we were able to access them.

8              (Plaintiffs' Exhibit No. 26 marked for

9    identification.)

10        Q    Okay.  And this indicates that it is a

11   corporate advance history screen.  Does that

12   indicate -- is that a correct representation of that

13   document?

14        A    Yes at the top, yes.

15             Which I believe matches up with what you

16   provided me just a little while ago.

17        Q    Sure, I think you're right.  I don't think

18   there's anything spooky about those numbers at all.

19             And then this is a -- called a fee activity

20   ledger or the Fee 1 screen, as the MSP training people

21   refer to it?

22             (Plaintiffs' Exhibit No. 27 marked for

23   identification.)

24        A    Yes, that's what it looks like.  That looks

25   to be tracking fees that are assessed by Option One.

**FREEDOM COURT REPORTING**

Page 254

1          (Plaintiffs' Exhibit No. 28 marked for

2      identification.)

3          Q     Right.  We pulled off what is labeled as a

4      P309, which is -- appears to be a life of loan

5      transaction sheet.  I'll hand you that, represent to

6      you that what your counsel told me was that that is

7      the P309 form.

8          A     Okay.

9          Q     And you had not seen that prior to printing

10     it off --

11         A     No.

12         Q     -- and bringing it in here, right?

13         A     No, I have not.

14         Q     And that was a document you were able to

15     access through --

16         A     Yes, we were able to access it.

17         Q     -- LPS?

18         A     Associates could access it, they just don't

19     have the ability to change any of the information.

20         Q     Sure.

21         A     And to be honest with you, I don't -- I do

22     not know how to read this.

23         Q     Sure.  And I'm not necessarily asking you

24     to, as much as asking you to identify that that is, in

25     fact, what you guys represented to me is the P309

**FREEDOM COURT REPORTING**

Page 255

1    form?

2        A    Yes, it is.

3             (Plaintiffs' Exhibit No. 29 marked for

4    identification.)

5        Q    Okay.  This document, or set of documents

6    labeled 29 appears to be, again, another batch of

7    those images which were pulled off during a lunch

8    break?

9        A    Uh-huh.

10       Q    That appears to be the invoices submitted by

11   the vendors associated with this account; is that

12   right?

13       A    That's correct.  That have been submitted

14   through Invoice Management.

15       Q    Okay.  Is there any information that was

16   submitted through Invoice Management with respect to

17   remittances to pay those invoices?

18       A    Not that I know of.

19       Q    With respect to this entity that -- LPS, the

20   spinoff that took place about a year ago, you said the

21   name change took place in February of 2009?

22       A    I don't know the exact date.  I think it was

23   approximately February.

24            MR. WOOTEN:  If y'all want to take about

25            five minutes and give me a break, I think I may

**367 VALLEY AVENUE**

**FREEDOM COURT REPORTING**

Page 256

1      be where I can stop.

2             THE VIDEOGRAPHER:  Off record at 4:51.

3             (Brief recess.)

4             THE VIDEOGRAPHER:  Back on record at 5:06,

5      beginning Videotape No. 7.

6             MR. WOOTEN:  We've been at this a long time,

7      Mr. Newland, and appreciate your cooperation in

8      answering my questions today with respect to

9      this.  I've looked back at my notes and gone

10     through the other documents I had here that were

11     unmarked, and I think what I'm going to do at

12     this point is shut down my questioning.  Your

13     lawyer may have other questions for you.

14            MR. CASH:  Okay.  I'm just going to have a

15     few.

16                      CROSS EXAMINATION

17   BY MR. CASH:

18     Q     This document that we looked at, Document

19   16, which says editor is The Summit, which is a

20   publication that had been talked about before, do you

21   remember that?

22     A     Yes, I do.

23     Q     Is it possible for that to be an authentic

24   Summit document?

25     A     No, it's not.

**FREEDOM COURT REPORTING**

Page 257

1    **Q**    Why is that?

2    **A**    We stopped publishing The Summit as of April

3    2008.

4    **Q**    And that's dated when?

5    **A**    November 1st, 2008.

6    **Q**    Okay.  So this would've been after there was

7    no longer a Summit publication?

8    **A**    That's correct.

9    **Q**    All right.  Let me take you more to kind of

10   what this case is about.  We've answered a lot of

11   general questions.  I want to focus on some very

12   specific questions with regard to Fidelity National

13   Foreclosure & Bankruptcy Solutions, all right?

14   **A**    Yes, sir.

15   **Q**    In the complaint, there's a statement of

16   facts, and I want to talk about those.  On

17   Paragraph 9, it says:  On November 2nd, 2006,

18   plaintiffs' home burned due to an electrical fire,

19   leaving plaintiffs' home uninhabitable.  Upon

20   receiving their notice for a mortgage payment

21   immediately following the fire, plaintiffs advised

22   Option One of the fire and informed Option One the

23   mortgage would be satisfied as soon as the insurance

24   proceeds were paid.

25          That was notice that went to Option One, not

**FREEDOM COURT REPORTING**

Page 258

1    to Fidelity, correct?

2        A    That's correct.

3        Q    On numerous occasions, plaintiffs contacted

4    Option One requesting a payoff figure, which took

5    several months to obtain.

6             Plaintiffs never contacted Fidelity for a

7    payoff figure, did they?

8        A    No, they did not.

9        Q    All right.  Here it says:  On March 23rd,

10   plaintiffs mailed to Option One, two checks, a State

11   Farm check in the amount of 138,482, which plaintiffs

12   had endorsed over to Option One, along with their

13   personal check in the amount of $6,304.04, which

14   represented the figure they were given to pay off the

15   mortgage.

16            Those checks did not come to Fidelity, did

17   they?

18       A    No, they did not.

19       Q    Of the 6,304.04, Option One asserted 4,000

20   was a prepayment penalty.

21            Fidelity doesn't assess or decide what

22   prepayment penalties are, do they?

23       A    No, they do not.

24       Q    That's an Option One decision?

25       A    Yes, it is.

**367 VALLEY AVENUE**
**877-373-3660 BIRMINGHAM , ALABAMA 35209 205-397-2397**

## FREEDOM COURT REPORTING

Page 259

1    Q    Option One initially refused to accept two

2  checks, insisting on a single payment.

3         Did Fidelity have anything to do with Option

4  One taking one check, two checks, five checks; is that

5  anything that you control?

6    A    No, we have no control of that.

7    Q    Upon learning State Farm would not issue a

8  second check, Option One then deposited the State Farm

9  check, but continued to -- continued to refuse

10  plaintiffs' check on the grounds plaintiffs' check was

11  not a certified check and Option One would not accept

12  personal checks in the sums in excess of $5,000.

13        Is that a Fidelity policy regarding

14  accepting noncertified checks?

15    A    No, it's not.

16    Q    Did Fidelity have anything to do with

17  whether to accept the payments from the plaintiffs or

18  not accept payments from the plaintiffs?

19    A    No, we did not.

20    Q    Option One refused to apply the payments it

21  received to plaintiffs' mortgage and continued to

22  assess fees and penalties against plaintiffs' mortgage

23  loan.

24        Did Fidelity assess any fees or any

25  penalties against plaintiffs' mortgage loan?

**FREEDOM COURT REPORTING**

Page 260

1    A    No, we did not.

2    Q    Did Fidelity make any decision whether to

3  apply payments or not apply payments to plaintiffs'

4  mortgage loan?

5    A    No, we did not.

6    MR. WOOTEN:  Let me interrupt.  I don't mean

7    to interrupt you, I know it's been --

8    MR. CASH:  That's okay.

9    MR. WOOTEN:  -- a long day, but let's just

10    clarify.  When you say Fidelity, you're talking

11    about LPS Default Solutions, not any of the other

12    Fidelity companies?

13    MR. CASH:  No, what I'm talking about is --

14    because I want to be clear and use the same name

15    that's in the complaint.  I'm talking what was

16    known as and sued as Fidelity National

17    Foreclosure & Bankruptcy Solutions.

18    MR. WOOTEN:  Which became LPS Default

19    Solutions, which is how we referred to them

20    today, for clarity.

21    MR. CASH:  Right.  So for my purposes, I'm

22    going to -- when I refer to Fidelity in my

23    questions, and I want you to understand this, I'm

24    referring to the defendant Fidelity National

25    Foreclosure & Bankruptcy Solutions.

**FREEDOM COURT REPORTING**

Page 261

1          THE WITNESS:  It just clarified that up

2      front.

3  BY MR. CASH:

4      Q    Okay.  In April 2007, it said defendants,

5  plural, force placed homeowners' insurance on the

6  plaintiffs' residence, knowing the home had suffered

7  fire damage and was uninhabitable.

8          Did Fidelity have anything to do with

9  placing forced homeowners' insurance on the

10  plaintiffs' property?

11     A    No, we did not.

12     Q    Is that a decision that would be made in any

13  way by Fidelity?

14     A    No.

15     Q    Paragraph 13:  Shortly thereafter,

16  defendants, plural, filed a notice of foreclosure,

17  which was later withdrawn.  In August 2007, a second

18  notice of foreclosure was filed with the DeKalb County

19  Probate Court, and notices were placed in the DeKalb

20  Advertiser posting the date the foreclosure would take

21  place.  Upon information and belief, the foreclosure

22  sale did take place on September 24th, 2007, but no

23  foreclosure deed has been filed.

24          Is a decision to foreclose a decision of

25  Fidelity's or is it Option One's decision whether or

**FREEDOM COURT REPORTING**

Page 262

1    not to foreclose?

2        A     It's Option One's decision.

3        Q     Does Fidelity have any input into or power

4    to change the decisions of Option One whether or not

5    they want to foreclose?

6        A     No.

7        Q     Plaintiffs allege that defendants placed

8    upon the subject mortgage charges and fees that were

9    both false and illegal, including placing single

10   premium vendor placed insurance or force placed

11   insurance upon the loan account of the plaintiffs in

12   violation of law.   That's Paragraph 14.

13            Did Fidelity place any type of charge or fee

14   on this loan, including single premium vendor placed

15   insurance?

16       A     No, we did not.

17       Q     Does Fidelity have the authority or ability

18   to place fees and charges on this Option One loan?

19       A     No, we do not.

20       Q     The plaintiffs allege that the foreclosure

21   is improper and illegal for all of the following

22   reasons:   A.   The defendant accepted moneys from the

23   plaintiff and failed to apply those funds to their

24   account in a timely and appropriate fashion.

25            Did Fidelity accept any money from the

**FREEDOM COURT REPORTING**

Page 263

1    plaintiff?

2         A    No, we did not.

3         Q    Did Fidelity have any ability to apply those

4    funds to the plaintiffs' account?

5         A    No, we did not.

6         Q    Two:  The defendants charged and applied

7    significant fees and expenses to the plaintiffs'

8    account in violation of law and without legal

9    justification.

10              As to 15 B, does Fidelity have -- does

11   Fidelity place any fees or expenses on the plaintiffs'

12   account in this case?

13        A    No, we did not.

14        Q    C.  The defendants failed to post payments

15   to the plaintiffs' account so that defendants could

16   create a default or a false pretense of default.

17              Does Fidelity have anything to do with

18   posting payments to the plaintiffs' account?

19        A    No, we do not.

20        Q    Does it decide what payments to post or not

21   post?

22        A    No, that's the client's responsibility.

23        Q    D.  The defendants failed to engage in loss

24   mitigation as required in its agreement with its

25   investors.

**FREEDOM COURT REPORTING**

Page 264

1        Does Fidelity have any agreement with any

2   investors to engage in loss mitigation?

3        A    No, we do not.

4        Q    Is it Fidelity's role to engage in loss

5   mitigation under any agreement with investors?

6        A    No, it's not.

7        Q    This agreement is called a Pooling and

8   Servicing Agreement, or PSA, and is the document which

9   sets out this defendants' right and responsibilities

10  with respect to managing and curing defaults by a

11  mortgagor.

12        Are you a party to any pooling or servicing

13  agreement, or PSA?

14        A    No, we're not.

15        Q    And by "you" I mean Fidelity.

16        A    No.

17        Q    The plaintiffs are an intended third-party

18  beneficiary of this agreement because the failure of

19  the defendants to properly manage and cure a default

20  by the mortgagor results in a loss to the trust

21  investors.

22        Again, are you, Fidelity, a subject to any

23  pooling and services agreement having to do with the

24  Woods' loan?

25        A    No.

## FREEDOM COURT REPORTING

Page 265

1     Q     E.   The defendants also, quote, packed,

2    closed quote, its charges against the plaintiffs'

3    account, such as repeatedly paying for drive-by

4    inspections, or no inspections at all, of plaintiffs'

5    home, when they knew the home was destroyed.

6          Did you add any charges, and by "you" I mean

7    Fidelity, add any charges against the plaintiffs'

8    account --

9     A     No.

10    Q     -- for any such --

11    A     No, we did not.

12    Q     All right.   F.   The defendants force placed

13   homeowners' insurance on the property and placed such

14   insurance in an amount and cost that is unreasonable,

15   predatory and unconscionable and did so to create a

16   false default with the specific purpose of instituting

17   the foreclosure against the plaintiffs.

18          Did you, Fidelity, force place any type of

19   homeowners' insurance on the property?

20    A     No, we did not.

21    Q     Did you in any way attempt to create a

22   default?

23    A     No, we did not.

24    Q     Do you have the authority to assess any

25   charges to the loan that would create a default?

FREEDOM COURT REPORTING

Page 266

1        A      No, we do not.

2        Q      The defendants lacked standing to foreclose

3   at a time in which they allegedly foreclosed under

4   Alabama law and the foreclosure is void ab initio.

5              Again, did Fidelity actually foreclose on

6   this property or did Option One?

7        A      Option One.

8        Q      Okay.  The defendants are engaged in a

9   pattern of conduct with respect to their mortgaging

10  servicing practices whereby the defendants seek to

11  create false or bogus defaults so they can foreclose

12  on property for the purpose of either equity stripping

13  or claiming various insurance coverages that are

14  available for servicers who foreclose on property.

15             First, is Fidelity a servicer?

16       A      No, we're not.

17       Q      And, in fact, subservicer is mentioned

18  earlier.  The services you provide aren't even

19  under -- aren't even subservice, are they?

20       A      No, we're not even subservice, no.

21       Q      Okay.  Now, is there any way that you can

22  create false or bogus defaults with the services you

23  provide?

24       A      No, we cannot.

25       Q      And you don't -- if property is foreclosed

**FREEDOM COURT REPORTING**

Page 267

1    upon, you don't get to equity strip it, do you?  It

2    doesn't --

3         A    No.

4         Q    You don't make more or less?

5         A    No.

6         Q    And you don't get any insurance coverages as

7    a servicer for foreclosure on a property, do you?

8         A    No, we do not.

9         Q    Paragraph 17:  The defendants are engaged in

10   a pattern and practice of conduct which is designed to

11   create or manufacture false defaults for the purpose

12   of churning fees and charges on the client's mortgage

13   account to increase profits to the defendants from

14   fees.

15           Do you charge any fees to the customer, the

16   borrower, like the Woods, do you charge any fees to

17   their account?

18        A    No, we do not.

19        Q    The defendants' conduct is oppressive,

20   wanton, malicious and intentional, and is designed to

21   profit the defendant at the expense of the mortgagors'

22   home.

23           Do you have any fees, any activities, which

24   add any cost or fees to the mortgagors' home from

25   which you profit?

**FREEDOM COURT REPORTING**

Page 268

1        A    No, we do not.

2        Q    Or to their loan from which you profit?

3        A    No, we do not.

4        Q    Paragraph 20 again talks about practices

5    designed by their very nature to cause plaintiffs'

6    home to be declared in default for the purpose of

7    imposing fees and charges to the account which could

8    then be claimed from the investors or trust holding

9    the mortgage so the defendants could increase their

10   profits.

11            Does a foreclosure on their home give you

12   any ability to claim any fees from investor or trusts

13   holding the mortgage?

14       A    No.

15       Q    By "you" I mean Fidelity.

16       A    No.

17       Q    Do you charge any fees that would be paid by

18   investors or trusts holding the mortgage?

19       A    No, we do not.

20       Q    This conduct was wanton in that the

21   defendants knew or should've known that by

22   manufacturing a default and imposing bogus or illegal

23   fees against the mortgagors that injury would result

24   to the mortgagors in the form of payment of illegal or

25   unauthorized fees or in the loss of the mortgagors'

**FREEDOM COURT REPORTING**

Page 269

1    home through foreclosure.

2            Again, imposing bogus or illegal fees, did

3    you impose any fees whatsoever, by "you" I mean

4    Fidelity, the defendant in this case, any fees

5    whatsoever upon the plaintiffs?

6        A    No, we did not.

7        Q    Okay.  Under Count II, Negligence,

8    Paragraph 24, it says:  The actions of defendants were

9    negligent in that the defendants failed to properly

10   apply and to post payments to the account of

11   plaintiffs when received and in the proper amounts.

12           Did you receive, you Fidelity, the

13   defendant, receive any fees from plaintiffs?

14       A    No, we did not.

15       Q    Or any payments from plaintiffs?

16       A    No, we did not.

17       Q    Was it your role or did you have the

18   authority to post payments to the account of

19   plaintiffs?

20       A    We have no authority to do that.

21       Q    Do you make any decision when to post them

22   or how much they should be -- in what amount they

23   should be posted?

24       A    No, we do not.

25       Q    The defendants placed payments into suspense

**FREEDOM COURT REPORTING**

Page 270

1    rather than applying the payments to the plaintiffs'

2    account.

3            Do -- does Fidelity play any role in

4    deciding whether payments are to be placed in suspense

5    or applied to the plaintiffs' account?

6        A    No, we do not.

7        Q    You made no decision in that regard and had

8    no authority to do so?

9        A    Absolutely not.

10       Q    The defendants placed charges onto the

11   account of the plaintiffs that were either wrong,

12   illegal, unauthorized or in a wrong amount and failed

13   or refused to correct the amount.

14           Did you place, and by you, Fidelity, the

15   defendant in this case, place any charges on the

16   plaintiffs' account?

17       A    No, we did not.

18       Q    Here it says:  The plaintiffs and defendants

19   are parties to the contract in the form of a mortgage

20   that exists between them.  It's a breach of contract

21   claim.

22           Do you have any contractual relation

23   whatsoever with Mr. and Mrs. Wood, the plaintiffs in

24   this case?

25       A    No, we do not.

**FREEDOM COURT REPORTING**

Page 271

1      Q      Have you ever entered into any mortgage or

2    any other contract with the Woods in this case?

3      A      No, we did not.

4      Q      Count IV, Breach of Contract, the pooling

5    and services agreement.  Under Count IV, that

6    basically allege that the pooling and services

7    agreement is a contract and that the defendants in

8    this case were acting as servicer for the subject

9    mortgage which had been securitized.

10           So let's start with that.  Were you acting

11   as a servicer of this loan?

12     A      No.

13     Q      At any time did you enter into a pooling and

14   servicing agreement regarding this loan?

15     A      No, we did not.

16     Q      And if you're not a party to the pooling and

17   servicing agreement, I guess you can't be in breach of

18   it, can you?

19     A      No, you cannot.

20     Q      All right.  Unjust enrichment.  Again, they

21   allege that the actions of defendants would result in

22   plaintiffs -- in defendants being unjustly enriched,

23   forced to pay charges that were illegal, wrong in

24   character, wrong in amount, unauthorized, or otherwise

25   improper.

**FREEDOM COURT REPORTING**

Page 272

1        Did you receive from the plaintiffs any

2    payment of any fees or charges in this case

3    whatsoever?

4        A    No, we did not.

5        Q    Do you have -- did you have any contact with

6    the plaintiffs in this case whatsoever?

7        A    No, we did not.

8        Q    Here it says:  Defendants instituted

9    foreclosure against the plaintiffs.

10        Did Fidelity foreclose on this loan?

11        A    No, we did not.

12        Q    Who's -- who was the holder of the note that

13    foreclosed?

14        A    Option One.

15        Q    Slander and defamation.  Defendants made

16    false, slanderous or defamatory statements about

17    plaintiffs.  Defendants have reported negative credit

18    information to credit reporting agencies concerning

19    the plaintiffs with knowledge that said information

20    was incorrect.

21        Did Fidelity, the defendant in this case,

22    make any reports to any credit agency of any kind

23    regarding any allegations regarding the Woods in any

24    way, shape, or form?

25        A    No, it did not.

## FREEDOM COURT REPORTING

Page 273

1          MR. CASH:  That's it.  Pass the witness.

2     Thank you.

3                    REDIRECT EXAMINATION

4     BY MR. WOOTEN:

5          Q     With respect to the document y'all talked

6     about, Plaintiffs' Exhibit 15, Mr. Newland, this first

7     page talks about desktop Process Management,

8     previously known as NewTrak, and explains that the

9     desktop Process Management system is and is replacing

10    NewTrak.  Is that information on that page accurate

11    with respect to the items that it describes?

12         A     That's --

13         Q     Is that correct?

14         A     That's approximately right.

15         Q     The second page, the information contained

16    on the second page on this side, does that relate

17    correct information regarding Fidelity?

18         A     As far as our addresses, yes.

19         Q     Persons involved, that sort of thing?  Scott

20    Barnes, president and COO?

21         A     Yes, that's correct.

22         Q     Customer/attorney relations, those people

23    all appear to be Fidelity employees?

24         A     Yes, they're all Fidelity employees, except

25    for Dennis Stemmle's no longer with the company.

**FREEDOM COURT REPORTING**

Page 274

1      Q      When did he leave?

2      A      I do not know.

3      Q      With respect to the information on that

4  page, does all that information appear to be correct

5  also?

6      A      Looks to be correct.

7      Q      And again, I hate to be tedious, but take a

8  look at that page.  Tell me if there's anything on

9  that page that appears to be incorrect.

10     A      That looks correct.

11     Q      With respect to the page that had the

12  information on it about the APR incentive winners, you

13  indicated when I handed you that document that you no

14  longer pay incentives to the APR winners, right?

15     A      That's correct.

16     Q      When did that process come to a conclusion?

17     A      I do not recall.

18     Q      Has it been since the name change of the

19  company?

20     A      It was prior to the name change of the

21  company.

22     Q      So sometime between today and prior to the

23  name change, you don't remember exactly when, you quit

24  paying incentives?

25     A      That's correct.  Well, prior to the name

**FREEDOM COURT REPORTING**

Page 275

1  change.

2      Q    Right.  But there was a time when Fidelity

3  paid incentives for their high APR firms?

4      A    There were times that we did pay incentives,

5  yes.

6      Q    The information on the next page, where it

7  talks about -- it says 2007 bankruptcy winners of APR.

8      A    That's the reason why November 1st of 2008

9  seems strange in reference to the front copy of this

10  document.

11      Q    Sure.

12      A    So --

13      Q    And I'm not saying that that date is

14  absolutely correct, that --

15      A    But that's what you insinuated when you gave

16  it to me --

17      Q    Right.

18      A    -- that date was correct.

19      Q    And I thought that it was.

20      A    Okay.

21      Q    I mean, I -- and apparently, it's not.  So

22  I'm not trying to misrepresent anything to you or your

23  lawyers or the Court.  I'm just trying to

24  verify that --

25      A    Sure.

**FREEDOM COURT REPORTING**

Page 276

1      Q      -- the information in this document is

2   accurate.

3      A      (Nods head.)

4      Q      So this says -- this mentions 2007

5   bankruptcy winners of APR?

6      A      Uh-huh.

7      Q      Appears to be that that's reflective of the

8   year?

9      A      Yeah, without going back, yes.

10      Q      Right.  And then this part talks about your

11   service excellence, honorable mentions?

12      A      Uh-huh.

13      Q      And that's a big long list, says 176 firms.

14   Apparently, again, that's for the year, and that --

15      A      That's correct.

16      Q      -- takes up several pages.

17             Then it has a spotlight on your referrals

18   department.  And is that information all also correct?

19      A      Well, it's -- looks to be.

20      Q      And the information with respect to this

21   referral production, referral issues, referral reports

22   on the next page, does that all also appear to be

23   correct?

24      A      From my -- from what I recall, yes.

25      Q      Sure.  And then there's another page there

Page 277

1    dealing with your referrals, and looks like folks

2    employed thereby --

3        A    Yes.

4        Q    -- does that seem correct?

5            And then this talks about your service data

6    on demand, desktop integration services.

7        A    Uh-huh.

8        Q    Does all that appear to be correct?

9        A    Yes.

10        Q    And then this last page, talks about payoff

11    express in default, and it says:  FIS MSP, Process

12    Management will provide real-time payoff quotes for

13    loans serviced using the FIS MSP platform.

14        A    Yeah, provide them to our attorneys.

15        Q    Right.  And that was the information you're

16    talking about with respect to the prices on the

17    properties that were referred for foreclosure, right?

18        A    Prices --

19        Q    On the loans that were on -- payoffs on the

20    loans that were in foreclosure?

21        A    Yeah, we basically referred the information

22    to the attorneys for the payoffs.

23        Q    Sure.

24        A    Uh-huh.

25        Q    And that -- what that's saying is that

**FREEDOM COURT REPORTING**

Page 278

1   through Process Management coupled with MSP, you can

2   get that information, right?

3        A    That's correct.

4        Q    And then the last couple of pages are

5   dealing with recognition of employees, apparently,

6   some of your document processing level people, right?

7        A    Uh-huh.

8        Q    So it says November 1st, 2008, but looking

9   through the actual documents, it makes reference to

10  the year -- yearly awards for 2007?

11       A    That's correct.

12       Q    So we know that that had to be complete

13  before this information could come out, right?

14       A    Yes.

15       Q    And you're not disputing the accuracy of the

16  information in the document, rather, this date, which

17  appears, obviously, to be wrong.

18       A    Yes.

19       Q    Okay.  Is it possible that this could've

20  been a January of 2008 document, since it refers to

21  your 2007 APR winners?

22       A    I don't know.

23       Q    But we know that it came after 2007, right?

24       A    We believe it did, yes.

25       Q    Okay.

**FREEDOM COURT REPORTING**

Page 279

1    A    I wouldn't know without seeing the original

2  documents if that was the case.

3    Q    Sure.  But with respect to the information

4  contained in there, you don't dispute the accuracy of

5  the document?

6    A    I don't dispute it.

7    Q    With respect -- your lawyer sat there and

8  went through the complaint line by line, and that's

9  fine, but with respect to what your actual obligations

10  are for the services that you've agreed to provide, we

11  don't have that information until we review the

12  contracts that govern your relationship both with

13  Mr. Humphrey's firm and Option One, right?

14    A    It's your determination.

15    Q    I understand that.  What I'm saying is, is

16  that you can sit here today and say that you don't

17  have any rights or duties that implicate the mortgage

18  or the contract or a pooling and servicing agreement,

19  but without the actual contracts for what you agreed

20  to do for Option One, we really don't know what your

21  company agreed to do, do we?

22    A    I don't know.  It's up to your

23  determination.

24    Q    Sure.  So, I mean, I understand that you're

25  saying that your company does not assess fees to the

FREEDOM COURT REPORTING

Page 280

1    account, but if the contracts that you've signed with

2    Option One state that you manage the foreclosure

3    process for them, then it would be your company's

4    decision as to how those things were done, right?

5        A    No, not necessarily.

6        Q    Okay.  Well, I guess we'll try to work

7    through that when we actually get our hands on those

8    contracts, okay?

9        A    It's up to you.

10       Q    Sure.

11           MR. WOOTEN:  All right.  I don't have

12       anything else.

13           MR. CASH:  No, I think --

14           MR. LAWLER:  Nothing.

15           MR. CASH:  I think our next step is to get a

16       summary judgment.

17           MR. WOOTEN:  What we need to do is talk

18       about those contracts also, so we can --

19           MR. CASH:  Well, I mean --

20           THE REPORTER:  Are we on the record?

21           MR. WOOTEN:  No.  No.

22           MR. CASH:  No, no, no.

23           THE VIDEOGRAPHER:  Ends the deposition at

24       5:30.

25           (Deposition concluded at 5:30 p.m.)

**FREEDOM COURT REPORTING**

Page 281

1                         - - -

2                  CERTIFICATE OF OATH

3

4    STATE OF FLORIDA   )

5    COUNTY OF DUVAL    )

6           I, Cindy D. McClary, the undersigned

7    authority, certify that BILL NEWLAND personally

8    appeared before me and was duly sworn.

9           WITNESS my hand and official seal this 25th

10   day of June, 2009.

11

12

                     _____
13                   CINDY D. McCLARY, RPR, CRR
                     Notary Public - State of Florida
14                   My Commission No. DD617209
                     My Commission expires:  1/10/2011
15

16

17

18

19

20

21

22

23

24

25

**FREEDOM COURT REPORTING**

Page 282

1                    C E R T I F I C A T E

2

3    STATE OF FLORIDA          )

4    COUNTY OF DUVAL           )

5            I, Cindy D. McClary, Registered Professional

6    Reporter, certify that I was authorized to and did

7    stenographically report the videotaped deposition of

8    BILL NEWLAND; and that pages 1 through 280, inclusive,

9    are a true record of my stenographic notes.

10           I further certify that I am not a relative

11   or employee or attorney or counsel of any of the

12   parties, nor am I a relative or employee of any of the

13   parties' attorneys or counsel connected with the

14   action, nor am I financially interested in the action.

15           Dated this 25th day of June, 2009.

16

17

18           _____

             CINDY D. McCLARY, RPR, CRR

19

20

21

22

23

24

25

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 284 of 326
FREEDOM COURT REPORTING

Page 283

**A**

**ab** 266:4
**abilities** 74:7
**ability** 35:20,21
  35:24 68:5
  94:25 96:20
  99:21 100:1
  148:25 174:18
  176:15 217:21
  223:21 232:10
  254:19 262:17
  263:3 268:12
**able** 96:18,20
  119:13 121:9
  121:12 122:7
  122:12 133:2
  138:6 171:4
  184:25 189:13
  195:7 196:25
  201:22 214:5,9
  243:9 246:14
  253:4,7 254:14
  254:16
**absolutely** 58:10
  116:10,18
  138:24 153:9
  153:12 173:9
  236:12 270:9
  275:14
**accept** 259:1,11
  259:17,18
  262:25
**acceptable** 31:6
**accepted** 184:11
  262:22
**accepting**
  259:14
**accepts** 181:21
**access** 35:20,22
  36:14,25 37:5
  38:8 39:3 43:4
  43:20 95:4
  122:3 133:15
  133:24 156:19

156:21,25
  189:11 239:24
  240:4 253:7
  254:15,16,18
**accessed** 49:2
  71:22
**accesses** 71:19
**accessible**
  100:15
**accessing** 155:25
**accomplished**
  65:12,15 66:24
**account** 18:9
  19:14 74:14
  157:8 173:11
  174:1 176:7,11
  178:5 196:6,19
  211:12 212:2
  217:16 223:9
  255:11 262:11
  262:24 263:4,8
  263:12,15,18
  265:3,8 267:13
  267:17 268:7
  269:10,18
  270:2,5,11,16
  280:1
**accounts** 19:10
  23:19 52:17
  121:19 174:9
**accuracy** 168:7
  278:15 279:4
**accurate** 192:8
  273:10 276:2
**accurately**
  204:16
**accusation**
  228:20
**acknowledging**
  161:3
**acquaintances**
  29:17
**acquisition**
  33:15
**acronym** 18:4

249:14
**acting** 45:9
  271:8,10
**action** 1:2 5:16
  5:19,23 6:18
  66:1 78:25
  132:16 139:9
  141:16 166:21
  167:2 282:14
  282:14
**actions** 66:10
  68:3 141:16
  169:14 189:21
  269:8 271:21
**active** 41:16
  61:17,23
  186:18
**activities** 64:6
  156:6 267:23
**activity** 33:12,13
  41:12,17 42:2
  42:9 180:12
  253:19
**actual** 117:16
  136:15 146:1
  162:8 199:15
  207:14 235:10
  278:9 279:9,19
**Adams** 2:8
**add** 52:17,18,21
  265:6,7 267:24
**added** 138:22
  144:12 218:6
  245:2
**addendum**
  199:16,17
**addition** 153:21
**Additionally**
  180:23
**address** 28:14
  173:16,20,21
**addressed**
  222:25 223:1
**addresses**
  273:18

**adjust** 136:1
**administrative**
  143:17,18
  151:1 155:15
  155:22,24
  156:5 212:7,11
  212:16
**admissible** 55:9
  104:6,7 114:7
  114:13
**advance** 14:15
  25:17 174:8
  243:16,23
  253:11
**advanced** 25:15
  25:19
**advancements**
  14:17
**advances** 122:7
  243:22 244:4
**adversarial**
  111:18
**Advertiser**
  261:20
**advices** 122:11
  208:2
**advise** 184:14
**advised** 257:21
**affect** 223:21
**affidavit** 75:24
  76:14 139:22
  140:7,16 141:1
  150:9 156:10
  157:2 231:13
**affidavits** 7:6
  17:17
**affiliate** 47:19
**affiliated** 219:23
**affiliates** 34:24
**afield** 56:12
  57:19
**agencies** 272:18
**agency** 18:7
  272:22
**ago** 229:4 245:20

253:16 255:20
**agree** 29:23
  111:12 115:15
  115:17 116:2
  120:17 138:1
  138:14 160:20
  180:8,19 181:4
  181:11 191:23
  215:9 251:8
**agreed** 115:25
  206:4 207:14
  215:13 279:10
  279:19,21
**agreeing** 115:18
**agreement** 8:16
  94:1 95:8,12
  96:22 113:19
  116:16,17
  120:4,20
  123:10 129:11
  130:14,19
  131:10,13,15
  131:17,17,20
  132:1,6 137:17
  137:20 144:15
  146:1,22
  147:23,25
  151:20 154:9
  179:19,20,24
  180:6 181:23
  181:25 182:2,7
  182:12,14,17
  182:25 191:16
  206:7 207:7
  215:15 216:12
  217:12 236:10
  263:24 264:1,5
  264:7,8,13,18
  264:23 271:5,7
  271:14,17
  279:18
**agreements**
  130:20 131:23
  132:13,14
  136:16,21

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 285 of 326
FREEDOM COURT REPORTING

Page 284

137:6,10
146:16 149:13
206:15
**ahead** 31:3
43:18 56:15
59:5 61:20
97:18 98:14
121:3 168:16
184:6 226:11
**ain't** 60:23
**Air** 20:12,14
**al** 2:4,9 5:5
189:6
**Alabama** 1:1 5:6
29:15,18,21
30:8 44:25
45:7 55:4
57:20,24 95:23
104:2 109:1
110:7 112:6
140:1 148:9
169:20 172:9
172:25 215:6,9
215:11 216:22
266:4
**alarm** 194:12
**allegation** 78:10
108:13,16
114:22 168:10
168:12,14
**allegations** 7:11
53:11,15 78:16
139:15 152:5
272:23
**allege** 262:7,20
271:6,21
**allegedly** 266:3
**allonge** 199:24
199:25 200:6,7
**allonges** 200:2
200:14,22
**allow** 109:1,24
120:1,11
**allowed** 93:21
**allowing** 56:9

80:15
**allows** 206:17,22
**Alpharetta** 28:8
**alter** 36:13
232:13
**altered** 101:3
232:4
**amended** 232:4
**America** 54:19
**American** 217:5
217:12 219:21
219:22 220:1
222:17 249:7
**amount** 94:18
143:24 144:2,4
144:12 148:21
152:17 153:7
154:4,20
164:14 178:3,9
214:7 215:10
258:11,13
265:14 269:22
270:12,13
271:24
**amounts** 21:24
153:19 156:25
269:11
**Anderson** 90:23
91:21
**ands** 136:20
**and/or** 68:7
100:24 152:21
171:20 206:17
206:23 207:9
212:10 231:6
**Ann** 166:7 167:1
183:23,25
186:16 195:24
196:8 197:5
**announcement**
229:12
**answer** 36:2
40:7 47:6 49:8
49:8 52:20
54:22 55:16

56:8,9,25 57:5
57:14,20 58:23
59:23 63:25
64:5 74:3
75:17 80:19
86:9,11 89:18
98:9,14 99:2
103:16,17,20
106:13 107:4
107:18 108:7
108:21 109:14
109:24 110:6
110:24 112:2
113:6,20,23
115:9,16,22
116:10,12,14
120:2,9,11,21
121:22,24
130:2,3,22,25
134:1 136:20
146:19 149:3
164:2,6 168:16
181:1 192:3
207:6 208:15
212:8 235:25
236:18
**answerable**
62:12 63:20
**answered**
115:19 257:10
**answering** 7:5
46:13 103:12
207:2 236:4
256:8
**answers** 64:10
87:19 88:3,6
111:22 113:15
205:14
**anybody** 45:23
71:25 121:16
135:19
**anybody's** 199:2
**anymore** 108:22
**anyway** 9:1
229:5

**apart** 68:25
**apologize** 11:24
69:15 113:12
116:8 199:1
238:24
**apparently**
162:20 184:11
187:7 197:20
213:23 225:14
225:15 250:15
275:21 276:14
278:5
**appear** 32:20
194:1 197:4,14
197:17 198:6
199:11 200:2
200:13,20
226:10 236:24
237:3 242:11
243:10 244:3
246:13 273:23
274:4 276:22
277:8
**APPEARANC...**
2:2,6,12
**appeared** 44:23
281:8
**appears** 20:22
160:23 161:8
166:25 187:3
195:12 197:14
225:23 235:19
244:14 254:4
255:6,10 274:9
276:7 278:17
**application**
187:13
**applied** 176:12
263:6 270:5
**apply** 182:24
259:20 260:3,3
262:23 263:3
269:10
**applying** 270:1
**appreciate** 84:23

256:7
**apprenticeshi...**
25:7
**approach** 13:20
**appropriate**
13:4 94:18
262:24
**approval** 175:15
177:21,25
178:3 179:8
215:20
**approve** 171:5
**approximately**
7:17,20 10:7
11:3,15 12:5
13:25 16:8
19:18 20:21,23
20:24 21:1
24:12 26:11
27:4 33:1
54:17 67:6
95:23 193:25
217:9 241:5
255:23 273:14
**APR** 66:5 167:4
167:6,8,20,24
168:3,8,12,22
169:3,4,7,9,10
170:2,19
171:22 172:2,8
172:17 233:23
234:4,14,24
274:12,14
275:3,7 276:5
278:21
**April** 257:2
261:4
**archival** 232:14
**archive** 31:23
**archived** 41:11
**area** 8:3 10:9
11:9 26:17
41:7,23 50:10
52:10 99:3
135:15 178:22

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 286 of 326
FREEDOM COURT REPORTING

Page 285

221:17
areas 45:24
  140:7 171:19
  180:25
arrive 144:3
  239:7
article 204:20
  205:2 233:17
  235:4
article's 235:8
Arvind 202:2
ASAP 184:3
ascertain 69:11
  133:2 146:1
  222:18
Ashley 2:19 5:11
asked 39:23 44:1
  47:20 62:2
  78:9 80:4
  81:11 85:16
  97:9 98:18,19
  102:9 105:14
  126:6 135:14
  166:19 167:1
  206:14 234:25
asking 33:9
  34:15 41:22
  46:11 51:21
  55:19 60:9
  89:10 115:13
  118:16 121:24
  130:12,13
  131:15 132:5
  132:12 174:3
  178:17 180:24
  254:23,24
aspect 67:12
asserted 258:19
assess 217:16,21
  258:21 259:22
  259:24 265:24
  279:25
assessed 83:21
  253:25
assessment

123:21 248:8
assessments
  145:17
asset 8:5 125:14
  125:16,18
  126:4,8
assets 8:3 62:23
  62:25 63:14
assigned 71:23
  80:13 151:2
  241:20
assignment
  75:19 76:15
  77:2,8,9,17,19
  78:4 80:15
  172:3,3 188:23
  189:1 190:6,25
  191:23 192:1
  193:2 195:8
  200:1 219:1,9
  229:25 231:13
  246:4
assignments
  77:21 78:2,11
  188:22 192:7
  192:12,13
  203:10,12
assist 8:8 103:3
assistance 12:24
  248:22 249:5,6
assistant 8:13
  9:22,25 11:7
  11:10 25:21
  26:7,10,12
  28:17 65:2
associate 102:1
  196:10
associated 30:21
  30:22 37:1
  73:6 74:13,21
  75:10,14 83:5
  83:7 104:25
  110:20 115:20
  190:9 244:7
  245:22 255:11

associates
  101:25 102:2,5
  196:13 231:6
  254:18
Associate's 28:1
association
  218:19
assume 22:16
  27:20 37:4
  67:10 178:14
  178:16,18
  223:1 245:23
assumed 169:2
  190:2
assuming 14:20
  22:16 24:1
  26:1,13 37:24
  39:17,22 50:19
  64:9,15 170:10
  172:13 194:24
  206:19 214:14
  245:9
Atlanta 20:8,10
  23:11,11
Atlanta's 20:9
attached 199:23
  200:7,15,16
  203:11,12
  251:9,10,12
attachments
  199:14
attempt 121:13
  265:21
attempting
  12:25
attention 60:2
  166:2
attorney 8:2
  30:17 65:2,5,7
  65:22 66:4,4
  66:13,24 69:20
  70:16,21,25
  71:3,24,25
  75:18,22,24
  76:2 77:11

78:5,19 79:5,9
  79:16 83:8,20
  83:22,25 84:2
  84:21 90:20
  92:2,9 93:14
  93:18,20,23
  94:3 95:3,11
  96:11,18,21,21
  97:1,2 129:24
  130:15 144:13
  146:6 147:10
  147:13,24
  148:3,8,9
  149:1,9,9
  151:1,2,11,15
  151:18 152:21
  153:23 162:15
  163:10 164:13
  167:7,8 169:3
  169:8 170:2
  171:13,23,25
  174:19 184:2,8
  184:16,18,24
  185:1,2,5,15
  186:3 191:9,11
  192:4 206:2
  209:4,8,10
  212:13 215:18
  216:1,6,9
  219:7 223:4,13
  223:14 231:8
  231:10,12
  235:14 244:25
  282:11
attorneys 54:1,6
  54:10 65:11,24
  66:9 67:20
  68:3,5 71:16
  71:18 73:11
  92:18 93:16,22
  94:3,8 95:2,6,7
  95:13,14 96:16
  140:1 147:6,18
  147:20,25
  148:20,24

155:16 167:5
  167:12,13,25
  168:9 169:1,12
  170:12,17
  172:9,9,20,24
  174:14 185:10
  191:19 202:17
  215:9 216:24
  223:6 231:2
  248:8 250:3
  277:14,22
  282:13
attorney's
  110:23 153:19
  154:14 168:25
  215:5,10
attorney-client
  129:14,21
Auburn 2:4
August 12:14
  18:22 187:1
  193:14 194:8
  194:21 195:13
  195:23 196:17
  236:24 237:3
  245:18 246:6
  261:17
authentic 256:23
authority 103:23
  129:21 176:10
  262:17 265:24
  269:18,20
  270:8 281:7
authorization
  163:11
authorized
  282:6
authorizes 207:8
auto 158:9,11,12
  159:21
automated
  158:18,20
  161:2 162:21
  163:1 197:2
  201:6 202:7

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 287 of 326
FREEDOM COURT REPORTING

Page 286

**automatically** 159:21 160:7
**AutoProc** 159:6
**available** 30:14 33:4,7 39:10 49:2,14 83:9 88:12,13 92:2 95:14 122:3 159:23 176:5 196:23 240:22 266:14
**Avenue** 1:20 2:8
**AVM** 245:11
**award** 173:6
**awards** 233:23 234:7 278:10
**aware** 17:15 45:21 52:5 61:10,23 93:25 95:5 100:14 101:16 122:16 131:18,23 132:2,17 133:10 228:23 230:5,7 239:18 239:22
**a.m** 1:19 5:7 158:18 192:23 193:22 194:6,7 194:9 195:17 197:7,13 202:6

**B**

**B** 263:10
**bachelor's** 27:22
**back** 14:5,6 20:6 22:15 30:21 37:13 47:16 50:7 53:17 57:16 68:12,24 70:3 77:10 86:14 97:16 99:16 102:3,10 102:10 117:13 118:4 119:24

128:12 131:7 140:10,22 150:5 152:21 163:7 165:20 165:22 175:24 178:13 179:2 187:25 193:15 194:18 198:15 198:22 200:8 201:22 209:4 210:22,24 211:6 214:18 221:16,25 225:9 231:7 233:18 238:11 248:11 251:16 256:4,9 276:9
**backup** 100:6
**bad** 191:25
**balance** 115:16 173:16,19 174:8 175:16 176:1 177:17 177:23 178:5 178:10,15,19 178:24 179:6 196:3
**balances** 23:18
**Bank** 1:8 12:9 16:18,20,25 17:5,13,17,20 17:22 18:25
**bankrupt** 98:15
**bankruptcies** 54:2 144:25
**bankruptcy** 1:9 5:19 8:18 11:12 28:18,22 29:1,12 33:25 40:6 48:1,8,19 61:8,12,13 65:25 78:5 81:5 85:10,13 89:4 92:15 98:6,10,11,15

99:3,4 102:3 136:22 141:10 177:4,11 203:24 226:21 226:22 228:4 234:8 250:25 257:13 260:17 260:25 275:7 276:5
**barely** 218:13
**bargain** 147:4
**Barnes** 86:11,24 87:18 89:12 90:11 273:20
**base** 20:12,14
**baseball** 27:16
**based** 20:22 41:19 44:16 53:11,13 55:24 70:9 79:6,17 79:20 94:25 101:22 103:25 114:15 124:12 124:21 144:6,9 145:16 151:10 151:13,14 156:15 160:11 169:9,11,13 170:6 177:20 179:4 183:25 188:12,13 201:8 206:19 215:23 239:13 242:25
**basically** 8:7 15:10 21:12 25:5 37:21 51:19 65:5,9 65:10,23 68:1 71:14 77:9 92:12,17 96:22 103:3 108:10 123:20,21 124:4,6 143:20 144:18 147:13

148:23 158:9 159:5,7,22 163:4,8 164:20 168:5 171:3,7 174:15,23,24 177:20 183:22 184:19 185:6 186:21 189:23 189:25 198:1,2 204:25 223:18 231:2,4 232:10 248:6 250:2 271:6 277:21
**basis** 34:14 62:12 64:13 74:5 112:13 116:3 121:19 124:11 172:8 207:11 217:16
**batch** 173:22,25 174:2,3 218:1 255:6
**Bates** 31:1,4 247:1,20
**Baum's** 225:7
**Beach** 63:18
**bear** 193:17
**bearing** 194:7
**began** 19:18
**beginning** 47:18 50:8 97:17 139:20 140:25 150:6 158:1 170:15 173:11 188:1 222:1 256:5
**begins** 5:1 92:17 164:9
**behalf** 1:15 45:9 46:2,2 133:19 155:6 179:14 180:4 201:1
**belief** 195:16 261:21
**believe** 18:1,5

26:5 28:15 45:8 51:16 63:1 73:25 88:14 89:17 90:8 91:14 99:4 122:13,17 123:5 126:7 144:5 164:21 169:22 179:2 186:24 188:18 188:21 212:8 214:16 220:8 224:12 238:1 243:2 246:23 247:18 253:15 278:24
**belong** 251:10 251:12 252:20
**belongs** 165:9,15 165:17
**beneficiary** 264:18
**benefit** 147:3,8 148:6
**benefits** 147:12
**best** 21:3 119:2 159:3
**bet** 111:1,1
**better** 25:13 167:21 169:4,6 181:7
**beyond** 41:23 49:7 104:17 167:16 180:25
**bid** 164:20,22 175:15 177:20 178:1,3,6
**bidding** 197:1,10 197:16,22 198:3,4 250:2 250:4 251:15
**big** 20:9 121:1 129:19 229:8 276:13
**bigger** 138:25

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 288 of 326
FREEDOM COURT REPORTING

Page 287

**bill** 1:14 3:2 5:2
6:1 83:9 84:1
208:3 251:22
281:7 282:8
**billable** 234:9,10
**billed** 85:5,6
144:13 154:4
**billing** 85:4
135:22 244:18
**bills** 52:14 84:2
208:1
**Birmingham** 2:9
45:7 70:1 93:3
**bit** 37:13 134:16
140:24 181:6
212:11 233:22
**Block** 200:4
246:5
**blood** 29:15
**board** 103:20
**boarding** 33:15
**bogus** 266:11,22
268:22 269:2
**Bomar** 23:2,4,10
23:14,17,21
24:7
**bonuses** 172:20
**Book** 221:8
**borrower** 137:9
153:6 185:5,16
213:17 248:22
249:6 267:16
**borrowers** 12:24
13:16
**borrower's**
137:1,3,5
249:5
**boss** 88:7,21
89:10,12 90:4
**bottom** 166:24
246:12,15
**bought** 23:21
**Box** 2:3
**BPO** 245:11,13
**branch** 22:20

24:25 26:9,10
26:15 27:2
**Brandi** 166:4,10
166:25
**breach** 270:20
271:4,17
**break** 43:19
97:20 116:21
150:4 151:6
194:13 210:20
221:21 255:8
255:25
**breaks** 97:25
**Brief** 89:25
97:15 142:20
145:4 162:17
194:11 198:14
198:18 201:18
211:16 221:24
256:3
**bringing** 225:21
254:12
**broad** 44:11
**broader** 9:14
**broadly** 130:6,8
**broken** 91:16
**broker** 123:4,6
123:12,19,20
124:1,9 125:6
125:10 126:5
126:11,19,22
127:7,12,20
217:17 242:12
**brother** 60:8
233:6
**brought** 25:14
75:12 121:10
166:1 190:16
231:21 245:20
245:21
**bucks** 21:16
**building** 28:13
40:20 43:3,6
**buildings** 43:10
**bunch** 210:6

213:5
**burden** 114:6
**burdens** 114:10
**bureau** 153:11
**burned** 165:2,4
184:13 257:18
**business** 18:12
21:2,10 22:7
22:17 26:21
29:1 81:5
107:16 114:16
138:19 146:7
152:13 168:23
192:6,10
208:11,14
219:12 240:22
**businesses**
241:14
**business's** 61:13
**button** 37:2
42:10,23
**buyer** 209:8
**bypassed** 219:7
**bytes** 193:23
194:9,22 195:5
**B-O-M-A-R**
23:4

———————
**C**
**C** 263:14 282:1,1
**California** 148:8
**call** 19:13 56:13
56:15,18 81:25
93:3 97:21
174:4 194:12
194:14 198:11
207:22
**called** 17:24 23:2
68:6 71:8
98:22 99:8
117:2,5,9
134:5 165:9
180:6 188:14
197:22 229:17
248:21 253:19

264:7
**calling** 21:19
**calls** 80:17 153:6
180:14 192:2
**capabilities**
73:23 99:14
**capable** 94:9,12
204:18
**capacities** 73:23
74:6 204:16
240:6
**capacity** 25:10
25:12,15 99:25
**caps** 137:1,2
**caption** 204:24
**capture** 174:19
**Carbiener** 89:24
90:1,10
**Cardenas**
235:15
**cards** 23:20
**care** 106:4,7
109:21,25
113:3 138:16
213:12
**career** 81:2
**carries** 164:11
**case** 5:5 6:16 7:2
7:5 33:24 48:3
48:4,5 54:24
55:22 70:1,11
70:16 78:11
79:25 80:3
89:3 97:21
98:11 103:19
103:21 104:18
104:25 105:6,6
106:3,14,17,25
107:1,5,8
108:2,12,12,19
108:22 109:20
111:7,11 114:4
114:18 118:12
120:5,6,13,22
121:1 129:2

131:12 139:23
141:5 150:15
152:22 157:13
158:8 164:19
168:11 169:23
173:15 174:9
175:21 176:18
192:12 199:15
206:16 210:16
210:21 215:19
216:9,12
218:17 222:8
224:3,10
225:13,16,17
226:21 227:1,2
227:6,9 232:25
233:9,12
234:21 236:1,7
236:19 237:14
257:10 263:12
269:4 270:15
270:24 271:2,8
272:2,6,21
279:2
**cases** 106:20,22
106:23 108:2,6
109:23 141:10
153:23 220:4,5
224:16
**Cash** 2:13 3:5
5:17,17 8:15
8:23 30:16,16
31:2,12 33:22
34:2,6,8,11,17
34:18,21,23
35:4,10 40:4
43:23 44:9,22
45:1,5,8,12,17
45:25 46:5,9
46:11,13,20,23
47:9,23 49:6
52:19 53:9,16
53:20 54:21,25
55:1,5,13,17
56:5,11,20

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 289 of 326
FREEDOM COURT REPORTING

Page 288

57:2,13,17
58:1,5,10,14
58:17,21,24
59:9,14,18,24
60:2,7,15,17
60:19,24 61:20
68:10,14,18,21
69:6 73:2 78:9
78:14 80:17
82:24 84:16
87:22,25 88:25
90:2 97:23
98:2,8,14
103:9,17 104:1
104:11,13,16
104:22 105:11
105:21,24
106:2,6,10,13
106:18,22,25
107:4,7,10,21
108:1,4 109:7
109:10,15,18
110:13,22
111:5,8,12,16
111:20,23
112:5,17,20,23
113:4,13,17,24
114:9,20
115:25 116:2
116:11,18
118:2,13 119:8
119:18,25
120:24 121:22
123:3 125:21
130:2,22,24
131:3,24 132:5
135:25 136:19
137:8,21,24
138:6,12,15,18
138:20,24
140:17 164:1,4
167:21 168:2
168:10,16
177:2,6 179:16
180:14,23

181:14 192:2
194:15 198:10
207:1,12,17
210:13,23
211:1,4 213:2
213:16,20
214:1,12,16,23
224:15,23
225:11 226:11
226:19 227:13
227:21 228:3,7
228:12,15
229:1 232:23
233:4,7,10,15
234:15 235:21
235:24 236:3
236:12,16
238:20 239:2
247:15,21
248:11 251:17
256:14,17
260:8,13,21
261:3 273:1
280:13,15,19
280:22
**categories** 30:18
98:19
**category** 90:19
137:11 185:25
245:6
**caught** 116:21
**cause** 176:10
225:13 227:9
268:5
**Center** 101:18
**CEO** 89:24
**certain** 36:15
37:5 66:9,24
91:19 100:1
102:14 146:12
147:11,20
156:21 168:1,1
177:22 220:6
**certainly** 50:4
228:20

**Certificate** 3:7,8
281:2
**certified** 259:11
**certify** 281:7
282:6,10
**chain** 223:7
**chance** 139:18
**chances** 236:5
**change** 48:11,15
50:3 97:11
99:22 100:1
115:4 149:25
187:21 203:25
221:20,22
232:12 254:19
255:21 262:4
274:18,20,23
275:1
**changed** 14:2
100:16,16,17
232:4,15
**changes** 31:24
33:20 35:25
36:13,15,19
100:5,12,24
217:25
**channel** 91:19
**character**
271:24
**charge** 22:19
36:3,6 52:23
53:4,7 54:6
81:4 83:17
88:4 89:20
92:9 142:19
154:5,10,17,19
155:25 208:18
215:9,10
217:17 223:9
235:13 238:4
262:13 267:15
267:16 268:17
**charged** 23:20
137:3,5,9
142:13,17

155:15 213:11
213:21,24
263:6
**charges** 52:17
142:9 151:1,11
151:20 153:22
218:2,3,5
262:8,18 265:2
265:6,7,25
267:12 268:7
270:10,15
271:23 272:2
**charging** 213:13
214:10
**Charles** 62:19
64:20,21
**check** 84:22
118:3 184:11
184:12 208:3
223:10,15
258:11,13
259:4,8,9,10
259:10,11
**checked** 175:24
**checks** 258:10
258:16 259:2,4
259:4,12,14
**cheese** 86:7
**choice** 96:13
115:23 127:24
**choose** 93:23
94:7 95:10,18
96:7,15,16,17
147:13 148:25
149:1
**chooses** 96:21
112:10
**chose** 93:18
**chosen** 96:1
**Chris** 129:18
**Christine** 90:23
**chronological**
157:24
**Chuck** 90:23
**churning** 267:12

**Cindy** 1:22
281:6,13 282:5
282:18
**CIRCUIT** 1:1
**circumstance**
13:4
**circumstances**
152:3
**citizens** 111:10
**city** 20:9
**CIVIL** 1:2
**claim** 53:13
70:11 165:3
166:21 167:2
175:21 177:19
268:12 270:21
**claimed** 268:8
**claiming** 266:13
**clarified** 261:1
**clarify** 44:23
64:7 66:6 72:7
98:12 123:18
135:5 137:16
137:23 215:7
260:10
**clarity** 125:21
260:20
**clause** 206:21
**Clay** 88:8,21
89:10,15,18
90:11
**Clay's** 88:9
**clear** 8:15 9:19
40:9 46:19,24
56:2 57:3
104:15 107:19
107:21,22
109:16,18
112:14,18,18
112:20 113:7,8
113:25 119:25
120:8 125:23
127:3 132:3
210:19 214:3
238:20 260:14

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 290 of 326
FREEDOM COURT REPORTING

Page 289

**clearance** 39:7
**clearly** 179:21
**clerk** 228:4
**client** 35:15,19
36:12 44:5,15
45:10 55:16
56:25 57:2,4
58:23 60:14
62:3 63:3
70:13 77:24
78:20 79:6,18
79:21,23 83:11
92:22,23 93:7
96:19,19,23
103:4 105:15
107:13,18
109:13 114:16
114:22 115:8
115:16 117:24
124:12,14,17
124:21 125:4
128:19 144:20
144:22 148:13
149:11 152:22
159:18,21
160:11,11,13
161:25 165:15
171:15,18
175:15 177:21
177:24,25
178:2,6,23,25
179:3,6,7,10
184:24 187:16
200:11 217:23
218:2,16
241:20
**clients** 40:15
50:25 51:12
52:3,23 53:1
62:9 65:10
66:18,19 68:8
71:20 73:12
79:10 82:14,15
84:22 95:10,17
96:7,7,12

99:23 105:14
125:4 127:10
128:4 139:10
145:17 148:25
149:20,21
152:12 171:14
199:12 206:4
215:13 217:15
218:5,9 231:6
**client's** 36:16
42:1,16 46:2
47:8 49:1,5
70:1 107:15
119:2 134:21
153:1 237:1
263:22 267:12
**Clip** 252:17
**closed** 265:2
**coach** 115:6
**code** 44:7 50:16
237:16 241:20
248:19,23
**codefendants**
129:23 132:11
**codes** 44:7 50:16
189:4,21
**coding** 242:18
**coincide** 244:16
**collect** 15:11
19:10,14
**collecting** 23:16
153:7
**collection** 15:8
18:7,13,17
23:8 81:1
152:24 206:17
206:22 207:9
**collections** 13:13
13:14,16 14:6
14:10 15:2,5
15:14,19 16:1
16:4,5,7 19:9
21:11,13 29:25
**collector** 23:15
24:2

**collectors** 19:13
**collects** 155:13
**college** 22:23
24:16,21 27:10
27:11,12 28:4
**column** 193:16
**come** 10:23
21:20 53:17
59:10 69:23
70:3 77:10
92:20 108:9
110:8,8 140:10
143:14 145:1
174:12 178:13
180:21 215:15
226:20 238:17
243:10 248:3
258:16 274:16
278:13
**comes** 92:22
149:17 171:2
215:22 242:9
252:3
**coming** 9:18
21:15 30:11
39:18 109:9
139:11 183:5
205:16
**commensurate**
37:6
**comment** 156:15
187:6
**comments**
175:20
**Commercial**
20:5,16,17
21:2 22:14,25
24:4
**Commission**
281:14,14
**commitment**
163:12
**commonly** 18:3
125:15 188:14
249:18

**communicate**
70:25 71:2
146:5
**communicating**
186:2
**communication**
65:23 129:14
129:16 196:8
241:24
**communicatio...**
44:3 50:13
65:11 71:16
98:23 141:8
185:9
**companies** 125:5
125:9,13
126:21 128:5
133:6 220:2,3
260:12
**company** 9:14
17:24 18:1
23:2,8 34:10
34:25 40:18,20
49:4 51:7
52:16 66:5
81:4 83:17
87:10,11 98:5
99:15 108:10
117:25 120:16
123:16 147:4
160:4,7,21
161:3,9 162:9
163:1 165:20
166:8 168:23
172:19 176:17
182:9 185:12
186:3,8 188:17
191:16 196:4
196:23 204:7
213:19,22
214:13 219:22
225:24 226:9
229:14,16,17
229:18 230:18
238:4 242:10

243:19 248:21
249:4 273:25
274:19,21
279:21,25
**company's**
61:18 165:23
280:3
**compared**
169:12
**compensation**
155:4,9,10,11
156:4
**competitor**
220:2
**competitors**
138:4
**complaint** 54:24
55:24 57:7
58:7 139:8,11
139:15 142:8
257:15 260:15
279:8
**complete** 27:24
66:9 121:23
130:19 169:14
169:25 170:14
170:23 171:4
171:15 172:3,4
190:6 192:18
278:12
**completed** 68:2
164:13,18
190:6 193:2
**completely**
111:12 112:1
114:4
**completing**
170:3
**completion**
162:16,18
169:10,17
171:7
**completions**
100:25
**compliance** 66:3

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 291 of 326
FREEDOM COURT REPORTING

Page 290

compound 43:7
43:10 49:22,25
computer 36:24
concept 138:9
concern 138:25
concerned 138:9
138:21 168:7
concerning
272:18
concise 205:4
concluded
280:25
conclusion 80:18
192:3 274:16
concomitant
78:20
condensing
172:12
conduct 179:14
180:3,9 266:9
267:10,19
268:20
conducted 209:7
210:8
conducting
201:1 215:11
conduit 65:10
conference 61:2
confidential
120:13 179:20
179:23
confidentiality
120:4,10,18
137:20 179:18
179:24
connected
200:17 282:13
Connecticut
61:24
considered
82:13 171:25
172:20 181:12
consists 172:2
202:6
Consolidated

99:9 237:15
239:6 240:17
243:7,8
constitutes
214:6
construction
110:19
consultation
244:24
consumer 21:4,7
21:10,12 23:6
138:23 154:5
154:10 218:6
consumers
19:13,15
consumer's
223:9
contact 157:7
272:5
contacted
152:15 258:3,6
contain 76:5,10
76:16 209:3
225:23
contained 44:4
50:14 99:22
117:23 119:1
133:17 151:20
151:24 178:21
193:5 240:17
250:6 273:15
279:4
contents 98:24
156:15 232:22
continue 69:10
186:20
continued 4:1
259:9,9,21
continuing
115:6,8
contract 85:21
85:25 86:4,5,6
95:15,16 96:2
96:3 129:5,8
129:10,15

132:9 145:20
146:4,14 149:7
151:25 181:20
206:10 207:14
217:2 224:11
225:23 226:7,9
270:19,20
271:2,4,7
279:18
contracted
151:18 160:16
182:10
contractors
241:11,14
contracts 54:1,5
54:9,12 94:6
127:7,11
128:25 129:3
137:13,15
206:15 227:1
279:12,19
280:1,8,18
contractual
128:3 207:7
216:11 217:1
270:22
contractural
94:1
contributing
168:15
control 42:7
67:13,16 111:7
111:10 113:21
114:1 259:5,6
conversation
116:15
conversations
80:7
convince 112:25
113:1,2
convinced 113:3
COO 273:20
cool 82:25
cooperation
256:7

copied 225:9
copies 31:4,5,7
31:18 133:16
134:7 154:2
215:25 227:3
copy 30:6 32:18
132:10 139:8
140:15,22
199:11 202:16
205:20 208:3,3
216:20 217:2
231:14,14
235:11 237:13
275:9
core 92:12
189:25
Cornett 88:8,21
89:10,15,18
90:11
corporate 6:24
17:14 19:5
35:16 79:5,15
112:8 119:13
122:7 174:8
243:15,22,23
244:3 253:11
corporation 1:7
5:5,22 9:8
24:10 148:8
217:5
Corporations
83:1
correct 7:7,12
9:4,8 12:3,7
13:5,9,18
16:15 18:10
19:15,16 24:3
24:6 25:9
28:18 30:1
32:3,6,7 35:21
35:23 37:6
40:19,22,24
41:4,8,13
42:11 45:4,5,8
45:16,17 50:20

50:21 66:10,11
66:13,14 67:3
67:4,14,18
68:18 70:7,18
70:22 72:2
74:21,22 78:23
79:1,11,19
80:5,12,16
81:3,7 83:6
85:20 86:19,22
90:12,16 91:4
92:14 93:12,19
94:11,14 95:9
99:10,11 117:3
126:10 127:5
129:6,9 135:8
136:6 137:7
139:15,24
141:13,19,24
142:3,6 143:2
143:12 145:14
147:2,22
150:22,24
151:22 152:14
153:17 154:7
156:14,20,22
157:6,9,17,18
157:22,24,25
158:14,21,25
159:1 161:1,6
161:10,13
163:3 165:18
165:20,21
166:6,9 167:3
169:17 170:1,4
170:5,8 172:7
175:18,22
176:3,13,15,19
176:23 177:1
177:11,12
178:8 182:5
183:13 185:13
186:9 187:9,19
190:7,18
191:24,24

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 292 of 326
FREEDOM COURT REPORTING

Page 291

192:8,14,21,24
192:25 193:2
195:1,14,21,22
196:24 197:8
200:21 201:2,3
202:9 203:5,6
204:19 206:6,9
212:3,6,15
215:16 216:17
216:23 219:24
219:25 220:6
221:9 222:10
222:16,17
223:23 226:1,5
231:23 232:1
234:1 238:8,16
240:9 242:2
245:3,15 251:2
252:14 253:3
253:12 255:13
257:8 258:1,2
270:13 273:13
273:17,21
274:4,6,10,15
274:25 275:14
275:18 276:15
276:18,23
277:4,8 278:3
278:11
**corrected**
222:19
**correlate** 194:2
197:4,14,17
198:6
**correlates**
197:25 198:2
**correlation**
193:17 238:25
**correspondence**
8:8 44:2 50:12
133:17 184:3
184:17 185:1,3
**corresponding**
202:4
**cost** 110:9

171:16,17,20
265:14 267:24
**costs** 110:7,20
115:20 148:11
171:6,8,12,14
171:15,20
172:5 218:9,18
245:1
**could've** 96:1
191:8 219:6
235:6 247:10
247:10 278:19
**counsel** 4:19
5:12 30:24
44:24 45:3
48:25 109:2
227:16 254:6
282:11,13
**Count** 269:7
271:4,5
**country** 91:9,12
112:10 167:17
**county** 1:1 5:6
26:5 29:15,18
29:20 30:8
44:24 57:24
59:10 111:10
148:10 216:22
230:2 261:18
281:5 282:4
**couple** 22:15
140:4 278:4
**coupled** 278:1
**course** 252:23
**court** 1:1 5:5,12
5:14 30:7
37:13 46:3
56:10,14,15,18
56:21 57:14,16
58:20 59:3
65:9 69:15
104:22 109:4
110:3,9,18,22
113:25 115:9
115:18 120:8

168:8,21
203:18 225:7
226:22 227:7
233:1 252:16
261:19 275:23
**covenants**
146:16
**cover** 203:2
249:22 250:8
250:10,16
252:5,6
**coverages**
266:13 267:6
**co-counsel**
179:11 193:4
237:14
**create** 70:4
115:11 216:5,7
232:15 263:16
265:15,21,25
266:11,22
267:11
**created** 76:6,11
**creative** 82:24
**credit** 17:25 20:5
20:16,17 21:3
22:14,25 23:2
23:20 24:4,7
153:11 272:17
272:18,22
**crop** 164:24
**Cross** 3:5 256:16
**CRR** 1:22
281:13 282:18
**cumulative** 69:2
157:12
**cumulatively**
68:23
**cure** 264:19
**curing** 264:10
**current** 13:16
**currently** 5:20
7:21 36:24
159:8
**customer** 52:17

152:20,21
153:3 267:15
**customers** 52:14
142:19,21
152:10
**customer's**
173:21
**Customer/atto...**
273:22
**cut** 25:16
**cycle** 213:12
**C-A-R-B-I-N-...**
90:8
**C-E-R-B-I-N-...**
90:7

**D**

**D** 1:22 263:23
281:6,13 282:5
282:18
**daily** 64:12 74:5
**damage** 261:7
**dance** 214:25
**dash** 188:20
194:24 195:4
**data** 31:23,24
33:19 35:25
36:12,13,14,19
37:5 44:8
50:17 52:2
62:8 76:9 77:4
79:20,22
100:16 101:2,9
133:17 136:22
136:23 141:8
159:14 164:14
169:11 170:6
210:7 215:22
217:25 218:1,4
218:8,16 277:5
**database** 101:17
153:15
**date** 1:18 11:24
11:25 15:25
19:20 77:14

162:15 170:25
171:21 173:17
173:21 175:20
197:6,16
201:23 220:14
220:22 221:2
234:10 235:7
242:15 243:23
244:9 250:12
252:24 255:22
261:20 275:13
275:18 278:16
**dated** 39:14
183:7 200:22
200:23 221:6
244:14 245:18
246:5 248:17
252:24 257:4
282:15
**dates** 244:16
**David** 1:3 5:3
75:3
**day** 39:14 87:19
160:23 176:7
236:5 260:9
281:10 282:15
**days** 10:25 12:6
15:12 45:14,19
124:18 169:13
169:22 239:11
**day-to-day** 36:6
36:8 62:12
64:6 86:20
121:19
**DDCH** 133:13
134:11
**DD617209**
281:14
**deal** 97:21 105:3
108:22 115:24
191:18 229:8
**dealing** 143:8
277:1 278:5
**deals** 71:15 98:5
121:18 126:9

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 293 of 326
FREEDOM COURT REPORTING

Page 292

208:11,13
**debt** 18:6,13
80:23
**debtor** 184:8,10
**Decatur** 26:6,17
**decent** 134:22
**decide** 258:21
263:20
**deciding** 270:4
**decision** 9:16
70:20 93:7
105:9 128:20
142:4 147:14
258:24 260:2
261:12,24,24
261:25 262:2
269:21 270:7
280:4
**decisions** 207:3
238:22 262:4
**declared** 13:17
268:6
**declined** 57:9
**deduct** 196:1
**deed** 81:16,16,17
216:18,20,21
217:3 261:23
**deep** 37:12
**defamation**
272:15
**defamatory**
272:16
**default** 13:17,21
48:13,22 54:13
54:16 85:14
86:13,13,25
87:2,10,24
89:2,2,7,13
95:13 96:3
102:20 118:15
118:24 124:25
125:22 126:1
127:6,10,18,19
127:21 128:3
129:1,4,7,11

131:12,12,14
131:16 132:10
133:23,25
134:12 141:7
141:12,17
142:1,12,14,18
142:24 143:15
145:21 146:4
146:14,15,24
147:1,8 148:9
149:7 150:14
150:14,18,23
150:25 151:17
151:19,24
152:6,16,17,23
153:4 154:3,8
154:11,19,22
155:1,5,13,18
156:5,7,11
157:3,21
158:19 164:17
171:24 175:11
176:9,23 177:4
177:9 182:1,8
188:11 204:6
204:11 207:8
209:4,13,15
218:10 219:23
229:19 230:9
238:7 239:21
242:18 244:23
251:3 260:11
260:18 263:16
263:16 264:19
265:16,22,25
268:6,22
277:11
**defaults** 264:10
266:11,22
267:11
**defect** 222:15
**defendant** 2:6,12
5:19,23 6:18
8:17 33:24
34:6,24 35:16

47:25 48:2
89:3 112:9
118:25 206:16
213:21 260:24
262:22 267:21
269:4,13
270:15 272:21
**defendants** 1:10
129:2,4 132:15
136:24 192:11
207:8 261:4,16
262:7 263:6,14
263:15,23
264:9,19 265:1
265:12 266:2,8
266:10 267:9
267:13,19
268:9,21 269:8
269:9,25
270:10,18
271:7,21,22
272:8,15,17
**defendant's**
118:25
**defense** 109:2
**define** 89:5
**defined** 15:9
47:18 118:24
**defines** 131:21
**defining** 40:5
47:21,23
**definition** 30:20
40:7 44:12,14
44:15 62:24
**definitional** 44:7
50:16
**degree** 27:22,24
28:2
**degrees** 28:4
**DeKalb** 1:1 5:6
26:5 29:15,18
29:20 30:8
44:24 57:24
59:10 111:10
148:10 216:22

261:18,19
**delineate** 212:16
**delineated** 41:11
42:1 50:10
**delinquencies**
15:11
**delinquency**
12:25
**delinquent** 18:9
21:18 182:4
**delivered** 52:14
231:24
**delivery** 169:16
232:4
**demand** 277:6
**Dennis** 273:25
**department** 8:4
8:6 12:19 15:2
15:3,5,6,8
38:14,15,16,18
61:11 84:5,11
91:23 98:20,21
102:3 188:19
276:18
**departments**
87:1,3
**depending**
123:15 148:21
171:21
**depends** 79:4,4
125:4 171:18
**deposed** 6:13,14
16:17 46:6,14
**deposited** 259:8
**deposition** 1:13
3:2 5:2,8 6:10
19:2 30:11,14
31:6,8 32:3
39:11 44:2
45:11 46:4
55:3,16 56:4
56:19 57:23
59:10,17 60:3
60:6,12 98:18
105:10 109:3,6

109:9 110:10
115:21 116:4
116:17 117:1
119:19 120:4
128:14 132:20
139:21 185:20
205:16 225:22
253:2 280:23
280:25 282:7
**derived** 144:1
**derives** 155:21
**describe** 44:8
50:17
**describes** 273:11
**description**
10:10,11
221:11 222:15
222:19 223:25
**designated**
71:25 105:20
**designed** 267:10
267:20 268:5
**desktop** 71:8
273:7,9 277:6
**destroyed** 227:4
265:5
**detach** 252:19
**detail** 33:12
**details** 33:16
189:17
**determination**
124:14 128:18
145:18 192:5
279:14,23
**determine**
128:15 165:24
169:7 214:8
253:5
**determined**
66:16,17
114:16 144:4
149:11 151:7
212:22
**determining**
141:22

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 294 of 326
FREEDOM COURT REPORTING

Page 293

**deviate** 149:21
181:22,23
**deviation** 217:20
**deviations**
182:24
**devices** 70:24
**dictated** 177:24
179:5,22
**difference**
195:12
**different** 15:5
34:2 38:3
40:15 50:25,25
51:12,24,25
55:3 63:3,5
67:7,9 81:15
81:15,21,21
91:8,23,24
105:1 116:8
118:17 125:5
136:8 163:23
171:19 194:7
213:19,22,25
214:1
**differently** 91:16
**direct** 3:4 6:5
35:2 38:21,24
46:1,11 157:7
**directed** 69:10
228:21
**direction** 179:9
**directives**
179:12 180:2
**directly** 10:24
14:15 43:13
62:11 63:20,25
64:5 86:10
146:17 191:9
191:11 209:11
209:14 219:6
**director** 14:7,14
14:16 15:4,19
16:10,16
**disagree** 111:23
**disagrees** 104:22

110:4,18
**discoverable**
55:6 104:4
**discovery** 55:8
75:16 103:25
104:7 105:10
108:6 109:1
110:19 113:21
114:1,7,12
185:20 199:8
202:17 236:6
241:4
**discretion**
127:22
**discuss** 148:24
152:19 153:2
**discussed** 130:21
**discussing**
204:25
**discussion** 50:6
119:23 128:11
150:3 187:24
194:17 198:21
247:16
**dispute** 73:19
136:17 183:25
235:7 279:4,6
**disputing** 278:15
**distinct** 40:10
**distinction**
123:25 251:5
**distinguish**
135:19
**distinguishing**
15:17
**distribute**
209:11,12
**distributed**
234:10
**distributes**
234:6
**District** 225:14
226:23 227:7,8
227:18
**division** 98:5

124:11 155:18
226:18
**divisions** 87:16
91:22
**docs** 159:7,9,23
162:14
**document** 30:9
30:10 31:17
32:16,20 33:8
33:18 45:13
72:13,14,19,21
73:8,10,14,22
74:6,18,21,22
75:4,10,11,14
75:20,21 76:1
76:2,10,15,16
76:17,21 77:3
77:12 78:18,25
79:2,16 81:24
82:4,9,12,17
90:17 100:9,10
100:12 117:1,5
117:8,9,21,23
121:8 122:17
123:13,14
132:21 135:9
135:11,21
136:9,10 139:5
146:6 153:14
156:1 159:2
175:2 180:5
184:24 185:7
185:14,21
188:15 190:9
191:2,5 192:16
197:17,21
198:1 199:6,8
199:9 202:10
202:18,24
203:10,20,21
204:10,25
205:13 207:15
209:2 218:23
218:25 219:2,3
219:17,19

220:9,10,18
221:3,10
230:22,23
231:3,4,8,10
231:14,19,21
232:2,9,12,14
232:22,22
233:11,13
234:2 236:23
237:12 238:15
238:17 241:2,3
242:7,8,11
243:18,21
244:13 246:1,3
246:9,12,23
247:4,6 248:3
248:16 250:12
251:24 253:13
254:14 255:5
256:18,18,24
264:8 273:5
274:13 275:10
276:1 278:6,16
278:20 279:5
**documentation**
216:25
**documents**
17:18 30:13,18
30:19,21,25
31:11,13 37:5
42:8 44:3,17
47:5,7,12,17
48:25 49:1,13
50:12,13 62:3
69:6,7,8 72:22
72:24,25 73:6
73:11,18 74:24
75:1,2 76:5,11
76:11 79:11,13
79:14 93:9
98:19,23
107:17 118:5
118:11,23
119:1,14
123:11 132:20

132:24 133:3
146:12 155:25
158:23 160:9
162:8,24 163:4
163:13 164:10
178:18 184:23
185:19 191:20
192:22 193:5,9
194:23 199:4
199:23 200:9
200:14,24
201:4,9,12,15
201:21,23
202:1 210:23
210:25 216:1
216:10 224:18
224:19,24
225:2,12,12,22
226:17,20,25
227:3,4,15,22
228:23 229:3
231:7 232:3
237:13,18
240:15 243:1,3
243:10 247:23
247:23,24
248:1,7 249:24
249:25 251:8,9
252:4,7,19
255:5 256:10
278:9 279:2
**document's**
73:16 224:20
**DOCX** 229:17
230:10
**doing** 21:10
25:18 58:3
59:24 107:20
109:19 114:5
169:4 174:23
178:17 183:22
204:18 213:10
223:18 235:14
238:24
**dollar** 144:2,4,6

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 295 of 326
FREEDOM COURT REPORTING

Page 294

214:7 251:22
domiciled
183:17
dominated
145:13
door 192:7
double-check
91:11
downhill 90:10
dozing 211:21
draw 123:25
drawing 238:25
drive-by 123:21
124:2 265:3
dual 163:8
due 151:23
171:2 257:18
duly 6:2 281:8
duties 279:17
DUVAL 281:5
282:4

**E**
E 265:1 282:1,1
earlier 10:15
15:13 63:1,2
90:14 128:25
171:10 175:4
191:16 208:10
212:12 233:22
236:11,25
239:4 240:14
245:12 250:19
266:18
early 14:1 16:3,5
16:7 21:14
easier 134:16
easily 43:13 49:2
ECF 228:1
editor 256:19
effect 117:18
effectively
141:11
efficiently
141:11

effort 134:23
240:20
efforts 112:12
152:24 206:18
206:23
eight 202:6,10
202:11
either 14:21 19:2
30:19 37:22
38:5,10,21
63:21 64:2
77:24 85:18
100:8 125:9
129:1,12,20
145:1 152:21
153:5 180:10
197:4,6 209:1
209:22 219:3
242:11 245:16
266:12 270:11
Eldon 186:8,18
elected 111:9
electrical 257:18
electronic 76:9
76:16 77:4
184:19 215:25
218:1,16
Electronically
93:15
eliminate 214:4
else's 110:20
employ 49:12
52:8 62:7
63:16 170:16
employed 7:18
10:21 11:1,6
12:10 17:23,24
18:15 19:8
20:23 23:1
65:13,16 87:19
98:22 101:21
277:2
employee 7:15
8:11 16:18
17:13 39:6

43:20 71:23
76:14,17,22
77:1,3,18 92:1
102:6 103:7
105:16 108:13
114:22 133:23
134:13 166:5,8
166:25 175:12
183:11,12
186:7 187:3,4
188:5,10
192:20 241:8
282:11,12
employees 36:12
38:7,21 39:2
43:3,6,7,12
51:6 71:19
78:1 79:8,21
91:23 99:21,24
102:15,16,18
103:1,2 107:14
107:16 112:11
114:25 156:18
211:10,14
238:7 239:15
239:19,24
240:6 242:17
242:23 252:25
273:23,24
278:5
employment
11:17 16:21
18:19,23 19:18
20:3,7,17,19
23:10 24:11
26:3 28:10
42:25 63:5
183:15 186:13
206:11
employs 49:15
74:12 99:15
105:13 117:25
168:23
enabling 141:10
ended 18:22

endorsed 258:12
Ends 280:23
engage 22:7
152:24 263:23
264:2,4
engaged 59:20
170:17 266:8
267:9
engaging 59:25
171:23
Engle 62:19,21
64:15
enjoy 60:21
enriched 271:22
enrichment
271:20
entail 67:25
199:17
entails 32:13
enter 22:17
35:24 36:12
37:9 239:25
240:2 242:18
271:13
entered 158:7
170:7 189:4
197:15 271:1
entering 42:15
240:7
enterprises
145:2 149:18
entire 29:23 59:1
88:4,5 152:12
172:8 204:24
entirely 170:6
213:25
entirety 226:20
entities 129:3,12
145:12
entitled 46:16
81:9
entity 9:7 34:3
40:10 76:23
79:6 89:7
93:18 94:13

98:13 118:17
145:2 176:21
191:24 214:1
214:10,15
230:14,14
239:21 245:9
255:19
entries 78:24
162:25 163:1,8
164:14 194:6
194:21 195:13
195:20 197:4
202:20 238:6
238:13 239:14
239:15,19
245:8,10
246:18
entry 9:25 39:6
78:20 153:18
157:19 158:6
158:15 159:2,3
159:5 160:1,23
160:24 161:8,9
161:12 162:8
162:13,20
164:9,11,23
166:15,24
175:9 179:18
183:7,9 184:7
184:15 186:6
186:16,16,25
187:2 190:4,13
192:17,24
193:13,14,21
194:1,2,5,8
195:2,7,13,17
195:23 196:15
197:2,14,16,18
197:20,21
198:5,6 202:2
202:4 237:21
245:11 246:17
environment
100:2
equals 33:13,14

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 296 of 326
FREEDOM COURT REPORTING

Page 295

**equity** 266:12 267:1
**Eric** 89:19,23 90:10
**error** 192:13 222:18
**errors** 222:22
**escrow** 174:8 175:16 176:1,7 176:11 177:17 178:5,9,20 179:6 196:6,18
**esoteric** 148:14
**especially** 233:12
**ESQUIRE** 2:3,7 2:13
**establish** 151:5 224:20
**established** 50:18 150:12
**estimated** 164:15 171:17
**et** 5:5
**event** 100:25 159:17 162:16 162:18 171:2,4 189:23 231:12
**events** 146:11 169:10,11 170:3,12
**eventually** 12:20 120:22
**everybody** 12:20 109:3 110:20 113:17 116:22 226:2
**evidence** 55:9 103:10 104:7 109:1 114:8,13 114:21 209:3
**evidentiary** 224:10 227:14
**exact** 19:20 28:14 143:24

171:16,20 255:22
**exactly** 7:22 37:14 51:17 62:8 69:5 123:19 200:10 212:19 245:22 247:21 274:23
**examination** 3:4 3:5,6 6:5 39:22 41:7,24 256:16 273:3
**examples** 103:6 105:15
**excellence** 276:11
**exception** 109:4
**excess** 259:12
**Excuse** 30:9 50:2 67:15 97:11 149:24 187:20 221:19
**executed** 76:1,14 151:25 199:12
**executing** 79:14
**execution** 79:3 188:15
**executives** 144:5
**exercise** 79:16
**exhaustive** 211:13
**exhibit** 3:12,13 3:14,15,16,17 3:18,19,20,21 3:22,23,24,25 4:3,4,5,6,7,8,9 4:10,11,12,13 4:14,15,16,17 4:18 30:2,5 32:14,17 40:23 68:20 69:2,2 69:18 75:7 117:22 118:8 119:14 132:22 139:1,2,7

140:13 157:12 175:6 190:20 190:23 193:17 194:2 195:21 197:6 198:23 199:7 202:12 202:15 203:16 203:20 205:18 218:21,24 219:15,18 220:16,19 224:6,9 229:9 229:12 232:19 236:20,24 237:10 240:25 241:2 242:4,7 242:21,25 243:13 245:24 246:2,7,10 248:20 249:15 249:18 253:8 253:22 254:1 255:3 273:6
**exhibits** 3:10 4:1 44:21
**exist** 30:19
**existing** 25:25 54:19 131:15 223:20
**exists** 270:20
**expanding** 26:21
**expect** 182:15
**expedition** 55:20 56:13 57:5 59:1 103:21 104:17,19 105:5 234:20
**expense** 59:11 267:21
**expenses** 218:10 218:18 263:7 263:11
**experienced** 26:1
**expert** 180:15

208:8
**expertise** 176:22 177:1
**expires** 281:14
**explain** 12:23 33:3 44:8 50:17 67:23 77:15,22 108:25 118:13 118:18 170:22 183:20 203:21 219:18 240:12 249:25
**explained** 202:3
**explains** 273:8
**explanation** 119:8 168:21 189:7
**exposing** 213:8
**exposé** 108:10
**express** 277:11
**extend** 167:16
**extent** 34:2 80:17 130:25 180:12 214:19 226:8 231:15
**eyes** 120:5
**E-N-G-L-E** 62:21

**F**

**F** 265:12 282:1
**facilitate** 160:17
**facilitator** 160:12
**facility** 8:2 26:1 63:21,22
**fact** 7:1 35:15,24 42:6 95:6 114:15 115:24 158:22 159:13 175:20 206:1 220:1 238:10 243:10 254:25 266:17

**factor** 151:13 168:15
**factors** 171:23
**facts** 257:16
**failed** 262:23 263:14,23 269:9 270:12
**failure** 264:18
**fair** 13:15 18:6 24:14 26:20 27:6 31:22 36:4 120:24 181:23,24 189:16 190:14 191:21 216:2 245:16
**fairly** 134:22
**fall** 90:19 92:16 133:7 137:10
**falls** 125:24 126:2
**false** 262:9 263:16 265:16 266:11,22 267:11 272:16
**familiar** 7:10 74:11 99:8 100:3 101:11 101:14,17 139:21 163:10 203:14 225:3 226:3 229:16 229:18 230:22 230:24 239:5,8 240:6 241:7,9 241:10,13
**familiarized** 139:14
**family** 220:1
**Fannie** 145:13 149:17 180:11 180:22 181:12
**far** 33:1 45:25 50:25 53:18 56:12 57:18

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 297 of 326
FREEDOM COURT REPORTING

Page 296

65:24,25 68:2
92:3 94:14
108:23 110:25
121:1 146:11
148:23 170:19
186:4 232:9
243:12 273:18
**FARGO** 1:8
**Farm** 258:11
259:7,8
**FAS** 125:15,23
**fashion** 157:24
172:6 226:14
262:24
**fast** 94:14 172:2
**faster** 140:24
**FC** 188:20 189:5
190:2 194:24
194:24 195:4
**FCL** 248:24
**FC_Alabama_...**
189:25
**features** 94:12
**February** 11:20
12:15 48:16
255:21,23
**federal** 12:9
16:18,20,25
17:5,5,10,13
17:17,18,19,22
18:24 57:20
61:10,18 97:21
104:3 112:3
**fee** 52:17 54:10
83:17,21,23,24
85:7,18 134:5
136:25 137:2
138:2,4 143:14
143:16,17,19
143:22,25
144:1,3,10,12
144:17,22
145:11,15,19
146:18 147:11
147:21 149:10

149:16 151:1,7
151:8,10,16,19
151:23 152:2
154:10,11,14
154:15 155:15
155:22,24,25
156:5 206:5,8
212:12,19,21
213:21 214:6
214:10 217:16
223:15,17
226:8 253:19
253:20 262:13
**feel** 34:18 47:1
57:18
**fees** 52:21,23
53:4 54:5 83:9
85:1 110:23
137:3,5,9
138:10,11
142:9,13,17,19
144:13,19
149:13 153:19
155:12 164:13
164:21 171:6,7
171:11,14,15
212:8,13,17,17
213:9,10 215:5
215:10 223:9
230:3 244:7
253:25 259:22
259:24 262:8
262:18 263:7
263:11 267:12
267:14,15,16
267:23,24
268:7,12,17,23
268:25 269:2,3
269:4,13 272:2
279:25
**Fernambucq**
45:7 140:2
**Fidelity** 1:8,20
2:12 5:9,18
6:16,17,21,24

7:15 8:11,17
8:18 9:1,20
10:20,24 11:13
12:5 28:23,25
30:17,22 31:24
32:6 33:24,25
35:17 37:24
40:5,5 44:5,13
44:14 47:17,19
47:21,23,24,25
48:2,3,4,7,18
48:20 49:4
50:15,18 66:13
66:23 67:13
77:1 80:8 84:1
89:3 93:21
95:3 102:8
118:17 134:21
134:25 141:4
142:9,13
150:10,17,20
154:17 157:3
159:6 164:16
166:5 183:11
187:3 188:10
203:23 204:8
212:10 214:15
220:2 224:12
229:13,13
230:6 245:9
250:25 257:12
258:1,6,16,21
259:3,13,16,24
260:2,10,12,16
260:22,24
261:8,13 262:3
262:13,17,25
263:3,10,11,17
264:1,15,22
265:7,18 266:5
266:15 268:15
269:4,12 270:3
270:14 272:10
272:21 273:17
273:23,24

275:2
**Fidelity's** 31:11
40:3 42:21
261:25 264:4
**field** 36:25 37:1
42:16,22 87:8
99:8 119:16
125:14,16,18
126:4,8 133:17
134:4,6,8
177:1,2 240:3
242:9 246:14
**fields** 35:25
36:13 98:24
101:2 119:16
136:12 239:25
240:3 253:1
**fight** 129:19
130:1
**figure** 207:15
213:4 253:5
258:4,7,14
**figured** 213:4
**figures** 152:7,9
174:21 248:9
**file** 19:9 30:23
37:21 41:12,17
42:2,9 45:10
46:2 55:24
74:21 76:10
83:6,7 93:8
154:21 160:25
184:2,9,16,17
184:18,19,19
185:8,14
189:21 211:24
218:1 234:9,10
**filed** 17:18 30:7
45:17,23 139:9
139:23 140:1
221:8 222:8
261:16,18,23
**files** 33:13,14
41:10,25 74:5
99:23

**finance** 21:4,11
21:12 23:6
24:10 28:3
29:24 81:1
**financial** 172:16
174:21 229:14
230:6 234:7,13
234:24 248:9
**financially**
282:14
**find** 25:3 41:16
43:19 84:14,16
89:11 94:19
140:18
**finds** 115:19
**fine** 8:22 34:14
34:20 35:9
53:22 56:18
57:22 59:13
60:1 69:13
106:19 115:23
116:13,18,19
119:20 130:23
139:17 140:21
168:13 230:20
233:6 234:19
252:18 279:9
**finish** 105:25
112:21
**fire** 257:18,21,22
261:7
**firm** 45:6 52:14
141:21 144:16
170:16 176:18
177:9,13,16
179:14 180:3
182:3 223:4
230:12 234:14
234:17,18
239:14 279:13
**firms** 141:11
172:17 234:7,9
234:11 275:3
276:13
**firm's** 177:18

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 298 of 326
FREEDOM COURT REPORTING

Page 297

**first** 6:2 7:23
9:21,24 10:17
22:5,8,22
24:20 27:10
32:5 39:21
41:23 44:21
55:9 60:11
86:17 87:15
104:3,7 114:10
116:12,25
119:15 194:8
194:21 196:4
197:16 219:8
219:10,21,22
220:1,11 221:4
222:8,17,25
237:1 243:23
247:23 252:13
266:15 273:6
**FIS** 71:4 277:11
277:13
**Fiserv** 50:24
51:13,15,23
52:5,13,16
62:9
**fish** 232:23
**fishing** 55:20
56:12 57:5
59:1 61:1
103:13,21
104:17,19
105:5 234:20
**five** 7:17 12:11
25:20 43:11
110:25 111:1,3
193:1 245:7
255:25 259:4
**fixed** 148:21
**flat** 144:10 151:8
206:5
**flip** 238:12
**floor** 74:4
121:18
**Florida** 1:21
5:10 16:23

28:11 43:1
56:4 153:5
241:17 281:4
281:13 282:3
**flow** 65:23 67:19
67:23,24
191:17
**flows** 90:10
**FNFS** 234:6,10
**focus** 257:11
**folks** 27:13
69:22 138:17
159:13 277:1
**follow** 182:15,20
214:8 217:19
250:9
**followed** 179:9
**following** 164:14
195:3 257:21
262:21
**follows** 6:3
**forbearance**
13:3
**force** 20:12,14
128:16,18
133:3,7 261:5
262:10 265:12
265:18
**forced** 137:19
261:9 271:23
**foreclose** 69:21
80:4,11,16,23
81:5,9,18 93:4
96:1 148:01
162:1 182:4
191:25 223:16
223:22 261:24
262:1,5 266:2
266:5,11,14
272:10
**foreclosed** 209:9
266:3,25
272:13
**foreclosing**
83:25 95:11

**foreclosure** 1:8
5:18 7:16 8:3,5
8:18 11:11
13:7 28:18,22
29:1,11 33:25
35:17 37:23
40:6 48:1,8,18
50:14 51:4
53:4 61:8,13
65:9,25 75:20
78:5 79:11
81:6 83:8
85:10,13 89:4
92:2,13,17
93:8,13 98:20
102:3 112:12
114:17,19,24
131:11 136:22
141:9 143:6,10
144:17 145:11
146:5 149:8
150:15,19
151:3 152:8
153:6,8 154:6
154:10,21,21
154:25 155:7
155:14,22
156:12,23
157:1,4 158:16
160:8 161:5
167:5 169:16
169:17 170:15
170:17 171:24
173:12 174:10
176:14,19,22
176:24 177:4,5
177:11 180:3,9
186:17,18,20
186:21 187:7
187:14 190:1,2
194:25 201:1
203:23 205:23
206:17,23
207:9 209:7
215:6,11,17,20

216:4,14,15,18
217:18 218:11
218:19 223:10
224:13 233:20
234:8 238:1
239:9,25 244:5
244:8,24
246:13 248:24
249:9,19
250:16,25
252:4,7 257:13
260:17,25
261:16,18,20
261:21,23
262:20 265:17
266:4 267:7
268:11 269:1
272:9 277:17
277:20 280:2
**foreclosures**
54:2 94:15
96:25 112:10
144:25 179:14
**foremost** 104:8
**form** 31:20,22
32:9 33:18,22
36:19 37:10
39:23,25 40:24
41:6 44:4 47:9
49:6 50:13
52:19 61:20
76:9 79:17
87:22 164:14
171:9 226:14
234:8 254:7
255:1 268:24
270:19 272:24
**format** 119:5
218:4,8
**forms** 37:1 39:8
39:24
**forth** 47:16
53:12 54:5
66:8,12 68:12
74:20 85:25

129:10 130:16
131:8 144:19
144:22 145:16
180:21 226:8
**forthcoming**
252:8
**forward** 120:20
183:19 184:1
228:7
**found** 195:9
231:21
**four** 7:20 20:21
22:11,13 27:5
27:19 90:15
110:25 111:1,3
**fourth** 90:22
**frame** 169:16,18
169:19,20
**frames** 170:3
**frankly** 8:22
137:24
**Freddie** 145:13
149:18 180:11
180:22 181:13
**free** 34:18 47:1
93:20,23 95:10
95:18 104:23
**Freedom** 5:11
**friends** 29:17
**front** 57:16 61:6
225:9 236:7
250:8,11,13
261:2 275:9
**front-end** 13:13
13:15 15:14
16:5
**FS** 245:8
**full** 129:10 165:6
184:10
**fully** 118:14
**function** 13:12
15:9 94:20
170:11 209:24
232:3
**functions** 73:7

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 299 of 326
FREEDOM COURT REPORTING

Page 298

97:6 232:11
**funds** 156:6,12
176:10,16
178:23 187:13
196:5,18
262:23 263:4
**funnel** 77:24
**further** 227:17
282:10
**fuss** 210:16
**fussing** 59:15
228:13
**future** 136:2
171:20
**F-I-D-E-L** 245:9
**F-I-S-E-R-V**
51:15
**F119** 164:13
171:9

**G**
**gain** 230:2
**game** 110:3
**Gardere** 2:13
**gather** 43:13
59:2 109:20
**gathered** 59:5
**general** 13:8
90:19 107:14
130:14 138:7
145:11 149:5
180:19 183:24
225:4 257:11
**generalities**
108:18
**generalization**
144:24
**generally** 13:6
81:9 83:1
103:20 143:3
152:25 153:2
180:5,10
181:11,17,21
181:23 182:1
182:20,22,23

236:17
**generate** 33:16
**generated**
185:15 212:10
**gentleman** 165:9
**geographic**
91:18
**Georgia** 20:8,18
23:11,12 26:6
26:17,18 27:17
28:8
**getting** 122:18
130:9 145:9
164:2 184:8
244:25
**give** 17:9 33:18
68:23 97:7,25
113:15 137:18
138:6 179:22
216:13 227:21
255:25 268:11
**given** 6:10 33:21
36:20 40:6
108:23 155:14
169:8 172:17
172:21 180:2
233:12 258:14
**giving** 57:6
138:3
**glad** 107:23
228:8
**glam** 205:8
**glaring** 88:19
**go** 13:21 14:4
18:24 20:6
25:16,18 27:10
27:13,14 31:3
39:7,10 41:15
43:17 44:9
47:2,15 53:11
55:20 56:12
57:16 58:25
61:1,20 68:7
68:24 72:22
77:10,16 83:4

86:14 96:10
97:18 98:14
104:18 109:22
111:5 113:18
115:9,23 118:4
119:17 120:19
121:2 124:6
140:4 146:8,17
146:20 148:10
148:17,24
153:15 161:20
163:11 168:16
171:3 174:18
177:25 184:4,6
194:13 196:10
198:5,12
210:22,24
226:11 231:4
247:15 251:24
**goal** 13:6,8
**goes** 65:25 77:22
94:15 249:22
**going** 31:7 33:17
34:3,3,12,16
34:18 35:1,4,5
40:9 42:16
43:18 44:9
46:20 47:9
48:23 50:7
53:9 55:19
56:12 58:8
59:6 60:23
68:22,23,24
69:1,13 74:23
84:17,18 97:19
98:8 103:9,13
104:18 105:4
106:13 108:18
108:24 110:3
110:13 112:24
112:25 113:1
115:14 120:9
122:18,25
130:11 131:7
139:5 145:18

147:11,20
148:12 149:9
157:10 164:1
178:6,16
187:18 190:22
199:3 210:13
210:14,22,24
213:7 218:12
224:15,23
225:11 226:19
227:21 230:16
230:17 232:23
232:25 234:15
235:21,22,24
236:14 247:22
248:12 256:11
256:14 260:22
276:9
**good** 171:21
**goods** 21:7
**Gotcha** 161:21
**gotten** 110:2
**govern** 279:12
**governed** 145:12
180:10
**government**
145:1 149:18
**graduate** 28:6
**grand** 61:6
**granted** 45:2
**greater** 175:16
176:2 177:17
179:7
**grew** 27:18
**ground** 165:2
184:14
**grounds** 113:24
116:9 259:10
**group** 18:16,17
19:9,13 68:11
98:6 220:2
**grow** 27:17
**guess** 21:14
101:9 123:18
126:20 135:2,4

137:15 223:19
233:18 243:6
244:19 248:21
271:17 280:6
**guesstimation**
20:22
**guesswork** 249:3
**guidance** 56:15
**guidelines** 66:8
66:12,15,17,23
67:7 145:1
179:12 180:12
180:21 181:9
181:12 182:15
182:18,20
**Gulf** 61:2
**guys** 9:1 113:9
207:21 245:1
254:25

**H**
**hac** 45:2
**half** 12:11 15:23
27:4 28:23
204:23
**hand** 140:22
202:15 244:22
254:5 281:9
**handed** 48:25
274:13
**handle** 8:7 63:11
64:21 91:8
125:10
**handled** 28:20
131:11 194:14
**handles** 37:21
**hands** 280:7
**Hang** 188:4
**happen** 191:17
**happened**
114:18 213:14
**happens** 84:3
129:23 154:13
**happy** 56:13,21
60:25

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 300 of 326
FREEDOM COURT REPORTING

Page 299

**harassing** 55:21
104:16 108:20
111:25
**harassment**
57:18 112:8
**harnessing** 94:9
**Harris** 226:21
227:6,8,9
**hate** 88:25 274:7
**hazard** 101:9
**head** 10:19
15:22 18:21
38:9 49:16
52:12 84:7,13
87:12 88:11
93:1 117:12
143:23 166:12
189:2 208:20
209:21,23
235:3 250:20
276:3
**heading** 184:16
**headings** 172:14
**heads-up** 98:1
**hear** 12:20 51:2
73:2 116:5
119:10 218:13
225:19
**heard** 6:8 23:5
**hearing** 227:14
**hearsay** 130:12
**Heights** 63:21
64:2 188:12,13
252:3
**held** 8:10,12
9:19,22 11:7
14:14 16:13,25
24:1,4 196:5
**help** 65:24
143:20
**helps** 119:9
**hereof** 221:2
**hey** 21:20
**high** 28:6,8
184:1 234:14

234:24 275:3
**higher** 86:23
169:3
**highest** 172:21
172:24
**highlighted**
140:8,23
204:14,21,22
221:17
**highlighter**
204:14
**Hill** 20:13
**hire** 53:3 142:1
148:8
**hired** 8:12 12:16
12:18 13:11
24:23 176:17
**hires** 191:18
**history** 33:13,14
33:14,14,19
41:10,12,12,17
41:18,25 42:2
42:2,9,9 121:7
121:15 253:11
**hmm** 69:21
**hold** 7:21 14:12
113:11 226:19
229:13 235:23
**holder** 272:12
**holding** 187:13
268:8,13,18
**holds** 86:23
**Holt** 2:19 5:11
**home** 13:7 63:18
217:6,13 249:7
257:18,19
261:6 265:5,5
267:22,24
268:6,11 269:1
**homeowners**
261:5,9 265:13
265:19
**honest** 25:11
137:25 254:21
**honorable**

276:11
**hope** 60:21
**hour** 60:11
111:2
**hours** 211:21
**house** 69:21
124:3 165:2,4
184:13
**Household**
24:10 25:22
**Houston** 2:15
**HUD** 161:15
**Hughes** 226:24
226:24 227:18
**Hughes's** 227:19
**Huie** 45:6 140:2
**Humphrey** 80:4
80:8,10 93:3
129:2,5,16
131:11,16
132:12 142:2
143:13 144:11
145:21 146:15
146:17,20
151:21 153:13
158:17,24
160:8,24 161:4
162:23,24
169:25 194:1
198:2 200:25
205:24 206:8
206:11 223:2
239:14 245:7
245:18 249:20
250:23
**Humphrey's**
144:16 164:13
164:19 192:23
196:1,9 197:23
279:13
**hundred** 251:22
**hurdle** 104:3
**hurry** 211:6
**hypothetical**
105:17

**H&R** 200:4
246:5

**I**

**ID** 158:16,22,23
163:18 193:5,9
193:16,18,24
194:7 195:3,19
197:3,17 242:3
**idea** 133:22
163:15 228:10
239:17 246:16
246:17 249:10
249:11
**identification**
30:3 32:15
69:19 134:19
139:3 140:14
190:21 198:24
202:13 203:17
205:19 212:1
218:22 219:16
220:17 224:7
225:4 229:10
232:20 236:21
237:11 241:1,6
242:5,22
243:14 245:25
246:8 249:16
253:9,23 254:2
255:4
**identified**
162:10,11
195:9,20
201:22 211:25
224:5 242:3
248:20
**identify** 5:12
100:23 158:23
199:4 210:25
254:24
**identifying**
135:16 213:10
**identity** 73:16
214:9,12

**IDs** 163:17,17
**II** 269:7
**illegal** 262:9,21
268:22,24
269:2 270:12
271:23
**illusory** 95:19,21
**image** 72:3,4,5,9
117:15 158:23
160:9 163:5,9
191:6,12,13
193:5,9,18
195:19 197:3
**imaged** 72:23
159:7,9 162:14
231:21
**images** 44:3
49:13 50:12
74:13 98:23
133:16 134:7
153:22 161:11
190:17 207:25
255:7
**imagine** 243:7
**imaging** 72:4
117:13,24
118:20 122:20
123:13 159:10
159:22 163:6
190:16 194:23
197:5,21
201:17,19,23
202:21 205:1
207:22 219:4,5
**immediately**
195:2 257:21
**implicate** 279:17
**implicated**
120:15
**implication**
120:25 228:20
**imply** 228:19
**implying** 228:16
**import** 173:10
**important** 191:2

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 301 of 326
FREEDOM COURT REPORTING

Page 300

**impose** 269:3
**imposed** 226:24
**imposing** 268:7
268:22 269:2
**impossible**
191:25
**improper**
262:21 271:25
**inaccurate** 30:20
205:10 235:19
**incentive** 172:16
172:23 233:23
234:4,7,12,13
274:12
**incentives** 173:4
233:25 234:24
235:1 274:14
274:24 275:3,4
**include** 41:10
141:21 185:23
185:24 227:1
**included** 30:14
92:12 141:15
193:9
**including** 104:2
107:14 122:11
131:21 147:19
154:14 262:9
262:14
**inclusive** 282:8
**income** 155:21
**Incorporated**
18:2
**incorrect** 204:20
205:3 235:20
272:20 274:9
**increase** 154:4
267:13 268:9
**incur** 59:12
**incurred** 144:19
171:7 218:10
218:18
**independent**
206:10
**INDEX** 3:1,10

4:1
**India** 241:11
**indicate** 32:25
33:18 36:19
73:18 76:23
78:6 100:16
101:2 123:6
126:14 137:8
141:4,14
142:13,17
150:25 161:11
165:2,8 170:21
175:14 176:6
180:1 185:2
190:24 193:24
208:5 220:10
221:3,10
222:11,14,22
250:22,24
253:12
**indicated** 28:16
47:10,11 93:17
94:5 126:14
133:13 139:20
141:20,25
142:4,7,24
150:17 151:7
168:24 177:18
193:18 196:17
197:2 208:10
212:13 216:18
222:7 233:25
274:13
**indicates** 33:1
159:4 161:14
162:8,13
164:12 183:8
183:19 184:15
186:6,17
187:12 190:5
194:9 202:23
212:9 222:24
224:2 226:7
235:5 237:7
241:4 243:21

248:23 250:9
252:2 253:10
**indicating** 77:17
78:21 161:3
195:8,25
231:20 236:25
**indication**
175:25 196:4
221:13 242:1
**individual**
132:14
**individually**
6:23,25 132:25
**individuals** 1:4
63:15 208:14
**industry** 8:25
180:8,13,21
181:10,21
182:21,23
204:5 205:9
226:3
**inferred** 238:23
**info** 167:1
**inform** 165:15
**information**
33:7 37:9
38:11,17 41:19
42:16,22 43:5
43:14,21 49:14
59:2 67:20
68:4,9 70:13
71:21 76:5,10
76:17 81:14
88:13 93:15
94:10 96:19
97:7 99:22
101:6 109:21
110:2 119:1,2
119:5 122:8,12
123:7 127:14
132:18 133:24
134:4,13,20,24
135:6,16,17
143:20 146:9
152:18,20

153:11 157:20
164:15 166:21
173:11,14,18
173:23 174:5,6
174:7,12,20,24
175:23 176:5
177:22 179:23
187:8 190:17
191:20 192:19
196:22 201:24
210:6 211:11
212:4 214:5,11
215:12,14,24
216:8 218:17
230:2 240:7,17
240:22 250:3
254:19 255:15
261:21 272:18
272:19 273:10
273:15,17
274:3,4,12
275:6 276:1,18
276:20 277:15
277:21 278:2
278:13,16
279:3,11
**information's**
33:4
**informed** 257:22
**inherited** 165:12
**initial** 101:20
172:3 190:6
**initially** 259:1
**initials** 117:17
**initiate** 157:4
**initiated** 33:14
**initiation** 216:14
**initiative** 70:19
**initio** 266:4
**injury** 268:23
**input** 134:20
262:3
**inputted** 100:24
135:17 169:12
**inputting** 211:11

**inquire** 41:2
136:7,13
177:17
**inquiry** 41:2,6
41:10,23 42:4
45:24 50:10
74:9 81:20
109:2 122:2
133:15,20
134:2,6 135:15
**insert** 181:14
**insinuated**
275:15
**insisting** 259:2
**inspection**
122:16 124:2
124:18 126:15
217:17 242:12
242:14 244:6
244:10 245:14
**inspections**
122:10,15
124:6,9,22,24
126:6,7,9,14
127:20 244:17
265:4,4
**instance** 169:15
**instituted** 272:8
**instituting**
265:16
**instruct** 57:19
111:22,24
112:2 113:6,19
115:8,15 120:9
164:1,6 217:15
235:25
**instructed** 110:6
110:24 116:11
**instructing** 56:7
59:22 103:15
103:17,19
108:21 109:13
112:15 227:23
**instruction** 57:9
113:22 130:3

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 302 of 326
FREEDOM COURT REPORTING

Page 301

**instructions**
59:19 113:14
180:2 186:19
197:1,10,16,23
197:24 198:3,5
217:19 250:4
251:15
**instrument**
161:17 202:21
203:8
**insurance** 69:22
70:3,11 128:16
128:19 133:3,7
165:3 166:21
167:2 175:21
177:19 184:11
196:2 257:23
261:5,9 262:10
262:11,15
265:13,14,19
266:13 267:6
**integration**
277:6
**intend** 69:16
**intended** 264:17
**intent** 161:23,24
**intention** 161:25
**intentional**
267:20
**interacting** 74:5
211:12
**interaction**
186:10 241:5
**intercom** 183:20
183:23 195:24
**interest** 199:19
199:20
**interested** 84:19
210:5 213:8,10
282:14
**interesting** 79:7
**interfere** 60:5
**interfering**
59:17,18 60:7
**intermediary**

191:19
**intermediate**
14:16,18
**internally** 81:25
82:8
**interpret** 44:19
112:7 246:14
**interpretation**
182:19
**interrogatories**
7:6 205:15
206:15 211:9
**interrogatory**
212:8 216:19
**interrupt** 112:22
260:6,7
**interruption**
89:25 142:20
145:4 162:17
194:11 198:18
201:18 211:16
**intervening**
223:21
**introduce** 6:8
**investigation**
17:6,10 61:11
61:18,24
240:16
**investor** 77:25
209:17,22
210:10 268:12
**investors** 263:25
264:2,5,21
268:8,18
**invoice** 82:19,20
82:22 83:3,5
83:10,11,16
84:1,3,4,9 85:1
85:3 90:17
118:3,5,21
122:23 126:18
135:21 145:22
153:13,22
207:24 208:8
208:15 209:2

210:23 255:14
255:16
**invoiced** 126:16
**invoices** 118:7
122:11,13,17
126:13 145:22
146:23,25
153:25 208:6
212:9 245:17
245:19,21
255:10,17
**invoicing** 153:16
205:2 207:21
207:22
**involve** 65:4
106:21 186:23
**involved** 9:16
25:1 29:24
45:4 56:21
73:22 79:6
84:8 109:3
112:9 129:22
134:23 211:11
211:14 273:19
**involves** 166:4
193:23
**involving** 17:19
108:4 114:18
193:22 224:16
225:15
**in-house** 28:20
29:10 103:5
**irrelevant** 55:10
57:5 59:4
104:13,16
108:20 112:1
120:12 214:19
**issue** 55:21
56:10 67:12
69:23 70:4,8,9
70:10,11,15,16
78:12 103:11
108:12 115:1
130:8 164:24
165:19,22,25

166:1 179:3
210:15 213:7
222:25 223:5
225:17 234:16
259:7
**issues** 51:3 61:25
62:4 68:6
69:10,20 94:17
98:6 175:19
176:23 214:4
229:23 232:25
233:8 276:21
**item** 118:11
122:6 211:10
213:2
**items** 68:6,7
124:10,10
141:16 212:24
273:11
**iteration** 72:14
**it'll** 8:21 57:23
**IV** 271:4,5

___

**J**

**Jacksonville**
1:21 5:10 8:2
28:11,12 43:1
56:3 57:25
63:16,17 153:5
166:10 241:17
248:23
**James** 63:9
64:16
**January** 278:20
**JAX** 249:9
**Jeff** 89:24 90:9
**job** 22:22 24:7
25:1,18 27:10
60:3 65:4
181:7
**Jr** 1:3 2:7 5:3
**Judge** 225:7
226:23,24
227:17,18
236:6

**judgment**
280:16
**judgments**
111:15
**July** 9:11 221:7
237:2 244:11
244:11,18
**June** 1:18 5:8
39:14 45:15
158:17,24
159:6 166:3
169:23 175:9
183:7 193:13
193:21 195:13
220:15 221:16
222:15 242:16
246:22 250:14
281:10 282:15
**jurisprudence**
105:1
**jury** 61:6
**Justice** 61:12
**justification**
263:9
**JX050** 248:23

___

**K**

**Karen** 1:4 5:3
75:3 164:12,18
183:23 195:25
196:9,22
**keep** 13:20 56:19
58:3 96:15
103:13 112:17
118:16 179:20
**kept** 120:13
**key** 101:11
170:12
**kind** 58:1 80:7
81:12 239:23
257:9 272:22
**knew** 228:24
229:2 265:5
268:21
**knocked** 203:19

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 303 of 326
FREEDOM COURT REPORTING

Page 302

**know** 18:22
26:24 29:14
31:21 32:9,11
32:12 36:2,16
37:18 38:1,5,9
38:11 39:5,9
39:23,24 41:19
42:14,18 43:15
45:25 49:8,10
49:16,24 52:7
52:12,20 58:1
59:8,9,24
60:21 73:9,17
73:20 74:3,5,8
75:14,17 80:18
80:20,25 81:9
81:19 83:24
84:7,12,18,18
84:23 85:2,2
85:11,17 86:2
86:4,6 87:5,12
87:17 88:10,21
90:3,8 91:15
93:1 94:16
97:8 100:7,20
101:4,5,10
105:8 106:6,11
111:4 112:8
121:14 123:10
125:16 127:1,2
127:6 128:2
130:25 133:9
133:11 134:1
134:14 136:17
138:3 143:23
144:11,14,15
145:20,24,24
146:3,19,21,23
147:5 148:11
148:15 149:8
149:23 153:25
153:25 154:1
161:15,21
162:5 163:16
166:13 168:2

173:25 174:1
175:23 176:4,8
178:11 180:7
181:1,4 182:11
182:16 183:2,3
183:14 186:13
188:25 189:2
189:14 191:10
192:3 193:20
204:9 208:4,9
208:19 209:20
212:25 213:1,3
213:13 214:20
215:4,8 216:3
217:9,11,14
219:2,11 220:7
223:19 224:21
226:11,14,16
226:17 228:4
230:11,13,15
232:6,11,17,17
233:5 235:3
237:24 238:9
239:13,24
240:2,3,11
241:16 242:13
242:17,20
244:6,7 245:12
245:22 251:9
254:22 255:18
255:22 260:7
274:2 278:12
278:22,23
279:1,20,22
**knowing** 261:6
**knowledge**
49:13 52:9
126:12 228:18
272:19
**knowledgeable**
73:22 84:20
105:18 240:11
**known** 18:3 48:8
48:19,20,20
49:3 51:19

65:13 101:18
260:16 268:21
273:8
**knows** 147:10
175:25 226:2
**KSS** 248:19
249:4
**Kumar** 202:2

——————
**L**
**L** 2:18
**label** 251:14
**labeled** 184:25
254:3 255:6
**lack** 25:13
**lacked** 266:2
**lady** 166:20
190:4
**land** 165:11,12
**larger** 195:4
**Larry** 1:3 5:3
75:3
**late** 16:2,8 24:13
**law** 141:11,21
262:12 263:8
266:4
**Lawler** 2:7 5:21
5:21 80:6
129:13,20,25
130:6,13,23
280:14
**lawsuit** 17:19
44:24 45:4
47:24 53:12,13
59:2 61:1
108:5,6,7,9
115:2 164:5
167:22,23
234:17
**lawsuits** 19:10
**lawyer** 69:25
70:2,2 96:1
119:13 256:13
279:7
**lawyers** 95:22

199:8 207:4
275:23
**lead** 15:1 55:7,8
104:6 114:7,12
**leader** 12:18
14:9,15,21
208:17
**learn** 167:24
**learned** 81:20
**learning** 25:2,5
101:18 259:7
**leave** 10:23
69:13 274:1
**leaves** 239:23
**leaving** 11:16
12:6 15:23
196:3 257:19
**ledger** 255:20
**left** 16:14 27:7
150:8 193:16
**legal** 55:12,17
80:18 103:23
141:16 180:15
192:2 207:3
221:11 223:24
263:8
**Lender** 9:6
48:10,21 63:24
**lending** 17:6
**lend/collect** 25:6
**letter** 161:25
214:17,17
220:14 221:17
222:16 250:16
**letters** 222:4
236:25
**letting** 112:21
**let's** 53:16 79:24
100:19 104:15
107:9,11
113:16,18
125:23 173:17
178:14 198:12
198:17 221:21
229:5 252:15

252:18 260:9
271:10
**level** 39:6 278:6
**levels** 167:18
170:20,21
171:6
**library** 189:17
**lien** 220:11
229:22 237:1
**liens** 223:20
**lies** 58:14 106:6
**life** 29:24 121:7
121:14 213:11
254:4
**limit** 103:24
109:2 111:22
**limited** 19:12
109:13 120:12
156:25
**line** 38:21 41:9
67:12,16 94:15
179:4 188:6
198:2 249:1
279:8,8
**lines** 66:8 67:9
94:16 216:15
**list** 74:13 211:10
211:13 242:23
276:13
**listed** 243:24
**listening** 135:13
**litigation** 7:10
17:14,19 19:3
19:6 139:21
228:24
**little** 34:4 37:13
134:16 140:24
181:6 189:3,4
204:23 212:11
233:22 247:16
253:16
**live** 19:2 27:14
29:15
**LLC** 131:11
229:17

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 304 of 326
FREEDOM COURT REPORTING

Page 303

**LLP** 2:8,13
**loan** 31:11,14,25
　33:12,15,15,21
　36:20 37:21,22
　40:16 41:16
　42:1,16 44:6
　44:20 47:8
　49:5 50:15
　68:14 69:22
　70:2,5 71:24
　74:14,21 75:4
　75:10,15 83:6
　93:8 96:1,9,15
　103:13 108:15
　115:2 117:21
　121:7,14 123:5
　128:17 133:4
　134:21 137:1,3
　137:5 141:18
　141:23 143:1
　143:14 144:7
　150:12 153:1
　153:24 155:14
　157:16,20
　173:11 174:6,7
　176:12 178:15
　178:20 182:3
　184:10 211:12
　211:14,24
　212:2 215:15
　217:18 241:6
　254:4 259:23
　259:25 260:4
　262:11,14,18
　264:24 265:25
　268:2 271:11
　271:14 272:10
**loans** 21:7,17,19
　21:24 22:2,5
　49:2 73:6
　141:12 177:10
　209:21 218:2,6
　277:13,19,20
**local** 43:17 45:3
　97:20 203:3

**locate** 105:16
　112:11 195:8
**located** 16:21
　20:17 26:4
　28:10,13 42:25
　63:16,17,18
　159:9,10
　184:17 219:3
　231:19 241:16
**location** 20:11
　22:3 26:19
　49:25 115:1
　166:13,16,17
**locked** 36:24
**lodge** 44:10
**log** 42:7 243:7,8
**logs** 99:9 237:15
　239:7 240:17
　240:19
**log-in** 36:25
　163:19,23
**long** 7:14,18
　11:1 12:10
　13:23 22:10
　23:24 25:10,12
　26:7 27:2
　60:22 145:13
　211:20 229:3
　256:6 260:9
　276:13
**longer** 9:2 257:7
　273:25 274:14
**look** 30:9 47:5
　68:7,25 86:15
　117:13 124:6
　138:14 139:18
　140:9,22
　145:18 159:22
　161:19 190:23
　200:23 201:22
　205:21 211:6
　220:8 225:2,5
　226:13 228:8
　235:17 238:15
　240:24 242:6

　242:24 243:5
　246:25 274:8
**looked** 133:1
　163:9 230:18
　256:9,18
**looking** 11:23,24
　116:25 140:17
　146:1 168:20
　188:6 191:9
　210:7 278:8
**looks** 32:24
　187:1 202:1
　219:20 222:4
　226:6 233:16
　233:16 237:2
　242:9,13,13
　243:25 244:19
　245:5,8 246:4
　246:5,20 248:5
　249:22 253:24
　253:24 274:6
　274:10 276:19
　277:1
**loss** 11:11 12:19
　12:22 13:6,7
　13:10,20 14:4
　14:5,6,13 15:4
　15:6,20 16:9
　16:17 28:17,22
　184:1 242:18
　263:23 264:2,4
　264:20 268:25
**lot** 78:9 94:9
　109:8 115:14
　131:7 257:10
**lots** 31:7
**Louisiana** 2:14
**love** 109:23
**lower** 169:4
**LPS** 2:18 9:3,13
　32:8,22 35:18
　36:3 37:8 38:7
　39:2 40:10,12
　40:13 41:16
　47:22 48:13,13

　48:20,22 49:15
　49:20 50:19,22
　51:5,6 52:22
　54:1,3,10,12
　54:15 61:7
　62:24 63:20
　64:6 65:13,16
　67:16 69:21
　70:15,19 71:16
　71:18,23 72:5
　72:10 74:12
　76:14,22 77:4
　77:18 78:2,20
　79:8,21 82:14
　82:17 83:17
　84:8 85:8,9,12
　85:14,16 86:13
　86:21,23 87:1
　87:4,19,23
　88:15,18,22
　89:1,1,2,5,5,7
　89:13,21 92:1
　93:6,11,13
　94:2,3 95:3,8
　95:12,12,14,15
　95:16,19 96:3
　96:4,10,10,23
　97:1 98:22
　99:22,24 102:6
　102:14,20
　103:7 105:13
　105:18,24
　106:21 108:4
　108:13 117:25
　119:13 122:4
　124:24,25
　125:2,10,18,19
　125:21,22,22
　125:24 126:1
　126:21 127:4,6
　127:10,18,19
　127:21 128:3,5
　128:23 129:1,4
　129:7,11,17
　131:12,14,16

　132:10 133:7
　133:23,25
　134:12 141:6,7
　141:17 142:1
　142:12,14,18
　142:24 143:15
　145:21 146:4
　146:14,15,24
　147:1,8,10
　148:9 149:7
　150:14,18,23
　150:25 151:17
　151:19,21,24
　152:2,6,15,17
　152:23 153:4
　153:10 154:3,8
　154:11,19,22
　155:1,5,13,18
　156:4,7,10
　157:3,21
　158:19 159:16
　164:16 165:22
　171:24 174:10
　175:11 176:9
　177:9 182:8
　183:12 187:4
　188:10 196:10
　203:25 204:6,8
　204:11 205:24
　206:1,8 207:8
　209:4,12,15
　211:10,13
　212:12,16
　215:4 217:24
　218:10,15
　219:23 229:14
　229:19 230:9
　238:7,20
　239:15,18,21
　241:8 242:9,18
　244:23 249:5
　249:12 251:2,3
　253:6 254:17
　255:19 260:11
　260:18

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 305 of 326
FREEDOM COURT REPORTING

Page 304

**LPS's** 32:19
40:17 88:12
97:2 102:19
127:15 158:13
212:1
**LSI** 126:25
127:1,8,12
**lunch** 118:6
123:1 150:4
190:16 245:20
255:7
**lunchtime**
252:23
**Lynn** 226:23,24

**M**

**Mac** 180:22
**Madam** 69:15
203:18
**Mae** 180:11,22
**mailed** 258:10
**main** 172:14
**maintain** 14:8
143:20 209:15
**majority** 112:9
**making** 21:15,16
22:7 45:12,20
45:21 46:10
55:12,17 56:6
56:8 59:19,19
60:8 104:4
116:12 145:8
231:25 236:10
**malicious**
267:20
**manage** 8:2 65:8
65:24 81:5
141:11 180:4
264:19 280:2
**managed** 13:13
**management** 8:3
62:13 64:9,17
65:3,20,22
66:2,3,8 67:19
67:21,23,24,25

68:11,15 70:23
71:4,7,12,19
71:22 72:13,14
72:20,21 73:8
73:10,23 74:6
74:18,22 75:11
75:21 76:2,16
78:6 81:23,24
82:5,6,9,10,11
82:12,17,18,19
82:21,22 83:3
83:10,11,16
84:1,3,5,9 85:1
85:3 90:13,17
90:18,18,20
92:10,16 94:24
95:1,4,7 100:9
100:9,10,21,23
101:2 102:21
102:23 117:2,5
117:8,10,23
118:3,5,19
122:23 124:17
124:19,20
126:18 135:1,3
135:7,10,12,21
135:21 136:5,9
136:10 142:8
145:22 146:7,9
153:15 156:16
157:11,16,21
163:8 170:7,11
171:12 173:10
174:11 177:5
184:20,24
185:18,21
194:3 198:1
201:7 205:1
207:24 208:9
208:15,22
209:2,2,2
210:23 219:4
230:23 231:8
231:11,16,20
232:2,9 238:10

241:21,25
242:2 247:4,6
248:3,4 255:14
255:16 273:7,9
277:12 278:1
**manager** 14:21
15:2,3,19
18:16,17 22:18
22:19 24:5
25:21 26:1,8,9
26:10,12,15
27:3 49:17
84:11 208:11
208:13
**manages** 65:5
141:8 154:6
**managing** 19:9
19:12 176:24
264:10
**Mankato** 153:5
166:11
**manner** 192:16
**manufacture**
267:11
**manufacturing**
268:22
**March** 10:7
48:16 258:9
**Marietta** 20:11
**mark** 68:22 69:1
190:22 235:14
251:15
**marked** 30:2,4
31:1 32:14,17
68:19 69:18
75:5 116:25
119:14 132:21
138:22 139:2,6
140:13 190:20
198:23 199:6
202:12 203:16
203:20 205:18
218:21,23
219:15,17
220:16,18

222:4 224:6
229:9 232:19
236:20,23
237:10 238:13
240:25 241:2
242:4,21
243:13 244:13
245:24 246:2,7
246:10 249:15
249:17 253:8
253:22 254:1
255:3
**market** 145:13
176:21,25
**marking** 69:4,16
**Marques** 183:8
**marriage** 29:15
**Martisek** 64:20
64:22 73:21
90:24 91:3,12
91:22
**Mary** 187:2
**match** 131:25
**matches** 253:15
**materially** 55:5
**matter** 5:3 42:15
43:14,15 59:4
74:23 106:24
178:4 184:9
**ma'am** 116:20
**MB** 162:3,5
**McClary** 1:22
281:6,13 282:5
282:18
**McNamee** 187:3
**mean** 12:21
50:25 77:23
79:22 82:1
89:10,11 93:20
94:14 95:20
102:1 112:17
125:21 130:25
144:1,18 158:6
162:4 168:12
172:12 184:18

188:23 189:8
207:10 211:5
211:20 214:23
224:19,21
225:5 226:16
228:25 234:17
248:23 260:6
264:15 265:6
268:15 269:3
275:21 279:24
280:19
**meaning** 189:17
**means** 13:1
50:19 65:10
169:3 246:17
249:1,10
**meant** 190:2
**measure** 66:4
169:4 170:20
171:22
**measured**
167:20 171:13
**measurements**
170:19
**measures** 170:2
170:16 172:14
**mechanism** 68:2
167:11 168:24
212:1 215:25
231:5
**mechanisms**
100:22
**medium** 44:4
50:14
**meet** 6:9 94:14
208:24
**member** 75:18
90:22 96:11
97:2 188:14
**members** 64:16
64:18 66:13
95:3
**Mendota** 63:21
64:2 188:12,13
252:3

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 306 of 326
FREEDOM COURT REPORTING

Page 305

**mention** 27:9
79:7
**mentioned** 20:16
63:2 91:2
118:4 131:10
131:13 171:9
198:7 266:17
**mentions** 276:4
276:11
**merely** 216:8
**merger** 33:16
**mess** 159:13
**message** 183:21
195:24 196:21
**method** 186:2
**MICHAEL** 2:13
**microphone**
203:19
**mid** 16:8,8 24:13
**Middle** 234:2
**might've** 240:22
**Mike** 5:17 30:16
84:14 105:8
106:15 107:20
111:4 115:6
140:15 144:24
167:24 210:5
213:7 225:4
228:1 238:24
246:25
**Mike's** 140:22
**mill** 114:17
**Milton** 28:8
**mind** 96:6
**mine** 110:21
**Minnesota** 49:25
64:3 153:5
**minute** 110:17
116:15 128:9
178:13,14,19
226:13 229:13
235:18,23
**minutes** 42:12
53:18 193:1,25
195:5 232:24

255:25
**misinformed**
34:11,12,15
**misrepresent**
275:22
**missing** 230:22
231:10
**mistakes** 168:15
**misunderstood**
116:7
**mitigation** 11:11
12:19,22 13:1
13:6,10,20
14:4,6,7,13
15:4,6,20 16:9
16:17 28:18,22
263:24 264:2,5
**model** 152:13
168:23
**models** 21:14
**modification**
13:3
**modify** 181:20
**module** 169:11
171:12
**modules** 38:3,23
39:1 70:24
81:25 204:11
239:5
**moment** 50:3
140:9
**moments** 43:14
43:16
**Monetary** 173:3
**money** 109:8
143:11 148:21
150:18,23
154:20 262:25
**moneys** 15:11
142:25 150:10
262:22
**monitor** 191:17
**monitoring**
141:15

**monthly** 85:4,6
85:7
**months** 11:3,4
11:16,19,21
23:25 28:24
29:2 258:5
**morning** 25:4
39:18 40:1
**mortgage** 1:7
2:6 5:4,22
10:22 17:7
22:2 37:16,20
51:1,20 53:3
54:12,15,19
75:19 77:2,8
78:2,4,11 80:1
80:13,24
127:11 141:12
143:1 150:12
153:6 156:13
157:5,8,20
159:11 161:9
162:9 165:5
166:7 173:15
176:12,17
177:19 178:10
178:24 180:6
180:20 181:10
182:3,8 186:7
200:4,5,10
202:16 203:11
206:18,24
207:10 217:4,6
217:16,22
219:1,9,13
220:11 221:4,5
221:6,12 222:8
222:25 223:5
224:13 225:24
225:24 226:3,9
229:22 231:14
236:25 237:2,6
237:9 243:19
246:4 257:20
257:23 258:15

259:21,22,25
260:4 262:8
267:12 268:9
268:13,18
270:19 271:1,9
279:17
**mortgagee**
165:16
**mortgages** 22:6
22:8
**MortgageServ**
51:13
**mortgaging**
51:21 266:9
**mortgagor**
180:24 264:11
264:20
**mortgagors**
267:21,24
268:23,24,25
**motion** 75:25
139:23
**motivation** 9:13
**move** 15:18
140:24 199:3
214:20
**moved** 15:4
**Moving** 188:3
**MPS** 118:16
**MSP** 29:4,7
31:20,22,24
32:19,21 33:20
34:7 35:18
36:14,25 37:9
37:15,16,21,23
38:2,6,23 39:7
39:25 40:1,12
40:13,16 41:6
49:3,14 50:19
50:20,23 51:7
65:13 73:15
74:16 94:19,22
95:11 96:9
98:22,25 99:10
99:14 100:2,4

100:4,5,6,7,19
101:3,15,20
102:19 118:15
119:3,16 121:8
133:14 134:6
135:22 136:12
142:16 156:19
156:22,24
173:12,18,23
213:24 215:21
237:15,24
238:6,11,17
239:5,19,25
240:8,23
242:19 243:3
243:11 245:2
246:19,20
248:5,19 253:1
253:20 277:11
277:13 278:1
**multivarious**
177:7
**muscle** 211:18
**M-A-R-T-I-S-...**
64:25

**N**

**name** 5:11,15,17
5:21 6:7 18:1
48:11,15 62:21
65:18 72:6,18
82:2,20 87:11
90:25 107:17
117:9,16
173:16,21,22
173:25 174:3
183:8 203:25
204:5 210:1,2
230:18 255:21
260:14 274:18
274:20,23,25
**named** 186:8
**names** 51:10
82:8,25 126:24
**narrow** 110:18

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 307 of 326
FREEDOM COURT REPORTING

Page 306

**narrowly** 118:24
**national** 1:8,20
  2:12 5:9,18
  7:15 8:18
  35:17 40:5
  47:25 48:7,18
  89:4 114:17
  148:19 167:19
  203:23 224:12
  226:2 229:13
  230:6 250:25
  257:12 260:16
  260:24
**nature** 8:9
  136:24 156:4
  182:13 206:19
  268:5
**near** 20:12
**nearby** 27:14
**necessarily**
  67:11 91:18
  96:5 103:2
  171:11 185:6
  254:23 280:5
**necessary** 80:15
  93:9 177:22
  199:3
**neck** 225:7
**need** 21:17 47:5
  47:15 68:2,4
  89:5 96:12
  97:18 103:4
  104:6 112:17
  113:5 115:14
  116:21 118:2,4
  135:4 149:24
  150:1 171:3
  174:20 187:20
  194:13 199:4
  207:19 210:11
  213:13 218:12
  233:6 240:5
  280:17
**needed** 205:12
**needs** 103:4

  179:7 182:4
  216:4
**negative** 272:17
**Negligence**
  269:7
**negligent** 269:9
**neither** 180:15
  222:11
**network** 65:5,7
  65:22 66:4,5
  66:25 67:3
  70:25 71:3
  73:12 75:18
  83:20,22 84:21
  90:20 92:2,4
  92:10 94:3
  95:3 96:11,16
  96:18 97:2
  130:15 143:15
  147:6,10,18,19
  147:24 148:9
  148:20,25
  149:9 151:2
  155:15 168:9
  170:17 171:25
  172:9 185:9,16
  186:3 206:2
  209:4,8,10
  212:14 215:8
  215:18 216:6
  216:24 223:4
  235:14
**never** 17:12
  25:16 78:2
  86:7 96:6 97:9
  116:11 120:21
  135:19 152:3
  154:13 248:12
  258:6
**new** 26:22,24
  33:15 72:3,4,5
  72:9 117:5,15
  123:14 156:1
  158:22 163:5,9
  186:23 191:12

  193:9 217:12
**Newland** 1:14
  3:2 5:2 6:1,7
  31:20 32:21
  33:17 35:14
  36:11,18,23
  47:4 48:7,23
  50:11 53:25
  61:5 63:11
  73:24 109:4
  116:24 121:6
  128:15 139:6
  150:8 157:15
  168:20 188:4
  191:3 199:1
  215:3 222:3
  225:22 239:24
  256:7 273:6
  281:7 282:8
**NEWMAN** 2:18
  119:17 135:13
  213:19 247:3,6
  247:8,13
  251:23
**newsletter**
  203:22 204:4
**NewTrak** 71:6
  71:10,11,14
  117:3,6 118:18
  118:20 193:5
  193:18 195:19
  197:3 273:8,10
**Nick** 2:3 5:15
  6:8 46:5,14
  53:14 54:24
  58:5,25 59:20
  60:20 68:10
  78:9 98:10
  105:5 107:23
  109:18 110:14
  116:5 118:14
  120:6 137:24
  198:10 232:23
  235:24
**nickel** 236:13

**Nick's** 119:19
**NIE** 117:18
  158:16,22
**night** 211:20
**Nods** 250:20
  276:3
**NOI** 161:22
  162:3
**noncertified**
  259:14
**nonemployed**
  10:25
**non-monetary**
  172:23 173:4
**non-objection...**
  47:13
**normal** 208:21
  209:24
**normally** 123:23
  192:15 223:3
  223:15
**North** 2:8
**Notary** 281:13
**note** 4:18 98:24
  99:8,9 100:11
  161:14 166:2
  179:1 199:12
  199:15,22,23
  200:1,3,10,14
  200:15,15,16
  200:18,23
  202:5 231:15
  237:15 239:7
  240:17,18
  246:14 272:12
**notes** 44:3,5,16
  44:20 47:16
  49:14 50:13,15
  68:11,17 78:6
  86:15 98:23
  99:5 100:10,24
  117:13 142:8
  157:12,16
  177:18 187:11
  188:4 193:19

  193:24 194:3
  195:8 196:15
  222:21 231:20
  238:2 239:25
  240:4 243:6,7
  243:8 246:13
  248:18 256:9
  282:9
**notice** 30:6,15
  32:3 39:12
  45:11,24 46:4
  98:18 117:1
  161:23,23,24
  179:4 237:21
  245:6 253:2
  257:20,25
  261:16,18
**noticed** 193:15
**notices** 261:19
**notification**
  61:17
**notified** 178:25
  223:3
**notify** 178:22
  179:3 223:7
**notifying** 161:25
**November**
  184:14 233:13
  235:4,8 257:5
  257:17 275:8
  278:8
**number** 30:17
  97:4 134:22
  158:22,23
  193:16 194:7
  195:3 211:24
  225:13,13
  227:9
**numbered**
  194:22 195:17
  202:4,21,23
**numbers** 193:18
  253:18
**numerous** 258:3
**N.A** 1:8

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 308 of 326
FREEDOM COURT REPORTING

Page 307

## O

**oath** 3:7 46:23
47:7 281:2
**object** 33:22
35:10 47:9
49:6 53:9
57:12,17 58:13
58:20 60:19
80:17 87:22
98:8 103:9
111:19 113:6
129:13 130:11
177:6 180:14
207:1 210:15
224:16 225:11
226:19 235:21
**objected** 206:19
206:20 207:2
**objecting** 227:13
**objection** 35:5,5
35:6,8,11,12
40:4 44:10
45:22,23 46:3
52:19 53:20
54:21 55:25
56:6,9 61:20
80:6 103:11
104:12,13,14
104:20 106:1
107:10 109:12
111:23 113:22
113:25 114:20
115:3 116:4,9
116:12 120:25
164:5,7 180:23
181:15 192:2
207:11 213:4
224:22 225:20
236:10
**objectionable**
60:9,10,15,17
60:20
**objections** 35:2
35:3 44:16

45:10,12,20
46:6,15 47:2
47:14 55:3
59:19,21 60:8
69:9 109:25
111:20 113:13
115:7 120:19
181:16 206:20
207:3
**objection's**
129:25
**obligations**
217:1 279:9
**obtain** 79:9
80:15 133:16
134:7,24 159:7
258:5
**obtaining** 68:8
77:8
**obvious** 88:19
**obviously** 25:19
89:15 120:25
137:18 207:3
213:7 251:10
252:20 278:17
**occasion** 79:10
**occasions** 258:3
**occupied** 245:7
**occur** 153:24
**occurred** 243:23
**October** 245:18
**Ocwen** 12:9,10
12:17 13:12,24
15:8,25 16:18
16:20,25 17:4
17:13,17,19,22
18:24 29:7,12
**offer** 82:19
230:17
**offered** 82:14,15
179:17
**offering** 46:22
**offers** 110:16
**office** 2:3 61:12
161:5 164:13

164:19 166:20
167:1 192:23
196:1,9 197:23
230:3
**official** 203:3
252:5 281:9
**oh** 25:11 37:8
70:4 73:5
121:25 145:6,8
193:15 198:19
224:18 248:11
**okay** 6:17,20 7:1
7:18 8:14,23
9:10 10:14
14:12,23 15:16
15:24 22:22
23:13 25:22
26:3 27:9,19
31:15 32:16,25
33:3,7 34:1,16
36:6,10 38:2
38:15 39:11
40:1,14 41:5
41:22 42:6
43:9,12,22
45:15 46:8
47:21 48:7,11
48:18,23 51:10
52:22 53:2,7
60:5 62:16,18
63:2,12,19
64:5,12,15
65:6 66:12,15
68:21 71:6,21
75:9 77:15,22
78:1,14 79:20
79:24 80:1
83:16 84:6
85:16 87:25
88:3 89:18
90:9 91:15
92:5,20 97:23
98:2 99:6
100:3 104:9,21

106:11,18
107:9 113:16
113:23 115:5
116:1,6,13,17
116:22,22
117:8 119:18
121:25 122:20
123:17 124:13
125:2,13 126:8
126:19,24
127:17,24
129:18 131:2
131:19 132:18
133:2,6 134:18
135:9,25
138:12,15,15
138:20 143:8
143:18,22
144:6,11 145:8
146:3,10,22
147:8,16 148:1
148:5,16 149:4
149:12 151:16
159:12 160:6
164:3 169:7
172:11 175:9
178:4,17
181:19,25
182:13 185:8
188:3 194:5,13
194:15 196:14
197:12 198:4
199:1,14,17,25
200:9 202:14
204:7 205:12
205:21 207:13
211:1,4 212:19
212:21 213:20
213:23 214:2
216:2 222:3,14
227:25 231:9
235:7 236:9
237:17,23
238:3,19 239:1
242:6,15

243:20 244:1
244:15 246:11
248:12,12
249:8,25 250:6
251:6,17
253:10 254:8
255:5,15
256:14 257:6
260:8 261:4
266:8,21 269:7
275:20 278:19
278:25 280:6,8
**old** 239:11
**once** 6:14 37:23
89:3 196:21
**ones** 119:4
**One's** 28:12
159:13 166:1
179:21 219:11
241:4 261:25
262:2
**ongoing** 229:3
**on-site** 101:24
102:15,16
103:3,8 105:16
107:14 108:14
**open** 68:5
**opened** 159:5,21
159:21 160:3
169:24
**opening** 26:22
160:13,17
**opens** 231:5
**operate** 207:21
**operates** 107:16
**operating** 72:15
**operation** 25:23
219:13
**operations** 7:23
9:21 10:18
14:14,16 15:4
15:19 16:11,17
21:6 32:6 36:7
36:9 40:12
86:18,21 98:4

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 309 of 326
FREEDOM COURT REPORTING

Page 308

opine 180:25
235:22
opinion 123:5,7
123:12,19,20
124:1 180:15
180:15 217:18
242:12
opinions 124:10
125:7,11 126:5
126:11,20,22
127:7,12,21
opportunity 6:9
18:24 57:7
oppressive
267:19
Option 1:7 2:6
5:4,22 10:22
10:23 11:1,6
11:13,18 12:1
12:8 28:9,12
28:16 29:1,4
70:17,20 80:4
80:8 93:2,9,10
93:17 95:25
99:18,19
101:21 102:3
102:10 106:21
108:4 114:23
119:3 128:20
129:1,8,17
131:14,20
132:12 141:17
141:21 142:5
142:25 143:4
143:10 144:13
146:4,14,17,21
147:5,19 148:2
148:7,18 149:6
150:11,21
151:23 152:2
152:22 154:17
154:19,25
159:11,13
160:10,14,16
161:9,12 162:9

162:14 165:24
166:1,7,20
173:15 176:17
179:13,14,21
180:2,4 182:8
182:14,17
186:7,14,17
187:8,12
191:17 196:8
196:21 200:4
200:11 201:2,9
206:11 212:5
215:15,19
216:9,12 217:4
218:17 219:11
237:14 238:16
238:18 239:11
239:15 241:4
241:16,24
242:1 243:4,19
246:5,16 247:1
247:20,24
249:20 252:3
253:25 257:22
257:22,25
258:4,10,12,19
258:24 259:1,3
259:8,11,20
261:25 262:2,4
262:18 266:6,7
272:14 279:13
279:20 280:2
order 53:19
69:16 120:18
124:15,21
127:22 207:16
226:25 227:2
227:19 228:5
228:11,18
229:6 251:10
ordered 124:10
ordinarily 191:6
organized
157:23
original 201:11

250:16 279:1
originally 139:9
origination
37:22 76:9
Orlando 16:23
ors 136:21
OS 159:25
OSI 18:4,6,15,19
18:23 19:1,6,8
19:9,19 20:1,3
20:6,7
ought 61:2
outside 96:18
114:4 227:6
Outsourcing
18:2,3
outstanding
164:15
overall 89:20
overhead 156:7
overly 44:11
overreaching
108:20
overriding
232:11
overruled 110:1
oversight 8:1
owed 15:11
152:17 153:7
164:14
owned 34:9
40:17 49:4
125:10,19
owner 80:1,23

_____
**P**
P 2:7,13 210:20
Pacer 228:2,10
228:23
package 93:11
175:1 192:22
216:5,7 249:19
250:16
packed 265:1
packet 247:13

page 3:3,11 4:2
32:18 68:17
158:2 162:21
164:10,12,23
195:14 203:2
204:23 220:9
221:8 243:6
250:8,10,11,13
273:7,10,15,16
274:4,8,9,11
275:6 276:22
276:25 277:10
pages 157:10,11
193:22,23
194:10,22
195:5 200:20
202:6,10,11,22
202:24,24,24
202:25 203:1,7
250:9 276:16
278:4 282:8
paid 53:8 69:22
70:2,5 126:16
126:16 130:19
137:2 142:18
155:5 156:4
165:6 177:19
208:7 213:11
213:16 223:9
235:5 244:19
244:25 257:24
268:17 275:3
Palm 63:18
paragraph
140:25 141:14
141:25 142:7
142:23 150:9
152:6 156:10
234:2 257:17
261:15 262:12
267:9 268:4
269:8
parameters
216:13
parcel 209:9

239:20
parent 9:8 34:9
40:17,20 47:19
49:4 51:7
229:14
parents 165:13
part 12:2 16:16
17:16 65:7,8
72:9,21 73:12
75:4,10,11
79:8 85:4,9,12
85:14,16
102:17 113:22
116:2 117:22
118:7 122:20
130:15 135:22
147:8,12 148:6
157:12 184:20
192:6,10
201:21 204:8
206:1 208:21
214:24 216:25
223:15,17
224:11 238:3
239:20 241:3
244:21 245:19
247:11 248:2,7
249:3 276:10
partial 99:16
207:18
particular 38:6
65:12 79:24,25
80:1 83:6
114:20,24
115:1 176:22
177:1 209:9
212:2
parties 130:16
131:21 152:1
181:20 270:19
282:12,13
partner 11:13,15
12:5 209:4
partners 37:25
54:3 205:9

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 310 of 326
FREEDOM COURT REPORTING

Page 309

**party** 152:8
    209:17 264:12
    271:16
**pass** 196:11,13
    273:1
**passed** 138:10
    138:22 191:12
    196:21 213:17
**passes** 196:12
**passing** 191:20
**pattern** 266:9
    267:10
**pay** 60:2 85:1,7
    85:18,24 86:1
    86:7 110:7,8
    110:11,13,20
    110:23 111:2
    115:19 131:22
    138:16 143:11
    143:16 146:18
    146:25 147:5
    149:13 150:17
    150:20,21
    172:20 178:9
    184:10 255:17
    258:14 271:23
    274:14 275:4
**payee** 245:6
**paying** 234:25
    265:3 274:24
**payment** 13:3
    21:20 54:9
    122:11 143:4
    151:23 173:17
    173:21 183:25
    199:19 208:1
    257:20 259:2
    268:24 272:2
**payments** 21:16
    209:3 234:23
    259:17,18,20
    260:3,3 263:14
    263:18,20
    269:10,15,18
    269:25 270:1,4

**payoff** 37:23
    152:7,9 178:11
    196:2 258:4,7
    277:10,12
**payoffs** 277:19
    277:22
**payouts** 234:12
**pays** 143:13,16
    156:7
**peer** 90:23 91:2
**peers** 169:13
**penalties** 258:22
    259:22,25
**penalty** 258:20
**pending** 61:10
**people** 13:21
    21:6,15,19
    42:19 90:15
    92:9 98:7
    103:3 241:5,7
    241:7,9 253:20
    273:22 278:6
**percentage**
    54:18 94:15,17
    144:2 209:20
    210:8
**perform** 13:11
    126:11,22
    144:16 148:20
    149:10 168:1
**performance**
    167:7,8 168:25
    168:25
**performed**
    142:25 150:11
**performers**
    172:21
**performing**
    167:12 169:6
    234:7,11
**period** 12:12
    16:21 17:4
    20:19 25:15
    26:20 39:12
    48:1 149:2

199:19
**person** 36:3
    38:10 49:12
    52:8,11 62:7
    62:11 73:21
    74:2 80:22
    84:8,19 87:18
    89:20 101:5
    105:17 111:6,9
    112:16 183:8
    208:21 215:4
    227:5 231:24
**personal** 184:12
    258:13 259:12
**personally** 7:10
    186:12 281:7
**persons** 64:5
    134:22 273:19
**phone** 21:19
    93:2 145:6
**phrase** 206:21
    207:11
**phrased** 135:23
**physically**
    200:17
**pick** 93:2 163:7
    163:12 201:24
**picked** 161:4,5
    162:24 163:5
    163:16 197:23
**picking** 21:18
**pictures** 123:22
**pink** 204:14
**place** 1:20 5:9
    9:10 20:7 23:9
    48:12,14 77:5
    94:16 102:16
    103:3 119:2
    126:1 133:4
    143:6 216:4,16
    217:10,13
    219:12 224:3
    233:20 255:20
    255:21 261:21
    261:22 262:13

262:18 263:11
    265:18 270:14
    270:15
**placed** 114:23
    128:16,16,19
    133:3,7 261:5
    261:19 262:7
    262:10,10,14
    265:12,13
    269:25 270:4
    270:10
**places** 102:15
    142:11
**placing** 114:25
    261:9 262:9
**plaintiff** 152:8
    152:10 262:23
    263:1
**plaintiffs** 1:5,15
    2:2 3:12,13,14
    3:15,16,17,18
    3:19,20,21,22
    3:23,24,25 4:3
    4:4,5,6,7,8,9
    4:10,11,12,13
    4:14,15,16,17
    4:18,19 5:16
    30:2,5,6,23
    32:14,17 69:2
    69:18 75:7
    132:22 139:2,6
    140:13 143:1
    150:12 156:13
    157:8 190:20
    190:22 193:17
    194:2 195:20
    197:6 198:23
    199:6 202:12
    202:14 203:16
    203:20 205:18
    206:18,23
    207:10 218:21
    218:24 219:15
    219:18 220:16
    220:19 224:6

227:16 229:9
    232:19 236:20
    236:23 237:10
    240:25 242:4
    242:21,24
    243:13 245:24
    246:2,7,10
    248:20 249:15
    249:18 253:8
    253:22 254:1
    255:3 257:18
    257:19,21
    258:3,6,10,11
    259:10,10,17
    259:18,21,22
    259:25 260:3
    261:6,10 262:7
    262:11,20
    263:4,7,11,15
    263:18 264:17
    265:2,4,7,17
    268:5 269:5,11
    269:13,15,19
    270:1,5,11,16
    270:18,23
    271:22 272:1,6
    272:9,17,19
    273:6
**plan** 13:3
**platform** 29:4
    35:18 37:16
    40:17 51:5,20
    72:4 73:5,10
    100:4 117:14
    117:24 122:21
    122:23 154:22
    157:21 163:6
    204:24 240:23
    277:13
**platforms** 50:22
    51:8,11,22
    81:25 135:20
    204:11,17
**play** 27:14,16
    110:3 207:15

FREEDOM COURT REPORTING

270:3
**played** 7:4
**please** 5:12,14
    7:14,25 12:13
    12:22 20:4
    21:3 24:24
    31:18 37:13
    38:8,12 50:23
    51:11,18 53:8
    54:16 62:18,20
    62:22,25 63:8
    63:13 64:8
    65:1,18,21
    66:16,20 67:23
    69:4 77:15
    84:15 105:25
    116:10 159:2
    168:18 183:25
    184:2,7,14
    199:18,25
    203:21 205:13
    219:18 220:9
    220:14 234:5
    242:15 250:1
**plural** 261:5,16
**poem** 205:6
**point** 7:5 9:25
    15:18 53:14
    55:23 80:10
    106:4,7,8
    137:16 151:6
    179:19 181:16
    221:17 224:4
    256:12
**points** 205:5
**policies** 114:25
    177:23 179:5
    179:21,22
**policy** 259:13
**pooling** 264:7,12
    264:23 271:4,6
    271:13,16
    279:18
**portal** 65:16,18
**portion** 21:9

36:8 65:13
67:25 71:15
91:8,12 98:24
123:13 140:11
140:12 146:7
147:3 156:12
156:19 208:6
208:11,14
209:1 223:8
224:9 225:23
226:7
**portions** 36:15
    36:17 38:6
    91:24 204:21
    204:22
**position** 7:21
    12:16 13:23
    16:14 22:17
    23:13 24:1,5
    24:20,23 25:8
    26:13 80:3
    86:10,24
    120:15 168:5
    186:13 188:17
    220:11 221:4
    237:1
**positions** 9:20
    14:2 16:24
    19:25
**possibility**
    171:20 244:18
**possible** 74:4
    167:2 214:5
    256:23 278:19
**possibly** 159:10
    233:17 248:6
**post** 2:3 263:14
    263:20,21
    269:10,18,21
**posted** 269:23
**posting** 261:20
    263:18
**potentially**
    127:11
**power** 58:2 79:5

79:15 262:3
**powers** 79:9
**practice** 170:18
    171:24 267:10
**practiced** 105:2
**practices** 17:7
    61:7,8,14,18
    266:10 268:4
**Pre** 203:25
**preaching** 113:4
**predatory**
    265:15
**Premiere** 17:25
**premium** 262:10
    262:14
**preparation**
    240:21
**prepare** 77:18
    77:20 79:13
**prepared** 76:17
    76:18 201:5
    216:19
**preparing** 79:11
    128:14 132:19
    196:16
**prepayment**
    258:20,22
**prequalify**
    148:11
**present** 2:17
    163:21,22
    200:2,6
**presented**
    180:16
**presenting**
    240:15
**presently** 163:20
    234:25
**preserve** 115:13
**preserved**
    192:15
**preserves**
    109:12
**preserving**
    56:10

**president** 7:19
    7:23 8:13 9:20
    9:21,23,23,24
    10:1,6,12,18
    11:8,10,24
    14:21 28:17
    32:5 49:18
    62:23 63:7,14
    65:2 86:13,17
    87:15 208:18
    235:12 273:20
**presidents** 62:13
    62:17 63:19,23
    64:4
**press** 42:23
**pressing** 42:17
**pretense** 263:16
**pretty** 26:21
    94:13,18,20
    140:18 191:2
    199:4 205:4
    213:3
**prevent** 13:7
    115:6,7
**previous** 11:20
    117:9 135:18
    179:1 222:8
**previously** 10:21
    15:10 30:4,15
    31:1 32:2,17
    44:6 47:11,11
    68:13 75:15
    132:21 136:15
    139:6 179:1
    198:6 199:6
    235:6 244:13
    246:2,9 249:17
    273:8
**pre-agree** 116:3
**price** 123:3,4,6,12
    123:19 124:1,9
    125:6,10 126:5
    126:11,20,22
    127:7,12,20
    217:18 242:12

**prices** 277:16,18
**primarily** 8:12
    22:1 23:16
    25:6 71:4 91:7
**primary** 8:1
    10:13
**principal** 23:9
    173:16,19
    178:10,14,19
    178:24 219:12
**principally**
    28:10 42:25
**principles**
    180:20
**print** 37:1,9 39:7
    42:8,17 74:24
    75:1 189:11
    194:24 253:6
**printed** 42:22
**printing** 254:9
**prints** 195:4
    247:11,11,14
**prior** 6:9 9:18
    10:20 11:16
    12:6,8 15:23
    17:22 20:3
    22:14,25 24:7
    30:10 39:18
    139:11 175:20
    183:4 196:17
    196:20 205:15
    220:10 221:3
    222:25 223:5
    223:20 232:4
    237:19 240:14
    246:22 254:9
    274:20,22,25
**privilege** 129:14
    129:22 130:4
**privileged**
    130:24
**privy** 175:19,23
    226:17
**prizes** 173:8
**pro** 45:2

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 312 of 326
FREEDOM COURT REPORTING

Page 311

**proactive** 13:20
**probably** 8:21
  16:8 31:3
  38:13 52:10
  70:11 161:16
  161:17 189:15
  208:15 210:13
  210:14 223:12
  224:21,23
  225:8 247:3,14
**Probate** 261:19
**probates** 8:9
**problem** 58:15
  105:8 110:15
  168:11 221:11
**problems** 106:15
  223:7
**procedure** 104:2
  108:25
**procedures**
  177:23 179:5
**proceeding**
  218:19
**proceedings**
  157:4 207:9
  227:17
**proceeds** 69:23
  70:3 196:2
  209:10,11,12
  257:24
**process** 65:20,21
  65:24 66:2,3,7
  67:17,21,25
  68:11,15,17
  70:23 71:4,7
  71:12,19,22
  78:6 79:8
  81:23 82:5,9
  82:11,18 90:18
  91:24 92:15,17
  94:23 95:1,4,7
  100:8,10,21,23
  101:2 102:21
  102:23 105:13
  111:18 118:19

124:16,19,20
134:25 135:3,6
135:21 136:5
142:8 146:6,7
146:8 153:15
154:6,10
156:16 157:11
157:16,21
158:10,11,12
158:20 159:5,6
159:20 160:3
160:12,13,17
161:2 162:21
163:8 164:20
170:7,11
171:12 173:10
173:12 174:11
176:14,16
180:5,10
184:20 185:18
186:22 188:3
188:20 189:5
189:25 190:1
191:7 193:23
194:3 195:8
197:3 201:7
202:7 205:1,23
209:1 215:21
215:23 217:19
218:11 219:4
230:23 231:5
231:11,16,20
238:4,10
241:21,25
242:1 244:5
248:2 273:7,9
274:16 277:11
278:1 280:3
**processed** 160:7
**processes** 68:6
  81:6 82:16
  120:16 176:24
  189:3,7,19,24
  201:6 216:5
**processing** 9:6

48:10,21 63:24
73:7 191:13
219:7 232:3
278:6
**procure** 78:25
**produce** 31:3
  62:2 94:25
  98:22 118:6
  119:13 121:9
  121:13 123:7
  210:20
**produced** 6:2
  30:15 68:12,13
  69:1 73:18
  75:2,11,15
  117:22 123:11
  132:19,21
  135:6 185:19
  185:22 200:10
  202:16 235:10
  237:13
**producing** 30:23
  137:17
**product** 29:10
  40:16
**production**
  193:9 205:15
  226:15 246:24
  276:21
**products** 82:13
**professional**
  22:22 29:24
  81:2 282:5
**profit** 156:7
  267:21,25
  268:2
**profits** 267:13
  268:10
**program** 25:14
  174:15
**programs** 122:4
  204:17
**projects** 168:6
**promissory**
  199:12,15,22

199:23 200:14
200:17
**promoted** 9:23
  9:24 10:5,17
  11:25 26:15
**promotion** 26:14
**promotions**
  14:19
**proof** 203:2
**proper** 20:10
  120:20,22
  180:10 269:11
**properly** 264:19
  269:9
**properties**
  277:17
**property** 80:5,11
  122:10,15,16
  123:21 124:1,5
  124:7,9,17,22
  124:23 126:6,7
  126:9,13
  127:20 165:8
  165:16 166:22
  167:2 184:13
  217:17 220:12
  221:4 242:12
  242:14 244:6,9
  245:13 261:10
  265:13,19
  266:6,12,14,25
  267:7
**propounding**
  7:6
**proprietary**
  53:10 138:1
  141:9 164:2,7
  212:24 213:2
**protective**
  207:16 226:25
  227:2,19 228:5
  228:11,18
  229:6
**protocols** 204:12
**provide** 17:16

41:24 52:2
53:3 54:1,9,15
68:1 70:13
81:14 93:15
96:3 105:13,15
122:7,12 126:5
129:12 130:14
130:18 133:6
135:11 136:21
136:25 143:10
147:11,12,20
148:19 151:14
152:7,9 153:11
153:21 174:7
174:19,20
178:2 182:2,10
192:11 206:4,7
215:20,25
216:25 217:2
218:1,4,8,15
241:14 266:18
266:23 277:12
277:14 279:10
**provided** 12:24
  41:20 44:6,19
  62:8 67:20
  73:11 75:21
  76:2 77:3
  79:18,21,22
  96:22 134:22
  136:5 139:22
  143:5 144:9
  147:6 148:23
  150:14 154:5
  161:12 162:14
  164:16 174:14
  179:9,11
  182:18 193:4,8
  212:4 216:8
  241:3 243:3,19
  253:16
**provider** 154:9
**provides** 33:12
  52:22 54:13
  65:10,22 74:13

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 313 of 326
FREEDOM COURT REPORTING

Page 312

82:17 83:25
93:11 147:4,9
151:17 176:18
177:10 182:14
218:1,17 241:6
**providing** 77:8
141:17 148:7
148:22 182:3
244:23
**provinces** 91:20
**provision** 94:1
127:7 128:3
182:9
**prudent** 178:22
**PSA** 264:8,13
**Public** 281:13
**publication**
186:23 256:20
257:7
**publicly** 88:13
88:15
**publish** 204:4
**published**
181:12 204:2
**publishing** 257:2
**pull** 68:25
157:10 189:10
189:13 230:17
**pulled** 30:21
228:9,22 229:3
248:6 252:25
254:3 255:7
**pulling** 174:23
189:14
**Pune** 248:21
**purchase** 18:9
210:9
**purchased** 217:6
230:5
**purchases** 209:8
209:18
**purchasing**
18:11
**purely** 127:24
**purpose** 48:5

201:1 225:21
227:5 230:25
265:16 266:12
267:11 268:6
**purposes** 48:3
59:6 75:19
78:5 260:21
**pursue** 206:17
206:22 207:8
**purview** 127:15
**push** 37:2 42:10
201:9,15
**pushed** 202:2
**put** 90:3 108:13
110:4 168:5
180:21 224:21
225:19 240:4
249:20 251:16
**putting** 107:14
**P-U-N-E** 248:22
**p.m** 1:19 166:3
186:25 197:7
197:22 280:25
**P309** 31:20,22
32:9,11,25
33:2,3,4,8,12
33:18 36:18,25
37:10 39:8,23
39:24,25 41:2
41:6 118:10
119:16 134:15
134:17 210:21
211:6 254:4,7
254:25

**Q**

**QA** 193:1
**qualify** 21:17
**quarter** 234:6
**quarterly**
234:11
**quash** 214:20
**question** 6:22
33:23 36:2
45:22 47:4,10

48:24 49:7
50:10,15,17
55:3,16,18
56:8,9 57:8,15
64:7 66:6 72:7
75:17 76:7
79:23 81:12
82:3 85:2 86:9
87:23 88:19
89:9 92:6 97:9
98:9,15 103:10
103:16 107:5
107:13 108:8
114:21 116:5
119:11 121:22
126:20 130:4
131:1,19 132:8
134:1 136:19
146:19 148:14
149:5 166:19
167:21 168:17
177:6 181:5
187:15 206:14
206:18 215:7
**questioning**
111:25 256:12
**questions** 22:15
34:13,15,17
46:14 47:1,13
56:20 57:5
58:6,9,20,23
59:15 60:9,10
78:10 103:18
106:14 108:21
110:5,24 111:1
111:3 112:24
113:5,14 120:2
120:11 140:10
140:23 181:15
187:12 208:16
236:1,4,18
256:8,13
257:11,12
260:23
**question's**

112:13
**quickly** 171:14
199:5
**quiet** 58:11
**quit** 59:15,16
113:4 274:23
**quite** 20:15 92:6
**quote** 44:13,14
265:1,2
**quotes** 277:12

**R**

**R** 282:1
**raised** 70:12
115:2
**ran** 252:23
**range** 108:23
234:20
**ranging** 105:4
**ranking** 167:4,6
167:8,25 168:3
168:22 169:3,5
169:8,9 172:24
**ranks** 168:24
**rapidly** 26:21
**rating** 66:5
**read** 33:9 40:23
94:5 140:2
179:1 184:6
234:5 248:24
254:22
**readily** 133:24
**reading** 112:5
142:7 207:5
**ready** 43:23
184:9
**real** 40:10 46:19
109:16,18
112:14,18
**realize** 15:16
211:19
**really** 59:4
138:16 148:15
158:2 205:12
210:7 279:20

**real-time** 277:12
**reask** 110:23
**reason** 53:11
109:19 110:14
135:23 168:4
187:6 247:18
275:8
**reasonable**
110:23 177:16
**reasonably** 55:7
55:8 114:12
**reasoning** 171:3
**reasons** 105:16
262:22
**recall** 10:19
12:12 15:21
17:8,21 18:11
18:21 19:11,20
20:19 21:3
23:22 25:11
26:8,23 28:14
32:1 37:3,11
72:18 117:12
123:10 163:25
274:17 276:24
**receivable** 19:10
**receivables**
18:10 19:14
**receive** 70:15
92:18 154:24
173:14,14,17
196:7 269:12
269:13 272:1
**received** 26:13
39:6 45:14,18
61:17 76:22
78:21 142:24
150:10 156:12
160:24 173:23
179:13 184:23
196:4 199:8
200:11 231:3
259:21 269:11
**receives** 66:5
209:10

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 314 of 326
FREEDOM COURT REPORTING

Page 313

receiving 156:11
198:3 234:9
257:20
recess 97:15
198:14 221:24
256:3
recognition
278:5
recognize 199:5
199:9 202:18
242:7,8 243:1
245:13 246:3
246:21
recollection
19:22
recommended
169:15
reconsider 55:25
57:9 105:7
record 5:7 8:15
45:13,20,22
46:7,9,10,15
46:24,25 47:14
50:5,6,7 55:14
56:24 57:1,3
59:21 68:10
69:3,4 73:15
97:14,16 100:4
107:24 110:4
113:8 115:12
115:21 118:2
119:17,21,23
119:24 120:1,7
121:23 128:8
128:10,11,12
130:1 132:3
143:21 150:2,3
150:5 156:11
187:23,24,25
194:16,17,18
198:12,13,15
198:19,20,21
198:22 207:25
210:19,19
216:21 221:23

221:25 224:22
225:20 226:22
228:16,19
232:15 248:13
256:2,4 280:20
282:9
recorded 161:16
202:16 220:11
223:5 237:3
recording 203:2
203:3 230:3
records 78:6
123:6 191:6
209:15 231:9
record's 112:20
113:7 238:20
recurring
124:11
redact 238:22
redacted 237:22
238:14 239:12
redaction 138:1
207:18
redactions
238:21 239:13
Redirect 3:6
273:3
redo 110:5,9,21
236:13
Reese 2:8
refer 40:9 71:13
72:5 81:24
82:9,11 93:8
96:7 152:20
174:22 221:16
249:19 253:21
260:22
reference 6:15
6:16 68:3,8
92:7 182:17
248:9 275:9
278:9
referenced
15:13 117:15
118:11 135:20

236:25
referral 54:10
92:2,4,7,19,20
92:23,24 93:11
95:8 96:4
143:14,15,16
159:23 169:16
173:15 196:3
215:22,23
216:1,3,5,7
226:22 246:22
248:7 276:21
276:21,21
referrals 188:18
276:17 277:1
referred 72:12
97:1 125:15
128:25 173:24
174:9 206:5
260:19 277:17
277:21
referring 85:17
93:21 95:18
150:13 154:20
180:5 185:3
260:24
refers 9:1 93:13
278:20
refigured 171:1
reflective 276:7
refuse 259:9
refused 259:1,20
270:13
regard 13:19
61:24 103:12
106:14 108:14
141:18 257:12
270:7
regarding 44:20
50:12 61:13
78:24 99:3
103:18 114:25
115:2 134:21
143:1,5,10
150:11 157:4,8

157:20 166:21
167:1 173:11
180:11 187:13
190:14 206:14
206:15 259:13
271:14 272:23
272:23 273:17
regardless
104:24
regards 61:7
181:10 218:11
218:18
region 167:17
Registered
282:5
regular 217:16
regularly 208:24
regulations
180:11
reign 104:23
relate 273:16
related 125:10
relation 167:12
270:22
relations 245:4
273:22
relationship
230:9,13
279:12
relative 130:16
144:18 282:10
282:12
relatively 189:11
relatives 29:14
relay 70:16
release 229:23
released 237:7
relevance 53:12
55:10 104:5,14
164:6 234:16
relevant 54:21
55:6,19,21,24
57:8,12,15
60:25 104:5,8
107:7 108:11

109:22 112:14
114:11,15,17
115:1 120:3
167:22,23
168:4 210:15
236:6
relief 75:25
remaining 152:5
remains 37:24
remember 12:16
19:18 24:11,15
117:11 118:24
123:9 233:22
256:21 274:23
remittances
255:17
remuneration
154:24
renamed 72:9
REO 87:6 98:21
98:24
rep 35:17
repeat 8:19 57:4
76:7 166:23
168:17 181:5
181:16 218:13
repeatedly 265:3
rephrase 67:15
replacing 273:9
report 101:12,15
101:16 210:3,4
221:12 235:19
235:22 239:6
282:7
reported 1:22
272:17
reporter 3:8
5:14 31:4
69:15 110:9
113:8 203:19
252:17 280:20
282:6
reporters 109:5
Reporter's 4:18
reporting 5:12

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 315 of 326
FREEDOM COURT REPORTING

Page 314

94:12,20 97:6
170:10 209:24
272:18
**reports** 94:25
141:17 272:22
276:21
**represent** 5:13
5:16,18,22
30:5 32:18
43:18 133:13
134:5 139:7
141:21 157:19
199:7 202:15
225:6,21
227:11,25
237:12 241:3
243:2,18 254:5
**representation**
253:12
**representative**
6:24 17:14
19:6 24:25
26:10 34:24
155:20 180:17
**representatives**
166:14
**represented**
54:20 254:25
258:14
**representing**
5:11 205:24
**represents** 69:5
195:19
**reprojected**
172:4
**repurchase**
210:10
**repurchased**
209:22
**repurchases**
209:18
**request** 31:14
44:11,18,19
68:6 69:7,12
78:7,18,21

119:15 121:7
124:23 135:23
146:20 160:19
171:14 172:5
183:23 185:20
188:23 189:1
201:10 210:12
210:14 219:20
220:20,24
231:3,10,15,25
246:14 248:24
249:9
**requested** 30:18
39:22 61:6
77:1,18 78:4
80:10 126:15
152:16 177:25
231:13
**requester** 232:5
**requesting**
146:11 258:4
**requests** 45:13
69:12 75:18,24
136:1 205:15
**require** 96:4
103:7 104:3
171:16 236:6
**required** 144:16
145:21 146:5,8
146:23,25
216:24 263:24
**requirements**
230:3
**requires** 94:2
167:25
**requiring** 128:4
**residence** 261:6
**resolution** 8:7,8
79:5,15
**resolve** 12:25
**resolved** 94:17
**respect** 7:5 14:2
17:6,9 28:9,16
31:11,14,25
32:19 33:20

37:20 38:2,4
41:25 44:2
46:3 47:8 49:1
49:4 51:4 54:2
55:2,15 61:7
62:3,12 63:3
64:6 66:19
67:22 75:3
78:12,18 83:3
84:21 85:8,17
90:20 91:21
94:23 95:18
98:4,20,21,23
99:2,14,21
100:8 101:1
112:15 116:20
116:24 117:1
117:21 119:15
120:14 121:6
121:10 122:6
122:10 123:4,5
124:9 125:6
126:19 127:19
130:17 131:19
132:15,20
133:4,12 134:4
134:11,19
135:6,9,15
136:12,17
137:1,14 139:9
140:8 141:1,22
143:13 144:24
147:17 150:15
150:19 152:5
152:11,12,25
153:8,18,24
154:14 155:7
155:13,21
158:6 167:5
170:16 171:22
173:23 175:20
176:19,22
177:10 179:13
180:3,9,20
181:9 182:1,3

184:15 186:6
190:17 195:16
196:23 197:1
200:10 202:14
202:20 204:17
207:13 209:16
211:10 212:7
212:12 213:6
215:14 216:14
217:4 218:9
219:4,12 224:3
224:9 229:8,12
232:8 239:12
240:7,21
243:22 248:16
249:8 250:21
253:1 255:16
255:19 256:8
264:10 266:9
273:5,11 274:3
274:11 276:20
277:16 279:3,7
279:9
**respond** 70:8,10
115:12 172:5
**responded** 35:7
201:11
**response** 106:1
134:10 137:4
169:2 211:25
216:19 231:20
**responses** 211:9
**responsibilities**
7:24 130:17
264:9
**responsibility**
10:10,13 86:20
91:5,7 178:1
263:22
**responsible** 77:7
91:13
**responsive** 31:13
44:17 47:12
69:7,11
**rest** 116:17

184:6 236:5
**restart** 186:21
187:7
**restarted** 186:18
**restricted**
175:16 176:1,6
178:20 179:6
196:6,18
**result** 209:16,17
210:9 218:5
268:23 271:21
**results** 264:20
**retain** 142:1
**retained** 4:19
**retake** 110:12
**retaking** 115:20
**retrieve** 231:7
**retrieved** 201:6
201:8
**return** 252:21
**reverse** 157:23
252:11
**review** 72:22
83:5 167:7
178:2 184:25
189:1 190:6,10
192:18 193:2
195:10 205:14
223:17 233:11
240:16 279:11
**reviewed** 30:10
32:3 39:18
86:5 132:18
139:11 183:4
192:17,20
196:14 225:3
**reviewing**
188:21 192:12
200:13
**re-projection**
170:25 171:5
**re-projections**
170:24
**Richards** 63:9
64:16

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 316 of 326
FREEDOM COURT REPORTING

Page 315

**rider** 199:20
**right** 9:1,3 13:21
  15:6 16:6
  20:25 21:22
  26:12 27:2,17
  33:10 35:22
  39:19 40:21
  43:14 48:21
  57:12,17,19
  59:14 60:18
  63:12 69:14,23
  70:6,14 78:22
  80:11 81:16,17
  81:18 86:18
  88:20 90:15
  94:10 98:14
  101:1 103:24
  105:3,11 106:9
  108:3 109:12
  110:12,19
  111:14,16,19
  111:21,24
  112:2 113:21
  114:1,2 115:23
  116:22 117:6
  119:7 120:24
  123:3,14 124:4
  126:2,17,19
  127:19 129:5
  132:6 136:11
  137:21,24
  138:18 139:17
  140:17 142:5
  142:10 144:21
  145:2 146:3
  148:1 149:14
  149:19 158:3
  158:13 160:4
  161:9,18,21
  162:11 164:10
  165:25 166:8
  166:22 175:1
  176:2 178:7,17
  187:4,18 189:5
  189:22 190:2

192:8,13,20
200:20 201:7
201:13,24
202:8 203:1
204:12 206:24
207:16 208:12
210:17 212:14
213:18 214:15
216:13 219:2
220:3 221:18
222:9 223:3,10
223:22,25
225:25 226:4
226:10 228:14
230:6 231:22
231:25 233:7
233:10,15,21
235:5 236:3
238:4,12
239:16 240:8
241:22 245:16
248:19 251:4
253:6,17 254:3
254:12 255:12
257:9,13 258:9
260:21 264:9
265:12 271:20
273:14 274:14
275:2,17
276:10 277:15
277:17 278:2,6
278:13,23
279:13 280:4
280:11
**rights** 37:5
  130:16 131:21
  217:7 279:17
**risk** 184:2 236:8
**Riverside** 1:20
**Road** 20:13
  28:15
**Roberson** 183:9
**Roberson's**
  183:14
**Robin** 183:24

**role** 7:4 264:4
  269:17 270:3
**room** 61:3
**roughshod**
  111:17
**RPR** 1:22
  281:13 282:18
**RQA** 188:20
**RSI** 161:15
**rule** 57:15 58:20
  59:3 107:15
**rules** 55:2 57:20
  57:21 81:21
  104:1,2,3
  108:25 112:3,6
**ruling** 55:12,18
**run** 36:8 56:17
  93:6 111:16
  113:20 147:7
  192:9
**running** 124:3
**runs** 34:7 215:4
**rush** 168:6
**rushed** 168:11
**rushing** 226:14
**Russo** 166:7
  167:1 183:23
  186:17 195:24
  196:8 197:5

_____
**S**
**safe** 21:23 71:13
  80:21 85:24
  191:21
**sail** 60:10
**sale** 169:17,25
  170:15 180:4
  186:20 209:7,9
  210:4 261:22
**sales** 209:16,17
  209:17 210:8
**sanctions** 227:6
**Sandeep** 248:21
**sat** 196:14 279:7
**satisfaction**

237:8
**satisfied** 178:24
  222:12 257:23
**save** 8:21 121:2
  213:4 225:9
**saves** 100:5
**Saxon** 224:13
  225:24 226:9
**saying** 40:11
  51:3 55:18
  56:1,11 112:13
  112:17 113:7
  119:10 135:5
  136:4 147:17
  148:6,15,17
  149:6 160:6
  205:9 223:14
  228:3,15 230:8
  275:13 277:25
  279:15,25
**says** 40:24 69:21
  103:24 129:21
  136:21 156:10
  157:2 158:5,15
  158:16 159:24
  165:11,14
  177:22 183:25
  189:5 190:5
  194:23 195:4
  202:5,5,7,22
  207:6 234:4,6
  237:21 243:6
  246:12 248:22
  249:9 252:3,4
  256:19 257:17
  258:9 269:8
  270:18 272:8
  275:7 276:4,13
  277:11 278:8
**scans** 201:14
**scenario** 125:7,8
**schedule** 215:5
  226:8
**school** 28:6,8
**scope** 49:7

104:17 114:4
129:11
**score** 167:4,7
**scoring** 167:11
  168:24 169:10
**Scott** 86:11,24
  87:18 89:12
  90:11 93:3
  129:2,5,16
  131:11,16
  132:11 142:2
  143:13 145:20
  146:15,16,20
  151:21 153:13
  158:17,24
  160:8,24 161:4
  162:22,24
  164:12,19
  169:24 195:25
  196:9 198:2
  200:25 205:24
  206:8,11 223:2
  245:7,17
  250:23 273:19
**scrape** 174:15,22
  175:6 248:6
**screen** 32:11,12
  32:25 33:2,6,8
  36:21 74:20
  83:4 100:11
  133:13,14,16
  134:5,15,17
  174:15,17,19
  174:22,25,25
  175:6 194:24
  195:4 210:21
  239:9 243:5
  247:11,11,14
  248:5,6 253:11
  253:20
**screens** 39:9
  51:24,25 52:5
  100:2 119:3
  156:21,23
  163:12 253:1

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 317 of 326
FREEDOM COURT REPORTING

Page 316

seal 281:9
search 220:23
second 20:6 22:5
  22:6 51:14
  68:23 86:14
  142:23 179:3
  192:22 193:16
  195:2 197:21
  198:4 220:9
  221:20,22
  230:16 251:24
  252:2,13 259:8
  261:17 273:15
  273:16
secrecy 60:22,24
section 74:12
  197:5
sectioned 71:14
secured 80:23
securities 38:13
  38:15 52:10
securitized
  79:25 80:14,16
  271:9
security 38:16
  38:18 74:2
  101:9 161:16
  164:4 202:20
  203:7
see 12:21 31:17
  58:4,14 106:22
  118:4 124:3
  159:22 166:2
  173:17 175:24
  184:2,9 191:1
  193:12,21
  198:17 202:20
  203:12 205:11
  211:5 221:15
  227:9 235:18
  235:18 237:8
  243:9,12
  250:11
seeing 146:22
  279:1

seek 79:9 134:11
  266:10
seeking 187:8
seen 32:12 78:15
  86:7 196:16
  218:24 219:5,9
  219:10 225:2,8
  228:9 232:21
  235:9 237:18
  240:18 254:9
segment 204:23
segregates 185:9
segregation
  244:21
select 93:20,21
  142:1
selecting 74:24
  141:21
send 77:19
  171:13 178:6
  216:5,8 228:12
  250:3
sending 174:24
  183:23 192:7
  215:24
senior 15:3,18
seniority 37:4,6
sent 26:16,18
  79:3 97:1
  149:9 158:17
  158:24 160:8
  162:22 169:24
  177:20 179:7
  191:8,11
  192:22 219:6
  238:11 248:7
  249:20
sentence 41:9,23
  73:3 142:23
  157:2 165:14
  166:24
separate 9:14
  71:14 89:6
  91:5,22 98:5,6
  151:16 193:8

200:20 210:12
227:14 229:16
231:9
separately 85:5
  195:9
September 10:4
  11:22 24:16
  194:8 261:22
sequentially
  202:21
series 243:21
serious 120:17
serve 6:20 19:5
  25:10 26:7
  180:12 181:9
  191:19 229:19
served 25:12,14
  69:7
service 17:7
  37:16 83:17,19
  85:19,22 144:9
  148:21,23
  154:5 167:18
  170:20,21
  171:6 276:11
  277:5
serviced 277:13
servicer 71:23
  77:2,3 83:20
  84:22 103:12
  103:19 105:17
  112:11 127:25
  147:9,9,19
  148:18 155:5,6
  173:13 180:24
  209:12,14,18
  209:22 210:10
  215:17,19
  216:3 217:15
  218:5,9 225:16
  225:25 226:3
  231:12 245:2
  266:15 267:7
  271:8,11
servicers 53:3

54:13,15,18,19
66:21 67:2
71:20 84:25
85:7,18,22
94:2 99:23
102:14 127:11
141:10,10
147:4 216:12
224:17 266:14
servicer's
  102:18
services 7:16
  35:17 44:5,15
  51:1 52:22
  53:3 54:2,7,13
  54:16 63:24
  82:14,16 85:8
  85:25 87:8
  105:14 125:14
  125:17,18
  126:4,8 127:22
  128:6 129:11
  130:17 136:16
  136:23,25
  137:2 141:15
  141:20 142:12
  142:25 143:5,9
  144:17,23
  147:6,11,20
  148:18,20
  149:10 150:11
  150:14 151:14
  151:17 153:14
  154:9,21
  176:19 177:10
  182:1,2,9
  206:4,7 212:7
  212:11,17
  220:6 224:12
  224:13 229:25
  230:9 241:19
  241:21 242:9
  242:18 244:22
  264:23 266:18
  266:22 271:5,6

277:6 279:10
servicing 40:17
  51:20,21 95:17
  128:4 136:22
  180:20 181:11
  217:6,6,13,22
  218:16 219:13
  264:8,12
  266:10 271:14
  271:17 279:18
set 10:14 53:12
  54:5 66:12,23
  85:25 129:10
  144:2,17,19,21
  145:16 149:10
  149:13 160:11
  198:4 216:13
  226:8 229:5
  230:18 231:9
  255:5
sets 66:8 67:7,9
  74:20 130:15
  264:9
setting 223:10
settings 239:1
setup 33:15
Sewell 2:13
shape 226:14
  272:24
shared 154:11
Sharma 248:21
sheet 44:7 50:16
  243:16 249:22
  251:13 252:2,5
  252:6 254:5
Shelley 175:11
SHERYL 2:18
shop 148:18
short 97:20
  172:10,11
  204:10
Shortly 261:15
shot 36:21
shots 174:25
  243:5

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 318 of 326
FREEDOM COURT REPORTING

Page 317

**should've**
115:19 251:4
252:13 268:21
**show** 30:4 32:16
54:22 57:7,11
77:4,7 114:6
114:10,11
139:5 142:9
167:11 178:18
190:10 192:19
203:18 218:23
219:17 220:18
231:16 233:14
234:17,18
237:12 243:15
246:1,9 249:17
**showed** 175:4
**shown** 40:23
**shows** 31:23
221:5
**shred** 229:7
**shut** 232:25
256:12
**sic** 198:10
**side** 33:10 90:10
101:25,25
163:10 229:6
230:19 273:16
**sign** 78:2 96:21
107:17 217:12
**signature** 77:10
77:13,25
**signed** 77:19
95:8,14,16
280:1
**significance**
183:20
**significant** 263:7
**similar** 61:25
175:5 204:4
**simple** 37:2
42:10 82:23
**simpler** 89:9
**simply** 42:15
70:20 74:23

82:9 120:17
131:20 185:14
186:19 189:11
**single** 259:2
262:9,14
**Singleton** 164:12
164:18 183:24
195:25 196:9
196:22
**sir** 6:13 7:14,25
11:2 12:13
17:23 20:4
21:3 24:24
29:16,19,22
31:18 35:15
37:20 38:3,8
38:12 39:12
42:6 47:7
48:14 49:16
50:23 51:11,18
53:8 54:16
55:1,17 56:5
62:18,20,22,25
63:8,13 65:19
66:16,20 77:15
169:19 178:12
181:6 199:18
199:25 205:13
220:9,14
242:15 250:1
257:14
**sister** 165:12
**sit** 43:4 58:10,22
74:7 133:22
176:4 186:4
215:3 235:22
236:16 279:16
**sitting** 69:14
107:2 115:10
119:12
**situation** 115:10
115:11 130:9
140:8 203:1
**six** 23:25 24:12
**size** 193:23

**Slander** 272:15
**slanderous**
272:16
**sleep** 211:22
**slightly** 195:4
**slow** 51:14
136:23
**small** 21:7 23:18
**smaller** 21:24
**Smith** 166:4,10
166:25 183:24
186:8,11,18
**snapshot** 174:25
175:8
**snatch** 251:13
**software** 29:4
32:19,21,22
33:21 34:5,7
35:18 37:17,18
38:2,4 39:2,7
40:1,2,3 42:20
42:21,21 44:5
44:13 49:3,15
50:15,19,22
51:1,5,7,17
62:9 65:13,16
70:24,24 71:1
71:15 72:1
74:12,15 82:21
83:4 94:19,20
97:7 98:21,25
99:14 102:19
102:22,24
117:10,24
118:15 122:3
134:24 142:11
142:16 163:10
201:7,7,10
202:22 237:16
237:25 238:7
239:6,19
241:19 242:19
243:3 245:2
246:19,21
**softwares**

118:16
**solely** 98:6
**solution** 134:12
204:25 205:1
**solutions** 1:9
5:19 8:19 9:6
18:2,3 33:25
40:6 48:1,8,10
48:13,19,21,22
85:15 86:13,25
87:2,24 89:2,2
89:4,7,13
95:13 96:3
102:20 125:1
125:22 126:2
127:6,10,18,19
127:21 128:3
129:1,5,7,12
131:12,13,14
131:16 132:10
133:24,25
141:7,18 142:1
142:12,14,18
142:24 143:15
145:21 146:4,6
146:14,15,24
147:1,9 148:9
149:7 150:15
150:18,23,25
151:17,19,24
152:7,16,18,24
153:4 154:4,8
154:11,19,22
155:1,5,13,18
156:5,8,11
157:3,21
158:20 164:17
171:24 175:11
176:10 177:4,9
182:8 188:11
203:24 204:6
204:11 209:5
209:13,15
218:10 219:23
229:20 238:8

239:21 244:23
251:1,3 257:13
260:11,17,19
260:25
**somebody** 39:5
70:9 84:4
**somewhat** 25:7
230:24 239:8
**soon** 257:23
**sorry** 11:23
15:16 23:3
32:8 50:2
52:25 62:19
72:24 73:4
113:10 116:20
119:22 126:8
129:20 135:13
136:23 139:8
145:7 150:21
153:14 154:18
163:21 166:23
174:1,17
188:11 193:15
194:20 203:18
211:17 218:12
218:14,15
247:8 251:4
**sort** 13:4,19 21:7
21:21 26:14,22
64:10 123:22
175:2 205:8
213:15 214:7
225:3 273:19
**sought** 160:9
**sound** 20:24
202:8 234:13
**Sounds** 202:9
**source** 154:25
155:21 173:12
174:13 227:15
**south** 26:5
**Southern** 225:14
227:7,18
**space** 211:17
239:23

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 319 of 326
FREEDOM COURT REPORTING

Page 318

**speak** 179:16
**speaking** 35:2,7
  35:12 130:6,8
  143:3
**speaks** 46:9
**special** 8:3,5
  62:23,24 63:14
  109:5
**specialist** 178:22
**specialty** 176:18
  177:13
**specific** 7:2 10:9
  11:9 34:4,19
  35:6 44:18
  45:13 69:10
  80:14 138:2
  182:25 227:2
  232:7 257:12
  265:16
**specifically**
  36:16 39:9
  56:7 143:5,7
  150:13
**specifics** 130:9
**spell** 62:20 63:9
  90:2,25 140:3
  140:3
**spend** 23:22
**spent** 16:7 19:23
  19:24 109:8
**spinoff** 9:10
  72:10 88:4,5
  255:20
**sponsored** 145:1
  149:18
**spooky** 253:18
**sport** 27:14
**spot** 90:4
**spotlight** 276:17
**spun** 9:7
**stack** 251:16
  252:21
**stamp** 31:4
  76:20 77:14
  100:23 247:1

247:20
**stamped** 31:1
  100:11 163:6
**stand** 9:5
**standard** 54:6
  180:13 181:10
  181:22 182:21
  182:23
**standards** 180:9
  180:21
**standing** 116:16
  124:3 266:2
**stands** 127:1
  161:17 162:5
  194:24 237:24
  238:1
**stapler** 252:16
**start** 33:11 158:1
  271:10
**started** 11:22
  16:4 19:21
  24:16,17
  228:25
**starting** 121:24
**starts** 90:9
**state** 5:13 17:5
  17:10 27:12,13
  27:25 30:8
  46:15 47:14
  61:24 76:19
  81:17 91:17
  95:22 105:2
  113:24 147:18
  167:13,14,16
  169:1,13,20
  172:17,21,25
  204:16 215:6
  215:11 258:10
  259:7,8 280:2
  281:4,13 282:3
**stated** 15:10
  165:18 235:9
**statement** 31:12
  114:14 257:15
**statements**

272:16
**states** 28:23
  36:21 61:11,12
  81:15,21 91:19
  91:20 226:23
  227:7 244:11
**stating** 164:21
**station** 42:8
  253:6
**statistics** 96:25
  97:3
**status** 141:16
**stay** 26:17 75:25
  96:9
**stayed** 10:13
**Steele** 165:10,12
  165:17
**Stemmle's**
  273:25
**stenographic**
  282:9
**stenographica...**
  282:7
**step** 104:5
  280:15
**steps** 65:9 68:2
  92:13 214:21
**stickler** 89:1
**Stipulated**
  161:19
**stipulates** 41:20
**stop** 51:2 60:9
  256:1
**stopped** 257:2
**store** 26:16,24
  26:25
**stored** 190:18
**storefront** 21:5
  25:23
**stores** 26:22
**storing** 33:13
  41:12,17 42:2
  42:9
**straight** 149:17
**straightened**

222:22
**strange** 275:9
**street** 21:6
**strictly** 71:15
  148:13
**strike** 22:11
**strip** 267:1
**stripping** 266:12
**structure** 97:24
  98:13 125:24
  138:4,11
  144:22 149:17
  212:12 213:9
**structures**
  145:16,19
**stuff** 69:16
  104:19 113:20
  138:2 164:4
  252:25
**subject** 17:5
  44:6 50:15
  69:9 120:3
  179:18 227:6
  227:18 228:11
  229:6 262:8
  264:22 271:8
**submission**
  224:10
**submit** 145:22
  146:23
**submitted** 83:9
  146:25 175:15
  208:1,6 216:21
  245:17 255:10
  255:13,16
**subpoena**
  214:11,18,20
**subservice**
  266:19,20
**subservicer**
  266:17
**subservicing**
  180:6 181:25
  182:7,11,13,16
**subsidiary**

125:18 127:4
**substance**
  130:10
**substitute**
  111:15
**suburbs** 20:10
**sub-entity** 125:2
**sued** 260:16
**suffered** 261:6
**suit** 184:9
**Suite** 2:9,14
**suits** 108:11
**summary**
  204:10 280:16
**Summit** 203:14
  204:2 233:18
  235:10 256:19
  256:24 257:2,7
**sums** 259:12
**SunTrust** 221:5
**supervision**
  38:21,24
**supervisor**
  208:17
**supplied** 215:12
**support** 75:25
  112:11 139:22
  143:9,17,19
  144:12 151:1
  155:15,22,24
  156:5
**supported** 54:23
  58:6 153:22
**supports** 53:15
  108:17,17
**supposed** 70:5,6
  79:25 105:19
  165:5 227:24
**sure** 9:19 22:2
  33:12 35:9
  42:24 46:17
  53:25 55:11,13
  56:17,23 64:23
  66:7 78:15
  81:11 82:3

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 320 of 326
FREEDOM COURT REPORTING

Page 319

86:15 92:25
95:2 97:13
102:12 104:15
107:6,11,25
113:11 119:18
120:14 121:4
122:20 123:12
124:8 125:23
131:6 132:4
135:4 137:14
139:18 140:6
140:18 145:9
149:3 150:1
155:3 160:18
168:20 170:23
172:13 176:25
183:22 187:22
189:14 191:4
192:6 201:16
203:22 213:3,6
214:14,22
215:8 220:13
221:21 223:14
223:18,19
224:8 227:11
227:20 228:6
228:22 229:1
233:20 239:10
244:9 246:1
247:9 248:10
248:16 249:13
249:23 250:2
250:14 253:17
254:20,23
275:11,25
276:25 277:23
279:3,24
280:10
**surprised** 42:19
**suspense** 174:9
176:11 269:25
270:4
**sustained** 110:1
**swear** 5:14
**Swenson** 89:19

89:23 90:11
**Swiss** 86:7
**sworn** 6:2 281:8
**symbol** 88:17
**system** 30:7
35:20,22,25
36:16 37:17,18
37:23,24 38:7
41:11,25 42:20
42:21,21 47:8
47:19 66:2,3,8
71:5,22 72:22
75:11 76:12
78:21 82:5,6
84:3,20 94:9
95:4,14 96:10
96:13,15,20,23
100:6,6,7,18
100:25 118:20
118:22 123:14
124:21 134:21
134:25 135:17
143:21 145:23
153:16 156:1
156:16 159:11
159:22 160:21
160:22 162:22
163:7,24 170:7
170:11 184:21
186:20 189:8
189:12 190:10
190:18,25
195:18,25
196:11,12
197:15,21
198:1 201:17
201:19,23
207:21,23,25
208:5,6 212:1
215:21 217:22
219:3,5,7
222:21 224:2
228:1,10
231:22 232:2
232:14,18

238:11,11
243:3 249:19
273:9
**systems** 82:12
118:22 163:17
163:18,20
**S-E-N** 90:25
**S-O-N** 90:25
91:1

---

**T**

**T** 282:1,1
**take** 7:9 9:10,13
30:8 42:12
43:19 47:4
48:11,14 50:3
56:4 57:23
59:10 60:3
70:19 86:14
94:15 97:20
106:12 109:6,9
116:21 120:25
123:22 124:6
139:18 140:9
140:22 151:6
190:23 194:13
199:2 205:21
214:21 216:4
216:16 220:8
221:21 226:13
228:4,8 235:17
235:18 236:5,7
242:6,24
255:24 257:9
261:20,22
274:7
**taken** 1:15,18
78:25
**takes** 111:3
276:16
**talk** 74:2 82:1,2
108:18 121:16
211:2 227:23
233:1 240:5
257:16 280:17

**talked** 90:14,14
117:2 118:21
122:21 132:9
132:14 136:15
141:5 159:12
162:7 186:4
191:15 205:13
212:11 231:18
233:22 250:17
253:2 256:20
273:5
**talking** 8:17
51:3,4 60:13
89:6 102:6
113:9 137:13
141:5 143:4,24
150:9 181:21
194:20 211:8
218:14 222:3
260:10,13,15
277:16
**talks** 268:4
273:7 275:7
276:10 277:5
277:10
**tape** 50:3 149:25
150:1 187:21
215:22 221:20
221:22
**Tara** 62:19
64:15
**task** 158:18
**tasks** 66:24
168:1
**team** 12:18 14:9
14:15,21 15:1
64:9,17 90:13
90:15,22 184:2
188:15 208:17
208:22 248:22
249:6
**tear** 251:18,20
252:15
**tearing** 251:21
**technology**

38:17 49:17,18
141:9,15
212:10,17,19
212:20 213:21
213:23 214:6
**tedious** 274:7
**tell** 6:12 7:14
25:1 37:13
38:6,22 39:1
46:21 47:6
51:10 52:5
53:7 58:21,22
60:25 62:7,8
62:11 65:21
66:15 69:4
70:5,21,21
83:23 88:6
97:18 98:9,10
107:3 115:22
116:14 119:12
123:18 135:18
140:25 143:18
159:2 160:2
166:15 171:3
178:7 187:17
212:21 227:12
233:10 235:12
274:8
**telling** 38:20
56:25 57:2,4
107:18 112:4
112:12 116:9
148:19 233:4
**tells** 110:22
**ten** 42:12 45:14
45:19 116:15
234:7,9
**term** 8:17 11:17
24:11 25:13
33:23 34:4
35:11 44:14
71:10 101:11
175:7 244:24
249:6
**terminal** 133:25

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 321 of 326
FREEDOM COURT REPORTING

Page 320

termination
  37:22
terms 130:7,10
  181:20
test 114:13
testified 6:3
  17:13 61:5
  239:4 240:14
testify 6:23
  34:13 35:3
  43:23,24 61:6
  62:2 78:3
  103:22 105:21
  108:19 114:3
  159:14 196:16
  224:24 236:17
  240:21
testifying 42:20
  46:24 155:4,20
  179:10
testimony 12:4
  12:21 17:9,12
  19:3,17 28:25
  31:10 32:2,8
  36:10 37:14
  40:11 41:1,5
  41:15 46:19,20
  48:24 50:11
  62:6 66:22
  67:13,16 70:14
  74:1 75:9 78:1
  81:8 83:13
  93:10 95:25
  99:24 104:9,11
  117:20 121:9
  143:9 149:16
  152:6,17,23
  153:10 154:3
  154:13 155:12
  156:3,18
  172:19,22
  176:9 178:4
  211:13 216:11
  217:24 219:8
  224:16 225:12

  227:22 232:16
  242:25 248:1
testimony's
  61:16
Texas 55:4 225:8
  225:15 227:8
Thank 181:8
  219:11 273:2
they'd 93:23
  96:8
thing 13:4 21:7
  21:21,25 26:22
  44:1 114:2
  116:25 123:23
  184:5 205:8
  213:15,20
  214:8 225:4
  273:19
things 8:9 60:25
  81:24 82:1
  90:19 103:7
  114:3 138:2,22
  140:4 146:12
  220:6 251:16
  252:21 253:6
  280:4
think 6:8 8:25
  17:25 63:11
  80:3 110:14,25
  112:18 118:14
  120:2,12
  122:18 130:22
  130:24 131:24
  131:25 132:1,2
  134:21 151:7
  197:25 214:19
  214:23 225:6
  233:6 247:3,13
  252:10 253:4
  253:17,17
  255:22,25
  256:11 280:13
  280:15
thinks 104:23
third 2:8 115:4

  156:9 209:16
third-party 23:7
  209:8 210:4,9
  264:17
thought 78:14
  159:12 211:18
  275:19
three 9:22 13:25
  19:24 27:4
  90:14 118:22
  129:3,22
  136:20 163:17
  163:18,19
  172:14 195:5
  205:5 245:7,10
threshold 55:9
tie 105:6
tied 234:19
till 24:18
time 1:19 6:21
  8:20 11:14
  12:4,12 13:10
  14:9 16:22
  17:2,4 19:1,8
  21:3,10 22:3
  23:23 25:15,22
  26:20 28:21
  29:5 31:23
  39:12 43:17
  44:10 47:5
  56:16 57:6,23
  64:7 66:8 67:9
  67:12,16 70:12
  72:8 73:14
  76:19 77:14
  80:14 92:18
  94:15,16,18
  97:20 100:11
  100:23 102:8
  103:5 105:3
  110:11,14
  111:2 115:4,11
  115:13,17
  122:14 134:3
  151:6 154:6,20

  156:9 161:3
  163:5,6,21,22
  164:17 168:18
  169:16,18,19
  169:20 170:3
  170:14,24
  172:4 174:9
  178:1 181:5
  190:11 195:18
  196:20 199:2
  203:23 205:23
  216:15 217:13
  219:9,10 229:4
  233:2 252:24
  256:6 266:3
  271:13 275:2
timely 172:6
  262:24
times 6:12 275:4
title 7:22,25 8:7
  8:8,12 11:7
  14:8,14 16:13
  62:22 63:13
  65:1 86:12,24
  87:10 88:9,10
  220:23 221:12
  222:15 223:7
  223:11,16,17
  234:3
titles 8:10 14:12
  16:24 19:25
today 6:9,10
  17:12 30:7,11
  30:14 36:10
  45:15 48:19,25
  49:23 54:19
  59:7 62:6
  66:22 69:1
  74:7 75:4,12
  115:14,17
  117:22 120:3
  121:11 132:10
  132:19 133:22
  135:18 139:12
  155:19 156:3

  176:4 180:16
  183:5 186:4
  196:16 205:16
  206:20 214:4
  215:3 225:22
  236:11 237:19
  240:21 250:19
  256:8 260:20
  274:22 279:16
today's 252:24
told 22:10 63:1
  70:1 102:10
  254:6
tongue 8:21
top 10:19 15:22
  18:21 38:9
  49:16 52:12
  68:11 84:7,12
  87:12 88:11
  93:1 113:9
  117:12 143:23
  160:1 162:21
  164:9 166:12
  172:17 188:25
  189:2 208:20
  209:21,23
  234:7,11 235:3
  243:6 251:13
  253:14
topic 39:21
total 196:2 215:5
  215:9
touching 211:19
Touchton 28:15
track 77:9,12,16
tracking 100:22
  141:16 231:5
  253:25
tracks 170:12
traded 88:15
trail 214:9
train 102:25
  103:2
trained 232:10
training 32:19

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 322 of 326
FREEDOM COURT REPORTING

Page 321

32:20 99:13,16
101:17,20,22
102:9 232:7
253:20
**transaction**
37:20 101:12
103:18 121:7
121:15 158:7
254:5
**transactions**
33:16,19
243:22
**transfer** 77:11
**translates**
168:22
**transmitted**
200:25
**traveled** 56:3
**trees** 225:10
**tried** 118:18
184:10
**trigger** 215:22
**trip** 109:5
**trips** 173:6
**true** 36:18,23
37:21 38:3
73:14 102:14
102:17 112:3,5
124:2 137:25
282:9
**trust** 79:25
80:14,16 81:16
81:17 168:2
264:20 268:8
**trustee** 61:12
81:17
**trusts** 268:12,18
**truthfully**
147:18
**try** 13:20 64:21
68:24 97:24
122:25 135:19
140:3 181:6
199:3 214:8
231:6 280:6

**trying** 13:21
17:25 25:3
44:18 58:5
69:20 89:11
98:12 102:11
105:12 107:2
107:12 113:2
113:11 115:5
117:11 119:6
119:11 123:9
137:15,22
140:18 151:5
214:3 223:19
224:19 275:22
275:23
**Tucker** 20:18
26:18,24 27:3
**Tuesday** 1:18
5:8
**turn** 158:2
**turned** 247:24
**turns** 84:2
**twitch** 211:18
**two** 9:19 11:16
15:17 16:7
26:11 28:23,24
29:2 62:17
64:18 91:20
114:10 131:25
135:18 171:19
181:15 192:11
194:6 195:13
195:20 197:4
202:20 211:21
235:13 239:1
245:7,10
252:15 258:10
259:1,4 263:6
**two-prong**
114:13
**two.With** 224:8
**TX** 2:15
**type** 13:1 17:17
21:25 23:19
25:23 26:21

64:12 68:4
75:20 76:1
92:3 154:24
156:4 159:7
183:21 185:7
191:5,6 192:16
204:5 216:25
218:3 230:9
262:13 265:18
**types** 103:6
105:15 144:23
182:2 218:2
**typically** 153:20
223:6 231:18
**T-A-R-A** 62:21

---

**U**

**Uh-huh** 11:5
32:4,23 38:16
40:25 52:1
80:2 82:7
92:11 95:24
139:16 141:3
150:16 157:14
158:4 162:12
164:25 167:9
169:21 175:10
183:10 187:5
203:15 204:15
221:14 239:2
255:9 276:6,12
277:7,24 278:7
**ultimately**
142:18 166:19
**umbrella** 9:14
87:4 126:21
128:5 133:8
204:8
**unauthorized**
268:25 270:12
271:24
**unclear** 44:12
**unconscionable**
265:15
**underneath** 87:3

184:25
**underscore**
189:5,6,6
**undersigned**
281:6
**understand** 6:22
7:4 12:21
18:12 35:8
46:18 53:25
66:7 67:24
79:23 82:3
85:6 86:16
92:6 95:20
105:12 107:12
107:15 120:6
121:8 138:24
148:4,15 149:3
168:8,21
181:19 205:5
213:17 215:1
260:23 279:15
279:24
**understanding**
9:12 72:19
76:4,8 80:22
84:25 94:7
102:13 124:5
145:3,5,15
146:2,13
155:23 156:9
159:3 162:2
179:17 182:20
184:12 217:5,8
248:25 249:5
**understood**
116:7 118:14
**undertaking**
165:23
**underwriting**
219:20 220:19
222:4
**unfamiliar**
36:11
**uninhabitable**
257:19 261:7

**United** 61:11,12
226:23 227:7
**Unjust** 271:20
**unjustly** 271:22
**unmarked**
256:11
**unpaid** 173:16
173:19
**unreasonable**
265:14
**unwilling** 120:7
**update** 51:21,24
51:25 96:18,20
183:24 190:5
**updated** 51:13
218:2
**updates** 52:6
96:22 162:22
**updating** 146:11
**upload** 76:19
124:18 149:8
184:22,23
185:7 231:7
**uploaded** 73:15
73:16 75:21
76:1,12,15,21
123:15 153:13
154:1 185:16
191:14 193:24
195:9 202:7
217:3
**uploading**
154:25
**use** 8:16 29:4,7,9
35:10 36:25
40:12 49:3
50:22 67:2
71:25 85:1,8
85:18,22 94:2
96:10,12,17
102:21,23
109:20,22
120:13 125:5
128:4 228:2
229:22,25

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 323 of 326
FREEDOM COURT REPORTING

Page 322

232:10 252:18
260:14
**user** 31:24 71:22
95:12 100:15
134:20 135:16
159:6 162:14
163:17,17,18
196:23 242:3
**users** 136:10
**uses** 35:18,19
50:19 122:4
142:12
**usually** 27:13
**Utilization**
212:20
**utilize** 40:13
50:24 51:6,9
51:12 73:6
85:3 148:2
149:1,20
167:11 185:7
220:5,7
**utilized** 28:23
120:5 123:16
**utilizes** 83:11,19

— **V** —

**vague** 44:12,19
**Valdosta** 27:12
27:13,24
**valuation** 245:11
**value** 144:6
192:10
**various** 38:22
79:10 239:5
266:13
**vast** 112:9
**vehicle** 52:2,13
52:16 108:5
109:20 215:18
**veil** 60:22,24
**vendor** 206:1
229:19,21
241:20 262:10
262:14

**vendors** 136:25
255:11
**verbal** 129:15
**verification**
152:16
**verify** 102:11
118:8,9 134:12
223:24 238:13
275:24
**version** 172:10
172:11 205:6
**versus** 5:4 210:9
**vice** 7:19,23 8:13
9:20,21,22,23
9:24,25 10:5
10:12,17 11:7
11:10,24 14:21
28:17 32:5
45:2 49:18
62:13,17,23
63:7,14,19,23
64:4 65:2
86:17 87:15
208:18 235:12
**Vicki** 175:11
**VIDEOGRAP...**
2:19 5:1 50:2,5
50:7 97:11,14
97:16 119:21
119:24 128:10
128:12 145:7
149:24 150:2,5
187:20,23,25
194:16,18
198:13,15,20
198:22 221:19
221:23,25
256:2,4 280:23
**videotape** 5:1
50:8 97:12,17
150:6 188:1
222:1 256:5
**videotaped** 1:13
3:2 282:7
**view** 37:14 73:6

74:24 189:13
196:25
**violation** 262:12
263:8
**vis-a-vis** 168:25
**void** 266:4
**voluntary**
165:23
**vs** 1:6

— **W** —

**wait** 70:20
110:17 131:24
**waive** 130:5
**walk** 21:6 36:24
**want** 10:7 12:14
31:3 34:13
37:12 43:19
44:22 46:17,18
47:6,6 48:16
53:18 55:11,13
56:2,14,14,23
57:1 58:12
61:1 80:6
86:14,15 93:3
94:19 96:9
104:24 106:16
107:19,21
109:16 112:14
118:13 120:1,8
123:18 129:13
129:19 132:2,3
137:18 140:4,9
140:21 149:2
155:3 158:1
165:14 184:4
192:7,12 199:2
210:16,19
214:18 224:21
225:1,5,19
227:14 243:1
246:25 247:15
248:11 251:13
251:18 255:24
257:11,16

260:14,23
262:5
**wanted** 78:15
81:11 96:2
97:25 110:2
124:17 139:17
146:21 190:3
**wanting** 112:8
**wanton** 267:20
268:20
**wash** 120:17
**wasn't** 116:6
135:13 137:12
238:24
**wasting** 233:2
**way** 25:3 31:1
53:2 54:23
55:23 69:17
70:4 82:14
96:8 135:24
138:13 148:11
166:15 200:22
218:14 228:16
230:19 232:13
235:19 239:13
261:13 265:21
266:21 272:24
**ways** 71:2
**web** 32:18
101:22
**website** 88:12
**web-based** 32:20
**weekly** 21:15
64:12
**welcome** 53:23
**WELLS** 1:8
**went** 14:5,5,6,9
15:1,1 16:9
25:25 27:16
35:7 77:13,16
160:9 165:22
175:24 203:22
213:14 233:17
247:12,23
248:12 257:25

279:8
**weren't** 25:17
**West** 63:18
**we'll** 31:5 34:22
43:24 53:17
56:18 97:24
105:3 115:17
115:23,24
116:16 118:6
120:19 178:13
184:23 211:2,6
214:19,21
229:7 251:14
252:17,20
280:6
**we're** 8:17 33:23
34:3,16,18,23
40:4,11,20
43:18,23,24
44:9 45:12
49:22 59:6
82:24 103:13
103:21,22
104:15,18
105:4 106:22
106:25 108:15
108:18 109:18
110:15 115:13
115:17 116:24
117:21 122:18
130:9 137:13
138:3 139:1
143:8 151:18
160:16 164:2
180:24 198:19
210:18 227:21
233:2 235:21
236:4,9 247:15
264:14 266:16
266:20
**we've** 30:20
50:18 56:3
103:10 131:10
141:4 178:25
196:14 207:14

Case 10-01172-DWH   Doc 76-3   Filed 02/05/11   Entered 02/05/11 16:24:31   Desc
Exhibit 3 to amended complaint   Page 324 of 326
FREEDOM COURT REPORTING

Page 323

207:14 251:7
256:6 257:10
**whatsoever** 41:7
42:4 99:13
228:21 269:3,5
270:23 272:3,6
**whim** 108:11
**whims** 103:25
104:1
**wide** 105:4
108:23 234:20
**Wilborn** 1:4 5:4
75:3
**WILLIAM** 2:7
**willing** 118:9
120:11 236:7
**Windy** 20:13
**winner** 233:23
**winners** 234:4
274:12,14
275:7 276:5
278:21
**wish** 148:3 149:1
**wished** 165:24
**withdraw** 55:25
**withdrawn** 4:19
226:23 261:17
**witness** 5:14 6:3
6:4,20 7:1 19:2
47:1 49:10
56:7 59:23
61:21 88:1
90:1,5 98:16
108:7 111:22
111:25 114:3
115:7 120:1
121:25 131:2,4
131:7 137:7
142:21 145:5
162:18 164:3
168:17 181:2
181:17 201:19
207:4 233:16
236:15 247:10
251:20 252:1,6

261:1 273:1
281:9
**Wood** 1:3,4 5:3
5:4 75:3 80:11
103:21 106:25
107:5,7 128:16
133:4 236:1,19
241:6 270:23
**woods** 117:21
139:10 141:18
152:12,15
157:4,20 225:8
264:24 267:16
271:2 272:23
**Wood's** 75:3
**Wooten** 2:3 3:4
3:6 5:15,15 6:6
6:7,8 8:21,24
30:25 31:7,9
31:15,16 34:1
34:6,8,9,16,20
34:22 35:1,9
35:13 40:8
43:25 44:22
45:3,6,9,15,21
46:1,8,10,17
46:22 47:3,21
48:6 49:11
50:4,9 53:16
53:22,24 54:25
55:2,11,15
56:2,6,17,23
57:11,14,22
58:3,8,12,16
58:19,22 59:8
59:13,16,22
60:1,5,13,16
60:18,21 61:4
61:22 68:13,16
68:19,22 69:13
78:12,17 80:9
83:1,2 84:14
84:17,24 87:24
88:2 89:8 90:6
97:13,18,24

98:3,12,17
103:15,23
104:9,12,14,21
105:8,12,23,25
106:4,8,11,15
106:20,24
107:2,6,9,11
107:25 108:3
108:24 109:8
109:11,16
110:11,17
111:4,6,9,14
111:19,21
112:4,7,19,21
113:2,11,16,18
114:6,14 115:5
116:1,6,13,19
116:23 118:9
119:7,10,20
120:14 121:4,5
122:1 128:8,13
129:18 130:12
131:6,9 132:4
132:7 135:14
136:1,3 137:14
137:22 138:5,8
138:13,16,19
138:21,25
139:4 140:15
140:20 142:22
145:6,8,10
150:1,7 162:19
164:8 167:23
168:4,14,19
177:3,8 179:25
180:18 181:3
181:18 187:22
188:2 194:12
194:19 198:11
198:16,19,25
201:20 205:20
205:22 207:5
207:13,18,20
210:5,22,24
211:2,5,8,17

211:23 213:6
213:18,23
214:2,14,22,25
215:2 221:21
222:2 224:18
225:1,18
226:12 227:11
227:20,25
228:6,8,14,17
228:21,22
229:2,11
230:16,21
233:3,5,8,14
233:19 234:22
235:23 236:2,9
236:22 238:23
239:3 246:25
247:5,7,9,18
247:22,25
248:15 251:18
251:21,25
252:2,7,9,15
252:22 255:24
256:6 260:6,9
260:18 273:4
280:11,17,21
**word** 60:11 73:7
232:3
**words** 129:4
189:24 208:2
**work** 12:8 13:2
16:16 17:16
19:12 25:3,25
28:20,24 29:11
35:18 36:12
38:7,10 39:2
42:7 43:12
51:4 53:4,5,8
62:13,17 63:18
63:20 65:23
67:19,23,24
68:8 71:24
79:12 91:21,23
92:3 99:22
102:18 138:17

150:18 155:6
155:21 156:19
166:10,11
182:17 191:17
239:9,20
244:25 280:6
**worked** 12:1,9
22:11 24:18
60:14 159:18
**working** 10:20
31:19 89:15
**works** 38:11
63:7 84:20
97:23 121:18
166:13
**workstations**
157:1
**work-at-home**
166:14
**world** 69:25
224:11
**worried** 120:10
251:21
**wouldn't** 42:13
42:17 76:23
86:6 153:16
192:1 279:1
**would've** 12:1
14:20 15:21
16:1 17:18
20:23 21:24
24:13 25:25
31:13 78:19
164:20 165:23
179:1 186:19
192:15 196:22
196:25 200:25
201:5,8,10,11
201:21 202:1
246:18 248:3
250:15 257:6
**write** 19:14
214:17,17
**written** 45:23
75:15 132:13

Case 10-01172-DWH    Doc 76-3    Filed 02/05/11    Entered 02/05/11 16:24:31    Desc
Exhibit 3 to amended complaint    Page 325 of 326
FREEDOM COURT REPORTING

Page 324

158:5,6 160:1
186:7 189:7
**wrong** 11:23
114:9 121:2
228:17 230:18
236:15,15
270:11,12
271:23,24
278:17
**wrongful** 114:18
**Wynne** 2:13

_____

**Y**

**yeah** 24:15 25:5
25:21 30:16
60:13 124:5
125:23 140:17
162:16 164:18
171:2 174:4,23
175:3 186:21
198:11 207:12
210:4 211:5
214:12,16,23
233:16 236:2
236:12 246:16
246:20 247:3
247:13 252:12
276:9 277:14
277:21
**year** 10:3 15:23
48:17 255:20
276:8,14
278:10
**yearly** 278:10
**years** 7:17,20
12:11 13:25
16:7 19:22,24
20:21 22:12,13
24:12 25:20
26:11 27:4,19
**Ying** 188:4
**y'all** 82:1 84:22
97:19 98:1
122:25 123:7
134:22 137:18

174:4 190:16
244:24 245:19
247:19 252:23
252:24 253:4
255:24 273:5
**y'all's** 138:19

_____

**Z**

**zero** 13:14 15:12
97:4

_____

**$**

**$10** 234:9
**$10,563.72** 196:3
**$1300** 121:1
164:15
**$137,000** 178:15
178:20
**$138,000** 176:6
178:21
**$138,482** 196:1
**$20** 234:8
**$402,000** 234:11
**$5,000** 21:24
175:17 176:2
177:18 259:12
**$500** 84:1
**$6,304.04** 258:13

_____

**0**

**05** 10:8
**07** 194:5 243:25
244:2,11,12
248:17
**08** 9:11
**08-0314** 225:14
**08-183** 1:2 5:5

_____

**1**

**1** 3:12 5:2 30:2,5
68:17 118:11
119:14 134:5
164:23 253:20
282:8
**1st** 158:17,24

159:6 169:23
193:13,21
195:13 233:13
235:8 246:22
250:14 257:5
275:8 278:8
**1,335,168** 193:22
**1,453,112** 194:9
194:22
**1,468,858** 195:5
**1/10/2011**
281:14
**1:05** 150:5
**1:25** 198:10
**1:55** 186:25
**10** 3:21 205:18
**10/10** 244:2
**10:00** 43:17
**10:07** 50:5
**10:10** 50:8
**10:54** 197:7,13
**10:55** 197:15
**1000** 2:14
**11** 3:22 156:10
202:22,24
203:7 218:21
218:24
**11th** 237:4
**11:07** 97:14
**11:19** 97:16
**11:41** 119:22
**11:48** 119:24
**11:52** 192:23
195:17
**11:57** 128:10,12
**1100** 2:9
**114** 186:6
**118** 183:7
**12** 3:23 122:6
202:23,24,25
202:25 203:1
219:15,18
222:5,6,7
**12:23** 150:2
**1235** 221:8

**125** 175:9 179:4
**13** 3:24 220:16
220:19 222:5,5
222:6,7 261:15
**134** 166:3,25
**136** 164:23
**138,482** 258:11
**139** 3:13 164:11
**14** 3:25 222:5
224:6,9 262:12
**14,000** 95:22
**140** 3:14 164:10
**144** 162:25
**145** 162:25
**147** 162:20
**149** 162:13
**149,045.72** 196:2
**15** 4:3,18 198:5
229:9,12
230:17 263:10
273:6
**15th** 242:16
**150** 161:19,20
162:8 202:2
**150s** 179:2
**151** 161:8
**152** 161:2
**153** 160:23
**154** 159:2
**156** 158:15 194:3
**157** 158:3,5
**16** 1:18 4:4
232:19 256:19
**16th** 5:8 45:15
**17** 4:5 193:22,23
236:20,24
267:9
**176** 276:13
**178** 221:8
**18** 4:6 11:3,4,19
11:20 194:9,22
195:5 237:10
**18th** 166:3
**19** 4:7 135:15
240:25 241:2

248:20
**19th** 175:9
**190** 4:13
**198** 3:17
**1984** 24:16
**1990** 20:24
**1994** 20:24
**1997** 18:22
**1998** 16:5
**1999** 14:1

_____

**2**

**2** 3:13 50:8
139:1,2,7
**2nd** 184:14
257:17
**2:03** 187:23
**2:04** 187:25
**2:10** 197:7,22
198:5
**2:17** 194:16,18
**2:26** 198:13
**2:30** 97:19,20
**20** 4:8 194:8
243:13,15
268:4
**20th** 183:7 187:1
**2000** 14:1 16:2,2
16:8
**2001** 16:2
**2002** 16:3 99:16
102:10
**2003** 12:2,15
**2004** 10:4 11:22
12:2 221:7
236:24
**2005** 11:20 246:6
**2006** 184:14
257:17
**2007** 158:17,24
159:6 165:1
169:24 175:9
183:8 187:1
190:7,13
193:21 194:21

Case 10-01172-DWH Doc 76-3 Filed 02/05/11 Entered 02/05/11 16:24:31 Desc
Exhibit 3 to amended complaint Page 326 of 326
FREEDOM COURT REPORTING

Page 325

195:13,24
196:17 220:15
220:25 221:2
222:15 233:20
242:16 245:19
250:14 261:4
261:17,22
275:7 276:4
278:10,21,23
**2008** 233:13,18
235:4,8 257:3
257:5 275:8
278:8,20
**2009** 1:18 5:8
39:14 255:21
281:10 282:15
**202** 3:18
**203** 3:19
**205** 3:21
**21** 4:9 242:4,7
244:13 245:13
**21st** 193:14
194:8,21
195:14
**2100** 2:8
**218** 3:22
**219** 3:23
**22** 4:10 164:12
242:21,25
**22nd** 195:23
196:17 221:7
237:2 246:6
**220** 3:24
**224** 3:25
**229** 4:3
**23** 4:11 164:10
245:24 246:2
**23rd** 258:9
**232** 4:4
**236** 4:5
**237** 4:6
**24** 4:12 69:2,18
75:7 117:22
118:8 132:22
157:12 197:20

198:2 269:8
**24th** 244:11
261:22
**240** 4:7
**242** 4:9,10
**243** 4:8
**245** 4:11
**246** 3:15
**249** 3:16
**25** 4:13 68:17
157:11 190:20
190:23 193:12
193:17 194:2
195:21 197:2,6
197:14,18
**25th** 281:9
282:15
**253** 4:14,15
**254** 4:16
**255** 4:17
**256** 3:5
**26** 4:14 253:8
**27** 4:15 253:22
**273** 3:6
**28** 4:16 21:16
216:19 254:1
**280** 282:8
**281** 3:7
**282** 3:8
**29** 4:17 255:3,6

___
**3**
**3** 3:14 97:17
140:13,25
211:10
**3/29** 243:25
**3:03** 198:15,20
**3:12** 198:22
**3:49** 221:23
**3:56** 221:25
**30** 3:12 10:25
124:18 232:24
**30th** 220:25
221:1,2
**30(b)(6)** 6:20

30:6 34:23
45:10,24 47:13
47:25 49:7
50:11 69:8
155:20 180:17
**309** 210:20
**32** 3:20
**3389** 2:3
**34** 54:17,18,20
67:2,5,7,9
**3400** 2:14
**35203-3367** 2:9
**3550946** 158:16
193:10,24
**36831** 2:4
**37** 195:23

___
**4**
**4** 3:15 141:14
150:6 211:25
246:7,10
**4th** 39:14 45:18
**4,000** 258:19
**4:41** 119:21
**4:51** 256:2
**40** 193:25
**4137583** 193:6
195:19
**4368311** 197:3
**44** 192:24 195:17
**49** 192:18

___
**5**
**5** 3:16 188:1
212:9 249:15
249:18 251:14
**5th** 244:11,18
**5,000** 179:7
**5/25** 248:17
**5:06** 166:3 256:4
**5:30** 1:19 280:24
280:25
**5:42** 202:6
**50** 91:19
**53** 190:4

**54** 188:7

___
**6**
**6** 3:4,17 141:25
158:17 198:23
199:7 222:1,15
**6th** 45:18 220:15
221:16
**6,304.04** 258:19
**6/15/2007**
244:14
**6/18** 165:1
**6/4/07** 202:2
**6/5/07** 202:6
**60** 12:5
**601** 1:20
**67** 187:2
**67471976** 202:22
**67471977** 202:23
**67471979** 202:5
**69** 4:12

___
**7**
**7** 3:18 142:7
202:12,15
256:5
**7th** 45:19
**71874430** 194:23
**71874554** 195:3
**73** 186:16
**73300397** 197:17
**73316049** 197:22
198:9
**77002-5011** 2:15

___
**8**
**8** 3:19 142:23
150:9 203:16
203:20
**8/21** 190:7,13
194:5
**8/21/07** 192:23
**8:38** 193:22
**8:45** 194:6,8
**8:48** 194:7

**80** 241:5
**80s** 24:13
**89** 24:18

___
**9**
**9** 3:20 32:14,17
40:23 175:6
205:13 257:17
**9:07:50** 158:18
**9:10** 1:19 5:7
**9:17** 193:25
**90** 15:12 169:22
**90-day** 13:14
**91** 20:24
**97** 12:14
**99** 16:2