## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

In re:

JONATHAN R. THORNE and                  **BANKRUPTCY CASE:**

DARLENE S. THORNE, Debtors          **09-11763-DWH**

**CHAPTER 13**

============================================================

JONATHAN R. THORNE and
DARLENE S. THORNE, Debtors
LOCKE BARKLEY, Chapter 13 Trustee for the Northern
District of Mississippi

            Plaintiffs,

vs.                                      **Adversary Proceeding Number:**

                                         **10-01172-DWH**

PROMMIS SOLUTIONS HOLDING CORPORATION,
PROMMIS SOLUTIONS, LLC, GREAT HILL PARTNERS,
LLC, MORRIS, SCHNEIDER AND PRIOR, now known as
JOHNSON & FREEDMAN,
LENDER PROCESSING SERVICES, INC., LPS DEFAULT SOLUTIONS, LLC,
DANIEL D. PHELAN

            Defendants,

============================================================

## PLAINTIFFS' OPPOSITION TO THE MOTIONS TO DISMISS FILED BY PROMMIS SOLUTIONS HOLDING CORPORATION, GREAT HILL PARTNERS, LLC and DANIEL PHELAN

Comes now the Plaintiffs in this matter and files herewith their opposition to the Motion

to Dismiss filed by Prommis Solutions Holding Corporation ("Prommis Holding") (Doc. 91),

Great Hill Partners, LLC ("Great Hill") (Doc. 93), and Daniel Phelan ("Phelan") (Doc. 90)

(Collectively referred to as "Motions") as follows:

I.    **INTRODUCTION**

Despite Prommis Holding, Great Hill and Phelan's (hereinafter collectively referred to as "Defendants") arguments to the contrary, Plaintiffs' Third Amended Complaint ("Complaint") is a well-pled complaint meeting all requirements set forth in Twombley, and Iqbal.   Importantly, Defendants' only specific request for relief in their Motions rest on their contention that the Plaintiffs failed to allege facts which would support a corporate "veil-piercing" argument. Although the Defendants set out their version of a boilerplate legal standard, it does not specifically attack whether the elements of the separate causes of action alleging the Defendants direct liability is well-pled, nor does it attack the sufficiency of the factual allegations. The Defendants simply argue that the 100 page, 407 paragraph complaint is conclusory. The utter lack of any analysis on the specific causes of action evidences the Defendants' recognition of the well-pled nature of the Complaint.  Otherwise, the Defendants would have demonstrated to the Court the specific "deficiencies" in the Complaint.

The Complaint along with its incorporated and attached documents lay out in extreme granular detail the wrongdoing complained of against each named defendant along with plausible theories of liability and recovery[1]. Furthermore, the Complaint exceeds 100 pages in length and 400 paragraphs and is more than plausible on its face especially in light of the fact that many allegations cite to admissions made amongst the Defendants in their SEC filings, agreements, websites and deposition transcripts.   The Complaint clearly describes the Defendants' wrongdoing, why Plaintiffs are entitled to relief, and the laws that provide for recovery.  For example, as a "Non-Attorney Equity Owner," as the term is defined in the Complaint, the Defendants illegally split attorneys' fees for professional legal services. This should come as no

---

[1] Plaintiffs have reiterated the factual wrongdoing of Prommis Holding, Great Hill, and Mr. Phelan below.

surprise to the Defendants because the web of Prommis entities and Daniel Phelan made almost identical admissions to the SEC.  These sworn statements demonstrate that each Defendant was well aware that the conduct of the "combined entities," constituted unauthorized practice of law and that they were illegally splitting attorneys' fees.  Its knowledge is the exact reason why the Defendants did not specifically challenge the factual or legal allegations of the Complaint.

Instead, the Defendants catapult into their arguments regarding piercing the corporate veil.  Defendants' arguments about veil piercing are nothing more than a red herring in their attempt to avoid analysis of the specific, granular, factual-based allegations of the Complaint. The Plaintiffs will demonstrate herein that the Complaint does properly allege direct liability on multiple counts.  For example, Defendants are directly liable because they acted in concert by conspiring to split attorneys' fees in contravention of the Bankruptcy Code to the detriment of Plaintiffs.  Importantly, this Court has broad authority under Section 105 of the Bankruptcy Code to remedy an abuse of the bankruptcy process.  Defendants completely skip any analysis and fail to cite to any cases addressing their *direct* liability for the first six counts based in large part on Bankruptcy rules, procedures and federal statutes and Count Nine – Civil Conspiracy. In addition, the Defendants cannot use the corporate shell as protection when the entities were established for the primary purpose of illegally splitting attorneys' fees and to perform the unauthorized practice of law.  Importantly, the Court will need to look no further than the sworn statements filed, or caused to be filed, by these Defendants admitting that they were acutely aware their conduct was illegal.  Normally, the Defendants lay out their arguments and the Plaintiffs would respond to the specific attacks on the sufficiency of the factual recitations as synthesized with the legal requirements of the specific causes of action.  Because of the structure of the Defendants' Motions, there is nothing to respond to other than the piercing the corporate

veil argument.  Defendants, therefore, having waived the opportunity to make specific attacks on the elements of the causes of action, should not be allowed to make an end around in its reply brief.

## II.      STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); accord Ashcroft v. Iqbal, 556 U.S. --, 129 S. Ct. 1937, 173 L. Ed. 2d 868, 884 (2009).  This "plausibility" standard replaces the traditional standard, under which the movant was required to show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).  During this threshold review, it is immaterial whether plaintiff will ultimately prevail. Johnson v. Dallas Indep. Sch. Dist., 38 F.3d 198, 205 (5th Cir. 1994) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).  Dismissal for failure to state claim is disfavored and rarely granted. Sosa v. Coleman, 646 F.2d 991, 993 (5th Cir. 1981).

The party moving for dismissal has the burden of showing that no claim has been stated. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991) (under Fed. R. Civ. P. 12(b)(6) defendant has burden of showing no claim has been stated).  For Rule 12(b)(6) purposes, the court must accept the plaintiff's factual allegations as true. Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007).  The court should draw all reasonable inferences in plaintiff's favor. Eason v. Holt, 73 F.3d 600, 601 (5th Cir. 1996).  The court should construe a plaintiff's allegations liberally, because the rules require only general or "notice" pleading, rather than detailed fact pleading. United States v. Uvalde Consol. Indep. Sch. Dist.,

625 F.2d 547, 549 (5th Cir. 1980). If a complaint is ambiguous or does not contain sufficient information to allow a responsive pleading to be framed, the proper remedy is a motion for a more definite statement under Rule 12(e)." <u>Cates v. IT&T</u>, 756 F.2d 1161, 1180 (5th Cir. 1985).

### III.   **PLAINTIFFS' COMPLAINT CONTAINS WELL-PLED FACTUAL ALLEGATIONS THAT GIVE RISE TO PLAINTIFFS' ENTITLEMENT TO RELIEF**

Defendants to this action are involved in serious systemic abuses of the bankruptcy rules, code and process in their roles as attorneys and vendors to creditors. (Complaint, ¶ 14). Many loan originators sell their loans into the secondary markets and LPS enters its relationship with mortgage related companies through its "cradle to grave" software system which LPS refers to as MSP.[2] (Complaint, ¶¶ 24-27). According to LPS' own SEC filings, half of all loans by volume in the United States are managed on the MSP software program. (Complaint, ¶ 35). LPS enters into a Default Services Agreement ("DSA") with its mortgage servicer clients requiring them allow LPS to manage all delinquent loans and provides it to its clients for free. (Complaint, ¶¶ 42-46 and 63). The DSA also requires the mortgage servicer to *select* attorneys ("Network Firms") who have executed a LPS network agreement to perform legal services. (Complaint, ¶¶ 47-53). The network agreement is in addition to the DSA and is executed between LPS and their Network Firms such as the one with Defendant Johnson and Freedman ("Network Agreement"). (Complaint, ¶¶ 58). LPS earns all of its income from the fees paid to it by Network Firms from the attorney's fees. (Complaint, ¶¶ 64). LPS controlled the lion's share of the default mortgage servicing market for its LPS Desktop software product. (Complaint, ¶ 71). LPS then secured approximately 200 creditor's rights law firms who executed the Network Agreements fully understanding that they were agreeing to split fees with non-lawyers for the referral of legal

---

[2]  See attached exhibit 2 the 2009 Annual Report filed with the SEC.

matters.   (Complaint, ¶¶ 71-74).   The Network Agreement contains an express fee splitting arrangement between the Network Firm and LPS. (Complaint, ¶ 76).

Defendants Phelan and Great Hill created a business plan to capitalize on the impending housing downturn through illegal fee splitting and the unauthorized practice of law. (Complaint, ¶¶ 98-101). Defendants Great Hill and Phelan created a plan to purchase four major Network Firms of LPS Default[3] wherein Great Hill would buy the "non-legal" assets of McCalla Raymer, Defendant Phelan's law firm[4] for $137 million dollars in a "spinout" from the law firm. (Complaint, ¶¶ 100-101, 378, 395, 397). The operations became Prommis Solutions, LLC ("Prommis Solutions").   Previously these operations were "co-mingled" inside a working law firm which was in reality the operations of the law firm which were being carried on by law firm employees. (Complaint, ¶¶ 102-103 and 105). In exchange for this purchase, McCalla Raymer agreed to use this new company, Prommis Solutions, as the exclusive service provider for all mortgage processing services for a term of 20 years.   (Complaint, ¶¶ 107-108).   In addition to McCalla Raymer, Defendants Great Hill and Phelan purchased three other Network Firms including Defendant Johnson and Freedman for a total of $250 million. (Complaint, ¶¶ 108-109). Defendants Great Hill and Prommis Holding filed a registration statement with the SEC that details the Network Firms purchased by Prommis Holdings.[5] (Complaint, ¶ 167). The SEC sworn statements included the following admissions:

> 1)   the services agreements to which we are a party with our law firm customers could be deemed to be unenforceable **if a court were to determine that our agreements constituted an impermissible fee sharing arrangement between the law firm and us** ."

---

[3] See also Exhibit 6 to the Complaint, the registration statement filed with the Securities and Exchange Commission by Prommis Holding dated June 21, 2010.

[4] Phelan would later become Chairman of Prommis Holding's Board according to the SEC filings of Prommis.

[5] See also Exhibit 6 to the Complaint, the registration statement filed with the Securities and Exchange Commission by Prommis Holding dated June 21, 2010.

2)   "Many states define the practice of law to include…the preparation of legal documents or the preparation of documents for another person. In addition, **all states and the American Bar Association prohibit attorneys from sharing fees for legal services with non-attorneys**."

3)   "We may also incur significant expenses in connection with a claim regarding the **unauthorized practice of law, including substantial fees for attorneys and other professional advisors. If this type of claim were successful, we may need to materially modify our operations in a manner that could adversely affect our revenue and profitability** and we could be subject to a range of penalties that could damage our reputation in the markets we serve.

(Complaint, ¶ 167).   This web of Prommis entities and Defendant Phelan made a sworn statement to the SEC that they should be treated as one when it affirmed as follows:

Except where the context otherwise requires or we otherwise indicated, the terms "Prommis," "we," "us," "our," "our company," and "our business" refer to Prommis Solutions Holding Corp., in each case together with its predecessors and its consolidated subsidiaries as a combined entity." (Complaint, fn 12).

Prommis Holdings[6] required the Network Firms to contract with Prommis Solutions for an exclusive twenty-year term.[7]   (Complaint, ¶ 118). The Prommis organizational structure and business model of purchasing Network Firms was created by the Defendants as a corporate sham for illegal purposes, splitting attorneys' fees, the unauthorized practice of law, and they are controlled by Great Hill. (Complaint, ¶¶ 113-126, 128, 132, 133, 135-36, 146-47, and 152-163). The legal services provided by Prommis Solutions include the following: a) Fair Debt Collection Practices Act notice letter and demand letters to the borrower on law firm letterhead; b) all information required to complete the data entry into the Foreclosure Management System from

---

[6] See Doc. 26-1 to this action which is a Bill of Sale to MR Processing Holding Corp. now known as Prommis Solutions Holding Corporation.  In FN 14, the Complaint adopts and incorporates this document as if fully set out therein.
[7] See Doc. 26-3 to this action section 4.1. In FN15, the Complaint adopts and incorporates this document as if fully set out therein.

the mortgage servicer or other third parties; c) preparation of an advertisement package showing the law firm as foreclosing attorney; d) "eviction support services," including the "administrative and paralegal services required in connection with an eviction;" e) generating correspondence to debtors or opposing counsel; f) scheduling hearings; g) "coordination with authorities to arrange for removal of occupants and personal effects from property;" h) "Foreclosure Administrative Services," including data entry of "customer' (i.e., client) information packages onto Prommis Solutions' "automated Foreclosure Management System;" and i) Prommis Solutions mails the letters and other documents it has generated with its automated systems after the attorneys sign them. (Complaint, ¶¶ 150-151). The Defendants allow Prommis Solutions to be identified as a Default Services Provider by LPS and along with the Network Firms, the Defendants have all agreed, and created a structure to illegally split legal fees with the Network Firms. (Complaint, ¶¶ 152-163). The Defendants illegal splitting of attorneys' fees, the unreasonableness of the attorneys' fees, and the fact that most of the filings are being produced and signed by non-attorneys is not disclosed to the bankruptcy courts as required under applicable rules and statutes. (Complaint, ¶¶ 170-73).

Great Hill structured the Prommis transaction as a vehicle for Great Hill to control this illegal business model while attempting to protect Great Hill from financial penalty in the event that the scheme was uncovered. (Complaint, ¶ 211). According to the Registration Statement filed with the SEC by the combined entities and Defendant Phelan:

> Great Hill will, for the foreseeable future, have significant influence over our reporting and corporate management and affairs, and will be able to control virtually all matters requiring stockholder approval… (Complaint, ¶ 212).

> We will be a controlled company within the meaning of the New York Stock Exchange rules…(Complaint, ¶ 212).

> Because Great Hill owns a majority of our voting equity, we will qualify as *"controlled company"* for the purposes of the New York Stock Exchange listing requirements…(Complaint, ¶ 212).

> Upon completion of this offering, Great Hill will continue to control a majority of the voting power of our outstanding common stock. As a result, we will be a "controlled company" under the corporate governance standards. (Complaint, ¶ 212).

In addition, five of the six Prommis Board Members and the CEO were all nominated to the Board by Great Hill and McCalla Raymer. (Complaint, ¶ 212).

## IV.   DISCLOSURE OF FEE SPLITTING IS A FUNDAMENTAL CONCEPT IN BANKRUPTCY

At the heart of the litigation is the Defendants' contravention of the Bankruptcy Code, and in particular Rule 2016. The broad policy of the Bankruptcy Code favors transparency and disclosure whenever possible. In re eToys, Inc., 331 B.R. 176, 187 (Bankr. D. Del. 2005). Disclosure goes to the heart of the integrity of the bankruptcy system and disclosure of fees is a fundamental concept in bankruptcy. In re B.E.S. Concrete Products, Inc., 93 B.R. 228, 236 (Bankr. E.D. Cal. 1988); In re Century Plaza Assocs., 154 B.R. 349, 352 (Bankr S.D. Fla. 1992). This Court has found Rule 2016(a) filings to be necessary. (In re Jones, 400 B.R. 525, 529 (Bankr. N.D. Miss. 2009).

Rule 2016 provides in pertinent part:

> **Rule 2016. Compensation for Services Rendered and Reimbursement of Expenses**
> **Application for compensation or reimbursement**.

> An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. **An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in**

**connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefore**, except that details of any agreement by the applicant for the sharing of compensation as a member or regular associate of a firm of lawyers or accountants shall not be required.

As these Defendants have admitted in the records attached to the Complaint, they have an interest in the fees of the law firm defendant that sought compensation from this Court. As Rule 2016 clearly requires, the particulars of any sharing of compensation or any agreement to share compensation should have been disclosed. However, all Defendants were not identified by design on Johnson and Freedman's Rule 2016 application for fees (Complaint, ¶¶ 90, 121, 122, and 168).

A creditor's failure to properly file an application for postpetition fees under Rule 2016(a) means that, as a matter of law, any such postpetition fees are per se unreasonable. *In re Sanchez,* 372 B.R. 289, 304-05 (Bankr. S.D. Tex. 2007); *In re Jones,* 366 B.R. 584, 594-95 (Bankr. E.D. La. 2007); *In re Padilla,* 379 B.R. 643, 2007 Bankr. LEXIS 2655, 2007 WL 2264714, at *6 (Bankr. S.D. Tex. Aug. 3, 2007). As discussed in the In re Sanchez matter, the Court does not need to address whether the Plaintiffs have a private right of action under *Rule 2016*. Instead, the Court may use its equitable powers under *§ 105(a)* to enforce the provisions of *Rule 2016*. The Court may invoke its civil contempt powers pursuant to *§ 105(a)* with regard to the Defendants' improper fee sharing arrangement. Id. Each of these Defendants violated their own individual obligations to disclose their interest in compensation from these fees as well as acting in concert with the co-Defendants to obtain fees from the bankruptcy estates' of the class members to the detriment of not only the debtors and unsecured creditors but the Court as well and the bankruptcy process by paying themselves unapproved fees in contravention of Rule 2016(a).

## V.    THE COMPLAINT SUFFICIENTLY ALLEGES THE DEFENDANTS ACTED IN CONCERT AND ENGAGED IN A CONSPIRACY AND CAN BE HELD DIRECTLY LIABLE FOR THE CAUSES OF ACTION ASSERTED

Each count incorporates the previous 303 paragraphs of factual allegations, which contain ample detail to demonstrate the Defendants were acting in concert and conspired to create legal entities with an illegal purpose, illegally split attorneys' fees, and misrepresenting the reasonableness of attorneys' fees to the courts. In addition, the ninth count in Plaintiffs' Complaint properly pleads that Defendants are individually liable for Civil Conspiracy. In reality, the Court does not need to look any further than the sworn statements filed by the Prommis Defendants, signed and affirmed by Defendant Phelan, and under the direction and by agreement with Defendant Great Hill affirming the Defendant entities should be treated as one:

> Except where the context otherwise requires or we otherwise indicated, the terms "Prommis," "we," "us," "our," "our company," and "our business" refer to Prommis Solution Holding Corp., in each case together with its predecessors and its consolidated subsidiaries as a combined entity." (Complaint, fn 12).

Now, albeit different circumstances for the Defendants, they want this Court to believe they were all acting as separate entities and should only be held accountable under a piercing the corporate veil theory.  Nothing could be further from the truth.

A civil conspiracy is an agreement to accomplish an unlawful objective through lawful means or to use unlawful means to accomplish a lawful objective. See "Conspiracy", 16 Am. Jur. 2d Conspiracy 50, 50 (Bourdeau 2010). According to the common law definition in most jurisdictions, there are five elements required to prove a civil conspiracy: 1) Two or more persons enter into an agreement; 2) Either an unlawful objective to be accomplished or a lawful purpose accomplished by unlawful course of conduct 3) A meeting of the minds on the unlawful purpose or the unlawful means; 4) One or more overt, unlawful acts in furtherance; and 5)

Damages as a proximate result of the act(s). <u>Symetra Life Ins. Co. v. Rapid Settlements, Ltd.,</u> 599 F.Supp.2d 809 (5th Cir. 2008). See Also <u>Murray v. Earle,</u> 405 F.3d 278 (5th Cir. 2005); <u>Cooper Tire & Rubber Co. v. Farese,</u> 423 F.3d 446; <u>"Conspiracy"</u> at 51 (Bourdeau 2010).

The first three elements are clearly met as the Complaint amply alleges the first element by identifying more than two participants who identified an illegal business plan to split attorneys' fees, engage in the unauthorized practice of law and charge unreasonable attorneys' fees. The "agreement" requirement can be met through circumstantial evidence because conspirators rarely formulate their plans in ways susceptible of proof by direct evidence." <u>Crowe v. Lucas,</u> 595 F.2d 985, 993 (5th Cir. 1979). See also <u>Thomas v. City of New Orleans,</u> 687 F.2d 80 (5th Cir. 1982). In <u>American Tobacco Co. v. United States,</u> the Supreme Court said:

> Since conspiracies, whether among businessmen or others, are rarely evidenced by explicit agreements, the determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators. At a minimum, their actions, to support a finding of a conspiracy, must suggest a commitment to a common end. <u>328 U.S. 781, 810 (1946)</u>.

Based on the understanding that agreement and meeting of the minds are largely fact questions, courts require a much lower evidentiary threshold to establish these elements as questions best left up to the trier-of-fact.   In <u>Cooper Tire</u>, the defendant moved for summary judgment on the count of civil conspiracy arguing that plaintiff failed to allege with particularity the required meeting of the minds. <u>Id</u> at 458. The court rejected this reasoning, "These types of determinations, which involve the summary judgment movant's state of mind, are particularly ill-suited for summary judgment." <u>Id</u> at 459.   In <u>Interstate Circuit v. U.S.,  306 U.S. 208 (1939)</u>, the Supreme Court held there was sufficient circumstantial evidence to give rise to an inference of conspiracy when defendants jointly or independently perform acts (legal or illegal) that would not provide any benefit but for an agreement or engage in a pattern of repeated or nearly

identical acts of fraud. Another court held that the pattern of fraud established a conspiracy when "[m]embers of the referenced trade associations suppressed publication as well as general dissemination of medical and scientific data concerning the health hazards associated with inhalation of asbestos fibers." Nicolet, Inc. v. Nutt, 525 A.2d 146, 148 (Del.1987).[8]

The Defendants' sworn statements to the SEC, website material, and Network Agreements provide undisputed proof that an agreement was reached. The Defendants identified an illegal business plan, purchased the assets of four law firms for $250 million, created a holding company for the four law firms, filed registration statements for a holding company with the SEC containing admissions regarding the splitting of fees and unauthorized practice of law, appointed Defendant Phelan as Chairman of the Board, took advantage of the signed Network Agreements with other vendors, and accepted, shared, and distributed legal fees derived from law firms amongst multiple entities. Without question, there are ample allegations to meet this element.

The fourth element for proving civil conspiracy requires that the agreement must be accompanied by an overt act in furtherance of the agreement and cannot be based on some independent, unrelated purpose. See Murray v. Earle, 405 F.3d 278 (5th Cir. 2005); Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446; Zervas v. Faulkner, 861 F.2d 823 (1988). In Nicolet, the defendant had written a letter to the U.S. Navy misrepresenting the state of medical knowledge regarding asbestos; an act, which the court found a jury could reasonably have concluded was in furtherance of the conspiracy. 525 A.2d at 148 (Del.1987). See Also Cipollone v. Liggett Group, Inc., 683 F.Supp. 1487 (D.N.J.1988); City of New York v. Lead Industries Ass'n, Inc., 190

---

[8] Importantly, as the court stated in Cooper Tire, due to a lower evidentiary standard necessary in proving a claim for civil conspiracy, it is an issue better left for a jury or the finder of fact. Cooper Tire at 458. Furthermore, summary judgment, or in this case, a motion to dismiss is procedurally improper. Id at 459.

A.D.2d 173, 597 N.Y.S.2d 698 (N.Y.Sup.Ct.1993); <u>Sackman v. Liggett Group, Inc.,</u> 965 F.Supp.

391 (E.D.N.Y.1997).

The Defendants here went beyond the requirement of taking a necessary step towards

carrying out the illegal act.   Defendants here actually carried out the illegal act by sharing

attorneys' fees with non-attorneys without disclosing the interest to the bankruptcy court.   This

conduct is consistent with the unauthorized practice of law, violation of the bankruptcy rules,

violation of the Bankruptcy Code and abject contempt for the bankruptcy court demonstrated in a

pattern of abuse of the bankruptcy process manifested in an ongoing course of business that

involves lying to this court and all other courts before which these defendants appear about the

nature of these Network Agreements and the unlawful sharing of compensation.

The final element, causation, requires that the overt acts taken in furtherance of the

conspiracy were the proximate cause of real, ascertainable damages to the plaintiff.   Once the

prior four elements are established, every member of the conspiracy is liable for any and all

damages the plaintiff can establish would not have occurred but for the conspiracy and the overt

acts taken in furtherance.   <u>Chrysler Credit Corporation v. Whitney National Bank,</u> 51 F.3d 553,

557 (5th Cir. 1995). As described in the Complaint, Plaintiffs, the Court and the Trustee have

been damaged by Defendants' illegal conduct in satisfaction of the fifth and final element

necessary to prove that Defendants are liable for civil conspiracy.

### VI.      DEFENDANTS ARE INDIVIDUALLY AND COLLECTIVELY LIABLE FOR THEIR  VIOLATIONS OF THE BANKRUPTCY CODE

Under Section 105(a) in relevant part:

> [T]he court may issue any order, process, or judgment that is necessary
> or appropriate to carry out the provisions of this title. No provision of
> this title providing for the raising of an issue by a party in interest shall
> be construed to preclude the court from, *sua sponte,* taking any action or

making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. Id.

As the Supreme Court held, § 105(a) grants bankruptcy judges "broad authority ... to take any action that is necessary or appropriate 'to prevent an abuse of process.'" Marrama v. Citizens Bank of Mass., 127 S.Ct.1105, 1111-12, 166 L. Ed. 2d 956 (2007) (quoting § 105(a)). The Fifth Circuit has held that § 105(a) is to be "interpret[ed] liberally," so long as any action taken pursuant to § 105(a) is "consistent with the rest of the Bankruptcy Code." Feld v. Zale Corp. (In re Zale Corp.), 62 F.3d 746, 760 (5th Cir. 1995). Section 105(a) thus permits bankruptcy courts to "fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code." Perkins Coie v. Sadkin (In re Sadkin), 36 F.3d 473, 478 (5th Cir. 1994) (quoting Chiasson v. Bingler (In re Oxford Management Inc.), 4 F.3d 1329, 1333 (5th Cir.1993)). To be sure, the Court's authority is also circumscribed by the plain language of 105(a), which requires a link between its exercise of power and one or more provisions of the Code.

The Court also has the power, under § 105(a), to issue sanctions under its civil contempt power or pursuant to its equitable powers. Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.), 108 F.3d 609, 613 (5th Cir.1997) ("The language of §105 is unambiguous.  Reading it under its plain meaning, we conclude that a bankruptcy court can issue any order, including a civil contempt order, necessary or appropriate to carry out the provisions of the bankruptcy code."); In re Harris, 297 B.R. 61, 70 (Bankr. N.D. Miss. 2003)("[Section] 105 provides a bankruptcy court with statutory contempt powers, in addition to whatever inherent contempt powers the court may have.").  As the Fifth Circuit has observed, "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the

complainant for losses sustained." <u>American Airlines Inc. v. Allied Pilots Ass'n</u>, 228 F.3d 574,

585 (5th Cir. 2000) (emphasis added) (quoting <u>United States v. United Mine Workers of</u>

<u>America</u>, 330 U.S. 258, 303-04, 67 S.Ct. 677, 91 L.Ed. 884 (1947)).

Using its broad authority to enforce the Bankruptcy Code, courts have routinely made

similar findings for failures to comply with Rule 2016.  In the <u>In re Wood</u> case, the court found

attorney's fees excessive and unreasonable after the attorney failed to disclose his fee

arrangement with a legal services organization that performed the bankruptcy consultation,

intake, and prepared nearly all of the debtor's schedules. The court also found that the attorney

aided and abetted the organization's unauthorized practice of law in violation of bankruptcy

laws.  408 B.R. 841 (Bankr. KS 2009).  In <u>Matter of Futuronics Corp.</u> the court found that

general counsel and special counsel were not entitled to any compensation due to their violation

of the rules, which required attorneys seeking compensation to disclose whether an agreement

existed between the applicant and any other person for sharing of compensation received or to be

received. 655 F.2d 463 (2nd cir. 1981).  Similarly in <u>In re Downs</u>, the court found that

disgorgement of attorneys' fees was an appropriate sanction when an attorney acted affirmatively

to conceal his fee arrangement. 103 F.3d 472 (6th Cir. 1996). In the <u>In re Lafferiere</u> case,

counsel's nondisclosure of fees was considered "slipshodness" at best by the court. 286 B.R. 520

(Bankr. VT. 2002). In the <u>In re Holmes</u> case, this Court found that sharing of attorneys' fees with

non-lawyers that were not disclosed on the attorney's 2016(a) fee request was contrary to public

policy and not allowed.  304 B.R. 292, 297 (Bankr. N.D. Miss. 2004).  Consistent with the

authority cited supra, Defendants here are in contempt of Rule 2016(a) of the Federal Rules of

Bankruptcy Procedure because they have charged and collected unapproved, undisclosed,

improper and illegal fees. (Complaint, ¶¶ 90, 121, 122, and 168). After being caught engaged in

the unauthorized practice of law and not disclosing to this Court their undisclosed interest in the attorneys' fees, Defendants now seek to avoid a trip to the woodshed by filing these baseless Motions. Disclosure of fees is a fundamental concept in bankruptcy, and goes to the heart of the integrity of the bankruptcy system. In re B.E.S. Concrete Products, Inc. at 236 (Bankr. E.D. Cal. 1988); In re Century Plaza Assocs., at 352, In re eToys, Inc. at 187.  Accordingly, Defendants are directly liable for their own conduct relating to the non-disclosure of their interest in this case and acting in concert to avoid disclosure when the Defendants knew it was required. Accordingly, their Motions should be denied.[9]

**VII.   EVEN IF THE COURT CONCLUDES THAT THE COMPLAINT DOES NOT CONTAIN THE REQUISITE FACTUAL ALLEGATIONS FOR PRIMARY OR DIRECT LIABILITY, THE COMPLAINT ADEQUATELY ALLEGES THAT THE CORPORATE STRUCTURE WAS DESIGNED, CREATED, AND IMPLEMENTED FOR AN ILLEGAL PURPOSE AND SHOULD BE DISREGARDED**

The Plaintiffs have alleged that the design, creation, and implementation of the Defendants' Prommis entities were to orchestrate a fraud. Court's have ignored the corporate form in the name of equity when the corporate form is used as a "sham to perpetrate a fraud." Pan Eastern Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1132 (5th Cir. 1988) as cited in Bridas S.A.P.I.C. v. Gov't of Turkm., 447 F.3d 411, 416 (5th Cir. Tex. 2006). "note holders could disregard the corporate fiction without showing common-law fraud or deceit when the circumstances amounted to constructive fraud".  Pacific American Gasoline Co. of Texas v. Miller, 76 S.W.2d 840, 849 (1934); "whether the individual misled them or subjectively intended to defraud them is immaterial…for the action was so grossly unfair as to amount to constructive fraud".  Tigrett v. Pointer, 580 S.W. 2d 385 (Tex. 1979). We disregard the corporate fiction, even though corporate

---

[9] All Defendants chose to file a general Motion insufficiently arguing that the underlying factual allegations were non-existent leaving the Plaintiffs  with no specific arguments in which to respond.  Accordingly, Plaintiffs request that all specific attacks in the Reply Brief on the elements of the causes of action be struck.

formalities have been observed and individual property has been kept separately when the corporate form has been used as part of a fraud. The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations, but when these individuals abuse the corporate privilege the courts will disregard the corporate fiction and hold them individually liable. The notion of using a corporation "as a sham to perpetrate a fraud" occurs "where the corporate fiction is resorted to as a means of evading an existing legal obligation" and "where the corporate fiction is relied upon as a protection of crime or to justify wrong." Id.   What could be more fraudulent than the scenario set forth in the Complaint describing how Great Hill provided the corporate vehicle in the form of Prommis Holdings for this group of actors to commit an ongoing fraud upon the Court.  The issue of whether Great Hill created the Prommis entities as alleged and for the reasons alleged is a legal question that the Court must decide after review of the facts.  It is not the type of question subject to resolution by a motion to dismiss without any discovery or any evidence being presented to the Court. However, it is clear from the documents attached to the Complaint, the statements about Great Hill's role in this business, and Great Hill's level of control over Prommis that Great Hill is directly liable for the wrongdoing set out in the Complaint, including the allegations that Great Hill acted together in concert with Phelan to commit fraud on this Court.

## VIII.   CONCLUSION

For the foregoing reasons, the Defendants' Motions should be denied by the Court. Alternatively, leave should be granted to make any necessary amendments.

Respectfully submitted this  29th day of March 2011.

/s/ Nick Wooten_____
Lead Counsel for the Plaintiffs
P.O. Box 3389
Auburn, Alabama 36831
334 887 3000
334 821 7720
nhwooten@gmail.com

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon counsel of record for the parties and the US Trustee on this the 29th day of March 2011 by use of the ECF system.

Representing

Johnson & Freedman, LLC
1587 Northeast Expressway
Atlanta, GA 30329
(Defendant)

Jason Wilton Bailey
Watkins Ludlam Winter & Stennis, P.A.
P.O. Box 1456
Olive Branch, MS 38654
662-895-2996
jbailey@watkinsludlam.com
LEAD ATTORNEY

Kristina M. Johnson
P.O. Box 427
Jackson, MS 39205-0427
601-949-4785
601-949-4804 (fax)
kjohnson@watkinsludlam.com

===========================
Representing

Prommis Solutions Holding Corporation
400 Northridge Road

Atlanta, GA 30350
(Defendant)


 Bill D. Bensinger
420 20th Street North
Wells Fargo Tower, Suite 1600
Birmingham, AL 35203
205-250-8359
 LEAD ATTORNEY


John P. MacNaughton
1600 Atlanta Financial Center
3343 Peachtree St., N.E.
Atlanta, GA 30326-1044
404-504-7689

James H. White, IV
420 20th Street North
Wells Fargo Tower, Suite 1600
Birmingham, AL 35203
205-250-8369

John H. Williamson
1600 Atlanta Financial Center
3343 Peachtree St., N.E.
Atlanta, GA 30326-1044
404-495-3618

R. Spencer Clift, III
165 Madison Ave., Suite 2000
Memphis, TN 38103
901-526-2000
901-577-2303 (fax)
sclift@bakerdonelson.com


==========================

Representing

Great Hill Partners, LLC
One Liberty Square
Boston, MA 02109
(Defendant)

R. Spencer Clift, III
165 Madison Ave., Suite 2000
Memphis, TN 38103
901-526-2000
901-577-2303 (fax)
sclift@bakerdonelson.com

===========================
Representing

LPS Default Solutions
601 Riverside Avenue
Jacksonville, FL 32204
(Defendant)

 Lender Processing Services, Inc.
601 Riverside Avenue
Jacksonville, FL 32204
(Defendant)

James A. McCullough, II
P.O. Drawer 119
Jackson, MS 39205
601-960-6898
jmccullough@brunini.com
===========================

Representing

Darlene S. Thorne
1568 Central Trails Dr.
Southaven, MS 38671
(Plaintiff)

 Jonathan R. Thorne
1568 Central Trails Dr.
Southaven, MS 38671
(Plaintiff)

Locke D. Barkley
P.O. Box 55829
Jackson, MS 39296-5829
601-355-6661
sbeasley@barkley13.com
 (Trustee)

Nicholas Heath Wooten
Wooten Law Firm
Post Office Box 3389
Auburn, AL 36831
334-887-3000
334-821-7720 (fax)
nhwooten@gmail.com

Jimmy E. McElroy
3780 S. Mendenhall
Memphis, TN 38115
(901) 363-7283
mcelroylawms@hotmail.com


Robert G. Rikard
P.O. Box 5640
Columbia, SC 29250
(803)978-6111
==============================


U. S. Trustee
100 West Capitol Street
Suite 706
Jackson, MS 39269
601-965-5241
USTPRegion05.AB.ECF@usdoj.gov


*/s/ Nick Wooten*_____
Lead Counsel for the Class